UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                            Case No. 3:20-cr-86-J-32JBT

JORGE PEREZ
RICARDO PEREZ
SETH GUTERMAN
AARON DURALL
JAMES F. PORTER, JR.
SEAN PORTER
CHRISTIAN FLETCHER
NEISHA ZAFFUTO
AARON ALONZO

**GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE
DEFENDANTS FROM ARGUING NO FRAUD OCCURRED
BECAUSE INSURANCE COMPANIES PAID CLAIMS**

The United States, by and through undersigned counsel, hereby moves *In Limine* for a ruling that precludes the Defendants from arguing or offering evidence that the private insurance companies were not defrauded, or that the Defendants lacked the requisite fraudulent intent, because the insurance companies initially paid claims for urine and blood toxicology testing originating from the four rural hospitals that are the subject of the Superseding Indictment. Such evidence is irrelevant, improperly blames the victims of the alleged fraud, and would mislead the jury.

The grand jury indicted the Defendants based on their respective roles in a massive health care fraud and money laundering conspiracy. More specifically, as alleged in the Superseding Indictment, this case involves a wide-ranging billing fraud

scheme in which rural hospitals in several states were used as "shells" through which to submit claims for expensive and unnecessary urine drug and blood tests conducted at independent laboratories. The scheme was designed to take advantage of the fact that many rural hospitals had in-network contracts under which private insurers provided higher reimbursement rates for many hospital services, including laboratory testing, than they would have provided to independent laboratories.

Given this higher reimbursement rate, the conspirators sought out and acquired control over the hospitals for the sole purpose of billing lab claims under the in-network contracts. The laboratory tests were billed through the rural hospitals even though very little of the testing took place at the hospitals, and, more critically, despite the fact that none of the individuals whose specimens were tested had any connection to the hospitals. The claims submitted under the hospitals' billing credentials were fraudulent in that (a) they falsely represented that the testing had some connection to the hospital when it did not, (b) they omitted any mention of the independent labs, and (c) many of the claims were for medically unnecessary testing.

## FACTUAL BACKGROUND

The government anticipates that it will offer the following evidence. The scheme started in 2015 when Jorge Perez, the owner of Empower H.I.S. ("Empower"), a Miami-based billing software business, and Seth Guterman, the CEO of People's Choice Hospital ("PCH"), a Chicago-based hospital management company, teamed up to obtain control over Campbellton-Graceville Hospital ("Campbellton Graceville"), a rural Critical Access Hospital ("CAH") in the Florida

panhandle. In May 2015, Guterman signed an agreement with the Campbellton Graceville Board for PCH to manage the hospital in exchange for a monthly management fee. At that time, Campbellton Graceville was on the brink of financial failure and entered the agreement in a last-ditch effort to save the community 25-bed hospital. Guterman promised to make investments in new equipment, bring in telemedicine, and take steps to improve efficiency and boost the hospital's profitability. The management agreement gave PCH total control of the hospital and its finances, including its billing system and bank accounts. Guterman became CEO of the hospital.

 Jorge Perez, the CEO of Empower, held himself out as a vice president of PCH, and was also involved with the management of Campbellton Graceville. Jorge Perez installed Empower's billing software at Campbellton Graceville and, along with his brother Ricardo Perez, took control of billing insurance companies.

 Due to its designation as a CAH, Campbellton Graceville had very favorable in-network contracts with several private insurers, including Florida Blue, United HealthCare ("UHC"), and Aetna. These contracts provided substantially higher reimbursement rates for many hospital services, including laboratory tests, than would have been provided to an out-of-network provider of those same services. In general, insurers offered higher reimbursements to rural hospitals so as to ensure the financially viability of these hospitals and enable them to provide health care services to the insurers' subscribers located in rural areas.

3

In the fall of 2015, Jorge Perez and Guterman, together with various lab owners and marketers, began using Campbellton Graceville to operate a fraudulent pass-through billing scheme designed to take advantage of the high reimbursement rates under the hospital's in-network insurance contracts. Specifically, Jorge Perez and Guterman struck deals with the owners of independent labs, including co-conspirators Aaron Durall (Reliance Labs in South Florida), Christian Fletcher (Lifebrite Labs in Atlanta), and Jim Porter, Jr. (Pinnacle Labs in Ocala, Florida), to bill urine drug tests ("UDTs") conducted at the labs through Campbellton Graceville.[1] The claims were submitted by Empower, acting on behalf of Campbellton Graceville, to various insurers, including Florida Blue, UHC and Aetna, purportedly under the insurers' contracts with Campbellton Graceville but without identifying the independent labs where the tests were performed. Recruiters brought in by Jorge Perez and Aaron Durall, including Defendants Aaron Alonzo and Nestor Rojas and co-co-conspirator Kyle Marcotte (who pleaded guilty to money laundering), sometimes working through networks of lower-level recruiters, solicited urine specimens from doctors' offices, sober homes, and drug treatment facilities all over the United States, typically paying some form of a kickback to obtain the specimens. The specimens were supplied by patients who never visited Campbellton Graceville or had any connection to the hospital. After receiving the

---

[1] The testing involved "qualitative" and "quantitative" screens. Qualitative testing refers to a basic screening test to determine whether drugs such as cocaine or opiates are present in the body. If a positive result is obtained, quantitative testing, a more sophisticated test using advanced equipment, can pinpoint the specific type and amount of drug involved.

4

claims, the insurers sent reimbursements to a Campbellton Graceville bank account in Graceville, Florida. From there, much of the money was distributed back to Empower, PCH, other companies controlled by Jorge Perez and/or Guterman, the lab owners, co-conspirator recruiters who signed up additional labs, and co-conspirator recruiters who paid kickbacks to sources of urine specimens. Very little money was left for the hospital which was ostensibly providing the service.

Although some of the qualitative testing was performed at Campbellton Graceville's lab, the bulk of the overall testing was performed at the independent labs; indeed, Campbellton Graceville lacked the capacity to test all the specimens that were billed through the hospital, and it had no capacity to perform the more expensive quantitative testing.[2]

By early February 2016, Jorge Perez had obtained operational control over another rural hospital in Florida, Regional General Hospital of Williston ("Williston") and, with the defendant lab owners, began using that hospital to bill UDTs performed at independent labs in the same manner as Campbellton Graceville.

In or about June 2016, Jorge Perez and Guterman had a falling out, and Campbellton Graceville's board obtained a state court injunction to force PCH out of

---

[2] Testing specimens at the hospital(s) does not legitimize the billing. The urine samples tested at Campbellton Graceville (even if tested correctly) came from patients with no connection whatsoever to the hospital. The claims to insurance companies led insurers to believe the patients were indeed outpatients of the hospital or had some connection to the hospital. The claims did not inform the insurance companies that the patients who provided the specimen had no connection whatsoever to the hospital(s).

the hospital and re-took control of it. Shortly after that, Florida Blue began an investigation of claims arising out of Campbellton Graceville, and effectively shut down the program there.

Jorge Perez, his brother Ricardo Perez, and Guterman, as well as the lab owners, then sought out rural hospitals in other states with similar favorable in-network contracts so they could continue to engage in the scheme, and stay ahead of private insurers' audits. For example, email communications show co-conspirator David Byrns and Christian Fletcher discussing other rural hospitals that would have high (and favorable) reimbursement rates, and that those hospitals should be targeted. In the fall of 2016, Jorge Perez and David Byrns obtained control over Putnam County Memorial Hospital in Unionville, Missouri[3] ("Putnam County") and teamed up with Defendants Jim Porter and Christian Fletcher, among others, to have hundreds of millions of dollars' worth of UDTs and blood tests performed at outside labs they controlled billed through Putnam County. As at the Florida hospitals, the patients who provided the urine and blood specimens had no connection to Putnam County. Evidence will show that the conspirators even back-billed insurers through Putnam County for UDT claims that insurers had denied when submitted through Campbellton Graceville, indicating that the conspirators merely sought out hospitals for the purpose of being able to bill and obtain reimbursements.

---

[3] The population of Unionville, Missouri is approximately 1,766.

With the end of the billing at Campbellton Graceville, Defendant Durall began obtaining control of rural hospitals. In August 2016, Durall purchased Chestatee Regional Hospital, a 49-bed rural hospital in Dahlonega, Georgia, and worked with Jorge Perez to start pass-through billing there. Durall later used a billing company named Medivance, operated by Defendant Neisha Zaffuto to submit claims to the insurers. At Chestatee, Durall controlled both the hospital and the lab that performed much of the testing (Reliance). Durall and Zaffuto caused millions of dollars' worth of UDTs to be billed out of Chestatee using Chestatee's NPI number and Tax ID. As at Campbellton Graceville, Williston, and Putnam County, the patients who provided the UDTs had no connection whatsoever to Chestatee.

None of the patients from whom the specimens were collected had any connection whatsoever with the four rural hospitals. The specimens were obtained from patients in doctors' offices, recovery centers, and sober living homes throughout the United States, including throughout Florida, from both Jacksonville Beach, and Miami, Florida. Indeed, patients' specimens came from as far away as California and New Jersey. Thus, samples often came from thousands of miles away from the hospital purportedly serving them, which belies common-sense, and shows Defendants used each rural hospital as a billing hub. There is no valid reason for a patient's urine sample to be shipped from California, tested at an independent laboratory in Miami or Atlanta, and billed through a rural hospital in northwest Florida or north-central Missouri.

Insurance company representatives will testify at trial that the insurers would not have paid the claims coming out of the rural hospitals if they had known the UDTs were performed at independent labs for patients with no connection to the hospitals, or if they had known they were being billed for excessive and medically unnecessary testing. Nor would they have paid claims for any testing performed at the hospitals, where the specimens were sent to the hospitals for the sole purpose of maximizing insurance recovery under the hospital's in-network contract. These insurers will further testify that the inclusion in some billing submissions of a billing code "141" in the claim—to purportedly identify non-hospital patients—did not make such claims permissible, as the submission of the claims on behalf of the hospitals was a representation that the testing had some connection to the hospitals (and was therefore reimbursable under the hospitals' in-network contracts) when the opposite was true: the rural hospitals were used as billing hubs, not as locations to provide health care.

Insurers will clarify that their contracts with the rural hospitals were intended to cover services provided at the hospitals' labs for inpatients and outpatients *of the hospital*. In the rare circumstance in which a hospital inpatient or outpatient needed a test that could not be done at the hospital lab, the specimen could be referred out to another laboratory and the insurer would reimburse the test at the hospital's contracted rate. Likewise, in the rare circumstance in which a non-patient of the hospital (*i.e.*, someone who lived in the surrounding community) needed a test performed at the rural hospital lab, that test would be reimbursed at the hospital rate.

But the government will show that the scheme here is the exact inverse of these situations. Instead of the hospital lab referring out tests it could not perform, or performing the rare test for a non-patient member of the community, Jorge Perez, Guterman, Reliance, Lifebrite, and Pinnacle solicited UDTs from patients throughout the United States unconnected to the rural hospitals, arranged for the testing to be performed at one of the independent labs (or occasionally at the hospital lab), and then used the hospitals solely as vehicles to obtain the higher insurance reimbursement available under the in-network contracts.

Overall, the scheme involved over $1.4 billion dollars of claims originating from the pass-through billing scheme at the four rural hospitals, with insurance companies paying over $400 million in claims. Jorge Perez often described his formula for reviving struggling rural hospitals as his "secret sauce," and guaranteed success in restoring the financial viability of these hospitals. This never happened, because when the insurance companies discovered the fraudulent billing via their investigations, they stopped paying claims. Then, the rural hospitals were forced to permanently close, often via bankruptcy. Defendants, on the other hand, simply continued their scheme at a different rural hospital in another part of the country. In this manner, the scheme leapfrogged to at least four different locations over the course of the scheme to defraud.

## MEMORANDUM OF LAW

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence which is not relevant is not admissible. Fed. R. Evid. 402. In determining if evidence is relevant under Rule 401, the Eleventh Circuit imposes two requirements: "(1) the evidence must be probative of the proposition it is offered to prove, and (2) the proposition to be proved must be one that is of consequence to the determination of the action." *United States v. Glasser*, 773 F.2d 1553, 1559 n.4 (11th Cir. 1985).

Relevant evidence may be excluded if its probative value is "substantially outweighed by a danger of" unfair prejudice, confusing the issues, and misleading the jury, among others. Fed. R. Evid. 403.

The Government moves *In Limine* to preclude Defendants from arguing, offering evidence, or eliciting on direct or cross-examination, any "blame the victim" defenses that because the Insurance Plans paid many of the claims submitted by and through Empower and Billing Company A, the Defendants could not have defrauded these private insurers, or known that their claims were fraudulent. Such evidence and arguments that the insurers somehow validated Defendants' alleged criminal conduct by paying their claims should be excluded. These "blame the victim" defenses to a health care fraud case are irrelevant, improper, and mislead the jury, and the Eleventh Circuit and its sister circuits have thus expressly forbidden them.

Evidence regarding the insurance companies' conduct has nothing to do with the Defendants' guilt or innocence as a matter of law, and therefore fails to meet the standard for relevance. It is well established that the negligence of the victim in failing to discover a fraudulent scheme is not a defense to the defendant's criminal misconduct. "A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence." *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009).[4] This concept holds true throughout criminal law. Bank robbers are not absolved of their crimes if the bank security systems are deficient; home invaders are not absolved if homeowners leave a key under the mat; and individuals who perpetrate Ponzi schemes are not innocent if their clients include sophisticated Wall Street brokers. There is no contributory negligence in criminal law.

Defendants cannot point their finger at the insurance companies, or anyone else to excuse their own conduct. The Eleventh Circuit made this clear in *Svete* when it analyzed the section of the mail fraud statute which reads "any scheme or artifice to defraud." 556 F.3d at 1161–62. This same phrase is part of the health care fraud statute, 18 U.S.C. § 1347, which is modeled after the mail, bank and wire fraud statutes. *United States v. Mermelstein*, 487 F. Supp. 2d 242, 254 n.2 (E.D.N.Y. 2007) ("The health care fraud statute is modeled after the bank fraud statute, 18 U.S.C. §

---

[4] *See also United States v. Coyle*, 63 F.3d 1239, 1244 (3rd Cir. 1995) (negligence of victim in failing to discover fraud scheme is not a defense to criminal conduct); *United States v. Thomas*, 377 F.3d 232, 242-44 (2d Cir. 2004) (same) (collecting cases); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) ("a victim's lack of sophistication is not relevant to the intent element of mail or wire fraud.") (collecting cases).

11

1344, and the bank fraud statute was modeled after the federal mail and wire fraud statutes, §§ 1341 and 1343"). Relying on this history and the Supreme Court's interpretation of "any scheme or artifice to defraud", the Eleventh Circuit, sitting *en banc*, explained:

> Because the focus of [a fraud] statute, like any other criminal statute, is on the violator. … a defendant who intends to deceive the ignorant or gullible by preying on their infirmities is no less guilty. … whatever role, if any, a victim's negligence plays as a bar to civil recovery, it makes little sense as a defense under a criminal statute that embraces "<u>any</u> scheme or artifice to defraud." A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence.

*Id*. at 1165 (emphasis in original) (internal citations omitted). Following the Eleventh Circuit in *Svete*, and various other Circuit courts,[5] this Court should exclude any discussion of the insurance companies' purportedly negligent conduct. Even if these entities were at fault—which they were <u>not</u>—such evidence would still be irrelevant, improper, and no defense to the charged scheme.

In addition to being irrelevant, evidence concerning the insurance companies' conduct would be prejudicial under Rule 403. Allowing the Defendants to argue that the insurance companies were negligent in paying the claims at issue, or in failing to

---

[5] *See Thomas*, 377 F.3d at 243-44 (rejecting argument that victim's foolishness vitiated defendant's fraudulent intent); *United States v. Davis*, 226 F.3d 346, 358-59 (5th Cir. 2000) (affirming jury instruction that "the naivety, carelessness, negligence, or stupidity of a victim does not excuse criminal conduct, if any, on the part of a defendant"); *Amico*, 486 F.3d at 780; *see also United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("[i]f a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts") (quoting *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980)).

discover the fraud sooner, and that this somehow excuses the Defendants' criminal conduct, would mislead the jury. As explained above, what each of these entities did or did not do has no bearing on a determination of the Defendants' guilt. But allowing evidence before the jury concerning the insurers purported contributing conduct could create the erroneous impression that in order to find the Defendants guilty, the jury must find that the insurance companies could not have discovered the Defendants' misconduct. Because that is not necessary under the law, the Defendants should not be allowed to create such improper inferences.

Further, any arguments that the insurance companies were somehow at fault are not only legally irrelevant, but factually wrong. The Government will show that the Defendants and their co-conspirators took extensive and systematic steps to conceal their fraudulent activities through claims that used the NPI number and tax ID numbers of the four rural hospitals. The claims never alerted the insurance companies about the involvement of the independent laboratories, or that the patients themselves had no connection to the rural hospitals. Finally, the Government will show that the Defendants submitted fraudulent claims for medically unnecessary services that appeared legitimate and were purportedly authorized by a medical professional, thus concealing their massive fraud from insurers who had no ability to audit such a massive amount of claims in real time as they were submitted. Defendants cannot take advantage of this fact now by pointing to the insurance companies' payments.

Moreover, when the insurance companies and a state regulatory agency in Missouri launched their own investigations and identified the fraudulent claims, the billings were shut down. This caused co-conspirators like Jorge Perez to move from one hospital to the next. In addition, Aaron Durall and Neisha Zaffuto (at Chestatee) coded the claims in other fraudulent ways once the bogus UDT claims were identified by the Anthem's (Georgia Blue) Special Investigative Unit (SIU). Because they deliberately prevented the insurance companies from knowing all the facts about their bogus claims, permitting a defense based on the insurance companies' payment of the claims would be unduly prejudicial. Further, testimony about the victim's conduct could distract jurors from addressing the true question in this case: whether the Defendants, along with others, knowingly engaged in a scheme or artifice to defraud the insurance companies.

Because any evidence of the insurance companies' conduct is irrelevant, misleading, and prejudicial, the Court should preclude the Defendants from introducing any such "blame the victim" defense that they were at fault. Defendants should not be permitted to argue that anyone should have discovered their fraud and denied their claims, or to assert that the insurance companies led them to believe that the billed claims/their conduct were legitimate when they paid these fraudulent claims.

## CONCLUSION

For the foregoing reasons, the Court should preclude the Defendants from offering evidence or arguments, in opening statements, cross-examination, and direct testimony or otherwise, with respect to the matters addressed in this Motion.

         Respectfully submitted,

         MARIA CHAPA LOPEZ
         United States Attorney


By: */s/ Tysen Duva*
   TYSEN DUVA
   Assistant United States Attorney
   Florida Bar No. 0603511
   300 N. Hogan Street, Suite 700
   Jacksonville, Florida 32202
   Telephone: (904) 301-6300
   Facsimile: (904) 301-6310
   E-mail: Tysen.Duva@usdoj.gov


   DANIEL KAHN
   ACTING CHIEF
   U.S. DEPARTMENT OF JUSTICE
   CRIMINAL DIVISION, FRAUD SECTION

By: */s/ James V. Hayes*
   GARY A. WINTERS
   JAMES V. HAYES
   TRIAL ATTORNEYS
   United States Department of Justice
   Criminal Division, Fraud Section
   1400 New York Avenue, NW
   Washington, DC 20005
   Tel: (202) 598-2382
   Email: Gary.Winters@usdoj.gov
       James.Hayes@usdoj.gov

## CERTIFICATE OF SERVICE

I, hereby certify that, on January 19, 2021, a true and correct copy of the foregoing was filed and served on all counsel via the CM/ECF system.

/s/ Tysen Duva
Tysen Duva
Assistant United States Attorney