**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

v.

AARON DURALL, et al,

        Defendants.

Case No.
3:20-CR-86-TJC-PDB

**DEFENDANTS JOINT MOTION TO DISMISS INDICTMENT AND**
**INCORPORATED MEMORANDUM OF LAW**

Defendants Aaron Durall and Christian Fletcher ("Durall" and "Fletcher") jointly move the

Court under Fed. R. Crim. P. 12 to dismiss the indictment.

**I.      INDICTMENT**

The indictment alleges Durall owned and controlled Reliance Laboratory Testing Inc.

("Reliance"), a clinical testing laboratory that performed toxicology testing on urine samples, and

one of Durall's companies (Durall Capital) owned and operated Chestatee Regional ("Chestatee"),

a rural hospital.  The indictment alleges Fletcher owned and controlled LifeBrite Laboratories Inc.

("Lifebrite), also a clinical testing laboratory that performed toxicology testing on urine samples.

Both Defendants are charged with conspiracy to commit healthcare fraud and wire fraud (count

one); Durall is charged with substantive healthcare fraud (counts two through six); and both

Defendants are charged with conspiracy to commit money laundering and substantive money

laundering with the alleged specified unlawful activity being the same frauds (Durall – counts

seven, nine, ten and twenty-three; Fletcher – counts eight, fifteen and eighteen.)

The indictment alleges a scheme to defraud private insurance companies through the

submission of electronic claims for payment for services rendered by hospitals and laboratories

that the government claims were not payable pursuant to the insurance contracts with the hospitals,

1

known as provider agreements.  The indictment alleges that when rural hospitals submitted claims for laboratory tests that were performed on urine samples, the claims were "false" and "fraudulent."  *Not* because the tests were not performed: there is no dispute that the tests were performed, precisely as ordered by a physician.  And *not* because the tests were inaccurate or provided false results.  Rather, the allegation is that the tests were not performed at the right location, or because the tests were performed on specimens provided by individuals who were not appropriate (or eligible) "patients" of the hospitals.  Significantly, there is *no* allegation of any false statement in the claims.  Nevertheless, the government (and the insurers) content that the claims that were filed, though containing no false statement or material omission, were for services that were not covered and were therefore fraudulent.

## II.  MEMORANDUM OF LAW

The mail fraud statute is among the oldest federal criminal offenses, having been enacted by Congress nearly 150 years ago pursuant to its constitutional power to regulate the post office. For the 150 years since the enactment, the government has routinely gerrymandered the boundaries of the mail fraud (and later the wire fraud) provisions to criminalize behavior that the government condemns, even if the conduct (worthy of condemnation, or not), does not fit within the concept of fraud by any reasonable definition.  Whether an attempt to outlaw "dishonest services"[1] or to criminalize deceit without an accompanying effort to deprive the "victim" of money or property,[2] or pursuing public corruption conduct that shocks the conscience, but is not fraud,[3] the appellate

---

[1] *Skilling v. United States*, 561 U.S. 358 (2010); *McNally v. United States*, 483 U.S. 350 (1987).
[2] *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016); *United States v. Cleveland*, 531 U.S. 12 (2000).
[3] *McDonnell v. United States*, 136 S. Ct. 2355 (2016); *Kelly v. United States*, 140 S.Ct. 1565 (2020); *United States v. Van Buren*, 940 F.3d 1192 (11th Cir. 2019) (*cert granted on other grounds*).

2

courts, including several Supreme Court decisions have persistently declined the government's invitation to employ the fraud statutes to prosecute behavior that is unethical, "shoddy business" or otherwise distasteful – but not fraudulent.

This case presents the Court with a novel theory of prosecution which on its face seeks to expand the healthcare and wire fraud federal criminal statutes to reach and encompass insurance contract disputes between payors (non-government insurance companies) and payees (rural hospital providers).  The essence of the indictment is that Durall and other rural hospital defendants (or their co-conspirators) filed claims for payment electronically, on their own behalf and on behalf of laboratories[4], including Durall's Reliance and Fletcher's LifeBrite, on forms provided by the insurance companies *without any false statements or material omission*s, but because the insurance companies did not envision paying for the claims (but did so), Defendants should be held criminally responsible for defrauding the insurance companies.   No deceit, no false statement, no material omissions; yet because the insurance companies did not contemplate that their contracts with the rural hospital providers would cover the services for which payment was sought, Defendants should be found guilty of criminal fraud.  In fact, the discovery reveals that the claim forms expressly revealed the pertinent facts, but the insurance companies simply did not review that portion of the claim form (the TOB – Type of Bill), when deciding whether to pay a claim.[5]

---

[4] LifeBrite did not submit any billing or claim forms to the insurance companies. Indeed, the contracts entered into between LifeBrite and the rural hospitals prohibited LifeBrite from billing the insurance companies directly. And, LifeBrite was not a party to any of the contracts between the insurance companies and the rural hospitals.

[5] Referring to grand testimony of FBI agent Schwinger, Grand Jury February 12, 2020,  Bates: MDFL – 0361020-21; 361024. Schwinger testified that the TOB code 141 used on the claim form was accurate and identified the patient as a "non-patient" of the hospital.  *See also* Little River v. Blue Cross and Blue Shield of Texas, AAA Case No. 01-18-0001-0136 Final, May 6, 2020, ¶ 80. EXHIBIT "A" is attached to this Motion.

Perhaps the most striking thing about the Indictment is what it does not allege. The Indictment does not allege that Defendants billed for a single test that was not performed.   It does not allege that Defendants filed claims for fake patients.    It does not allege that Defendants falsified any medical records or filed any inaccurate claims.   It does not allege that Defendants sought to conceal from the health insurers any material information.   It does not allege that any tests were conducted other than pursuant to validly-issued prescriptions from licensed doctors.   It does not allege that the tests were conducted past an applicable expiration date of the prescriptions. It does not allege that Defendants doublecharged for any service performed.   And, perhaps most importantly, it nowhere alleges that any private insurer places the burden or even the right to determine medical necessity on a drug testing laboratory (whether in a hospital, or otherwise).

At most, this case involves a matter of contract interpretation.    And that is giving the benefit of the doubt to the insurance companies which drafted the contracts and which now claim those contracts did not cover the services that were submitted by the defendants for coverage.[6]   A contract dispute cannot morph into a federal crime absent fraud; and a fraud offense requires an intent to defraud, coupled with deceit, either through a false statement or an actionable material omission.

This motion to dismiss relies on the deficiency of the indictment to allege an offense.  The indictment alleges a scheme to fraud in the abstract but does not allege any facts to provide notice to the defense what conduct, or representation, or omission is the *corpus delicti* of the offense.   A

---

[6] In one conference that Durall's counsel had with government attorneys, the latter stated, "Your client found a loophole and drove a truck through it." This, to be sure, is the essence of a contract dispute, and a dispute for which the drafter of the contract bears full responsibility. In litigation that mirrored many of the same claims as appear in this case, an arbitrator expressly concluded that testing done by a laboratory outside the hospital is covered by the insurance contract that governed the claims filed by the hospital. *Little River* Arbitration Award, *supra*, footnote 5, ¶ 71, ¶ 73.

vague contract, even if it is breached (and we do not concede that there was any breach) does not constitute fraud.   Just as a vague criminal statute may not be the foundation for a criminal prosecution; and just as a vague tax provision may not be the foundation for a tax evasion prosecution; a vague contractual obligation may not be the foundation for a criminal prosecution. Moreover, if a contract is subject to varying interpretations, the government may not prosecute conduct that may violate one interpretation of the contract.   Even if the contract is unambiguous, there is no crime when one party breaches a contractual obligation.

The indictment fails to allege what was "fraudulent" in the claims, it does not even allege what was "deceptive."[7]   This case is unique in the annals of fraud cases insofar as it alleges a scheme to defraud without ever identifying what specific false statement or deceptive practice was employed to victimize the insurance company.   An essential element of any fraud case is deceit. Yet, there is no deceitful representation that is alleged in the indictment.

If filing a claim that is not payable (according to the insurance company) amounts to fraud – with no allegation of any false statement in the claim – there would be tens of thousands of crimes committed throughout the country on a daily basis.   Insurance claims often include requests for payment or reimbursements by people or institutions seeking insurance payments for costs that are not payable under the insured's insurance contract.   This applies to health insurance claims, property insurance claims, and car insurance claims.   On a daily basis, thousands of claims for

_____

[7] Throughout the indictment, the government alleges fraud, but never identifies any fraudulent representation.   For example, in Count One, the indictment alleges that the defendants:

> "knowingly and willfully execute[d] a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in 18 U.S.C. § 24(b), that is, the Private Insurers, and to obtain, *by means of materially false and fraudulent pretenses, representations, and promises*, money and property owned by, and under the custody and control of, said health care benefit programs,…" (emphasis supplied).

insurance benefits are rejected by insurance companies on the basis that the claims are not covered by the insured's insurance contract.  Yet, absent a false statement in the reimbursement claim, no court would ever entertain a case in which the insurance company (or a prosecutor) alleged that the claim is fraudulent based solely on the fact that the claim is for a non-covered event (or that the patient was not covered).  This court should refuse to entertain this case and grant this motion to dismiss.

The indictment also alleges that the tests were not medically necessary, despite the fact that they were ordered by a physician and the laboratory owners and operators had no authority or basis to conclude that the tests were not medically necessary.  In fact, if a laboratory employee or owner were to refuse to perform a test based on the laboratory owner's assessment of what is "medically necessary," the laboratory owner would be guilty in many jurisdictions of practicing medicine without a license.   Under Federal law, the responsibility for determining that a controlled substance is for a legitimate medical purpose is not only with the prescriber, but "a corresponding responsibility rests with the pharmacist who fills the prescription."   21 C.F.R. § 1306.04 (2015).  No such responsibility to evaluate medical necessity has ever been placed on a testing laboratory.  In fact, the Department of Health and Human Services has promulgated the Office of the Inspector General (OIG) Compliance Program Guidance for Clinical Laboratories, which expressly states, "laboratories ***do not and cannot*** . . . make medical necessity determinations."   Federal Register, Vol. 63 No. 163, Published August 24, 1998, at 45079 (emphasis added).

Despite repeated requests by Durall for a Bill of Particulars to isolate and identify the specific false statement that is the foundation for the fraud charges, the government has declined to provide any information revealing the specific false statements made by Durall or other rural hospital defendants in any filed claim, insisting that all the defendants should review the millions of pages of discovery to learn the basis for the fraud charge.    Durall submitted a letter with

6

detailed requests for an explanation of what was false in the applications for insurance benefits; the government responded that the answer could be found among the several million pages of discovery provided under Rule 16.   Durall then requested a meeting with the prosecutors so that the government could clarify or define what was false in the claims in order to prepare a defense. The government again refused.   Yet a third time, Durall requested just a phone call to discuss this matter in order to avoid having to file a formal Bill of Particulars.   The government refused to discuss the matter on the phone.

Contemporaneous with the filing of this motion to dismiss, Durall is also filing a motion for a bill of particulars, but it is apparent that the indictment does not allege a crime and that is why the government persists in its refusal to identify the key ingredient of *any* fraud case: deceit.[8] There was no deceit in this case.   The indictment does not allege the utterance or writing of a false statement.   There is no allegation of a material omission.

> **A.  A Breach of Contract Alone Does Not Amount to Criminal Fraud and the Failure to Comply with the Terms of a Contract is Not a Federal Crime in the Absence of a Material False Statement or Omission.**

As stated above, Durall owns a rural hospital and a testing laboratory; Fletcher owns a testing laboratory.  In Durall's hospital, there are laboratory testing machines that can perform "screening" tests on a urine sample to determine if the specimen contains evidence of the ingestion of a controlled substance.  If the screening test shows the existence of a controlled substance, the sample then undergoes a confirmatory test at a testing laboratory, such as Reliance or LifeBrite, in order to identify the specific controlled substance present.[9]  Testing the urine sample through the

---

[8]  Needless to say, a bill of particulars, even if it is supplied, does not cure a defective indictment. *Russell v. United States*, 369 U.S. 749, 769-70 (1962).

[9] Confirmatory testing is also done on negatives as false negatives are prevalent in routine initial screenings. This is up to the ordering physician-provider to decide upon ordering the tests. Additionally, the screening menu(s) are not as expansive as confirmatory testing menus, so

initial screening procedure and then conducting a more thorough confirmatory test to determine what substance is in the urine that triggered the positive screening test is precisely what the doctor who submitted the urine sample requested.  All of this information is contained in the indictment.

With regard to both tests, payment for the service provided to the beneficiary is sought by the rural hospital. The rural hospital that performed the screening test (Chestatee, for example) is eligible for payment because the laboratory facility in the hospital actually performed the test.  The confirmatory laboratory (Reliance or LifeBrite), is paid by the hospital to perform the confirming test and thus, the hospital is entitled to payment or reimbursement for the cost it incurred in ordering this test as well.

Who are the "patients" whose urine specimen is tested?  The government contends that the urine is supplied by individuals who are not "patients" of the rural hospital.  It is true that the people whose urine is tested do not occupy a bed in the hospital and, in fact, do not come to the hospital.  But their urine is initially screened at the hospital, and the hospital refers to and pays the laboratory that performs the confirmatory test on the positive screen (or when the physician-provider orders the more complex confirmatory test).  The urine specimens come from what the CMS and the industry label "non-hospital patients" to differentiate them from inpatients and outpatients.[10]

Thus, there are two basic questions – legal questions – presented by the allegations in the indictment that can be decided in the context of a Rule 12 challenge to the sufficiency of the indictment, based entirely on the allegations (or the lack thereof) in the indictment:

---

oftentimes providers order both to test for other illicits and substances not available on the screening menu. To summarize, confirmatory testing may be performed whether the screening results are positive or negative based on the tests ordered from the ordering provider.

[10] Government and private insurance may cover all three types of patients – inpatients, outpatients, and non-patients.

(1) Does it matter if the individual whose urine is tested never enters the rural hospital and never occupies a bed there?  Does that fact (which is alleged in the indictment) render the claim fraudulent, even if the data on the claim form electronically submitted to the insurance company is not false and identifies the individual as a non-hospital patient by the TOB code 141?

(2) Does it matter that the confirmatory test is analyzed at an off-site laboratory that then receives payment for performing the test at the request of the rural hospital and the doctor who submitted the sample?  Does that fact render the rural hospital's submitting a billing claim on behalf of the confirmatory laboratory for payment fraudulent?

The answer to both questions is no.  There is nothing in the insurance contract (the provider agreements) that explicitly says that only screening tests performed for inpatients or outpatients (as opposed to non-patients) are eligible for payment.  In fact, the claim forms submitted for payments by or on behalf of Durall specifically identified the individuals whose urine was tested as "non-patients" through the TOB code 141.  It bears repeating: The insurance companies provide a code to the hospitals to identify the status of the person who contributed the specimen and one of the codes ("141") explicitly identifies the individual as a non-patient.  That code was placed on the claim form prepared and used by the insurance companies.  Perhaps, then, it is no wonder that the government declines to identify any false statement on the claim form.  And equally important is this fact: nothing on the claim form that was prepared for the submission of claims requests any information about where the testing was performed.  If this was an important fact for the insurance company, it should have requested that information on the claim form.

If the government and the insurance companies think these claims were not payable, then there is ambiguity in the contract and in the payment claim forms, because neither the insurance contract, nor the claim forms state that non-patients may not utilize the rural hospital's laboratory services.  And if there is a flaw or an ambiguity in the contracts or the claim forms – both of which

are drafted by the insurance companies – there may (or may not) be a civil dispute that requires the parties to repair to another court or to arbitration.   But a criminal prosecution is not appropriate. And that is for the simple undeniable and facially apparent fact that Durall never filed any claim that falsified who the donor of the specimen was (i.e., that the specimen came from a non-patient). There was no deceit that occurred and, more to the point, *no deceit that is alleged in the indictment* with regard to the identity of the specimen donor.

If the government's allegation is that the insurance contract does not "contemplate" payment for these services, then the essence of the supposed crime that the government is prosecuting is a breach of contract, or the filing of a claim for coverage – concealing no fact – for a service that was not covered.  Absent fraud, this is not a crime.  This is an issue that is ripe and appropriate for the court to decide.  The interpretation of a contract term is a question of law for the court to decide.   *See Saregama India, Ltd. v. Mosleyley*, 635 F.3d 1284, 1290 (11th Cir. 2011) ("The interpretation of a contract, or agreement, presents a question of law."); *Carneiro Da Cunha v. Standard Fire Ins. Co.*, 129 F.3d 581, 584–85 (11th Cir. 1997) ("Contract interpretation is generally a question of law.  The initial question of whether a contract is ambiguous is also a question of law for the court . . . .").

**B.     Citation of Authority**

When analyzing challenges to the sufficiency of an indictment, courts give the indictment a commonsense construction, and its validity is to be determined by practical, not technical, considerations.  The appropriate test is not whether the indictment might have been drafted with more clarity, but whether it conforms to minimal constitutional standards. *United States v. McGarity*, 669 F.3d 1218, 1235–1236 (11th Cir. 2012); *United States v. Poirier,* 321 F.3d 1024 (11th Cir. 2003).

An indictment must contain every element of the charged offense to pass constitutional

muster.   *United States v. Fern,* 155 F.3d 1318 (11th Cir. 1998); *United States v. Stefan,* 784 F.2d 1093 (11th Cir. 1986).   This is because the Sixth Amendment guarantees every defendant the right to be informed of the government's accusations against him or her.   *United States v. Chilcote,* 724 F.2d 1498 (11th Cir. 1984).   Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment shall be a plain, concise and definite written *statement of the essential facts* constituting the offense charged.   *United States v. Resendiz-Ponce,* 549 U.S. 102, 127 S. Ct. 782, 166 L. Ed. 2d 591 (2007).

If the indictment tracks the language of the statute, it must be accompanied with such *a statement of facts and circumstances as will inform the accused of the specific offense*, coming under the general description, with which he or she is charged.   Additionally, when the indictment uses generic terms, it must state the offense with particularity.   *United States v. Bobo,* 344 F.3d 1076, 1083 (11th Cir. 2003) (holding that health care fraud indictment was deficient, because it failed to adequately allege factual basis for charge); *United States v. Schmitz,* 634 F.3d 1247 (11th Cir. 2011) (holding that § 666 counts of an indictment were deficient, because they failed to allege any facts to support the allegation of theft or fraud and failed to expressly incorporate the facts that were set forth in related mail fraud counts).   In *United States v. McGarity,* 669 F.3d 1218, 1238–1240 (11th Cir. 2012), the defendant was charged with obstruction of justice under 18 U.S.C. § 1512(c) and the indictment correctly recited the essential elements of the crime tracking the language of the statute.   However, the indictment did not identify the official proceeding that was allegedly the target of the defendant's obstruction effort.   The Eleventh Circuit held that the indictment on this count was defective.   In *United States v. Martinez,* 800 F.3d 1293 (11th Cir. 2015), the court held that an indictment for making a threatening communication was defective because the indictment failed to allege the defendant's *mens rea*.

A breach of contract does not constitute evidence of a materially false or fraudulent

representation designed to defraud the victim in a fraud case. *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir. 1990) (interpreting the mail fraud provision of Section 1341 as a predicate act in a civil RICO action and stating "[n]or does a breach of contract in itself constitute a scheme to defraud."); *see, e.g., United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980), where the court wrote:

> [T]he [mail fraud] statute does not reject all business practices that do not fulfill expectations, nor does it taint every breach of a business contract. Its condemnation of a "scheme or artifice to defraud" implicates only plans calculated to deceive. The government must prove not only that there was fraudulent activity but also that the defendant had a " conscious knowing intent to defraud," *United States v. Kyle*, 257 F.2d 559, 564 (2d Cir. 1958).

*United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980). *See also United States v. Blankenship*, 382 F.3d 1110, 1132 (11th Cir. 2004) ("It is not illegal for a party to breach a contract; a contract gives a party two equally viable options (perform or pay compensation), between which it is generally at liberty to choose."); *United States v. Berheide*, 421 F.3d 538, 540 (7th Cir. 2005) ("breach of contract is not a crime").

In *United States v. Blankenship,* 382 F.3d 1110 (11th Cir. 2004), the Eleventh Circuit reversed a false statement conviction.   The defendants submitted contracts and equipment leases to the government to demonstrate the bona fides of the defendants' relationship (in order to qualify for a government contract).   Actually, the parties did not intend to have that relationship, but submitted the documents in order to win the contract.   The Eleventh Circuit concluded that this conduct did not amount to a false statement under § 1001.   A contract is not a "false statement" unless it is fraudulent, or actually contains false statements of fact.   A contract like the one at issue in that case is not like a guarantee that a party never intended to honor (which could constitute a false statement).   A contract can be breached without any criminal culpability.   The existence of the contract was not actually disputed, even if the parties never intended to comply with its terms

or to sue the other party for breaching the contract.   The Eleventh Circuit went on to hold, "Based on our analysis of both the text of § 1001 and the caselaw, it appears there are only two ways in which a contract can possibly be considered "false."   First, a contract is false if a person forges or alters it.   Like a forged birth certificate or counterfeit currency, the document itself would be, quite literally, false. … The only other way in which a contract can be "false" is if it contains *factual misrepresentations*."[11]

*United States v. McCarrick,* 294 F.3d 1286 (11th Cir. 2002), elaborates on the principles that differentiate a civil claim for breach of contract and a criminal charge of fraud.   The defendant was charged with making a false statement to the government (SBA) in violation of 18 U.S.C. § 1001, as well as bank fraud, in violation of 18 U.S.C. § 1344.   The defendant applied for a bank loan which was guaranteed by the SBA.   The application indicated that the proceeds were intended to be used, in part, to buy certain equipment for his garage.   The check was issued by the bank and the defendant deposited the check in his account.   Later, he used the money for a different (though business-related) purpose.   The question was whether he had the intent to defraud the bank at the time he signed the loan documents.   The Eleventh Circuit reversed the conviction, holding that there was insufficient evidence that he had the intent to deceive the bank or the SBA at the time he applied for the loan.   His conduct after he signed the loan documents did not establish his state of mind at the time he signed the documents.   Moreover, he used the balance of the money loaned to him for the agreed-upon purpose, including the purchase of other machinery for the garage.

---

[11] The court in *Blankenship* affirmed fraud counts based on false statements in the claims for payment; forged signatures; false addresses that were placed on claim forms; false wage and hour documents that lied about who was performing the work.  None of this type of conduct is alleged to have occurred in this case.

### C.     Contractual Terms That are Ambiguous or Subject to Varying Interpretations Do Not Form the Basis for a Fraud or False Statement Charge.

Where the basis for a § 1001 prosecution is the defendant's alleged false statements on a form, if the form is inherently ambiguous or reasonably subject to an alternative interpretation, a false statement prosecution may be barred.  A prosecution based on an uncertain law or contract violates due process.  *United States v. Manapat,* 928 F.2d 1097 (11th Cir. 1991); *United States v. Payne,* 750 F.2d 844 (11th Cir. 1985).

In *United States v. Whiteside,* 285 F.3d 1345 (11th Cir. 2002), the defendants' convictions were reversed on sufficiency grounds.  The defendants were charged with making false statements in connection with Medicare reimbursement cost reports and conspiracy to defraud the government.   In the reimbursement cost reports, the defendants reported that part of their hospital's annual costs included certain interest payments on a note that represented a capital expenditure.  According to the government, these interest payments should not have been reported as a capital expenditure.   The jury convicted the defendants.   The Eleventh Circuit held that it was far from clear what the appropriate definition of a "capital expenditure" is in the context of interest payments for the note.   Consequently, as a matter of law, the defendants could not be found guilty of making a false statement.   The court held that, "In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law."  *Id.* 285 F.3d at 1351.   The recent case *United States v. Harra*, --- F.3d --- (3rd Cir. 2021), emphasizes these same principles: if there is ambiguity regarding a duty (whether contractual, regulatory, or otherwise), the prosecution may not claim that under *its* interpretation, the defendant did not comply with the duty.   Moreover, the government must prove (and allege) that there was no reasonable alternative interpretation (regardless of the state of mind

of the parties).  In other words, whether the defendants shared the same interpretation as the government is not determinative.  The government is required to allege that there was no objectively reasonable alternative interpretation of the rights and responsibilities of the parties – or the eligibility for payment.  The fact that an objective arbitrator in Texas reviewing the same contract found that payment for non-patients *was* required by the contract proves that there are objectively reasonable alternative interpretations of the contract.  The fact that the government's expert can only offer an opinion about what the contracts "meant" as opposed to what the contracts explicitly provided provides further support for the lack of clarity in the obligations and rights of the parties.

In the context of tax evasion prosecutions, these principles have been recognized by appellate courts throughout the country: if the tax obligation of a tax payor is not certain, then the person *cannot be prosecuted* for tax evasion.  *See, e.g., United States v. Mallas*, 762 F.2d 361 (4th Cir. 1985); *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir. 1983); *United States v. Harris*, 942 F.2d 1125 (7th Cir. 1991).  It violates due process to criminalize conduct where the unlawfulness of the conduct is not clearly defined.

This same principle provided the basis for a reversal of the conviction in *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974), another tax case, where the Fourth Circuit wrote: "We hold that defendant must be exonerated from the charges lodged against her.  As a matter of law, defendant cannot be guilty of willfully evading and defeating income taxes on income, the taxability of which is so uncertain that even co-ordinate branches of the United States Government plausibly reach directly opposing conclusions.  As a matter of law, the requisite intent to evade and defeat income taxes is missing.  The obligation to pay is so problematical that defendant's actual intent is irrelevant.  Even if she had consulted the law and sought to guide herself accordingly, she could have had no certainty as to what the law required."

15

The principles that are reflected in the *Mallas*, *Dahlstrom* and *Harris*, cases – decisions that condemned prosecutions based on ambiguous tax obligations – also require the dismissal of an indictment that is based on a similarly ambiguous law or contract that governs the rights and responsibilities of the parties.  *United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000).   In other words, the issue of ambiguity is not reserved for the jury's decision: if the law is unclear (and by analogy, if a contract is ambiguous – such as a claim form or an insurance contract), an indictment based on a violation is subject to dismissal.

These decisions also reflect the Rule of Lenity which ensures that if a law is unclear or subject to inconsistent or alternative interpretatations, the "tie" goes to the defendant.  When a criminal statute is ambiguous in its application to certain conduct, the rule of lenity requires it to be construed narrowly.   Where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. *Yates v. United States*, 574 U.S. 528, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015); *Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896 (2010); *United States v. Santos,* 128 S. Ct. 2020 (2008); *Jones v. United States,* 529 U.S. 848 (2000); *United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013); *United States v. Trout,* 68 F.3d 1276 (11th Cir. 1995); *United States v. McLemore,* 28 F.3d 1160 (11th Cir. 1994); *United States v. Cruz,* 805 F.2d 1464 (11th Cir. 1986); *United States v. Jenkins,* 58 F.3d 611 (11th Cir. 1995).   *Santos* explained that the Rule of Lenity, "not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead." 128 S. Ct. at 2025.

The Rule of Lenity is not limited to the interpretation of statutes.  The Eleventh Circuit condemned a conspiracy to commit mail fraud conviction in *United States v. Chandler,* 388 F.3d

16

796 (11th Cir. 2004).   The defendants were recipients of stolen or embezzled winning McDonald's game pieces that they redeemed for considerable prize money.   They did not realize that the winning game pieces were stolen, but they did know that the game pieces were transferred to them by others in exchange for a share of the winning prize.   The government contended that the redemption of the winning pieces amounted to a false representation because the defendants were "implicitly" stating that they obtained the pieces "legitimately"— but it was entirely unclear what the scope of legitimacy was under the McDonald's game rules.   Thus, under the Rule of Lenity, this could not amount to criminal fraud.[12]

In addition, if the theory of the indictment is that the claims filed by Durall's and other defendants' rural hospitals contained a material omission, the indictment fails to allege what was omitted and what law required the information to be included:

> The indictment failed to sufficiently allege the second element of a section 7206(1) violation, namely a material falsehood or an omission that amounted to a material falsehood. In this case, the allegation is that Pirro omitted something from a tax return. An omission cannot amount to a false statement, which is an essential element of a section 7206(1) violation, without the crucial background fact that gives rise to the duty to disclose the fact that was omitted. *Only the omission of facts required to be reported constitutes a material falsehood. The indictment must therefore allege what made the omission in this case criminal.*

*United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000) (emphasis supplied).

In *United States v. Mitchell*, 165 Fed. Appx. 821 (11th Cir. 2006), the government failed to establish, in a prosecution for conspiracy to commit fraud based upon an alleged submission of claims for services not eligible for Medicare coverage, that services for which claims at issue were submitted were *per se* ineligible for Medicare coverage, where the government did not introduce any written authority governing the circumstances under which the services at issue could be

---

[12] As noted above, the interpretation of a contract term – and the determination whether a contract is ambiguous – are questions of law for the court to decide.

payable under Medicare, and where the testimony of a government's investigator with respect to specific services at issue was contradictory as to whether such services were per se excludable. Moreover, the court remarked, the government failed to establish that specific services for which the subject claims were submitted were nonbillable on the ground that they were performed by a technician at the patients' homes rather than at the clinic with the physician present, where the applicable rule as set out in the testimony of the government's investigator was ambiguous as to whether the provision of services in the patient's home pursuant to the treatment plan drawn up by the physician amounted to a provision of services under the "direct supervision" of a physician.

*United States v. Hale*, 762 F.3d 1214 (10th Cir. 2014), also illustrates this principle: At the meeting of creditors in a bankruptcy case, the defendant was asked, "To your best knowledge and belief, is the information contained in your petition, statements, schedules and related bankruptcy documents true, complete and accurate?"   There is an ambiguity in this question, because it is not clear if the truthfulness of the answer is measured at the time the statement was made (i.e., the bankruptcy schedules were filed) or at the time of the creditors' meeting.   In this case, the ambiguity was important, because the defendant learned after filing the schedules that one of the assets was worth substantially more than what he had listed on the schedule.   Because of this ambiguity, the defendant could not be convicted of making a false statement in a bankruptcy proceeding.

In *United States v. Stack*, 821 F.3d 1038 (8th Cir. 2016), the court held that no reasonable jury could have found that defendant knowingly and willfully made a false statement, within the meaning of statute proscribing false statements to a government agency, by affirming, in the loan authorization and agreement for disaster loan from the Small Business Administration (SBA), that there were no substantial adverse changes in his financial condition.   The adverse changes alleged by the government, namely, additional loans since defendant's initial application, a

$900,000 balance owed to suppliers, and the bank's suggestion that the loan be moved to another lender, were not comparable to the liens, bankruptcies, and convictions listed in agreement documents as examples of "substantial adverse changes."   Because the government did not introduce evidence of amount defendant owed suppliers at time of original application, evidence of amount he owed when later signing agreement did not demonstrate "change" in financial condition.

The *Stack* decision went further, holding that no reasonable jury could have found that defendant knowingly and willfully made a false statement, by certifying on the loan authorization and agreement for his disaster loan from the Small Business Administration (SBA) that his original application was true, correct, and complete.   Even if the agreement encompassed defendant's statement from schedule of liabilities that his loans were "current" and not "delinquent," those terms were not defined in the schedule of liabilities, there was no consistent definition for those terms in the banking industry.   18 U.S.C.A. § 1001.

It bears repeating: even if the court were to determine that one or more of the contracts was unambiguous, this motion to dismiss must still be granted because absent fraud – a false statement – the filing of an insurance claim for payment that is not covered is not fraud: fraud requires a false statement, deception, a material omission.   Nowhere in the indictment are these essential elements of a fraud allegation included.

> **D.**      **If A Party Intends to "Deceive" Another Party, This Does not Necessarily Constitute Fraud.  Fraud Requires an Intent to Unlawfully Deprive the Other Party of Money Or Property Through False Deceptive Statement.**

In a mail or wire fraud case, the government must prove that the defendant intended to defraud the victim.   The decision in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), *modified*, 838 F.3d 1168 (11th Cir. 2016), explained:

> Section 1343 forbids only schemes to *defraud*, not schemes to do other wicked things, *e.g.*, schemes to lie, trick, or otherwise deceive. The difference, of course, is that deceiving does not always involve harming another person; defrauding does. That a defendant merely "induce[d] [the victim] to enter into [a] transaction" that he otherwise would have avoided is therefore "insufficient" to show wire fraud.

*Takhalov*, 827 F.3d at 1310. In *Takhalov*, the defendants were charged with an assortment of crimes involving their operation of nightclubs in Miami.   The defendants hired "bar girls" to lure men to the bar; the girls would pose as tourists from Eastern Europe and invited men in nearby hotels to accompany them to the bar.   At the bar, the men were allegedly defrauded in different ways (credit card fraud, hiding costs, etc).   One issue on appeal, however, was whether hiring the women to pretend to be tourists, when, in fact, they were employees of the bar, amounted to fraud. The Eleventh Circuit said no.   While this conduct is deceptive, it is not fraudulent.   Even if the men would not have gone to the bar, but for the "invitation" from the women who were believed to be tourists looking for a good time, this is merely deception, not fraud.   The men got what they paid for: drinks at a bar with the women.   The definitions of "deceive" and "defraud" reveal the distinction: "These definitions make clear that there is a difference between deceiving and defrauding: to *defraud*, one must intend to use deception to cause some injury; but one can *deceive* without intending to harm at all." *Id.* at 1312.   Citing Second Circuit precedent, the court wrote:

> Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself.   Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.

*Id.* at 1314.  *See also United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020) (The Ninth Circuit pattern jury instruction defined the *mens rea* for mail fraud as "a scheme to deceive or cheat."  In this case, based on cases from around the country and the bank fraud case in the Supreme Court, *Shaw v. United States*, 137 S. Ct. 462 (2016), the court held that the appropriate instruction must

explain that the crime requires an intent to deceive *and* cheat: the defendant must not only intend to deceive the victim, but must intend to obtain money or property through the deception (*i.e*., to cheat)).

Thus, if the government's contention is that there was some aspect of the insurance claim that was not accurate, but the insurance claim was still valid, the defendant's conduct is not fraudulent.

As explained in the opening paragraphs of this motion, though, the unique feature of this health care and wire fraud case is the absence of any allegation of a specific false statement.   There is no allegation of deception.   The indictment alleges, in essence that if the insurance companies know what they now know, they either would not have paid the claim, or would have re-written the contracts to avoid any ambiguity about what they were willing to pay.   That does not amount to fraud on the part of the defendants in this case.

## III.   CONCLUSION

For the foregoing reasons, Defendants Durall and Fletcher urge this court to dismiss the indictment.

 Respectfully submitted this 19th day of January, 2021.

<table>
<tr><td>*s/ Donald F. Samuel*</td><td>*/s/  Brendan Herbert*  </td></tr>
<tr><td>Donald F. Samuel</td><td>Brendan Herbert</td></tr>
<tr><td>Georgia Bar No. 624475</td><td>Florida Bar No. 0076925</td></tr>
<tr><td>GARLAND, SAMUEL & LOEB. P.C.</td><td>POLSINELLI PC</td></tr>
<tr><td>3151 Maple Drive, N.E.</td><td>1111 Brickell Avenue, Suite 2800</td></tr>
<tr><td>Atlanta, Georgia 30305</td><td>Miami, FL 33131</td></tr>
<tr><td>404-262-2225</td><td>Telephone: (305) 921-1820</td></tr>
<tr><td>dfs@gsllaw.com</td><td>bherbert@polsinelli.com</td></tr>
<tr><td></td><td></td></tr>
<tr><td>*Admitted Pro Hac Vice*</td><td>Brian McEvoy</td></tr>
<tr><td></td><td>Brian Rafferty</td></tr>
<tr><td></td><td>Grace Zoller</td></tr>
<tr><td></td><td>POLSINELLI PC</td></tr>
<tr><td></td><td>1201 West Peachtree St NW</td></tr>
<tr><td></td><td>Suite 1100</td></tr>
</table>

Atlanta, GA 30309
Telephone: (404) 253-6000
Facsimile: (404) 253-6060
bmcevoy@polsinelli.com
brafferty@polsinelli.com
gzoller@polsinelli.com

*Counsel for Aaron Durall*

s/ Vincent A. Citro
Vincent A. Citro
Florida Bar Number: 0468657
LAW OFFICES OF HORWITZ &
CITRO, P.A.
17 East Pine Street
Orlando, Florida 32801
Telephone: (407) 843-7733
Facsimile: (407) 849-1321
vince@horwitzcitrolaw.com

s/ Steven H. Sadow
Steven H. Sadow
Georgia Bar No. 622075
STEVEN H. SADOW, P.C.
260 Peachtree Street, N.W.
Suite 2502
Atlanta, Georgia 30303
Telephone: (404) 577-1400
Facsimile: (404) 577-3600
stevesadow@gmail.com

*Admitted Pro Hac Vice*

*Attorneys for Defendant Christian Fletcher*

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

v.

AARON DURALL, et al,

     Defendants.

Case No.
3:20-CR-86-TJC-PDB

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 19, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ Brian Rafferty*
Brian Rafferty

23