UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.  Case No. 3:20-cr-86-TJC-JBT

JAMES F. PORTER, JR.,
SEAN PORTER, et al.

### UNITED STATES' MOTION TO STRIKE CERTAIN OPINIONS OF ELIZABETH SHAW, AND TO STRIKE OPINIONS OF C. ROSS BERRY

The United States hereby moves to strike certain of the opinions of Elizabeth Shaw, and to strike the opinions of C. Ross Berry, both experts proffered by Defendants James F. Porter, Jr. and Sean Porter.

Shaw, a health care attorney in private practice, proposes to opine on several topics that are not the proper subject of expert testimony because they are little more than legal opinions or legal advocacy. For example, she proposes to testify that "[t]he fraud claims described in the Indictment appear to be no more than, at most, a possible breach of contract by the Rural Hospitals" (Shaw Report at 19) and that laboratories have no legal responsibility to make determinations of medical necessity in connection with submitting claims to insurance payors. *Id*. at 10. At other points, her report reads like the legal briefs previously by filed the Porters and other defendants: "There was no intent by James Porter, HLP or Pinnacle to conceal the identity of Pinnacle as the reference laboratory that performed the laboratory testing for the Rural Hospitals" (*id*. at 19), and "[t]he record does not contain evidence of

Pinnacle or HLP or James Porter or Sean Porter implementing any scheme or artifice to conceal the nature of laboratory services provided by Pinnacle or billed by the Rural Hospitals." *Id*. at 20. None of this amounts to "scientific, technical or other specialized knowledge [that] will help the trier of fact to understand the evidence or determine a fact in issue," Fed. R. Evid. 702(a), and much of it directly contravenes Fed. R. Evid. 704, which explicitly prohibits an expert in a criminal case from opining on whether the defendant had the requisite mental state to commit the crime.

With regard to other opinions, Shaw either lacks the qualifications to offer them, or fails to explain them or provide any basis on which the Court could find them reliable. For example, Shaw opines that "[t]he Rural Hospitals did not misrepresent the identity of the reference laboratories." Shaw Report at 9. Although the question whether the rural hospitals' claims to insurance payors contained material misrepresentations is a proper subject of expert testimony, Shaw, who appears to lack any experience with health insurance claims, is just not qualified to weigh in on this subject.

As for Berry, he simply does not offer anything that could reasonably be called an "expert opinion." In his three-and-a-half page report, Berry expresses no statement in the form of an opinion, supplies virtually no basis for the meager and anodyne statements he does set forth, and provides no hint of what scientific, technical, or specialized knowledge he possesses that will assist the trier of fact in understanding the evidence or determining any facts in issue. Berry should not be

2

permitted to cloak his testimony at trial, whatever it might consist of, in the guise of an "expert opinion."

I. **LEGAL STANDARD**

    A. **Federal Rule of Evidence 702**

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 requires the trial court to act as a "gatekeeper" to ensure that speculative and unreliable opinions do not reach the jury. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 n.7, 597 (1993). The critical gatekeeping function "inherently requires the trial court to conduct an exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (internal quotation and citation omitted) (emphasis in original).

As this Court has recognized, to be admissible, expert testimony must satisfy three requirements:

3

> First, the expert must be qualified to testify competently regarding the matter he or she intends to address. Second, the methodology used must be reliable as determined by a *Daubert* inquiry. Third, the testimony must assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue.

*United States v. Clark*, 2018 WL 4744306, at *2 (M.D. Fla. October 2, 2018) (citing *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1309 (11th Cir. 2016). Moreover, "[i]f the testimony satisfies these three requirements, it must then still satisfy Rule 403." *Id*. It is necessary for the district court to weigh the value of this type of evidence against the potential to mislead or confuse because expert testimony may be assigned "talismanic significance" in the eyes of lay jurors. *Frazier*, 387 F.3d at 1263. The burden of establishing each of these three requirements rests on the proponent of the expert opinion. *Id*. at 1260.

The qualification prong "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (internal quotation and citation omitted). Put another way, the court "must consider whether an expert is qualified to testify competently regarding the matters he intends to address." *Id*. (citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562–63 (11th Cir. 1998)). Admittedly this is not a "stringent inquiry," but experts must meet a minimal level of qualification in order to testify. *Ryken v. Celebrity Cruises, Inc.*, 2019 WL 5485177, at *4 (S.D. Fla. 2019) (finding that proposed expert's report did not explain how his work experience applied to the opinions he intended to offer or the facts of the case).

4

As to reliability, the same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony. *Kumho Tire v. Carmichael,* 526 U.S. 137, 152 (1999). In determining whether an expert's testimony is reliable, the *Daubert* factors are applicable in cases where an expert eschews reliance on any rigorous methodology and instead purports to base his opinion merely on experience or training. Thus, in all instances, the district court's gatekeeping function requires it to find "that an expert's testimony . . . rests on a reliable foundation." *Daubert*, 509 U.S. at 591. Experience, standing alone, is not a sufficient foundation rendering reliable any conceivable opinion the expert may express. *Frazier*, 387 F.3d at 1261. The Committee Note to the 2000 Amendments to Rule 702 states that:

> if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

(quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). Eleventh Circuit caselaw "plainly establishes that one may be considered an expert but still offer unreliable testimony." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1342 (11th Cir.2003). "Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility." *Frazier,* 387 F.3d at 1261.

With regard to the third prong of the analysis—whether the testimony can assist, or be helpful to the trier of fact—it has long been recognized that expert testimony is admissible only if it concerns matters that are beyond the understanding of the average lay person. *Frazier,* 387 F.3d at 1262; *see also United States v. Rouco,* 765 F.2d 983, 995 (11th Cir.1985) (expert testimony is admissible if it offers something beyond the understanding and experience of the average citizen). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than factual and legal conclusions that can be argued by experienced lawyers for the parties in closing arguments. *Frazier,* 387 F.3d at 1263.

In keeping with this principle, "expert witnesses are not permitted to offer legal conclusions as opinions." *Link v. Hall*, 2011 WL 13232375, *2 (M.D. Fla. Feb. 4, 2011) (citing *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112, n.8 (11th Cir. 2005)). Nor may they testify "as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct," as legal determinations and what the law means are for the Court to explain. *SEC v. Spartan Securities Group, Ltd.*, 2020 WL 7024885, at *7 (M.D. Fla. Nov. 30, 2020) (internal quotation omitted). A person's legal obligations under federal law are "a matter for instructions from the trial court and not properly a subject for testimony by an expert witness." *Id*. (internal quotation omitted); *see also Jones v. Midland Funding, LLC*, 616 F. Supp. 2d 224, 227 (D. Conn. 2009 ("[A]n expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the Court."); *United*

6

*States v. Long*, 300 Fed App'x 804, 815 (11th Cir. 2008) (expert's statement that an entity was an artifice or scheme to defraud was "an impermissible legal conclusion"); *Pinal Creek Group v. Newmont Mining Corp.*, 152 F. Supp. 2d 1037, 1046 (D. Ariz. 2005) (precluding law professor from offering opinion regarding the law that governed the case and federal antitrust law).

### B. Federal Rule of Evidence 704

As the Advisory Committee Notes to the Proposed Rule 704 states, older cases often foreclosed expert testimony on the "ultimate issue" in the case on the ground that such testimony invaded the province of the jury. Rule 704(a) reflected a trend in the caselaw toward liberalizing this rule. But Rule 704(b) contains a clear and explicit exception:

> In a criminal case, an expert witness *must not* state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

(emphasis added). The case law applying Rule 704 could not be more clear that Rule 704(b) bars expert testimony that expressly states an opinion as to the defendant's state of mind at the time of the offense. *United States v. Alvarez*, 837 F.2d 1024, 1031 (11th Cir. 1988).

## II. ARGUMENT

### A. Portions of Elizabeth Shaw's Opinions Should be Excluded

On page 9 of her report, Shaw provides a summary of her seven opinions. She should be precluded from testifying on the opinions expressed in bullet points 1-2,

7

and 5-7 because they amount to impermissible legal opinions or legal advocacy on behalf of the defendants, leaving her to testify only on the opinions expressed in bullet points 2-3.

### 1. Shaw seeks to express legal opinions

Shaw's first two opinions (bullet points 1 and 2) concern whose legal obligation it is—a medical professional or a laboratory—to determine the medical necessity of tests performed by a laboratory when claims are submitted for reimbursement to a payor. Shaw opines that medical necessity is exclusively the purview of the clinician who ordered the test and requested that the laboratory perform it, and not the responsibility of either a laboratory or a payor.

Shaw should be precluded from offering any opinion on this subject for several reasons. First, even apart from the question whether a lawyer can provide an expert opinion on an individual's legal obligations, Shaw barely addresses whether *the charged defendant, James Porter*, was legally capable of making medical necessity determinations. She merely claims that as a non-clinician, Porter would be practicing medicine without a license if he did so—without explaining how a laboratory owner who *knew* his laboratory was submitting medically bogus claims could be relieved of all legal liability for fraud. Shaw Report at 10. Shaw has virtually nothing to say about Porter because it is plain that a laboratory owner who knowingly joins an agreement with a hospital to submit claims that he knows are medically unnecessary has conspired to commit criminal fraud. As with much of her report, Shaw is simply

engaging in legal advocacy and offering legal conclusions that can be argued by Porter's defense attorney in closing arguments. *Frazier,* 387 F.3d at 1263.

Second, in addressing the legal responsibility of Pinnacle, the laboratory Porter controlled, her opinion is based on a citation to 42 C.F.R. § 493.2 (a regulation that sets forth the definition of a laboratory) and a citation to Florida Statutes Section 483.803 (which similarly provides a definition of a clinical laboratory). Shaw Report at 10-11. Drawing on language in these legal authorities describing laboratories as places where materials from the human body are examined in order to provide information for diagnosing and preventing disease, Shaw opines that the job of Pinnacle was only to examine the materials provided to them, and not to make determinations of medical necessity of the tests ordered by clinicians. This "opinion" is nothing more than her own view of the legal conclusions to be drawn from the federal regulation and the state statute. This does not amount to employing "specialized knowledge" to assist the jury in understanding the evidence or any of the facts in issue; at best it is lawyering, which is not the job of an expert witness but of Porter's lawyer, and at worst it is an invasion of the Court's responsibility to instruct the jury on the applicable law. As Judge Covington observed just a few months ago, a person's legal obligations under federal law are "a matter for instructions from the trial court and not properly a subject for testimony by an expert witness." *Spartan Securities*, 2020 WL 7024885, at *7.

In bullet point 7 of her summary, Shaw opines that "[t]he claims described in the Indictment are not fraudulent [but] amount to no more than a possible breach of

9

contract claim." In the body of the report, Shaw describes the case law distinguishing fraud from breach of contract and goes on to explain that in order to find fraud, "[t]here must be some level of prior intent." Shaw Report at 19-20. This "opinion" is almost indistinguishable from the legal argument Porter made in his motion to dismiss: "Even if the Hospitals potentially breached their contracts with the health plans by being reimbursed for uncovered services, that is not a crime." D.E. 246, at 10. In fact, to support her point, Shaw's report even describes the holdings in the two cases, *United States v. Soler* and *United States v. Chaplin*, that Porter cited following the quote above. This does not remotely qualify as expert testimony. This Court will provide the definition of what constitutes fraud in its jury instructions. Moreover, a witness cannot get up in front of a jury and opine—with the full authority of an expert—that the Government's fraud theory is legally deficient because there is insufficient evidence of fraudulent intent. Here the point the Eleventh Circuit made in *Frazier* is especially apt: expert testimony is unhelpful when it merely consists of factual and legal conclusions that lawyers will argue in closing argument.

> 2. **Shaw lacks the qualifications to opine on whether claims submitted by the rural hospitals contained material misrepresentations, and fails to provide a reliable methodology for these opinions**

Bullet points 5-6 in Shaw's summary are that the rural hospitals "did not misrepresent the identity of the reference laboratories" and "Pinnacle did not conceal its identity from payers." The topic of what information the insurers would have expected to receive in the claims submitted by the rural hospitals, and whether the

10

claims contained material misrepresentations or omissions in light of the agreements between the hospitals and the insurers, is an appropriate subject for expert testimony. The Government's expert, Dr. Peter Kongstvedt, addressed these topics in his report, and indeed a good deal of Shaw's report appears to be directed at rebutting Dr. Kongstvedt.

However, the fact remains that Shaw plainly does not possess the qualifications to offer expert testimony on these subjects. Shaw is a lawyer in private practice who, according to her resume, "represents healthcare clients in government investigations and enforcement actions" involving various federal health care-related statutes. She assists in responding to government investigations, including responding to search warrants, subpoenas, requests for information, and other enforcement activities. Put another way, Shaw is primarily an advocate for her clients in responding to government investigations and allegations of potential wrongdoing in the health care space—certainly an honorable calling, but hardly one that makes her an independent expert qualified to render opinions on behalf of a criminal defendant charged by the government with fraud. Viewed in light of her other inadmissible legal opinions, it seems apparent that Shaw's testimony—even on topics that would otherwise be appropriate for expert opinion—is designed to place a defense lawyer on the stand to offer evidence in the guise of an expert. Porter's lawyer may argue such points to the jury in his opening and closing, but Shaw may not.

Even apart from her role as a defense advocate for health care clients, Shaw lacks the required qualifications to weigh in on the issues surrounding the submission of claims by rural hospitals to insurers or the insurance contracts. In regard to transactional work, she claims to have "extensive experience in analyzing and structuring complex health care arrangements" so as to comply with state and federal fraud and abuse statutes, but one searches her resume in vain for any specific examples of experience with the terms or scope of contracts between private insurers and providers, not to mention the process of claim submission that is at the heart of this case. Nor do her presentations or publications offer any clues, as they deal with subjects such as DOJ enforcement actions, HIPAA, medical marijuana, and general contract negotiations.[1] Simply having experience in "health care-related transactions" does not qualify Shaw to testify as an expert on whether there were misrepresentations to insurers in this case any more than an experienced cardiologist would be qualified to testify as an expert in a case involving alleged podiatric malpractice. The Court must consider Shaw possesses the qualifications needed "to testify competently regarding the matters [s]he intends to address." *Clena Invs,* 280 F.R.D. at 661 (S.D. Fla. 2012). Shaw roundly fails such an evaluation.

Furthermore, Shaw fails to provide any explanation for how she reaches her opinions about the lack of misrepresentations by the rural hospitals and the absence

---

[1] After 2006, all of Shaw's listed publications are law firm client alerts—hardly the kind of independent scholarship that marks the development of expertise that qualifies one to come before a jury as an expert witness.

of Pinnacle concealing its identity from insurers. At the top of page 13, Shaw purports to rebut Dr. Kongstvedt's opinion that the defendants engaged in misrepresentations by submitting lab testing claims under the NPI of the hospital and declining to identify the independent laboratories that performed the tests. On this point, Shaw simply says the language of the Putnam-RightCHOICE contract providing for reimbursement for services "available from Hospital" is ambiguous, and would permit the hospital to submit claims that were "made available" through a reference laboratory. In stark contrast to Dr. Kongstvedt—who conducted a detailed analysis of the lab claim datasets, the (limited) circumstances under which a health care provider may bill for services provided by another provider, the relationship between Medicare regulations on this subject and the provisions of private payor contracts (Kongstvedt Report at 39-45)—Shaw just offers her own *ipse dixit*.

    Elsewhere, Shaw addresses a core aspect of the Government's case—that the purpose of the scheme was to take advantage of the higher in-network reimbursements offered under the insurers' contracts with rural hospitals—by saying simply that when a rural hospital submits claims under its own NPI for lab tests conducted at independent laboratories, "[p]ayment will be higher, but this does not mean that there is a scheme to take advantage of the in-network contracts." Shaw Report at 12. Again, her report lacks any explanation of why this is so, how Shaw came to this conclusion (other than relying on her perspective as a health care defense attorney), or what materials Shaw relied on.

13

Shaw provides more information concerning her opinion that Pinnacle did not conceal its identity as the reference lab for Putnam Hospital from the insurers. On page 18, she cites to Pinnacle submitting documents containing its logo to certain insurers in connection with pre-payment reviews and audits. This, she claims, put the insurers on notice that Putnam was billing for lab services actually provided by Pinnacle. But this evidence hardly supports her opinion or renders it reliable as a general statement of Pinnacle or Porter's lack of concealment: these submissions occurred after Putnam had already been billing the insurers for quite some time *without* revealing the identity of Pinnacle or any other reference lab, and this evidence relates to only one of the three rural hospitals that the Government alleges submitted fraudulent claims to insurers for lab tests performed by Pinnacle. In short, Shaw's purported opinions on these core issues are utterly unexplained and lack foundation, rendering them unreliable and therefore inadmissible. *Frazier*, 387 F.3d at 1281.

### 3. Shaw's opinions about Porter's intent are inadmissible

Shaw baldly contends that "[t]here was no intent by James Porter, HLP or Pinnacle to conceal the identity of Pinnacle as the reference laboratory that performed the laboratory testing for the Rural Hospitals." Shaw Report at 19. Later, after describing the difference between fraud and breach of contract (in an inadmissible portion of her opinion, as illustrated above), she explains that fraud requires "some level of prior intent." She then goes on to say that the record contains no evidence that the Porters, HLP, or Pinnacle engaged in a scheme or artifice to

14

defraud, thereby connecting the absence of evidence to the requirement of intent to defraud.

Any opinion by Shaw that Porter lacked criminal intent is squarely foreclosed by Federal Rule of Evidence 704(b), which provides that an expert "*must not* state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." *See also Alvarez*, 837 F.2d at 1031. There is no question that intent to defraud is an element of the wire fraud and health care fraud offenses that underlie the conspiracy with which James Porter is charged. *See United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009). Rule 704(b) could not be clearer: Shaw cannot express any opinion about Porter's lack of criminal intent, as that is exclusively for the jury to determine.

B. **C. Ross Berry's Opinions Should Be Excluded**

Counsel for the Porters submitted what purports to be an expert report of C. Ross Berry, the President and Principal Consultant at Shandon Enterprises, which is described on Berry's resume as a business advisory group. Berry has also served as the CEO of hospitals and in other executive positions in the health care field. This cursory three-page report, bereft of any opinions, bases, or conclusions at all, is not worthy of being called an expert opinion. It is simply advocacy.

To the extent Berry expresses anything resembling an expert opinion, it appears to be that hospitals, and particularly rural hospitals, outsource many of their services, both in the clinical and non-clinical areas. A few of the many examples given by Berry include staffing of medical specialties, ambulance services, laundry,

15

billing, legal, information technology, and laboratory services. This is "frequently undertaken" and is driven by factors such as compressed profit margins and the need to fill a gap and prepare for a more permanent solution.

It is perhaps too obvious to require citation to authority that a prerequisite to a witness testifying as an expert is the expression of some opinion about a matter in issue. Berry's report offers nothing in the form of an opinion, but instead just some observations about the frequency of outsourcing. Presumably the point of Berry's testimony is to reinforce the notion that rural hospitals contracting with reference laboratories to perform urine and blood testing on behalf of non-patients living all across the country is normal and routine, just like outsourcing physician staffing, laundry, legal services, and information technology is normal and routine. But this case is not about the practice of hospital "outsourcing" in general—as the Superseding Indictment alleges, it is about very specific plans set up by rural hospital operators and independent laboratory operators to perform testing at the independent labs and bill them through the hospitals in order to take advantage of generous reimbursement rates from insurers. Nothing in the brief report supplied by Berry even remotely touches on that issue or offers anything that could possibly help a jury understand the evidence or determine a fact in issue. Simply put, this is not an expert opinion, and Berry should be precluded from testifying.

## CONCLUSION

For the foregoing reasons, the Government's motion to strike portions of Elizabeth Shaw's expert opinions, and all of C. Ross Berry's expert opinion should be granted.

        Respectfully submitted,

        KARIN HOPPMANN
        Acting United States Attorney

By:  */s/ Tysen Duva*
        TYSEN DUVA
        Assistant United States Attorney
        Florida Bar No. 0603511
        300 N. Hogan Street, Suite 700
        Jacksonville, Florida 32202
        Telephone:  (904) 301-6300
        Facsimile:   (904) 301-6310
        E-mail:  Tysen.Duva@usdoj.gov

        DANIEL KAHN, ACTING CHIEF
        U.S. DEPARTMENT OF JUSTICE
        CRIMINAL DIVISION, FRAUD SECTION

By:  */s/ James V. Hayes*
        JAMES V. HAYES (FL Bar # A5501717)
        Senior Litigation Counsel
        GARY A. WINTERS (FL Bar # A5501852)
        Trial Attorney
        United States Department of Justice
        Criminal Division, Fraud Section
        1400 New York Avenue, NW
        Washington, DC 20005
        Tel: (202) 598-2382
        Email: Gary.Winters@usdoj.gov
                James.Hayes@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on March 16, 2021, a true and correct copy of the foregoing was filed and served on all counsel via the CM/ECF system.

>　　　　　　　　　　　　　*/s/ Gary A. Winters*
>　　　　　　　　　　　　　GARY A. WINTERS
>　　　　　　　　　　　　　Trial Attorney
>　　　　　　　　　　　　　Criminal Division, Fraud Section