```
              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                     JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,        Jacksonville, Florida

              Plaintiff,          Case No. 3:20-cr-86-TJC-JBT

   vs.                            April 27, 2021

JORGE PEREZ, et al.,             10:02 a.m.

              Defendants.         Courtroom No. 10D
_____
```

```
                  MOTION AND STATUS HEARING
          BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
                 UNITED STATES DISTRICT JUDGE
```

COURT REPORTER:

        Shannon M. Bishop, RDR, CRR, CRC
        221 North Hogan, #150
        Jacksonville, FL  32202
        Telephone:  (904)549-1307
        dsmabishop@yahoo.com


    (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

      **ANDREW TYSEN DUVA, ESQ.**
      US Attorney's Office - FLM
      300 North Hogan Street, Suite 700
      Jacksonville, FL  32202

      **GARY A. WINTERS, ESQ. (via telephone)**
      **JAMES V. HAYES, ESQ.**
      United States Department of Justice
      1400 New York Avenue, N.W.
      Washington, DC  20902


COUNSEL FOR DEFENDANT JORGE PEREZ:

      **THOMAS M. BELL, ESQ.**
      Thomas M. Bell, PA
      301 West Bay Street, Suite 1460
      Jacksonville, FL  32202

COUNSEL FOR DEFENDANT RICARDO PEREZ:

      **RICHARD J. LANDES, ESQ.**
      Richard Landes, Esq.
      736 2nd Street North
      Jacksonville Beach, FL  32250

COUNSEL FOR DEFENDANT AARON DURALL:

      **BRIAN T. RAFFERTY, ESQ.**
      Polsinelli PC
      1201 West Peachtree Street NW., Suite 1100
      Atlanta, GA  30309

      **DONALD FRANKLIN SAMUEL, ESQ.**
      Garland, Samuel & Loeb, P.C.
      3151 Maple Drive
      Atlanta, GA  30305

COUNSEL FOR DEFENDANT JAMES F. PORTER, JR.:

      **SETH SCHWARTZ, ESQ.**
      **ALBERT J. TASKER, IV, ESQ.**
      Schwartz Law Group, PA
      10365 Hood Road, Suite 105
      Jacksonville, FL  32257

COUNSEL FOR DEFENDANT SEAN PORTER:

**CALEB D. ROWLAND, ESQ.**
Rowland Law
2130 Riverside Avenue
Jacksonville, FL  32204

COUNSEL FOR DEFENDANT CHRISTIAN FLETCHER:

**STEVEN H. SADOW, ESQ.**
Steven H. Sadow, PC
260 Peachtree Street NW, Suite 2502
Atlanta, GA  30303

**VINCENT ALBERT CITRO, ESQ.**
Law Offices of Mark L. Horwitz, PA
17 East Pine Street
Orlando, FL  32801

COUNSEL FOR DEFENDANT NEISHA ZAFFUTO:

**JOSHUA SABERT LOWTHER, ESQ.**
Lowther Walker LLC
Centennial Tower
101 Marietta Street NW, Suite 3325
Atlanta, GA  30303

COUNSEL FOR DEFENDANT AARON ALONZO:

**DARCY D. GALNOR, ESQ.**
Galnor Shumard, P.A.
121 West Forsyth Street, Suite 610
Jacksonville, FL  32202

COUNSEL FOR DEFENDANT NESTER ROJAS:

**PHILIP ROBERT HOROWITZ, ESQ.**
Law Office of Philip Robert Horowitz
990 Biscayne Boulevard, Suite #O-903
Miami, FL  33132

1              P R O C E E D I N G S

2    April 27, 2021                              10:02 a.m.

3                         - - -

4              COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Timothy J. Corrigan presiding.

7              Please be seated.

8              THE COURT:  Well, good morning.  I -- when we set

9    this case for a hearing on April 27th, I think we did so almost

10   a year ago.  And, of course, I had hoped that we would be free

11   of our COVID restrictions at this -- at this time, but we're

12   not.

13             We have recently -- probably starting February 1st,

14   we started having more in-person hearings.  We resumed jury

15   trials in March.  As a matter of fact, there are at least one

16   and maybe two jury trials going on in the building right now,

17   and -- but we have kept -- based on the advice of our

18   epidemiologist who consults with the court, we have kept our --

19   the rest of our protocols in place.  Everybody wears a mask.

20   We try to spread people out as much as we can.

21             And, of course, this case has a lot of lawyers and a

22   lot of parties.  And so we're doing the best we can to keep

23   everybody spread out.  And we're going to wear masks.

24             But we don't want anybody to feel uncomfortable.  And

25   if anybody does, you know, please let us know and we'll try to

1   figure out another way to do this.  We -- and so I -- I

2   don't -- and so I think we're okay.  But if you feel

3   differently, please let me know.

4            And, of course, I know a number of persons, including

5   myself, have been vaccinated.  And so that's a comfort as well,

6   but -- and I think all the court staff, so...

7            Anyway, we're going to proceed today.  And the way

8   we're going to do it is that I'll let the -- since the

9   government is kind of on one side of the -- of the courtroom

10  here, I'll let the government, if comfortable doing so, remain

11  at their table while they're speaking.

12           I'm going to ask on the defense side -- if you're the

13  one speaking, I'm going to ask you to come up to the podium,

14  because I don't think we'll be able to see or hear you as well

15  without doing that.

16           I'm sometimes asked if you can take your mask off

17  when you're speaking.  And the answer is if -- the preference

18  is to keep it on.  But if it interferes with your ability to

19  speak or if you really feel like it's better for you to take it

20  off, I'm not going to -- not going to object to that, so -- so

21  that's how we're going to proceed.

22           And let me go ahead and open the record.  This is the

23  case of *United States versus Perez, et al.*, 3:20-cr-86.  And

24  let me go ahead and get appearances here.

25           And I'll start with the government.

1          MR. DUVA:  Good morning, Your Honor.  Tysen Duva for

2    the government.

3          MR. HAYES:  Good morning, Your Honor.  Jim Hayes for

4    the government.

5          THE COURT:  And who's on the phone?

6          MR. WINTERS:  Good morning, Your Honor.  Yes.  Good

7    morning, Your Honor.  It's Gary Winters for the government.

8          THE COURT:  All right.  And, of course, we -- I'm

9    allowing Mr. Winters to appear by phone because of a medical

10   situation that seemed appropriate to allow him to do so, so...

11         All right.  Let's start with the attorneys for Durall

12   and Fletcher, please.

13         MR. SAMUEL:  Excuse me.  My name is Don Samuel from

14   the Atlanta Bar.  I represent Aaron Durall, along with Brian

15   Rafferty, who is lead counsel.

16         MR. RAFFERTY:  Good morning, Your Honor.  Brian

17   Rafferty for Mr. Durall.

18         THE COURT:  Good morning.

19         MR. SADOW:  Good morning, Your Honor.  Steve Sadow

20   for Mr. Fletcher, and Vince Citro.

21         MR. CITRO:  Good morning, Your Honor.

22         THE COURT:  Good morning.

23         All right.  What about James Porter, please?

24         MR. SCHWARTZ:  Seth Schwartz on behalf of James

25   Porter.

1          MR. TASKER:  Albert Tasker on behalf of James Porter.

2          THE COURT:  And what about Sean Porter, please?

3          MR. ROWLAND:  Good morning, Your Honor.  Caleb

4    Rowland on behalf Sean Porter.

5          THE COURT:  All right.  And Ms. Zaffuto.

6          MR. LOWTHER:  Good morning, Your Honor.  Joshua

7    Lowther for Neisha Zaffuto.

8          THE COURT:  Defendant Alonzo?

9          MS. GALNOR:  Good morning, Your Honor.  Darcy Galnor

10   on behalf of Mr. Alonzo.

11         THE COURT:  Ms. Galnor.

12         Mr. Bell, you're -- of course -- do you pronounce it

13   Jorge Perez?

14         MR. BELL:  He tells me Jorge Perez, Your Honor --

15         THE COURT:  Jorge Perez.

16         MR. BELL:  -- is how you use that.  And he is

17   appearing by phone for medical conditions as well.  He's

18   executed a waiver of appearance as well.

19         THE COURT:  Okay.  Mr. Landes.

20         MR. LANDES:  Richard Landes appearing on behalf of

21   Ricardo Perez, who is present here in court.  Good morning,

22   Judge.

23         THE COURT:  Good morning.

24         And Mr. Rojas.

25         MR. HOROWITZ:  Good morning, Your Honor.  Phil

1   Horowitz on his behalf.  And pursuant to docket entry 292, we

2   filed a waiver of his appearance.

3           THE COURT:  All right.  Did I miss anybody?

4           Okay.  So let's -- let me circle back.  If your

5   client is present in the courtroom today, you don't need to say

6   anything.

7           If your client has waived appearance, which I

8   permitted, and filed a written waiver -- let me just make sure

9   I've -- I've got those.  So if your client is present, then

10  they're present.  And I'll understand that.  So let's start

11  again with the waivers, just to make sure I got them all.

12          Who's on a waiver?  Mr. Bell.

13          MR. BELL:  Mr. Perez -- Jorge Perez has filed a

14  waiver.  And he is participating by phone.

15          THE COURT:  Okay.  All right.

16          MS. GALNOR:  Your Honor, Mr. Alonzo, we filed a

17  waiver as well.

18          THE COURT:  All right, Ms. Galnor.

19          MR. HOROWITZ:  And Mr. Nester Rojas, once again, Your

20  Honor.

21          THE COURT:  Okay.  Other than that, all clients are

22  present?

23          MR. SAMUEL:  Yes, Your Honor.

24          THE COURT:  Okay.  All right.  We're here today with

25  a fairly big agenda.  We have a number of motions before the

1  Court.  Before we -- before we address how we're going to

2  proceed -- and I did get an e-mail this morning from, I

3  believe, Mr. Landes suggesting an order of a way to proceed.

4  We'll talk about that in a moment.

5        Let me just say for the record that the Court, in

6  preparation for the hearing, has read, of course, the

7  superseding indictment.  And then I have read every motion and

8  every response to the motions.

9        A number of you have adopted motions.  And everybody

10 is going to be able to adopt any motion they want to.  And the

11 rulings will pertain, of course, to those who have adopted.

12       In addition to that, I have read -- I will not claim

13 to have read cover to cover, but I have read certainly portions

14 of the expert opinions in each case where there's a *Daubert*

15 challenge.

16       We have a number of experts where there was no

17 *Daubert* challenge, but, obviously -- and I did take a look at

18 those just to see what the difference was.

19       But I have -- in addition to reading your *Daubert*

20 motions and responses, I have also read portions of the

21 reports.  And, of course, I've had some good help to help me to

22 digest that material.

23       And so I think I have read everything that I could

24 and that was humanly possible over the last several days.  And

25 so as we talk about these things -- I mean, we've got a lot of

1    motions.

2            As we talk about these things, I'm going to be -- of

3    course I want to hear from the parties, but I also want to --

4    as much as we can, to cut to the chase, because we obviously

5    can't spend an hour on each motion.  That's just not going to

6    work, so -- and some of them probably deserve more time than

7    others.

8            And so what I'm going to also ask you to do is -- I

9    assume there will be a primary spokesperson for each motion.

10   And unless -- I'll probably, at the end of the presentation --

11   this will be on the defense side.

12           At the end of the presentation of the primary

13   speaker, I will ask if any other counsel wish to be heard.  But

14   I'm going to really encourage you not to feel like you have to

15   be heard unless you have something else to say other than what

16   the person has already said or other than what's in the

17   writings.  So we'll -- we'll try to handle it that way.  We'll

18   see how it goes.

19           I don't have any particular time frame for this,

20   other than we'll just keep going.  We'll take a break when we

21   need to.  And if we are still here past a reasonable lunch

22   hour, we'll take a lunch break.  And, you know, we'll just take

23   as long as it takes.  But we'll also try to be as efficient as

24   we can.

25           And then at the end of this -- at the end of the day,

1    I do want to carve out some time to talk about where we are in

2    the case.  We've got pending deadlines.

3              Whether those deadlines remain realistic -- whether

4    the -- whether the COVID protocols play into a trial -- when we

5    should have this trial, given that it's a multi-defendant case

6    where there's going to be lots of people, should we be taking

7    that into account for the September date, and whether we'll

8    still be -- where we'll be in that process in September.

9              So we'll have that discussion at the end.  And any

10   adjustments that need to be made, we'll talk about that at that

11   time.  So that's how we're going to proceed.

12             Now, with respect to the order in which we're going

13   to proceed, I do appreciate the help that Mr. Landes' e-mail

14   gave me.  I had already constructed an order to go in.  And I'm

15   probably going to stick to mine.  It's not that much different

16   than what's here.

17             But the other thing about this list is it doesn't

18   have all the motions in it.  So I want to obviously try to at

19   least make sure we're addressing all of the motions that are on

20   file.

21             So I'll probably go in the order in which I had

22   previously decided to go.  And unless somebody -- you know,

23   sometimes the order that you-all give me is based on some type

24   of decision-making, in terms of whether there's been an

25   announcement, whether there's been some agreement on something

1    or another.

2         And if that's the case, I'm happy to hear from

3    anybody, but -- but unless that's the case, I'm going to

4    probably go in the order that -- that I had picked out for

5    myself.

6         So let me just -- I'll just pause here.  Is there any

7    announcement or any -- any limitation on the motions that have

8    been filed?  Or should the Court just proceed?

9         MR. DUVA:  Your Honor, the government -- there's no

10   agreement on how to proceed.  The government assumed the Court

11   would proceed as it saw fit.

12        THE COURT:  Okay.  Okay.  All right.  So here's how

13   we're going to proceed.  The -- we're going to first discuss

14   the *Brady* motion.  We're then going to discuss the motions to

15   dismiss.

16        And the order of that, I'll -- probably the motion by

17   Durall and Fletcher first, and then the motion by Zaffuto, and

18   then the motion by Porter -- the two Porters.  I think those

19   are the three.  Yeah.

20        Then we'll talk about the motions for bill of

21   particulars and we'll do -- I'll tell the order when we get

22   there.

23        There's a motion -- the preliminary motion to sever.

24   I saw that it was -- there had been some adjustment to it, but

25   it wasn't entirely clear to me.  When we get to it, we'll talk

1    about where we are on that motion.

2         There's a motion to strike surplusage.  There's a

3    motion for a *James* hearing.  There's a government motion in

4    limine.  And then there's the *Daubert* motions.  That's my

5    proposed order of proceeding.  And so unless there's any other

6    preliminary matters, we're going to go ahead and get going

7    here.

8         All right.  Then -- then I'm on the *Daubert* motion.

9    Which -- who on the defense is going to speak to that motion?

10        MR. SAMUEL:  *Brady*?  The *Brady* motion, Your Honor?

11   You said *Daubert*.  I --

12        THE COURT:  *Brady*.  Sorry.

13        MR. SAMUEL:  Your Honor, I would feel more

14   comfortable taking my mask off.

15        THE COURT:  That's fine.

16        MR. SAMUEL:  I just get incredibly overheated for

17   some reason.

18        THE COURT:  That's fine.

19        MR. SAMUEL:  I have been vaccinated twice and all,

20   so...

21        THE COURT:  That's fine.  All right.  And --

22        MR. SAMUEL:  I appreciate it.

23        THE COURT:  -- we'll try to crank up the

24   air-conditioning a little bit.  It is a little bit warm in

25   here.

1        MR. SAMUEL:  Yeah.

2        THE COURT:  All right.  And even though counsel have

3    made appearances, go ahead -- when you start to speak, go ahead

4    and reintroduce yourself and who you represent, please.

5        MR. SAMUEL:  All right.  Your Honor, my name is Don

6    Samuel, S-a-m-u-e-l.  I'm from the Atlanta Bar.  And I'm here

7    with Brian Rafferty, who's lead counsel in the case.  I'm just

8    arguing the motions.  We represent Aaron Durall, who is present

9    in the courtroom.

10        With regard to the *Brady* motion, I know you said

11    it -- you preferred one counsel to be lead.  Mr. Sadow, who

12    represents Chris Fletcher, is a co-author of this.  And we

13    really divided responsibilities both in the drafting of the

14    motion and in the presentation to the Court.  So we'll both

15    take half the amount of time that you thought we would take.

16        THE COURT:  All right.

17        MR. SAMUEL:  And so you won't be having to listen to

18    any repetitive portions at all.  My argument is much more

19    focused on some of the legal issues and principles.  Mr. Sadow

20    is a master of the discovery.  And we'll talk about some of the

21    specifics, if that's okay.

22        Do you have a sense of how much time you're thinking,

23    I mean, just a ballpark or...

24        THE COURT:  Well, I mean --

25        MR. SAMUEL:  Whatever we think is --

1          THE COURT:  -- you know, if you're going to tell

2    me -- if you're going to tell me what *Brady* says, I think I

3    kind of know a little bit about that already.  And so I

4    wouldn't think that would take all that long.

5          MR. SAMUEL:  Right.

6          THE COURT:  And so I'm -- I'm --

7          MR. SAMUEL:  We'll be efficient.

8          THE COURT:  I don't have a -- I don't have a real

9    sense yet.  But what's going to happen, of course, is that the

10   first few motions are going to take forever, and then we're all

11   going to realize that we got to -- we got to get moving.

12         MR. SAMUEL:  We're hungry.

13         THE COURT:  That's usually what happens.

14         MR. SAMUEL:  We're hungry, right.

15         THE COURT:  Yeah.

16         MR. SAMUEL:  Your Honor, I am not going to do a

17   general explanation of *Brady*.  That would be pointless.  We all

18   know the basic framework of *Brady versus Maryland*.  And that

19   would be incredibly inefficient.

20         But I think in this case there are three aspects of

21   *Brady* that we need to focus on.  One is the definition of what

22   is exculpatory.  We apparently don't agree with the government

23   on that point.  At least their response to us indicates that

24   they don't agree with us as to what is exculpatory.

25         Second, there seems to be disagreement between the

1    defense and the government about the entity or people from whom

2    we are entitled to receive information.

3           And by that I mean, you know:  Where does the

4    government have to seek or obtain the exculpatory information

5    that they have to produce to us?

6           And third is the timing issue.

7           Those are the three basic problems and disagreements

8    we seem to have with regard to *Brady*.

9           It's interesting in this case that all the motions,

10   in a way, deal with the same topic.  I was talking to Mr. Sadow

11   yesterday and I said it's almost like we have four sides of the

12   same coin in the motion to dismiss, the bill of particulars,

13   the *Brady* motion, and the motion in limine that's pending.

14          With regard to the *Brady* motion, what is exculpatory?

15   It is our position that the emails that we filed to you on

16   Friday are the quintessential *Brady* information.

17          The emails were filed in connection with our -- we

18   supplemented our response to the motion in limine.  That's the

19   pleading we attached it to.  There were seven emails that we

20   attached to that which were part of the *Brady* disclosure to us,

21   part of what the government provided to us.

22          And it is our position that in a case such as this,

23   and what this case is about primarily -- almost exclusively,

24   but I'll say primarily, because there's some wiggle room there.

25          Those emails are the essence of the defense in this

1    case.  And yet the government's position appears to be, or at

2    least what they've written in their response certainly

3    implies -- they're really -- they're just -- there's some

4    Rule 16 out there, but it's not exculpatory.

5           Those emails include statements by people from Blue

6    Cross Blue Shield, internal emails between various

7    representatives at Blue Cross Blue Shield, supervisors,

8    executives, albeit in Missouri, who are discussing the Putnam

9    Hospital, which is one of the defendants in this case, the

10   Putnam -- one of the hospitals in this case, their use of

11   reference labs to do the testing and billing it through the

12   hospital.

13          And they explicitly say to one another it's not

14   prohibited by the contract.  All right.  I mean, that is our

15   entire defense in this case.  That's our defense.

16          And yet the government's view, apparently, is it's --

17   that's not exculpatory.  This is -- this is the victim in the

18   case, Blue Cross.  The private entity is the -- this is not a

19   government case.  This is not Medicare or Medicaid or some

20   ephemeral victim.

21          This is the insurance company executives

22   communicating with each other and coming to the conclusion that

23   pass-through billing, using the reference labs to do billing,

24   is legal under the contract.

25          Of course, it's not a crime in and of itself,

1    obviously.  The question is whether it was fraudulent.  And

2    they conclude that they -- that the hospital was permitted to

3    do this under -- under the contract with the hospital.

4             And then they -- the emails, if you read them, you

5    know, they then say, well, what we're going to do is we're

6    going to unilaterally change the contract now, so that we can

7    stop this practice, because we don't want them doing that.

8             So they then -- and that's what they do.  They

9    unilaterally change the contract.  And you'll hear, you know,

10   if necessary, that this actually happened with other private

11   insurers, too.  They also changed their contracts to explicitly

12   prevent this pass-through billings process by which

13   reference -- sophisticated laboratories were doing the

14   confirmatory tests.

15            Judge, this is a -- it took me a long time to

16   understand this.  And if some of this is confusing and you want

17   me to slow down, I certainly will.  But the bottom line is that

18   these emails absolutely authenticated what we were doing,

19   absolutely approved what the hospitals were doing.

20            They explicitly stated it was permissible under the

21   contract; therefore, we should just unilaterally change the

22   contract so the hospitals can't do it anymore.

23            And then they go on and say we need to get -- you

24   know, to see if we can get the U.S. Attorney's Offices

25   involved.  And they even opined with each other, even if

1  there's no crime involved here, maybe they will -- maybe the

2  U.S. Attorney's Offices around the country will help us do the

3  investigation in this case and figure out what's going on.

4          I'm not saying that this is a directed verdict.  But

5  how can anybody look at those emails -- how could the

6  government -- anybody on the government's side have looked at

7  those emails and thought anything other than *Brady*?  It had to

8  have been the first thing that came to their minds when they

9  saw those emails.  So that's part of what we contend is the

10  actual *Brady* information.

11         The second thing is something that Mr. Sadow is going

12  to spend more time talking about, which is the data, which they

13  also learned about -- the government learned about and also

14  claim is not *Brady*.

15         The data is the method by which the hospitals and

16  laboratories would communicate with the insurers, Blue Cross

17  Blue Shield, and would -- it's all done on the computers.  It's

18  all done with, you know, ones and zeros and dots and dashes.

19         But the communication between the hospital, slash,

20  laboratory and the Blue Cross Blue Shield identified the

21  reference laboratories.  Okay?

22         So not only do you now -- and, again, I'm going to

23  pass right over that, because that's Mr. Sadow's.  I'm not

24  going to trespass on his argument.

25         Not only does the government -- excuse me.  Not only

1    does Blue Cross and Blue Shield think it's legal what they're

2    doing, they're being told what's happening by the -- by the

3    hospitals and the laboratories.

4           And the significance of that is not only that Blue

5    Cross knew, because, I don't know, maybe they didn't read it.

6    The significance is that we told them, which is the antithesis

7    of fraud.  We told them it was a reference laboratory.

8           THE COURT:  So the -- I guess the question is that --

9    to the extent these -- this communication and this data is

10   something that you find favorable to the defense, I guess the

11   question is -- or one of the questions would be:  What's the

12   source of it and -- because you're contending that the

13   government had a duty to turn it over as *Brady*, I guess,

14   earlier than it did, because you have it now.

15          But what was -- so, for example, these emails -- and

16   I read the motion, but it's now -- I'm not sure I remember the

17   answer.  Where did these emails come from?

18          MR. SAMUEL:  Well -- the emails?

19          THE COURT:  Yeah.

20          MR. SAMUEL:  Well, the government gave them to us

21   last Friday.

22          THE COURT:  All right.

23          MR. SAMUEL:  Right.  They gave -- I'm sorry.  That

24   may be the wrong day.  Friday or Thursday or Wednesday -- last

25   week.  We filed the motion Friday with the emails.

1          I think it was Wednesday or Thursday we got some of
2    them.  It's been over the course of the last two or three
3    weeks, four weeks.
4          THE COURT:  Right.  But what I'm saying is what was
5    the source -- where --
6          MR. SAMUEL:  I can't tell you where the government
7    got them from.  I don't know for sure.  I assume it came from
8    the U.S. Attorney's Office in Missouri.  And I assume the
9    U.S. Attorney's Office in Missouri got it from Blue Cross Blue
10   Shield.
11         But my assumption is only that, because we -- we --
12   well, there's Bates stamps -- there's some confusion about the
13   Bates stamps.
14         THE COURT:  And so --
15         MR. SAMUEL:  But I want to be clear I don't know the
16   answer to that, because I --
17         THE COURT:  Because -- because there is a civil suit,
18   right?
19         MR. SAMUEL:  That's correct.
20         THE COURT:  And there's a summary judgment motion --
21         MR. SAMUEL:  That's correct.
22         THE COURT:  -- that y'all are interested in and so
23   forth?  Is it likely that that's where the emails came from?
24   Or do you think they came from somewhere else?  Or you just
25   don't know?

1          MR. SAMUEL:  I think that the majority were included

2   in a PowerPoint presentation, which we attached to our motion,

3   which was provided by the defendants in that case to the

4   U.S. Attorney's Office; not in the civil litigation, but to

5   dissuade the U.S. Attorney's Office from going forward.

6          The motion for summary judgment, of course, is in the

7   civil case.  And I think a number of the emails are also

8   included there, all of which were filed under seal.  So it

9   wasn't until literally the eve of this hearing that we were

10  able to see most of those, when the government turned them

11  over.  So they got them somewhere.

12         It may very well be that that question should --

13  better directed to the government, because they gave them to

14  us.  And maybe they know a couple of generations back the

15  provenance of those emails.

16         THE COURT:  All right.

17         MR. SAMUEL:  Can I -- if I can -- and I certainly

18  obviously want to answer all your questions.  There's a third

19  aspect to the "what is exculpatory" that the government seems

20  to disagree with us, and that is the fact that a lot of this

21  information apparently was not given to the government by the

22  insurance companies.

23         And to me that is also exculpatory information.  I

24  say apparently.  I'm going to be very careful not to make

25  representations to the Court that I'm not willing to absolutely

1    vouch for.

2           But there's a lot of information we have discovered

3    was given to the government -- for example, in this case --

4    very late in the game.  And the question is why.

5           If the government sought from the insurance companies

6    everything related to this case, and -- either through grand

7    jury subpoenas or voluntary disclosure, and Blue Cross Blue

8    Shield wasn't revealing this information, either the data

9    stream or the emails or their conclusions about pass-through

10   billing, or the prior contracts that permit -- why was the

11   insurance company not telling the government?

12          We think -- we believe that that failure to reveal

13   that to the government -- it's not the government's fault, but

14   the government now knows that the insurance company was not

15   sending that information.  So that's *Brady* information.  So

16   that's category one.

17          What is exculpatory -- where do we disagree as to

18   what is exculpatory?  It's the -- the hiding of information

19   from the government -- may be too strong a word -- the data,

20   and the emails, and the conclusions of the Blue Cross Blue

21   Shield.

22          And, of course, it's not just these documents.  As I

23   explained in the brief, it's the information.  It's the

24   conclusion of Blue Cross as to what they believed about

25   pass-through billing and the contracts, about what they

1   believed about the legality of what the hospitals were doing,

2   and about their efforts to reform the contracts to make it

3   clear what the hospitals could and couldn't do.  That's the

4   *Brady* information, not the individual e-mail with one sentence.

5           All right.  I mean, the government is like, Well, if

6   you look at this sentence, it's not that exculpatory.

7           That's not the point.

8           The point is that Blue Cross knew that pass-through

9   billing was happening, and apparently thought it was okay under

10  the contract.  So that's category one:  What is exculpatory?

11          Second, from whom we are entitled to get it.  We

12  clearly disagree about that, the government and the defense.

13  And I've cited -- I mean, I just start string-citing cases with

14  fairly long annotations towards the end of the brief talking

15  about the duty of the government not to play ostrich, not to

16  put its head in the sand when they realize that there's

17  exculpatory information out there, and to certainly cooperate

18  with other U.S. Attorney's Offices that are related in the same

19  type of case with the same defendant.

20          We have one defendant who's pled guilty in both --

21  pled guilty, Rule 20'd over to here; you know, one of the

22  coconspirators.  We have -- the hospital is in both cases.

23  They've met together.  They've talked together.  And the agents

24  are all working together.

25          It seems odd that the government would say, well, we

1    don't have anything to do with Missouri.  You know, they're --
2    you know, they're halfway across the country.  And so we don't
3    have a duty to get the information from them.
4           I think not only do they have the duty to get it,
5    they have, in my opinion -- the law, I think, supports my
6    opinion, for what it's worth.
7           They have a duty to affirmatively go to Missouri and
8    say, You need to share the *Brady* information with us.
9           Missouri decided not to prosecute this case.  They
10   declined a prosecution after looking at this information.  They
11   decided, whatever's in their mind, not to prosecute.
12          There's no crime at all, maybe they thought.  It's
13   too weak of a case.  Maybe's what they thought.  Who knows what
14   they thought.
15          But for sure they reach a conclusion that they
16   weren't going to prosecute.  And for the government to say we
17   don't know anything about what's going on in Missouri, we have
18   no duty -- okay?
19          Now -- I can hear them laughing next to me here.  And
20   I apologize for -- if I'm being humorous to them.  But the fact
21   of the matter is they've now turned it all over only because we
22   demanded it, because we started getting hints that this
23   information was out there.
24          And that brings up a topic of -- you know, the
25   government, in their brief, seems to suggest:  What is this all

1    about?  We've turned everything over to them.  We've given them

2    everything.  They've got everything.  What kind of *Brady*

3    violation is it when we've turned over -- everything over to

4    them?

5         The *Brady* violation is they didn't turn anything over

6    to us, not one piece of paper, until Mr. Sadow started making

7    demands and saying, We want to see this supposed PowerPoint

8    that was shown, because we heard about a PowerPoint.

9         We've looked online and PACER.  We've seen a redacted

10   motion for summary judgment.  But the whole guts of it isn't

11   present on PACER.  What's going on in Missouri?  Right?

12        And this is in late March -- Steve -- Mr. Sadow will

13   correct me -- late March, early April.  What is going on?  What

14   is over there?

15        That's when the government went over there -- you

16   know, I don't want to -- well, that's when they did it.  And I

17   don't think there's anything in this record that would support

18   a conclusion that they were going to do it anyways and it was

19   just a coincidence that we asked and that's why they did it.

20        They weren't going to do it, in our opinion.  They

21   had no intention of providing anything from Missouri, not --

22   and I'm not -- this is not an in persona -- not a -- I'm not

23   making an argument personally.  I hope it's not taken that way.

24   And I hope you don't take it that way.

25        But I don't believe the government intended to go to

1    Missouri and get this information and provide it to the defense

2    until we demanded it.

3            So this notion in their response brief, you know, No

4    harm/no foul, they've got everything; in fact, you know, we

5    gave it to them a couple of weeks ago, is a rather odd argument

6    without coupling it with the recognition that it was never

7    going to be given to us until we demanded it.  And it was in

8    the government's possession and not our possession.

9            So it is our position they have an absolute duty to

10   go to Missouri and any other U.S. Attorney's Office in the

11   country that's involved in this investigation of hospitals, an

12   absolute obligation.  They are the government.

13           Especially given our friend on the phone here who's

14   with DOJ who -- I think it's safe to assume is -- is monitoring

15   what's going on in these cases nationwide.  He's on emails

16   coming out of Missouri, coming out of Blue Cross to -- excuse

17   me, yes, coming out of Blue Cross in Missouri straight to

18   Mr. Winters in Washington.  He knows what's going on over

19   there.  And he should.  He's responsible.  He's the DOJ, kind

20   of, you know, the umbrella organization in this -- in this

21   case.

22           So it's all part of the government.  They're all

23   doing this investigation.  And they can't parcel it out and

24   compartmentalize it and say, Well, the information in Missouri

25   is Missouri.  You know, okay, you asked for it.  We'll go get

1    it.

2            There's something going on in Ohio.  The emails

3    reveal that there's stuff going on in Ohio, California.  We

4    don't know where else.  That's the problem with *Brady*.  We

5    don't know what to ask for, which is why we seek the remedies

6    we seek at the end of our *Brady* motion.

7            Also included -- and this is a little more difficult,

8    I recognize, with the -- who has got the duty.  We believe that

9    Blue Cross at this point has the duty.

10           Now, there are plenty of cases that say private

11   parties aren't part of the government, they're not part of the

12   prosecution team.  But this -- Blue Cross Blue Shield isn't

13   like, you know, someone walking in the park who gets mugged.

14           Blue Cross Blue Shield had -- had participated in

15   interviews, participated in the production of information,

16   was -- was intimately involved, the best we can tell, in all

17   aspects of this case with the government.

18           They have former FBI agents working in their -- they

19   call them the SIUs, the special investigation units.  They have

20   a -- you know, they are -- to use the 404(b) lingo, they're

21   inextricably intertwined with the government in this

22   investigation, and -- which is why we seek in our remedies that

23   the government in this case, having first said, Well, Blue

24   Cross never gave us this stuff -- right?  That's one of their

25   arguments in their brief.  We never had this until we got it

1    from Missouri, even though Blue Cross had it -- that we seek in

2    our remedies that Blue Cross should be required to produce

3    anything more along these lines.  They should be subpoenaed by

4    the government or come to court here and say what else is out

5    there.

6              You claim to be the victim in this case.  You know,

7    you had civil cases with millions of dollars in damages, you

8    know, and you have an obligation in this case to produce

9    information that is -- that is exculpatory or that's at all

10   relevant.

11             We don't -- listen, we -- you know, one of the things

12   the government said to us a while back was we'll file 17(c)

13   subpoenas.

14             We filed one, what, in late March?  And right now

15   they've gotten an extension until, like, the end of May or

16   early June to respond, which will probably be when we first

17   start seeing objections.

18             We can't use Rule 17(c) and be ready for this trial

19   anytime this year if that's the government's response.  We're

20   not going to go to Blue Cross.  We're not going to the

21   insurance companies, you know, getting all this exculpatory

22   information.  We're not going to go and do your job for you.

23   You go use your 17(c) subpoenas.

24             And the result of that will be we'll -- you know,

25   respectfully, Your Honor, we'll never try this case in

1  September, because we're going to be fighting with the

2  insurance companies over what they have to produce and, you

3  know, the delays that they're going to cause, as civil

4  litigants are wont to do.

5          So -- and, finally, on this second topic of, you

6  know, from whom are we entitled, you know, I would point out

7  there are cases -- I meant to -- one of the cases in my brief

8  talks about once problems arise in *Brady* the court has the

9  right to believe it's the tip of the iceberg.

10         And I -- and I may have used that language in my

11  brief on it, but I didn't cite the case that said it.  I think

12  it was one of the Third Circuit cases that said once it appears

13  that things are not going as they should, once it appears that

14  things have gone awry for some reason, either a difference of

15  opinion about what's exculpatory or whatever, I'm going to

16  assume it's the tip of iceberg and we're going to get to the

17  bottom of this before trial, which is why I cite, you know, the

18  well-known Southern District of New York case and the D.C., you

19  know, *Ted Stevens* case and all.

20         That's why we seek the remedies we seek.  Let's get

21  it done now, not after trial.  Let's not do this in a 2255 and

22  find out what wasn't disclosed.

23         Third topic, timing.  And then I'm going to, if I

24  can, turn it over to Mr. Sadow to some of the specifics.  The

25  government forthrightly says in its brief that they first

1   started participating with Missouri -- I don't know when the

2   *Byrns* case was, but that was obviously a while back.

3           They first got wind of all this, the PowerPoint and

4   the exhibits, sometime in December -- right? -- which is now

5   five months ago, but more so in January.  There's some

6   reference in their brief to learning about this in December,

7   but then finally, in January, they actually got the PowerPoint.

8           And the significance of the PowerPoint isn't that

9   it's a PowerPoint.  It has all these exhibits embedded in it,

10  as -- you've got the PowerPoint.  And I cite all the slides

11  that have all this exculpatory information in it.  In January

12  they had that.

13          We've had status conferences since then.  We have had

14  a gazillion pages of discovery submitted -- delivered to us

15  since then.  And yet when I began my presentation by saying it

16  is the quintessential *Brady*, it wasn't turned over until we

17  demanded it, demanded whatever it is that's out there that we

18  haven't been given yet.

19          And then it suddenly starts coming, ahh, we're still

20  four months before trial.  What are you -- what's the big beef,

21  is the -- is the government's response now.

22          The big beef is that when something is -- is, in our

23  opinion, and should have been in their opinion, that important

24  and that explosive, they should have taken the phone records

25  that were six trillion pages and put that on the back burner

1   and turned this over to us, and not do nothing for four months,
2   nothing.

3          And that timing issue concerns us.  It concerns us
4   because that is why we believe it never was going to be turned
5   over.  It's not just a coincidence that we filed a motion, you
6   know, and the information is produced.  It was produced because
7   it was *Brady* and they knew it was *Brady*.  They knew it was
8   *Brady*.

9          You can't look at these things and not recognize the
10  exculpatory value of the emails, the data, and the other
11  information in the PowerPoint.

12         So the timing issue is important.  If this is all
13  there is, if there's nothing else out there, which we don't
14  believe, then we're still four months before trial, we're fine.
15  There's still a lot of data.  We're going to have to get the
16  EDI from the different insurers, the EDI from different
17  hospitals, or the billing companies.

18         There's no way there's not more out there.  It
19  couldn't have just been seven emails between them, between the
20  Blue Cross people.  And, again, they're talking about the same
21  problems going on in Ohio.  There's emails with DOJ, all of
22  this stuff still missing from the disclosure to us.

23         And the timing is important.  To just say, you know,
24  here we are four months before trial, no harm/no foul is not an
25  answer.  I would suggest that the Court inquire what was going

1   on during those four months, or what was going on between, you

2   know, January, whatever date it was, you know, and April 24th,

3   whenever it was -- 23rd, when it was produced?

4        So, Your Honor, those are -- that's the outline of

5   our *Brady* argument.  If you want to get into the actual details

6   of other documents, we would like you to.  Mr. Sadow is going

7   to address those.

8        THE COURT:  Well, I -- I'm happy to hear from

9   Mr. Sadow.  I mean, we're -- I mean, I think -- I appreciate

10   your presentation.  But I think we need to get Mr. Sadow up

11   here if he's got something extra to say.  And then we'll go

12   from there.

13        All right.  Thank you.

14        MR. SADOW:  And if the Court will allow me, I'd like

15   to take my mask off.  I, again, am also fully vaccinated.

16        THE COURT:  That's fine.

17        MR. SADOW:  I'm Steve Sadow.  I represent

18   Mr. Fletcher, along with Vince Citro.  Your Honor, I'm going to

19   be very specific, because Mr. Samuel has obviously carried the

20   ball as far as what *Brady* is.

21        I got lucky.  I managed to open up a dialogue with

22   one of the attorneys in the Western District of Missouri in the

23   civil case who referred me to the criminal defense attorney for

24   one of the individual defendants in the Western District of

25   Missouri civil case, what's called the *RightCHOICE* case.

1          And upon talking to that individual, that attorney, I

2     asked him if there was anything that he could share.  And he

3     said, yes, he could share there had been a PowerPoint presented

4     to the Western District of Missouri U.S. Attorney's Office.

5     And that PowerPoint was very strong.  It contained favorable

6     information, *Brady* information.

7          And he was waiting at that point for a decision as to

8     what the Western District of Missouri U.S. Attorney's Office

9     was going to do.

10          That began essentially my e-mail writing to the

11     government in this case, asking them about the PowerPoint.  I

12     was trying to stay on top of what was being filed in the

13     Western District of Missouri, the *RightCHOICE* case, and began

14     asking them about that.

15          The responses that I was getting back essentially at

16     that point was, We're not going to give you the PowerPoint

17     because we don't have to.  We don't have the other documents

18     that you're speaking of.  We're a separate investigation from

19     the Western District of Missouri.

20          And then we got more information, the PowerPoint.

21     After the individual was not to be prosecuted in the Western

22     District of Missouri, that individual reached out and gave us

23     the PowerPoint.

24          So then we first -- that was the first we knew what

25     was in there, the emails, the EDI 837I, which stands for

1    institutional transmissions, the ZirMed software data that was

2    transmitted.  And I began being more focused in my emails.

3           And what concerns us at this point is the

4    presentation of the PowerPoint to the U.S. Attorney's Office in

5    Missouri was on December the 16th of 2020.  This office,

6    according to its response to our *Brady* motion, received it

7    sometime in January of 2021.

8           I've been doing this a long time, and I know the

9    Court's been on the bench for a long time.  I've just got to

10   ask one question:  What are they waiting for?  Why didn't they

11   provide us the information -- if they weren't going to give us

12   the PowerPoint, fine.

13          But why wouldn't they tell us about the favorable

14   information in there in January or in February or in March,

15   when I started writing the emails?  Why was it only in April,

16   just before we were going to have this hearing, that material

17   started coming in?

18          Your Honor set a date for which motions had to be

19   filed.  And, basically, that was based on the idea -- and we

20   don't have a transcript.  But my recollection, and I shared

21   it -- discussed it with other lawyers, is that the government

22   had indicated to the Court that we had about 99 percent of the

23   discovery at the time we had our last conference, which is why

24   the Court set dates that it set both for retained counsel and

25   appointed counsel that still needed more time.

1          But that data never came.  The information never

2     came.  It never got entered into the motions that we filed.

3     The government files a motion in limine to stop us from blaming

4     the victim.  And we don't even know that these emails exist or

5     this data exists.

6          So what's the concern right now, that, for whatever

7     reason, the government doesn't see this as favorable

8     information.  I don't know why, but they don't.  And,

9     therefore, the concern that I raise to the Court is:  What else

10    is out there?

11         But I know what else is out there.  I'm not just

12    speaking that I'm guessing.  There was -- and I have a copy of

13    it if the Court wants to see it.

14         In our motion we talked about:  Is Anthem, is Blue

15    Cross Blue Shield, hiding information from the government?

16         And the answer in the government's response was

17    they're not hiding, but then they don't say anything more than

18    that.

19         There is an FBI 302 -- and I'm sure the Court is well

20    aware of what a 302 is, so -- dated -- September 21st of 2018,

21    there was a conference.

22         Now, this is in the midst of the investigation.  This

23    is September of 2018.  In that conference is an FBI agent --

24    two FBI agents, someone from the Office of Professional

25    Management named Derek Holt, who literally started the

1    investigation back in 2016 which winds up in this case.

2            Mr. Duva; Mr. Winters; Mr. Hayes; a Zachary Zabo from

3    Anthem Special Investigative Unit; Linda Kearney, the in-house

4    counsel for Anthem, which is Blue Cross Blue Shield; and Nate

5    Moore, the attorney representing Blue Cross Blue Shield.

6            And they had a conference.  And at that conference,

7    what the government was asking -- not just Mr. Duva, but

8    Mr. Winters specifically were asking:  What data is transmitted

9    by the hospitals to Anthem, to Blue Cross Blue Shield?

10           And if the Court looked at the memo -- or the 302,

11   you would see they couldn't get an answer.  They kept getting

12   the word -- "We don't know.  We have to check.  We don't know.

13   We have to check.  We don't know.  We have to check.  We'll get

14   back to you."

15           They never did.  They never got back to them.

16           Whether the government didn't follow up or Anthem and

17   Blue Cross Blue Shield didn't give it, we now know what data is

18   in their possession, or should be in their possession, which

19   goes back to this EDI ZirMed data.

20           The government responded to one of my emails by

21   saying, We don't have any documents that reflect that LifeBrite

22   is in any of the information that was turned over to Anthem,

23   Blue Cross Blue Shield."

24           But I do.  I managed now to come forward with it

25   with -- indicating -- and I have documents for the Court and

1    for the government to show them that LifeBrite is mentioned in

2    Putnam County transmissions and that LifeBrite is mentioned in

3    Regional transmissions.

4              This data I managed to get by having someone in India

5    look it up for me to see whether or not it was transmitted in

6    the same way that the Sero data that is in the stuff that the

7    Court has, the PowerPoint and the exhibits.  And it exists,

8    which means it exists in Anthem, and it exists in whoever it is

9    for Regional.

10             This is how it was transmitted.  We don't have it.

11   If we had not gone into this, if we had not gotten lucky -- if

12   I hadn't gotten lucky enough to have a lawyer kind of point me

13   in the right direction, with all due respect to the government,

14   we would never have known this existed.

15             It can't be that way when we're talking about people

16   that are on trial for their liberty.  And our concern is that

17   there are other things like this that the -- for whatever

18   reason the government chose not to follow up on, that may be in

19   the files of the insurance companies, or the insurance

20   companies just chose not to disclose.

21             I'd almost like to make an exhibit of the memo,

22   because it's amazing.  The government asked specifically:  What

23   information did you get?

24             And they said, Well, we generally put it on a form.

25             No, no.  What information did you get?

1        Well, we don't know.  We'll have to look into it.

2   We'll get back to you.

3        They never did.  And if we're going to have a process

4   where the Court -- and I know wants to give us nothing but a

5   fair trial, assuming we get to that point, we've got to make

6   sure that we have all of the evidence that is favorable to the

7   defense that we can put forward.

8        We have now -- I've also uncovered in that same 302

9   the definition of what we have called a type of bill 141, which

10  is loosely referred to as nonpatient.  And I'm not going to get

11  into all that at this point.

12       But they ask about that when they're on the phone

13  with these people.  And the definition that they give during

14  that is different than their expert's definition now and other

15  statements that we've gotten.

16       So there is a considerable amount of -- of evidence

17  out here that deals with the transmission of this EDI data,

18  these emails.

19       And I can tell you we don't have all the emails that

20  have -- in there, because I've managed in some form or fashion

21  to get some of those.  And the government didn't turn them over

22  to me.

23       What has happened is the government, because they

24  were pushed, went to the Western District of Missouri U.S.

25  Attorney's Office and said, What do you have that we don't

1    have?  And they received it.  But they've made no effort -- and

2    we think -- this really is a joint investigation.

3          If you saw this -- this 302 and go back to SIU, the

4    Special Investigative Unit, Blue Cross Blue Shield of Florida

5    was involved in this from the very beginning.  They've been

6    working this case since 2016.  We're suggesting that there is

7    data that the insurance companies have that the government

8    should already have but doesn't.

9          And what I'm asking the Court to do is basically call

10   the insurance companies in and say, Look, you're going to

11   supply this data.  You're going to supply the data at this

12   timetable.  We don't want to hear anything more about how broad

13   it is and so forth.  Supply it immediately.  Turn over the

14   emails that deal not just with Anthem and Putnam, RightCHOICE,

15   but with Regional, with CGH, all the hospitals, that we get to

16   the bottom of all of this, and whether this information is

17   available and can be used by the defense.

18         And that's -- to sum it up, do I think the government

19   is engaging in any misconduct?  I do not.  In fact, I was

20   trying to do everything I could to make sure it was clear to

21   them in my emails that I wasn't accusing them, that I believed

22   that it existed out there and it was their obligation to get

23   it.

24         Do I believe that there is something going on with

25   the insurance companies?  150 percent.  They've got information

1    they don't want other people to know about, particularly the

2    government.

3           That's why all these exhibits are sealed in the

4    RightCHOICE civil litigation.  Those exhibits are exactly what

5    it is that we're trying to get our hands on.  But they're

6    sealed.

7           And, in fact, even the fact that the PowerPoint has

8    been made available, which is not part of that civil, they have

9    now filed a motion to show cause, RightCHOICE, BCBS, Anthem, in

10   the civil investigation, to show cause why the defense in that

11   case shouldn't be held in contempt for allowing the information

12   to go into a PowerPoint that was presented to the government in

13   order for the government to decline prosecution in the Western

14   District of Missouri.

15          That's the extent that they're doing now to try to

16   make sure some of this information doesn't get out.  So I'm

17   asking the Court, with the Court's help, to tell the government

18   it appears that this information is favorable, you're a little

19   stingy in what you think *Brady* is.  We want -- we want the

20   insurance companies to come forward with all of this

21   information, and we want you to get it from them.

22          As Mr. Samuel said, if we go a subpoena duces tecum,

23   a pretrial subpoena, we'll be lucky if we get the objections

24   decided by July or August, let alone start getting the data.

25          THE COURT:  What is the status of it, the Rule 17?

1          MR. SADOW:  They've all -- every one has so far filed

2    for an extension in which to determine whether they're going to

3    comply or file objections.  In my personal communications with

4    them, we're going to get nothing but objections.  They're not

5    going to turn over what we've asked for so far.  They're going

6    to object.

7          THE COURT:  And what's the timing on that, in terms

8    of --

9          MR. SADOW:  Right now they've asked for, I believe,

10   the end of May.

11         THE COURT:  And that's -- and I should know this.

12         MR. SADOW:  That's for the in-network versus

13   out-of-network actual documentation of different rates.  One of

14   the counsel for insurance companies said, You have no idea how

15   many different rates.  It's not the same.  It varies per

16   contract.  You're talking about thousands and thousands of

17   pages, if we ever have to turn over anything to you.

18         THE COURT:  All right.  Thank you.

19         MR. SCHWARTZ:  Judge, I just have something really

20   brief to add, please.  Seth Schwartz on behalf of James Porter.

21   I've also been fully vaccinated, sir.

22         Just real quick, since the government made contact

23   with my client in May of 2019, I've been asking for the native

24   billing, the actual raw billing that was sent from the biller

25   to the health care companies.

1          I repeatedly asked.  I've asked everybody involved in

2     this case on the prosecution side, although I may not have

3     asked Mr. Hayes directly, but I know I've spoke with Mr. Duva

4     repeatedly and Mr. Winters about that.

5          What they told me is that they don't have it.  And

6     then recently I received a phone call from Mr. Winters and

7     Mr. Hayes on the call, in response to a motion that I filed

8     indicating that we still didn't have the billing in a billing

9     fraud case.

10          They told me at that point there's 12 Excel

11     spreadsheets that are in the government's production -- I had

12     only seen two of the 12 -- but that is the native billing.

13     These are some of the biggest companies in the world.  And the

14     government's taken the position that the native billing, the

15     raw data, is kept and transmitted through Excel spreadsheets.

16     I said okay and continued to essentially ask for the native

17     billing.

18          I have approximately -- Bates numbers that are

19     approximately 210,000 Bates numbers, although they're not all

20     sequential.  But I am in possession of a good amount of native

21     billing that I recently discovered as part of the civil

22     litigation.

23          I am under a protective order in the Western District

24     of Missouri and the civil case.  So I have been unable to

25     release that information to the defense and to the government.

1    But I have some of it with me here.  And that billing --

2    essentially the way it works, with each text file is a packet

3    of billing that goes out.

4         Sometimes those pages can be as small as 10 or 12

5    pages.  And it can be as large as 250 pages.  And on those

6    pages, it lists at the top of each packet, the beginning of

7    each packet, the submitters, which are essentially the

8    reference laboratories in this -- in this case.

9         There's a number of reference laboratories that are

10   listed in the billing that I have.  Not all of those

11   individuals are codefendants in this case.  But, for instance,

12   today I have a pile with LifeBrite on it and a pile with

13   Pinnacle on it.  Again, I am unable to release that information

14   due to the protective order.

15        Let me talk about that for a second.  So in February,

16   a little over two months ago, I started negotiating with Blue

17   Cross pursuant to what the Court wanted us to do, and come up

18   with a consent order on how to modify the protective order in

19   the Missouri case so that the information could be used in this

20   case.

21        Blue Cross basically said, Sure, we'll figure it out.

22   What we're worried about is protected health information,

23   individuals' information that may be on these documents, which

24   is, you know, names, date of birth, Social Security numbers,

25   addresses, things like that.

1            Recognizing the vast volume of the billing, which I

2    estimated to be probably north of a million pages, it's

3    impossible to go through and redact all of that information,

4    especially because there's a lot of, you know, computer code

5    and things like that that you -- when you looked at it, you can

6    make it out, but it's not the easiest thing in the world to

7    find.

8            So we started going through that.  We had some issues

9    come up that each party had to deal with independently.  But my

10   understanding is that Blue Cross was, you know, going to act in

11   good faith and come up with some type of agreement.

12           In fact, counsel for Blue Cross advised that he had

13   talked with Mr. Winters to see if Mr. Winters would have an

14   objection to strengthen in the protective order in this case so

15   that would make, you know, Blue Cross feel a little bit better

16   that it was, you know, consistent, or at least somewhat

17   consistent, with the Missouri case.

18           Last week -- and regularly I was following up with

19   Blue Cross, usually every week or so, maybe every few days, on

20   what's going on with it, talking to clients, We'll get it

21   worked out.

22           Last week I advised, Listen, you know I have a

23   hearing on the 27th of April.  I need this order.  Let's get it

24   done.  And what I was told is, My clients aren't going to agree

25   to it, period.

1          So I said, I've got to file a motion.

2          They're like, File your motion.

3          So we filed the motion that day.  The Court, I

4  believe, gave until May 5th for suggestions and response.  And

5  the Court will rule on it at a later date.

6          They know what this is.  They know my client is

7  entitled to it constitutionally.  They know it's exculpatory.

8  They led me to believe that they would work with me.  There's

9  no reason for them not to.  And then last minute, when it was

10  too late to essentially file a motion and get a ruling prior to

11  that, they basically said, Yeah, we're not -- we're not going

12  to do that.

13          So that follows into another issue.  And one of the

14  big cases that has been cited by the defense in this case is

15  the *Little River* case, which is the arbitration that was done

16  in Texas with Blue Cross Blue Shield of Texas that was -- the

17  decision was authored by a former Texas Supreme Court justice

18  after a lengthy arbitration.  In that case Blue Cross sought to

19  seal that entire file and that result.

20          I was advised by the attorney that represented the

21  hospital in the *Little River* case that Blue Shield -- or Blue

22  Cross and Blue Shield of Texas actually offered several million

23  dollars to the hospital to agree to a seal and the hospital

24  declined, because the information out there was so important to

25  release to the public.

1          It seems that they have this history of trying to

2     hide information that is super relevant to these type of

3     claims, and definitely relevant to this case.

4          Now, their request to seal was before the indictment

5     in this case dropped, but they're pursuing similar indictments

6     across the country for similar claims as -- as in this case.

7          The other thing that I've requested from the

8     government, and this was discussed during the December status

9     conference we had with this Court, are the provider manuals.

10          And I asked about, you know, the provider manuals.

11     The importance of the provider manuals is they go hand in hand

12     with the contract.  And the contract says what a provider can

13     and cannot do.

14          The provider manual is hundreds and hundreds of pages

15     and very detailed on what's allowed, what's not allowed, what

16     have you.  They indicated to the Court that that would likely

17     be the last discovery.  They were going to get it.

18          A couple of weeks later I get a call.  I can't

19     remember who it was from.  But they basically told me, Yeah, we

20     can't figure out what provider manuals to use.  There's

21     thousands of them out there.  So we're just not going to

22     produce them.

23          And I said, All right.  So I went back into my office

24     and it took me about an hour to find one.  I wanted the

25     government to produce it, because, one, I didn't know if I'd be

1    able to find it that easy, and, two, that way at least there's

2    a BOC associated with it, so I don't have to call, you know,

3    somebody at trial to authenticate this manual.

4          But all they had to do was pick up the phone and call

5    Blue Cross or issue an investigative subpoena saying, Hey,

6    produce the manual.  Blue Cross is in possession of that, as

7    are the other insurance companies.

8          Apparently they didn't do that.  And that was

9    something extremely important.  That is a very exculpatory

10   document also.  And the reason is -- that it's exculpatory is

11   the contract that existed during the time in question and the

12   provider manuals are silent as to this issue of pass-through

13   billing and the way that the billing was done in this case.

14         But the subsequent versions of that specifically

15   disallow it.  And so they're going to want to bring people into

16   court -- and they've indicated in the -- the government's

17   indicated in some of their motions that they're going to want

18   to bring people into court to interpret the contract as the

19   insurance company saw.

20         But it's very important to know that these manuals

21   are silent as to these issues.  And then subsequent to the

22   relevant time period, they issue new manuals that replace the

23   original manuals and contracts that prohibit that conduct.  So

24   it's super important, it's super exculpatory.  And that wasn't

25   produced.

1        In the response that the government filed to the

2   *Brady* motion that was filed in this case, the government

3   basically says that Mr. Porter didn't file anything in the

4   civil case that indicated that, you know, he had this billing

5   or that the billing existed or anything else.

6        We have prepared a very detailed motion for summary

7   judgment, but we -- we resolved the case with Blue Cross and

8   Blue Shield.  The docket will reflect that there were a number

9   of joint motions filed with the Court asking to extend the

10  deadline to file our summary judgment motion, because we were

11  engaging in settlement discussions.  It will also reflect Blue

12  Cross discharging my client and voluntarily dismissing the

13  claim.

14       Litigation is expensive.  And sometimes things make

15  sense.  It's absolutely no bearing on whether we believed that

16  my client's defenses and claims were meritorious or not.  It

17  just made sense to do what we did.

18       But when they're making claims in their response

19  basically saying that, you know, Porter didn't file anything in

20  the case identifying that these things existed, they're making

21  assumptions that are just false.

22       And the important part about it is that this is a

23  billing fraud case.  The entire base of this case is based on a

24  billing issue.  And they have yet to produce any of the native

25  billing.  And literally I've been asking for it for about two

1    years.

2            The information that I have is not all encompassing

3    with the other -- the other insurance companies.  It is limited

4    to Blue Cross and Blue Shield.  And I know for a fact that

5    native billing is not transmitted via Excel spreadsheet.

6            And, finally, the -- the big issue, and the reason we

7    want the native billing and not some Excel spreadsheet, which

8    is just a summary, is that when you look at those spreadsheets,

9    the information that is contained in the actual native

10   billing -- some of that information is not on those

11   spreadsheets, which is talking about the labs that did the

12   testing, and, you know -- like, for instance, the one I have

13   here is LifeBrite and my client's lab Pinnacle.

14           That information does not show up in the Excel

15   spreadsheet, because somebody had to tell the Excel spreadsheet

16   what to import based on native data that they had in their

17   possession.

18           So I think that the -- the information that has been

19   presented in this motion is extremely important.  The

20   information is absolutely exculpatory.

21           I agree with counsel that Blue Cross, I believe, is a

22   bad actor in this, that they're aware that these things are out

23   there and they're doing their best to conceal that, not just in

24   the Western District of Missouri case, but in other cases that

25   they're litigating in, because they just don't want that

1    information out there.

2          And so I would ask the Court to grant the motion and

3    allow the -- the government to -- or have the government

4    produce this information that they have.

5          I also agree with counsel on the Rule 17 subpoenas

6    that being -- doing it that way is a very cumbersome and very

7    difficult way to get this done.

8          Thank you.

9          THE COURT:  Thank you.

10         Anybody else on the defense side want to be heard on

11   the *Brady*?

12         MR. LANDES:  I'd just like to be heard briefly,

13   Judge, if I can.

14         THE COURT:  Yes, sir, Mr. Landes.

15         MR. LANDES:  Judge, I'm taking my mask off.  I've

16   been fully vaccinated, like the others that have spoken.

17   Richard Landes appearing on behalf of Ricardo Perez.

18         Judge, cutting to the chase, the whole thrust of the

19   government's case is that these large health insurance

20   companies were somehow fooled or duped by all the defendants

21   into paying these bills that they otherwise would not have

22   paid.

23         And now, after this PowerPoint presentation, evidence

24   that, in the raw data form -- which, by the way, are called

25   837I transmittal forms.  Other counsel have shown them to you.

 1    I have some too.  They're starting to leak out now.

 2          On those forms -- this is the raw data, 837I

 3    transmittal forms that were sent from the billing companies --

 4    shows that there are independent labs that were doing the

 5    testing, front and center.

 6          Not only are they on these 837I transmittal forms,

 7    but they are on something called a PDF, a readable version.  If

 8    you don't want to go through all the computer code here, even

 9    though they're on the computer code, there are forms that are

10    readable.

11          And for the Court's edification, those are called

12    Liaison EDI forms -- or Liaison forms, because Liaison is a

13    software that's used if the insurance company wants to read

14    them.

15          So we know that -- now, how this works is the 837I

16    form goes to a clearinghouse.  That's called ZirMed, which the

17    Court has heard.  From ZirMed they're sent to the insurance

18    companies.

19          These insurance companies have to have these 837I

20    forms.  And I agree as well, in the million-plus pages of

21    documents that we've gotten, we have never gotten these 837I

22    transmittal forms.

23          What we need -- or what I need is not the universe of

24    all the 837I transmittal forms that are out there.  We need the

25    837I transmittal forms from the scope of this indictment, from

1   the period from May of 2015 through February of 2018, from the

2   three insurance companies, the three so-called victim insurance

3   companies here, Blue Cross Blue Shield, Aetna, United

4   HealthCare, as they relate to the four rural hospitals here,

5   Putnam, Campbellton-Graceville, Williston, and Chestatee, and

6   as they relate to the defendant labs here, Pinnacle, Reliance,

7   LifeBrite, I believe B3, others.

8              That is what we need in order to cross-examine and

9   question these insurance company executives or witnesses that

10  are going to take the stand and say, We had no idea that --

11  that there were independent labs involved.  We didn't know

12  this.

13             We need that information.  I agree -- I don't think

14  that this is something that the government was aware of,

15  because I've seen government filings claiming that the

16  insurance companies didn't have any idea.  The insurance

17  companies did have an idea.  And this information is leaking

18  out.  But we need this information from them.

19             I'm not going to go into the *Brady* violation.  That's

20  been discussed.  But in terms of discovery, at this point, that

21  very specifically is what we need from these -- these insurance

22  companies in order to prove our case.

23             Thank you.

24             THE COURT:  Thank you.

25             Did I see somebody else on the *Brady*?

1          Yes, sir.

2          MR. BLAKE:  May I approach, Your Honor?

3          THE COURT:  Sure.  I'm sorry -- yes.  Go ahead.

4          MR. BLAKE:  I've been fully vaccinated.

5          THE COURT:  That's fine.  Come on up.  If you'll

6    please reintroduce yourself and remind me who you're

7    representing.

8          MR. BLAKE:  Thank you, Your Honor.  My name is Mark

9    Blake.  I'm the individual who is subject to the contempt

10   motion for providing the PowerPoint, the pelican brief, and the

11   motion.  I was also a target of this case.

12         After our attorneys provided the PowerPoint to the

13   Missouri AUSA, she elected and -- suspended the investigation.

14   I realized as time was going on -- I was holding off on

15   delivering the PowerPoint to defense counsel in this case.

16         But as it got closer and closer to this hearing, I

17   realized they were not going to get it and they were unable to

18   put the dots together.  So I submitted the PowerPoint.  And I

19   also submitted the motion.

20         The response, of course, from RightCHOICE in Missouri

21   is that they want to hold me in contempt for submitting the

22   motion.

23         I think the PowerPoint speaks for itself.  It's a

24   great point that's being presented.  The Court has seen it.

25   The only thing I would ask right now is that I would like to be

1    able to tell Judge Kays in Missouri that I did ask that the

2    exhibits to the motion be sealed, so that I can show them that

3    I took remedial action and asked this Court to seal the

4    exhibits to the motion, the PowerPoint and the unredacted

5    motion for summary judgment that was filed on our behalf in the

6    Missouri case, because it's becoming a distraction, rather than

7    sticking along to the facts.

8            THE COURT:  I'm sorry, sir.  I'm not quite following

9    what you're saying to me.  So --

10           MR. BLAKE:  The --

11           THE COURT:  And I didn't realize you weren't -- so

12   you're -- you're a lawyer?

13           MR. BLAKE:  I'm a lawyer, yes.

14           THE COURT:  And you represent who?

15           MR. BLAKE:  I am a defendant -- I'm not in this case.

16           THE COURT:  Right.

17           MR. BLAKE:  I'm in the companion case in Missouri.

18           THE COURT:  The civil case?

19           MR. BLAKE:  The civil case.

20           THE COURT:  All right.

21           MR. BLAKE:  And a target of the criminal case, until

22   it was suspended after we presented the PowerPoint to the

23   Missouri AUSA.

24           THE COURT:  All right, sir.  And you're telling me

25   that you're the one that's the subject of the contempt motion

1    in Missouri?

2          MR. BLAKE:  For providing the PowerPoint, because I

3    believed that the insurance companies did hide the information

4    from the prosecutors.  I know they did.

5          Because when the -- our attorneys made the

6    presentation of the PowerPoint to the Missouri AUSA, they had

7    reported back to me that she was -- shell-shocked were their

8    words to me.

9          And so I did provide the information to defense

10   counsel, because they were clearly unable to connect the dots

11   as to what the carriers had been doing across the country.

12         THE COURT:  And you're saying that they have now

13   filed that in this case?

14         MR. BLAKE:  Yes.

15         THE COURT:  And you're now asking me to --

16         MR. BLAKE:  Seal the exhibits.

17         THE COURT:  -- seal the exhibits to the PowerPoint?

18         MR. BLAKE:  The PowerPoint and the motion for summary

19   judgment, which is the exhibits on the -- it's either the *Brady*

20   motion or the response to the *Brady* motion.  Right now I'm a

21   little nervous because I typically don't speak in court.  I'm a

22   business attorney.

23         THE COURT:  I understand.  Okay.  So -- and that's in

24   the service of being able to tell the judge in Missouri that

25   you have asked me to do that?

```
1            MR. BLAKE:  Yes, Your Honor.  I don't know if
2       there --
3            THE COURT:  And have you spoken with any of these
4       lawyers about that?
5            MR. BLAKE:  That I was going to ask?  I wrote -- I
6       wrote an e-mail to the attorneys.  I -- when I saw the motion,
7       I made a note on it to ask him to please seal it.  I saw in
8       PACER that it had not been done.
9            So I don't know if they moved to seal it or not,
10      because the timing has come so fast from the time I got it.
11      And there's a room full of attorneys and prosecutors and so
12      forth.  So --
13           THE COURT:  Sure.
14           MR. BLAKE:  -- I figured I'd just come and bring it
15      to the Court's attention myself, because it's distracting from
16      the merits of the case in Missouri.  The criminal case is over
17      with and the civil case isn't.
18           But I'm the only one left, and my business partner.
19      Everybody else has either defaulted or settled.  But we're not.
20      I never took the Fifth.  And I am not going to settle.  We're
21      taking it all the way to trial if the court doesn't give us
22      summary judgment.
23           But the court in Missouri is now aware of the ZirMed
24      data that you have now become aware of, that they have hidden
25      from the government and from the court, and lied to the court.
```

1        So for me to -- they indicted David Byrns based upon

2   a false reading of what the ZirMed data contained.  And then,

3   unfortunately, the Missouri AUSA reported to the Florida AUSA

4   the same false information.

5        And then David Byrns signed a plea agreement that's

6   perjured.  And now Blue Cross is using that perjured plea

7   agreement as a factual basis against me.

8        So there's a lot going on.  The cover-up from the

9   carriers is grand, on a nationwide scale, Your Honor.  These

10  lawyers are trying to do it, but they've only known the

11  information for a couple of weeks.  And same with the

12  government.  But I've known about it for over a year.  And I've

13  kept quiet because it would not work favorably to the case,

14  until the Missouri AUSA suspended the investigation.

15       She could have indicted me along with everybody else.

16  She didn't.  But she was the only person that got all of this

17  information.  The government here, the AUSA, never got to see

18  it at the level that we were able to find it and get the ZirMed

19  data.

20       So in the end, we're -- if this Court grants the

21  relief that these gentlemen are asking for, and require the

22  carriers to come and speak and say what they knew and when they

23  knew it, along with the attorneys -- I didn't realize that Nate

24  Moore's name is in this 2018 document.

25       So he's been involved in *Little River*.  He's involved

1    in Missouri.  And he's involved in Florida.  So the lawyers are

2    guiding this too, Your Honor.

3            So there's a lot here to -- for the Court to

4    consider.  And here I am, johnny-come-lately, with a pelican

5    brief that exposes everything.

6            And it's hard to take in.  I understand that.  But I

7    do know that when it all settles out, even from that memo in

8    2018, the carriers knew that ZirMed data disclosed everything.

9    They just didn't like it.

10           They agreed the contract allowed it.  They continued

11    to pay the claims.  But what they did is they modified the

12    contract to reduce the payment.

13           So by doing that, they continued to pay the claims.

14    They never defaulted the hospital.  I was part of one of the

15    laboratories, the blood laboratory.  I never heard anything

16    from the carriers.  I never heard anything from the government.

17           My wife got served with a lawsuit that said that they

18    were being billed as inpatient services and that the patients

19    were at the hospital.  It was just a complete lie.

20           So when we took their depositions and they figured it

21    out, that that was true, they amended the complaint and then

22    said, in the most recent complaint, that the claims were being

23    submitted on a form UB-04, which is what a hospital submits to

24    the claim -- on the claim, and, by doing that, it omitted the

25    name of the labs, and that's the fraud.  That is false.

1          Just last week they admitted that not a single UB-04

2    claim was ever filed.  It was the ZirMed data that has become

3    the subject of this hearing, which did contain the name of the

4    lab.  It did contain the name of the physician who was located

5    out of state.  It contained the name of the patient who was

6    located out of state.

7          They hid it from the government from the beginning.

8    And here we have wasted so much judicial time and resources

9    that could have been spent on other things.

10         If they didn't like the contract, just as they said

11   in Texas, they had the opportunity to amend it.  And they did.

12   But, no, they then go and hide the truth from the government,

13   from Mr. Winters, all the way back in 2018, and back further

14   than that.  And then that false information was provided to the

15   Missouri AUSA, who then reported the false information to the

16   government here.

17         I understand why they're doing what they're doing.

18   But when you look back and every -- you take a step back and

19   then see what really happens, the truth will ultimately come

20   out.

21              THE COURT:  All right, sir.

22              MR. BLAKE:  Thank you, Your Honor.

23              THE COURT:  Thank you.

24         I don't know who -- who -- I'm not going to -- go

25   ahead.  Thank you, sir.

1          I'm not sure who on the defense side was

2    responsible -- I can't recall -- for filing the PowerPoint and

3    the other materials.  Who was it?  Mr. Sadow?

4          MR. SADOW:  It was jointly filed by Fletcher and

5    Durall's counsel.

6          THE COURT:  All right.  So do you have any reaction

7    to the request to have that information sealed?

8          MR. SADOW:  The only reaction would be if that's what

9    the Court deems to be most appropriate, we do not object.

10         THE COURT:  Okay.  And, obviously, this gentleman is

11   the one that you got it from, apparently.

12         MR. SADOW:  I can't -- I can tell the Court I did not

13   receive it directly from him, but I understand that he was the

14   initial source.

15         THE COURT:  Okay.  All right.  Anybody else?

16         And I'll -- so remind me, sir -- I apologize.

17   What -- what's your name again?

18         MR. BLAKE:  My name is Mark Blake.

19         THE COURT:  Mr. Blake, I will take under advisement

20   the request to seal those documents.  But to the extent that

21   you want to be able to tell the judge in Missouri that you came

22   to Florida and you asked me to do it, you can do that.

23         MR. BLAKE:  Thank you, Your Honor.

24         THE COURT:  Anybody else on the *Brady*?

25         Who's speaking for the government?

1          MR. DUVA:  Gary Winters.

2          MR. WINTERS:  Your Honor, Gary Winters.  I will be

3    speaking.

4          THE COURT:  All right.  Mr. Winters, I -- I -- my

5    prediction was correct, that the first motions take the

6    longest.  Obviously this is a -- this is a matter that

7    obviously goes to not only *Brady*, but discovery and the

8    whole -- kind of the whole way the case is being handled, so --

9    and a lot of things have been said.  So I want to hear from the

10   government.

11         So you may proceed, sir.

12         MR. WINTERS:  Thank you, Your Honor.

13         The first issue I want to address is the first issue

14   that Mr. Samuel raised, which is the question of disagreement

15   on what's exculpatory.  And we do have a disagreement on what's

16   exculpatory.

17         But I don't think that that's particularly relevant

18   at this point, because the government has turned out -- as

19   Mr. Samuel acknowledges, and as Mr. Sadow has acknowledged, the

20   government has turned over all the materials that it obtained

21   from the Western District of Missouri, including the exhibits

22   to the PowerPoint.  And the defense obviously has the

23   PowerPoint.

24         Our view was that the PowerPoint itself was just a --

25   was a lawyer's advocacy piece.  And ultimately we turned over

1    the exhibits to -- to the PowerPoint, as well as all other

2    discoverable materials that were obtained in the Western

3    District of Missouri investigation.

4            The government is not aware of any other U.S.

5    Attorney's Office or any other component of the Department of

6    Justice that's pursuing claims.

7            I heard mention of Ohio.  I will represent to the

8    Court that I am not aware of a U.S. Attorney's Office in Ohio

9    pursuing any criminal investigation relating to these

10   defendants or relating to the same subject matter, nor am I

11   aware of any other U.S. Attorney's Office or any other

12   component of DOJ anywhere in the country pursuing similar

13   claims.

14           We are, of course, aware, and have been aware, of the

15   investigation by the Western District of Missouri.  And I do

16   believe that the record will show that after David Byrns

17   entered his plea, which was in November -- or October, I think,

18   of 2019, our investigation -- what we call the Jacksonville

19   investigation, which is Mr. Duva, myself, and Mr. Hayes at the

20   criminal division -- our investigations really diverged.

21           Now, we don't disagree that the PowerPoint and the

22   exhibits to the PowerPoint were presented to the government in

23   January of 2021, this year.  We acknowledge that.  And we

24   acknowledge that our disclosure has been delayed.  But we have

25   now produced, as I said, everything that we received from the

1    Western District of Missouri well before trial.

2            And I heard -- I think I heard something different

3    from Mr. Samuel and Mr. Sadow.  I think -- you know, Mr. Samuel

4    seemed to suggest that the government was acting in good faith.

5    And if that's not what he intended to say, then I misheard him.

6            But I think I pretty clearly heard that -- Mr. Sadow

7    indicate that he did not believe that the government was acting

8    in bad faith or was -- was intending to withhold any of this

9    material from the defense.

10           There has been a delay in producing this material.

11   And I will acknowledge that the communications back and forth

12   between the government and Mr. Sadow caused us to go back and

13   make sure that we had uncovered all of the material that would

14   be discoverable or producible to -- to the defense.

15           We acted -- we acted swiftly and we acted promptly.

16   And we have taken great -- we have made great efforts since

17   those exchanges back in March to obtain materials from the

18   Western District of Missouri.

19           As the Court, I'm sure, can appreciate, you can't

20   just make a phone call and get all the materials in one day and

21   get them ready to produce.

22           So we took -- we took aggressive steps to get that

23   material to ensure that the defense had all of it.  And -- and,

24   as I said, we've turned all of that over.

25           Our understanding in the Western District of Missouri

1   is that they have now turned over their entire file to us.

2   We've looked at it very carefully to ensure that we've turned

3   over everything that could possibly be discoverable, and turned

4   that over to -- to the defense.

5          Now the question of these ZirMed -- let's call them

6   the electronic data interchange, the EDI submissions, which

7   play such a central role.

8          We do have a disagreement as to whether they're

9   exculpatory.  And, frankly, when the government first looked at

10  those, it wasn't clearly apparent to us that they were

11  exculpatory.

12         And I think what's very important to say is that Blue

13  Cross does not believe that they're exculpatory, in the sense

14  that they don't undermine their civil case.  Blue Cross

15  obviously doesn't take a position on what's exculpatory for

16  *Brady* purposes.

17         But as the Court knows, there's civil litigation in

18  Missouri in which Blue Cross is seeking to enforce the terms of

19  its contract and to recover money that it paid to Putnam

20  Hospital, and then ultimately went to these outside

21  laboratories.

22         And Blue Cross very aggressively in that litigation

23  takes the position -- and we pointed that out in our brief.

24  This is page 4 of our brief, that Blue Cross -- Blue Cross

25  filed a reply brief on March 26th, 2021, in which they pointed

1    out that in those EDI submissions which we've heard so much

2    about today the defendants are pointing to a field which

3    indicates that an outside laboratory or reference -- or

4    reference laboratory were the submitter of the claim, which is

5    sort of an odd field to find the name of the reference lab in,

6    since the submitter of the claim was actually Putnam Hospital.

7            So Blue Cross does not view these as -- as submitting

8    information that would put them on notice that a reference lab

9    was actually performing the tests, which is really what this

10   case is all about.

11           The case is about claims being billed from the

12   hospitals as if they were -- as if the lab tests were somehow

13   associated with the hospitals and properly billed under the

14   hospital's in-network contracts.

15           THE COURT:  Well, let me just -- Mr. Winters, let me

16   just ask you a question.  And this maybe goes to the merits of

17   the case, but I just want to understand.

18           When I read the indictment and when I read the papers

19   that I've read -- and, of course, my knowledge of this is but a

20   thimble full of your knowledge and the knowledge of these

21   defense lawyers.  And so I'll acknowledge that.

22           But if -- if there are documents, though, that -- for

23   example, that were submitted to Blue Cross, let's say -- if

24   there were documents, or digital transmissions, or whatever --

25   however people send information these days, that have on them

1   the names of these laboratories as being involved in the -- in

2   the process that is being billed for, in whatever capacity --

3   and I understand there may be different fields and so forth --

4   wouldn't that be something that the defense would want to have

5   in order to test at trial what role those labs played?

6         Because I would have been led to believe by the

7   papers I was reading that the heart of the government's case is

8   that the bills were being presented as if they were from the

9   hospital when, in fact, the testing had been done by these

10  independent labs.

11        That's what I understood the nature of the fraud to

12  be in this case.  If I'm wrong about that, you can correct me.

13  But wouldn't -- wouldn't -- if there are fields or submissions,

14  or whatever there are, in the possession of Blue Cross that

15  show some involvement of some type in this testing by these

16  independent labs, whether it be their logo, whether it be --

17  whatever it is, wouldn't that be information that the defense

18  would be entitled to see?

19        MR. WINTERS:  Your Honor, we don't disagree that it

20  would be material and information that the defendant would --

21  the defense would certainly want to see.  It is not apparent on

22  the face of the -- of the ZirMed -- or I'll call it the EDI

23  transmission that was presented as an exhibit to the PowerPoint

24  in the Western District of Missouri -- it is not apparent on

25  the face of that document, just looking at that document, which

1    is all -- which is all -- the only document, I think, that was

2    presented to the Western District of Missouri -- a couple of

3    additional examples were provided at the end of January.

4         It's not apparent just from looking at the face of

5    that document that it indicates that the reference lab was

6    involved in the testing that was being billed from the

7    hospital.

8         And Your Honor is absolutely correct that the theory

9    of the government's case is that the bills were transmitted,

10   the claims were transmitted from the hospital as if the claims

11   had some connection to the hospital, and did not identify the

12   reference labs.

13        Now, the spreadsheets that I think Mr. Schwartz and

14   perhaps other defense counsel referred to -- the spreadsheets

15   that identify the claims that the insurance companies provided

16   to us in response to subpoenas that we served way back in

17   2018/2019 -- those claims' data sheets do not identify the

18   outside reference labs.

19        And the government understands that those

20   spreadsheets were pulled from the data that was provided, the

21   electronic data that was transmitted directly to the insurance

22   companies.

23        Now, having said all that, the government certainly

24   has an interest -- a very keen interest in seeing these

25   electronic data submissions.  And we've taken active steps to

1    obtain -- to obtain the electronic data, not just the hard copy

2    printouts that I -- I assume have been shown in court, and

3    that -- that we've received and that we've turned over to the

4    defense.  But we have a very strong interest in obtaining those

5    electronic data submissions.  We did not have them before.

6          And so this refrain that I've heard multiple times

7    today that -- that the insurance companies are hiding this

8    information from the government is simply not true.

9          The government has not had these electronic data

10   transmissions in this case until -- until this year -- or,

11   actually, I'd say we don't even have the electronic

12   submissions.  We have the hard copy paper representations of

13   what's in those electronic submissions, which we've turned over

14   to the defense.  So we do not have the internal -- the

15   internal --

16         THE COURT:  Well, hold on.  Hold on, Mr. Winters.

17   And I -- believe me, I don't know -- I am not making any

18   pronouncements.  I'm not making any decisions.  I'm just asking

19   questions.

20         But when you say that -- that Blue Cross -- that it's

21   not correct that Blue Cross has been hiding things from the

22   government, and the way you say that is to say that the

23   government doesn't have this information, how is it -- one

24   reason -- one possible reason could be that Blue Cross hasn't

25   given it to you, that it exists and that they haven't given it

1   to you when -- and I guess you could call that lots of things.

2   But I guess one thing you could call it would be hiding it from

3   you.

4           And so what -- what are you meaning to say -- in

5   response to a contention that Blue Cross has not been

6   forthcoming with the government in terms of producing material

7   that might bear on this case, which then may create a duty of

8   the government to produce it to the defense, how is it an

9   answer to that to say, We don't have it?

10          I'm not understanding what you're saying.

11          MR. WINTERS:  Well, we've asked -- we asked the -- we

12  asked the insurance companies -- not just Blue Cross, but all

13  the insurance companies.  We asked them through subpoenas to

14  provide us with the claims data.

15          We -- we can only -- we have what they turned over to

16  us.  We can't go into their systems and -- and force them to

17  obtain information -- additional information and turn it over

18  to us.  I mean, we have what they -- we receive what they give

19  us.

20          And we can't possibly know -- I mean, I have no

21  reason to believe that anybody at any of these insurance

22  companies is actively hiding information or declining or

23  refusing to turn over responsive information in response to

24  government subpoenas.  I would be shocked if that was

25  happening.

1          And so for that reason, I don't believe there's any

2   indication, any evidence that the insurance companies are

3   actively hiding information from the government.

4          What I'm representing to the Court is just what the

5   government has received in response to those requests from the

6   insurance companies.

7          We've asked for claims data.  We previously asked for

8   claims data.  We received them in the form of spreadsheets that

9   were represented -- as Mr. -- either Mr. Samuel or Mr. Sadow

10  pointed out, were represented in a -- in a phone conversation

11  with an individual from Blue Cross.

12         And we had similar conversations with individuals

13  from other insurance companies.  And all of those records of

14  those conversations have been turned over.

15         We wanted to understand the claims, the way that they

16  were transmitted to the insurance companies, and what these

17  claims spreadsheets showed.  And so --

18         THE COURT:  So let me ask you --

19         MR. WINTERS:  -- again, what we --

20         THE COURT:  Let me ask you this.  Is there anything

21  that has happened recently, that is, the production that the

22  government has made of these emails that were discussed this

23  morning, or the additional documentation that either defense

24  counsel has been obtaining through other means or that the

25  government has obtained recently -- is there anything about

 1    that -- what's in that information or the way it was obtained

 2    giving the government any concern that there may be additional

 3    materials that these insurance companies have, whether they be

 4    emails or documentation, or whatever it might be, that would be

 5    relevant not only to the government's case, but also

 6    potentially discoverable to the defendants?

 7              Are you concerned about that?  Or are you comfortable

 8    that these companies have, in fact, produced everything that

 9    they need to produce in this case?  Because I recognize -- you

10    know, they're not -- they are portrayed, of course, in the

11    indictment as the victims of this crime.

12              And -- but they're unlike many victims of crimes that

13    I see.  They're -- they're very sophisticated entities that

14    have lots of lawyers and lots of people that work on these

15    things.  And I assume you've been working with some of those

16    same lawyers.

17              I'm just -- I'm just asking you the question whether

18    you have -- what your level of comfort is that you, in fact,

19    have been provided everything that you should have been

20    provided.

21              MR. WINTERS:  Well, as I indicated to the Court just

22    a few moments ago, we have taken active steps to communicate

23    with all the insurance companies that are referenced in the

24    indictment to ensure that we do have everything, particularly

25    these electronic data submissions.

1        I am -- I am concerned that I don't have those

2   electronic data submissions.  And I want to have them.  And

3   I -- you know, I want to be very clear with the Court that we

4   have made those efforts.  We're in communication with the

5   insurance companies about obtaining those and understanding --

6   and, you know, ensuring that we fully understand what they are.

7        As we indicated in our brief, Blue Cross has

8   explained in a -- in an unredacted brief that it filed in the

9   Putnam litigation at the end of March that they don't believe

10  that those electronic submissions identified the reference labs

11  in a way that indicated that the reference labs were actually

12  performing tests, but rather identified them somehow as the

13  submitter.

14       Notwithstanding that -- notwithstanding that, that's

15  not to say that the government doesn't want to have a full

16  picture of what these electronic data submissions are, as well

17  as any internal emails that may -- that may bear on -- on the

18  use that's been discussed.

19       THE COURT:  Sure.

20       MR. WINTERS:  And with respect to the e-mail,

21  Mr. Samuel --

22       THE COURT:  So, for example -- I'm just projecting

23  here.  But, for example, it could well be that the fact that

24  one of these labs is on the -- is on some submission that was

25  made -- it could well be that Blue Cross is right that that

1   doesn't have anything to do with what we're talking about.

2          But I suppose if I was cross-examining a Blue Cross

3   official on the stand who was claiming that he was the victim

4   of a fraud, I would sure want to be able to ask him about it,

5   wouldn't I?

6          MR. WINTERS:  We don't disagree.  We do not disagree,

7   Your Honor.  The government -- as I said, the government is

8   seeking to obtain that material and to turn it over to the

9   defense so the defense has a full picture.

10          Again, we don't think it's -- we don't think that

11   it's case dispositive in any way.  We don't think that it

12   undermines our fraud theory.

13          We believe, as Your Honor, I think, observed, that

14   the insurance companies will -- as they said -- as Blue Cross

15   has said in the civil litigation, will take the position that

16   they -- that that did not inform them of anything having to do

17   with the reference lab doing the testing.

18          THE COURT:  Do you have any -- do you have any --

19          MR. WINTERS:  And we believe --

20          THE COURT:  Do you have any concern that -- so right

21   now we have these Rule 17 subpoenas that have been issued by

22   the defense.  And they're in the process of being implemented,

23   I suppose.

24          But you indicated to me that there were subpoenas

25   issued to these insurance companies.  I assume by that you mean

1    grand jury subpoenas.

2            And are you -- are you concerned that -- at all that

3    you've not received full compliance with those subpoenas?  Is

4    that what you're investigating?  Or do you view this somehow

5    differently than that?

6            MR. WINTERS:  Well, I think -- I'm not -- I'm not

7    sure that I would say that we haven't received full compliance

8    at the time that those subpoenas were served.  It's not clear

9    to me if the insurance companies appreciated or understood that

10   the electronic submissions needed to be produced.

11           They did produce extensive spreadsheets that

12   identified the information that had been provided to them.  And

13   those spreadsheets were pulled from the electronic claims

14   submissions themselves.

15           And so it may be that the insurance companies did not

16   understand or appreciate that the electronic submissions

17   themselves were relevant, given that the -- given that the

18   spreadsheets that were produced to us and that have been

19   produced to the defense identified -- or pulled from --

20   directly from those -- directly from those electronic

21   submissions.

22           And the government has always been prepared to offer

23   those claim spreadsheets and to offer a witness, if necessary,

24   if the defense is not going to stipulate to authenticity or

25   admissibility.

1        But certainly the government is prepared to offer a
2   witness to authenticate those claim spreadsheets, identify
3   where they come from.  And so, as I said, I don't think we're
4   concerned that they failed to comply with the subpoena, given
5   that they produced those -- that extensive claims information
6   to us.
7        And that's the way that claims information is
8   typically provided in these types of cases.  Certainly in
9   Medicare fraud cases and other cases involving private
10  insurance that I've been involved in, what the government
11  obtains is -- is claims -- you know, spreadsheets that pull
12  from the underlying data itself.
13       And nobody actually goes to the underlying electronic
14  transmissions -- for example, in a Medicare case, when a
15  provider is, you know, submitting to Medicare, what we see are
16  these claim spreadsheets.  And that's typically the evidence
17  that's presented of what the claims are.
18       And so, you know, this very much parallels that type
19  of situation.  We obviously now, as I said, are interested in
20  seeing those underlying transmissions to determine if for any
21  reason they're at odds with the claims data that's been
22  presented.
23       But, again, we don't believe that -- based on what
24  we've seen so far in these EDI transmissions the defense has
25  been focusing on, we don't see any reason to believe that

1    there's anything that undermines the government's theory that

2    the transmissions -- the submissions to the insurance companies

3    from the hospitals indicating that these were claims associated

4    with the hospitals and billable -- probably billable and

5    reimbursable under the hospital's in-network contracts -- we

6    don't see anything to suggest that that undermines our claim.

7            So, again, as I think Your Honor recognized, much of

8    this goes to the underlying merits of the case, which -- you

9    know, I think that's going to be before a jury.  And so that's

10   going to be a subject of cross-examination.  The government is

11   going to have to offer proof and the defense can cross-examine.

12           THE COURT:  Sure.  And I appreciate that.  And I'm

13   not -- I'm by no means trying to make any judgment at all to --

14   about the merits of the government's case.

15           My interest at this precise moment -- I guess there

16   will be -- I'll have other interests as we talk about some of

17   these other motions.  But my interest at this precise moment is

18   to make sure that, to the extent that these victim insurance

19   companies have information in their possession that a defense

20   lawyer who's defending a claim of fraud would want to, and be

21   entitled to, have as he or she prepares to cross-examine the

22   representatives of the victim, to make sure they have all that

23   information.

24           And whether or not the victim itself thinks that it's

25   exculpatory or not is not, I don't think, the test.  And so it

1    would just seem to me that that -- and, of course, I know

2    that's what the government wants too, because the government

3    wants justice in the case and wants a fair trial.

4            And -- and so I'm going to be interested to do

5    everything I can, without casting any aspersions on the

6    government's conduct to date -- I have no reason to question

7    the bona fides or the good faith of any of the government

8    attorneys at this point.  And I hope I will never have to.

9            But it is a matter of interest to make sure that --

10   that these third parties understand their obligation to produce

11   this information.  And I guess we'll come up with the same

12   issue with respect to the Rule 17s issued by the defense.

13           But I guess to the extent that the government has a

14   relationship with these victims and their attorneys and they

15   worked with them and there have been investigators who have

16   been working with the government on these cases -- I would

17   think the government would use all efforts to make sure that --

18   that the -- that all information which should be disclosed,

19   which is discoverable, and whether it's exculpatory or not --

20   or whether they view it as exculpatory or not, is, in fact,

21   produced.

22           MR. WINTERS:  And, Your Honor, we share that -- that

23   interest.  And, as I said, we are taking active steps.  We're

24   in communication with all of the insurance companies to ensure

25   that we obtain all the information that would bear on the case,

1    as Your Honor said, not just information that might -- you

2    know, might be viewed by some as exculpatory, but all

3    information that would bear on -- bear on the defense that the

4    defendants might wish to -- wish to raise.

5           I would just -- just if I could respectfully disagree

6    with Your Honor, though, that that -- that there has been any

7    kind of joint investigation between us and the insurance

8    company SIUs, that has -- that has not happened.

9           The defense has pointed to some emails back in 2018

10   in which SIUs made reference to myself and communications with

11   myself.  Those communications certainly happened.

12          Those were -- that was over three years ago, just

13   around the time that I think I was getting involved in this

14   investigation.  And no one should -- there's nothing surprising

15   or even nefarious about those kind of communications.

16          Private insurance companies are considered to be the

17   victims of health care fraud all the time.  And they frequently

18   communicate with the government.

19          So the notion that they communicated with the

20   government and alerted the government, or sought to alert the

21   government, to potential fraud on them in no way suggests that

22   the insurance companies are either working with the government

23   actively -- we've been very careful not to have that happen in

24   this investigation -- nor does it suggest in any way that

25   they're -- that they're hiding information or anything like

1    that, or that they're somehow in cahoots to -- with the

2    government to ensure that -- that the government doesn't get

3    the -- you know, the bad stuff, I think as was suggested by

4    some of the defense counsel.

5         So those communications which are cited in the brief

6    and which were referenced today, respectfully, I don't think

7    those suggest in any way any -- any wrongdoing on the part of

8    the insurance companies, and certainly not on the part of the

9    government.

10        THE COURT:  All right.  Fair enough.  Thank you.

11        I think -- I think I've probably said what I needed

12   to say.  I'm not -- I'm not ruling on the motions so much at

13   the moment on the -- on the *Brady* motion so much as I am just

14   trying to ensure that whatever there is that should be produced

15   by these insurance companies is, in fact, produced.

16        And -- and so I'm going to -- regardless of whatever

17   else I do, I'm asking the government to use its good offices to

18   ensure that that happens.

19        Because otherwise we are going to have -- we are

20   going to run the risk of -- and maybe there's nothing else.

21   Maybe this is it.  Maybe we know everything we're going to

22   know, or maybe not.

23        But whatever it is, we need -- it needs to be known.

24   And I'm going to ask the government to use its good offices to

25   make sure that that happens, so that the case can be tried on

1   its merits, and not -- we -- the last thing we want is a trial

2   where there's relevant -- potential exculpatory, but at least

3   relevant information, that just simply wasn't produced by the

4   insurance companies, because that's not a result any of us

5   want.

6           So enough said, Mr. Winters, unless you want to say

7   something else.

8           MR. WINTERS:  The only other comment I would have

9   would be to the presentation that Mr. Blake made.  And I would

10  just observe that -- I think what Your Honor heard from

11  Mr. Blake was essentially the argument of an interested party

12  in the civil litigation in -- in Putnam, the Putnam civil

13  litigation.

14          I think many of the arguments you heard are the same

15  arguments that are presented in his company's -- Serodynamics'

16  summary judgment brief.  And I need not address any of those,

17  because I think I've already addressed the point that there's

18  no evidence that the insurance companies are hiding information

19  from the government or -- they're certainly not hiding it in

20  the Putnam litigation.

21          I mean, all of -- all of the documents that have been

22  talked about today, that stuff has all come out in the Putnam

23  litigation.  And Blue Cross obviously has a very different view

24  of -- of its conduct and of its obligation to have to pay those

25  claims from Putnam than Mr. Blake does.  So that would just be

1   my final observation.

2          THE COURT:  Well -- and Mr. Blake came here today.

3   And I -- to be honest with you, when he first stood up, I

4   wasn't -- I thought he was representing one of the defendants

5   in this case.  It turned out he wasn't.  He made his

6   statements.

7          But I agree with you that the only relevant thing for

8   my consideration is whether I'll agree to seal the filings that

9   he requested me to seal, apparently where he's the subject of a

10  contempt motion in Missouri.  So I have that under advisement.

11         Anything else that Mr. Blake said -- I understand he

12  said it, but that's not really for my consideration.  And I'm

13  going to take that at that point.

14         All right.  I'll -- we've been going two hours on

15  this motion, but obviously this is important to the case.

16  Before -- I'm going to take a break in a moment.

17         But, Mr. Sadow, or whoever -- if there's somebody who

18  wants to say something for five minutes in response to what

19  you've heard --

20         MR. SAMUEL:  Yeah.

21         THE COURT:  -- I'll let you do that.

22         MR. SAMUEL:  They want to --

23         MR. DUVA:  Your Honor, can I just add one thing?

24  I'll be brief.

25         THE COURT:  Oh, sure.

1          MR. DUVA:  This is Tysen Duva for the government.
2    The only thing -- other thing I'd like to point out, in our
3    efforts to get --
4          THE COURT:  I'm not hearing you very well.  Do we
5    have a microphone up -- okay.  Go ahead, sir.
6          MR. DUVA:  Can you hear me?
7          THE COURT:  Yeah.
8          MR. DUVA:  Okay.  I just wanted to make clear one
9    other point.  It's in our response brief to the motion.  We
10   issued, back in 2018, grand jury subpoenas to Empower and JVS
11   Billing, who at the time we believed were material to the
12   billing, and certainly were at all four hospitals.  Less so at
13   Chestatee, but absolutely at Campbellton-Graceville, Williston,
14   and Putnam as well.
15         And we asked for the electronic data submissions from
16   them as well.  We never received any.  So there is not some
17   head-in-the-sand attitude about this.
18         In fact, it's a very odd motion, because we all want
19   the same thing.  The Court wants the information.  The
20   government wants it.  The defense has more of it than we do.
21   Mr. Schwartz had -- looked like about three inches full of
22   information.  Why don't we have that?
23         And I know they would say, Well, get it from the
24   insurance companies.  We're taking steps to do that.  We have a
25   call with Blue Cross Blue Shield tomorrow.

1        We've been in contact with all of them, Aetna and

2   UHC.  But it would, frankly, be helpful if Mr. Schwartz could

3   give us what he has.  And he has not done that.

4        And so I think it would facilitate everybody getting

5   to the finish line.  Because we do want to try the case on the

6   merits.  I won't get into whether it's case dispositive or not.

7        I agree with Mr. Winters.  And he's already addressed

8   that.  But I think if there's a little collaboration here that

9   we can get to the finish line.  And then we'll decide,

10  obviously, what is the appropriate time to try the case.

11        THE COURT:  Thank you.

12        MR. SAMUEL:  I'll even allow to defer part of my five

13  minutes to that.

14        THE COURT:  You got five minutes.

15        MR. SAMUEL:  I want two.  The only thing I would

16  remind the Court is the timing issue.  Mr. Winters said -- you

17  know, agreed in their brief that they received this information

18  in January, and it wasn't until the middle of -- towards the

19  end of April before it was turned over to us.

20        And I think the Court, in emphasizing to the

21  government the obligation to get things from the -- from Blue

22  Cross, should also remind the government that when they get

23  information that is significant and important and *Brady*, it

24  shouldn't be on the back burner for four months before it's

25  turned over.  And it shouldn't have to await a request from the

1    defense.

2            We spent a lot of time talking about the EDI and

3    the -- and the electronic data.  I want to remind the Court

4    about the emails.  They are attached to document 298,

5    hyphen -- Exhibit 1, which maybe you -- you ought to add that

6    to the sealing, by the way, because that was also part of what

7    was disclosed to us, to document 298, Exhibit 1, in which one

8    of the people from Blue Cross says, Do you have an opinion as

9    to whether they can be held to the pass-through rule?

10           And the Blue Cross representative says, I don't think

11   we can hold them to the pass-through rule if it is silent in

12   their current contract.

13           And then they go on to say, The current contract does

14   not address pass-through billing.

15           This was what I mentioned before.  This isn't just

16   data.  This is the conclusion of the Blue Cross individual

17   saying that they're not held to the pass-through requirements.

18           And we'd ask you to include in your direction to the

19   government that they search not only for data and documents,

20   but also this type of information, where Blue Cross says it's

21   not -- they are not holding them responsible for using a

22   pass-through -- a pass-through billing that was not included --

23   that was a provision that was not included in the contract.

24           So I would just ask that that be included.  Because

25   it's all *Brady*.  Everything that's *Brady* should be turned over,

1  not item by item that we're able to discover ahead of time,

2  or --

3          THE COURT:  What about the notion that Mr. Duva

4  raised that some of this material is likely to reside in some

5  of the -- the -- the folks here?

6          I understand it's not a defendant's obligation to

7  produce any material, particularly, although there's reciprocal

8  discovery, but is -- is the state of knowledge of the

9  defendants as little as you're putting forward?  Or is there

10  really more to know -- is there really more that the defense

11  knows?  That doesn't alleviate the government's obligation or

12  Blue Cross's.  But how do you respond to that?

13          MR. SAMUEL:  It's a hard confession to say I know

14  actually less than you think I know.  I did put in a brief

15  citations to cases which you just referenced, that, even if the

16  defense is aware of certain information, it does not alleviate

17  in any way, shape, or form, the government's *Brady* obligation.

18          The honest answer to your question is I have no idea

19  what Mr. Schwartz's client has.  I have zero idea.  I talked to

20  Mr. Schwartz yesterday for the first time in my life.  And I

21  don't think I can, with all due respect, count on him to tell

22  me what he has.  And I wouldn't even ask him.

23          THE COURT:  Okay.  Fair enough.  All right.

24          MR. SAMUEL:  So I don't know the answer to that.

25          We're interested in what Blue Cross has.  And I

1    seriously doubt that Mr. Schwartz or his client or any of the

2    other defendants here have internal emails about Blue Cross

3    conceding that their contract doesn't require --

4              THE COURT:  Okay.

5              MR. SAMUEL:  -- the pass-through billing.

6              So we would ask you -- well, obviously, we are asking

7    for specific remedies in our *Brady* motion.

8              THE COURT:  I understand.

9              MR. SAMUEL:  We believe they're all appropriate.  And

10   if it's not going to happen, we would ask that the government

11   look not just for EDI data, but for *Brady* information of all

12   kinds, including the types of emails and what kind of search

13   terms they're going to use to figure out whether Blue Cross, in

14   fact, acknowledges that the defendants in this case complied

15   with the contracts -- complied with the contracts, in which

16   case there's not even fraud.  There's not even a civil claim.

17             THE COURT:  Thank you.

18             MR. SADOW:  I have 30 seconds.  And that's all I'll

19   need.

20             THE COURT:  Yes, sir.

21             MR. SADOW:  Two points.  One, I'd like to make -- if

22   the Court will allow me, to make part of the record this FBI

23   302 that took place on September 21st, 2018, so the Court can

24   see the interaction between BCBS, Anthem, and the government.

25   Not for purposes of showing any misconduct, just so the Court

1  knows what I was referring to.

2         THE COURT:  That's fine.

3         MR. SADOW:  So I don't know how the Court would want

4  to mark it.

5         THE COURT:  I'll just make it -- who's your client?

6         MR. SADOW:  Fletcher.

7         THE COURT:  Fletcher 1 to the hearing.

8     (Defendant Fletcher's Exhibit 1 received into evidence.)

9         MR. SADOW:  And the other part of this would be

10  that -- the government makes two points when it comes to the

11  defense either production of evidence or failure to produce.

12  One must assume if they ask Perez and those companies for

13  electronic data, EDI, that they must have also asked the

14  insurance companies, the private insurers, for the same data

15  and received nothing from them.

16         Second, Mr. Schwartz made it clear he can't turn over

17  the information that he wants to turn over to defense counsel,

18  which we didn't know he had, because he's under the order in

19  the Western District of Missouri civil case that says he's --

20  it's a protective order.

21         So if the Court were to release him from that

22  protective order, then he can share that with all of us.

23  That's what he's been trying to do with, as I understand it, no

24  success.

25         THE COURT:  Well, I'm certainly not in a position to

1   release anybody from an order from a different judge at the

2   moment, so...

3           All right.  Anything else?

4           Yes, sir?

5           MR. RAFFERTY:  Your Honor, one point of clarification

6   on behalf of Mr. Durall.  Brian Rafferty.

7           The government has candidly admitted that they're

8   going to be searching for the materials that we've been

9   discussing here today.  But I just want to be clear that the

10  government is going to be searching for both EDI and emails

11  like the ones we saw today for all of the hospitals and all the

12  payors.

13          Is that correct?

14          MR. DUVA:  That's correct.

15          MR. RAFFERTY:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17          All right.  We've been going two hours.  Let's take a

18  break.  I have no idea where we are in terms of timing.

19  We're -- it's -- but this was obviously an issue that needed to

20  be addressed.  And so we did.  We'll figure it out as we go

21  along.

22          But let's just go ahead and take a ten-minute break

23  now and we'll come back and we'll kind of see how we progress.

24  And then we'll go from there.  Ten minutes.

25          COURT SECURITY OFFICER:  All rise.

1          (Recess from 12:05 p.m. to 12:16 p.m.; all parties
2    present.)
3          COURT SECURITY OFFICER:  All rise.  This Honorable
4    Court is back in session.
5          Please be seated.
6          THE COURT:  All right.  Well, given that I think
7    there's more than ten motions and we spent two hours on the
8    first one doesn't bode well for us, but we'll -- we're going
9    to -- I'm just going to go for a while, and then I'll see what
10   we're going to do here.
11         I'm going to hear argument on the motion to dismiss
12   filed by Durall and Fletcher.  Who's going to be arguing that?
13         MR. SAMUEL:  Your Honor, Don Samuel on behalf of
14   Mr. Durall.  And I guess we'll adopt the motion of
15   Mr. Christian Fletcher as well.
16         If we took two hours on the *Brady* motion, maybe if we
17   do this one in 15 minutes our average will be back down to
18   where it needs to be, you think?
19         THE COURT:  That would be fine with me.
20         MR. SAMUEL:  Okay.  You know, I'm almost tempted to
21   say we have put everything in our brief we could think to say
22   on this issue.  We bumped up against the page limit, I think.
23   And we did, in fact, cite all the authority we intend to cite.
24   But I would just like to --
25         THE COURT:  Well, let me -- let me just try this.

1    Let me ask you this question.

2              MR. SAMUEL:  Okay.  Sure.

3              THE COURT:  You know, I'm sure, by virtue of your

4    experience, that it's a rare thing for a federal criminal

5    indictment to get dismissed.  And it's really -- it's really

6    got to be defective.

7              It's either got to not have the elements in it or

8    it's not -- it's got to be devoid of any facts that support

9    those elements.

10             And, you know, I've read a lot of indictments over

11   the years.  I've read a lot of fraud indictments.  I've read --

12   I've had a number of multi-defendant cases.

13             And if I were to say to you this indictment seems

14   like it's about in the mainstream of indictments -- obviously

15   they're just allegations.  They have to be proven beyond a

16   reasonable doubt.

17             A lot of the things we just finished talking about in

18   the motion -- the *Brady* motion and a lot of the factual issues

19   and the role of the arbitration in Texas, and all kinds of

20   things that are interesting, and I'm sure will be a feature of

21   the defense when the case is tried, if it is, but that it just

22   doesn't -- it reads -- that your motion reads more like a

23   summary judgment motion than a motion to dismiss -- if I were

24   to say all that to you, what would you say to me?

25             MR. SAMUEL:  I'd -- I'd say can we move on to the

1    next motion or...

2         I'll tell you what I would say to that, Judge -- or

3    what I will say to that, not that I would.  I think that

4    considering this motion and the bill of particulars together is

5    worthwhile and would also be efficient.

6         But the short answer to your question is, in many

7    ways this does look more -- not like summary judgment, since I

8    don't do civil work at all, but more like a directed verdict

9    motion.  And I will concede that there's a lot to our motion

10   that sounds a lot more like a Rule 29 motion than a motion to

11   dismiss.

12        But here's the point that we -- that we are trying to

13   make in the motion to dismiss.  And, again, if you couple it

14   with a bill of particulars request and think about what we just

15   went through with the *Brady*, I think it maybe will make more

16   sense.

17        First of all, Rule 7 doesn't just say -- state the

18   elements of the offense.  Any lawyer here, or in America for

19   that matter, can open up the code and read, you know,

20   18 U.S.C. 1341 or 1349.

21        What Rule 7 says is you have to also have a concise

22   statement of the facts.  And it's not just any facts.  The

23   facts that have to be laid out are the facts which relate to

24   the elements.  It's not a requirement that the government prove

25   its case beyond a reasonable doubt in the indictment.

1          But the facts must allege, must relate to the

2    specific elements.  And the element that we are focused on, of

3    course, is the actual element of fraud.

4          And the fraud allegation that we are seeking to have

5    the Court focus on is:  Where is the misrepresentation?  Frauds

6    come in different shapes and sizes.  We're not talking about

7    honest services fraud here or anything like that.

8          The typical fraud case has either -- one of two

9    things.  There's a false representation.  There's a lie.

10   There's deceit.  And there's a material omission.  Those are

11   the two ways that frauds are committed.

12         It's either a lie, a misrepresentation, some kind of

13   deceit, through which the defendant obtains property or money,

14   or there's a material omission.

15         And what we seek in our bill of particulars is

16   specifically that.  What we are asking for is:  Where is the

17   lie?  What lie is being told?  And that's why it's kind of

18   interesting to think back to the *Brady* issue, why this is so

19   important to us, to know what lie is it that you're saying that

20   we told.

21         So we ask in the bill of particulars, Just tell us,

22   where on the claim form is there a lie?  What --

23         THE COURT:  Isn't the -- isn't -- you know, sometimes

24   this argument comes up in qui tam cases, too.  And the response

25   is sometimes the whole thing was a lie.

1      In other words, isn't -- isn't, fairly read, the

2  indictment alleging that when these billing claims went in to

3  Blue Cross or these other carriers, that claim to be from these

4  rural hospitals, when in truth and in fact they were tests that

5  had been performed by independent labs on persons who had no

6  connection to the hospital at all, or even to the locality at

7  all -- that when a claim was put in like that, it was either a

8  lie or it was an omission that -- that failed to tell the true

9  story of what the claim was?

10      Now, whether that can be proven beyond a reasonable

11  doubt and so forth, that's a completely different question.

12  But why is it not just that simple?

13      MR. SAMUEL:  Well, because even in -- you know, I

14  don't do qui tam litigation.  But even there they have an even

15  more -- in a fraud claim, they have even more obligation to

16  spell out what the lie is and what the material omission is and

17  what truth would be if there was no material omission.

18      And, you know, we know in this case that there's

19  nothing on a claim form that says where the test -- where the

20  lab -- excuse me, where the blood or urine was tested.  They

21  don't even say that in the indictment.

22      They don't say, You lied about where the claim --

23  excuse me, where the urine was tested.  They don't say that in

24  the indictment.  They don't say, You failed to tell Blue Cross

25  and Blue Shield that it was, you know, in a claim form, or in

1    any document that was sent to Blue Cross Blue Shield.  You

2    know, you failed to say that it was not a -- a patient

3    associated with the hospital.

4            And we need to know that because, as you know from

5    the other pleadings in this case, we -- we use the 141 code.

6    We told them it was not a patient of the hospital.  And if they

7    won't answer these questions for us, our concern is this moving

8    target that will happen at trial, where there's just kind of

9    this ephemeral sense of fraud.  There's this, It shouldn't have

10   happened.

11           Or sometimes we hear it referred to, like in the --

12   in the expert's report, it was just kind of a loophole that

13   they drove through.  And we want specificity.

14           And, again, I'm -- I'm addressing both the bill of

15   particulars here -- we're going to get two for one when I'm

16   done.  I'm addressing both the bill of particulars and the

17   motion to dismiss.

18           If we could just pin down what is the lie.  If the

19   lie is under no circumstances can a rural hospital ever get

20   reimbursed if the urine is not tested on site, say that.

21           There's -- we don't -- if that's their -- if that's

22   their allegation, that's what they're going to claim, if

23   they're going to say nonpatients can't be the subject of -- a

24   141 code can't be used -- you can't use 141 and identify the

25   patient as a nonpatient, that is a crime to do that, say that.

1    But they don't.  You just -- we just get this kind

2    of -- we're -- as you say, it's a detailed indictment.  It's

3    quite long.  But we're not talking about defrauding the

4    government.  We're talking about a victim who apparently claims

5    we didn't want to pay these claims.  We didn't intend to pay

6    these claims.  We don't envision the contract as calling for

7    these types of claims.

8    But none of that in the indictment specifically

9    alleges that.  And if you read through the indictment -- I'll

10   give you the close calls.  I'm -- I will readily acknowledge it

11   comes close in places.

12   But what -- what scares all of us on our side is,

13   without the level of specificity, this jury is going to be

14   clueless, if they are given the indictment, as to what exactly

15   was the fraud unless the government is going to concede or say

16   none of this was permissible.

17   And if you find that any of it was permissible or

18   subject to a reasonable interpretation of the -- of the

19   contract, then we are facing a jury trial without knowing

20   exactly where the crime occurred.  What is the actus reus of

21   this crime?  What is the false statement in this crime?

22   THE COURT:  Well, I'm looking at the indictment,

23   paragraph 37(j).

24   MR. SAMUEL:  That's the one I've written down here.

25   37(j) is the only one that's come close.

1    THE COURT:  "...would and did cause false and

2  fraudulent claims for reimbursement of the aforementioned

3  screening and confirmatory UA tests and blood tests to be

4  submitted to the Private Insurers...using the NPI and other

5  identifying information for the Rural Hospitals, as though the

6  testing was reimbursable under the Rural Hospitals' insurance

7  contract...when in truth and in fact, it was not."

8    MR. SAMUEL:  Yeah.  I agree.  37(j) is the closest it

9  comes.  But here's the problem with 37(j).  This language "as

10  though" -- I couldn't quite understand what the phrase "as

11  though" means in that paragraph, that they -- they identified

12  the hospital that's filing the claim.  That's accurate.  It

13  was, in fact, for example, Chestatee.  And it says Chestatee is

14  filing the claim.  And -- and the government's allegation is

15  that that is a misrepresentation.  It is the person who -- it

16  is the entity that is filing the claim.  There's no

17  misrepresentation about that.

18    And if -- if, in fact, that is their case, it's the

19  misrepresentation about who is filing the claim, then that

20  should be in the bill of particulars.  They should say, This

21  hospital should not have filed a claim at all.  It is a false

22  statement to say that it is filing the claim or that it's

23  entitled to file a claim.

24    But we don't -- we don't read even 37(j) to be clear

25  enough to say that.  And why would the government ever say,

1    We're not going to give you a bill of particulars?  Why would
2    they ever say that?

3              I never could understand, in 40 years of doing this,
4    why the government says, We're not going to give you a bill of
5    particulars, as if there's something they don't want us to
6    know.

7              And, instead, what we got from the government -- and
8    I should apologize.  You know, I put some things in the brief
9    there -- I'm somewhat late to come into this case.  I wasn't
10   involved at all pre-indictment.  And there were discussions
11   before with Mr. Rafferty and other lawyers -- never with me.
12   They've -- you know, once I got in the case, repeated requests
13   were made -- let me get beyond that.

14             You know, they say, Look at the discovery.  That
15   tells you what the case is all about.

16             You know, then we look at the discovery and, you
17   know, we go through, like, the *Brady* stuff -- well, they did
18   tell them there was a lab.  And so that doesn't answer the
19   question.

20             And then we read the government's expert, and
21   that's -- you know, he's got a different version of what the
22   141 code means.  It's all over the place in the discovery.

23             All we want, all we're asking for in the bill of
24   particulars is spell it out, what the crime is, what the false
25   statement is.  If it's -- if it's the use of the NPI number,

1    then -- then that's the fraud and that's what we'll deal with.

2              If it's under no -- if it's the breach of contract,

3    we certainly will be having Rule 29 discussions with you about

4    that, that it's just you're not allowed to do this under the

5    contract?

6              And as I said in my brief, I file claims -- you know,

7    every time one of my kids gets injured in a baseball game, I

8    file an insurance claim and, by golly, they always say no.  Is

9    that a fraud that I filed a claim that somehow is not covered

10   by the insurance policy?  That couldn't possibly be a fraud.

11             So we think the combination of the bill of

12   particulars and spell out the material omission, and what the

13   truth would have been, or spell out the false statement, at

14   least would let us know what we're facing here.

15             A breach of contract is not a fraud.  If there's any

16   ambiguity in the contract, any reasonable ambiguity -- that's,

17   you know, the *Whiteside* case -- is not a fraud.  All this is in

18   the brief.  And I don't mean to be reading the brief, in

19   essence, to you.

20             You know, even filing a claim that's not covered is

21   not fraud if the statements in the claim are accurate.  And

22   this indictment does not allege where is the lie and, if there

23   was a material omission, what would the truth have been that

24   was omitted.

25             THE COURT:  All right.  Thank you.

1          Anybody else on the defense side have any brief

2    comment on this motion to dismiss?  I know a number of you have

3    adopted it.  But is there anything else on the defense side?

4          Who's responding on behalf of the government?

5          MR. DUVA:  Your Honor, Mr. Winters is going to handle

6    the --

7          MR. WINTERS:  I will, Your Honor.

8          MR. DUVA:  -- motion to dismiss and I'm going to

9    handle the bill of particulars, that motion.

10         THE COURT:  All right.  Go ahead, Mr. Winters.

11         I guess the combination argument was made on the bill

12   of particulars and the motion to dismiss, but I understand

13   you're addressing the motion to dismiss.

14         Go ahead, sir.

15         MR. WINTERS:  I will.  And I'll be brief.  And I

16   think Your Honor put your finger right on it.  First of all,

17   you do have to look at the indictment as a whole.

18         Your Honor focused on paragraph 37(j), and rightly

19   so.  And I believe Mr. Samuel was going to focus on that as

20   well.  You also have to look at paragraph 37(k) and 37(l),

21   which elaborate on that.

22         But what these are -- this is -- this is no

23   different, again, than in a typical Medicare fraud case where

24   the parameters of what Medicare covers are set out in various

25   rules and so forth.  And those were analogous to contracts.

1    They say what's going to be covered and what's not going to be

2    covered.

3         And if there was a fraudulent representation which is

4    made in the claims that a particular service is -- that

5    reimbursement is sought for a particular service that's not

6    covered, and there is a -- there's a false statement about what

7    was provided or whether the services were medically necessary,

8    and that's the basis for seeking reimbursement on the claim,

9    that's a fraud.

10        So I -- I fail to understand why the defendants can't

11   understand what the fraud theory is in this case.  It's spelled

12   out frequently in -- certainly in our brief, when we've

13   indicated that the claim submissions that were made to these

14   insurance companies were fraudulent, in that they identified

15   the hospital's NPI number and tax ID number, and asked for

16   reimbursement as if these claims were reimbursable under these

17   contracts when they were not.

18        Now, the question of ambiguity under the contract,

19   that's a -- again, that's a factual issue.  And that's an issue

20   the defendants can raise at trial.  We don't believe that these

21   contracts are ambiguous.  And we believe the evidence will show

22   overwhelmingly that the contracts were not ambiguous, that they

23   covered claims for services that were provided by the hospital

24   in connection with the hospital.  And that's not what was

25   provided for here.

1       What was provided was -- what was provided was

2  testing, or what was -- what the hospitals were asking for

3  reimbursement for was testing that was performed at these

4  outside independent laboratories and were out-of-network.

5       And the entire purpose -- as we explain in the

6  indictment, the entire purpose for doing this is that its own

7  independent laboratories, the laboratories owned by

8  Mr. Fletcher and Mr. Durall and Mr. Porter -- if they had

9  submitted those claims directly to the insurance company

10  truthfully and honestly, they would have gotten little or no

11  reimbursement, because they were out of the hospital's network.

12       So the only reason to connect those tests to the

13  hospital, as we allege in the indictment, is to be able to

14  submit those claims under the hospital's NPI number as if they

15  were somehow connected to the hospital.

16       Now, the defendants have mentioned this 141 code.

17  And that's right there in the claims.  The claims data

18  spreadsheets, which we talked about earlier, and undoubtedly

19  the underlying electronic claims, use this 141 code that

20  identifies the -- the person whose test is being done as a

21  nonpatient of the hospital.

22       And we've known that from the very beginning.  And

23  that's -- we've never attempted to hide it.  We've never --

24  we've never suggested that -- that that was not conveyed to the

25  insurance company.

1        We just don't think that it -- it undermines our

2   fraud theory in any respect.  Because one can be a nonpatient

3   of a hospital, have a test referred to the hospital, and have

4   that test referred out to a reference lab.  That's the exact

5   opposite of what happened here.

6        And as we -- I think we allege and we indicate in the

7   brief, and the proof will certainly show, this was the exact

8   opposite of that, that the samples were not referred to the

9   hospital in the first instance and then referred out to

10  reference labs.  They were -- they were sent directly -- in

11  some cases directly to the outside reference lab, and in some

12  cases to the hospital only for this initial screening test, and

13  then outside -- to the outside reference lab for the

14  confirmatory test.

15       The point here is that there is a -- there's a very

16  clear explanation of what the nature of the fraud here is.

17  It's that the claims were submitted by the hospital and the lie

18  is in the claims.  The lie is in the claims submissions.  It's

19  not in emails.  It's not in oral statements.  We haven't

20  alleged any of that.

21       The lie is in submitting these claims day after day,

22  week after week, month after month to these insurance companies

23  asking for reimbursement for tests that were not done at the

24  hospital, but that were represented as if they were somehow

25  connected to the hospital.  So we believe it's very clear on

1    its face.

2            Now, Mr. -- one thing Mr. Samuel said struck me

3    that -- you know, if the government wants to say that no claim

4    from a hospital or patient whose testing is not done at the

5    hospital can ever be -- can ever be nonfraudulent, the

6    government should say so.

7            Well, that -- that's not our theory at all.  What

8    we've alleged is that, in respect to these contracts, these

9    particular contracts between these hospitals and these

10   insurance companies, as we'll prove at trial -- those contracts

11   provided that the insurance companies would reimburse the

12   hospitals for services that were provided by the hospitals.

13           Now, if a contract said, We'll reimburse you for

14   services provided by the hospitals, but we'll also reimburse

15   you for services -- for any tests that you -- that somehow is

16   billed under this contract, but was done at the reference lab,

17   well, then, of course, we wouldn't have a fraud case.  But

18   that's not at all what these contracts say.

19           So, again, I -- without belaboring the point any

20   more, I think the indictment read as a whole and under the

21   relatively light standards, as Your Honor observed, under

22   Rule 7, from reviewing indictments for purposes of the motion

23   to dismiss, this -- this indictment clearly alleges fraud.  It

24   alleges fraudulent misrepresentations and omissions.

25           It alleges fraudulent claims in submitting medically

1   unnecessary claims, which is an entirely different dimension of

2   the case that really hasn't been addressed today, but I know

3   will be addressed more in connection with the *Daubert* motions.

4   We believe this indictment easily surpasses the hurdle for a

5   motion to dismiss under Rule 12.

6           THE COURT:  Mr. Duva, you're going to -- I think the

7   joint argument has been made on the bill of particulars, so

8   I'll hear from the government on that.

9           MR. DUVA:  Yes, Your Honor.  I think -- and I won't

10  belabor it, because I think Mr. Winters basically addressed

11  that sort of in combination.  It's hard not to.

12          But in the response -- I'll just point the Court to

13  the response -- is that every factual sentence that was written

14  is sourced to a paragraph in the indictment, namely mostly in

15  paragraph 37.

16          So there was discussion about 37(j).  And Mr. Winters

17  brought this up.  I circled it on my copy of the superseding

18  indictment.  We would ask the Court to look at 37(k) and 37(l),

19  and really every subparagraph in paragraph 37.

20          And this was a theme, really, in the motion practice,

21  that the defendants just don't understand what they're charged

22  with.  And I think the first two hours of today really shows

23  that they have a keen understanding of what they're charged

24  with.

25          And in looking at this sort of -- and I think it

1    makes sense to kind of back up.  And this is clear in the

2    discovery materials.  It's clear in the grand jury transcripts,

3    which include Kyle Marcotte's testimony, who pled to money

4    laundering conspiracy.  It's clear in the David Byrns

5    testimony.

6            I'll just give an example of:  What do these rural

7    hospitals have to do with someone at Beaches Recovery in

8    Jacksonville Beach who urinates in a cup a couple of times a

9    week and that cup is sent to Reliance Labs for testing?  What

10   do the hospitals have to do with that specimen, that person?

11   The answer is nothing.

12           And that's a large part of the allegations in the

13   indictment.  And it's clear on the face of the indictment such

14   that a bill of particulars is not necessary, because it's the

15   same lie, the involvement of the rural hospital in any way,

16   shape, or form with the claim -- it's not a different lie in

17   this set of claims and a different lie in this set of claims.

18   It's consistent with all four hospitals.  That's what is

19   alleged in the indictment.  And it's a repeated thing.  So

20   that's why the government believes that a bill of particulars

21   is not necessary.

22           There are allegations about Counts Two through Six.

23   And that is what Mr. Rafferty, in the motion that Mr. Samuel

24   prepared, wanted to talk about.

25           And we did not have a meeting, although we responded

1      to every e-mail and said, Counts Two through Six identifies the

2      specific claim at issue.  These are the substantive aiding and

3      abetting health care fraud counts.  The date of the claim, the

4      initials of the beneficiary, the claim number, the amount

5      billed, the amount paid and the identity of the insurer.

6             And the grand jury testimony of the FBI agent makes

7      that clear where interviews of the insureds -- and oftentimes

8      it was a parent of a child who was suffering from addiction.

9      Those are turned over.  Those are identified.  They're exhibits

10     to the grand jury testimony of the agent.

11            And so our response was:  What else is there to talk

12     about?  That's -- the specific claims are identified in a

13     count, similar to the money laundering counts.

14            Every financial transaction that is charged is

15     alleged in the table -- I believe it's Counts Eleven through

16     Twenty-Three, the specific monetary transaction involved is set

17     forth.

18            So the government struggles to really discern what

19     else can it do to educate the defendants about the case.  But

20     the reality is -- and the Court, I think, can understand this

21     from the first two hours -- they know exactly what it's about.

22     And it's just -- it's not a mystery at all.

23            THE COURT:  Thank you.

24            Ms. Galnor, do you want to be heard on Ms. Zaffuto's

25     motion to dismiss?

1          MS. GALNOR:  No, Your Honor.

2          THE COURT:  I did have a question about that of the

3     government.  And it has to do with Count Seven against

4     Ms. Zaffuto, this whole issue about a conspiracy to attempt.

5          And I recognize that the indictment doesn't -- that

6     that's not all it says.  But is -- is this attempt language in

7     Count Seven -- is it confusing?  Is it -- is it unnecessary?

8          What -- what is your -- what's the government's view

9     of the attempt language?  Could it come out of the indictment

10    without messing up Count Seven?  I just want to understand the

11    attempt issue.

12         I don't know who -- Mr. Winters, are you the one to

13    talk about that?

14         MR. WINTERS:  Yes, Your Honor.

15         The -- the knowingly conduct and attempt to conduct

16    the financial transaction, that tracks the statutory language.

17    I think that's -- in other indictments that I've seen involving

18    a conspiracy to commit money laundering, that language is

19    typically included.

20         There's no effort by the government to try to charge

21    an inchoate offense of conspiracy to attempt.  I think we know

22    well and we don't disagree with the point that -- that that --

23    that's not a crime, to conspire to attempt.

24         I don't think taking it out would do any violence to

25    the indictment.  I think that -- you know, if Your Honor would

1   want it redacted, for example, if it goes to the jury, we can

2   certainly agree to do that.

3         But the -- the overarching point is that we allege a

4   conspiracy to knowingly and intentionally combine, and to

5   knowingly conduct the financial transaction.  The "and attempt

6   to conduct" is really -- is really not necessary, and likely is

7   there -- well, I won't say likely.

8         It is there because -- because it -- you know, this

9   is sort of an effort to track the statutory language, which

10  is -- which is often good practice.

11        THE COURT:  All right.

12        MR. WINTERS:  But as I said, we don't have any

13  objection to redacting the attempt.  It doesn't -- it doesn't

14  take away from the point that the -- Count Seven is properly

15  charged as to Mr. Durall and Ms. Zaffuto.

16        THE COURT:  All right.  Thank you.

17        Well, I just wanted to ask the question.  I'll figure

18  out what to do with it.  You know, I don't -- I don't always

19  send my indictments back anyway.  In a multi-count case, in a

20  multi-defendant case, sometimes I do, but I redact them.  So

21  we'll figure it out.  But I just wanted to make sure I

22  understood the government's position.

23        So I'll -- I think it was a good point raised by

24  Ms. Galnor.  And I -- and I understand your position.  And

25  we'll -- we'll do something -- we'll either redact it or we

1   won't send the indictment back or something.  And if the

2   government is not going to attempt to prove a conspiracy to

3   attempt, then that -- that alleviates that issue.

4          All right.  Thank you.

5          On behalf -- the motion to -- or motion to dismiss on

6   behalf of James Porter and Sean Porter, Mr. Schwartz?

7          MR. SCHWARTZ:  Yes, sir.  Seth Schwartz on behalf of

8   James Porter.

9          This was a joint motion with Mr. Rowland, Sean

10  Porter's counsel.  He handled the money laundering aspects of

11  it, so I will leave that argument to him.  I won't bring it up.

12         I'm going to stand on the brief and just -- just

13  state very briefly that, from our perspective, the information

14  that is alleged in the indictment against Mr. James Porter is

15  not a violation of law.  That's the issue that we have.

16         The contracts and the provider manuals did not

17  prohibit this conduct.  If you go back to some of the

18  statements that were made during the *Brady* motion, Blue Cross,

19  which is the largest victim in this case, flat-out says in an

20  e-mail that there's nothing we can do about pass-through

21  billing, because the contract is silent as to it.

22         What the government is complaining about is that

23  notion of pass-through billing.  The idea that a hospital has

24  contracted with another entity to subcontract work, that the

25  hospital then bills for that work, and that the hospital

1  collects the money for that work and then pays the

2  subcontractor, that is known as pass-through billing.

3          The contracts are silent as to that.  The provider

4  manuals, which go into hundreds and hundreds of pages, are

5  silent as to that.

6          In health care, the standard essentially is that if a

7  contract is silent as to something -- I'm sorry.  This mask is

8  driving me crazy.

9          If a contract is silent as to something, then you

10 look to federal law, CMS guidelines, Center for Medicaid -- or

11 Medicare and Medicaid Services.

12         CMS guidelines that existed during the relevant time

13 period required that billing to be done exactly the way that it

14 was.

15         So pass-through billing at the -- during the relevant

16 time period was allowed through federal law, CMS guidelines.

17 It was also talked about in 42 U.S.C. 13951, which talks about

18 payment of fees and things like that.

19         And absent the contract prohibiting that conduct or

20 the provider manuals prohibiting that conduct, then it's

21 completely lawful.  There hasn't been anything that's been done

22 by Mr. Porter or his company that is violative of the contract,

23 the provider manuals, or federal law.

24         And that's the issue.  They want to complain that the

25 hospitals entered into some kind of agreement with the

1  reference laboratories, that the reference laboratories then

2  did the testing and the hospitals billed for those -- for those

3  items, that the basis of the testing was not individuals that

4  presented either as inpatients or outpatients at the hospital,

5  but individuals that were sprinkled all throughout the country,

6  where hundreds of different doctors ordered these tests and the

7  testing was done by these reference laboratories.

8          There's nothing violative of the contract.  Again, we

9  can look to the statement that was made in the emails that are

10  included in the *Brady* motion, where Blue Cross, on their

11  self [sic], is saying, Yeah, this is pass-through billing.  We

12  can't do anything about it, because the contract is silent as

13  to it.  Let's get them into a new contract.

14          And they got them into a new contract that prohibited

15  it.  That's when they issued the superseding -- the superseding

16  provider manual that followed the new contract that did, in

17  fact, prohibit it.

18          And then shortly thereafter, Medicare and Medicaid

19  Services -- federal law was changed in 2018 that also

20  prohibited pass-through billing.  But during the relevant time

21  period of this case, this -- this information was not illegal.

22          And that's the crux of what we're talking about in

23  our motion in citing to health care law and health care

24  standards, as well as normal, you know, law that's in the

25  federal system regarding a motion to dismiss.

1      We're aware that the Court has to look at the four

2  corners of the pleadings.  And it's not a summary judgment

3  standard.  And it's a very restricted standard in the Eleventh

4  Circuit.

5      But taken what has been claimed and looking at what

6  the law was at the time, what the contracts and provider

7  manuals were at the time, it was required to be billed the way

8  it was.  And there was nothing nefarious or illegal or improper

9  about any of this.

10     And, again, although not part of the indictment

11  directly, this Court can look to the e-mail that was part of

12  the *Brady* motion from Blue Cross Blue Shield flat-out saying,

13  We can't do anything about this, because the contract is silent

14  as to it.

15     So that's what I'd like the Court to focus on, as far

16  as Mr. Porter's motion to dismiss.

17     THE COURT:  Thank you.

18     MR. SCHWARTZ:  Thank you.

19     MR. ROWLAND:  Your Honor, Caleb Rowland appearing on

20  behalf of, today, Mr. Sean Porter, but I'm handling the money

21  laundering and conspiracy count for both of them.

22     I'm going to take my mask off.  I'm fully vaccinated,

23  but I'm burning up with that thing on.

24     This kind of piggybacks on Mr. Fletcher and

25  Mr. Durall's argument as well, in that there is nothing in the

1  conspiracy to commit money laundering count against both of

2  the Mr. Porters -- and I'll just say Porters, if that's okay

3  with you -- to indicate to them that they would know that they

4  were engaging or conspiring to engage in a transaction

5  involving the proceeds of illegal activity.

6         I have scoured the superseding indictment.  I've put

7  together paragraph after paragraph to try to understand how

8  either of the Porters would know that the funds that were

9  involved in the transactions that are complained about were the

10  proceeds of illegal activity.

11         And, admittedly, this gets into the -- the idea that

12  even Blue Cross didn't think that this was illegal, that --

13  that this was outside of their contract.

14         The reason that this is a -- that this is a

15  problem -- and, quite honestly, Your Honor, more specifically

16  for Sean Porter than for James Porter in this, but -- my

17  client, Sean Porter, is one step removed from everything else

18  that's going on in this case.

19         But the reason that it's a problem is there are no

20  facts that particularly support the material allegations of

21  money laundering here.

22         There's nothing in here that says that there was

23  money moved from A to B -- there was a financial transaction

24  involved.  The money moved from A to B that came from a

25  specific illegal act.  It just says, They're the proceeds of

1   illegal activity.  And the illegal activity is what we've

2   alleged in Counts Two, through, I believe, Six, or Seven.

3          Without that knowledge element, and without pleading

4   that in a -- in, I guess, a more specific way, essentially --

5   without that knowledge element, my client doesn't know how to

6   defend that.

7          If -- and I think there's a qualitative difference

8   here, Judge, between a money laundering -- money laundering

9   prosecution, where the accountant for a drug dealer moves money

10  for him, where there's no other source of legal income, that

11  that -- that that -- that accountant knows what his client does

12  for a living.

13         There I think that just pleading the knowledge, in

14  terms of knowing that the -- the funds were the proceeds of

15  illegal activity would probably be sufficient.  That's not what

16  we have here.

17         We have people who -- who very obviously believed

18  that what they were doing was legal and -- and, quite honestly,

19  weren't given any reason to think it was illegal.

20         So the issue that I have with the money laundering --

21  the substantive money laundering claims -- and those are -- for

22  James Porter, that's Counts Eleven through Twenty-Two; for Sean

23  Porter, that's Sixteen and Twenty-Two -- is that the government

24  hasn't given any facts that would support the idea that either

25  one of the Porters knowingly engaged in a financial transaction

1    that included funds that they knew to be from -- or funds that

2    they knew to be the proceeds of illegal activity.

3              And, again, I'm pretty much going to stand on the

4    portion of our brief as well.  But I did want to point out

5    to -- to Your Honor and just have you specifically look at the

6    *Butzman* case that we cited.  There's a quick citation from

7    that.

8              It says, An indictment is insufficient if it states

9    conclusions rather than the facts upon which the conclusions

10   are based.

11             Just saying that they engaged -- that they knowingly

12   engaged in transactions that were involving the proceeds of

13   illegal activity is a conclusion.  The facts would be:  How

14   would they know that?  What knowledge did they have?

15             Granted, it's hard to get into somebody's mind.  But

16   there's another case that I cited -- and I think it was the

17   *Toll* case that goes through some of that.  It explains how do

18   you determine that somebody knows or has knowledge of the

19   illegal character of the -- the funds that you're moving

20   around, that you're engaging in money laundering.  And none of

21   that is in this.  Literally nothing.

22             It boils down to there were two transactions with my

23   client, Mr. Sean Porter, and he knew that that was the proceeds

24   of illegal activity.

25             With James Porter it's -- I think it's six or seven

1    counts, exact same thing.  I don't disagree that the table

2    tells us which transactions we're talking about.  At least we

3    have that there.  I mean, that's better than the health care

4    fraud argument where it's just, Yeah, they just lied.  Where?

5    Where did they lie?

6              At least here we can say, Okay.  These are discrete

7    transactions.  And we -- at least we know which ones they are.

8    Now the question, at least in my mind, in terms of being able

9    to effectively defend my client here is, Okay.  Well, what are

10   you basing the idea that he had knowledge of the illegal

11   character of these funds on?  Because if I don't know that,

12   there's a whole world of possibility out there.

13             And so I think that in terms of -- of the factual

14   pleadings that would lead to the -- or that are the

15   underpinnings of both the conspiracy and the substantive money

16   laundering charges -- there simply isn't enough factually

17   listed here to sustain the -- those counts against our clients.

18             Thank you, Judge.

19             THE COURT:  Thank you.

20             Who's responding on behalf of the government?

21             MR. WINTERS:  Gary Winters, Your Honor.

22             THE COURT:  Go ahead, sir.

23             MR. WINTERS:  All right.  Let me first address

24   Mr. Schwartz's argument.

25             Now, Mr. Schwartz is focusing on -- on what he

1    believes those contracts say.  And he is going to, I think,

2    present a trial defense, as other defendants who have spoken

3    today have indicated, that the contracts are ambiguous, that

4    they don't address -- they don't address billing for tests that

5    were done at a reference lab.

6            And the contracts don't address a lot of things that

7    would -- you know, that would be prohibited if you -- and if

8    you did them and falsely alleged -- or falsely submitted a

9    claim indicating that you had done otherwise, the contracts

10   would be -- would be -- those would be fraudulent claims as

11   well.

12           So I don't need to get into the -- the details of --

13   of what the contracts provide.  But, again, as I said before,

14   suffice it to say the government intends to prove, just like in

15   a Medicare case -- and I keep drawing that analogy, because it

16   is very similar, in the sense that a health insurer payor has

17   rules, and submitting claims that seek reimbursements that are

18   not permitted under those rules, and lying about the nature of

19   the claims or the nature of the testing or the nature of

20   whatever medical service was provided in order to receive that

21   money is -- can be -- can be a fraud, if there's an actionable

22   fraudulent misrepresentation or material omission, which is

23   exactly what we allege.

24           Now, this rule with respect to the supposed -- you

25   know, the Medicare rule with respect to allowing the hospital

1   to bill for services that are -- that were provided by an
2   outside reference laboratory, which is permissible in some
3   circumstances under -- under Medicare law -- it's 42 U.S.C.
4   1395(l), which I think Mr. Porter -- or Mr. Schwartz cited --
5   again, that's -- that's not -- that rule is not incorporated in
6   any way into these insurance contracts.
7          Mr. Schwartz indicated that sort of general health
8   care law says, Well, if the contracts are silent, then
9   you -- you know, then you look to Medicare law.
10         The contracts don't say that.  The contracts don't
11  indicate that -- that they should be guided in any way by the
12  billing rules or the claims procedures that are set out in --
13  in Medicare law.
14         So -- and I -- I believe, you know, the defendants
15  are certainly -- and Mr. Schwartz, of course, is familiar with
16  this.  I mean, that's the position that I believe Blue Cross
17  has taken in the civil litigation in which it's seeking to
18  recover.
19         Now, they have -- their claims are slightly
20  different.  Their breach of contract claims were, of course,
21  not alleging the breach of contract.  And I do want to make
22  that very clear.  We are not alleging in any respect a breach
23  of contract.  This is a fraud theory.  And it has to be in
24  order to be a criminal violation.
25         So, again, the absence of -- of any mention of -- of

1   billing by the hospital for tests that were done at these

2   reference labs doesn't in any respect say, We can just go and

3   we can rely on Medicare law.

4          And so, again, the argument that we've heard from

5   Mr. Schwartz is primarily a summary judgment argument, or the

6   kind of argument that I think, you know, he will undoubtedly

7   make to the jury.

8          And we'll have evidence with -- you know, that we

9   believe that will show that the contracts are not ambiguous,

10  that show that they specifically covered services that were

11  provided by the hospital under those circumstances.

12         And given the way the contracts were written, that

13  was the coverage -- that was the coverage rubric that governed

14  the claims that the hospital submitted to the insurance

15  companies, and that -- that submitting claims without

16  identifying the reference labs and without indicating that

17  these tests were done at the reference labs didn't -- didn't

18  allow them to just fall back on -- on Medicare rules, which --

19  which in some circumstances would permit that type of billing.

20         THE COURT:  Thank you.

21         MR. WINTERS:  With respect to the money laundering

22  claims that Mr. Rowland raised, I think the question he asked

23  is:  How would the Porters know that the proceeds -- that the

24  proceeds were proceeds of illegal activity?

25         Again, that's -- that's a trial issue.  We've alleged

1    in the indictment -- and there are cases that we cited in our

2    brief, *United States versus Hill* and *United States versus*

3    *Lazarenko*, which has -- and they're not Eleventh Circuit cases,

4    granted, but they are well-reasoned opinions that set out the

5    way that money laundering can be properly alleged so it can

6    give the defendant the kind of notice that he's entitled to

7    under the rules and under the Constitution, indicates that

8    the -- precisely the allegation that we've made here, which

9    tracks the language of the statute in Count -- in Count Eight,

10   in which both Porters, as well as others, are charged with

11   money laundering is perfectly sufficient.

12          Because it tells them that they knowingly and

13   intentionally combined and agreed with each other to knowingly

14   engage in -- test and engage in monetary transactions.  And it

15   further says that the specified unlawful activities that

16   generated the proceeds -- the illegal proceeds are conspiracy

17   to commit health care fraud and wire fraud.  And the -- the

18   factual bases for those are set out in great detail earlier in

19   the indictment.

20          So the government certainly has to come in and prove

21   how the defendants knew that the -- that the property was

22   derived from specified unlawful activity.  But we don't have to

23   allege with precise details in the indictment to say how they

24   knew that.

25          Now, the same would go as to Count -- as to the

1    substantive money laundering counts, in which Mr. Porter --

2    Mr. James Porter is charged in a number of counts.  And I

3    believe Mr. Sean Porter is charged in one count.

4           As to James Porter, the notion that he can't

5    understand how -- how he knew that the proceeds were proceeds

6    of specified unlawful activities is hard to understand, given

7    the extensive allegations regarding the health care fraud and

8    the wire fraud conspiracy scheme that's set out in Count One.

9           And so, again, I think the argument that I heard was

10   that he can't understand how he could be -- how he could have

11   known that these were proceeds of unlawful activity, because

12   they're not unlawful activity in the first place.

13          Again, that goes back to the earlier motions to

14   dismiss, which -- which, as I indicated earlier, the -- the

15   allegations as to what the unlawful activity is and how there

16   was a conspiracy to commit health care fraud and wire fraud

17   that's adequately alleged in the indictment is -- is

18   sufficiently stated there.

19          THE COURT:  I think I -- I think that's going to be

20   sufficient, Mr. Winters.  Thank you.

21          MR. WINTERS:  All right.

22          THE COURT:  So the motions to dismiss are under

23   advisement.  We've already -- the Court's already heard

24   argument on Mr. Durall's motion for bill of particulars, which

25   is under advisement.  That's doc 213.

1        Mr. Bell actually filed a motion for bill of

2    particulars on behalf of Jorge Perez, doc 231.  The government

3    did not respond to it.  I assume that was just an oversight.

4        But what it requests -- it's a more targeted motion.

5    And it requests a list of unindicted coconspirators, which is

6    something that -- even going back in my days as a magistrate

7    judge, sometimes those were granted even -- even if you weren't

8    going to grant a larger bill of particulars -- and I've not

9    made a decision on that.  But sometimes those were granted as

10   being an appropriate item of specificity.

11       So I don't know, Mr. Winters, if you're the one to

12   respond to that or whether Mr. Duva, whoever.  But Mr. Jorge

13   Perez has asked for a bill of particulars to list unindicted

14   coconspirators.

15       And what's the government's response to that?

16       MR. HAYES:  Your Honor, Mr. Hayes.  I'll respond.

17       THE COURT:  Okay.

18       MR. HAYES:  One reason perhaps for the lack of a

19   response is we're willing to provide that information.  As the

20   Court has pointed out, that's not uncommon.  So happy to be

21   talking for the first time in the Middle District of Florida.

22       THE COURT:  Okay.

23       MR. HAYES:  I'm going to keep my mask on.  I've got

24   to make a mask joke now since they all have.  I am fully

25   vaccinated, but I got my second shot yesterday.

```
 1              THE COURT:  All right.
 2              MR. HAYES:  So if it's all the same to everyone, I'll
 3    keep the mask on.
 4              THE COURT:  That's fine.
 5              MR. HAYES:  I think people can hear me and I tend to
 6    project.  So it's probably better for everyone if I just leave
 7    this on.
 8              THE COURT:  That's fine.
 9              MR. HAYES:  We're willing to provide that.
10              THE COURT:  All right.  Well, then I'm going to go
11    ahead and grant the Defendant Jorge Perez's motion for bill of
12    particulars and direct the government, by way of particulars,
13    to file a list of un- -- or serve a list of unindicted
14    coconspirators, and do so on all the parties, of course.
15              And we can -- probably when we're at the end of the
16    hearing we'll set up deadlines for what -- how we're going to
17    proceed, in terms of the next steps in the case.  And we'll
18    include that.
19              So, Mr. Bell, you won your motion and you didn't have
20    even have to say anything, so...
21              MR. BELL:  Although I'm saving it up for later,
22    Judge.
23              THE COURT:  All right.  Good.
24              MR. HAYES:  Well done, Mr. Bell.
25              THE COURT:  All right.  The next motion, I'm not sure
```

1    of the status of it.  Defendant Christian Fletcher filed a

2    preliminary motion to sever.  I saw there was a filing, either

3    yesterday or today, but I couldn't quite tell if it had been

4    withdrawn or what the status of it was.

5            So let me just ask, Mr. Sadow, what's the status of

6    the motion to sever?

7            MR. SADOW:  Your Honor, the preliminary motion for

8    severance is still pending.  I think it would -- another

9    codefendant withdrew -- Mr. Porter withdrew their motion.

10           THE COURT:  Okay.  So -- all right.  So that doesn't

11   affect yours.

12           Okay.  So the Porters' motion to sever, pursuant to

13   doc 302, will be withdrawn.  We'll include that in whatever

14   order we do.  But you still have your preliminary motion.

15           I saw it was very brief and said you don't know yet

16   and the government says you should know.  We probably don't

17   need to spend a lot of time on it.  But if you want to -- if

18   you want to say something, where we stand right now, I'm happy

19   to hear from you.

20           MR. SADOW:  45 seconds.

21           THE COURT:  Sure.

22           MR. SADOW:  Some courts require you to file a

23   preliminary motion to keep it alive.  I did so.  I did not

24   attempt to set forth facts, because at the time I filed it I

25   didn't have any.

1        Things are a little different now.  And I'm not

2   suggesting that needs to be a motion for severance in a jury

3   trial.  I'm wondering whether or not -- and I have to confer

4   with my client a little further.

5        I'm considering whether or not I wish to file in

6   writing a Rule 23(a) nonjury trial request with the Court.

7   There's some case law that suggests, even if the government

8   does not consent, that the Court would have the authority.

9        With the matters that are now before the Court

10   through the *Brady* motion, as well as discovery and so forth, it

11   may well be that that right to a jury trial in this case is

12   something we're willing to -- to give up.  And I'd like the

13   opportunity to consider that.

14        If I file one in writing and the government consents,

15   that's fine.  If they don't, then obviously I need to brief the

16   issue as to what the Court would be able to do.

17        There's a recent case that was just decided out of

18   the Eastern District of New York in August of 2020 in which

19   COVID was a basis for ordering a nonjury trial upon the request

20   of the defendant, along with other factors, of course.

21        In this case it may be much easier for a

22   determination to be made in a speedy fashion to have the Court

23   do so.  And I'd like to keep it alive for that basis.

24        THE COURT:  All right.  Well, of course, I'm not

25   going to prejudge any motion you might file.  And I'm not --

1    I'm not -- I think, obviously, that would have to be a
2    considered decision.  And we'll see.
3         But I'll -- I'm going to just -- I'll rule on the
4    motion to sever at this point.  It's a preliminary motion to
5    sever.  That's not been a general practice in our court.  But
6    I'll rule on that motion.  I won't try to predict or prejudge
7    any other motion that might be filed in the future.
8         And I think we're also going to be -- as we get to
9    the end of the day, whenever that is, we will be talking about
10   schedule, we will be talking about trial date, we will be
11   talking about COVID.  We'll be talking about all of that by the
12   end of the day.  And so we can -- we can have those
13   discussions.
14        All right.  I have a motion by the defendant Durall
15   to strike surplusage, the word kickbacks.  And I think we can
16   have that discussion at some other point.
17        Again, it's possible I won't send the indictment
18   back.  It's possible that that might be an in limine issue in
19   terms of proof or terminology.  But I'm not going to take
20   additional argument on the motion to strike surplusage, doc
21   214, at this time.
22        Likewise, I will not be taking argument on the motion
23   for the *James* hearing, doc 253.  Well, I'll tell you what,
24   I'll -- if the Porters -- one lawyer, how about, since you both
25   filed it.

```
 1          If you just -- you saw what Mr. Duva said.  It's not

 2   typically the way we've been doing it.  It's not even clear

 3   that the rules contemplate it as much as they used to back in

 4   the day.

 5          If there's something I'm missing out of that, I'm

 6   happy to be educated briefly.  But does anybody -- do you wish

 7   to be heard?

 8          MR. SCHWARTZ:  Just briefly, Judge.

 9          I think that the main basis for the government's

10   objection is simply that the Middle District hasn't done it in

11   20 years, and if you start doing it you're going to break the

12   seal and have to do it in every case.

13          The concern that we have, obviously, with 801(2) --

14   or, I'm sorry, (d)(2)(E) hearsay, is that if it is presented

15   during trial, the jury has heard that information.  And if the

16   government can't button up their case at the end, then this

17   Court has to go back to the jury and say, When Witness No. 1

18   testified six weeks ago, they made the following statements.

19   You have to disregard that now, Witness 2, 3, 4, whatever it

20   may be.

21          And from a defense perspective, jurors, we don't

22   believe -- they just don't think that way.  Although the Court

23   gives instructions not to make your mind up about anything

24   until, you know, you've deliberated fully at the conclusion of

25   the case, human nature is to gauge individuals and make
```

1    decisions very quickly on whether you believe they're

2    trustworthy or not.

3            And for a jury to keep all of these statements

4    separate and independent in their mind in what's likely going

5    to be a six- or eight-week trial, maybe even longer, is --

6            THE COURT:  Give me a concrete example of what you're

7    talking about, so I can understand.  Because as you probably

8    know -- I mean, certainly it's not a reason not to do something

9    because we haven't done it in 20 years.

10            If it's supposed -- you know, if it's a good idea to

11    do it now, or the law says I should, of course I'll do it,

12    and -- but we -- I've tried a lot of conspiracy cases over the

13    years.  So have my colleagues.  And we haven't had *James*

14    hearings in advance.  We've used the tools the rules give us to

15    adjudicate those matters.

16            So just -- just give me an example of what you're

17    talking about, so I could -- can understand what you're saying.

18            MR. SCHWARTZ:  Sure.  The main concern that we have

19    is that -- at least from our perspective, and I believe from

20    the perspective of the documents that are in our possession,

21    the government's position in this case is way off base.

22            They believe certain things are occurring.  We have

23    documents to prove otherwise.  They believe that the insurance

24    companies have been forthright with them.  We have documents to

25    prove otherwise.

1          And the concern is -- is that they decide in their

2    judgment that we're going to call the following coconspirators

3    and they're going to elicit a bunch of this 801(d)(2)(E)

4    hearsay information.

5          And then they find out afterwards that the position

6    that they took or what they thought was just wrong.  And at

7    that point the Court has to correct that information.

8          I understand that taking a little bit of extra time

9    to do this ahead of time is difficult and the Court's very

10   busy.  I'm not suggesting that they have to bring the witnesses

11   in and have them testify or anything else.  I believe they can

12   do it by proffer.

13         But it would not be all that difficult to say, We

14   plan to bring in 801(d)(2)(E) hearsay statements with the

15   following alleged coconspirators, about whatever they're going

16   to say, and this is how these coconspirators tie together.

17         If they're able to show that ahead of time and the

18   defense looks at it and says, Okay.  Well, at least as to how

19   you're alleging these things occurred, we don't have anything

20   definitively to show that they're actually not coconspirators,

21   or whatever else, then no harm/no foul.

22         But if we determine that what we have -- you know,

23   documents and other information that will prove that these

24   people are not coconspirators, and by eliciting this hearsay

25   that's not able to be cross-examined, we believe that it would

be harmful to the defense, and -- because the jury would get it
and then it would have to be essentially redacted out of their
minds, we believe that's just a better -- a better way to
handle it.

And in the brief there's a number of quotes from
appellate courts throughout the country that basically says
that, you know, if possible, the better way to handle this is
ahead of time, to prevent potential irreparable injury to the
defense, possibly even a mistrial.

And normally, when you're dealing with conspiracy
cases, you're dealing with, you know, human trafficking or drug
trafficking. It's pretty straightforward. And usually the
government has, you know, done a good job investing in the case
and they have control of it.

In this situation, they're relying on insurance
companies to provide the base level of investigation. And we
just went over that with the *Brady* stuff, so I won't go over it
too much.

But we know at this point that the insurance
companies have withheld information -- material information
that the government has relied upon.

And there is an extreme concern that the government
will think one thing, but information that the defense has will
prove another. And I would just prefer not to have that occur
in front of the jury and then the Court go back at the

1  conclusion of trial saying that the government couldn't tie

2  those bows up.

3       I'm not even suggesting that we need a full hearing.

4  I think that the government can put a table together, identify

5  whatever coconspirators are going to testify, or they may --

6  you know, may testify, say generally what their statements are

7  and how they relate and tie in.

8       And I think the Court can look at that with a brief

9  and response by the -- by the defense that says, Wait a minute,

10 take a look at these documents, take a look at this

11 information, these deposition transcripts from the civil case,

12 whatever it may be, that show that that information is not

13 correct, and then the Court can make a determination.

14      THE COURT:  All right.  Thank you.

15      Okay.  Who -- Mr. Duva?

16      MR. DUVA:  Yes, Your Honor.  And we'll stand on the

17 response.  I mean, much of Mr. Schwartz's presentation was

18 about how wrong the government is and the allegations in the

19 case.  That doesn't really have much to do with a *James*

20 hearing.

21      And, arguably, the *James* case is no longer good law

22 for two reasons.  And if I was in South Louisiana, I'd probably

23 say Bour-jai-lay, but I'm in Jacksonville so I'll say

24 Bour-jaily.  And also --

25      THE COURT:  Kind of like *Dau-bert* and *Daub-ert*,

1     right?

2              MR. DUVA:  So the Supreme Court's decision in

3     *Bourjaily* and the subsequent amendments to Federal Rule of

4     Evidence 801(d)(2)(E) really negate the necessity or the

5     requirement of a *James* hearing.  And the game has changed since

6     the *James* decision.

7              So *Bourjaily* says the government needs to prove the

8     preliminary facts established in the conspiracy only by a

9     preponderance of the evidence and that the statements sought to

10    be admitted could themselves be examined as evidence of the

11    underlying conspiracy.

12             I've been here 14 years.  I've never had a *James*

13    hearing.  The only one that I know of was in 2001 from a

14    visiting judge in Oklahoma.  Judge Schlesinger similarly denied

15    motions.

16             And I would argue in this case it's even less

17    necessary.  And we point this out in the brief.  This case is

18    about what the defendants collectively did and what

19    misrepresentations were made to the insurance company that

20    caused the insurance companies to pay the claims, and how the

21    defendants then hopped from hospitals in Florida to a hospital

22    in Missouri, and then Mr. Durall from hospitals in Florida to

23    Chestatee and Dahlonega, Georgia.  So it's more of what they

24    did than what they said to each other along the way.

25             I will point out two individuals who pled to

1    informations, Kyle Marcotte and David Byrns.  They both

2    testified in the grand jury.  It was relatively expansive.  We

3    turned that information over early.  That was in one of the

4    initial discovery productions.

5            So the government believes for -- because of the

6    Supreme Court decision, the amendments to Rule 801, and the

7    discovery, and how it was provided with respect to grand jury

8    testimony, that a *James* hearing is just unnecessary in this

9    case.

10           THE COURT:  Thank you.

11           All right.  Here's what we're going to do.  We're

12   going to take a break.  We can't just keep going, I don't

13   think.  It's not fair to the court personnel nor to the

14   parties.

15           So I think what I'm going to do is we're going to

16   take a 45-minute break.  I think that's enough time for you to

17   step out, get a sandwich, if you're going to, and just take a

18   break.  And so we're going to be back in session at 2:05.

19           When we come back into session, the first motion will

20   be the government's motion in limine, and then we will get into

21   the *Daubert* motions.

22           And then we will do that.  And then at the end of the

23   day we will be talking about whether we need to reset the

24   schedule that we're on and any other matters by way of status

25   and whether we need an interim status.

1           Anyway, so I want y'all, to the extent that you're --
2  want to talk to each other about it or either -- at least talk
3  amongst yourselves, any -- any -- any motions to continue based
4  on anything, I'll entertain at that point.  Because I would
5  like to leave today having a better understanding of what we're
6  going to do going forward here.
7           So that's the plan.  And we are in recess until 2:05.
8           COURT SECURITY OFFICER:  All rise.
9       (Recess from 1:21 p.m. to 2:06 p.m.; all parties present.)
10          COURT SECURITY OFFICER:  All rise.  This Honorable
11 Court is back in session.
12          Please be seated.
13          THE COURT:  All right.  We're back in session.  And
14 we'll take up the government's motion in limine to preclude
15 defendants from arguing no fraud occurred because insurance
16 companies paid claims.  That's doc 211.
17          Who's going to argue that?
18          MR. DUVA:  Yes, Your Honor.  And we'll be very brief
19 about this.  And I -- and I think ultimately there's -- there's
20 probably some agreement here.
21          We want to bring the *Svete* case, which we know the
22 Court is well aware of, the Eleventh Circuit case, to light.
23 In this scenario, I think what ultimately will happen, which is
24 permissible, is the defendants will say -- of course, they
25 don't have to prove anything.  I'm not suggesting that.

1            But the theme of their presentation is going to be

2       the insurance companies paid because there was no fraud.  The

3       insurance companies paid because this was a proper reference

4       lab scenario.  We're not trying to preclude that.  That's

5       totally fine.

6            It can't stop at the insurance companies paid and

7       they just kept paying.  There's got to be the "because."  And I

8       think in this case, with this group of lawyers, there will be

9       the because.  And that's all we're after here.  And that's

10      totally permissible.

11            THE COURT:  All right.

12            There was a joint response filed by the defendants

13      Durall and Zaffuto.  Do either counsel for those parties wish

14      to be heard?

15            MR. SAMUEL:  I don't think I have much disagreement

16      with the government.  I mean, we know we can't say, You're a

17      victim and, therefore, it's your fault.  But as you can tell

18      from our defense so far, we don't think there was a victim at

19      all in this case, and -- but...

20            THE COURT:  Well, I -- okay.  You know, I think the

21      evidence will come in -- certainly -- certainly the fact that

22      these claims were paid will be part of the evidence.  And

23      people will make what they will of that.

24            But, you know -- and I think probably all of us know

25      what's permissible and what's not, so I'm -- I think to the

1    extent the government's motion has brought that issue to light,
2    I think that's fine.  I think the response of the defendants is
3    perfectly appropriate too.  So I don't -- I don't take us to
4    have a whole lot of disagreement in this area.
5         Mr. -- I guess, Ms. Galnor or Mr. Landes, did you
6    wish -- because I guess you filed one as well, Mr. Landes.
7    Does either one of you wish to be heard?
8         MR. LANDES:  Judge, I would, just -- I did file a
9    pretty detailed response.  And perhaps from what I've heard
10   here today, I -- it was my thought that the government was
11   seeking to preclude the defendants from talking about, you
12   know, all the conduct of -- of the insurance companies.
13        So -- and what I heard Mr. Duva just say, Well, we'll
14   allow that claims were paid, but not because -- I would just
15   like some clarification on that, because I think there's an
16   awful lot of fertile ground in terms of cross-examining these
17   insurance companies.
18        And I don't want to get into a situation where I ask
19   a question about, Well, isn't it true that you sought to
20   renegotiate these contracts, that a team of lawyers and Florida
21   Blue executives met with various defendants to try to
22   renegotiate this?  And then the government jumps up and says,
23   Nope, *United States versus Svete,* you're questioning the
24   conduct of these insurance companies.
25        So since we're on this issue, I would just like a

1   little bit more clarification as to what the government or what

2   the Court thinks is permissible and what's not permissible.

3          I mean, I can go through examples of what I would

4   generally seek to question the -- you know, the insurance

5   companies about.  I could do that if the Court wishes.  I've

6   got -- no.

7          THE COURT:  No, I don't think so.  I mean, I just

8   don't -- I mean, obviously, if I got an objection to that

9   question, I'd rule on it, but, you know, that sounds like

10  permissible cross to me.

11         And, you know, I think I'm just going to have to deal

12  with this at the moment.  But it certainly -- I just don't

13  think there's a real issue here.  And I don't want to try to

14  get into specifics or try to say what I'm going to do if

15  somebody raises an objection, but -- and if we get closer to

16  trial and we need to talk about this again, we will.

17         MR. LANDES:  All right.  It just -- it's only because

18  it was the government that filed the motion that put everybody

19  on notice that there were going to be certain objections to

20  things.  So I would -- I would just like some clarification as

21  to what the government thinks is over the line.

22         THE COURT:  I understand.  All right.  Thank you.

23         Ms. Galnor, did you wish to be heard?

24         MS. GALNOR:  No, Your Honor.  I would just rely on

25  the responses.

1          THE COURT:  Mr. Duva, did you want to say anything
2    else?

3          MR. DUVA:  No, Your Honor.

4          THE COURT:  All right.  Okay.  And as I said,
5    Mr. Landes, if we're still -- if we still need to talk about
6    this when we actually get closer to trial, we certainly can.

7          All right.  We're now on the *Daubert* motions.  And
8    we're -- let me make sure I got my ducks in a row here.

9          So it seems to me that -- we've got a number of
10   these.  It seems to me -- I'm just going take them up, frankly,
11   in the order that I prepared for them.  And if it makes -- it
12   may make more sense to -- I'm going to go ahead and take up the
13   motions regarding the expert that we have taken to calling
14   Dr. K, because we don't know how to say his last name.

15         MR. SADOW:  Absolutely.

16         THE COURT:  And so let's -- let's go ahead and do
17   that.  I have a joint motion to conduct the *Daubert* hearing
18   filed by Durall and Fletcher.  I've got the defendant James
19   Porter's motion to preclude expert testimony.  That's doc 261
20   and 262, respectively.  And I've got the government's written
21   response at doc 281.

22         Who's going to handle this for the defense?

23         MR. SAMUEL:  Your Honor, Don Samuel on behalf of
24   Mr. Durall.  And there's a jointly filed motion with
25   Mr. Fletcher.

1           I talked to Mr. Hayes a little bit over lunch.  And
2     here's the -- you know, kind of preliminarily, the problem is
3     we were given a 50-page report with lots of exhibits -- or a
4     couple of lengthy exhibits.
5           So we felt obligated to at least go through the
6     report and highlight, which we did, all of the objections we
7     had to what he said.
8           Mr. Hayes agrees, from my conversation with him, that
9     some of it clearly is -- they wouldn't even think about putting
10    it into evidence.  The report itself doesn't go into evidence.
11          Some of it is much more a -- kind of a 403 argument
12    than strictly a *Daubert* argument.  And, in fact, we don't
13    question the fact that Dr. K is, in fact, well-credentialed.
14    There's just no doubt that he is a -- someone who's experienced
15    in the field.
16          What we are left with, though, are what Mr. Hayes and
17    I probably think are going to be a fairly limited number of
18    disagreements.  And I say that only because I think some of my
19    objections are just kind of obvious.  He can't get on the stand
20    and say, Let me tell you how bad health care fraud is in this
21    country.
22          I mean, that's -- nobody is going to try to put that
23    in evidence.  He's not going to be able to say, Let me tell you
24    what these defendants were thinking.  He's not going to be able
25    to say that.

1      So what I suggested to Mr. Hayes, Why don't we try to

2  take this off of the judge's plate, at least temporarily, and

3  isolate where we really have disagreements.  And we agreed to

4  do that.

5      I'm not quite sure what -- our schedules of doing it,

6  but we could do it pretty quickly, because we've said, Look, 50

7  pages.  There are many pages we didn't have any objections to.

8  We agreed they're the proper subject of cross-exam- -- excuse

9  me, the proper subject of expert testimony, such as, you know,

10 what different codes mean, you know, strictly, and how the

11 systems work, you know, and how -- what the EDI is and all

12 that.  We have no objection to that.

13     I think there is going to be some disputes about --

14 if I had to guess, I would say that Mr. Hayes and I will

15 definitely disagree about the extent to which the expert can

16 testify, Let me tell you what these contracts mean to the two

17 parties.  I think there we will disagree.

18     You know, again, the expert is still going to come

19 testify.  So we're not talking about that.  And we're really

20 probably only talking about a legal argument as to, Why does he

21 think his expertise allows him to say what Mr. Durall was

22 thinking?  Why is his expertise such that he can offer an

23 opinion what a contract means to the two people who signed it,

24 both of whom are going to be in court?

25     And I kept stressing that in the -- in the -- in the

1    brief, which is that obviously the government is going to have

2    Blue Cross Blue Shield people here, and they're going to

3    testify, This is what the contract means to us.

4           And, you know, the defense will take the position

5    either that's not explicit and, therefore, it's ambiguous, and,

6    therefore, it is, you know, arguably a directed verdict motion,

7    because it's -- it's ambiguous, and one of the -- one of the

8    reasonable interpretations favors the defense, and that's the

9    end of the discussion.

10          So my proposal to you is to see if, you know, in the

11   next few weeks Mr. Hayes and I can talk or go through the

12   document and have him say, Here's where I disagree with your

13   highlighting.

14          Otherwise, I'm -- all I feel like I can do today is

15   sit here and go through all 50 pages, which is obviously

16   something you don't want me to do, and is pointless if the

17   government agrees with a lot of it.

18          THE COURT:  Well, I think that's fine.  I encourage

19   it.  And the only thing -- and this is a commentary on all of

20   the expert testimony.  And I don't have it all quite lined up

21   in my mind yet, because it's -- because I have -- I have a

22   bucket of experts who weren't objected to at all over here.

23          Then I've got some who were objected to by both

24   sides.  And I'm -- I'm not even sure right now I could match up

25   who's supposed to be responding to who exactly.  There's some

1    overlap.

2            But my point is that whatever I come down on, or

3    whatever I do by way of *Daubert* or a limitation on expert's

4    testimony, one thing I'm going to desperately be trying to do

5    is to be consistent, so that I'm not saying to the government,

6    You just can't have your expert do this --

7            MR. SAMUEL:  Yeah.

8            THE COURT:  -- and at the same time find that you're

9    trying to get your experts to do the opposite of the thing I

10   just told the government.

11           So when you're having those discussions, try to think

12   of it on a more global basis, too, because I don't -- I'd like

13   to be -- hopefully I'll be consistently right, but at least I'd

14   like to be consistent.  And so -- and so keep that in mind, if

15   you will.

16           MR. SAMUEL:  I will.  I don't -- you know, I -- I'll

17   have to consult with my colleagues on the defense side.  You

18   know, Mr. Hayes probably can keep better track of what

19   everything is, because I don't have the same familiarity with

20   their experts.

21           But, you know, as I said, I think we have very narrow

22   disagreements.  And if we could isolate those and get back to

23   you on that, I -- you know, I think it's likely we will still

24   need a hearing at some point.  We weren't going to have a

25   hearing today anyways.

1        So I just would like to be efficient with the Court

2    and I -- and from my conversation with Mr. Hayes he agrees with

3    me, so...

4        THE COURT:  Sure.  That's fine.  And I'm happy to do

5    that.  Just so we're clear, whatever we do today, I do consider

6    it to be a *Daubert* hearing.  If by meaning that we weren't

7    going to actually have the experts --

8        MR. SAMUEL:  Right.

9        THE COURT:  -- here testifying, that may be something

10    we do in the future, but it also may be something we never do.

11    That's not my typical practice.

12        If I -- because my experience has been that we can

13    usually figure it out and -- and to require a whole kind of

14    mini trial on experts and have them up here and so forth,

15    that -- I'm not ruling that out.  And if it's requested, I'll

16    certainly consider it.  But don't count on it.

17        MR. SAMUEL:  Right.  Well, you know, in my experience

18    you end up having a full evidentiary hearing with the expert on

19    the stand when you're talking about a scientific test.  You

20    know, is that test really reliable?  You know, what other

21    people have used that machine?  What other people have -- you

22    know, have said that that machine -- this is not that kind of

23    expert.

24        This is more like a gang expert or a -- you know,

25    something like that, where it's totally experience-based.  And

1    he's -- he's obviously got credentials that we're not going to

2    say, you know, he's just making this stuff up.  So I

3    understand.

4         THE COURT:  Okay.  Thank you.

5         Before I ask Mr. Hayes what he wants to say, there is

6    also the defendant's -- James Porter's motion.

7         And so, Mr. Schwartz, do you wish to be heard?

8         MR. SCHWARTZ:  Yes, sir.  In light of what counsel

9    just talked about with Mr. Hayes, I believe that it would be

10   prudent for us to also consult -- not just with Dr. K, but on

11   the other experts also with Mr. Hayes to see if we can come to

12   an agreement.  If we can't, then obviously we can advise the

13   Court on that, if the United States is willing to do that.

14        THE COURT:  All right.  Mr. Hayes, what say you?

15        MR. HAYES:  Your Honor, I think that makes good

16   sense, the suggestion from both counsel.  Obviously we are

17   willing to do that.

18        I would say that largely, if we were going to have a

19   full-blown argument today, the government would have rested on

20   the papers.

21        But what I would have said was there's no need for a

22   *Daubert* hearing where the expert has to come in, which is what

23   I call a *Daubert* hearing.

24        And the Court has said, I have a differentiation --

25   everything is a *Daubert* hearing.  It's just whether we're

1    taking evidence from the expert.

2           We would say that it's not necessary.  And we don't

3    think there's any question that both -- I can probably address

4    them both.  If we don't think there's any question that both of

5    the experts that there are motions from the defense on are

6    qualified, what the government seeks -- I don't think there's

7    any meaningful dispute about that, or that it would assist the

8    trier of fact.

9           Some of the objections seem to be about methodology

10   or prejudice, because largely I think, Your Honor, both motions

11   are almost 403 motions.  They're saying that -- they're going

12   too far in certain aspects.

13          So as I said in our response, we don't dispute that

14   Dr. Kongstvedt -- I just tried to pronounce it, but I will call

15   him from Dr. K from now on.  And I'm not even sure I said it

16   right, Your Honor.

17          But Dr. K will not draw legal conclusions.  He will

18   not tell the jury what to think.  He will not interpret the

19   contract as in the *Herman* case pointed out by the defense.

20   What he's doing is applying his knowledge of industry standards

21   to the contract terms that he reviewed and that the defendants'

22   conduct that he reviewed is expressed in billing he reviewed,

23   and then opining whether or not that industry standard was met

24   or deviated from, and whether, based on his experience, which

25   is extensive, over 30 years, in this industry -- what would

1    have happened in terms of would an insurer have paid these

2    claims or not.

3              And what I mean to get to, Your Honor, is we view

4    this very similar to the *United States v. Gold* case.

5    Mr. Winters earlier was saying it's very akin to a Medicaid

6    fraud case in a different context.

7              And we agree in this context, in that it is very

8    common for program witnesses in health care fraud cases

9    involving Medicare to come in and testify about what would or

10   would not have been paid.

11             And we think any prejudicial problems can be cured by

12   an instruction by the Court to the jury about, This is how you

13   take the expert's testimony.  Civil violations are not in and

14   of themselves a crime.  A violation of the contract -- I heard

15   the defense say this a few times -- is not in and of itself a

16   crime.  It just could go to the defendants' intent.  That's one

17   possible instruction.

18             The Court can also instruct the experts, You are not

19   to say they committed fraud, don't use the word fraud.

20             I found -- I'm going to give a shout-out.  This

21   exhibit was very helpful.  I've never seen this before, where

22   they highlight, These are the major points of contention.  It

23   made it very easy to prepare for the hearing.  So I thank

24   counsel for it.

25             I'll just point out that, yes, we think that saying,

1    The cost of fraud is borne by everyone, including you, every

2    member of the jury -- if someone cheats, you have to pay more.

3            Naturally, I don't think the Court would envision a

4    scenario where that kind of testimony would come out.  However,

5    there's other factual stuff in there that they appear to be

6    objecting to, like the percentage increase in billing once the

7    defendants took over different areas, and a few other things

8    that we think are four-on-the-floor facts.

9            So what Dr. Kongstvedt is going to be doing is

10   providing opinions on the ultimate issues of fact, not on the

11   ultimate issues of law.

12           And we think, as laid out in the papers, we have kind

13   of, I think, stated what he's going to do.  On page 6 of the

14   brief we lay out, These are some of the opinions he's going to

15   give, answering questions of hypotheticals or not.

16           He'll say, The defendants' lab wasn't a reference lab

17   as that term is commonly understood, because these samples

18   never went to the hospital.  They went directly to the lab.

19           That's not a reference lab.  No one thinks that's a

20   reference lab.  We think that's important to put everything in

21   factual context, because, yes, we are going to have insured

22   witnesses testify.  And they're going to be crossed ably by

23   defense on, You have a stake in this.  You are the victim.

24   They've said this today.

25           We're going to bring in someone to put what they're

1    saying in factual context to present to the jury that much of

2    what they say comports with the industry standard of -- albeit

3    a government expert, we understand.  But it is somewhat more

4    objective in the sense that he's not a victim.

5           Also, what Dr. Kongstvedt will be testifying to is

6    what the defendant -- what the defendants did, not what they

7    thought, and whether what they did was contemplated by the

8    contracts.

9           The analysis he gives is, I wouldn't expect a

10   contract to say you may not engage in the running of the bulls

11   of Pamplona down the hospital halls, appears in his report.

12          Why would you ever put that in the contract?  He

13   actually says this in his report.  We would say that another

14   thing he's saying is, I would not expect everything to be in a

15   contract that could be done to violate it.  What I'm saying is

16   that what the defendants did here wasn't even covered by this

17   contract.

18          That's not contract interpretation, as much as saying

19   there's an absence of the reference labs that they called

20   arrangement that exist in this case.

21          Unless the Court has any questions...

22          THE COURT:  Thank you.

23          All right.  Then I'll determine whether to just carry

24   the motion or to deny it without prejudice.  But I think the

25   idea of having the areas of disagreement narrowed is a good

1    one.  And I think it will make it more profitable when and if

2    we have to address this again.

3         All right.  We're on defendant James Porter's motion

4    to preclude expert testimony of Dr. Kelly J. Clark, doc 263, to

5    which the government filed an opposition at 282.

6         Mr. Schwartz.

7         MR. SCHWARTZ:  I would propose to do the same thing

8    that we're going to do with Dr. K. with the four experts.

9    There's obviously things in my client's experts' reports that

10   would not be testified to a jury, but it's more about how to

11   show your work, how you got from Point A to Point B.  I think

12   in having that conversation, we would streamline these issues,

13   if they're amenable to it.

14        MR. HAYES:  I think that --

15        MR. WINTERS:  Your Honor, if I may, Gary Winters for

16   the government.  I was planning to speak on the motion with

17   respect to Ms. Shaw and Mr. Berry, the Porter experts.  We have

18   a slightly different position with respect to those.

19        As to Ms. Shaw, as we say in our brief, we don't

20   believe she's qualified to offer these opinions.  She's an

21   attorney, and an honorable profession; we're all attorneys.

22        But, you know, as we read the report, it's

23   essentially, you know, trying to put an attorney on the stand

24   to testify to what the defense lawyer would like to argue to

25   the jury, let's put that in the guise of expert testimony.

1           And so we have real concerns about the qualifications

2    of this purported expert to provide any testimony in this case

3    at all.

4           I mean, there are thousands of practicing health care

5    attorneys in this country.  And that does not make them all

6    capable of testifying as experts in a criminal trial involving

7    fraud.

8           I think when you look at the qualifications of

9    Ms. Shaw and Dr. Kongstvedt in comparison, there really is no

10   comparison, in terms of industry knowledge and industry

11   involvement and industry background and so forth.

12          So I don't mean to get into the whole argument now,

13   and I'm happy to do it separately if Your Honor wishes, but I

14   just think we do have a different view as to Shaw and Berry, as

15   well, who -- it's hard to even discern what the opinions are.

16          THE COURT:  Well, I think it's probably worthwhile --

17   as long as you-all are going to be talking about experts, it's

18   probably worthwhile talking about them all.  And -- and I

19   understand.

20          And if you want to -- you know, if you want to

21   maintain that position after you've discussed it -- I mean,

22   there may be areas of testimony that you would agree that

23   Ms. Shaw would be able to talk about.

24          I don't have a view on it at the moment.  And I --

25   I -- when I hear you talk, in terms of relative qualifications

1    of your expert versus theirs, you know, that -- that can be a

2    *Daubert* issue, depending on lack -- if there's an absent -- if

3    there's an absolute lack of qualifications to talk about

4    whatever the person is talking about, that's one thing.  If

5    we're talking about relative qualifications, that's

6    cross-examination.

7            And so I -- I would eventually, if not now -- at some

8    point, I would have to make a determination of which of those

9    two things it was.  But I -- I think it's at least -- you know,

10   if the -- if the defendants are willing to talk to y'all about

11   your experts, I think you ought to at least be willing to talk

12   to them about theirs.

13           And you may not end up agreeing.  And I understand

14   there can be differences, and maybe that just because one

15   expert is qualified or can testify, the other one can't, but I

16   just want to be -- I think it would be good to have it all go

17   together and we can figure it out.

18           Because we're probably going to end up having some

19   discussions about experts at some point.  We're going to have

20   some type of *Daubert* discussion, I'm sure, even if it's on a

21   relatively limited number of topics.

22           So, Mr. Hayes, did you want to say something?

23           MR. HAYES:  Briefly, Your Honor.  So I think, Your

24   Honor, one appreciable difference we see is Ms. Shaw is a

25   lawyer advocating, as we said in our opposition to her

1    testimony; whereas, we see Dr. Kongstvedt as an industry

2    professional who's talking about the standard of practice in

3    the industry.

4         And moving aside from that, what I really wanted to

5    stand up and talk about, Your Honor, is -- I flew all the way

6    down here.  And I wanted to talk about Dr. Clark very briefly.

7         THE COURT:  Yeah.

8         MR. HAYES:  This is -- there is medical necessity --

9    or lack of medical necessity alleged in the indictment.  It's,

10   for example, in 37(k), the all-important paragraph 37.  It's

11   also in the substantive health care fraud counts.  It's a key

12   issue because this is a health care fraud case.

13        So what we're saying is that -- we've been talking

14   all day, and we had to -- I'm not blaming anyone.  There's a

15   lot of motions here.  We've been talking all day about how the

16   defendants billed for services and whether that was proper or

17   not.  We're also saying it's what they billed for that's a

18   problem.

19        And in a health care fraud case, there's no question

20   that medical necessity is an issue, as we've alleged.  And

21   there can be no meaningful dispute, we would submit, that

22   claims have to be medically necessary in order to be

23   reimbursed, and that everyone here, with the exception of

24   Mr. Porter, who's only charged with money laundering, knows

25   this, because the contracts and provider manuals -- and

1    Mr. Schwartz is right, that -- maybe one or the other, but
2    that's a distinction without a difference for these purposes.
3           There's no question that services have to be
4    medically necessary to be reimbursed, and everyone knows that,
5    lab owners, owners and operators of rural hospitals, everybody.
6    Page 23 of Dr. Kongstvedt's report outlines this.
7           We relied on doctors as a defense.  We understand.
8    But we're saying the fraud was so blatant here, so
9    systematic -- and, Your Honor, there was a lot of disclosure in
10   this case.  I'll just drop -- and it makes a thump -- the
11   expert report of Dr. Clark.
12          We have endeavored to provide an awful lot of
13   discovery for the experts here and given an outline of her
14   likely testimony.  And the patterns that she identified for
15   four hospitals for three billers are largely the same.
16          So what we're saying is it's systematic.  It's
17   repeated.  The volume is incredible.  The services are clinical
18   medical nonsense.  She said, I don't need to look at patient
19   files to tell that the diagnosis codes don't match.  There's no
20   earthly reason to do this sort of thing.
21          And what that means is -- we're saying we understand
22   there's no medical professional defendants in this case.  We're
23   saying this fraud is so blatant and systematic that --
24          THE COURT:  So tell me -- tell me -- because this was
25   something I was interested in anyway, because I saw "medically

1    unnecessary."  I saw that was one of your defenses to the

2    motion to dismiss, that it was alleged in the indictment, which

3    is a more -- I guess if you want to -- it's a -- maybe a more

4    typical health care fraud allegation.

5           Usually it's made against doctors or other people who

6    are prescribing tests that may be unnecessary or disallowed by

7    Medicare regulations, or something like that.

8           So just -- just help me for two minutes.  So how -- I

9    understand you say it was so blatant and obvious.  But what was

10   so blatant and obvious?  Who was -- who was ordering these

11   tests that you are now contending was medically -- were

12   medically unnecessary?

13          MR. HAYES:  What we're saying, Your Honor, and as we

14   said in our papers, we don't dispute that doctors order and

15   authorize the tests.  We're saying that the people who are

16   billing for the tests, which are most -- the main defendants

17   that run billing companies, they know what's being billed.  The

18   labs know what's being tested.

19          And similar to some arguments that have been made by

20   the defense in another context, you can't be an ostrich and

21   bury your head in the sand if you know certain things are going

22   on to a volume that goes over the top, where it's just common

23   sense, this sort of thing can't be done, and you don't need to

24   be a medical professional.

25          THE COURT:  So give me a -- give me a concrete

1   example so I'm understanding.  A doctor would order a drug test

2   for what reason, that the defendants should then have known

3   that that was unnecessary and should have, what, not submitted

4   it?  Is that -- if it was ordered?

5          MR. HAYES:  Correct, Your Honor.  Similar to

6   insurance companies can reject claims.  It's that same thing.

7   And, also, I'll give a specific example from the indictment,

8   37(m), Kyle Marcotte, kickbacks, where it is reasonable, at

9   least for Mr. Durall, if he -- if the allegations are proven to

10  be true, you're paying kickbacks for people from Beaches, a

11  sober home and addiction treatment facility in Jacksonville.

12         It stands to reason that it was in the same pattern

13  of massive overbilling, unbundling of claims, as Dr. Kongstvedt

14  points out.  And he's just talking about his -- my experience

15  in the industry is if you are -- contract in a certain way, it

16  may behoove you to make more money to unbundle claims and to

17  bill exorbitant amounts, because in percentage billing you make

18  that much more money.  And that's what I see happening here in

19  the billing.  And Dr. Clark says the same thing in different

20  ways.  She sees -- I see massively over-expensive tests again

21  and again with no medical reason.

22         So then what you've got is, I'm paying kickbacks to

23  even get these samples in the first place.  And that alone,

24  when it's this kind of activity -- they know the source of the

25  patients, Your Honor.  They know they're coming from all over

1    the country.

2          The same doctors all over the country -- there's two

3    million claims.  They're not -- we will present to the jury

4    that it doesn't make any sense whatsoever, not only for a

5    patient from California to send their sample to rural Florida

6    to be tested, but also that all these doctors from all over the

7    place are doing it in the exact same way all the time in the

8    same pattern over and over again, and it doesn't even matter

9    which hospital or which doctor.

10         So we'll say that -- the specific example the Court

11   just asked me for in the indictment is the connection between

12   Durall and Markotte.  And we will present other evidence as

13   well that connects this up.

14         THE COURT:  Okay.

15         MR. SADOW:  Your Honor, may I speak to this just for

16   a moment?

17         THE COURT:  Sure.

18         MR. SADOW:  What the government said is all in

19   good -- let me go to the podium.

20         What I understood the government to just say, Your

21   Honor -- Steve Sadow for Mr. Fletcher -- was that it's not

22   necessary for their medical expert to review the medical files

23   of any of the patients, so individuals submitting urines for

24   testing, because it was so overly done that everybody had to

25   know.

1          Now, when you're talking about *Daubert*, what's the

2   methodology that's involved in making that determination?  You

3   don't look at the medical record.  You don't look at what the

4   provider, that is, the physician, has said.

5          And is it, therefore, the methodology that's being

6   employed is that the laboratory that is complying with the

7   provider -- the physician's order, that there is something

8   within the methodology that's being used to say that the

9   laboratory individual or the laboratory itself is now supposed

10  to contest the requisition order of the provider physician,

11  because it could be too many, but we don't know if it's too

12  many because we really didn't look at the medical records?

13         I think what we're talking about here is a -- we're

14  going to put an expert up that really doesn't have methodology.

15  This expert has testified in other cases about rehab and what

16  has gone on with doctors and individuals in rehab situations,

17  in which he has actually looked at the medical records of those

18  individuals that are being, let's say -- being abused, and able

19  to determine from those that the doctors were prescribing

20  improperly or that tests were being ordered too much.

21         We're not going to have any of that.  What we're

22  going to have from the government here is some methodology,

23  apparently, in which the expert gets up and says, I'm an

24  expert.  I know how many urinalyses ought to be done, or urine

25  drug tests ought to be done.  This is way, way, way too many,

1    and everybody should have known.

2         I think that's a classic situation where there may

3    need to be a *Daubert* hearing to determine the qualifications

4    and the methodology in this particular case, particularly as to

5    the laboratories, like LifeBrite, Mr. Fletcher's.

6         The rules say as clear as it can be, he couldn't have

7    denied doing what he's been provided to do if he wanted to.  He

8    can't call the provider.  He can't call the doctor.  He can't

9    question the patient.  All he gets is a requisition form that

10   says test this.

11        So methodology-wise, I'm not in agreement that this

12   particular doctor meets the same standards as the others.

13   Because as far as I can tell -- maybe I've missed it, and I

14   would apologize if I have.  I haven't seen any expert testify

15   on this basis, particularly this expert, in the past.

16        THE COURT:  Thank you.

17        All right.  Well, my initial hope that the -- y'all

18   could all talk and we'd only have a few little issues to talk

19   about afterwards has dissipated slightly in the last ten

20   minutes, but I still think it's -- I still think it's a

21   worthwhile effort.

22        I mean, if we're going to have to talk about this --

23   and it's a little -- probably a little early anyway in the

24   cycle.  And, you know, we'll -- we'll -- once you-all have

25   talked and see whatever you can agree to, if -- whatever that

1    is -- and I hope you will make every effort to try to limit the

2    areas of disagreement -- then we can -- when it's appropriate

3    to do so, we'll -- if we need to, we'll tee it back up, but...

4           And I understand, Mr. Winters, your position that

5    Ms. Shaw and Dr. Berry are different than your experts, but

6    let's at least go through a process here where we try to see if

7    we can reach some agreements.  And if not, then I'll deal with

8    it, of course.

9           But I'm happy to at least get five minutes' worth of

10   education on the medically unnecessary aspect of the case,

11   because I -- I wasn't quite sure what I was -- what the issue

12   was.  And now I at least know what each of you are saying the

13   issue is.  And so I'll -- that will help me as I'm thinking

14   about the case.

15          So unless I am wrong, that's all the motions that are

16   in front of me today.  Have I missed any, or anybody...

17          All right.  All those motions are under advisement.

18   Obviously y'all are going to talk about the *Daubert*.  We'll set

19   up a schedule for that to be renewed, if we have to.

20          All right.  So let me -- let me see where we are here

21   in terms of -- of the trial schedule, and --

22          MR. BELL:  Your Honor, I'm going to make a motion, if

23   that helps move the ball along a little bit, in terms of

24   putting the scheduling issue before the Court.

25          THE COURT:  All right.  Go ahead, sir.

1    MR. BELL:  Based on Mr. Perez -- and, Your Honor,

2 based on all the information the Court heard this morning,

3 primarily concerning the Blue Cross Blue Shield emails from

4 both Missouri and Florida, relative -- and Georgia, relative to

5 the hospitals in this case, and the 837I information on behalf

6 of Jorge Perez, I'd make an ore tenus motion to continue.

7    If we got that stuff today, I'm not sure we could be

8 ready by September, given what I would expect the volume of the

9 information that would be there, particularly related to the

10 data -- the data transmittals, the 837I information.

11    With all the other issues that might unfold relative

12 to that, actually getting -- identifying and subpoenaing --

13 subpoena -- issuing subpoenas for all the correct people to get

14 them here, I think it's unlikely, under the best of

15 circumstances, if nothing changed, that we'd get ready -- be

16 ready by September.

17    But in light of the discovery, slash, *Brady* issues

18 this morning, I feel there's no alternative to adequately

19 prepare for this case but to move to continue it.

20    THE COURT:  All right, sir.  And are you specifying

21 to when?  Or are you just asking the Court to consider it?

22 What's your --

23    MR. BELL:  Well, Judge, I was going to respectfully

24 suggest a January/February range.  I think some of my

25 colleagues may have a conflict.  But I -- that may give a

1    target date so that we can discuss when everybody might be

2    available.

3           I know there may not be complete consensus on that

4    amongst the defense crowd, but it seems to be the minimum that

5    we would need.

6           THE COURT:  Okay.  All right.  Before I ask the

7    government its position on that, then let me hear from -- let

8    me hear from counsel -- and I guess I probably need to hear

9    from each counsel briefly.

10          And please be brief about what your position is on

11   the motion to continue and any requests that you have regarding

12   scheduling.

13          I'm not -- you know, moving a nine- or

14   ten-defendant -- I guess nine defendants who are before the

15   Court -- is never easy, especially one that's been scheduled to

16   take several weeks to try.  So, you know, I'll do the best I

17   can.  But let me at least hear what your positions are.

18          So, Mr. Samuel, Mr. Sadow, whoever is speaking for

19   your clients.

20          MR. SADOW:  Your Honor, if I might speak for

21   Mr. Fletcher.  We are joining in the motion.  We believe a

22   January date would provide us sufficient time, hopefully,

23   depending on the timing of the other disclosures, to get

24   prepared.

25          I have a trial that's supposed to take place in

1    March.  But to be perfectly candid, if this trial happens to

2    push that trial back, I don't have a problem it.

3          THE COURT:  All right.  Mr. Samuel, what about -- or,

4    Mr. Rafferty, what about your client?

5          MR. SAMUEL:  Your Honor, here's what we'd suggest, is

6    we don't oppose a continuance, because we think we're going to

7    need one, even if we wait a couple of weeks or months to see

8    what happens.

9          But we -- we would like to make it contingent on that

10   we also reach an agreement today as to when the government is

11   going to comply with these discovery requests.

12         Because if we push it off until January and we don't

13   get the EDI and emails and other discovery until November, we

14   haven't accomplished anything.

15         So, you know, if it's January/February -- I think

16   Mr. Rafferty has got a trial.  So whenever it is, we shouldn't

17   push back the discovery obligations correspondingly.  We should

18   keep the discovery obligations now.  And including in that, you

19   know, the -- the *Daubert* issues that, you know, Mr. Hayes and

20   the rest of us can figure out.

21         Because I think, in all honesty, these discovery

22   disputes are going to continue.  It's a -- you know, as you

23   know, it's a complicated set of issues.  We have -- we've only

24   talked about one private insurer so far.  We haven't even

25   talked about United and Aetna.  We're going to need all that

1    information.

2              And I know the government will do everything they

3    can.  And Mr. Winters will use the good offices of the

4    government, as you put it.  But there has to be some compulsion

5    or the delay just is going to -- we'll be right back where we

6    are again.

7              So we don't oppose a continuance, but we --

8              THE COURT:  Do you have -- either you or your

9    colleagues on the defense side, do you have Rule 17s out to

10   all -- all of the insurance companies?

11             MR. SADOW:  Not for the data that is currently being

12   told to the Court, only for in-network and out-of-network

13   actual documents for pricing purposes.  We have not done 17(c)

14   subpoenas for any of the other things brought up today.

15             MR. BELL:  That's correct, Judge.  I don't think

16   there are 17(c) subpoenas for any of the -- at least that I'm

17   aware of, for any of the subjects that we discussed today.

18             MR. SADOW:  Your Honor, if I might add, the Court

19   currently has a -- I think a deadline for entry of pleas on

20   July 1st under the current schedule.

21             Maybe the Court would consider giving a July 1st date

22   for the government to report back on all the progress it has

23   made on the discovery, with that date being -- not the

24   drop-dead date, but the date in which they should be attempting

25   to obtain that information from the insurance companies.

1        THE COURT:  So I have Mr. Bell's client, Mr. Durall,
2   Fletcher -- Fletcher.
3        So, Mr. Schwartz, what about James Porter?  What's
4   your position?
5        MR. SCHWARTZ:  Yes, sir.  We join in the motion also.
6   I would request the February or March trial term, and concerns
7   about volume of data, the dates that that data will be
8   produced.
9        I know I've got probably a million pages, maybe more,
10  of this billing and other stuff that I can't produce until the
11  protective order is modified in Missouri.  And I don't know
12  when that will be.
13       The response deadline for the plaintiff to respond is
14  May 5th.  I'm not sure if it will take the Court a week or
15  longer to decide that.  And then once I get the order, then I
16  have to put it all together and shoot it to the defendants and
17  to the government.
18       And this is just from one of the insurance companies.
19  There's multiple.  So whatever the government's able to obtain
20  is going to be ridiculously large.
21       So, again, to move trial now and then have to move it
22  again in three months or four months, you know, later, I don't
23  think is -- is very efficient.
24       And the other thing -- and I was going to bring this
25  up after the fact, but it's being talked about real quick by

1    other defense attorneys.

2           As a result of discovering this billing, the ZirMed

3    billing, we're likely going to need a defense expert to

4    interpret what this means and to assist the jury in

5    understanding what all of these codes are and things.

6           So there's going to be a motion filed on that, to

7    allow another defense expert for that reason, or maybe

8    multiples.

9           THE COURT:  Mr. Tasker -- I'm sorry.  You're with

10   Mr. Schwartz, right?  So -- Mr. Rowland, sorry.

11          MR. ROWLAND:  Thank you, Judge.

12          We'd just join in Mr. Schwartz's request.  And we had

13   talked about an additional expert.  I think that would be

14   prudent as well.

15          THE COURT:  All right.  Ms. Galnor?

16          MS. GALNOR:  Your Honor, I would join in the motion

17   also, and defer to the Court as to scheduling.

18          THE COURT:  Mr. Lowther?

19          MR. LOWTHER:  Your Honor, we don't oppose the motion.

20          THE COURT:  Mr. Landes?

21          MR. LANDES:  I join in Mr. Bell's motion.  I think

22   the January/February date would be prudent, or thereafter.  I

23   also agree that there should be a date -- I would propose

24   something like July 15th or August 1st -- where all of this EDI

25   material be produced by, so that all the collective defendants

1   will have enough time to process that, go through that, review

2   it, review it with experts, et cetera.

3           Thank you.

4           THE COURT:  Mr. Horowitz?

5           MR. HOROWITZ:  Your Honor, I would join in the motion

6   to continue on behalf of Nester Rojas.  And we agree to a

7   January, preferably a February date.

8           THE COURT:  Mr. Horowitz, I already see your defense

9   strategy to be in the corner and hope that nobody mentions your

10  client's name -- is that --

11          MR. HOROWITZ:  Judge, it worked pretty good except

12  for the three times you called on me.

13          THE COURT:  All right.

14          MR. RAFFERTY:  Your Honor, on top of scheduling, I

15  have a scheduled trial for January 25th of 2022 in the Central

16  District of California in front of Judge Oguin.

17          THE COURT:  And how long is that trial anticipated?

18          MR. RAFFERTY:  It's just a few weeks, Judge.  It's a

19  money laundering trial involving three or four defendants.

20          THE COURT:  Mr. Duva, Mr. Winters, who wants to

21  respond here?

22          MR. DUVA:  Sure, Your Honor.  Tysen Duva here.

23          I want to note that I think Ms. Galnor has the same

24  strategy as Mr. Horowitz, to sit in the corner and not be --

25  they're kind of together there, we think.

1          Yes, obviously we want to do what makes sense.  We
2     want all the information that we can get from the insurance
3     companies.  We think a continuance is inevitable.
4          I think setting a status conference, whether it's
5     telephone or in person, or whatever the Court prefers, a
6     reasonable time down the road to inquire what we've done, and
7     also what the defense has done -- I mean, I just heard
8     Mr. Schwartz say he's got millions of pages of documents.
9     Well, everybody ought to have those.
10          There's a protective order in this case that applies
11     to the discovery.  So if he's got it, that seems like a pretty
12     good jumping-off point to provide it to all defense counsel.
13     I'm thinking they probably have some of it already.  We don't
14     have any of it.  That was news to me when he came to the podium
15     today.
16          So I think this could really get kicked off by a
17     disclosure of that material.  And then we can take it and say,
18     Look, insurance company, this is what you have.  Give us
19     whatever else it is you have, together with emails, and have
20     that same conversation with -- I know we've before talking
21     about Blue Cross, but, of course, UHC and Aetna are in the case
22     as well.  I think it will facilitate the discussion.
23          So we are -- we want to be an open book.  And we are
24     supportive of some kind of status hearing to inquire where we
25     are and where we've been and what we've obtained.

1          In terms of a continuance, obviously this looks to be

2     a four- to six-, seven-week trial, depending on how many are in

3     it.  We're banking on all nine at this point.

4          So a one-month continuance to October makes no sense.

5     You can't start a trial like this in November.  And anybody who

6     wants to do this on January 3rd, you're nuts.

7          THE COURT:  Yeah.  I got over that.  I -- I set one

8     in 2020 for January, the 8th or something, thinking I was

9     getting past the holidays.  And both the lawyers and I spent

10    our entire holidays doing stuff that I hadn't really realized.

11    So I'm -- I'm not likely to set it right after the first of the

12    year, but I -- but...

13         All right.  Thank you, sir.

14         MR. DUVA:  And I know -- everyone has trial

15    conflicts.  I think Mr. Hayes has one as well.  That might be

16    even the same case as Mr. Sadow.  I think they have a

17    complicated --

18         MR. SADOW:  It is, Your Honor.

19         THE COURT:  Okay.

20         MR. DUVA:  So whenever it lands, I think it lands,

21    and everybody has to sort of react accordingly based on how the

22    discovery process from here goes.

23         And as far as a -- an additional expert by the

24    defense to hire and analyze the ZirMed billing, that's totally

25    fair.  We don't have any issue with that.  I mean, we would

1    likewise employ Dr. Kongstvedt to analyze the data as well, and

2    perhaps even issue a supplemental report.  So that's -- there's

3    no objection there.

4              THE COURT:  All right.

5         (Judge confers with law clerks.)

6              THE COURT:  All right.  Here's what we're going to

7    do.  What I'm going to do is -- it seems to me that we need to

8    understand the issue that was raised by the *Brady* motion before

9    we can really get too far.

10             And I don't know whether that's a big issue or a

11   medium issue or a little issue.  I cannot tell.  But it's an

12   issue.  It's been recognized by both the defense and the

13   government that further inquiry needs to be made from the -- to

14   the insurance companies.

15             And -- and so I think that should be at least the

16   focus now, to try to get our arms around that, see what that

17   issue is, see where that takes us.  And at the same time I

18   think there could be efforts made to discuss these expert

19   issues.

20             So what I'm going to do is I'm going to continue the

21   trial.  And I'll make the findings required in a moment.  But

22   I'm going to continue it -- and I -- I always -- I never leave

23   a case -- I learned this through pain of experience.

24             I never leave a case without a trial setting.  I

25   always have it set for trial sometime, because the Speedy Trial

1   Act doesn't really like you to just put off a case

2   indefinitely, so -- but that doesn't mean it can't be moved

3   again if that's what happens.

4          So what I'm going to do is -- I think the only two

5   dates that are going to be remaining after we leave here today

6   will be a trial setting, which won't necessarily be the final

7   one, but will be a trial setting that we'll be working toward,

8   and a date for a status conference with the Court to determine

9   the status of these -- of this inquiry from the insurance

10  companies, emails, and the other things we've been talking

11  about, where that stands in the process, what the government's

12  been able to accomplish, what the defense has been able to

13  accomplish, and, also, any progress on the experts.

14         In the meantime, I think I can make rulings on many

15  of the motions that have been filed.  And I'll go ahead and

16  prepare an order in that regard.  Obviously I'm not prejudging

17  at the moment.  But I think we -- we should continue to prepare

18  toward trial.

19         And so I think that's -- I think that's what we need

20  to do.  And I'm not interested -- I'm sure that those who are

21  charged with these crimes, who are -- many of whom are here

22  today -- I'm sure that the lawyers involved, who are all -- who

23  all have other matters to attend to as well -- I don't have any

24  intention of continuing this thing ad infinitum.  I don't have

25  any intention, you know, of continuing it more than I need to.

1          But on a case as big as this, as complex as this,

2   with as many moving parts as this, we cannot move forward

3   meaningfully until we kind of know what we've got and what

4   we're working towards.  So I think that's what we're going to

5   do.

6          Now, the question in my mind is how long -- because

7   I'm going to have a status.  And right now I think it can be by

8   phone.  I don't know that we need to get everybody here

9   together again.

10          But I'm going to have a status at some point.  And

11  I'm going to want to hear what's happened with the insurance

12  companies, where are we on that.  What's -- what -- are there

13  any productions made?  Are we done with that?  Is there more to

14  do?

15          You know, the things that you would expect me to want

16  to understand.  And I might even require a written report right

17  before the hearing so I at least know what we're dealing with.

18          What I don't have a good feel for is how long -- I

19  think 60 days is probably the minimum.  90 maybe would be

20  better.  But I don't really know.  And I'm -- you know, I --

21  and I guess it's not the end of the world if we have one and

22  it's not as productive, but I'd like it to be productive.

23          So I'll start with you, Mr. Duva.  If you were -- if

24  you were wanting to have a status where you're going to be able

25  to report substantial progress to me on the issues that have

1  been raised here, how far out reasonably do you think that

2  should be?

3          MR. DUVA:  Our thoughts -- I agree with Mr. Landes.

4  July 15th I think is a reasonable period of time.  We've

5  already got some plans in place.  I think we're going to issue

6  a trial subpoena in certain areas to get the ball rolling.

7          THE COURT:  Okay.

8          MR. DUVA:  And hopefully very soon we'll have

9  information that we can turn over.

10         THE COURT:  All right.  If I set it for July 15th, is

11  anybody -- or around there -- I don't have a date yet.  Has

12  anybody got a problem with that?  Does anybody have a problem

13  with doing it not in person?

14         MR. SADOW:  Could we have the option of being

15  present?

16         THE COURT:  Probably not.  I mean --

17         MR. SAMUEL:  Some of us, but not you.

18         THE COURT:  And it's nothing personal.

19         MR. SADOW:  That's what every judge has told me for

20  40 years.

21         THE COURT:  I just -- I don't particular- --

22  especially in a criminal case, I don't particularly like it

23  when some of the people are here and some of them aren't, and

24  the government might not be here.

25         Sometimes I'll get the government -- not Mr. Duva,

1   but they'll say, Can we be there, because we're right upstairs?

2   No, I don't really -- so is there a reason you want --

3             MR. SADOW:  No, no, no.  It's just -- just asking.

4             THE COURT:  Okay.  I think if I do it by phone or by

5   Zoom, or whatever I do it by, I think it's going to be for

6   everybody.  And I think your clients, of course, would be able

7   to attend as well, which is nice too, so -- and they can attend

8   virtually as well, so...

9             All right.  So --

10            MR. DUVA:  And, Your Honor, just to make clear, we're

11  not demanding like that specific day, just somewhere around

12  there.

13            THE COURT:  I understand.  I understand.  That's what

14  I'm looking at right now.

15            And then all other dates will be suspended until

16  we -- the plea deadline and all that would be suspended until

17  we get our ducks in a row here.

18            MR. ROWLAND:  Your Honor, I just checked that date.

19  And my girlfriend would kill me if I don't tell you this.  We

20  have a trip scheduled the week before that.

21            THE COURT:  Yeah.

22            MR. ROWLAND:  So I just want to make sure that -- you

23  said it would be around that July 15th date.  If it could just

24  be that date or after, that would make things a lot easier for

25  me.

```
1              THE COURT:  All right.  Where are y'all going?
2              MR. ROWLAND:  Well, that's a surprise, Judge.
3              THE COURT:  All right.
4              MR. SAMUEL:  Do they have ponies?
5              MR. ROWLAND:  They do have ponies.
6              MR. BELL:  Unionville, Missouri.
7              MR. ROWLAND:  I haven't told her where we're going
8    yet.
9              THE COURT:  All right.  Well, then I don't want
10   to -- I don't want to put it on a federal court record then.
11             MR. ROWLAND:  There's a transcript.
12             THE COURT:  Then we'd have to seal it.  It would get
13   kind of -- all right.  Well, I don't usually hold -- I've got
14   criminal status conferences on July 19th, Monday.  That's our
15   typical status day.
16             We don't usually hold criminal hearings other than
17   that on Mondays because that's -- one of my colleagues does all
18   her sentencings on that day.
19             But since we're doing this by phone, how about
20   Monday, July 19th, at -- I don't know.  With the way these
21   things go, maybe I should do it at -- what time do you think?
22        (Judge confers with courtroom deputy.)
23             THE COURT:  Yeah.  That's what I think, too.
24             How about 10 a.m., Monday, July 19th?  Going once.
25             MR. DUVA:  That works for the government, Your Honor.
```

1          THE COURT:  Going twice?  Sold.

2          Okay.  The ore tenus motion of the defendant Jorge

3    Perez to continue the trial, joined in by all of the other

4    defendants, and unopposed by the government, is granted for the

5    reasons which are borne out by the record of the hearing that

6    we conducted today.

7          The ends of justice served by that continuance will

8    outweigh the interests of the defendant and the public in a

9    speedy trial.

10         The Court will set the case at this time for the

11   January 2022 trial term, which begins on January 3rd, but

12   don't -- we would not start the case at that point.  But that's

13   just the beginning of the trial term on my schedule.

14         And the Court has already announced, but will

15   announce again, that we -- the parties and the Court will be

16   working toward that trial date, but a lot will depend upon the

17   review at the status conference of the situation of the -- of

18   the case.  And that status conference will be held on

19   July 19th at 10 a.m., by either phone or Zoom.  We'll figure

20   that out.

21         I'm going to ask for a status report to be filed by

22   the government and by defense counsel no later than July the

23   9th, so that the Court will head into the status conference

24   understanding where the parties are.

25         I don't -- I'm not envisioning that we would have

1    motion practice in advance of that hearing.  I really envision

2    it as being a true status conference, to see what we need to do

3    and who needs to do what.

4           So I'm not envisioning motion practice, but I'm not

5    prohibiting it as we run up to that hearing, if -- you know, if

6    there's something that you really need to bring to my attention

7    or something we can resolve at the status conference.  But it

8    is not designed to be what today was, which is, you know,

9    hearing motions and things like that.

10           And all other deadlines in the case are vacated.  So

11   the only dates right now are the July 19th status conference

12   and the January 2022 trial date.  All other dates will be

13   provided to the parties at a later time.

14       (Judge confers with law clerk.)

15           MR. SADOW:  Your Honor, the defense would like to

16   know -- do you want a filed written status report that is filed

17   of record, or just sent to your office for review?

18           THE COURT:  No.  I was assuming it would be filed.

19           MR. SADOW:  Okay.

20           THE COURT:  Yeah.

21           MR. SAMUEL:  And I'm not sure what you envision being

22   in the report.

23           THE COURT:  I don't know.  I mean, I just want to,

24   you know, know what's going on.

25           MR. SAMUEL:  The family is doing fine and --

1          THE COURT:  No.  I want to know how we're progressing
2    on the issue with the insurance companies.
3          MR. SAMUEL:  And the *Daubert*?
4          THE COURT:  And the *Daubert*.
5          MR. SAMUEL:  Okay.
6          THE COURT:  Whatever else I need to be apprised of so
7    I can make some intelligent decisions.  Because the -- the goal
8    would be that I would, at that point, have enough information
9    to schedule the case and mean it.  That's my goal.
10         But what the content of that is -- and to the extent
11   it can be a joint filing, that's fine.  But if not, I just want
12   to hear what people are saying.  So I'll -- I don't want to
13   just come into the hearing cold.
14         So the other -- the only other thing I can think
15   of -- actually, Ms. Weisman thought of it, was that the -- the
16   government did indicate that by way of particulars it was
17   willing to provide a list of unindicted coconspirators.  It may
18   well be that that list will be a surprise to absolutely no one.
19         But, Mr. Hayes, I think you were the one that said
20   you would do that.  How long -- if I gave the government 30
21   days to -- to serve that, would that be sufficient?
22         MR. HAYES:  More than sufficient, Your Honor.  Thank
23   you.
24         THE COURT:  All right.  Then that date is May 27th.
25   So by May 27th, 2021, the government will serve its list of

1    unindicted coconspirators by way of a bill of particulars.  The
2    remainder of the motion for bill of particulars remains under
3    advisement, as do all the other motions.
4            And in entering the order on the motions, if I can
5    provide any other help to the parties that I think I can, I
6    will do so.
7            Mari, anything else?
8        (Judge confers with courtroom deputy.)
9        THE COURT:  And my contemplation is on July 19th,
10   hopefully I'll be able to re-establish the other deadlines in
11   the case, plea deadlines and a trial date that we can all
12   actually mean.
13           And I -- you know, if we can try this case in January
14   or February of 2022, that's what I want to do.  I have no
15   interest in putting it off more than that if we can get it
16   done.  I just don't have a good sense of that right now.  So
17   that's why we're going to check -- do a temperature check in
18   July and figure out where we are here.
19           Anything else?
20       (No response.)
21       THE COURT:  Anything else?
22       LAW CLERK:  No.
23       THE COURT:  Mr. Duva, anything else from the
24   government?
25           MR. DUVA:  No, Your Honor.

1           THE COURT:  Anything from defense counsel?

2           MR. SADOW:  Just briefly.  The matter that Mr. Blake

3   brought up about the sealing of those exhibits, that's the one

4   thing that I would sense there is some urgency, if the Court

5   were to get to that.

6           THE COURT:  Okay.  I'll take a look at that.

7           And, Mr. Duva, as I recall, the government had no

8   objection to that either; is that correct?

9           MR. DUVA:  That's correct, Your Honor.

10          THE COURT:  Okay.  Well, yeah, that might well be the

11  thing to do.  And we'll make a note of that.

12          MR. SADOW:  Thank you.

13          THE COURT:  Anything else?

14          All right.  Well, thank you all for your attendance.

15          Let me just -- if I could briefly speak to -- I

16  don't -- I know a number of you out here are those who have

17  been charged in this case.

18          And I could imagine that some of you may be wishing

19  we could get to this sooner rather than later.  I probably

20  would feel that way if I were in your shoes.

21          But I hope you'll understand that I'm not delaying

22  this just to delay it.  We -- if this case is to go to trial,

23  or if people are in -- need to be in position to make good

24  decisions as to how they want to proceed, we need to kind of

25  get all the information that is available and that the law

1  requires, so that we can -- that we can all help make those

2  decisions, and then I can make the decisions that I need to

3  make.

4        So that's the primary reason we're continuing the

5  case.  And I'll do everything I can to get it to trial as soon

6  as I can.  But it's a big case.  There's a lot to it.  And

7  there's a lot at stake, as I'm sure you-all know better than

8  anybody.

9        So I just want you to know I don't -- I don't take

10  lightly further continuance of this case.  But it's -- it's

11  required in order for me to try to give everybody the fair

12  trial that they deserve.

13        All right.  We are in recess.

14        COURT SECURITY OFFICER:  All rise.

15     (The proceedings concluded at 3:19 p.m.)

16                           - - -

17

18

19

20

21

22

23

24

25

## CERTIFICATE

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


     I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.


     DATED this 3rd day of May, 2021.



               s/Shannon M. Bishop
               Shannon M. Bishop, RDR, CRR, CRC