IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Jacksonville, Florida |
| Plaintiff, | Case No. 3:20-cr-86-TJC-JBT |
| vs. | June 16, 2022 |
| JORGE PEREZ, et al., | 8:52 a.m. |
| Defendants. | Courtroom No. 13A |

EXCERPT OF JURY TRIAL PROCEEDINGS
(VOLUME XVII)
(CHARGE CONFERENCE NOT TRANSCRIBED)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT COURT JUDGE

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street, #150
Jacksonville, FL 32202
Telephone: (904) 549-1307
dsmabishop@yahoo.com

(Proceedings reported by mechanical stenography; transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

**ANDREW TYSEN DUVA, ESQ.**
US Attorney's Office - FLM
300 North Hogan Street, Suite 700
Jacksonville, FL  32202

**GARY A. WINTERS, ESQ.**
United States Department of Justice
1400 New York Avenue NW
Washington, D.C.  20902

**JAMES V. HAYES, ESQ.**
Department of Justice, Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C.  20902

COUNSEL FOR DEFENDANT JORGE PEREZ:

**THOMAS M. BELL, ESQ.**
Thomas M. Bell, PA
301 West Bay Street, Suite 1460
Jacksonville, FL  32202

COUNSEL FOR DEFENDANT RICARDO PEREZ:

**RICHARD J. LANDES, ESQ.**
Richard Landes, Esq.
736 2nd Street North
Jacksonville Beach, FL  32250

COUNSEL FOR DEFENDANT AARON DURALL:

**BRIAN T. RAFFERTY, ESQ.**
BakerHostetler
1170 Peachtree Street NE, Suite 2400
Atlanta, GA  30309-7676

COUNSEL FOR DEFENDANT JAMES F. PORTER, JR.:

**SETH SCHWARTZ, ESQ.**
**ALBERT J. TASKER, IV, ESQ.**
Schwartz Law Group, PA
10365 Hood Road, Suite 105
Jacksonville, FL  32257

COUNSEL FOR DEFENDANT SEAN PORTER:

 **CALEB D. ROWLAND, ESQ.**
 Rowland Law
 2130 Riverside Avenue
 Jacksonville, FL  32204

COUNSEL FOR DEFENDANT CHRISTIAN FLETCHER:

 **STEVEN H. SADOW, ESQ.**
 **VINCENT ALBERT CITRO, ESQ.**
 Steven H. Sadow, PC
 260 Peachtree Street NW, Suite 2502
 Atlanta, GA  30303

COUNSEL FOR DEFENDANT NEISHA ZAFFUTO:

 **JOSHUA SABERT LOWTHER, ESQ.**
 Lowther Walker, LLC
 Centennial Tower
 101 Marietta Street NW, Suite 3325
 Atlanta, GA  30303

COUNSEL FOR DEFENDANT AARON ALONZO:

 **DARCY D. GALNOR, ESQ.**
 Galnor Shumard, PA
 121 West Forsyth Street, Suite 610
 Jacksonville, FL  32202

# T A B L E   O F   C O N T E N T S

Page No.

PROCEEDINGS:

Motion for Mistrial by Mr. Rafferty............... 204
Motion for Mistrial by Mr. Lowther................ 205
Motion for Mistrial denied........................ 207
Motion for Mistrial by Mr. Rafferty............... 208
Motions for Mistrial denied....................... 215
Rule 14 Motion by Mr. Rafferty.................... 216
Rule 14 Motion denied............................. 221


WITNESSES FOR THE DEFENDANTS:

**JAQUANDA SMITH**
DIRECT EXAMINATION BY MR. RAFFERTY...............  21
CROSS-EXAMINATION BY MR. DUVA....................  60
REDIRECT EXAMINATION BY MR. RAFFERTY.............  74
**MARK STEPHEN THOMAS**
DIRECT EXAMINATION BY MR. SCHWARTZ...............  78
CROSS-EXAMINATION BY MR. DUVA.................... 108
REDIRECT EXAMINATION BY MR. SCHWARTZ............. 231
RECROSS-EXAMINATION BY MR. DUVA.................. 243

E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

23D.............................................. 256
69............................................... 188


Defendant James Porter, Jr.'s Exhibits:

28.............................................. 101


Defendant Sean Porter's Exhibits:

1............................................... 249


Defendant Durall's Exhibits:

200 ...........................................  45
210 ..........................................  51
3, 4, 6, and 14...............................  76

                        P R O C E E D I N G S

June 16, 2022                                    8:52 a.m.

                              - - -

            COURT SECURITY OFFICER:  All rise.  This Honorable
Court is now in session.

            THE COURT:  Have a seat for just a moment, please.

            So I just want to make sure I know what the lineup
is.  Where is Mr. Rafferty?

            MR. RAFFERTY:  I'm right here, Your Honor.  I'm at
the podium.

            THE COURT:  Oh, okay.  So you're going to call
Ms. Smith?

            MR. RAFFERTY:  I am, Your Honor.

            THE COURT:  Okay.  And then what's going to happen?

            MR. RAFFERTY:  Then I'm going to just introduce some
of the documents I mentioned yesterday and then I'm going to
rest.

            THE COURT:  Okay.  And then, Mr. -- I guess, Schwartz
would be next.  What's going to happen?

            MR. SCHWARTZ:  We've got Mark Thomas this morning.
And then I may have some questions for the witness that
Mr. Rowland is calling.  I'm not really sure.  That's the
CPA --

            THE COURT:  Okay.

            MR. SCHWARTZ:  -- for the Porters.

 1          THE COURT:  All right.  And how -- how long do you

 2     think Mr. Thomas is going to take, Mr. Schwartz?  Do you have

 3     any idea?

 4          MR. SCHWARTZ:  I'm not sure.  I mean, the direct --

 5     I -- probably 45 minutes, maybe an hour, maybe a little less.

 6     It just depends on how quickly we're running through some of

 7     the statutes and documents and things like that.

 8          THE COURT:  Now, is Mr. Thomas's testimony in support

 9     of an advice of counsel-type defense?

10          MR. SCHWARTZ:  Yes, sir.

11          THE COURT:  All right.  That raises the issue of

12     whether the privilege is waived with respect to matters which

13     are -- that you elicit on direct.  I -- I want to make sure we

14     have an understanding about that.

15          Is it your understanding that on cross-examination --

16     what's your understanding of what the waiver issue is with

17     respect to advice of counsel?

18          MR. SCHWARTZ:  My understanding is that issues that

19     are brought up on direct then -- that are directly related to

20     that would -- there would be a waiver.  I don't think you could

21     have a waiver at the same time of asking somebody something

22     without the ability to cross-examine that.  I don't think the

23     waiver extends to all matters, or it extends outside of those

24     narrow matters that are brought up on direct.

25          THE COURT:  Okay.

 1    MR. SCHWARTZ:  But I do believe that, you know, it's

 2   appropriate to be able to cross-examine on -- on just, you

 3   know, those issues.

 4    THE COURT:  All right.  Who's going to -- who's going

 5   to do the cross-examination of Mr. Thomas?

 6    MR. DUVA:  I am, Your Honor.  Mr. Thomas gave advice

 7   to Mr. Durall as well and Mr. Perez and the Porters.

 8    THE COURT:  Okay.  So I guess the understanding --

 9   the -- and I actually just commissioned a little research this

10   morning because it occurred to me that we might have a

11   privilege issue.

12    My understanding, according to my colleague, Judge

13   Scriven, who is relying on -- on some out-of-circuit authority,

14   but my understanding is that the advice of counsel defense, if

15   it's asserted, does waive the privilege with respect to the

16   matters which are the subject of the -- of the advice and the

17   subject of the direct examination, but would not waive it for

18   all purposes.

19    So that it would be, in -- in essence -- confined to

20   the issues that are -- that are elicited in support of the

21   defense.

22    You agree with that?

23    MR. DUVA:  I do, but Fletcher's Exhibit 78 has the

24   Mark Thomas letter to Mr. Durall.  So I think that opens the

25   door to me asking Mr. Thomas about the circumstances of that,

1　particularly what's in that letter.  It is in evidence.  So I

2　plan to do that.

3　　　　　THE COURT:  Sure.

4　　　　　MR. DUVA:  I plan to cover with him things that

5　happened before that date and exactly what he was advising, and

6　then ask him if he knew certain things about claims that were

7　being submitted to Campbellton-Graceville at that time, in

8　November through February of 20 -- November of 2015 through

9　February of 2016.

10　　　　　THE COURT:  Well, I think you've already previewed

11　that with another witness.  And I think -- it seems to me

12　that's within the area of -- proper area of cross-examination.

13　　　　　MR. RAFFERTY:  Your Honor, if I could be heard on

14　that.

15　　　　　THE COURT:  Yeah.

16　　　　　MR. RAFFERTY:  With respect to that, we have not

17　introduced that document.  We have not asked any questions

18　about that document.  I have no intention of asking Mr. Thomas

19　any questions about the preparation of that document.  And

20　Mr. Durall is not waiving any privilege.

21　　　　　THE COURT:  Well, I thought the exhibit was in

22　evidence.

23　　　　　MR. DUVA:  It is.

24　　　　　MR. RAFFERTY:  The exhibit was introduced by

25　Mr. Sadow, not by Mr. Durall, and I did not ask any questions

1　about it, and I haven't asked any questions about it, and I

2　haven't asked any questions of Mr. Thomas.  I have no intention

3　of asking Mr. Thomas any questions, and I'm not waiving the

4　privilege on behalf of Mr. Durall.

5　　　　　THE COURT:  Well, are you asserting an advice of

6　counsel defense?

7　　　　　MR. RAFFERTY:  No, I am not.  And I have not.

8　　　　　MR. DUVA:  I think I can do this with a did you know

9　this, not did Mr. Durall tell you something.

10　　　　　THE COURT:  Okay.

11　　　　　MR. RAFFERTY:  Respectfully, Your Honor, I think that

12　the exhibit itself -- I know it's already sort of like

13　unringing the bell, but the exhibit itself should be redacted

14　to the extent that it has a reference to Mr. Durall to avoid

15　the suggestion that he was even asserting an advice of counsel

16　defense.  He is not.

17　　　　　THE COURT:  Yeah.

18　　　　　MR. DUVA:  Mr. Rafferty didn't make that objection at

19　the time, and Mr. Sadow clearly went through who it was to and

20　all of the qualifications of Mr. Thomas.

21　　　　　THE COURT:  All right.

22　　　　　MR. DUVA:  And there was no objection.

23　　　　　MR. SCHWARTZ:  If I may be heard on this, Judge.  I

24　have to agree with Mr. Rafferty.  I think looking at the advice

25　of counsel, it's brought by the individual.  In this case

1  Mr. Porter and his brother Sean have sought that advice of

2  counsel defense, but I don't think that Mr. Thomas is able by

3  rule or that there's been any waiver by Mr. -- the Perezes or

4  Mr. Durall.

5      The letter's in evidence, sure, but the circumstances

6  surrounding that and everything else I do believe are

7  absolutely privileged.

8      MR. DUVA:  And, again, Your Honor, I think I can get

9  into this, did you know certain things, not tying it to did --

10  what did -- what were your conversations with Mr. Durall or

11  what did Mr. Durall tell you.

12      MR. RAFFERTY:  Your Honor, if Mr. Duva is going to go

13  that route with respect to this witness, then I would renew my

14  request to have the document redacted so that when Mr. Duva is

15  asking those questions, the inference can't be drawn that

16  Mr. Durall said something because he has never asserted his

17  privilege.

18      THE COURT:  Can I see the exhibit, please.

19      MR. BELL:  Judge, I think kind of the same issue.

20  There's an e-mail from Missouri to Jorge Perez.  But there's no

21  explicit waiver of Mr. Perez's privilege and he has not

22  asserted an advice of counsel defense.

23      THE COURT:  So you're not asserting advice of

24  counsel?

25      MR. BELL:  No.

1          THE COURT:  But you are?

2          MR. SCHWARTZ:  Yes, sir.  We are.  And we disclosed

3   that to the government and Mr. Sean Porter essentially, as it

4   also benefits him through the HLP Pinnacle-type deal as far as

5   what my client's advice was.  And so his information,

6   obviously, you know, to the extent that it's brought out in

7   direct will be -- will be waived, but I don't believe that any

8   other defendants are unless they specifically are indicating

9   they're asserting that advice of counsel as to Mr. Thomas.

10          THE COURT:  The letter is addressed to Mr. Durall.

11          MR. RAFFERTY:  That is correct, Your Honor, but

12   Mr. Durall has never asserted an advice of counsel privilege,

13   an advice of counsel defense.  I did not introduce this into

14   evidence, I haven't asked any questions about it, and I'm not

15   going to be asking Mr. Thomas any questions about it.  So I

16   don't think he's waiving the privilege.  And I understand

17   Mr. Duva's point that you can ask certain questions, but the

18   clear inference that's going to be drawn is that the

19   information he received came from Mr. Durall.  And if

20   Mr. Durall is not waiving his privilege, Mr. Thomas can't

21   answer those questions because Mr. Durall is not waiving his

22   privilege.

23          THE COURT:  Hasn't -- Mr. Rafferty, hasn't Mr. Duva

24   already asked these questions of another witness?  Maybe

25   Mr. Byrns, I don't recall.  But hasn't he already asked the

1  questions based on this letter?  Did -- the same line of

2  questioning?

3          MR. DUVA:  I did as to Byrns.  Mr. Durall wasn't

4  involved in Putnam.  So I did do that with Byrns because there

5  are e-mail communications with Mark Thomas, Christian Fletcher,

6  Jorge Perez that I covered.  That was 27Y.

7          But this -- this letter was put in front of witnesses

8  and it was shown to the jury.  And I think we're entitled to go

9  through it and say what does this say, and then point out it

10  doesn't say what happened generally.  Because now Mr. Durall

11  has the benefit of I have a lawyer -- I have a letter from a

12  lawyer in evidence, I'm not really asserting that defense, so

13  he sort of has the cake and eat it, too.  So it should have

14  been redacted, but it wasn't.

15          MR. RAFFERTY:  And, Your Honor, that may be the case.

16  I did not introduce it; Mr. Sadow did.  He introduced it for

17  his own purposes; I did not.  I have not asked any questions

18  about it.

19          I understand Mr. Duva wants to ask whatever questions

20  he wants to ask of Mr. Thomas.  I submit, though, he cannot ask

21  questions about any information he was provided in connection

22  with the preparation of that letter because it would violate

23  Mr. Durall's attorney-client privilege.

24          There are means by which the letter can be redacted,

25  and it could go back to the jury in a redacted form, in which

1   any reference to Reliance/Mr. Durall can be taken out.

2          I understand we can't unring the bell, but by making

3   those redactions, at a minimum, the jury will not be drawing

4   the inference that Mr. Durall provided the information that

5   formed the basis of that letter.

6          THE COURT:  So, Mr. Schwartz, what are you -- what

7   are you going to be asking Mr. Thomas about?

8          MR. SCHWARTZ:  I'm going to ask him about the advice

9   that he provided my client, the information that my client gave

10  to him for him to research and provide that advice.

11         THE COURT:  Are you going to be relying on this

12  letter?

13         MR. SCHWARTZ:  No.  I'm not -- I'm not relying on the

14  letter.

15         THE COURT:  So where -- what form is that advice --

16  what -- what form did that advice come in if it wasn't this

17  letter?

18         MR. SCHWARTZ:  Statutes, rules, and codes.  We're

19  going to talk about U.S. Code, we're going to talk about

20  guidelines, we're going to talk about things that are in print

21  that were -- were passed by the Congress and passed by

22  administrative agencies and those type of things.

23         THE COURT:  Hold on -- hold on a second.  I can't

24  have side conversations while I'm trying to listen to an

25  argument.

 1       So you're -- so you're just going to be talking to

 2  him about stuff he told your client?  There's no -- there's no

 3  writings or there's no letter?  There's no anything that

 4  memorializes that advice?

 5       MR. SCHWARTZ:  No.  He remembers providing the

 6  advice.  He remembers the circumstances around it.  He knows

 7  ultimately what happened and he stands behind that.  He's going

 8  to talk about the statutes, rules, and code, federal law that

 9  is the basis of his opinion and what my client disclosed to

10  him.

11       And based on that information that he provided the

12  advice and -- you know, essentially just down that advice of

13  counsel defense.  I mean, there's -- there's some documents

14  that he's reviewed and things like that, but it's mostly about

15  the disclosure that's required under -- under law, the advice

16  that he gave based on disclosure, and that -- that advice was

17  followed, essentially.

18       MR. RAFFERTY:  Your Honor, my understanding is

19  Mr. Duva has a version of this letter that apparently is almost

20  identical to the one that was introduced into evidence that

21  just doesn't have any reference to Mr. Durall or Reliance.  It

22  talks about ABC company.  In the brief moment, I just had a

23  chance to see it.

24       It seems to me that we could use that exhibit and

25  strike the exhibit that Mr. Sadow introduced into evidence so

1     that Mr. Duva can ask whatever questions he wants about ABC

2     company and accomplish the same -- same goals that I think he

3     intends on accomplishing.

4           MR. BELL:  Judge, me, too, on this.  There's the one

5     letter, Missouri, that came in through David Byrns, the e-mail

6     by the -- the vehicle was to get it in.  It was an e-mail to

7     Jorge Perez with multiple contacts there.  Mr. Thomas did

8     represent Mr. Perez prior to his representation of the Porters.

9     There was one --

10          THE COURT:  So let me make sure I'm understanding,

11    Mr. Bell.  You -- you're not calling Mr. Thomas, you don't want

12    to hear from Mr. Thomas, you don't -- you don't want the

13    benefit of anything Mr. Thomas said to anybody?  You would --

14    you don't want that?

15          MR. BELL:  That's correct, Judge.  Other than there

16    was one factual scenario where he was at Williston as a fact

17    witness and as an observer, but not that -- you know, that he

18    observed the agents there, the inspectors at Williston, but not

19    in his capacity as a lawyer and his capacity as an eyewitness

20    to that event.  Other than that, no.

21          I think we get a good-faith instruction other than

22    that, but I don't know that -- we're not relying on the

23    counsel.

24          THE COURT:  All right.  All right.  So, magically, a

25    redacted version of this same letter has appeared.  I'm not

1  sure where it came from.

2       Mr. Duva, I guess you found it or you have it, right?

3       MR. DUVA:  I did.  I think I found it on the

4  Internet.  It says the same thing.  It's, like, kind of a

5  fill-in-the-blank for I will write this and hand it out, and it

6  says ABC, which is the lab.

7       THE COURT:  Okay.

8       MR. DUVA:  So then I'll fill it in and, you know,

9  that's where I found it.

10      MR. BELL:  It's called a template, Judge.

11      THE COURT:  Okay.

12      MR. RAFFERTY:  Your Honor?

13      THE COURT:  Yeah.

14      MR. RAFFERTY:  I did have a chance to speak offline

15  with Mr. Duva just now.  You know, I understand the

16  government's argument, you can't have your cake and eat it,

17  too, by having the letter going into evidence, suggesting that

18  Mr. Durall's asserting an advice of counsel privilege of

19  defense when he's not.

20      My suggestion would be that that exhibit either be

21  replaced with this copy or that the copy that was introduced

22  into the evidence not go back to the jury, and that the

23  government use that particular version of the letter so that it

24  doesn't prejudice Mr. Durall.

25      MR. DUVA:  So if that's the case, then Fletcher 78

1   should be stricken.

2          THE COURT:  Okay.

3          MR. SADOW:  Whoa, whoa, whoa, whoa, whoa, whoa, whoa.

4          MR. DUVA:  The part that -- any part that deals with

5   Mark Thomas.

6          MR. SADOW:  Respectfully, if there is an issue that

7   deals with privilege, the name Durall simply needs to be taken

8   off of the exhibit itself.  And then to that extent, he can

9   either go back with the redaction, and we have redacted -- or

10  will be redacting other exhibits.  So -- but striking my

11  exhibit for which the purpose I used had nothing to do with

12  advice of counsel.

13         THE COURT:  Well, I'm not sure Mr. -- I'm not sure,

14  but I don't think Mr. Duva was necessarily saying the whole

15  thing needed to be stricken, but there's -- all I'm looking at

16  is the Mark Thomas letter, which is a part of a big packet of

17  information that makes up Fletcher 78.  I haven't had the --

18  had the privilege of going back and reviewing all this stuff.

19         But I take it, Mr. Sadow, are you in disagreement

20  about removing the Durall letter -- or the Thomas letter to

21  Mr. Durall from this exhibit?

22         MR. SADOW:  I guess the answer to that is if we can

23  substitute the one that has no identification to Mr. Durall,

24  that would be acceptable.

25         THE COURT:  Okay.

```
 1        MR. SADOW:  If we can redact Mr. Durall's name from
 2   the exhibit, that would be acceptable.
 3        THE COURT:  Okay.
 4        MR. SADOW:  To the extent that that letter and that
 5   letter alone be withdrawn or taken from the exhibit, I'd have
 6   to speak just briefly with Mr. Rafferty.  But it may be that I
 7   can work out a compromise with him on that.
 8        THE COURT:  Okay.  I'm looking just quickly through
 9   the exhibit and I don't see anything else that's really Mark
10   Thomas-related.  There's a bunch of other papers and stuff, but
11   it's not looking to me like this is Mark Thomas stuff.  So it
12   may be that we can figure that out.  So let me see where I
13   think we are.
14        So, Mr. Duva, you're willing to cross Mr. Thomas on
15   the form of the letter that is redacted.  And then we need to
16   figure out some relief on 78.  It's looking to me like -- that
17   the Thomas letter could just come out of 78 and leave the rest
18   of the exhibit intact and nobody would be hurt by it, but I
19   don't know, Mr. Sadow, if you're -- if you're --
20        MR. SADOW:  If the Court is inclined to ruling as
21   Mr. Schwartz, Mr. Rafferty, and Mr. Bell would like to do in
22   taking out the letter, if you'll give me 30 seconds, I'll talk
23   to Mr. Rafferty.
24        THE COURT:  Sure.
25      (Counsel confer.)
```

1          MR. RAFFERTY:  Your Honor, I just ask that it be
2    taken out.

3          MR. SADOW:  And I do not object.

4          THE COURT:  All right.  So -- so, Mr. Duva, is the
5    government in -- in agreement, or at least willing, to remove
6    the Thomas letter from 78 and to use this version, the redacted
7    version, in its cross-examination of Mr. Thomas?

8          MR. DUVA:  Yes, Your Honor.

9          THE COURT:  All right.  That's what we're going to
10   do.

11         MR. DUVA:  Can I -- can I get that back?

12         THE COURT:  Yeah.  You can get -- here, this can go
13   to whoever it came from.  And this can go -- and we will --
14   we're not going to take the time right now on 78, but we will
15   make sure -- and, Mr. Sadow, you'll help us make sure that we
16   do that work.

17         MR. SADOW:  Of course, Your Honor.

18         THE COURT:  Yeah.  Okay.

19         MR. RAFFERTY:  Your Honor, can I get the witness?

20         THE COURT:  Yes, please.

21         Is there anything else?  Okay.  Let's go.  Let's have
22   the jury, please.

23         COURT SECURITY OFFICER:  All rise for the jury.

24     (Jury enters, 9:10 a.m.)

25         THE COURT:  And I take it no other -- and nobody else

```
 1   wanted to be heard on that, correct?
 2            MR. LANDES:  No, Your Honor.  Thank you.
 3            THE COURT:  Okay.
 4        (The witness entered the courtroom.)
 5            COURT SECURITY OFFICER:  Please be seated.
 6            THE COURT:  Well, good morning, ladies and gentlemen.
 7   I apologize about -- that was my fault.  We -- we had a matter
 8   that we were talking about and it just took a little bit
 9   longer.  And so -- but we are now ready to go.  And we have a
10   new witness.
11            And, Ms. Hatfield, will you swear the witness,
12   please.
13            COURTROOM DEPUTY:  Raise your right hand.
14            Do you solemnly swear that the testimony you are
15   about to give before this court will be the truth, the whole
16   truth, and nothing but the truth, so help you God?
17            THE WITNESS:  I do.
18            COURTROOM DEPUTY:  Okay.  Please take a seat.  And if
19   you could state your full name and spell your last name for the
20   record.
21            THE WITNESS:  My name is Jaquanda Smith, S-m-i-t-h.
22        JAQUANDA SMITH, DEFENDANTS' WITNESS, SWORN
23                    DIRECT EXAMINATION
24   BY MR. RAFFERTY:
25   Q.   Good morning, Ms. Smith.
```

1   A.   Good morning.

2   Q.   As you know, my name is Brian Rafferty.  And I represent

3   Aaron Durall.  Can you tell us how old you are?

4   A.   Thirty-six.

5   Q.   And what is your educational background?

6   A.   I have a bachelor's of science in hospitality management

7   from Johnson & Wales University.  I also have a master's degree

8   in business administration from the University of Phoenix, and

9   I looked into a PhD with Florida Atlantic University, but I

10  haven't made a final decision on it as of yet.

11  Q.   Can you describe your professional career since you

12  graduated from -- I guess, since you got your college degree?

13  A.   Sure.  So since I got my college degree, I began a career

14  with GEICO insurance.  And, there, I started in customer

15  service.  I worked in sales.  And then I ultimately ended up in

16  the claims department as a claims adjustor.  I worked with

17  GEICO for about seven and a half years.

18  Q.   And after GEICO, where did you work?

19  A.   I worked for Reliance laboratory testing.

20  Q.   Okay.  And where are you currently employed?

21  A.   You said where?

22  Q.   Where are you currently employed?

23  A.   I work for myself now.

24  Q.   Okay.  And what do you do?

25  A.   I actually have an online business.

1   Q.    What kind of online business is that?

2   A.    It is a CBD online business.

3   Q.    Okay.  How long have you had that?

4   A.    About -- a little over a year and a half.

5   Q.    Okay.  You mentioned you worked at Reliance Laboratories.

6 How long did you work there?

7   A.    I worked for Reliance for about three or four years.  I

8 think it was three or four years.

9   Q.    Do you remember approximately when you started?

10   A.    October of 2015.

11   Q.    Okay.  And were you hired by Aaron Durall?

12   A.    Yes, I was.

13   Q.    Can you describe your relationship with Mr. Durall?

14   A.    Sure.  He was my boss.  I worked for him.

15   Q.    After -- there came a time that Reliance closed?

16   A.    Yes, there was.

17   Q.    And after it closed, did you continue to work with

18 Mr. Durall?

19   A.    Yes.  There was another opportunity or venture.

20   Q.    What was that?

21   A.    CanMedLabs.

22   Q.    And what was CanMedLabs?

23   A.    It was a cannabis testing laboratory.

24   Q.    Okay.  And where was that?

25   A.    It was based in California.  Sacramento, California.

1  Excuse me.

2  Q.   Okay.  When you worked at Reliance from 2015 to 2018, what

3  was your salary, if you remember?

4  A.   Oh, God.  My salary changed, but it ended at -- I was -- I

5  don't remember off the top of my head.  I'm sorry.

6  Q.   Okay.  Do you know an individual by the name of Neisha

7  Zaffuto?

8  A.   Yes, I do.

9  Q.   And how do you know her?

10  A.   I know Neisha is Aaron's partner, and they bought -- they

11  purchased the hospital together.

12  Q.   Do you remember which hospital?

13  A.   That was Chestatee Regional Hospital.

14  Q.   Do you know if Ms. Zaffuto has any other businesses?

15  A.   Not that I'm aware of.

16  Q.   Do you know if she works for or has an association with a

17  company called Medivance?

18  A.   Oh, yes.  I'm sorry.  I forgot all about that.

19  Q.   What -- what is Medivance, if you know?

20  A.   Medivance was a billing company.

21  Q.   Okay.  When you got hired in October of 2015 at Reliance,

22  what was your -- what was your job title?

23  A.   My job title was an administrative coordinator.

24  Q.   And did your title change over time?

25  A.   Yes, it did.

1   Q.   When was that?

2   A.   My title changed early 2016.

3   Q.   And what -- what did your title become?

4   A.   Office manager.

5   Q.   Now, as the office manager, did you have specific

6   functions that you had to perform?

7   A.   Yes, I did.

8   Q.   What were those?

9   A.   So as office manager, I oversaw a team of approximately

10  ten to 12 individuals.  No, excuse me, a little bit more than

11  that.  I oversaw a team of almost 15 to 20 people.  And I

12  oversaw the administrative tasks that they completed.  I did --

13  I had human resource responsibilities, so implementing

14  benefits.  Gosh, what else?

15  Q.   Were you associated with hiring?

16  A.   Yes.  Job posting, hiring, interviewing.  There were a ton

17  of things I was involved in.

18  Q.   How about relationships with vendors?  Did you have any

19  role with that?

20  A.   Definitely relationships with vendors.

21  Q.   What about marketers?

22  A.   Marketers as well, yes.

23  Q.   Okay.  Did you ever hear of a -- a hospital called

24  Campbellton-Graceville Hospital?

25  A.   Yes, I did.

1  Q.   And what did you understand Campbellton-Graceville

2  Hospital to be?

3  A.   That was a hospital that we referred samples out to.

4  Q.   And what about a hospital called Regional General

5  Hospital?

6  A.   Yes, I'm familiar with that hospital as well.

7  Q.   And what was your understanding of that hospital?

8  A.   That that was also another hospital that we referred

9  samples out to.

10  Q.   And what about a hospital called Chestatee?

11  A.   Yes, I am familiar with Chestatee.

12  Q.   And you mentioned before that Mr. Durall and Ms. Zaffuto

13  purchased the hospital at some point in time.  Was that

14  Chestatee Hospital?

15  A.   That is correct.

16  Q.   Did you understand that samples were also referred to

17  Chestatee?

18  A.   Yes.

19  Q.   Okay.  With respect to the process at Reliance, with

20  respect to testing samples, do you have some familiarity with

21  that process?

22  A.   Yes, I do.

23  Q.   Can you describe it for the jury?

24  A.   Sure.  So regarding testing samples, first thing we would

25  do, of course, is actually verify the identifiers -- excuse me,

1 I'm a little bit nervous. But we would verify the identifiers

2 on the samples, and then from there, we would check the test

3 code. And based on the test code, that would determine the

4 next step. We would pour off two aliquots from the main cup.

5 One aliquot was for the screen sample based on that test code,

6 and the second would be for a confirmation sample.

7 Q. Now, with respect to -- once the aliquots were created,

8 was one shipped to a hospital?

9 A. Correct. That is correct.

10 Q. Okay. And how is that shipped? What sort of shipper did

11 you use?

12 A. We used FedEx.

13 Q. Okay. And were you responsible for paying the FedEx

14 bills?

15 A. Yes, I was.

16 Q. Can you describe, just generally speaking, what the

17 monthly FedEx bills were like?

18 A. In the thousands, for sure. I would say well over $10,000

19 a month.

20 Q. And were you -- did you have the same person picking up

21 the samples and sending them to these hospitals, or were there

22 different shippers?

23 A. We had a designated driver, so that's what we called it, a

24 designated driver that would pick up and drop off samples

25 because they had assigned routes, was how I understood it.

1  Q.   Okay.  With respect to how test orders were accomplished

2  by clients of Reliance, can you describe how that happened?

3  A.   Sure.  So it was a pretty simplistic and straightforward

4  process to us because the clients would enter orders into the

5  system and enter in the test codes with those orders, and then,

6  of course, once it populated and transferred over to the

7  laboratory, from there, that dictated exactly what we needed to

8  do once we received those samples.

9  Q.   Was that -- would you call that an "electronic ordering

10  system"?

11  A.   That is correct.

12  Q.   Was there a menu of different kinds of tests that could be

13  ordered through that system?

14  A.   That is correct.

15  Q.   And who was responsible for sort of updating or

16  maintaining that?

17  A.   That would be myself.

18  Q.   Okay.  And what sort of things would you add or subtract

19  over time with respect to the menu of potential tests?

20  A.   Typically, the test codes.  So each client had a different

21  need.  And usually they would express that need upon signing

22  up.  And so if we didn't have a -- a specific test, or we --

23  they needed a new test added, we would create the code, so,

24  that way, it could be as simplistic of a process as possible in

25  order for them to place orders into the system.

1  Q.    And were there specific codes that were added to the

2  system as Reliance developed relationships with hospitals?

3  A.    That is correct.

4  Q.    So that if a -- so that -- so that when they ordered

5  tests, they had the ability -- the clients had the ability to

6  order from hospitals, too?

7  A.    That is correct.

8  Q.    Okay.  Tell me about your -- your interactions with

9  Ms. Zaffuto as you were working there at Reliance.  How

10  frequently did you see her?

11  A.    From what I recall, I would see her sometimes weekly,

12  sometimes biweekly.  It just depends on what was going on.

13  There were times where I would see her every day.  Again, it

14  all just depended on what was going on.  So...

15  Q.    What about Mr. Durall?  How frequently did you interact

16  with him?  And did there ever come a time that your ability to

17  interact with him may have changed?

18  A.    I interacted with Mr. Durall as well all the time, or

19  daily, I would say, weekly.  And, no, there was never a time

20  where I couldn't interact with Mr. Durall.

21  Q.    Did you ever come to know an individual by the name of

22  Kyle Marcotte?

23  A.    Yes, I did.

24  Q.    And how did you come to know him?

25  A.    Kyle was a marketer for Reliance, and so I knew him

1  through the job.

2  Q.   And did you know anything about Mr. Marcotte's substance

3  abuse history?

4  A.   Unfortunately, yes, I did.

5  Q.   During the time that you were -- you had a relationship

6  with Mr. Marcotte, did you come to know that he owned certain

7  companies?

8  A.   Yes, I did.

9  Q.   Do you recall the names of those companies?

10 A.   Yes.  There was a company called Beaches Recovery.  There

11 was a company called KTL Labs.  There was a company called

12 North Florida Labs.  And that's -- that's the most I can recall

13 as of now.

14 Q.   Okay.  As your time with Reliance went on, did things get

15 busier?

16 A.   Absolutely.

17 Q.   Did you end up having a lot of clients and customers?

18 A.   Absolutely.

19 Q.   And a lot of samples coming through Reliance?

20 A.   That is correct.

21 Q.   Okay.  As that happened, did there ever come a time that

22 Mr. Marcotte paid you additional money?

23 A.   That is correct.

24 Q.   Can you describe how that happened?

25 A.   Sure.  So it wasn't an overnight process.  However, just

1  dealing with him on a -- interacting with him on a regular

2  basis, he began to commend me for the job I was doing, in terms

3  of doing a good job and handling his clients, which, to me, I

4  was just doing my job.

5         And he started mentioning that he wanted to do more

6  for me and to do something special for me, which at the time I

7  didn't understand it.  But I did explain to him -- I was like,

8  you don't need to do anything more for me.  This is my job and

9  I'm going to do it regardless.

10        Then eventually, he, you know, talked about it more

11  and became serious and then asked me for my bank account

12  information, and he did pay me $5,000.  He didn't have to do

13  that.  I made that very clear multiple times, but there were

14  times where he actually didn't pay me.  He stated he would pay

15  me monthly.  But there were a few months where he didn't pay

16  me, and I never reached out, I never brought it up.  And I just

17  would keep it going because, again, I was still doing my job.

18        And then there were times where he would continue to

19  pay me and ask me why I didn't remind him.  And I told him

20  then, I was just doing my job, it was nothing special or

21  nothing more that I would have done or anything different.  So

22  I was grateful.

23  Q.   So was it your sense that -- that Mr. Marcotte was paying

24  you because he wanted to be a priority client of Reliance?

25  A.   It was.  But, again, that's why I always stressed to him,

1   that, hey, I'm going to make sure you're taken care of,

2   regardless, because I would make sure any of our sales reps

3   were taken care of the best that I could.  So I tried to stress

4   it, but I knew that's where he was going with it, but that

5   wasn't the case.  I was going to do my job regardless.

6   Q.    Do you remember how much he paid you?

7   A.    In total or you mean the --

8   Q.    In total.

9   A.    Oh, gosh.  Exact number, no, but I would say it was well

10  over $100,000.

11  Q.    Okay.  You mentioned that you had some awareness of

12  Mr. Marcotte's substance abuse history.  Did there ever come a

13  time that you saw Mr. Marcotte have a relapse?

14  A.    I did.

15  Q.    Can you describe that for the jury.

16  A.    Yes, I can.  So there was a time where we met up with

17  Mr. Marcotte, we were supposed to be meeting at the hospital.

18  Q.    Which hospital?

19  A.    Chestatee Regional Hospital.  And for whatever reason --

20  excuse me, I was with Mr. Durall and Ms. Zaffuto.  And for

21  whatever reason, he kept, like, kind of giving us the

22  runaround, which was odd and strange and not really a part of

23  his character.  But eventually we met up as we were heading

24  out, and it wasn't a pretty sight.  So he had lost a ton of

25  weight, his nails were dirty, he had on flip flops which was

1  not his normal attire.  His toe was bleeding to the point where

2  it was literally running.  He looked very messy, dishevelled.

3  He was sweaty.  He seemed very jittery as well.

4          But that's the best that I could describe it, which

5  was extremely disheartening because I did grow and build a

6  rapport with him, so seeing him before that, and then seeing

7  him at that time made me super emotional.  I won't lie.

8  Q.    And did that -- did that relapse go on for some time?

9  A.    Yes, it did.

10  Q.    With respect to the hospital -- you mentioned Chestatee --

11  did you travel to Chestatee from time to time?

12  A.    Yes, I did.

13  Q.    And when that hospital was purchased -- we heard it was

14  purchased by Mr. Durall for approximately $15 million.  Did you

15  know that?

16  A.    Yes, I was aware.

17  Q.    After the hospital was purchased, did you participate in

18  efforts at refurbishing the hospital?

19  A.    Yes, I did.

20  Q.    Can you describe that for the jury?

21  A.    Sure.  So there were a ton of efforts or things done to

22  actually refurbish the hospital.  There was about $1.8 million

23  worth of OR equipment that was purchased to try to upgrade the

24  OR.  There were beds that were purchased for the swing bed and

25  swing bed unit, excuse me.

1   Q.   What's a swing bed unit, if you know?

2   A.   I don't recall the exact details of it as of right now

3   because it's been a while.  But it just stood out to me.  There

4   was new furniture that was purchased to go in the waiting area.

5   The geriatrics site was painted.

6        We hired two -- two hospitalists that we paid

7   $250,000 each, and that was supposed to help with just

8   increasing the bedside care, which it did because we started

9   getting surveys and feedback from patients that were there,

10  that, you know, essentially they enjoyed their care, which was

11  more than what we had received prior to -- well, within two

12  decades, was kind of my understanding.

13       A lot of people starting ranting and raving about the

14  fact of, you know, upgrading the hospital.  The hospital was

15  painted as well.

16       So there was a ton of things done at Chestatee, but

17  that's what I can recall for now.

18  Q.   Did you ever hear of a company called Global Analytics?

19  A.   Yes, I did.

20  Q.   What did you understand that company to be?

21  A.   Global is where we purchased reagents to run the testing.

22  Q.   And were you responsible, along with others at Reliance,

23  for making sure that you had a sufficient number of reagents at

24  the various hospitals?

25  A.   That is correct.

1  Q.   You mentioned FedEx.  Do you -- well, strike that.  Let me

2  move on to something else.

3        With respect to testing, you talked about some

4  awareness of testing.  Are you aware of the different kinds of

5  urine tests that were -- that are performed at Reliance?

6  A.   Yes, I am.

7  Q.   Are you familiar with something called a "screen"?

8  A.   Yes, I am.

9  Q.   Are you familiar with something called a "confirmation"?

10 A.   Yes, I am.

11 Q.   Now, Reliance had the ability to perform both of those

12 tests?

13 A.   That is correct.

14 Q.   With respect to the samples that were being sent to the

15 hospitals, what kind of tests did you understand were going to

16 be performed at those hospitals?

17 A.   Screen testing.

18 Q.   Okay.  I want to direct your attention to the 2018

19 timeframe, the early -- latter part of '17, early part of '18.

20 Was Mr. Marcotte still associated with Reliance at that time?

21 A.   Yes, he was.

22 Q.   Were you having any difficulties with getting in touch

23 with Mr. Marcotte?

24 A.   Yes, I was.

25 Q.   Can you describe that?

1   A.   Sure.  So there were multiple times where I would reach

2   out to Mr. Marcotte just for various things, of course.  And a

3   lot of those times he was unresponsive, which I later grew to

4   know that it was because of his drug abuse and -- and

5   relapsing.

6   Q.   Okay.  Around that same time, did there come a time

7   that -- that Reliance was named in connection with a bankruptcy

8   proceeding related to Campbellton-Graceville Hospital?

9   A.   Yes, there was.

10  Q.   And in connection with that, did you assist Mr. --

11  Mr. Durall and others in collecting documents, making sure that

12  you had files and things of that nature?

13  A.   That is correct.

14  Q.   Now, with respect to Mr. Marcotte, are you aware if there

15  was a contract between Reliance and Mr. Marcotte?

16  A.   Yes, I am.

17  Q.   Okay.  As part of your responsibilities there at Reliance,

18  were you responsible for maintaining the contracts?

19  A.   Yes, I was.

20  Q.   Did there come a time where you were unable to locate a

21  contract for Mr. Marcotte?

22  A.   That is correct.

23  Q.   Can you describe that for the jury?

24  A.   Yes, I can.  So in the midst of going through -- or

25  preparing for the mediation --

1  Q.   When you say "mediation," you mean the mediation for the

2  bankruptcy?

3  A.   The mediation for the bankruptcy, that is correct.  There

4  were a ton of meetings being had that I sat upon -- sat in on

5  and was a part of.  And, of course, again, because I kept all

6  the records, contracts, I -- I worked with all the vendors,

7  that was my responsibility.  So in the midst of all that and

8  preparing documents, I realized that I was missing his

9  contract, which was not a good thing for -- excuse me -- it was

10 not a good look for myself.

11 Q.   Why do you say that?

12 A.   Because I could have lost my job, plain and simple.  I

13 don't know another way to put that.  But --

14 Q.   Can you describe Mr. Durall as a boss?

15 A.   Yes.  Very straightforward, low tolerance when it came to

16 mess-ups or hiccups, and definitely expected you to hold your

17 own.  So if this was your responsibility, it was your job to

18 keep up with it.  And if you didn't, there definitely were

19 going to be consequences.  And so that was super important.

20 That was a contract.  That wasn't coming in late to work.

21 Q.   Okay.  Now, with respect to the contract with

22 Mr. Marcotte, did there come a time where, after you learned

23 that you didn't -- you couldn't find the contract, that you

24 contacted Mr. Marcotte?

25 A.   That is correct.

1  Q.   Did you tell Mr. Durall you were doing that?

2  A.   Absolutely not.

3  Q.   Why not?

4  A.   Because I didn't want to get in trouble.

5  Q.   Okay.

6  A.   Plain and simple.

7  Q.   I'm -- I'm showing you what's been marked as Government's

8  Exhibit 53A on the ELMO in front of you.  I've shown you this

9  before.

10         Do you recognize this e-mail?

11  A.   Yes, I do.

12  Q.   And the e-mail's from you to a person by the name of Dylan

13  Smith.  Do you know who that is?

14  A.   Yes, that's someone that works on Kyle's team with Kyle.

15  Q.   And there's a person copied named Kim.  Do you know who

16  that is?

17  A.   I know that she also worked on his team, or works with

18  him -- or for him, excuse me.

19  Q.   And I note that Mr. Durall is not on this e-mail?

20  A.   That is correct.

21  Q.   And why is that?

22  A.   Because I did not want him to know.

23  Q.   Okay.  And you say in the e-mail that you need one of

24  these for both North Florida and KTL; is that right?

25  A.   That is correct.

1  Q.    And what you were referring to is an attachment to this

2  e-mail?

3  A.    That is correct.

4  Q.    I'm going to just flip to the next page.  This is a -- the

5  contract; is that right?

6  A.    That is correct.

7  Q.    There are various blanks in here that, you know, are

8  supposed to be filled in, I think, per your e-mail; is that

9  right?

10  A.    That is correct.

11  Q.    Okay.  And I just want to flip to one page.  When you sent

12  to Mr. Smith, I note on page 6, at the top, there's a reference

13  in here to a Tyler & Jacob Consulting.

14         Do you see that?

15  A.    Yes, I do.

16  Q.    What does Tyler & Jacob Consulting have to do with this

17  contract?

18  A.    Technically, nothing.  It was a standard contract -- or,

19  excuse me, a template standard contract.

20  Q.    So at various points in the contract, it looks like you

21  just left blanks, right?  I'm looking at page 2 of Government's

22  Exhibit 53A; is that right?

23  A.    That is correct.

24  Q.    So it appears on page 7, it looks like you left this other

25  company in by mistake; is that right?

1  A.   That is correct.

2  Q.   Okay.  So you send this on -- on February 26th at

3  11:58 p.m.; is that -- or 11:58 [sic] a.m.  Excuse me.

4  A.   That is -- oh, I'm sorry.

5  Q.   Okay.  And then Dylan filed -- it looks like at the top if

6  you look at the top, Mr. Smith sends it on to Kyle Marcotte.

7       Do you see that?

8  A.   Yes, I do.

9  Q.   Is there a particular reason why you didn't bother to

10  include Mr. Marcotte on your original e-mail?

11  A.   That was around the time where -- that was around the time

12  where, again, it -- I -- I wasn't able to get ahold of him

13  right away, so I went ahead and sent it to his team, dealing

14  with somebody that I was dealing with at that time directly.

15  Q.   Okay.  I'm going to turn to 53B.

16       Again, this was -- this was sent to Mr. Marcotte

17  at 1:22.  You sent it originally at 11:59.  I'm speaking to

18  53A.

19       And if we go to 53B, you see Ms. -- a person by the

20  name of Kim Davis.  It appears at the bottom that she's sending

21  something to herself with an attachment, right?

22  A.   Correct.

23  Q.   And then she forwards that on to you at 3:19?

24  A.   That is correct.

25  Q.   So about two hours after the e-mail that was sent to

1   Mr. Marcotte, correct?

2   A.   Correct.

3   Q.   And this is the same attachment, but now all those blanks

4   had been filled in on page 2 with KTL Labs, right?

5   A.   Correct.

6   Q.   If I go forward, there's another version of this contract

7   for North Florida Labs.

8         Do you see that?

9   A.   Yes.

10  Q.   Now, we already talked about this, but if you look at

11  page 7, we still have included this reference to Tyler & Jacob

12  Consulting.

13        Do you see that?

14  A.   Yes.

15  Q.   So they obviously didn't catch that error either, did

16  they?

17  A.   That is correct.

18  Q.   Now, with respect to the attachment, there's a fee

19  schedule.

20        Do you see that?

21  A.   Yes, I do.

22  Q.   And if you look at the fee schedule, it's talking about

23  shall be compensated -- do you see the word "ten"?

24  A.   Yes, I do.

25  Q.   But in parentheses, it's actually a 20?

1  A.   Yes, I do.

2  Q.   That also doesn't make a lot of sense, does it?

3  A.   No, that's a typo.

4  Q.   Okay.  And the same is true with the contract for North

5  Florida.  If I go to page 17 of 53B, this is the contract

6  for -- I think this is the contract for KTL.

7           Do you see there's this reference to Tyler & Jacob's

8  at the top, right?

9  A.   Yes.

10  Q.   And then you see the same issue with -- the same -- same

11  problem with this contract; it says ten, but in parentheses

12  says 20, right?

13  A.   That is correct.

14  Q.   That makes no sense, does it?

15  A.   Correct.

16  Q.   Now, the dates on the signatures for both of these,

17  starting with the KTL -- or the North Florida one, 2/26 of '18.

18           Do you see that?

19  A.   Yes.

20  Q.   That's page 20 of 53B.  And if I go to page 10 of 53B,

21  similarly, there's a signature with the date of February 26 of

22  2018.

23           Do you see that?

24  A.   Yes, I do.

25  Q.   Now, at the time that you had these contracts sent -- I

 1  believe you testified that it was in connection with this CGH

 2  bankruptcy that you were sending these contracts to have them

 3  prepared; is that right?

 4  A.   That is correct.

 5  Q.   They weren't going to be submitted to the bankruptcy

 6  trustee or anything else, correct?

 7  A.   That is correct.

 8  Q.   It was because of a recordkeeping function to demonstrate

 9  Mr. Marcotte's companies' relationship with Reliance?

10  A.   That is correct.

11  Q.   And CGH was in existence from -- had a relationship, I

12  should say, with -- with Reliance from 2015 to 2016?

13  A.   That is correct.

14  Q.   When you saw the dates that the -- that had been signed on

15  this contract, what, if anything, did you do?

16  A.   So based on what I recognized when I got the contract

17  back, I realized that because it was dated for 2018, that

18  didn't help me.  So I did still attempt to reach out to

19  Mr. Marcotte.

20       Once I got ahold of him, I explained to him that, you

21  know, I needed to go ahead and update it because this was

22  really for my recordkeeping.

23       There were a ton of times where, you know, Mr. Durall

24  may have asked me for -- asked me, you know, about something

25  that I had, but never asked to see it.  And so, especially me

1  knowing that we were in the process of also winding Reliance

2  down, to me, it was just filling in a gap, and it wasn't

3  supposed to go any further than that, which is had he ever

4  approached me and said, Hey, Jay, do you still have the

5  contract for KTL?

6  　　　　　Yes, I do.

7  　　　　　Oh, okay.

8  　　　　　That was a normal interaction between us.  And so I

9  was operating off of the pretense that it's not something he's

10  necessarily going to want to ever see, but I need to go ahead

11  and correct my mistake.

12  　　　　　There were tons of -- on a regular day, I had piles

13  of paperwork on my desk.  That was normal.  And so in the midst

14  of sometimes cleaning up my desk, I'm confident that at some

15  point, you know, it got shredded or thrown away accidentally.

16  　　　　　So, again, in the midst of us winding down and

17  attempting to just, you know, make sure that I filled in that

18  gap, the goal was for me to just go ahead and make sure that I

19  got a contract put in place for recordkeeping purposes.  It

20  wasn't supposed to go any further than that.

21  　　　　　MR. RAFFERTY:  If I can approach the witness, Your

22  Honor?

23  　　　　　THE COURT:  Yes.

24  BY MR. RAFFERTY:

25  Q.   Ms. Smith, I'm showing you what's been marked as Durall

 1  Exhibit 200.  If you can take a look at that, please.

 2          MR. RAFFERTY:  Sorry about that.

 3  BY MR. RAFFERTY:

 4  Q.   Ms. Smith, have you had a chance to look at that -- that

 5  document?

 6  A.   Yes, I have.

 7  Q.   That's an e-mail exchange between -- if you go to the back

 8  page, it begins with a e-mail from Kim Davis to you, and then

 9  an e-mail from Dylan Smith to you, and then an e-mail from you

10  to Dylan Smith; is that right?

11  A.   That is correct.

12          MR. RAFFERTY:  And I'd offer into evidence at this

13  time Durall Exhibit 200.

14          MR. DUVA:  No objection, Your Honor.

15          THE COURT:  Be received, Durall 200.

16      (Defendant Durall's Exhibit 200 received into evidence.)

17  BY MR. RAFFERTY:

18  Q.   And just going back for a second --

19          MR. RAFFERTY:  I'm going to go to this ELMO.

20  BY MR. RAFFERTY:

21  Q.   You received the contracts, the PDF versions of those

22  signed contracts at 3:19 p.m.

23          Do you see that?

24  A.   Yes, I do.

25  Q.   That's page 1 of 53B?

1   A.   That is correct.

2   Q.   Okay.  If we look at Durall 200, this starts with that

3   same e-mail, just in a different form, where you're receiving

4   the contracts from Ms. Davis.

5           Do you see that?

6   A.   That is correct.

7   Q.   At 3:19 p.m.?

8   A.   Yes, I do.

9   Q.   Okay.  And then you see at 3:25 p.m., Dylan Smith says,

10  Jay, Kim went ahead and filled them out.

11          Is that right?

12  A.   That is correct.

13  Q.   I will let Kyle know when I reach him.

14          Do you see that?

15  A.   Yes, I do.

16  Q.   And that's sent about six minutes or so after you get the

17  contracts, Mr. Smith sends it to you at 3:25?

18  A.   That is correct.

19  Q.   Okay.  And then at the top -- let's let that focus for a

20  second -- you send another e-mail back at 4:01 p.m. in which

21  you indicate, Hi, Dylan, he texted me earlier so I kept it

22  brief, but you will still need to connect with him.  Thanks

23  again.

24          Do you see that?

25  A.   Yes, I do.

1  Q.   Now, this communication, does this have anything to do

2  with the date issues that you identified and the contracts that

3  were signed?

4  A.   That is correct.

5  Q.   Can you explain that to the jury?

6  A.   Yeah.  At the end of the day, I was going based on the

7  fact that we needed something in place -- or I needed an

8  updated record or records of Kyle's contracts.  So I reached

9  out to Kyle once I got the original contracts from Dylan and

10 Kim, I believe that was -- or Dylan, excuse me.  And I advised

11 him that, you know, hey, I received it.  But because it's

12 related to the bankruptcy, I needed to make sure that he was

13 covered for the right period.

14         I was aware that Kyle was going to be covered in

15 the -- or when I say "covered," he was going to be included in

16 the settlement for the bankruptcy and was going to be -- you

17 know, so that way, he wasn't sued as well, or separately.

18         And so because of that, I was taking all of that into

19 consideration, but, again, more importantly, just making sure

20 that, you know, I had records of his contract that,

21 technically, I knew I lost.  I mean, I'm not proud of it.  It

22 wasn't definitely a positive light on my career, but, you know,

23 I do want to be transparent.  It happened and it was my fault.

24         MR. RAFFERTY:  Your Honor, if I can have just a

25 minute with Mr. Hayes.

1    (Counsel confer.)

2  BY MR. RAFFERTY:

3  Q.    Okay.  So did you have an opportunity to speak to

4  Mr. Marcotte about the issues that you identified in the

5  contracts?

6  A.    Yes, I did.

7  Q.    And what did you tell him?

8  A.    I explained to him that I needed to change the dates --

9  Q.    Okay.

10  A.    -- on the contracts because it needed to be representative

11  of 2015 and not 2018.

12  Q.    Okay.  Did you make any other changes to the contract as

13  well?

14  A.    I actually updated the -- the company names.

15  Q.    Okay.  So I'm going to show you what's been marked as

16  Government's Exhibit 7Y.  This is the -- the contract.

17          Do you see the first page continues to say February

18  26 of 2018; is that right?

19  A.    That is correct.

20  Q.    Okay.  But if you go to the back page -- it's not the back

21  page, it's the -- page 9 of 7Y, do you see the date is now

22  August 15 of 2015?

23  A.    That is correct.

24  Q.    How did you come to the date of August 15, 2015?

25  A.    So I actually went based on -- this was, unfortunately,

1  another error I made within this contract, but I was going

2  based on the fact -- or based on when Beaches Recovery was

3  actually working with Reliance and not when KTL and North

4  Florida Labs were actually established.

5  Q.    Okay.  With respect to page 6 -- we saw this before.

6  There was a reference in the version that you sent to a company

7  called Tyler & Jacob Consulting.

8        Do you remember that?

9  A.    Yes, I do.

10 Q.    Paragraph D.  And if we look at this, it appears that that

11 company's name has also been changed?

12 A.    That is correct.

13 Q.    Did you -- did you happen to -- do you recall how you came

14 to notice that it -- it was in the original contract?

15 A.    I just went -- I was skimming through it.  And when I

16 realized that it was there, I edited that as well.

17 Q.    Okay.  And similar to that, with respect to 7Z, do you see

18 the signature has -- has also been -- has been changed in this

19 version to August 15th of 2015?

20        Do you see that?

21 A.    That is correct.

22 Q.    Okay.  And, again, how did you come to that date?

23 A.    Because I was going based on when Beaches Recovery was

24 working with Reliance, and not when North Florida and KTL Labs

25 were actually established and beginning to work with Reliance.

```
 1   Q.   By this -- at this point in time, August 15th of 2015,
 2   were you even working at Reliance?
 3   A.   No, I was not.
 4   Q.   So were you relying on other records to try and figure out
 5   which date to put on these contracts?
 6   A.   That is correct.  I was going based on the laboratory
 7   information system.
 8   Q.   And the purpose of that was because -- I think you said at
 9   that point in time Reliance was in the midst of a -- of a
10   mediation related to the CGH bankruptcy?
11   A.   That is correct.
12   Q.   And did you assist Mr. Durall and others in connection
13   with preparing for that mediation?
14   A.   Yes, I did.
15   Q.   Did you attend various meetings about that?
16   A.   Yes, I did.
17   Q.   And during the course of that, did there ever come a time
18   that you gained access to certain claims-related data from CGH?
19   A.   Yes, I did.
20   Q.   Now, prior to seeing that claims-related data, did you
21   have any access to the billing at CGH?
22   A.   No, I did not.
23   Q.   Okay.
24             MR. RAFFERTY:  If I can approach, Your Honor?
25             THE COURT:  Yes.
```

1   BY MR. RAFFERTY:

2   Q.   And I'm handing you, Ms. Smith, Durall Exhibit 210.

3          Do you recognize that document?

4   A.   Yes, I do.

5   Q.   Is that a document you had a chance to see during the

6   course of preparations for the mediation between Reliance and

7   the CGH bankruptcy trustee?

8   A.   Yes.

9          MR. RAFFERTY:  Your Honor, I'd offer that into

10  evidence at this time.

11         MR. DUVA:  No objection, Your Honor.

12         THE COURT:  Be received, Durall 210.

13      (Defendant Durall's Exhibit 210 received into evidence.)

14  BY MR. RAFFERTY:

15  Q.   And did you attend meetings with Ms. Zaffuto, Mr. Durall,

16  and yourself concerning this particular document?

17  A.   Yes, I did.

18  Q.   And I'm putting it on the screen here.  It appears to be

19  remittance advice.  If we look at the right-hand corner there,

20  it says remittance advice.  Are you familiar with what that is?

21  A.   Yes, I do -- yes, I am.

22  Q.   And how are you familiar with that?

23  A.   Just based on me seeing it before now and just the basic

24  information that I was privy to in terms of helping to prep for

25  the bankruptcy case.

1   Q.   And at the time of the bankruptcy case, Mr. Durall owned

2   Chestatee Hospital; is that right?

3   A.   That is correct.

4   Q.   And did you have access -- who was doing the billing for

5   Chestatee Hospital?

6   A.   Medivance was doing the billing for Chestatee Hospital.

7   Q.   And did you have access to the manner in which the claims

8   were billed by Medivance to -- for Chestatee Hospital?

9   A.   I'm sorry.  Ask your question one more time.

10  Q.   Did you have access to the manner in which claims were

11  billed by Medivance to Chestatee Hospital?

12  A.   No, I did not.

13  Q.   Okay.  With respect to the testing, though, you said you

14  understood what kinds of tests were being performed at the

15  various hospitals.

16  A.   That is correct.

17  Q.   What kind of tests were those?

18  A.   Screens.

19  Q.   Okay.  When you looked at this particular piece of

20  remittance advice at Durall Exhibit 210, this is the first time

21  that you had a chance to see the manner in which claims were

22  being billed by CGH?

23  A.   That is correct.

24  Q.   And what, if anything, did you know or did you learn from

25  reviewing this document about what was being billed or what

1  kinds of tests were being billed by CGH?

2  A.   So after reviewing the document, I then learned that these

3  were confirmation testing -- or confirmation codes that were

4  being billed out.  And the term, I believe, that was used was

5  "unbundled."  They were being unbundled.

6  Q.   Okay.  So this -- this type of billing was different than

7  the manner in which claims were being billed at Chestatee?

8  A.   That is my understanding.  And that is correct.

9  Q.   And this was the first time you learned that CGH hospital

10  was actually -- had actually been billing for confirmations?

11  A.   That is correct.

12  Q.   How, if at all, did the discovery of this document impact

13  the approach that Reliance took with respect to the mediation

14  in the CGH bankruptcy?

15  A.   It was a big impact.  Originally we didn't take the

16  bankruptcy serious.  After reviewing this document and

17  realizing what was going on, it became clear that we were going

18  to have to actually make a settlement in the case.

19          Mr. Durall obviously was not happy about it as well,

20  and had began to express that he no longer wanted to be in the

21  business, and, you know, was unhappy and wanted to shut down.

22  So from there, you know, we began taking steps to do just that.

23          He also made it clear to me that, you know, his goal

24  was to try to get in first, to try to settle or mediate the

25  case, and to try to include as many people as he possibly

 1   could.

 2   Q.    Did that include Mr. Marcotte?

 3   A.    Yes, it did.

 4   Q.    Did you consider Mr. Marcotte almost a part of Reliance?

 5   A.    I'm sorry.  I don't understand your question.

 6   Q.    At the time, did you have a close relationship with

 7   Mr. Marcotte?

 8   A.    Yes, I did.

 9   Q.    And when you said you were -- they were going to try and

10   include as many people as -- as they could in the settlement,

11   what did you mean?

12   A.    The sales reps that -- primarily, the sales reps and

13   anybody that was affiliated with Reliance that was of

14   importance.

15   Q.    Okay.  After you had a chance to see that claims-related

16   data, did there come a time that you attempted to contact

17   Mr. Marcotte?

18   A.    Yes.

19   Q.    And were you successful?

20   A.    Not right away.  No, I was not, but eventually he did

21   answer.

22   Q.    And was that in or around March of 2018?

23   A.    Yes, it was.

24   Q.    What was the purpose of your call to Mr. Marcotte at that

25   time?

1   A.   My purpose was to, one, advise him of what was going on --

2   or, excuse me, was to advise him that we needed to speak with

3   him further because of the things that we had discovered, which

4   was basically that we were going to start winding down, there

5   was a bankruptcy out there, but that he had nothing to worry

6   about because the goal was to keep him included.

7   Q.   And did you arrange a meeting between Mr. Marcotte and

8   Mr. Durall and Ms. Zaffuto down in Fort Lauderdale?

9   A.   Yes, I did.

10  Q.   And was that around March of 2018?

11  A.   Yes, it was.

12  Q.   And did you tell Mr. Marcotte the purpose of the meeting?

13  A.   Essentially, yeah.  I told him the basics of it.

14  Q.   Did you tell him that there was going to be a settlement

15  in the bankruptcy?

16  A.   Yes, I did.

17  Q.   And that Reliance was going to be closing?

18  A.   Yes, I did.

19  Q.   In fact, did Reliance end up closing in May of 2018?

20  A.   Yes, it did.

21  Q.   You weren't present for the meeting down in -- in Fort

22  Lauderdale, though, right?

23  A.   No, I was not.

24  Q.   Do you remember when -- the date that that happened?

25  A.   I don't recall the exact date of that meeting.

1  Q.   Was it before the mediation?

2  A.   Yes, it was.

3  Q.   Do you recall the exact date of the mediation?  Or would

4  it assist you to look at certain documents related to that?

5  A.    It would be -- I -- I would prefer to look at the

6  documents to confirm.

7        MR. RAFFERTY:  May I approach, Your Honor?

8        THE COURT:  Yes.

9  BY MR. RAFFERTY:

10 Q.   I'm handling -- I'm handing you a document.

11       MR. RAFFERTY:  If I can stay up here, Your Honor.

12       THE COURT:  That's fine.

13 BY MR. RAFFERTY:

14 Q.   I'm going to show you a part of a pleading from the

15 bankruptcy proceeding, and just ask you to take a look at the

16 top of page 3.  If you can just read the highlighted portions

17 to yourself.  And I ask if that helps refresh your recollection

18 of when the mediation occurred.

19 A.   Yes, it does.

20 Q.   What dates did the mediation occur?

21 A.   March 22nd and March 23rd of 2018.

22 Q.   And what was the resolution of that mediation?

23 A.   The resolution was that Reliance ended up settling -- or

24 making a payment for $5 million.  I believe Mr. Durall advised

25 me at some point that they ended up giving back about half of

1  that, so it was like $2.5 million that they ended up giving

2  back because certain insurance companies opted out.

3  Q.   Okay.  And do you recall when the official settlement

4  agreement was signed?

5  A.   I believe --

6  Q.   Maybe I just should --

7           MR. RAFFERTY:  Let me approach again, if I could,

8  Your Honor.

9           THE WITNESS:  Thank you.

10 BY MR. RAFFERTY:

11 Q.   And I'm showing you that same document at page 29.  And

12 I'll ask if you recognize the signature on the document?

13 A.   Yes, I do.

14 Q.   And whose signature is that?

15 A.   Aaron Durall.

16 Q.   And what is the date?

17 A.   April 15th of 2018.

18 Q.   Now, with respect to the settlement in the bankruptcy,

19 when did -- when did Reliance ultimately close its doors after

20 that?

21 A.   May 31st of 2018.

22 Q.   And so with respect to the mediation that occurred on

23 March 22nd, it was sometime before then that you arranged the

24 meeting between Mr. Marcotte, Ms. Zaffuto, and Mr. Durall?

25 A.   That is correct.

1  Q.   Now, in addition to closing Reliance, did there come a

2  time that Mr. Durall also sold Chestatee Hospital?

3  A.   That is correct.

4  Q.   Do you remember when that was?

5  A.   That was July of 2018.

6  Q.   Now, after the hospital was sold, you said you continued

7  working for Mr. Durall?

8  A.   That is correct.

9  Q.   And when did you stop working for Mr. Durall?

10 A.   That would have been May of 2020.

11 Q.   Okay.  And since then, have you been running your

12 business?

13 A.   Yes, I have.

14      MR. RAFFERTY:  If I can have a moment, Your Honor.

15      (Counsel confers with client.)

16      MR. RAFFERTY:  I have no further questions, Your

17 Honor.

18      MR. BELL:  Judge, can we approach sidebar.

19      (Sidebar conference:)

20      MR. BELL:  Judge, riding again on Mr. Sadow's

21 coattails, can we have a curative instruction on, you know, the

22 -- a civil judgment on one party should have no weight on a

23 criminal case, or something to that effect, and instruct the

24 jury that the settlement on a bankruptcy case for Mr. Durall

25 has no -- the jury shouldn't give that any weight in

1    considering the criminal charges.

2         MR. DUVA:  Judge, I don't think you can invite your

3    own curative instruction, which Mr. Rafferty is not asking for.

4    I mean, Mr. Bell is.  I mean, Mr. Rafferty went in there.  I'm

5    entitled to ask questions about it.

6         I wasn't going to do it if he didn't do it, but I

7    don't think there's a general curative because of something

8    that was brought out on direct by a defense -- by a defendant.

9         THE COURT:  I guess I'm not -- I thought maybe that

10   Mr. Rafferty was trying to show that it was a civil matter, or

11   that it was more in the nature of a -- of a civil matter.

12        MR. BELL:  Well...

13        THE COURT:  And so I wouldn't -- I wouldn't think a

14   curative would really be appropriate if -- I'm not sure if that

15   was his point, but that was something that possibly could have

16   been taken away from it.

17        MR. BELL:  Well, I think the purpose of the admission

18   was to -- or for other reasons, but in any event --

19        THE COURT:  All right.  I just don't -- I don't

20   really see a curative as being appropriate in this

21   circumstance.  Mr. Rafferty is not asking for it.  Nobody else

22   is asking for it.  I don't really see how it affected Jorge

23   Perez.

24        MR. BELL:  Well -- well, he would have been a -- he's

25   a party to the bankruptcy proceeding.  That's why I did it.

1  Maybe I didn't waive the appropriate predicate.  I'm sorry.

2  The Court would have no way of knowing that.

3         I will object, while I'm up here, to him making --

4  Mr. Duva making any extensive cross-examination, particularly

5  with Mr. Perez's association with Campbellton-Graceville -- CGH

6  and the bankruptcy proceeding.

7         MR. DUVA:  Mr. Rafferty didn't ask this witness about

8  Mr. Perez.  I have no intention of asking her about Mr. Perez.

9         THE COURT:  Okay.  All right.

10     (The following proceedings occurred in open court, in the

11  presence of the jury:)

12         THE COURT:  I just want to make sure there's no other

13  defendant that wanted to examine the witness?

14         MR. LANDES:  No, Your Honor.

15         THE COURT:  All right.  Okay.

16         Then, Mr. Duva.

17         MR. DUVA:  Just going to grab something, Your Honor.

18         THE COURT:  Yes, sir.

19         MR. DUVA:  I'm not finding it, so I'll just call it

20  up when we get to it.

21                    **CROSS-EXAMINATION**

22  BY MR. DUVA:

23  Q.   Okay.  Good morning, Ms. Smith.  I'm one of the

24  prosecutors in the case.  We've never met, correct?

25  A.   That is correct.

1   Q.   Okay.  Now, you were asked some questions about the

2   services contract with KTL Labs, correct?

3   A.   That is correct.

4   Q.   Okay.  And, ultimately, regardless of how hard you tried,

5   this isn't the original contract?

6   A.   That is correct.

7   Q.   Okay.  So, again, in the -- in the age of computers and

8   e-mail and servers and all of that stuff, the original just

9   never came to light?

10  A.   That is correct.

11  Q.   Now, Mr. Marcotte -- you -- you were asked some questions

12  about his -- his habits, and he was a heroin user, wasn't he?

13  A.   That is correct.

14  Q.   And during the whole time that he worked with

15  Mr. Durall -- while I'm not vouching for that at any stretch --

16  but Mr. Marcotte continued to send samples from all over the

17  country through KTL Labs to Reliance, correct?

18  A.   That is correct.

19  Q.   And those samples did not go directly to the hospitals, as

20  far as you know?

21  A.   That is correct.

22  Q.   Okay.  And so he was -- even though he was a heroin user,

23  he was reliable, and samples kept coming in, and they kept

24  building up as they arrived at Reliance from throughout the

25  United States?

1  A.    That is correct.

2  Q.    Now, what, if any, relationship did Beaches Recovery or

3  any of those places -- I'm asking your knowledge of this --

4  have -- these -- Beaches Recovery, or any of those recovery

5  centers throughout the country, what, if any, relationship did

6  they have with Campbellton-Graceville, the small rural hospital

7  in Graceville, Florida?

8  A.    My understanding is they referred samples to those

9  hospitals.

10 Q.    Really, wasn't it that Reliance took the position that it

11 was referring samples to those hospitals?  Because the samples

12 came from Beaches Recovery and all those places through KTL

13 Labs that Marcotte recruited.  The samples came to Reliance

14 first, did they not?

15 A.    The samples did come to Reliance first, but based on the

16 orders that those -- those facilities were ordering, they were

17 the ones that were dictating where those samples went.

18 Q.    Do you have any of those orders?

19 A.    I do not have them on me, no.

20 Q.    Did you provide any of them to Mr. Rafferty to show you?

21 A.    No, I did not, as of right now.

22 Q.    Okay.  And so are you saying that doctors' offices in

23 California knew and intended to send their samples to

24 Campbellton-Graceville in Florida?

25 A.    That is correct.

1  Q.    Now, urine samples, it -- there's -- there's some timing

2  involved; is there not?  You talked about sort of your general

3  knowledge of testing and -- and the like.  I mean, there's --

4  there's sort of importance in timing, isn't there?

5  A.    To some degree, yes, there is.

6  Q.    Okay.  So -- because the samples are coming from people in

7  treatment centers throughout the country, right?

8  A.    That is correct.  Excuse me.

9  Q.    So wouldn't it make more sense for, you know, a doctor in

10  California to -- to seek out a lab in the -- in the area to

11  sort of cut out shipping and things of that nature?

12  A.    It's difficult for me to say that, only because that was

13  just something that was -- that was an internal decision by the

14  doctors and their facilities.  So if they felt like that was

15  going to be more convenient, then --

16  Q.    Did you talk to those doctors?

17  A.    No, I didn't speak with them directly.

18  Q.    Wasn't part of your job, was it?

19  A.    No, I didn't have to.

20  Q.    Okay.  And were you aware that as Mr. Marcotte obtained

21  samples and sent them to Reliance and insurance companies paid

22  hospitals which paid Reliance which paid KTL Labs and North

23  Florida Labs, that Mr. Marcotte would make payments to these

24  recovery centers and doctors throughout the country?

25  A.    Oh, I was not familiar with that.

1  Q.   Mr. Durall didn't tell you that?

2  A.   That was not something that he discussed with me.

3  Q.   Okay.  You talked about the $5 million settlement.  And

4  you -- you just -- there was this surprise about confirmation

5  testing and that that was happening at Campbellton-Graceville

6  and -- and Williston in terms of the billing, right?  You

7  talked about that surprise in learning that?

8  A.   That is correct.

9  Q.   Okay.  And that's why Mr. Durall agreed to the settlement

10  of $5 million in the bankruptcy proceeding?

11  A.   That is correct.

12  Q.   How much money did Reliance make from claims through

13  Campbellton-Graceville and Williston?

14  A.   Oh, I'm not sure.  I was not privy to that information.

15  Q.   Can I show you?

16  A.   Sure.  You can.

17        MR. DUVA:  Can we put up 24E.  If you can just do the

18  Reliance part.  Well, do the top, actually, first, yeah, so

19  that -- so that she understands.  She can see it.

20  BY MR. DUVA:

21  Q.   Okay.  So this is the top.  I'm not asking about

22  LifeBrite.  You don't -- you didn't say anything about

23  LifeBrite.

24        But there's a laboratory listed, and then there's

25  entities, which are hospitals and other -- lab-related company

1  there.  And you see deposits from the entity.

2       Do you see that?

3  A.   Yes, I do.

4  Q.   Okay.

5       MR. DUVA:  Let's go down to Reliance.

6  BY MR. DUVA:

7  Q.   Okay.  Ma'am, and, all told, from Campbellton-Graceville

8  to Reliance, do you see that figure of over $67 million?

9  A.   Yes, I do.

10 Q.   And do you see the figure of over $20 million from

11 Regional Health Partners (Williston)?

12 A.   Yes, I do.

13 Q.   Were you aware that 98 percent of the billings to

14 insurance companies were for confirmation testing?

15 A.   I learned that in the midst of the bankruptcy case.

16 Q.   So that would be about an $87 million mistake in

17 Mr. Durall's favor?

18 A.   I'm sorry.  I don't understand your question.

19 Q.   I mean, your testimony is that that was just a mistake,

20 right?  Like, we didn't know this, this was -- it was just a

21 mistake, based on your conversations with Mr. Durall and

22 Ms. Zaffuto?

23 A.   That is correct.

24 Q.   So that was an $87 million mistake?

25 A.   Not on our behalf, but it was a mistake.  We didn't do the

 1  billing.

 2  Q.   And so from -- from the 87 million, then Mr. Durall

 3  ultimately had to cough up about 5 million, which he got back

 4  some of that?

 5  A.   That is correct.

 6  Q.   Pretty good deal, isn't it?

 7  A.   I can't say that it is or it isn't.

 8  Q.   I mean, through that, if you just take 87 million minus

 9  5 million plus whatever he got back, I mean, he cleared about

10  $80 million, $82 million?

11  A.   Based on these numbers that I see here.

12  Q.   Pretty favorable result in his favor, isn't it?

13  A.   I -- it could be.

14  Q.   And -- and a lot of that was generated by the samples that

15  Mr. Marcotte would collect and send to Reliance Labs for

16  testing?

17  A.   That is correct.

18  Q.   Because he was your biggest client at Reliance?  You had

19  access to the client records and all that kind of stuff?

20  A.   That is correct.

21  Q.   And even though -- a lot of questions about his heroin

22  use, which I know I'm bringing up, he was reliable in getting

23  the samples from all over the country to Reliance?

24  A.   Well, it wasn't as -- it wasn't that he was sending the

25  samples in directly.  He had a team of individuals that he --

1 that worked for him, so...

2 Q.   But he's kind of running the business, so he sort of gets

3 the credit for that, doesn't he?

4 A.   That is correct.

5 Q.   He's directing these people?

6 A.   That is correct.

7 Q.   He's saying, Go out to the doctor's office, strike the

8 deal, and get the samples sent to Reliance in Sunrise, Florida.

9        And it happened?

10 A.   That is correct.

11 Q.   At Reliance, Linda Sullivan was the lab manager?

12 A.   That is correct.

13 Q.   Over 30 years of experience?

14 A.   That is correct.

15 Q.   Did a great job?

16 A.   That is correct.

17 Q.   She knows a lot more than you do -- and I'm not picking on

18 you, I don't mean it that way -- but she's the expert as far as

19 Reliance Laboratories and machines and testing and what -- and

20 what could be done, right?

21 A.   Linda trained me on everything I knew at Reliance.

22 Q.   So if -- if she -- if you knew it, it was because she knew

23 it?

24 A.   That is correct.

25 Q.   Okay.  And are you aware that Ms. Sullivan took the

1  position that Reliance could test and did test absolutely

2  everything that came in its doors?

3  A.   I was not aware of that.

4  Q.   But, again, you know, Ms. Sullivan, with all those years

5  of experience, she would know better than you about Reliance's

6  testing capacity?

7  A.   You would think that, but based on that statement, that's

8  incorrect.  Reliance could not test all those samples.

9  Q.   And so you're saying Ms. Sullivan is dead wrong about

10  that?

11  A.   Listen, I'm not here to try to call anyone out.  I --

12  honestly I can't tell you.

13  Q.   Well, all I'm -- all I'm saying, ma'am, is you're saying

14  that Ms. Sullivan is incorrect, is wrong?

15  A.   That is -- that is true.  She is incorrect.

16  Q.   How much -- how much laboratory training do you have?

17  A.   I do have approximately five years in the laboratory.

18  Q.   But Ms. Sullivan's been in the game a lot longer than you

19  have?

20  A.   That is correct.

21  Q.   Are you aware that she was confused and that it made no

22  sense to her why Reliance was sending any samples to the

23  hospitals?

24  A.   I was not made aware of that.

25  Q.   Okay.  On Campbellton-Graceville, that could only do

 1  screening tests, right?

 2  A.    That is correct.

 3  Q.    And Reliance could do screening tests as well?

 4  A.    That is correct.

 5  Q.    Reliance had many more machines than

 6  Campbellton-Graceville did?

 7  A.    I believe that is correct.

 8  Q.    You've been to Campbellton-Graceville?

 9  A.    I have never visited Campbellton.

10  Q.    Ever seen a picture of the hospital?

11  A.    I have seen a picture of the hospital.

12  Q.    What does it look like?

13  A.    It was an older hospital.  I believe, at the time, it was

14  painted either white or cream.  That's all that I can recall as

15  of right now.

16  Q.    Never took a visit to the lab there?

17  A.    No, I did not.

18  Q.    Never talked to the lab manager, Gary Ayres?

19  A.    I don't believe I did.

20  Q.    Did you ever talk to him about -- so you never did.  So

21  then you would have never talked to him about what happened

22  with those samples when they got to Campbellton-Graceville?

23  A.    That is correct.

24  Q.    In other words, stacked-up boxes in the halls?  Couldn't

25  test?  He never told you that stuff?

1  A.   No, he did not.

2  Q.   How about Williston, did you ever go there?

3  A.   I did not.

4  Q.   Did you ever see -- so you don't -- you didn't see the lab

5  there?

6  A.   I did not.

7  Q.   Did you ever talk to Arceli Encienzo?

8  A.   No, I did not.

9  Q.   So she never -- you have no information about the testing

10  capacity at -- at Williston?

11  A.   I actually -- the only thing that I do recall is the

12  company, Global Analytical [sic] -- Global Analytics that

13  provided the reagents, I was at least familiar with the actual

14  invoices that went to some of those locations, and they were

15  pretty hefty invoices, so that was enough for me to understand

16  that there had to be -- had to be a lot of testing going on

17  there because the reagents were being sent there.

18  Q.   And the reagents were even in the tens of thousands of

19  dollars, correct?

20  A.   That is correct.

21  Q.   And Mr. Durall outfitted the OR.  Was at that at Chestatee

22  for about $1.98 million?

23  A.   That is correct.

24  Q.   And when you buy a hospital, I mean, it's a good idea to

25  upgrade it, right?

1  A.   Yes, it is.

2  Q.   And Mr. Durall, through Chestatee --

3       MR. DUVA:  If we can put back up 24E.  Go down to

4  that -- that column there.

5  BY MR. DUVA:

6  Q.   So DL Investment Holdings, that's the company that owned

7  Chestatee?

8  A.   That is correct.

9  Q.   And Mr. Durall or Reliance was paid about 90 million

10 through DL Investment Holdings?

11 A.   That is correct.

12 Q.   So we add that to the prior ones we talked about, it's a

13 total of about $178 million?

14 A.   That is correct.

15 Q.   Okay.  So a $1.8 million OR, the swing bed unit, the

16 reagents, I mean, that's a small amount comparatively, isn't

17 it?

18 A.   I would not say that.  I --

19 Q.   How much did he spend on the reagents?

20 A.   He spent at least over $100,000 per month on reagents.

21 Q.   Okay.  And then the -- are you saying that the OR -- I'm

22 just trying to clarify your testimony from direct.  Was it

23 about 1.8 million?

24 A.   The equipment that -- itself was.

25 Q.   Okay.  And Marcotte paid you 100,000?

1  A.    That is correct.

2  Q.    Was that cash or just write you checks, or how did that

3  work?

4  A.    No.  He would send a wire.

5  Q.    To your bank account?

6  A.    To my bank account.

7  Q.    And do you know how much Marcotte was making throughout

8  this whole deal that he had with Mr. Durall and -- and getting

9  these samples through KTL Labs and North Florida Labs to

10  Reliance?

11  A.    No, I was not aware.

12  Q.    Was it tens of millions of dollars?  Does that sound --

13  you don't know one way or the other?

14  A.    I'm not sure.

15  Q.    So 100,000, to Marcotte, to kind of keep you happy, not a

16  huge deal to him, is it?

17  A.    Well, it wasn't to keep me happy.  I was doing my job.

18  That was more so to keep him happy, I guess, because that was

19  something he felt.

20  Q.    He paid you to keep himself happy?

21  A.    That was how I perceived it because I didn't need it.

22  Q.    And -- and money is kind of relative, right?  I mean,

23  if you -- if you have only a hundred bucks, then 20 bucks is a

24  big deal, but if you have tens of millions of dollars, then

25  100,000, it's not such a big deal, is it?

1 A.    Depends.  That's in the eye of the beholder, if you ask

2 me.

3 Q.    So let's -- if Reliance was able to do all the testing and

4 Linda Sullivan is correct, then why would any of the samples

5 need to go to the hospitals?

6 A.    Reliance was not able to do all the testing.  That's why I

7 told Lisa Zini that we were going to be sending her our

8 overflow.

9 Q.    You told -- so you told Lisa Zini that.  Do you know what

10 the communications were between Linda Sullivan and Lisa Zini,

11 Lisa Zini being the lab manager at Chestatee and Ms. Sullivan

12 being in charge of the lab at Reliance?

13 A.    Yes.  I know that in the beginning Linda did visit the

14 hospital, and she also worked closely with Lisa to make sure

15 that the logistics of sending samples out to her were set up,

16 which is a similar role she took with Campbellton and Regional,

17 making sure that the logistics for sending samples to them were

18 put in place and -- and done correctly.

19 Q.    So, yes, so then we agree, samples were going from

20 Reliance to Chestatee, that was happening for sure.  But what

21 I'm saying is you were never privy to a conversation where

22 Linda Sullivan was talking to Lisa Zini and said, I don't know

23 what's going on here.  This just isn't necessary.  Are you?

24 A.    Oh, I'm not aware of that happening.

25       (Counsel confer.)

1          MR. DUVA:  Nothing further, Your Honor.

2          MR. RAFFERTY:  If I could have a brief...

3          THE COURT:  Yeah.

4          MR. RAFFERTY:  If we can bring up Government's

5 Exhibit 41A, page 2, please.  And I think it's -- if we could

6 blow up the middle of the screen where it says "tests ordered."

7             **REDIRECT EXAMINATION**

8 BY MR. RAFFERTY:

9 Q.   Ms. Smith, you were asked specifically about -- by

10 Mr. Duva if you had seen any of the requisition forms or

11 anything else about what kinds of tests were ordered.

12       Do you recall that?

13 A.   Yes, I do.

14 Q.   Taking a look at where it says "tests ordered," are you

15 familiar with those two particular entries?

16 A.   Yes, I am.

17 Q.   Are you familiar with CH_FSCR?

18 A.   Yes, I am.

19 Q.   And what does that mean?

20 A.   That is Campbellton-Graceville Hospital.

21 Q.   And with respect to the other hospitals, were there other

22 menu items that allowed --

23       THE COURT:  Sir, would you mind getting in front of

24 the microphone.  Thank you.

25 BY MR. RAFFERTY:

1   Q.   Were there other -- other menu options to order other

2   kinds of tests using the electronic order form for the other

3   hospitals?

4   A.   That is correct.

5           MR. RAFFERTY:  If I can have a moment, Your Honor?

6           THE COURT:  Yes.

7       (Counsel confers with client.)

8           MR. RAFFERTY:  No further questions.

9           THE COURT:  All right.  Thank you very much, ma'am.

10  You may step down, and you can just leave those papers there.

11  They'll take care of it.

12      (Witness excused.)

13          THE COURT:  Mr. Rafferty?

14          MR. RAFFERTY:  Your Honor, based on my discussions

15  with the government, I move to admit at this time Durall

16  Exhibit 3, which are -- thank you -- Federal Express shipment

17  records; Durall Exhibit 4, Global Analytical [sic] development

18  records; Durall Exhibit 6, which are clinical laboratory

19  consultant records.  And I believe that's Durall Exhibit 14,

20  which are just articles of incorporation of Durall Capital

21  Holdings.

22          I believe Durall Exhibit 15 has already been admitted

23  into evidence, but if it has not already been admitted into

24  evidence, I admit it at this time.  That's the asset purchase

25  agreement between Southern Health Corporation of Dahlonega and

1   Durall Capital Holdings.

2        And I'd move into evidence, which I also think has

3   already been admitted, Durall Exhibit 16, which are Stryker

4   business records for Chestatee Regional Hospital concerning the

5   hospital operating room installation.

6        I'd move those into this evidence at this time, and

7   at this time, on behalf of Mr. Durall, I rest.

8        THE COURT:  All right, sir.

9        MR. DUVA:  No objection to the entry of those

10  exhibits.

11       THE COURT:  All right.  Let me make sure that we've

12  got them.

13       Ms. Hatfield, are we -- do we have --

14       COURTROOM DEPUTY:  15 and 16.

15       THE COURT:  15 and 16 were already in?

16       COURTROOM DEPUTY:  Correct.

17       THE COURT:  Okay.  So -- all right.  Then I'll admit

18  without objection Durall Exhibit 3, Durall Exhibit 4, Durall

19  Exhibit 6, and Durall Exhibit 14.  15 and 16 are already

20  admitted.

21       Does that take care of it, Mr. Rafferty?

22       MR. RAFFERTY:  It does, Your Honor.  Thank you.

23      (Defendant Durall's Exhibits 3, 4, 6, and 14 received into

24  evidence.)

25       THE COURT:  And you're now announcing rest?

```
 1              MR. RAFFERTY:  I am, Your Honor.

 2              THE COURT:  All right.

 3              MR. RAFFERTY:  Thank you.

 4              THE COURT:  Thank you.

 5              Mr. Schwartz, does James Porter wish to call a

 6    witness?

 7              MR. SCHWARTZ:  Yes, sir.  We call Mark Thomas.

 8              THE COURT:  All right.

 9              If y'all want to stand up a minute, feel free.

10         (The witness entered the courtroom.)

11              COURTROOM DEPUTY:  This way, sir.

12              Watch your step.

13              I'm going to need to swear you in.

14              THE WITNESS:  I'm sorry?

15              COURTROOM DEPUTY:  I need to swear you in.  Please

16    stand and raise your right hand.

17              Do you solemnly swear that the testimony you are

18    about to give before this court will be the truth, the whole

19    truth, and nothing but the truth, so help you God?

20              THE WITNESS:  I do.

21              COURTROOM DEPUTY:  Please state your full name and

22    spell your last name for the record.

23              THE WITNESS:  Mark Stephen Thomas, T-h-o-m-a-s.

24              THE COURT:  All right.  Mr. Schwartz, you may

25    proceed.
```

1    MR. SCHWARTZ:  Thank you, Judge.

2    **MARK STEPHEN THOMAS, DEFENDANTS' WITNESS, SWORN**

3    **DIRECT EXAMINATION**

4    BY MR. SCHWARTZ:

5    Q.    Mr. Thomas, do you know James Porter?

6    A.    Yes, I do.

7    Q.    How do you know him?

8    A.    He has been a long-term client of my law firm through

9    several of his companies.

10   Q.    And what's the name of your law firm?

11   A.    Thomas Health Law Group, PA.

12   Q.    And do you know Sean Porter?

13   A.    Yes, I do.

14   Q.    How do you know him?

15   A.    Same.  Through my law firm with several companies that

16   he's been affiliated with.

17   Q.    All right.  And are you aware of Pinnacle Laboratories?

18   A.    Yes, I am.  It's a client.

19   Q.    Okay.  And is Mr. Porter the owner of Pinnacle

20   Laboratories?

21   A.    Yes.

22   Q.    All right.  And are you aware of HLP, which is otherwise

23   known as Hospital Lab Partners -- Hospital Laboratory Partners?

24   A.    Yes, that's a client of ours.

25   Q.    Okay.  And you're aware Mr. Porter is associated with HLP?

1  A.   My recollection is he's an owner.

2  Q.   Now, let's talk about your education.  You have a law

3  degree?

4  A.   Yes.

5  Q.   All right.  When did you get that law degree?

6  A.   I think it was '93 or '94.

7  Q.   Okay.  And you've been licensed by the Florida Bar since

8  1994?

9  A.   Yes.

10 Q.   So almost 30 years?

11 A.   Yes.

12 Q.   Do you have any certifications?

13 A.   I'm Florida Bar board-certified in health law.

14 Q.   All right.  And what does that mean?

15 A.   Since 2003 the Florida Bar has considered me an expert in

16 health care law by means of continuing legal education and a

17 certification exam.

18 Q.   All right.  And there's approximately 128 total Florida

19 Bar board-certified health lawyers in the state of Florida,

20 right?

21 A.   I -- I assume so.  I think that that's probably a good

22 number.

23 Q.   All right.  So there's 128 like you.  There's 128,000

24 Florida Bar lawyers, correct?

25 A.   I'll take your word for it.

1  Q.   So you're about one in 1,000, right?

2  A.   Yes.

3  Q.   Can we talk about your work experience?  How did you

4  start?  Where did you start working as an attorney?

5  A.   I -- I was a law clerk in several government agencies.

6  Prior to that, I had been working for a Humana HMO, a Medicare

7  Advantage plan.  I had been a junior hospital administrator

8  with Holy Cross hospital in Fort Lauderdale.  I went to law

9  school, tried to specialize in health care matters.

10       Prior to that, I had had two master's degrees; one in

11 hospital administration, one in health care finance.

12 Immediately getting out of law school, I got a job with the

13 Florida Agency for Health Care Administration, which is the --

14 in Tallahassee, which is the government agency that regulates

15 facilities like hospitals and skilled nursing facilities,

16 clinical laboratories, and the Medicaid program.

17 Q.   And that's known as AHCA?

18 A.   Yes.

19 Q.   All right.  And then after that, who did you work with?

20 A.   After that, I was a staff attorney for the Florida

21 legislature and the Senate Health Care Committee, drafting

22 statutes dealing mostly with long-term care and hospice.

23       From there, I went to the Florida Attorney General's

24 office as a prosecutor.  Mostly civil, but some criminal work

25 with the Florida Medicaid Fraud Control Unit -- it's the health

1  care fraud division.  And I was a cross-designated Medicare

2  special Assistant United States Attorney for the three

3  U.S. Attorneys in the -- in the state of Florida, the Middle

4  District, Northern District, and the Southern District.  And I

5  probably handled or supervised the handling of in excess of 300

6  health care fraud cases.

7  Q.    All right.  And did you work for the Florida Attorney

8  General's office in a Medicaid Fraud Control Unit?

9  A.    Yes.

10  Q.    What did you do with them?

11  A.    Most of my work was Medicare and Medicaid whistleblower

12  cases, civil fraud, but I handled a little bit of everything,

13  including regular criminal work and -- and non-whistleblower

14  civil fraud cases, Medicare and Medicaid.

15  Q.    All right.  And then after the Florida Attorney General,

16  you went back to AHCA?

17  A.    Yes.  I went back to AHCA as the chief of staff, which is

18  really the chief operating officer position.

19  Q.    All right.  And you basically operated as chief operating

20  officer and counsel for 1,700 employee, health regulatory

21  policy, Medicaid agency issues?

22  A.    That's correct.  The offices that reported to me were all

23  of the statewide offices I was responsible for, the Medicaid

24  program.  I was responsible for all of the licensure work for

25  approximately 20, 22 different types of facilities, to include

1  hospitals and clinical laboratories.  The AHCA Washington, D.C.

2  office reported to me.  I was a -- I was a registered lobbyist,

3  and I handled lobbying in both Tallahassee and Washington, as

4  to matters related to Florida Medicaid and Florida facility

5  licensure.

6  Q.    All right.  And after that, in roughly 2009 you went out

7  and joined a civil firm?

8  A.    Yes.  I was with a firm right out of government for about

9  four years.

10  Q.    Okay.  And then when did you open your own firm?

11  A.    I think it was 2013.  My wife, who's also a health care

12  attorney, and I opened up our own firm.

13  Q.    All right.  And you've been in that firm since 2013?

14  A.    That's correct.

15  Q.    And that's the firm you currently have?

16  A.    That's correct.

17  Q.    All right.  Have you taught any courses?

18  A.    Yes.  I taught a course for a little while at the

19  University of Florida on health care compliance for doctors'

20  offices.  For five or six years I was the instructor for

21  Medicare and Medicaid for the board certification review class

22  for the Florida Bar.  So I was a teacher for the certification

23  that I had, the board certification that I had with the Florida

24  Bar.

25  Q.    All right.  Have you been involved with writing papers?

1   A.    I -- I've been involved with the -- the AHCA TAP.  It's

2   the technical advisory panel for clinical laboratory work.  I

3   focused on white papers dealing particularly with potential

4   kickback issues between physicians that write orders for

5   clinical laboratory testing and clinical labs and dialysis

6   providers, ESRD, end stage renal disease, providers.

7           I've been published in the *Florida Bar News* several

8   times.  I've done multiple book reviews.  I do consulting work

9   on Wall Street with two different consulting agencies, Gerson

10  Lehrman Group and Guidepoint Global.

11          They basically use me to review investigations and

12  subpoenas, search warrants, and litigation regarding publicly

13  traded entities, mostly clinical laboratories and hospital

14  companies, to make determinations as to what would happen with

15  the common stock price on Wall Street.  So I help them with,

16  you know, looking at damages models.

17          I do quite a few white papers with the Medicare

18  administrative contractors, the MACs, to adjust so-called LCDs,

19  or local coverage determinations, to decide what's going to be

20  a covered service for hospitals and for clinical laboratories,

21  and some for radiological services, like x-rays and MRIs.

22          And I've been a non-testifying expert in a couple of

23  cases, most recently, one in Texas regarding a software program

24  that had been sold for emergency department physicians that

25  allegedly had upcoded emergency department work to get people

1    into -- admitted into the hospital.

2    Q.    Okay.  I want to turn your attention to issues in this

3    case related to Mr. Porter, Pinnacle, and HLP.  All right?

4              Do you recall at some point, roughly 2015 or 2016,

5    Mr. Porter approaching you and indicating that he had a lab

6    that you're aware of, Pinnacle, and he had the ability to test

7    qualitative and quantitative urine samples?

8    A.    Yes, I recall.

9    Q.    And he also had a variety of other instruments for blood

10   and things like that, right?

11   A.    That's my recollection.

12   Q.    All right.  And he wanted to contract with critical access

13   hospitals and rural hospitals to perform the hospitals'

14   toxicology testing for nonpatients?

15   A.    That's my recollection.

16   Q.    And he wanted to find out whether he could either contract

17   directly with the hospital or through a lab management company,

18   such as HLP, to be able to form those arrangements?

19   A.    That's correct.

20   Q.    And he indicated to you that what he was asking about, if

21   it was authorized or lawful, would that not --

22             MR. DUVA:  Objection to the leading.  I think if

23   Mr. Schwartz can ask this witness, what did Mr. Porter ask you,

24   I think that's the way to do it.

25             THE COURT:  All right.  I'm going to sustain as to

1  leading.

2          MR. SCHWARTZ:  Okay.

3  BY MR. SCHWARTZ:

4  Q.    Did Mr. Porter ask you anything about nonpatient samples?

5  A.    I recall several conversations that I had with Jim Porter,

6  where he had asked me about how critical access hospitals and

7  rural hospitals work, and under arrangements, contracts,

8  between those and either clinical laboratories or clinical

9  laboratory provider companies, such as Hospital Lab Partners.

10  And I advised him what -- what the law was underneath Medicare

11  and what the *Medicare Claims Processing Manual* had provided

12  for.  And I can't recall specifically whether any of the

13  questions were dealing with Medicare, Medicaid, TRICARE, or it

14  was only commercial health insurance.  But the only guidance I

15  think that's available -- or that was available, at least at

16  the time, was as to Medicare.

17  Q.    And did you advise him that --

18          MR. DUVA:  Your Honor --

19  BY MR. SCHWARTZ:

20  Q.    -- there was any prohibition on where samples would come

21  from?

22          MR. DUVA:  -- I'm going to object on leading and --

23  I'm going to make an objection on leading, Your Honor.

24          THE COURT:  All right.  I'm going to -- I'm going to

25  overrule on that.  The witness can answer the question.

1    THE WITNESS:  I'm sorry, Mr. Schwartz.  Could you

2  repeat that.

3  BY MR. SCHWARTZ:

4  Q.    Sure.  Did you -- did he discuss and did you advise him as

5  to where samples for these nonpatients could come from?

6  A.    I think so.  I have a more vague recollection of that,

7  but, yes.

8  Q.    Okay.  And what was that?

9  A.    I -- I do recall that he asked me what would be the flow,

10  and that's a very common question, particularly for a clinical

11  laboratory because they're -- they're a provider at the end of

12  the process, right?  A specimen comes in -- blood, urine,

13  saliva -- along with a physician order.  And it is very

14  important to track or accession the -- the specimen and

15  maintain quality assurance.  And I do recall having a

16  conversation or two with him about how that would work with a

17  critical access hospital or rural hospital underneath a

18  nonpatient -- under arrangements contract.  I did.

19  Q.    Okay.  And what was the understanding of where the samples

20  could come from?

21  A.    There's really not a lot of guidance, but the -- the

22  claims processing manual.  It's chapter 16.  It's section 40,

23  as well as -- chapter 6 at section 70 does specify that the

24  critical access hospital and the rural hospital is not required

25  to have the specimen on-site.

1    Again, by definition, it's a nonpatient.  It's not an

2  inpatient, it's not an outpatient.  The only thing that the

3  hospital is really taking any possession over, you know, having

4  custody over, is the patient and the -- the right to control

5  the specimen.

6  Q.    So the samples could come from anywhere in the country?

7  A.    That's correct.

8  Q.    All right.  And you'd indicated that the hospital doesn't

9  have the sample.  The sample could go directly to the lab under

10  arrangement?

11  A.    That's correct.  There's not a lot of guidance on there --

12  on this, other than what's in the claims processing manual.

13    But I -- I mean, I don't have a direct recollection,

14  but if -- if I told Mr. Porter what I typically tell my clients

15  that deal with critical access hospitals and that deal with

16  under arrangements, lab platforms, is that it is important to

17  have the hospital take as much ownership over the specimen and

18  the patient as possible, meaning that the specimen and the

19  patient should be accessioned in the hospital's lab information

20  system.  The quality assurance measures should be that of the

21  hospital, and particularly if they differ from that with the

22  clinical laboratory.

23    And just -- just to maintain that the hospital's got

24  the right to be controlling the process and to be able to bill

25  for it.

1  Q.    And the accessioning is basically data entry of the

2  patient information and sample information into the lab

3  information system, the software?

4  A.    That's correct.

5  Q.    Now, did he ask you about how these type of under

6  arrangement models are billed?  As far as whether -- whether it

7  was billed by the hospital or by somebody else?

8  A.    Yes.  I don't think we talked in depth about that because

9  he did specifically tell me, I'm not going to do the billing.

10 Right?  Because it's a hospital claim, it's a hospital

11 accession, it's a hospital specimen, meaning it wouldn't be

12 going out underneath an outpatient claim form, which is

13 commonly called the CMS 1500 claim form.

14        And neither Pinnacle nor HLP would be, you know,

15 noted as the performing entity.  It's data field 32 on the

16 CMS 1500.  Instead, it would be a hospital claim, which is --

17 837I is the electronic version; UB-04 is the -- is the paper

18 version.  So the hospital would be reporting it underneath the

19 hospital's identifier information, hospital's federal employer

20 identification number, the hospital's national provider

21 identifier, NPI.

22        So I think -- from my recollection of the

23 conversation, we didn't talk about it a lot because Jim wasn't

24 handling the billing, but I -- I probably advised him to say

25 the hospital needs to bill it correctly.

1  Q.    Okay.  And that means that the hospital would bill it with

2  a UB-04 with their own NPI and EIN?

3  A.    Exactly, because it's a hospital nonpatient.  It's not a

4  laboratory patient.

5  Q.    And then did the hospital need to have a working

6  toxicology lab on its campus?

7  A.    On -- most states, certainly Florida, are -- it's a

8  licensure requirement for the hospital to have some kind of a

9  laboratory.  I think if you go into each hospital, every single

10  hospital everywhere is different.

11          But the entire point of an under arrangements

12  contract between a laboratory and a -- and a hospital is that

13  the hospital doesn't have the staff or the licensure level --

14  it's called a CLIA, it's Clinical Lab Improvement Act [sic] --

15  license for that particular testing, or -- or the -- the

16  equipment.  They don't have the capacity to do it.

17          So I -- I have seen everything from hospitals with

18  analyzers, right, who will do the initial test, so-called

19  the -- the qualitative test, and then send the lab out -- refer

20  it out under arrangements to the laboratories -- or the

21  hospital would send to the laboratory for a confirmation test,

22  the -- the quantitative piece.

23          But each and every hospital is somewhat different.

24  But that's -- that's the entire point of an under arrangements

25  contract.  If the hospital had all of the equipment and the

1    techs and the licensure and the equipment under their roof,

2    they -- they wouldn't need to utilize an outside laboratory.

3    Q.    Okay.  And you advised Mr. Porter of all this?

4    A.    Yes.

5    Q.    All right.  Now, you talked about "under arrangements."

6    Can you explain what that means?

7    A.    The statutes have been in place in the Social Security

8    Act -- it's 42 United States Code 1395l -- provide that a

9    critical access hospital can utilize what's called an "under

10   arrangements contract" with an outside provider.  And they're

11   -- they're very common.  I see them with pharmacy, with durable

12   medical equipment, with radiology, obviously a clinical

13   laboratory.

14          Critical access hospitals, rural hospitals,

15   they're -- they're small.  They just don't have a lot of stuff

16   underneath their roof.  And Congress -- and the law now is 36,

17   37 years old.  I was a hospital administrator, I remember when

18   it was passed because I was using it as a hospital

19   administrator before I went to law school.

20          It allows critical access hospitals as well as rural

21   hospitals to be able to essentially stretch their footprint

22   beyond their limits, which is a small campus.  And, by

23   definition, these hospitals are typically in the middle of

24   nowhere.  So it -- it allows them to provide services beyond

25   what they have underneath their roof.

1      So my recollection of my conversations with

2 Mr. Porter is that I told him that's the entire point, is that

3 it would allow -- if you can get a contract, an under

4 arrangements contract with a critical access hospital or a

5 rural hospital for -- when appropriate, to have the hospital

6 refer specimens over to the clinical laboratory, meaning

7 Pinnacle, to do the testing, and then refer it back to the

8 hospital, and then the hospital could bill the third-party

9 payer for the testing.

10 Q.   Okay.  I want to show you section 40.3 of the CMS

11 guidelines.

12      Do you recognize this?

13 A.   I do.

14 Q.   All right.  And there's two areas that are highlighted.

15 Can you read those, please.

16 A.   Hospitals must follow requirements for submissions of the

17 ASC X12 837 institutional claim or the hard copy form CMS 1450.

18 Q.   And the CMS 1450 is otherwise known as a UB-04?

19 A.   That's correct.

20 Q.   And the 837 institutional is the same as the -- the data

21 version of that, the 837I?

22 A.   That's correct.  It's the electronic version.

23 Q.   And then can you look below that?

24 A.   When the hospital obtains laboratory tests for outpatients

25 under arrangements with clinical laboratories or other hospital

1 laboratories, only the hospital can bill for the arranged

2 services.

3 Q.   All right.  And so when it talks about outpatients, is it

4 talking about outpatients and nonpatients?

5 A.   I have always interpreted it to -- to be that.  What I

6 would offer is that's kind of the point of what's typically

7 called an "HOPD," it's a hospital outpatient services

8 department.

9         And, again, sort of by definition, because the claim

10 is not billed by the performing laboratory, it must be billed

11 by the hospital on the UB-04.  That certainly makes sense with

12 that language that you just pointed to me in section 40.3.

13 Q.   Okay.  And this is another portion of that code -- I'm

14 sorry, those rules.  What does it say up here?

15 A.   In the case of a clinical laboratory test provided under

16 an arrangement (as defined in section 1861(w)(1)), made by a

17 hospital, CAH, or SNF -- and that is critical access hospital

18 or skilled nursing facility -- payment is made to the hospital

19 or skilled nursing facility.

20 Q.   I want to turn your attention to United States Code --

21 42 U.S.C. 1395l(h).

22         Are you familiar with this?

23 A.   I am.

24 Q.   Okay.  If we look to the bottom of that, there's a little

25 darkened area here.

1      Can you look at that?

2   A.   In the case of a clinical diagnostic laboratory test

3   provided under an arrangement (as defined in section

4   1395x(w)(1) of this title) made by a hospital, critical access

5   hospital, or skilled nursing facility, payment shall be made to

6   the hospital or skilled nursing facility.

7      This is the statutory companion to the regulation

8   that you had just shown.

9   Q.   So when you were giving the advice that hospitals could

10  contract with laboratories with an under arrangement situation,

11  and samples could be -- for nonpatients -- could be procured

12  throughout the United States, and those samples could go

13  directly to the laboratories, so long as the hospital was doing

14  some of the accessioning, which is data entry into the LIS

15  system, the testing would be run, the testing would be sent to

16  the providers, the hospitals would then bill with their own NPI

17  and EIN?

18  A.   Yes.

19  Q.   On a UB-04?

20  A.   Yes.

21  Q.   The hospitals would be paid.  The hospitals would then pay

22  the lab whatever their contract rate was.  The hospitals could

23  keep the difference.

24      That was all based on -- what you looked at were

25  statutes, rules -- federal law, essentially, right?

1  A.    That's correct.  The federal statute and the claims

2  processing manual -- and, importantly, at the time that I had

3  had the conversation with Mr. Porter, I was aware of multiple

4  HOPDs that were operating around the country.  Sutter in

5  Northern California, a hospital -- I think it was called

6  St. Mary's -- around Chicago, and one that's going strong right

7  now that I think started after the Pinnacle and HLP arrangement

8  to Crisp Memorial Hospital in north Georgia.

9         Again, these are critical access hospitals.  They're

10  kind of all out in the middle of nowhere.  But I -- the

11  arrangements that Mr. Porter had presented to me were not in

12  any manner -- or unroutine [sic] or exotic.  I had seen many of

13  them before.

14  Q.    But, importantly, this isn't something that you just

15  created on your own.  You looked to federal law to guide your

16  opinion?

17  A.    I'm not very creative.  I look everything up.  And that's

18  one of the wonderful things that I really enjoy about health

19  care law.  It's all written down.  So all I did was look it up

20  to confirm my recollection, and that's what I had passed on to

21  Mr. Porter.  And all of my communications with him, I always,

22  you know, include citations because I want to make sure that my

23  clients understand that there's a basis in law for everything

24  that I tell them.

25         (Counsel confer.)

1  BY MR. SCHWARTZ:

2  Q.    I'm going to show you some documents real quick.

3        Do you recognize those?

4  A.    Yes.  These appear to be invoices generated by my law firm

5  for payment to Pinnacle Laboratory Services, which is

6  Mr. Porter's laboratory.

7        THE COURT:  While he's looking at that, Mr. Schwartz,

8  where -- how much more do you have?  Is it -- do you --

9        MR. SCHWARTZ:  Maybe 15 minutes.

10        THE COURT:  All right.  Well, if it's going to be

11  15 minutes, we'll go ahead and take our break, then, if that's

12  okay.  Is that all right?

13        So, ladies and gentlemen, it's quarter to 11:00.

14  Let's get back at 11:00.  And please remember all my

15  instructions.  Thank you.

16      (Jury exits, 10:45 a.m.)

17        THE COURT:  Sir, if you want to take a break, you

18  can.  We have a rule that you can't discuss your testimony on

19  break.  Okay?

20        THE WITNESS:  Sure.

21        THE COURT:  Thank you.

22        Anything from counsel?  All right.  11 o'clock.

23      (Recess from 10:47 a.m. to 11:03 a.m.; all parties

24  present.)

25        COURT SECURITY OFFICER:  All rise.  This Honorable

1  Court is now in session.

2       THE COURT:  Are you ready for the jury?  Let's have

3  the jury, please.

4       MR. DUVA:  Your Honor, can we approach?

5       THE COURT:  Yes, sir.

6       MR. SADOW:  Your Honor, before you bring the jury in,

7  I think you're probably better to do this in open court.

8       THE COURT:  All right.  That's fine.  Let's just hold

9  up.  All right.  Then everybody have a seat.

10       MR. DUVA:  Yes, Your Honor.  And I know it's not the

11  time.  There was an early *Jencks* agreement.  We have not

12  received any communications between Mr. Thomas and Mr. Porter.

13  I asked Mr. Schwartz, he said he doesn't have any.  I find that

14  extremely hard to believe that there are no written

15  communications.  Mr. Thomas even said, in all of my

16  communications, I don't know if he's going to say there was

17  oral, but I have -- we have no writings, other than the David

18  Byrns e-mail, which we have.  But, otherwise, we have no

19  writings between Mr. Thomas and Mr. Porter, the privilege

20  wasn't waived, and we're making a Jencks Act request.

21       THE COURT:  All right.  Mr. Schwartz?

22       MR. SCHWARTZ:  Okay.  I'm going to go back and

23  double-check.  I believe we did produce.  There was an e-mail

24  in the production along with the other stuff that we produced,

25  but I'll go back and double-check to see if there's anything

 1    specific as to this issue.

 2         MR. DUVA:  We are looking at the production.  We're

 3    not seeing any e-mail or any -- any writings.

 4         MR. SCHWARTZ:  Well, there's one, I know, in my -- in

 5    my exhibit list.

 6         MR. DUVA:  What's the exhibit?

 7         MR. SCHWARTZ:  Let me give you the number.

 8         THE COURT:  Well, Mr. Schwartz, is it your position

 9    that there were no written communications that would -- between

10    Mr. Thomas and his client that would qualify for production?

11         MR. SCHWARTZ:  Well, that -- that I have at this

12    point.  I know there's a -- let me get the exhibit list real

13    quick, Judge.  There is an e-mail in there, No. 30, and then

14    there's also, I guess, 12.

15       (Counsel confer.)

16         THE COURT:  So, Mr. Duva, I'm not sure.  Or do you

17    have a request before the Court, or are you just trying to

18    verify?

19         MR. DUVA:  We're making our Jencks demand.  I'm not

20    comforted by the I'll double-check.  I mean, either there are

21    or there aren't.  And that's just all we're asking.

22         THE COURT:  Yeah.

23         MR. SCHWARTZ:  And I want an opportunity to -- to go

24    back, and I can either suspend the direct now, or I can finish

25    when I -- do it when I'm done.  However you want to do it,

1  Judge.

2       But I want to make sure that -- you know, that what

3  we have has been turned over.  I don't believe I have a lot.

4  And what I recall seeing was things that didn't have anything

5  to do with this issue directly.  There's a lot of other labs

6  and things like that that are outside of the relevancy of this

7  case.

8       THE COURT:  Well, I suppose it would -- it's a fair

9  question to the witness.  I mean, he's testified now about

10  extensive advice he gave to Mr. Porter about these matters and

11  the propriety of them.  And I suppose it's -- it's fair -- fair

12  to find out whether any of that was in writing or not.  Right?

13       MR. SCHWARTZ:  Sure.

14       THE COURT:  And what's the answer to that question?

15       MR. SCHWARTZ:  Do you remember if there were e-mails

16  discussing the issues that you're testifying about now?  There

17  is an e-mail in our exhibit list, and I can show you -- that to

18  you real quick.

19       THE WITNESS:  There certainly could be.  Mr. Porter

20  was not big on e-mails.  So I -- I believe most of the

21  conversations were verbal, by telephone, but, yes, that's --

22  that's an e-mail.

23       MR. SCHWARTZ:  That deals with the 30 percent

24  Medicare rule.  Is that something that's relevant to this?

25       THE WITNESS:  I would need to see the e-mail before,

1  but certainly I'm anticipating that Mr. Porter asked me, Is the
2  70/30 rule waived for a critical access hospital?  And I think
3  I told him yes.
4        MR. SCHWARTZ:  Okay.  And I can go back -- and,
5  actually, this e-mail is -- is from March 20, 2019, which is
6  well after the relevant time period here, and it's dealing with
7  a different lab issue and whatever else.  But I produced it.
8        MR. WINTERS:  Let me see it.
9        THE COURT:  All right.  Well, Mr. -- well, I'll let
10  y'all confer for a moment.
11     (Counsel confer.)
12        MR. SCHWARTZ:  Do you recall sending any letters to
13  Mr. Porter on this issue?
14        THE WITNESS:  I don't, but I would have to check.
15  I'm certain that I would have documentation as to any documents
16  that I created.  I don't keep e-mails more than about four or
17  five years, so I would have materials probably back to '18 --
18  '17 if I've got e-mails.  I'm happy to check.
19        MR. SCHWARTZ:  Okay.  And I will double-check, too,
20  Judge, just to -- just to make sure, but...
21        MR. DUVA:  We can continue, and then if I'm not done
22  with cross, we can hold on to Mr. Thomas until this is
23  resolved.  He can just stay here.
24        THE COURT:  All right.  Let's -- let's go ahead
25  and --

1      MR. DUVA:  Fair?

2      THE COURT:  Let's go ahead and -- I suppose

3  Mr. Tasker can be looking wherever there is to look.

4      I guess, Mr. Thomas, what I'm trying to understand

5  is you're testifying as to advice you gave to Mr. Porter.  Do

6  you memorialize your advice to either yourself or to the

7  client, or are these -- are you just remembering conversations

8  you had where you gave legal advice, but you don't have any

9  documentation of it?

10      THE WITNESS:  Your Honor, I -- I honestly do not

11  recall.  I would have to look.

12      THE COURT:  Okay.  All right.

13      Well, let's -- let's go ahead -- we'll go ahead and

14  proceed, and we'll figure this out, depending on where we are

15  at the end.  It's possible that Mr. Thomas would be subject to

16  recall if -- if there's pertinent information.  But we'll --

17  let's -- let's go ahead and go.  And it may turn out not to

18  be -- it may -- it may turn out all right.  So let's go ahead

19  and go.

20      Let's have the jury, please.

21      COURT SECURITY OFFICER:  All rise for the jury.

22      THE COURT:  I'd ask Mr. Tasker to do what he can do

23  while -- while the witness is on the stand.

24    (Jury enters, 11:11 a.m.)

25      COURT SECURITY OFFICER:  Please be seated.

 1          THE COURT:  Sorry for the little brief delay there,
 2   ladies and gentlemen, but we're ready to go now.
 3          And, Mr. Schwartz, you may proceed.
 4          MR. SCHWARTZ:  Thank you, Judge.
 5   BY MR. SCHWARTZ:
 6   Q.   So I've shown you documents that you've identified as your
 7   billing records?
 8   A.   Yes, sir.
 9   Q.   All right.
10          MR. SCHWARTZ:  I'd seek to admit those as Porter 28.
11          THE COURT:  Be received, James Porter 28.
12      (Defendant James Porter, Jr.'s Exhibit 28 received into
13   evidence.)
14   BY MR. SCHWARTZ:
15   Q.   So these are not all the billing records we have.  It's
16   just a part of them.
17          But your relationship, roughly, was going on in 2013
18   with RAJ Enterprises, doing business as Pinnacle Laboratory
19   Services, correct?
20   A.   That's correct.  I definitely don't remember the invoices,
21   but they certainly look like my invoices.
22   Q.   Okay.  And these may not be in chronological order, but,
23   for instance, in January of 2016 you billed to review Florida
24   statutes, Florida administrative code, Florida case law, and
25   the Medicare operating manuals regarding whether Pinnacle may

1  utilize Regional Health Partners' hospital lab for non-hospital

2  patient testing?

3  A.    That's correct.  And given that the -- the timing, I would

4  say that's directly applicable to the matters at issue in this

5  case.

6  Q.    All right.  And then, again, in 2016 you reviewed the CGH

7  candidate contract for Jim Porter and a call with Jim Porter

8  regarding BC Lab reimbursement?

9  A.    That's correct.

10  Q.    In 2016, reviewing and editing proposed contract between

11  Pinnacle and Regional General Hospital for Jim Porter?

12  A.    That's correct.

13  Q.    And then you filed the RAJ annual report for -- with the

14  Division of Corporations?

15  A.    Correct.

16  Q.    And that's Pinnacle's parent company, or the company that

17  Pinnacle is?

18  A.    Correct.

19  Q.    You drafted hospital management agreements for Mr. Porter,

20  charitable purpose agreements?

21  A.    Correct.

22  Q.    Hospital services agreements again?

23  A.    Correct.

24  Q.    You would make calls to him to discuss this with him?

25  A.    Correct.  As I stated, Mr. Porter was not big on e-mails,

1   so most of my communications with him, if it -- if it wasn't

2   the exchange of a document, would have been by telephone.

3   Q.    You also had in-person meetings?

4   A.    Yes.

5   Q.    Regularly?

6   A.    On occasion.  Unlike most of my clients, actually,

7   Mr. Porter was more likely to want to come to my office and sit

8   down and talk with me.

9   Q.    You have some calls with him here reviewing agreements?

10  A.    Correct.

11  Q.    Meeting with Jim and Sean Porter regarding the HLP

12  contracts?

13  A.    Correct.

14  Q.    And you're drafting the services agreements?

15  A.    Correct.

16  Q.    For Mr. Porter?

17  A.    Correct.  And, again, I'm -- I'm confident that I've got

18  copies of anything that I drafted, but I -- I don't generally,

19  as a matter of my own personal business practice, make notes to

20  my own files as to conversations that I've had with the client.

21  So if it exists in e-mail, I'll have a record of it.  But I --

22  I do not anticipate a lot of e-mail traffic between Mr. Porter

23  and myself, other than Mr. Porter sending me an e-mail saying,

24  call me, please.

25  Q.    Call with Jake Slowik regarding Pinnacle claims at CGH?

1  A.    Correct.  Mr. Slowik was with an Atlanta law firm that

2  Pinnacle also utilized.

3  Q.    An Atlanta health care law firm?

4  A.    Correct.

5  Q.    And Mr. Slowik is a health care attorney?

6  A.    That's correct.

7  Q.    All right.  More agreements and meetings with Sean Porter

8  regarding Putnam Memorial Hospital and Hospital Laboratory

9  Partners contracting?

10 A.    Correct.  That would be directly applicable to this case.

11 Q.    E-mails with Steve Hardy, AHCA.  Who is Steve Hardy?

12        THE WITNESS:  Could you please move the piece of

13 paper up, Mr. Schwartz.

14        MR. SCHWARTZ:  Oh, I'm sorry.

15        THE WITNESS:  Thank you.

16        I don't remember any e-mails with Steve Hardy, but I

17 can certainly check.  It's the -- it's the correct chapter of

18 the claims processing manual.  I don't particularly recognize

19 section 30.3 off the top of my head.

20        But, certainly, a 14X would be applicable to the

21 subject matter here.  And the timing would be appropriate.  And

22 it does specifically mention a critical access hospital.

23 BY MR. SCHWARTZ:

24 Q.    Okay.  And then reviewing current HLP marketing

25 distributor contracts for use with Pinnacle Labs with Jim

1  Porter?

2  A.    Correct.  That would indicate that it's not something that

3  I created, but that Mr. Porter had sent to me for review.

4  Q.    And research Missouri regulations as to non-hospital

5  patients?

6  A.    Correct.  I do specifically remember having to go to

7  Missouri law -- because I'm not as familiar with Missouri law

8  as I am with Florida law -- to ensure that I had hospital

9  licensure law covered when I was giving my advice to

10 Mr. Porter.

11 Q.    And review and edit draft HLP agreement with distributors?

12 A.    Correct.  Again, indicative that I didn't draft it, but

13 that Mr. Porter sent it to me for review.

14 Q.    And would he bring those to you in person?

15 A.    Not typically.  He would usually e-mail them.  But there

16 wouldn't be typically much substantive e-mail back and forth.

17 He would e-mail it to me and he would say, Please review the

18 attached, in common practice.

19          And if I can go back to one answer that -- I hadn't

20 thought of Steve Hardy in a long time.  I think I do

21 specifically remember that even after I checked the Florida and

22 federal law, just as a double confirmation, I picked up the

23 phone and called somebody that I knew at AHCA just to kind of

24 run it past them to make sure that there wasn't something that

25 I was missing.

1  Q.    Okay.

2  A.    And that's not the same thing as an approval from the

3  Agency for Health Care Administration as to any of the Pinnacle

4  or HPL models, but I'm confident I would have passed any

5  information on to Mr. Porter regarding what it is that the

6  government would have told me after reporting what it is that

7  Mr. Porter told me.

8  Q.    Yes, sir.  All right.  And so just to be clear, the idea

9  that a laboratory partners with a hospital, a critical access

10 hospital, to run nonpatient samples, that the samples can go

11 directly to the laboratory, they don't have to go to the

12 hospital first.  The hospital then has its data entry or

13 accessioning people put the patient information into the LIS,

14 the laboratory information system.  The hospital runs the

15 tests, sends it to the provider -- I'm sorry, the lab runs the

16 tests.

17 A.    Clinical laboratory.

18 Q.    Sends it to the provider.  The hospital then bills that

19 test to the insurance companies with its own NPI and tax ID

20 number, not the lab's.  The hospital is then paid by the

21 insurance company.  The hospital then pays the laboratory

22 whatever their agreed rate is.  The hospital keeps the

23 difference, if any.  And those samples can come from anywhere

24 in the United States, so long as they're nonpatient samples

25 billed as a 141, even if the hospital doesn't have an operating

 1    toxicology lab, but will have its own small lab that it's

 2    required to have.

 3            In your opinion, that was completely lawful?

 4    A.    That's correct.  That's a relatively common arrangement.

 5            I would like to sort of differentiate the difference

 6    between the matters that I think are very clearly expressed in

 7    the statutes and the claims processing manual, which is a

 8    regulation, and those matters that I simply recommend to all of

 9    my clients in terms of being a best practice.

10            For instance, underneath Missouri law, it's a

11    requirement that doctors submitting requisition orders for

12    nonpatient testing to a hospital in Missouri, they must be

13    admitted to medical staff.

14            Now, that's not a requirement in Florida.  But I

15    always advise my Florida clients, because I'm a conservative

16    person, to say, look, it would be sort of odd for the hospital

17    to be receiving nonpatient tests from a total stranger doctor.

18            I said, Figure out some way to get him on staff.

19    Just figure out and make sure that he's recorded in the

20    Medicare PECOS system, make sure that he's a physician, make

21    sure that he's alive.  Those are just basic, I think, quality

22    assurance provisions that I always recommend to everyone.

23            In terms of geographic spread, again, a critical

24    access hospital is going to necessarily be very, very limited.

25            But my understanding of Congressional intent and what

1  is really throughout many of the regulations and advisory

2  opinions coming out of HHS, OIG, is that the government was

3  attempting to have critical access hospitals expand their

4  footprint as much as possible, get as many doctors from as wide

5  an area as possible on staff, and as well, to get as many

6  patients from as wide an area on staff.  And that's done

7  through remote patient monitoring, through, you know,

8  long-distance ambulance services, through, you know, delivery

9  of durable medical equipment, and through non-hospital patient

10 testing.

11 Q.   Okay.

12       MR. SCHWARTZ:  That's all I have for this witness.

13       THE COURT:  Any other defense counsel?

14       MR. LANDES:  No, thank you, Judge.

15       THE COURT:  All right.  Mr. Duva.

16                    CROSS-EXAMINATION

17 BY MR. DUVA:

18 Q.   Good morning, Mr. Thomas.  How are you doing?

19 A.   I'm good, Mr. Duva.  How are you?

20 Q.   I'm good.  And I'm Tysen Duva.  And you recall during this

21 investigation, I called you and asked for an interview,

22 correct?

23 A.   I recall you calling me and introducing yourself.  Did you

24 ask me for an interview?  I don't remember.

25 Q.   I did.

1  A.    Okay.

2  Q.    And you -- you declined, didn't you?

3  A.    I don't remember.

4  Q.    You don't remember that?

5  A.    No, I don't.

6  Q.    You don't remember a federal prosecutor calling you and

7  saying, Mr. Thomas, there are letters that you wrote on the

8  Internet that are of interest in a criminal investigation, and

9  we'd like to ask you questions about that?

10  A.    No, I don't remember that, although I speak to criminal

11  prosecutors at least once a week.

12  Q.    But not me?

13  A.    I recall you left a message on my voicemail, and then we

14  talked on the telephone, and I -- I thought it was just an

15  introductory phone call.  That's what I remember.

16  Q.    No, I think I asked you for an interview, and I think my

17  recollection is you declined.

18         But you have a different recollection?

19  A.    I don't have a recollection of that conversation at all.

20  But if -- if you say that that's what I said, I guess that's

21  what I said.

22  Q.    Okay.

23  A.    Did I tell you why I declined?

24  Q.    You asked me if you were in any trouble.

25  A.    Yeah, I don't remember that.  All right.

1  Q.   And I said -- do you want me to tell you what I said, or

2  ask you if you recall?

3  A.   Sure.  What did you say?

4  Q.   I said that your -- a -- a letter that you have on the

5  Internet is at the center of a criminal investigation with

6  respect to private payers paying critical access hospitals for

7  potentially fraudulent claims to insurance companies.

8         Do you remember that?

9  A.   No.  I -- I definitely didn't put any of my communications

10  on the Internet.  I would have considered that a breach of

11  client confidentiality.

12  Q.   Well, I found one, just Googling it.

13  A.   I didn't put it on the Internet.

14  Q.   I'll show it to you in a little bit.

15  A.   Sure.

16  Q.   So, Mr. Thomas -- and I guess it's your common practice,

17  you wouldn't have any notes of any phone call that we had to

18  refresh your recollection?

19  A.   Again, my recollection of the conversation I had with you,

20  Mr. Duva, was just an introduction.  And you asked me, I

21  think --

22         MR. SADOW:  Excuse me.  Excuse me.  I apologize.

23         On behalf of Mr. Fletcher, I think we're going to

24  need to approach on this.

25     (Sidebar conference:)

1          MR. SADOW:  Are we all here?

2          MR. SCHWARTZ:  Almost.

3          MR. SADOW:  Okay.  I move to disqualify Mr. Duva as

4    counsel for the government.  He's put his own credibility at

5    issue.  He's now asking about conversations.  He's telling the

6    jury what that conversation was.  And that puts his

7    credibility -- and it makes him a potential witness.  So I move

8    to disqualify him.

9          This should not have been done by him.  It could have

10   been done by another counsel for the government.  But you're

11   not allowed to put your own credibility at issue in a case like

12   this.

13         And Mr. Duva knew this was going to happen.  He

14   intentionally did it by making these representations.  He

15   didn't do it just once.  He's done it three separate times now

16   in regards to this.

17         And, therefore, I move to disqualify him or strike

18   all of this questioning at this point from the -- from the

19   jury's attention.

20         MR. DUVA:  Your Honor, I think that's an

21   extraordinary remedy.  I'm allowed to ask this witness about

22   conversations that I had with him.  And I'm not putting my

23   credibility at issue.  I'm asking if he recalls the

24   conversation.  He's kind of doing it, and at the end of the

25   day, I'm prepared to move on from this topic.

1      MR. SADOW:  But that doesn't save the fact that he

2   has made reference to -- he didn't say what it is.

3      MR. DUVA:  Well, if the Court wants to make --

4      MR. SADOW:  My recollection is such and such.  Is

5   that your recollection?  He didn't say it that way.  He said it

6   as if this is, in fact, what was said.  And that representation

7   puts his credibility into issue, and, again, I move to

8   disqualify him or to stop him from questioning this witness any

9   further and turn it over to other government counsel, or strike

10  the testimony, or strike all of these questions that he's

11  brought up and tell the jury to ignore it from the point in

12  time that he started his cross until now.  Those are my various

13  sanctions.

14     MR. DUVA:  Your Honor, I think that's over the top.

15  I don't think it's necessary.  And if the Court wants a

16  curative instruction of whatever I recall is not evidence, I

17  think that's fine.  But other than that, I don't think there's

18  anything that's happened that would require such a severe

19  sanction.

20     THE COURT:  So this isn't the first time something

21  like this has ever happened before.  I've been in a number of

22  trials where their lawyers -- or had had conversations with

23  witnesses, and they asked them about those conversations.  It's

24  always a little bit awkward, but I don't think any serious

25  damage has been done here.

1    But I hear what you're saying, Mr. Sadow.  I do think

2 perhaps the back-and-forth got a little more than it should

3 have on that topic.  I'll be happy to give the jury a curative

4 instruction that Mr. Duva's recollections or impressions are

5 not evidence in the case.

6    But beyond that, I'm going to deny your motion to

7 disqualify him, and I'm going to deny any other requests for

8 further relief.

9    MR. SADOW:  And I will -- in light of the Court's

10 ruling, will ask for the curative instruction.

11    THE COURT:  All right.

12    (The following proceedings occurred in open court, in the

13 presence of the jury:)

14    THE COURT:  All right.  Ladies and gentlemen, so

15 you -- I've told you this before, but it's probably good for me

16 to remind you, in light of the testimony that -- that just

17 occurred here, that what the lawyers say in the case is not

18 evidence.  So anything that the lawyers say or recollections

19 lawyers have is not evidence in the case.

20    So the evidence in the case is the testimony of the

21 witness himself.  So to the extent there -- there was any

22 testimony there that would have given you any information about

23 what Mr. Duva remembers and that type of thing, go ahead and

24 disregard that for me.

25    And we -- and Mr. Duva will just be asking the

1  witness questions and the witness's testimony is what you need

2  to -- to focus on.

3          All right?  Thank you, ladies and gentlemen.

4          Mr. Duva, you may proceed.

5          MR. DUVA:  Thank you, Your Honor.

6  BY MR. DUVA:

7  Q.   Mr. Thomas, do you have any written memorializations of --

8  other than the contracts, and we'll get to those.  But in your

9  advice that you gave to Mr. Porter, it sounds like it was oral;

10 is that right?

11 A.   I would have to double-check my e-mails.  I'm confident

12 that most of the legal advice that I've given to Mr. Porter

13 throughout our relationship since 2013, many years, you know,

14 prior to events having to do with the critical access hospital

15 matters, was verbal.

16         It's -- it's certainly possible that I've written

17 legal opinions.  That's typically how it is that I would

18 document my findings.  But from my recollection -- and, again,

19 these -- these matters are all five, six, seven years old -- it

20 was essentially document review and primarily conversations

21 over the telephone.

22 Q.   Do you have any legal writings to Mr. Porter, where you're

23 laying out this laboratory scenario, saying that it is proper

24 under Missouri law and federal law?

25 A.   I would have to check as to whether or not I produced any

1  legal opinions.  But it would be -- you would ask me, Do I have

2  anything to memorialize the conversations?  If so, it would be

3  in a legal opinion.  I would have to check.

4  Q.   Did you provide anything like that to Mr. Schwartz,

5  Mr. Porter's lawyer?

6  A.   Not that I recall.

7  Q.   Okay.  Mr. Thomas, you, in fact, were on some e-mail

8  communications with Jorge Perez, J. T. Lander, and Christian

9  Fletcher, were you not?  And it was about some questions that

10  were being asked of Putnam CEO David Byrns with respect to the

11  laboratory program?

12  A.   I couldn't say as to J. T. Lander, and not as to Christian

13  Fletcher.  But have I had e-mail communications with Jorge

14  Perez?  Absolutely.

15  Q.   Okay.  I'm going to approach with some exhibits that are

16  in evidence, 27X, 27Y, and 27Z.

17          And are you making some notes here as you testify?

18  A.   Yes.

19  Q.   Okay.

20          MR. DUVA:  All right.  If we can go with 27X.

21  BY MR. DUVA:

22  Q.   Okay.  This is a -- at the top, just to kind of orient

23  things, Mr. Thomas, this is an e-mail from -- or a letter from

24  Anthem, dated March 1st of 2017, to David Byrns.

25          Do you see that?

1 A.   Yes.

2          MR. DUVA:   And if we can go to the end of the first

3 paragraph.

4 BY MR. DUVA:

5 Q.   It says, Our records indicate that from July 1, 2016,

6 through December 31, 2016, alone, Putnam has submitted claims

7 to Anthem totaling approximately $24 million in billed charges

8 for laboratory services code -- (CPT Codes 8000 [sic] through

9 89999).   The vast majority of these claims are for drug testing

10 services.

11          Is that right?

12 A.   That's correct.

13 Q.   And those CPT codes, those are confirmatory testing?

14 A.   They're definitely clinical laboratory CPTs.   I'll take

15 your credit -- I'll take your statement as -- as accurate that

16 they're for confirmations.

17 Q.   And Anthem -- and I know I'm asking you a question that's

18 completely obvious here -- Anthem's a private insurance

19 company, often referred to as a "private payer"?

20 A.   That's my understanding.

21 Q.   So in this arrangement with Putnam, there -- there is no

22 Medicare; it doesn't pertain in terms of billings to Medicare.

23 Like, that didn't happen?

24 A.   I -- I don't know.

25 Q.   Did you see any of the billing to the private insurance

1  companies?

2  A.   No, never.

3  Q.   Did Mr. Porter show you any claims?

4  A.   Not that I ever recall.

5  Q.   Okay.  There's some questions that are asked in this

6  letter from -- it's a Jennifer Forsythe at Anthem.

7          MR. DUVA:  And if we can go to questions 1 through 5.

8  BY MR. DUVA:

9  Q.   And the first says, Without disclosing confidential

10  contractual terms, what is the nature of Putnam's arrangement

11  with Hospital Lab Partners?

12          Number 2 is, What is Hospital Lab Partners' specific

13  role in providing these services?

14          Number 3 is, Is Hospital Lab Partners submitting

15  claims to any plan for these services?

16          Number 4 is, What is Putnam's specific role in

17  providing these services?

18          And number 5 is, In what geographical areas are the

19  specimens being collected?

20          Do you see that?

21  A.   Yes.

22  Q.   Okay.  So did you become familiar that private insurance

23  companies, including Anthem and UHC and Aetna, around this

24  timeframe and through June of 2017, started asking a lot of

25  questions about what was going on at Putnam County Memorial

 1  Hospital in terms of laboratory claims?

 2  A.   No.  I was aware of a state audit at Putnam.

 3  Q.   By the State of Missouri auditor's office?

 4  A.   Yes.

 5  Q.   State of Missouri?

 6  A.   Correct.  I was aware of that.

 7  Q.   Did Mr. Porter confer with you regarding answering

 8  questions to these insurance companies that were asking

 9  questions, the private payers?

10  A.   Not that I recall.

11  Q.   And Mr. Schwartz spent a lot of time with you going over

12  CMS regulations and things of that nature, but you understand

13  this arrangement is billing through Putnam's NPI and tax ID

14  number to private payers?

15  A.   I came to understand that relatively recently, but, yes,

16  that's my understanding.

17  Q.   So you thought initially that this was billing to Medicare

18  through Putnam?

19  A.   When I was --

20  Q.   Let me -- let me back up, sir.

21  A.   Sure.

22  Q.   I didn't mean to cut you off.  You said recently.  Is

23  that, like, this week or last month, or when?

24  A.   No, probably two years ago.

25  Q.   Okay.  So after this all happened.  It's 2022.  I mean,

1    this is two years ago, even after the pandemic started, is when
2    you learned this?
3    A.    Correct.  Probably around the time of the indictment.
4    Q.    Okay.  So that is the first time that you knew that this
5    arrangement through Putnam was billing private payers using
6    Putnam's NPI and tax ID number?  Entirely private payers?
7    A.    I was certainly aware of the Putnam arrangement.  I do not
8    recall, as we sit here today, whether it was exclusively for
9    commercial, and not for Medicare or Medicaid.  It's -- it's
10   very much my practice that I attempt to set up HOPDs, bluntly,
11   more sturdy they than they need to be.  So I -- I like to make
12   sure that they're Medicare-, Medicaid-, TRICARE-compliant for
13   multiple reasons, and a lot of it's just crossover claims.
14   It's real easy to make a mistake.  Even $1 going to Medicare,
15   I -- I like to make sure that that's not going to be a problem.
16   Q.    And can you take my word for it now, and based on your
17   recent realization two years ago, that this was all billing to
18   private payers?
19   A.    I'll take your word for it.
20   Q.    Okay.
21         MR. DUVA:  Let's go to 27Y, in the middle.  And we
22   can capture the signature block.
23   BY MR. DUVA:
24   Q.    So this is an e-mail from you to Jorge Perez copying a
25   J. T. Lander and Christian Fletcher?

1   A.   That's what it appears to be.

2   Q.   Okay.  And it says, Jorge, I think the attached is good.

3         And this is an e-mail, March 15, 2017, and it

4  references a letter to Anthem, and the attachment of March 13,

5  2017?

6   A.   That's what it says.

7   Q.   On -- on the subject line?

8   A.   That's what it says.

9   Q.   Sorry.  I wasn't real clear there.

10        Can you read what you sent Mr. Jorge Perez.

11  A.   Jorge, I think the attached is good.  The answer to

12  question 5 will be important.  I do recommend that the hospital

13  report that the specimens are to be primarily from within the

14  hospital's greater patient service area.  Thanks, Mark.

15  Q.   Okay.  Do you have 27Z there?

16        Well, let's first -- I'm sorry.

17        MR. DUVA:  Let's go back for purposes of just

18  refreshing, the top of 27Y.

19  BY MR. DUVA:

20  Q.   And I'm not suggesting, sir, that you were on this e-mail,

21  but it looks like Jorge Perez sent this to a David Byrns?

22  A.   That's what it looks like.

23  Q.   Did you ever talk to David Byrns?

24  A.   I think I was on a couple of conference calls involving

25  Putnam, where David Byrns was on the call along with six,

1  seven, eight other people.

2  Q.   Okay.  Let's look at 27Z, as in zebra.  There's an e-mail

3  and there's a March 13th -- there's a March 15th letter to

4  Anthem.

5        And the e-mail, that's from J. T. Lander to David

6  Byrns, copying Jorge Perez, Jim Porter, another Jorge Perez

7  e-mail, and Mark Thomas.

8        Do you see that?

9  A.   I do.

10 Q.   All right.  Let's go to the letter.  I know your comment

11 was as to number 5, but I kind of want to go through the

12 letter.

13       And you received, at least what appears to be a draft

14 of this, of 27Y?

15 A.   Well, there's no attachment to 27Y, but that would make

16 sense.

17 Q.   Okay.  So the top of the letter, it says -- and this is

18 coming into your sort of orbit as a health care lawyer.  Is

19 that why you're on this e-mail?

20 A.   That's correct.

21 Q.   Okay.  So it says, Dear, Ms. Forsythe, Putnam County

22 Memorial Hospital -- and I'm reading just from the very

23 beginning, sir -- is in receipt of your March 1, 2017

24 correspondence, or inquiry letter, containing requests for

25 certain information regarding the laboratory services provided

1 by Putnam.

2        Do you see that?

3 A.    I do.

4 Q.    And then it continues, I write to you in a good faith

5 effort to address your requests for information in the Inquiry

6 Letter.  Putnam works diligently to provide valuable health

7 care services to Anthem insured patients in compliance with the

8 Participating Hospital Agreement.

9        Sir, did Mr. Porter ask you to review Anthem's

10 hospital agreement with Putnam?

11 A.    No.

12 Q.    And that would make sense, right, because up until about

13 two years ago, you thought this was about billing Medicare and

14 Medicaid, correct?

15 A.    No.  I didn't say that.  I offered opinions as to any

16 payer class, whether it be Medicare, Medicaid, TRICARE, or

17 commercial.

18 Q.    But you weren't asked to review -- I mean, the contract

19 between the payer and the hospital as to how things can be

20 billed is pretty important, isn't it?  It governs the

21 relationship between the hospital and the insurance company?

22 A.    Let me -- if I could, let me bifurcate that into two

23 answers because it sounds like two questions formed into one.

24        I did not review any Blue Cross Blue Shield contract

25 for -- for Putnam.

1   Q.   And, I'm sorry, I thought you already said that.  So I was

2   moving on to your thinking whether or not it's important to

3   understand the relationship between the insurance company and

4   the hospital.

5   A.   Yes.

6   Q.   That would be important?

7   A.   Yes.

8   Q.   But that's not something you were asked to look at?

9   A.   That's correct.

10  Q.   All right.  Number 1, it says, Without disclosing

11  confidential contractual terms, what is the natures of -- what

12  is the nature of Putnam's agreement with Hospital Lab Partners?

13         The answer is, HLP provides consultation, guidance,

14  and expertise to Putnam in regards to the laboratory services

15  and operations performed at Putnam's laboratory facility.

16         Is that right?

17  A.   That's correct.

18  Q.   And I'm going to give you -- actually, I need to hold on

19  to this, sir.  I'll show it to you, and then I will just give

20  you a copy of this one.

21         This is 27KK.  Okay.  Does this appear to be the

22  Reference Laboratory Services Agreement between Putnam -- I'm

23  sorry, between Pinnacle Laboratory Services and Hospital

24  Laboratory Partners?

25  A.   It does.

1  Q.   Okay.  And then it's signed for both companies by Jim

2  Porter?

3  A.   I'm assuming that's Jim Porter's signature.  The two

4  signatures look the same.

5  Q.   How did Jim Porter pay you?

6  A.   You mean through Pinnacle?

7  Q.   For your legal services.

8  A.   I would bill him monthly, and he paid me on an hourly

9  basis.

10  Q.   Did he write you checks?

11  A.   My -- my partner handles that.  I -- I don't specifically

12  remember electronic funds transfers, so I think.

13         MR. DUVA:  So if we can use the ELMO, and then we'll

14  go back to...

15  BY MR. DUVA:

16  Q.   But you'll take my word for it that Jim Porter -- and if

17  there's -- there's any dispute, I'm sure this will be pointed

18  out -- that Jim Porter signed this contract on behalf of

19  Pinnacle Labs and Hospital Laboratory Partners?

20  A.   If that's what you say, that's fine.

21  Q.   And is this an agreement that you prepared?

22  A.   I'm sorry.  I would need to look at it --

23  Q.   Sure.

24  A.   -- to be able to tell you.

25         No.  This is not my work.  I've probably seen it.  It

1    looks familiar to me, but I didn't draft this.

2    Q.    Okay.  I just need to look for something, sir.

3          All right.  Mr. Thomas, I'm going to hand you your

4    billing records.  I'm having trouble finding if there's

5    anything in there.

6          Can you look for me and see if you have any entries

7    about preparing a contract between Pinnacle and Hospital

8    Laboratory Partners?

9    A.    What's the date of the contract?  That'll help me to not

10   have to go back to 2013.

11   Q.    September 1, 2016.  Here you go.

12   A.    Thank you.

13         Nothing that I can see from this set of invoices.

14   Q.    Okay.  Thank you, sir.

15         Mr. Thomas, I'll try to zoom in.  I just couldn't

16   find this.  I remember circling it when Mr. Schwartz was asking

17   you questions.

18         It says, Draft HLP-Pinnacle contract for Jim Porter,

19   1.75 hours, $350 per hour, and so $612.50.

20         Do you see that, November 7th of 2016?

21   A.    I do.

22   Q.    But that's not this contract that was dated September 1st

23   of 2016?

24   A.    I doubt it.  I don't see how it could be.

25   Q.    So there must be a different one out there?

1    A.    That's certainly what I would assume.

2    Q.    Do you remember if you finalized that?  I'll show you

3    here.  Sorry.  Right there.

4          Do you remember if you finalized that contract and

5    provided it to Mr. Porter?

6    A.    I do not.  Typically, unless it's a significant rewrite, I

7    don't bother to charge my clients for minor edits.  So I may

8    have provided edits after that draft of November 7, 2016.

9    Q.    Which would be about ten weeks after the September 1st

10   date on this document?

11   A.    Correct.  But, obviously, that contract was drafted before

12   I billed my client for the draft, so it -- it doesn't match up.

13   Q.    This appears to be final because there's a signature on

14   it, and as far as we know, there's no subsequent contract on

15   this date after September 1st of 2016?

16   A.    I couldn't say.

17   Q.    So this agreement between Mr. Porter and Mr. Porter, it

18   has some clinical laboratory testing provisions, and we're

19   going to cover some of those.

20          Can you -- can you read 2.1, please.

21   A.    You mean aloud?

22   Q.    I'm sorry?

23   A.    You mean aloud to the jury?

24   Q.    Yes, sir.  Thank you.

25   A.    Pinnacle shall provide clinical laboratory testing

1    services ("Testing Services") described in Exhibit A, attached

2    hereto, as requested by HLP for "overflow" Hospital specimens

3    that HLP cannot test within a clinically reasonable time

4    period, during the term of this Agreement.

5    Q.    Okay.  And I'll go to Exhibit A.

6          And Exhibit A says, The services to be provided by

7    Pinnacle are listed below but are not limited to these

8    services.  Additional services will be added as mutually agreed

9    by both parties.

10          And it says, 1, Toxicology (both Screening and

11    Confirmation).  And, 2, Other as needed?

12   A.    That's correct.

13   Q.    Now, did you ever go to any, you know, brick-and-mortar

14   building of Hospital Laboratory Partners?

15   A.    Not that I recall.  I -- my understanding of Hospital

16   Laboratory Partners was -- is that it was like a management

17   services organization.  It's not a laboratory.

18   Q.    Have you ever looked at the bank records?

19   A.    No.

20   Q.    Have you -- so you're -- so you're not familiar with any

21   business activity of Hospital Laboratory Partners?

22   A.    No.

23   Q.    Are you aware that, basically, the only money that came

24   into Hospital Laboratory Partners came from Putnam County

25   Memorial Hospital?

1  A.   I have no idea.

2  Q.   Have you seen any ledgers or documents or spreadsheets of

3  what samples that Hospital Laboratory Partners had?

4  A.   No.

5  Q.   Okay.  So this overflow -- HLP for overflow hospital

6  specimens, meaning HLP's overflow going to Pinnacle, that that

7  means that Hospital Laboratory Partners would have had to have

8  samples, correct?  I mean, for there to be an overflow,

9  something has to exist so that there can be an overflow.

10 Doesn't that make sense?

11 A.   Well, we're moving slowly here because I -- I'm examining

12 another lawyer's work, and I want to make sure that I

13 understand it.  It's not my contract.

14 Q.   How do you know a lawyer drafted this?

15 A.   I don't.  You're right.  Somebody drafted it.  I'm

16 assuming it was a lawyer.

17 Q.   Probably Jim Porter, maybe?

18 A.   I have no idea.

19 Q.   All right.  So what I'm asking is, Hospital Laboratory

20 Partners would have to have samples, wouldn't it, for there to

21 be an overflow?

22 A.   Well, there would need to be an overflow of hospital

23 specimens.  I don't think it specifically designates whose

24 overflow.  It says Pinnacle shall provide the testing --

25 Q.   Right.

1 A.    -- as requested by HLP.

2         And, again, my understanding of HLP, it was a

3 business process operations company, an MSO, management

4 services organization, not a laboratory.

5         That HLP cannot test -- because HLP doesn't have a

6 CLIA.  From my understanding, it's not a lab.  It means that

7 HLP isn't having tested by another entity, another laboratory

8 that's not Pinnacle.

9 Q.    So -- so HLP can't test anything, right?

10 A.    Again, I -- my knowledge of HLP -- and HLP was a client.

11 I didn't do a lot of work for that company, but I -- I thought

12 that it -- it was just a management services organization

13 company, not a lab.

14 Q.    Okay.  And so this -- going down to 2.5, this -- this

15 split here, it looks like we're getting into some of the

16 finances.

17         It says, HLP agrees to remit 50 percent of HLP's net

18 collections from such overflow laboratory claims reimbursements

19 to Pinnacle within ten days of the hospital's receipt of such

20 reimbursement.

21         Do you see that?

22 A.    I do.

23 Q.    So this is sort of the money-flow aspect of this contract

24 that Mr. Porter entered into with Mr. Porter on behalf of HLP

25 and Pinnacle; is that right?

1    A.    Well, I will say this:  2.5 I think is a lot more clear

2    than -- I think it was 1.2 that you showed me, because I hadn't

3    seen any reference to the hospital.  But, surely, that is the

4    source of the overflow, meaning it's going -- overflow testing

5    from the hospital to Pinnacle, and it's being handed by HLP as

6    an MSO.

7    Q.    Let's go back to 27Z.

8    A.    I'm sorry.  Did you say Z?

9    Q.    Yes, sir.  That's Z.

10           MR. DUVA:  And we're going to bring it up on the

11   screen there in front of you as well.

12           THE WITNESS:  Okay.

13   BY MR. DUVA:

14   Q.    Okay.  Mr. Thomas, first question says, Without disclosing

15   confidential contractual terms, what is the nature of Putnam's

16   arrangement with Hospital Lab Partners?

17           And it says, HLP provides consultation, guidance, and

18   expertise to Putnam in regards to the laboratory services and

19   operations performed at Putnam's laboratory facility.

20           Now, this letter is dated March 15th of 2017.  You're

21   aware that from September of 2016 to February 10th of 2017 that

22   Putnam County Memorial Hospital and its toxicology lab could

23   not test one sample?

24   A.    I have no idea.

25   Q.    Mr. Porter didn't tell you that?

1   A.   Because I have no idea, I'm confident Mr. Porter didn't
2   tell me that.
3   Q.   And then it says, Putnam has its own full-service
4   hospital-based clinical laboratory and the equipment to perform
5   all tests it bills with some minor exceptions.
6          Once Putnam got testing equipment -- and I'll
7   represent to you around February 10th of 2017 -- do you know
8   what testing could occur at Putnam?
9   A.   I don't.
10  Q.   Because it says, Putnam has its own full-service
11  hospital-based clinical laboratory and equipment to perform all
12  tests it bills with some minor expenses.
13          Do you see that?
14  A.   That's what it says.
15  Q.   And you looked at -- and we'll get to number 5.  But when
16  you looked at number 5 from the verbiage of your e-mail, you
17  say -- you say, Jorge, I think the attached is good.  The
18  answer to question 5 will be important.
19          Do you see that?
20  A.   I do.
21  Q.   So that kind of connotes there that you actually read the
22  entire letter, all the questions and answers, doesn't it?
23  A.   It does, but my response in the e-mail doesn't --
24  Q.   No, you're responding to number 5.  I know that.
25          But you do say, Jorge, I think the attached is good.

1    Which seems like, common reading of this, that you're
2  talking about the entire letter?
3  A.   I would agree with that.  My concern, I think, is that --
4  I'm kind of winding up my comment as to question 5 and I'm
5  looking at the letter.  There's two days' difference.  I
6  responded on March 13; the letter is dated the 15th.  And I'm
7  looking at my comment, and I'm looking at paragraph 5, and it
8  doesn't make a lot of sense.
9  Q.   We're going to get there.  No, I agree with that.  We're
10  going to get there.
11  A.   Perhaps the letter changed from the 13th to the 15th?
12  Q.   And I want to kind of go 1 and then we'll get to 5 --
13  A.   All right.
14  Q.   -- then we'll we get to 5.  Is that okay?  Can we do it
15  that way?
16  A.   Sure.  Absolutely.
17  Q.   Okay.  All right.
18    MR. DUVA:  If we can use the computer because I have
19  writing on this version.  If we can go to the answer to
20  question 1.
21    THE WITNESS:  Yes.
22  BY MR. DUVA:
23  Q.   The second sentence there says, Putnam has its own
24  full-service hospital-based -- I'm sorry, we covered that one.
25    The next sentence after "exceptions" is, Putnam

 1    strives to perform medically necessary laboratory services at

 2    an exceptional level of care.

 3            Do you see that?

 4    A.    Yes.

 5    Q.    Did you give any medical necessity advice to Jim Porter?

 6    A.    Gosh, not that I can recall.  Labs don't deal with medical

 7    necessity.  That's a determination solely for the ordering

 8    physician.  Labs are required to process an order as long as

 9    it's not clinically appropriate [sic] or it looks like it's

10    medically erroneous.

11    Q.    And -- and what I'm asking is, Did you give any of that

12    advice to Mr. Porter?  And you said no?

13    A.    I'm confident I have given that advice to Mr. Porter, not

14    necessarily in relation to this particular point in time.

15    Again, I -- I represented Pinnacle since 2013, and I'm

16    confident that I've told him that medical necessity is very

17    important or Pinnacle wouldn't get paid for its testing.

18    Q.    And so you -- but you've known -- so then Mr. Porter,

19    you've known him for about nine years?

20    A.    That -- yes.

21    Q.    So you've got a professional relationship?

22    A.    Yes.

23    Q.    And you think highly of him?

24    A.    Yes.

25    Q.    Okay.  The next paragraph starts off with, Prior to

1   Putnam's current relationship with HLP, Putnam was not equipped

2   to perform certain laboratory services for patients at the

3   level required to aid Putnam's providers with certain necessary

4   diagnostic and clinical evaluations and assessments.

5          Do you see that?

6   A.   Yes.

7   Q.   So if Putnam, from, you know, September of '16 to February

8   10th of 2017 -- I mean, isn't it a more clear answer to this,

9   that, essentially, you know, the -- the lab at Putnam County --

10  and I know we'll get to this question in a minute -- couldn't

11  do any testing during that period of time?

12  A.   I -- I can't say.  It's -- it's not my letter.  If -- if

13  you're asserting that Putnam didn't have the ability to do

14  toxicology confirmations, first of all, it's going to be

15  obvious from the CLIA.  And, secondly, I mean, whoever drafted

16  this letter certainly could have said that.

17  Q.   And you reviewed it?

18  A.   I did.  Well, I -- I reviewed a version of it.  I have no

19  idea if I reviewed this March 15 letter.

20  Q.   And the question and answer 2, it says, What is Hospital

21  Lab Partners' specific role in providing these services?

22  A.   Yes.

23  Q.   And it says, HLP assists Putnam in a consulting capacity

24  regarding personnel, equipment, supply, and administrative

25  matters related to Putnam's clinical laboratory.

1      Do you see that?

2  A.   Yes.  Yes.

3  Q.   And then, HLP provides expertise necessary for the

4  comprehensive operations of Putnam's hospital-based clinical

5  laboratory.  In addition, HLP assists Putnam with the legal and

6  regulatory compliance as well as accreditation.

7  A.   Correct.

8  Q.   So if 35 days before this, if Putnam didn't have a lab, a

9  truthful response to this is -- a question of, What is Hospital

10 Lab Partners' specific role in providing these services to

11 Putnam?

12      I mean, if Putnam didn't have a lab, isn't the

13 answer, Nothing?

14 A.   Well, let me unpack that.  That's -- that's a lot of

15 stuff.

16      First of all, my recollection of Missouri hospital

17 licensure law is that the hospital literally couldn't have had

18 a hospital license without a hospital lab, so there must have

19 been a CLIA.

20 Q.   Yeah, for inpatients and outpatients of the hospital?

21 A.   And nonpatients.

22      MR. SCHWARTZ:  Objection, Judge.  If the witness

23 could be allowed to fully respond before being questioned

24 again.

25      THE COURT:  Go ahead and finish your answer, sir.

1       THE WITNESS:  For inpatients, outpatients, and

2  nonpatients.

3  BY MR. DUVA:

4  Q.    Did Putnam have nonpatients before September -- before

5  February of 2017?

6  A.    I definitely couldn't speak to timing, but my

7  understanding at the time was that that was the entire purpose

8  of utilizing the under arrangements contracts handled by

9  Hospital Lab Partners and Pinnacle with the Putnam Hospital

10  because Putnam did not have LC-MS machines to conduct

11  toxicology confirmations on-site.  That's why they utilized

12  Pinnacle under arrangements.  If -- if the hospital had had the

13  equipment on-site, they wouldn't have needed to use Pinnacle.

14  They wouldn't have needed an under arrangements contract.

15  Q.    That's kind of what I'm getting at, is they didn't have

16  the equipment on-site?

17  A.    And I -- I don't know, but it would certainly make sense

18  that they didn't, or I don't know why Pinnacle would be

19  involved.

20       MR. DUVA:  Okay.  Let's pull up 27 -- well, it's

21  actually the next page.

22  BY MR. DUVA:

23  Q.    This is the answer to question 5.

24  A.    Yes.

25  Q.    So this is the ultimate answer.  And can you read that,

1  sir.  I'll read the question.

2          In what geographic areas are the specimens being

3  collected?

4  A.   You want me to read the answer?

5  Q.   Yes, sir.

6  A.   The letter says, Putnam maintains a state-of-the-art,

7  full-service laboratory.  The lab provides routine and

8  emergency clinical services for hospital patients, and to areas

9  where physicians associated and credentialed with Putnam are

10  located.  The hospital-based clinical laboratory provides 24/7

11  service, as well as online web portal -- I'm sorry -- as well

12  as an online web portal, where tests can be ordered and

13  reviewed securely online 24 hours a day.

14  Q.   So it talks about -- that answer says to areas where --

15  for hospital patients, and to areas where physicians associated

16  and credentialed with Putnam are located.

17          That's the answer that's given to this question?

18  A.   Correct.

19  Q.   Now, going back to your e-mail, this is 27Y.

20          MR. DUVA:  If we can show 27Y.

21  BY MR. DUVA:

22  Q.   The last part of your e-mail says, I do recommend that the

23  hospital report that the specimens are to be primarily from

24  within the hospital's greater patient service area.

25  A.   That's correct.

1  Q.   What did you mean by the "hospital's greater patient

2  service area"?

3  A.   As I had stated on direct, the entire point of an under

4  arrangements contract for a rural hospital or a critical access

5  hospital, for any kind of a service, whether it be ambulance,

6  whether it be radiology, durable medical equipment, pharmacy,

7  clinical laboratory, is to stretch the patient service area for

8  the critical access hospital.

9         Two ways to do that that I typically recommend are,

10  first of all, to get more doctors on staff to be sending tests

11  for nonpatient testing to -- for radiology, for clinical

12  laboratory work, for the dispensing of pharmaceuticals, for the

13  dispensing of durable medical equipment.  And --

14  Q.   Let me ask you about that real -- that part real quick,

15  and we -- and I'll let you continue.

16  A.   Sure.

17  Q.   Did Putnam get additional doctors on staff or affiliate

18  with doctors?

19  A.   I have no idea.  But I --

20  Q.   Right.

21  A.   -- I do -- I do remember offering legal advice in general.

22         First of all, it was based upon Missouri hospital

23  licensure law to say, Don't accept orders from just any doctor

24  anywhere.  Make sure that you know who the doctor is.

25         And I said that will expand your patient service

1  area.  So if you've got a doctor in Pennsylvania or Texas or

2  California, no matter where the critical access hospital is, it

3  allows the critical access hospital to expand its patient

4  service area by getting the doctors on staff.  That's the

5  concept.

6  Q.   But you have no idea if that happened?

7         MR. SADOW:  Your Honor, I -- it's not my witness, but

8  I'd like, on behalf of Mr. Fletcher, to be able to hear the

9  witness's whole answer before he's cut off.

10         THE COURT:  Finish your answer, sir.

11         THE WITNESS:  From my readings of the introductory

12  language to Congressional statutes and to what the Centers for

13  Medicare and Medicaid Services have used in their predicate

14  language for their regs --

15  BY MR. DUVA:

16  Q.   Sir, I'm not asking about Medicare and Medicaid.  I

17  promise if I do that, I will -- I will absolutely listen to

18  everything you have to say about it.  But I --

19         MR. SCHWARTZ:  I'm going to object again.

20         THE WITNESS:  I'm trying to answer your question,

21  sir.

22  BY MR. DUVA:

23  Q.   I'm asking you about private payer situations.

24         MR. SCHWARTZ:  Objection.

25         THE COURT:  Hold on.  Hold on.  We can't have

1  everybody talking at one time.

2          All right.  We're going to start all over again.

3          MR. DUVA:  Judge, I'm not asking him about Medicare.

4          THE COURT:  I understand that.  Ask a question,

5  Mr. Duva.

6          And, Mr. Thomas, answer the question.

7          What is your specific question, Mr. Duva?

8          MR. DUVA:  He's already really answered it, in that

9  he has no idea if Putnam --

10         THE COURT:  Well, let's just not do it that way.  Do

11  you have a --

12  BY MR. DUVA:

13  Q.   So, Mr. Thomas, am I correct that you do not know -- and

14  I'll use your words "I have no idea" -- if Putnam expanded its

15  footprint with doctors throughout the country?

16  A.   I do not know.

17  Q.   So --

18  A.   I do not know what Putnam did in terms of its medical

19  staff regarding the under arrangements contracts with Pinnacle

20  and Hospital Lab Partners.

21  Q.   And the hospital's greater patient service area, are you

22  answering that based on something that you gathered from

23  Medicare?  Is that what you're doing?

24  A.   Please have patience.  You're -- you're asking me very

25  technical questions and I'm giving you very technical answers,

 1    so let me finish.

 2         The definition of a critical access hospital is a

 3    Medicare definition.  We can't get away from Medicare law,

 4    right, or Putnam doesn't exist.

 5         Critical access hospitals have been favored by

 6    Congress and the Centers for Medicaid and Medicaid Services.

 7    The concept is that critical access hospitals and rural

 8    hospitals have their rules relaxed so that the critical access

 9    hospitals can operate.  Critical access hospitals are very

10    fragile operationally and financially.  The concept has always

11    been that Congress and CMS attempt to allow critical access

12    hospitals to expand their footprint beyond the geography of

13    their campus.  One of the ways to do that is with under

14    arrangements contracts with entities such as Pinnacle and HLP.

15         In Missouri, my understanding of hospital licensure

16    law is that a hospital should not be testing -- or either under

17    arrangements or in-house -- any orders from any physicians who

18    are not on medical staff.

19         So my legal advice was make sure you get these guys

20    on medical staff, right, before you accept any orders to make

21    sure you don't get in trouble with the Missouri division of --

22    of hospital licensure.

23    Q.   So if that didn't happen, that's a big problem?

24    A.   I have no idea if it happened.

25    Q.   If it didn't happen, that's a big problem, right?

1  A.    I -- I don't want to stand in the shoes of the regulator.

2        Again, I'm confident that I gave that legal advice.

3  Do I know what happened at Putnam?  I do not.

4  Q.    So your greater patient service area, I think most people

5  would read that as being sort of around Unionville, Missouri,

6  wouldn't they?

7  A.    Bear with me.  You're asking me technical questions.  I'm

8  going to give you technical answers.

9  Q.    We've got plenty of time, sir.

10  A.    Great.  Thank you.

11        When I have addressed this matter in court

12  previously, most of the judges that I have been before have

13  utilized a very old, antiquated certificate-of-need standard of

14  75 percent of the patient draw area for the provider by ZIP

15  code.  The entire point of bringing in new doctors and bringing

16  in new patients is to stretch that concept.

17        Again, as I had mentioned, because rural hospitals

18  and critical access hospitals aren't necessarily focused on

19  geography.  The entire point is that it allows these entities

20  to survive by increasing their patient base because every

21  hospital wants more patients.  That's how they stay alive.

22  Q.    I'm going to ask you to just kind of assume for purposes

23  of the question that certain doctors that collected samples had

24  not only no relationship with Putnam, but didn't know it

25  existed.  Okay?

1    So are you saying under this definition that if you

2 are a patient at a recovery center in Jacksonville Beach,

3 Florida, or Palatka, Florida, or Macclenny, Florida, and that

4 sample goes to Pinnacle Labs directly for testing, goes

5 directly from the doctor who has no relationship to Putnam to

6 Pinnacle Labs for testing, okay, both the point-of-care tests

7 and the confirmatory tests, and it never goes to Putnam and no

8 requisition form ever goes to Putnam, is it your testimony,

9 sir, in your years of experience, that that specimen can be

10 billed to a private insurance company through Putnam County

11 Memorial Hospital's NPI and tax ID number?

12 A.    Yes.

13 Q.    How does that make any sense, sir?

14 A.    You're going have to call your congressman.  That's the

15 way that the UB-04 is set up, and that's exactly what the

16 Claims Processing Manual, chapter 16, section 40.3 says.

17 Q.    And you're aware that -- and I'm not talking about CMS,

18 I'm not talking about Medicare.  You're aware that every single

19 private insurance company involved in this case disagrees with

20 you?

21 A.    I have no idea.

22 Q.    Okay.  So let's extrapolate that out.  Not just Florida,

23 but you can be in El Paso, Texas, same scenario.  Doctor, no

24 affiliation with Putnam whatsoever, can send the sample to

25 Pinnacle Labs for testing, it's tested both point of care and

 1   confirmation, it never goes to Putnam Hospital, and it can be

 2   billed through Putnam Hospital's NPI number?

 3   A.   As long as Putnam Hospital accessions --

 4   Q.   But what if it doesn't?  What if it does nothing?

 5          MR. SCHWARTZ:  Objection.

 6          THE COURT:  All right.  What's your -- what do you

 7   want to say, sir?  As long as Putnam Hospital does what?

 8          THE WITNESS:  It is important that the hospital

 9   recognize the patient and the specimen as theirs.  If not, the

10   hospital just turns into a billing company for the outside

11   reference laboratory.

12   BY MR. DUVA:

13   Q.   That's what I'm getting at, sir.

14   A.   Well, and I'm -- I'm happy to --

15   Q.   And that, sir --

16          MR. SCHWARTZ:  Objection.  He can't finish his answer

17   to the questions because Mr. Duva keeps interrupting him.  And

18   we've asked that this stop repeatedly.  The Court's instructed

19   him.  Yet he keeps do it.

20          THE COURT:  All right.  Mr. Duva, let the witness

21   answer the question.

22          Mr. Thomas, what were you getting ready to say?

23   BY MR. DUVA:

24   Q.   Go ahead, sir.

25          THE WITNESS:  Thank you, Your Honor.

1    Mr. Duva, there are multiple ways that -- that

2  hospitals do that.  This is more of a function of what I would

3  consider to be best practices and quality assurance than in

4  terms of a particular point of law that I can point to.

5    And, again, these are matters for quality assurance.

6  In the event that the hospital gets audited, the hospital needs

7  to be able to prove that it's a hospital patient, right?  A

8  nonpatient, but still a hospital patient.

9    The way that that's typically done is that the doctor

10  would be on medical staff or at least be recognized as some

11  kind of a provider who's authorized to submit requisitions to

12  the hospital to have the hospital, you know, tested at an

13  outside reference laboratory -- that's the entire point of the

14  under arrangements laws, right -- and for the hospital to

15  maintain custody of the specimen so the hospital doesn't simply

16  lose track of where the specimen is.

17    Because the hospital is controlling it.  It's a

18  hospital patient and it's a hospital bill.  And on the UB-04,

19  the 837I, the electronic claims form, the hospital is

20  promising this is my FEIN, right?  This is my NPI.  This is my

21  nonpatient.  Right?  It's billed as a type of bill 14X, TOB

22  14X.

23    That puts the payer on notice that it's a nonpatient.

24  And if anyone looks at the statute and anyone looks at the

25  claims processing manual, it describes the under arrangements

 1    provision.  Underneath the law, there shouldn't be a difference

 2    between handling that test under arrangements through an

 3    outside reference laboratory or underneath the roof of a

 4    hospital.

 5            And I would offer that I've seen many, many

 6    derivations of this, and I think that it's a hybrid in each and

 7    every hospital that I've ever seen.  They're all a little bit

 8    the same and they're all a little bit different.

 9            And I'm sorry if I'm taking you off your -- your

10    rhythm, but I'm trying to give you complete answers to very

11    technical questions.

12    BY MR. DUVA:

13    Q.   You're not taking me off my rhythm, sir.  We got plenty of

14    time.  Okay?  So I'm sorry for cutting you off.

15    A.   All right.

16    Q.   I'll let you explain.  And then we're probably going to

17    have a lunch break soon.  But we can continue this this

18    afternoon.  Okay?

19    A.   Sure.

20    Q.   But that's not the scenario I gave you.  I mean, you added

21    a lot of stuff there.  You added this has to be a doctor on

22    medical staff with Putnam, correct?  You just added that to the

23    scenario that I gave you, didn't you?

24    A.   It certainly should be, under Missouri law.

25    Q.   Okay.  And you added that there has to be some affiliation

1 between the doctor and Putnam in your answer, correct?

2 A.   Has to be.

3 Q.   I mean, you just said it, sir.  Right?

4 A.   I don't think I said has to be.

5 Q.   There has to be -- the doctor has to be on medical staff

6 and you said, I believe --

7          MR. BELL:  Judge, now I'm going to object, because he

8 asked and answered under Missouri law.  That answer came out

9 less than 30 seconds ago, and it --

10          THE COURT:  Overruled.

11 BY MR. DUVA:

12 Q.   And there has to be some affiliation between the doctor

13 ordering the test and Putnam, right?

14 A.   I would offer that I think that there's a responsibility

15 of the hospital to know who is sending orders for tests to the

16 hospital.  It shouldn't be a total stranger.  I don't have a --

17 a black-and-white answer for you.  It's gradient.  Every

18 hospital handles it a little bit differently.

19          I think that it would -- it would not reflect well on

20 the hospital's quality assurance process if a doctor they've

21 never even heard of, that they can't even look up on the

22 Medicare PECOS list to find out if it's a doctor, if the person

23 is alive, right?  I mean, just the basics.

24 Q.   And that's the scenario that I'm giving you.  So I think

25 we're just going to have to do it again.  Okay?

1  A.    Okay.

2  Q.    I will take a doctor in Maui in Hawaii -- the Big Island,

3  I think they call it.  Okay?  That's part of the U.S., right?

4  A.    Actually, Hawaii is the Big Island.

5  Q.    Okay.  Thank you.  I've never been there.

6          So, doctor in -- we'll call it Honolulu, okay -- has

7  no relationship, no credentials with Putnam, never heard of it,

8  doesn't know about it, nothing, okay?  Takes a sample -- let's

9  just say it's a recovery center, okay?  Takes a sample there,

10 it's in Honolulu, Hawaii.

11         For whatever reason, that doctor has a relationship

12 with Pinnacle.  That specimen goes 3,000 miles to Ocala,

13 Florida, to Pinnacle Labs, and it's tested, both

14 positive/negative and confirmation, and then the result is

15 provided to the doctor in Hawaii.  Okay?

16 A.    Got it.

17 Q.    All right?  So the doctor in Hawaii, no knowledge of

18 Putnam, no relationship with Putnam, no credentials with

19 Putnam, the dude's never been to Unionville, Missouri, okay, or

20 dudette, whoever it is; male doctor, female doctor.  Okay?

21         Have you got that?

22 A.    I do.

23 Q.    Okay.  The person who provided the specimen is a Hawaii

24 Blue member, okay?  Blue Cross Blue Shield Hawaii, all right?

25 Got it?

1   A.    I've got it.

2   Q.    Are you saying that Putnam's NPI number and tax ID number

3   can be used to bill that claim to Hawaii Blue?  Is that what

4   your testimony is?

5   A.    Yes, 42 United States Code, Section 1395l, paragraph (h)

6   paragraph (5), Roman numeral paragraph (iii) allows it.

7   Q.    So every person in America who has -- let's just say Blue

8   Cross -- who pees in a cup anywhere, under this advice that you

9   gave to Mr. Porter, can have that specimen billed through

10  Putnam County Memorial Hospital's NPI and tax ID number?

11  A.    That's what I think the Social Security Act and the claims

12  billing manual allow.

13  Q.    Okay.  Claims billing manual for Medicare, right?

14  A.    And -- and --

15  Q.    That wasn't my hypo.  Okay?  The hypo was private payer

16  insurance, correct?  You understood that?

17  A.    Absolutely.  May I expound a little bit?

18          All of the billing forms have at the bottom of them

19  CMS and then a number.  CMS stands for the Centers for Medicare

20  & Medicaid Services.  Those are the forms that all commercial

21  payers use, because it's just too darn hard to create software

22  and claims adjudication systems that separate out Medicare,

23  Medicaid, and TRICARE claims that must go on those versus the

24  commercial insurance.

25          And when patients come in, you know, they

 1    typically -- when they're admitted to a hospital, whether it's

 2    a nonpatient, an inpatient, or an outpatient, they just give

 3    the admitting team a copy of every insurance card they have.

 4    And it can be everything under the sun, right?

 5            People could be coming in from an automobile

 6    accident.  So they could have Allstate auto insurance coverage.

 7    It's a workers' comp claim, right, where somebody fell off a

 8    ladder while painting a roof.  There are --

 9    Q.   Sir, I'm asking --

10            MR. BELL:  Objection.

11            MR. SCHWARTZ:  Objection, Judge.  Again, he's --

12            MR. DUVA:  Your Honor, again, I'm not asking him

13    about car insurance.  I'm asking about private insurance claims

14    through rural hospitals.

15            THE COURT:  I -- I agree that Mr. Thomas is getting

16    off the point, and so I'm not -- I don't think he's being

17    interrupted.  I just think he's getting off the point.

18            Mr. Duva, what's your next question?

19    BY MR. DUVA:

20    Q.   Where have you -- now, again, I'm asking you for the hypo,

21    the doctor in Honolulu, no credentials with Putnam, none

22    whatsoever.

23    A.   I think that's problematic.

24    Q.   Why did it take like ten minutes for you to say that?

25            MR. LANDES:  Judge.

1    THE WITNESS:  I would offer that it sounds like

2  you're asking me very conclusory questions that compound a lot

3  of matters.  But you gave me a set of facts, and I would offer

4  that I believe that, from my understanding of the arrangements

5  involving Putnam and Hospital Lab Partners and Pinnacle, falls

6  underneath the under arrangements law.

7  BY MR. DUVA:

8  Q.    But for that to happen, okay, that's a CMS rule, right?

9  A.    CMS law to CMS rule.

10  Q.    There has to be some connection between the doctor and the

11  hospital who's ordering the hospital to do something, right?

12  A.    I would offer that there's a responsibility on behalf of

13  the hospital to know who it is who is submitting orders.  From

14  the physician --

15  Q.    Mr. Thomas --

16  A.    May I finish?

17  Q.    No.  Can I ask you another question and then you can

18  finish?

19    MR. SCHWARTZ:  Objection, Judge.

20    THE COURT:  Let him -- let him finish.

21    THE WITNESS:  I kind of have this other half of the

22  answer.

23    THE COURT:  Let me -- let him finish, please,

24  Mr. Duva.

25    Yes, sir.  Go ahead.

1      THE WITNESS:  From my long experience with doctors,

2  they fill out orders for lab tests.  They don't look at the

3  name of the laboratory at the top of the form.  And a lot of

4  these hospital forms have three or four different names on

5  them.  And it's a lot of branding and licensing arrangements,

6  royalties.

7      I think that the average doctor doesn't know -- it

8  might in very specialized services, but toxicology is not the

9  most sexy area of testing.  I think the average doctor just

10  fills out a form.

11  BY MR. DUVA:

12  Q.    Okay.  Mr. Thomas, respectfully, that had nothing to do

13  with my question of whether the doctor in this hypothetical had

14  any affiliation with Putnam.  Okay?

15      And you're saying the hospital has a responsibility

16  to know that.  How can the hospital CEO or whoever that is

17  running the hospital -- how can that person know that this

18  doctor in Hawaii is sending these samples to some independent

19  lab?  How can the -- how can the hospital know that?

20  A.    I don't know.  And if -- if you'll allow me, to me,

21  that's --

22  Q.    Go ahead, sir.

23  A.    -- the entire point of a hospital accessioning the

24  patient.  The accessioning data will include who the insurance

25  companies are, the name of the patient, and where it is that

1  the specimen is being tested, which is going to be Pinnacle.

2  That's the record.

3  Q.    But you're -- but you're assuming that the hospital, like

4  Putnam, accessions something.  That's not what my hypo was.

5  A.    I do think it's -- again, it's not -- it's not the law.  I

6  think it's very much a best practice that the hospital

7  accessions the specimen.

8          If not, if they get audited, it's very easy for an

9  auditor to conclude it's not a hospital nonpatient.  It's not a

10 hospital patient at all.  It's a Pinnacle patient.  That's why

11 the hospital needs to accession the specimen.

12 Q.    So there's a difference in your mind between a nonpatient

13 and not a patient at the hospital at all?  Right?

14 A.    Yes.  Absolutely.

15 Q.    Pretty critical distinction?

16 A.    I think so.

17 Q.    And the 141 code -- God help me for asking about this --

18 the 141 code means the specimen actually goes to the -- to the

19 hospital, right?

20 A.    No, actually, the claims manual says that the specimen can

21 be collected off-site.  Sorry about that.

22 Q.    Saying, yes, collected off-site, but it goes to the

23 hospital?

24 A.    It doesn't require the specimen to go to the hospital

25 unless the hospital is going to perform part of the tests.

1  Q.    Okay.  So --

2  A.    Like -- like, the -- you know, the analysis versus the

3  confirmation.

4  Q.    And in the Missouri Anthem claims data -- have you looked

5  at any of that?

6  A.    I have not.

7  Q.    Okay.  If the 141 code is there, and the NPI and the tax

8  ID number of the hospital are there --

9  A.    Right.

10 Q.    -- and there's a 22 place of service code, that means the

11 service happened at the hospital, that all means the urine

12 sample went to the hospital for some purpose?

13         MR. SCHWARTZ:  Objection, Judge.  Can we approach,

14 please?

15         THE COURT:  I don't know, sir.  I mean, is it

16 necessary?

17         MR. SCHWARTZ:  Well, the -- he's asking about the 22

18 code, and we know the 22 code was added by the insurance

19 companies.  So the information he's providing is not accurate.

20         THE COURT:  All right.

21         MR. SCHWARTZ:  Just like some of the other

22 information is not accurate.

23         THE COURT:  I tell you what, Mr. Schwartz.  You

24 know -- you know better than that.

25         All right.  All right.

1      Mr. Duva -- Mr. Thomas, do you have an answer for

2  your question?

3           THE WITNESS:  Absolutely.

4           I do have an understanding that the claims at issue,

5  at least going to Putnam, had a code 22 included on the

6  electronic claims data.

7  BY MR. DUVA:

8  Q.    From the insurance companies?

9  A.    I'm sorry?

10 Q.    From the insurance companies?

11 A.    It is my understanding that it was added by the insurance

12 companies.

13 Q.    And that's what they interpreted the 141 code -- so

14 you've -- you've been told that because you've never seen the

15 claims data, correct?

16 A.    And that is correct.

17 Q.    Okay.  And Mr. Schwartz told you that?

18 A.    Mr. Schwartz told me that, and I learned about it from

19 another source, and I couldn't tell you off the top of my head,

20 but he -- he had confirmed what I had heard earlier, yes.

21 Q.    And that scenario with the NPI and the tax ID number of

22 the hospital and the 141 code, it means the sample went to the

23 hospital for a test?

24 A.    My understanding of the code 22 -- and I'm a compliance

25 lawyer, I'm not a -- I'm not a biller, I'm not a certified

1  biller at all.  My understanding, the code 22 is it's an
2  outpatient code.
3  Q.    I didn't ask you about the code 22, sir.
4  A.    Actually, I think you did specifically ask me about the
5  code 22.  That's what it is that Mr. Schwartz just objected to.
6  Q.    What I asked you is about the 141 code.
7  A.    Yes.
8  Q.    And the -- okay?  I'm not going to say 22.  Well, I just
9  said it but I'm not going to say it again.
10          All right.  Hospital NPI, hospital tax ID --
11  A.    Correct.
12  Q.    -- claim to the insurance companies.
13  A.    Right.
14  Q.    And I'm going to ask you to also assume there is no NPI or
15  tax ID number of the independent lab.
16          THE COURT:  Before you do that, Mr. Duva, I do think
17  you asked him about the 22.  And if -- Mr. Thomas, if you had a
18  response to that, I think it's -- I think you should give it.
19          Do you have a -- did you want to say something about
20  the 22?
21          THE WITNESS:  Thank you, Your Honor.  I did have one
22  more sentence.
23          I think a 22 doesn't work with a 141.  A 141 is a
24  nonpatient code and a 22 is an outpatient code.  The only way
25  you can utilize a 22, from my understanding -- and, again, I'm

1  not a coder.

2          But my understanding of a code 22 means that the

3  patient went to the hospital.  I mean, you know, it was -- if

4  you're going to urinate in a cup on -- with a -- with a code

5  22, it means you literally were inside the hospital urinating.

6          The nonpatient code, the 141, the 14X, is the

7  opposite.  Means that the patient didn't go to the hospital,

8  that the specimen was taken somewhere else.

9          So I think putting a code 22 on a claim that's got a

10 141, it -- it conflicts.  One says outpatient, one says

11 nonpatient.  It doesn't work.

12 BY MR. DUVA:

13 Q.    The 22 code in the CMS regulations is actually a place of

14 service, isn't it?

15 A.    That, I think so -- yes.

16 Q.    Okay.  So I'm done with the 22 code.  Are you done?

17 A.    I'm here to answer your questions.

18 Q.    Okay.  I just want to make sure you didn't have more on

19 the 22 code.

20          So the 141 code for the specimen, okay, and the NPI

21 number and the tax ID of the hospital --

22 A.    Yes.

23 Q.    -- and the claim?

24 A.    Yes.

25 Q.    And there's no NPI or tax ID or what have you of the

1  Pinnacle -- I'll take out the what have you.  There's no NPI or

2  tax ID number of Pinnacle Labs, right?

3  A.    Right, there's no place on the UB-04 to put it.

4  Q.    There's the 141 code, right?

5  A.    Right.

6  Q.    So that means in that bill, that the specimen went to the

7  hospital for some kind of test?

8  A.    No.  It means that the hospital is billing the claim as a

9  nonpatient.  The specimen definitely needed to go to the

10  hospital in the event that the hospital did any testing at all.

11  Q.    And that was my question, if the hospital did a test.

12  A.    Oh, absolutely.  And I'm sorry.  I misunderstood.

13         In the event that the hospital did testing underneath

14  its own roof and underneath its CLIA and not the under

15  arrangements lab CLIA, does the specimen need to go to the

16  hospital?  Without a doubt.  There's no -- there's no way to

17  test without getting the specimen.

18  Q.    So have you written any opinions -- not just for

19  Mr. Porter, I'm just talking about anywhere -- about the

20  scenario that I gave you?  Okay?  About this person in Honolulu

21  who is in a recovery center and he pees in a cup, and this

22  doctor has no credentials, affiliation, connection, anything,

23  with Putnam, okay?  And the sample goes directly to an

24  independent lab, but that it's okay to bill through the NPI and

25  tax ID number of the hospital?

1          Have you written that down anywhere?

2   A.    Not with that level of specificity.  What I would offer is

3   typically what happens is clients come to me, and before they

4   initiate any kind of a delivery platform, they ask their

5   compliance lawyer if it's legal.  So I usually don't get that

6   kind of detail ahead of time because even they don't know it.

7   Q.    So the answer to -- the simple answer is -- and I'm fine

8   with the explanation, that's totally fine, sir.

9   A.    Probably not.  I mean, I have to -- I'm sorry, Mr. Duva.

10  I -- I'm an old guy.  I've probably written a thousand

11  opinions.  And this is all that I do, so I would have to look.

12  Q.    But that doesn't ring a bell, does it?

13  A.    Not with that level of specificity.

14          MR. DUVA:  Your Honor, I'm going to transition to

15  another area, so now might be a time for a break.

16          THE COURT:  All right.  Ladies and gentlemen,

17  let's -- let's have our lunch.  It's 12:30.  So let's do 20

18  minutes to 2:00.  Let me just -- before you leave, let me just

19  remind you -- I haven't done the little litany in a while.

20          Please remember, don't talk about the case with each

21  other or with anybody else.  Please don't let anybody talk to

22  you about the case.  Please don't do any of your own research,

23  computer or otherwise, nothing about the case on social media

24  or any other source.  Everything you need and everything you're

25  entitled to under the law, you get here in the courtroom.

1       All right.  Thank you, ladies and gentlemen.  Have a

2   nice lunch.

3       COURT SECURITY OFFICER:  All rise for the jury.

4   (Jury exits, 12:29 p.m.)

5       THE COURT:  All right.  Everybody have a seat for a

6   moment.

7       So let me say this because I -- I don't really want

8   to keep having to -- to referee here.  I think that, Mr. Duva,

9   you do need to -- after you ask a question, you do need to

10  allow the witness to give his complete answer before you ask

11  the next question, and I think -- I think you need to police

12  that a little more carefully than you have.

13      Mr. Thomas, I'd also offer to you that I -- I think

14  you ought to try to answer Mr. Duva's questions directly, and

15  not offer additional commentary unless it's directly related to

16  the question, and then it can go from there.

17      You will -- Mr. Schwartz will have an opportunity to

18  redirect.  If there's some area that he feels wasn't covered

19  sufficiently, he will certainly ask you.

20      So I think we can just clean this up a little bit.  I

21  think we need to go a little slower, and I think we'll get the

22  same amount of content for the jury, but maybe just with a

23  little bit less interruptions and problems.

24      So can we do that, please.

25      MR. DUVA:  Yes, sir.

1      THE WITNESS:  Yes, sir.

2      THE COURT:  All right.  All right.

3      You may have your lunch.  And please don't talk about

4   your testimony over lunch.  All right, sir?

5      THE WITNESS:  Yes, sir.

6      THE COURT:  Thank you.

7      I'm sorry.  I didn't mean to -- yeah, you can go

8   ahead and leave.  You can go ahead and leave, sir.  I'm going

9   to talk to the lawyers about scheduling here.

10     All right.  So, Mr. Duva, can you estimate for me how

11  much longer you have on cross?

12     MR. DUVA:  Your Honor, I'm not trying to be evasive,

13  I really can't.

14     THE COURT:  Okay.

15     MR. DUVA:  I'm not sure.  I'm going have to think

16  about a landing spot, but it could be a while.  I'll say that.

17     THE COURT:  Okay.  All right.  And then -- you can go

18  ahead and leave, sir.

19     THE WITNESS:  Thank you.

20     (The witness exits the courtroom.)

21     THE COURT:  And then after Mr. Thomas, who's -- who's

22  the next -- Mr. Schwartz, are you going to have additional

23  witnesses for Mr. Porter?

24     MR. SCHWARTZ:  No, sir.

25     Oh, well, tomorrow, not today.

1          THE COURT:  Okay.

2          MR. SCHWARTZ:  I have my -- my expert flying in late

3     tonight.  He's coming from California.  So he'll be here first

4     thing in the morning.

5          THE COURT:  All right.  And, Mr. Rowland, you have a

6     witness, if I recall?

7          MR. ROWLAND:  We have a witness available, Judge.

8     I'm going to talk with him over the break and Mr. Porter to

9     determine whether we think it's necessary for him to testify

10    today or not.

11         THE COURT:  Okay.  Well...

12         MR. ROWLAND:  We believe that it is -- or have up to

13    this point.  With that being said, I think that his testimony,

14    realistically, on direct is about 20 to 30 minutes.

15         THE COURT:  Okay.  And then, Mr. Sadow, or -- I'm

16    sorry, Mr. Citro, I guess you're -- you've got the con now,

17    right?

18         MR. CITRO:  Yes, Your Honor.

19         THE COURT:  What's -- what's your situation?

20         MR. CITRO:  Our expert will be in town and available

21    after 5:00.  So he'll have -- he'll be here tomorrow morning,

22    and go after Mr. Arrigo.

23         THE COURT:  All right.  And is it -- you said you had

24    two other witnesses from Georgia.  Are you going to call those

25    witnesses?

 1          MR. CITRO:  No, Your Honor.  We've spoken to them and
 2   decided not to call them.
 3          THE COURT:  All right.  So let's recap here.
 4          Mr. Duva still has a while with this witness.
 5   Will -- and Mr. Schwartz will have redirect.  So that'll put us
 6   at some period of time.
 7          And then, Mr. Rowland, you are likely, but not
 8   certain, to call your witness?
 9          MR. ROWLAND:  Correct, Your Honor.
10          THE COURT:  And then, Mr. -- so -- so the two experts
11   are tomorrow.
12          Mr. -- and Mr. Fletcher is not going to call any
13   other witness.  So is it true, Mr. Citro, that Mr. Fletcher is
14   not going to call any other witnesses, other than the expert?
15          MR. CITRO:  Yes, Your Honor, that's correct.
16          THE COURT:  Okay.  And then you'll rest after that.
17          MR. CITRO:  Yes, sir.
18          THE COURT:  And, Mr. Schwartz, you will rest after
19   your expert testifies tomorrow?
20          MR. SCHWARTZ:  Yes, sir.
21          THE COURT:  All right.
22          And, Mr. Lowther, and, Ms. Galnor, you have
23   previously told me that you are -- you are not going to be
24   putting on any witnesses; is that correct?
25          MR. LOWTHER:  That's correct, Your Honor.

1    MS. GALNOR:  Yes, Your Honor.

2    THE COURT:  All right.  So what I think will happen

3  is -- depending on what time we finish today, we may well try

4  to at least have a charge conference or at least talk about the

5  charges if we -- if we can, if we've got time at the end of the

6  day to do that, and we may well.

7    And then who -- now, who's going to go first tomorrow

8  morning?  I want to make sure we have that understood.

9    Mr. Schwartz?

10    MR. SCHWARTZ:  My -- my guy will.  Yes, sir.

11    THE COURT:  All right.  And then, Mr. Citro, you're

12  after him?

13    MR. CITRO:  Yes, Your Honor.

14    THE COURT:  Okay.  Okay.  All right.  All right.  I

15  think that helps.  All right.  Everybody -- anybody -- anything

16  else?

17    MR. ROWLAND:  Your Honor, I do have a question on the

18  Rule 29 arguments.

19    THE COURT:  Yeah.

20    MR. ROWLAND:  And I apologize, I was doing about 14

21  different things at one time.  When did you say that we were

22  going to address those?  Or did you --

23    THE COURT:  Well, I mean, it's possible -- it's

24  possible we'll do it this afternoon.

25    MR. ROWLAND:  Okay.

 1          THE COURT:  Yeah.  Possible we'll do it this

 2   afternoon.  Mr. Rafferty said he wanted to talk about how long

 3   closings are going to be.  We got -- there's lots of things we

 4   could talk about.  Forfeiture's another issue that, at least,

 5   we have to be -- have on the radar screen.

 6          So we'll -- we -- let's see if we've got some time at

 7   the end of the day, and we'll try to -- try to use it wisely.

 8          MR. ROWLAND:  Just want to confirm that what I heard

 9   was actually what I heard, rather than --

10          THE COURT:  Yes, sir.

11          MR. ROWLAND:  -- what was in my head.

12          THE COURT:  All right.  20 till.

13          MR. CITRO:  Thank you, Your Honor.

14          COURT SECURITY OFFICER:  All rise.

15      (Recess from 12:35 p.m. to 1:39 p.m.; all parties

16   present.)

17          COURT SECURITY OFFICER:  All rise.  This Honorable

18   Court is now in session.

19          MR. DUVA:  All right.  Your Honor, if we can bring

20   something up.

21          THE COURT:  Yes, sir.

22          MR. DUVA:  There is a writing from Mark Thomas to Jim

23   Porter.  I'll sort of spare the back-and-forth of who said what

24   about when it was sent.  We don't have it.

25          I think Mr. Schwartz's position, he tried to upload

1    it before the trial on April 26th.  We have that download.  We

2    did download from April 26th.  We've looked at it.  It's not in

3    there.  It's not Bates stamped.

4          Mr. Schwartz is trying to e-mail it to us now.  He

5    tried to e-mail it to Mr. Winters at 12:41.  Mr. Winters did

6    not receive it.  He tried to e-mail it to me and Mr. Winters

7    and Mr. Hayes now.  I have my phone here.  I don't have it.

8          At the end of the -- what I'm asking for is if we

9    have to take a break to resolve this so that we can print it

10   out and look at it.

11         I think what it is is it's -- the letter that I found

12   on the Internet, but specified as to Pinnacle Labs.  The first

13   iteration is as to Aaron Durall.

14         Okay.  Now I'm hearing behind me that we have it and

15   that's all we're asking for.  So it looks like it's being

16   resolved.  But that's what -- you know, that's why I was making

17   the Jencks demand and that kind of thing.

18         So I think -- I think we're going to have it soon,

19   and maybe this is put to bed.  But if I -- I will read it as

20   I'm crossing Mr. Thomas, but I might ask for a break just to

21   look at it.

22         I don't know -- if it's exactly the same, I'll be

23   able to tell pretty quickly.  And we may mark it as an exhibit

24   if it is.  If it's not and there's some differences, then I

25   might ask for a break to look at it to decide if we want to do

1  anything with it.

2  　　　　THE COURT:  Okay.  All right.

3  　　　　MR. DUVA:  So it is different.  I can tell you that,

4  by looking at the first page.

5  　　　　THE COURT:  All right.  Do you want to --

6  　　　　MR. SADOW:  Why don't we just -- we can print it out.

7  How long is the letter?

8  　　　　MR. SCHWARTZ:  It's been printed.

9  　　(Counsel confer.)

10  　　　　MR. SADOW:  Your Honor, never mind.

11  　　　　MR. SCHWARTZ:  And, Judge, I just want to put on the

12  record that on April 26th at 7:22 p.m., a number of documents

13  related to Mark Thomas -- and it specifically says Mark Thomas

14  documents for the advice-of-counsel issue -- was zipped up on

15  my system.

16  　　　　There were a number of productions that were done

17  April 27th, the following morning.  I had a lot of issues with

18  USAfx with just some e-mail exchanges on that that Mr. Tasker

19  has printed, going back and forth.

20  　　　　The thing kept kicking me out.  It kept making me

21  change my e-mail -- not my e-mail, my passwords and all kinds

22  of stuff.  Bottom line is -- is that I uploaded those

23  documents.  Apparently the government did not receive them.  I

24  don't know what's going on with that.

25  　　　　In addition, today, when I was showing Mr. Winters

 1    what I had sent -- because I could not download what was in

 2    USAfx.  Despite trying multiple times, it wouldn't download

 3    those things from here.  Maybe my hotspot is just not strong

 4    enough.  I don't know.

 5            So I was like, This is what I sent.  And I showed him

 6    the file.  There's some opinions in there, there's some e-mails

 7    in there, and there's other stuff.  None of them were Bates

 8    stamped because they were reserved for the advice-of-counsel

 9    defense.

10            He saw an opinion.  He ask that I e-mail it.

11    Standing with him, I did at 12:41 p.m.  It went through on my

12    end, but they still have not received it.

13            When we came to the courtroom, Jim Hayes sent a test

14    to me, and I responded to that with it and he got that.  But I

15    did send it to Mr. Duva and Mr. Winters today, Mr. Winters at

16    12:41 and then again when I got back in the courtroom, and they

17    haven't received it for some reason.

18            I just want to be clear that I did send these things

19    on April 27th, well before trial or anything else, consistent

20    with the disclosure of the advice of counsel.

21            And --

22            THE COURT:  Okay.

23            MR. SCHWARTZ:  And why --

24            THE COURT:  I understand.  All right.

25            MR. SCHWARTZ:  We have gone back into the office,

1   Mr. Tasker did, he pulled up some stuff over lunch and was

2   talking to me.  The stuff that he found is what is contained in

3   this zip file that was provided.

4          So to the extent that they want to look at anything

5   else, in this, I mean, I'm happy to go over it with them, but,

6   you know, I thought that it was provided.  Apparently they say

7   that they looked at it, they didn't get it.  But just like I

8   sent the e-mail, I didn't get any bounce-backs or anything else

9   today, and they don't have that either.

10         So I don't know what's going on, but it was provided,

11  and I take my obligations very seriously.  And that's why I

12  told the Court that I would double-check because it was

13  previously provided.

14         THE COURT:  All right.

15         MR. DUVA:  I'm going to ask for some more time to

16  look at this.  This is a nine-page legal opinion that we just

17  now have.

18         THE COURT:  I'll give you some time.  But let me just

19  say something before we do that.

20         So it's been brought to my attention that during one

21  of the breaks that there was a heated exchange between counsel.

22  And also I've -- of course, even when we were in session, I

23  certainly have noticed the tension.  And I just want to say

24  that I think for the most part we have conducted this trial in

25  an atmosphere of mutual respect and professionalism and -- at

1    least as far as I know -- maybe a lot of things have gone on

2    that I don't know about.  That's often the case.

3          But I will tell you this, that that's what's going to

4    happen.  We're going to be -- we are going to conduct this

5    trial in an atmosphere of mutual respect and professionalism,

6    and that includes both when we're in session and when we're out

7    of session, and there are not going to be any ifs, ands, or

8    buts about that.

9          And so I just want to say that, because if I have to

10   deal with that again, I may well deal with it in a different

11   way.

12         So having said that, I -- Mr. Duva, I'll be happy to

13   give you some time.  How much time would you like?  Do you want

14   to -- do you want me to -- I take it it's going to be part of

15   your cross of Mr. Thomas here, so you're looking at it now.

16         Do you want me to -- to just tell the jury, what, 15

17   minutes, 10 minutes?

18         MR. DUVA:  Can we get 20?  It's a tough spot, Your

19   Honor.  A nine -page legal opinion and get 20 minutes to digest

20   it.

21         THE COURT:  I understand.

22         MR. DUVA:  I've never seen this before.

23         THE COURT:  Okay.  All right.

24         All right.  And remind me -- you go ahead -- be

25   reading it.

 1        Remind me, Mr. Rowland, have you decided whether
 2   you're calling your witness or not?
 3        MR. ROWLAND:  At this point, Your Honor, I'm not
 4   totally sure.  I think -- I think the answer is probably going
 5   to be no, but --
 6        THE COURT:  Okay.
 7        MR. ROWLAND:  -- I -- I hate to tell you no and
 8   then --
 9        THE COURT:  That's fine.
10        MR. ROWLAND:  You know what I mean?
11        THE COURT:  All right.  Remind me, is that the only
12   other witness we have in the building today?
13        MR. ROWLAND:  I believe that's correct, Your Honor.
14        THE COURT:  All right.  And, Mr. Rafferty and Mr. --
15   I'm sorry, Mr. Schwartz, did you have something you wanted to
16   say?
17        MR. SCHWARTZ:  Yes, sir.  I would just request the
18   ability to give that opinion to the witness so that he can
19   review it also so when they start questioning, he's not sitting
20   up there for 20 minutes or whatever reading a nine-page
21   document.
22        THE COURT:  Perfectly reasonable request.  You can do
23   that.
24        MR. DUVA:  Can you print another one?
25        MR. SCHWARTZ:  You have --

```
 1              THE COURT:  So we can -- do we have an extra copy?

 2              MR. HAYES:  If you'll print one now for me.

 3              MR. DUVA:  I need a clean one to mark, because I

 4   marked on mine.  So if we can get --

 5              THE COURT:  We'll print a couple more.  Sure.

 6              MR. HAYES:  I'll give him mine and --

 7              MR. DUVA:  Can we take a break out of the courtroom?

 8              THE COURT:  Yes, sir.  We can do that.

 9              All right.  We're going to -- Ms. Hatfield, if you'll

10   tell the jury that we're going to be in recess until 2:10.  And

11   we'll come back at 2:10.  Tell them I appreciate their

12   patience.

13              And, Mr. Rowland, when are you going to make a

14   decision about whether that witness will be called?

15              MR. ROWLAND:  I can let you know in the next half

16   hour, Judge.

17              THE COURT:  Okay.  That's fine.  All right.

18              And is the answer to my question that there's no

19   other witnesses available today?  Is that correct?

20              MR. RAFFERTY:  I believe -- that is my understanding.

21              THE COURT:  Okay.  All right.

22         (Counsel confer.)

23              MR. DUVA:  Can we go out of the courtroom, Your

24   Honor?

25              THE COURT:  Yeah.  We're going to be in recess.
```

1          (Recess from 1:48 p.m. to 2:12 p.m.; all parties present.)

2               THE COURT:  So I want to make sure I understand.

3               Mr. Rowland, it was told to me over the break that

4     you're not going to call a witness?

5               MR. ROWLAND:  Correct, Your Honor.  We decided not to

6     call him.

7               THE COURT:  All right.

8               MR. ROWLAND:  The only other issue that I have is

9     there's one exhibit that we got that Mr. --

10              THE COURT:  I'm sorry, sir.  I can't hear you.

11    There's only one exhibit what?

12         (Counsel confer.)

13              MR. SADOW:  The Court just wanted to know if you

14    have --

15              MR. ROWLAND:  Sorry, Judge.  There's one exhibit I

16    have that I wanted to go ahead and put in evidence before we

17    announce rest.

18              THE COURT:  Okay.

19              MR. DUVA:  No objection to it.

20              MR. ROWLAND:  My understanding, there was no

21    objection to it.

22              THE COURT:  No objection.  Okay.  That's fine.  All

23    right.

24              So, Mr. Schwartz, after this -- after Mr. Thomas is

25    done, you're going to announce rest?

1    MR. ROWLAND:  Your Honor, I apologize.  There is one

2    other.  We have the documents we're waiting on from Blue Cross.

3    If we get those, I'd like to be able to put those into

4    evidence.  But other than that, I don't have any other witness.

5         THE COURT:  All right.  Do you have those documents

6    yet?

7         MR. ROWLAND:  We're waiting on them, Judge.

8         THE COURT:  Okay.  I guess what I'm trying to figure

9    out is -- I'm going to tell the jury that I appreciate their

10   patience and this will be the last witness of the day.

11        Is that correct?

12    (Nods head affirmatively.)

13        THE COURT:  And the only other witnesses -- I

14   understand we've got documents.  But the only other witnesses

15   are the two experts tomorrow; is that correct?

16        Nobody wants to call any other witnesses, right?

17    (No response.)

18        THE COURT:  Okay.  All right.  Thank you.

19        MR. SADOW:  But we do have -- I think there's a

20   matter with the letter opinion that counsel may wish to

21   address.

22        MR. RAFFERTY:  Your Honor, there's an aspect of this

23   opinion which I've seen for the first time that concerns the

24   patient brokering statute, which I don't believe the witness

25   has testified to on his direct examination.

1     THE COURT:  Can you get in front of a microphone,

2  please.

3     MR. RAFFERTY:  Yes.  There's an aspect of this

4  opinion letter that has to do with the patient brokering

5  statute, which I don't believe was the subject of any testimony

6  on his direct examination.  This testimony, as I understand it,

7  concerns the propriety of the relationship with these rural

8  hospitals.

9     You know, I would object to the admission of that

10  aspect of this letter that addresses the patient brokering

11  statute.  I think it's overly prejudicial to Mr. Durall, a 403

12  analysis.  And I don't think it's really relevant at all to the

13  testimony of this witness.

14     MR. DUVA:  Your Honor, we disagree.  Mr. Porter,

15  through Pinnacle Labs, was paid directly by

16  Campbellton-Graceville and Williston.

17     The date of this letter, which I've seen for the

18  first time just, you know, before the little break here, is

19  November 29th, 2016.

20     There was all kinds of billings to insurance

21  companies through Campbellton-Graceville and Williston before

22  that time, which are both in Florida.

23     And this is a waiver of the attorney/client privilege

24  between Mr. Porter and Mr. Thomas.  And I am not going to say

25  the word "Aaron Durall" one time during this cross and the

1    examination of this letter.

2           THE COURT:  All right.  May I see the letter -- or

3    the portion, Mr. Rafferty, that you're talking about?  Do you

4    have it?

5           MR. RAFFERTY:  I saw it electronically.  Mr. Duva has

6    the paper copy.

7           MR. DUVA:  And, Judge, I'd mark this as Government's

8    69.

9           THE COURT:  All right.

10          MR. SCHWARTZ:  And, Judge, if I may add, this is an

11   antikickback-type opinion that we didn't discuss at all on

12   direct, didn't discuss about kickbacks or anything of that

13   sort, so I don't think it's relevant.  I think it's outside the

14   scope of direct.  For that reason, I don't think it should be

15   able to be gone into.

16          MR. SADOW:  Depending on the Court's ruling, we will

17   ask for a limiting instruction that it only applies to the

18   particular defendant in which it's being -- the admission is

19   being sought.

20          THE COURT:  Now I have to read the nine-page letter?

21   I was not advised when we took a break that there was objection

22   to it.

23          MR. BELL:  Judge, and --

24          THE COURT:  And so --

25          MR. BELL:  -- I would characterize it as 80 percent

1   anti-referral kickback and 10 percent, you know, legitimate

2   cross-examination about what the topic of the direct is, but

3   the letter itself, probably 80 percent of it, is directed to

4   the kickback referral statute.

5          THE COURT:  Well, I understand that, but Mr. Schwartz

6   put Mr. Thomas on the stand and he -- this is a letter that

7   Mr. Thomas has authored to Mr. Porter about apparently matters

8   that are pertinent and maybe there's matters in here that

9   aren't pertinent, but I don't know how I'm going to be able

10  to -- to pick and choose here.

11         And the topic is Pinnacle Laboratory -- the first

12  sentence of the letter, You've asked that I review for

13  compliance purposes the business proposal of d/b/a Pinnacle

14  Laboratory to have Pinnacle market and promote the clinical

15  laboratory toxicology testing services of Putnam County

16  Memorial Hospital in Missouri to independent physicians.

17         It seems to me this is pertinent to the case.

18         And I understand there may be things in here that

19  aren't directly pertinent.  I assume that if they aren't, they

20  won't be gone into.  But I don't -- I don't have a way to

21  restrict cross-examination on the letter just as a -- as an

22  initial matter.  If there's specific questions, I suppose I can

23  get an objection, and I'll rule on it.

24         But I -- I guess the only question I would have,

25  Mr. Duva, is -- is whether an instruction to the jury that this

 1    just relates to Mr. Porter would be appropriate.

 2            MR. DUVA:  We're not asking for that, Judge.  If you

 3    determine that that's the proper way to go, then that's fine.

 4            MR. BELL:  And, Your Honor, I don't want to speak out

 5    of turn for the rest of the group, but my understanding, we

 6    don't really dispute that he can cross-examine him about the

 7    relevant portions of the letter.  I think the complaint was to

 8    admit the letter as an exhibit.  And I don't think there's any

 9    question he can cross-examine him about it.

10            MR. DUVA:  I mean...

11            THE COURT:  I'm just not sure how I -- on what basis

12    I would not admit it.  I mean, it's a letter from -- so

13    Mr. Porter has an advice-of-counsel defense.  He's going to

14    want a jury instruction on it.  He's put up Mr. Thomas as the

15    counsel that he took advice from.  Mr. Thomas has now testified

16    on direct and now a long time on cross about these matters in a

17    general way without any reference particularly to any -- any

18    opinions that he wrote down or any -- any notes he kept or any

19    e-mails he kept.  And now, on November 29th, 2016, Mr. Thomas,

20    at the request of Mr. Porter, according to the letter, has

21    written an opinion letter about matters that seem pertinent to

22    the case that's before us, and certainly pertinent to some of

23    the opinions that Mr. Thomas has already shared.

24            And I don't -- and Mr. Schwartz told me that, of

25    course, the attorney/client privilege is waived with respect to

 1   matters that are pertinent to Mr. Thomas's testimony, so I

 2   don't think we have a privilege issue.

 3           The fact that it may potentially have some collateral

 4   consequence for other defendants, I think, is probably true of

 5   other exhibits in the case, that some of them may, in effect,

 6   bleed over to other -- other parties, but they're in evidence

 7   and the jury can make -- make them -- of what they will.

 8           MR. SADOW:  Well, I -- let the record reflect -- the

 9   Court will rule as it deems appropriate, obviously.  But on

10   behalf of Mr. Fletcher, I am asking for a limiting instruction

11   that this exhibit is being introduced against the Porters

12   are for the purpose of the advice-of-counsel defense.

13           MR. RAFFERTY:  And I would join in that request, Your

14   Honor.

15           THE COURT:  All right.  I think that's right,

16   Mr. Duva.  Because as I'm thinking about it, Mr. Porter -- and

17   I don't know about Mr. Sean Porter.

18           Is Mr. Sean Porter asserting an advice-of-counsel

19   defense as well, Mr. Rowland?

20           MR. ROWLAND:  Yes, Your Honor, through the corporate

21   connection there.

22           THE COURT:  All right.  Is there any other defendant

23   that is asserting advice of counsel?

24      (No response.)

25           THE COURT:  All right.  Well, the only reason this

1    comes in is because of the advice-of-counsel defense.  So I

2    think it is appropriate for me to -- to give a limiting

3    instruction.  And so what I'll do is I'm going to admit the

4    exhibit, but let me think of what I want to say for a minute,

5    and then I'll --

6               MR. RAFFERTY:  Your Honor, can I add one other point

7    here?

8               THE COURT:  Yes, sir.

9               MR. RAFFERTY:  There's a significant portion of this

10   letter which is described as the applicable law, and it's

11   essentially a summary of various statutes and laws.  So in

12   addition to asking for that limiting instruction, I would also

13   ask that the Court state that to the extent that there's law

14   referenced in this document, the Court, Your Honor, is the

15   ultimate source of the law in this case, not this letter or any

16   other exhibit that's being admitted during trial.

17              MR. DUVA:  Your Honor, no.  This is Mr. Thomas's

18   written opinion, which we just learned about through James

19   Porter, and the applicable law part of that is what he's saying

20   to Jim Porter.  There are summation paragraphs that I

21   definitely want to cover with Mr. Thomas.  The Court should not

22   give a limiting instruction on that.

23              MR. RAFFERTY:  Your Honor, I would just add that, you

24   know, if Mr. Thomas's opinion said something different than

25   what the Court ultimately instructs the jury on the law, it is

 1   only going to create confusion.  I understand that Mr. Duva,

 2   based on the Court's ruling, intends on using this exhibit

 3   however he wants to during the course of his cross-examination.

 4   But I think it is proper for the jury to be reminded that

 5   whatever a document might say, that is not the law in this

 6   case.  The law in this case comes from the Court.

 7            MR. DUVA:  The Court makes that instruction generally

 8   in the jury instructions.  I don't see any other reason to do

 9   it, other than at that phase.

10            MR. RAFFERTY:  The reason, Your Honor, is because

11   this particular exhibit purports to state what the law is.

12   Now, this is not like any other exhibit in this case.  It is a

13   letter that says this is what the law is on the Anti-Kickback

14   Statute and other statutes that are referenced throughout this

15   letter.

16            That creates the impression, especially if Mr. Duva

17   is going to use it during his cross, that that is the law,

18   when, in fact, it is not the law.  The law in this case comes

19   from the Court.

20            MR. HAYES:  Your Honor --

21            MR. DUVA:  It's conflating two things, Your Honor.

22            MR. HAYES:  Your Honor, this witness has testified

23   about the law in his answers, so if you are going to give a

24   limiting instruction, we'd like to broaden it to encompass some

25   of his answers.  I mean, one of his direct answers to

1   Mr. Duva's question was 1395, this Roman numeral, this, this.

2   That's all -- I mean, if the Court is inclined to give an

3   instruction, we would like it to say that it's not just what's

4   in this letter, it's also what the witness testified about.

5   That law comes from the Court.

6           MR. RAFFERTY:  And I have no objection to that.

7           MR. DUVA:  Your Honor, Mr. Thomas has also been

8   writing notes throughout, so I'm going to make a *Jencks* demand

9   for -- to get those notes.  He's doing it right now.

10          MR. SADOW:  Whoa, whoa, whoa.  Every time the

11  government -- you ask the government for notes, never get them

12  because their position is it's not a statement.

13          MR. DUVA:  He's writing them down.  He's the witness.

14  I can literally see him --

15          THE COURT:  Okay.  Let's -- talk to me, please.  I --

16  I'm not accustomed -- although I've seen it happen before, that

17  when witnesses make notes during examination it is very -- it's

18  not unusual for the lawyer who's doing the examination to ask

19  to see those notes.

20          I don't find that request unusual.  It doesn't happen

21  very often, because most witnesses don't take notes while

22  they're testifying.  But the ones that do -- or if they bring

23  them up with them, then that also can be the subject of -- of

24  review.  And so I think it's a -- I think it's correct.  I have

25  no idea what Mr. Thomas has been writing, but I think Mr. Duva

1  is entitled to take a look at it.

2      MR. SADOW:  When you're done with them, can we also

3  look at them, please?

4      THE COURT:  Sure.

5      MR. DUVA:  Your notes.

6      THE WITNESS:  Sure.  Can I get them back?

7      MR. DUVA:  Yes.  Tear off that page.

8      THE WITNESS:  Sure.

9      MR. DUVA:  Thank you.  Appreciate it.

10     (Counsel confer.)

11     THE WITNESS:  And, Mr. Duva, I've also taken notes on

12  the legal opinion that you handed me.  Sorry.  I'm not much of

13  a witness.  I'm a trial attorney.  I take notes.

14     MR. DUVA:  Okay.

15     THE WITNESS:  You can look at this as well.

16     THE COURT:  And, Mr. Thomas, did you tell me you also

17  represented Sean Porter?

18     THE WITNESS:  I represent Pinnacle Laboratory

19  Services and I represent Hospital Lab Partners.  I don't

20  necessarily represent either Mr. Porter -- Mr. Sean Porter or

21  Mr. Jim Porter personally, but I -- I would offer that I think

22  I represent Sean Porter indirectly through my representation of

23  the two companies.

24     MR. ROWLAND:  I probably could have said that a

25  little bit clearer than I did, Judge.  I apologize.

 1          THE COURT:  Well, I just was trying to draft the

 2    instruction here.

 3          All right.  Here's the instruction I'm contemplating.

 4    I am admitting Government's Exhibit 69, which is a letter

 5    expressing Mr. Thomas's legal opinions as it bears only on the

 6    case involving Mr. Thomas's clients, James S. Porter, Jr., and

 7    Sean Porter, and not as to any other defendant.

 8          MR. DUVA:  Your Honor, could we say James S. Porter,

 9    Jr., and Pinnacle Labs?  I don't think until now anyone has

10    said that Mr. Thomas was representing Sean Porter.

11          THE COURT:  All right.  I'll take that out, because I

12    wasn't sure about that.  I think what I want to say is it bears

13    only on the case involving James S. Porter, Jr., and Sean

14    Porter.  I don't -- we don't have to have "client" in there.

15          That's -- the important point -- the one that

16    Mr. Rafferty and others asked me to do was to make sure that

17    it's not being admitted as to any other defendant because

18    they're not raising the advice-of-counsel defense.

19          So I'm going to read this again.

20          I'm admitting Government's 69, which is a letter

21    expressing Mr. Thomas's legal opinions, comma, as it bears only

22    on the case involving James S. Porter, Jr., and Sean Porter,

23    and not as to any other defendant.

24          Does anybody wish to be heard further?

25          MR. RAFFERTY:  I would just renew my request that the

1   instruction include some reference to the fact that to the

2   extent that there are statements of the law contained in the

3   exhibit, that those are only the opinions of this witness, and

4   the ultimate law in this case would be provided by the Court at

5   the conclusion of the case.

6          THE COURT:  Okay.  You know, I think that Mr. Thomas,

7   in his testimony, already has told -- told what he thinks the

8   law is.  It seems to me that he is entitled to do that as a

9   lawyer, and he's asked questions that require him to do that.

10          I think by saying "which is a letter expressing

11  Mr. Thomas's legal opinion," I think I am covering that, and

12  I'm not inclined to give a further instruction on that.

13          So I -- so to that extent, Mr. Rafferty, I guess

14  I'm -- I'm overruling your objection.

15          Does anybody want to be heard further on the

16  instruction?

17     (No response.)

18          THE COURT:  All right.  We ready to go?

19          MR. SADOW:  Your Honor, I'm -- with the Court's

20  permission, since we only have one copy of the notes, is it

21  okay if I take a picture of the notes so I have my own?

22          THE COURT:  Yes, sir.

23          All right.

24     (Counsel confer.)

25          MR. DUVA:  I think Mr. Thomas was -- I think the

1    note-taking continues.  I think he's written some notes on the

2    letter as he testifies.

3            THE COURT:  I don't know, Mr. Duva.

4            MR. DUVA:  Okay.  Is there another copy of this

5    floating around?

6        (Counsel confer.)

7            MR. DUVA:  I'm going to give this back to Mr. Thomas

8    and I do want to use this at some point.

9            THE COURT:  Okay.  That's fine.

10           MR. DUVA:  He can take notes as much as he wants.

11   I'm not trying to be difficult.  Maybe he should stop.

12           THE COURT:  Okay.  All right.

13           THE WITNESS:  I'll take that under advisement.

14           THE COURT:  All right.  Are we ready?

15           MR. SADOW:  Yes, sir.

16           THE COURT:  All right.  Let's have the jury, please.

17           COURT SECURITY OFFICER:  All rise for the jury.

18           MR. DUVA:  Your Honor, do you have the original?

19           THE COURT:  Yes, I do.  You can have it back.

20           MR. ROWLAND:  And, Your Honor, I'm not sure if you

21   moved our exhibit into evidence on the record.

22           THE COURT:  I'm not sure.

23           MR. BELL:  No, he can do it after.

24           THE COURT:  I'll do it afterwards, yeah.

25           MR. ROWLAND:  Okay.

1          THE COURT:  Just remind me.

2       (Jury enters, 2:34 p.m.)

3          COURT SECURITY OFFICER:  Please be seated.

4          THE COURT:  Well, I apologize, ladies and gentlemen,

5    for the delay.  We did have a matter that we needed to discuss

6    and it just took longer than I thought it would.

7          So the good news for you today, though, is that

8    Mr. Thomas, who's on the stand now, will be our last witness

9    today, so that when we finish with Mr. Thomas, we'll be done

10   for the day.

11         So that may make up a little bit for the time that --

12   that we had you sitting back there, but we'll see how long that

13   plays out.

14         So you recall that Mr. Duva was cross-examining

15   Mr. Thomas.

16         And you may proceed.

17         MR. DUVA:  Thank you, Your Honor.

18   BY MR. DUVA:

19   Q.   Good afternoon, Mr. Thomas.

20   A.   Good to see you.

21   Q.   Do you have in front of you what's been marked -- make

22   sure it's the same so that you're satisfied -- Government's 69?

23   A.   I do.

24   Q.   Okay.  Mr. Thomas, this is a letter that you wrote to Jim

25   Porter as president for Pinnacle Labs on November 29th of 2016?

1   A.   It is.  And for the record, this is a very typical way

2   that I would communicate with all of my clients, and Mr. Porter

3   in particular.  I didn't put a lot of substantive things in

4   e-mails.  I would generate a legal opinion so it's formal.

5   Q.   And before lunch you weren't really clear if there was any

6   legal opinion in writing to Mr. Porter, correct?

7   A.   I didn't particularly remember one, but now that I see

8   this, this is definitely my work.

9   Q.   And you're aware that the government just received this?

10  A.   That's my understanding.

11  Q.   Like, 20, 30 minutes ago?

12  A.   That's my understanding.

13  Q.   Okay.  So I apologize.  I'm going to have to just kind of

14  go through it the best I can.

15         MR. DUVA:  Your Honor, the government seeks to move

16  in Government's Exhibit 69.

17         THE COURT:  All right.  Government's 69 will be

18  admitted.

19     (Government's Exhibit 69 received into evidence.)

20         THE COURT:  And, ladies and gentlemen, let me give

21  you an instruction on this exhibit that Mr. Duva is just

22  talking about.

23         I am admitting this exhibit, Government Exhibit 69,

24  which is a letter expressing Mr. Thomas's legal opinions as it

25  bears only on the case involving James S. Porter, Jr., and Sean

1   Porter, and not as to any other defendant.

2           All right?  Mr. Duva, you may proceed.

3           MR. DUVA:  Thank you, Your Honor.

4           If we can have the ELMO.

5   BY MR. DUVA:

6   Q.   Okay.  Mr. Thomas, this is the letter, correct?

7   A.   That's correct.

8   Q.   And it's November 29, 2016, to Jim Porter?

9   A.   That's correct.

10  Q.   Now, were you aware that in terms of some backdated

11  billings, that there were billings to Putnam County Memorial

12  Hospital as far back as June of 2016?

13  A.   Oh, I have no idea.

14  Q.   Didn't see any of those claims?

15  A.   No.

16  Q.   But they're available as of the date you wrote this

17  letter, correct?

18  A.   If there were claims from -- prior to November 29, 2016,

19  then, yes.

20  Q.   And, really, all the way up through the date of the

21  letter, November 29, 2016, if those claims existed to insurance

22  companies?

23  A.   Certainly if any claims were generated prior to November

24  29, 2016, they would have existed prior to November 29, 2016.

25  Q.   Did Mr. Porter show you any of those?

1  A.    No.

2  Q.    Okay.  Can you go ahead and read the first paragraph of

3  the letter, sir?

4  A.    You have asked that I review for compliance purposes the

5  business proposal of RAJ Enterprise of Central Florida, LLC,

6  d/b/a Pinnacle Laboratory Services (Pinnacle), a Florida

7  clinical reference laboratory, to have Pinnacle market and

8  promote the clinical laboratory toxicology testing services of

9  Putnam County Memorial Hospital (PCMH) in Missouri to

10  independent physicians.

11  Q.    So this is for Pinnacle to promote the testing services of

12  Putnam County Memorial Hospital to independent physicians?

13  A.    That was my understanding of the request for the legal

14  opinion.

15  Q.    And this is the toxicology testing services of the

16  hospital, just to be clear?

17  A.    Correct.

18  Q.    Okay.  Are you aware that at this time the hospital

19  couldn't do any testing whatsoever?

20  A.    I have no idea.

21  Q.    Are you aware that that continued up to February 10th of

22  2017?

23  A.    I don't know.

24  Q.    Mr. Porter didn't tell you that?

25  A.    No.

1   Q.   Okay.  Let's go to the next paragraph.  It says,

2   Specifically, PCMH -- which is the hospital, right?

3   A.   Correct.

4   Q.   -- will reimburse Pinnacle a percentage of net

5   compensation, or per-test compensation, for Pinnacle's

6   marketing and promotional activities.  The arrangement will be

7   limited to commercial third-party payers, and will not include

8   any Medicare, Medicaid, or TRICARE work, correct?

9   A.   That's correct.

10  Q.   Okay.  This -- so we're talking entirely commercial payers

11  in this letter, right?

12  A.   That was certainly my assumption when I drafted this

13  opinion.

14  Q.   And then it says in paragraph 3, Most importantly,

15  Pinnacle will be merely educating physicians as to the benefits

16  of PCMH, and Pinnacle in no manner will be in a position to

17  refer any patients or patient specimens to PCMH.

18          Do you see that?

19  A.   Yes.

20  Q.   It says, i.e., the specimens will be collected at the

21  physicians' offices and sent directly to PCMH for testing.

22          Do you see that?

23  A.   Yes, that's correct.  In other words, this is the exact

24  opposite of what we were talking about this morning.  This is

25  not an under arrangements testing arrangement.  This is an

1  in-hospital testing arrangement.

2  Q.   This is your written advice, right?

3  A.   Yes.

4  Q.   You don't have any written advice about what you were

5  talking about this morning, do you?

6  A.   Oh, I don't know.  I'd have to look.  I may have an

7  opinion that reflects the under arrangements contracts.  I

8  don't know.

9  Q.   What we're talking about is physicians having -- we're

10  talking about is patients or physician specimens going to

11  Putnam?

12  A.   Correct.

13  Q.   And what I'm getting at is if Putnam didn't have a lab at

14  the hospital, a toxicology lab that could do qualitative

15  testing or confirmatory testing, why would a physician, as you

16  say in your letter, send the specimen to Putnam?

17  A.   I think by definition if Putnam did not have the equipment

18  that they needed to do confirmations, it's called an LC-MS

19  machine, clearly the hospital couldn't have done LC-MS

20  confirmatory testing.

21  Q.   And are you aware that for several months, all the way

22  until after February of 2017, that Putnam could not do LC-MS

23  testing?

24  A.   I have no idea what the equipment inventory was at Putnam

25  at any point.

1  Q.    I mean, that's kind of an important fact for Mr. Porter to

2  tell you for you to put this opinion together; is it not?

3  A.    I can't say, Mr. Duva.

4  Q.    And it also says the physician would have to know,

5  basically, right, about -- or have a connection to -- that's

6  that language -- with the hospital?

7  A.    The physician or some representative for the physician,

8  yes.  I mean, clearly, someone's got to know to ship the

9  specimen to the hospital.

10  Q.    And so in the hypothetical I was giving earlier, where the

11  physician doesn't have any clue that this hospital exists or

12  have any relationship with Putnam, or be a Putnam service area

13  doctor, or anything like that, how could the physician know to

14  send the specimen to Putnam?

15  A.    Well, the -- and that's sort of the typical arrangement

16  where you've got an entity such as Lab Health Partners -- it's

17  a business process operation or a management services

18  organization.  I mean, doctors' offices don't know that --

19  often don't know that much about laboratory operations, so they

20  need assistance.  I have no idea whether HLP was involved in

21  this arrangement or not.  But, clearly, I mean, to get a -- a

22  specimen for testing over to Putnam Hospital, somebody had to

23  get the specimen to Putnam Hospital.

24  Q.    And it says, i.e., comma, the specimens will be

25  collected -- right here?

1  A.    Right.

2  Q.    -- at the physicians' offices and sent directly to PCMH --

3  for what?  What does that say?

4  A.    For testing, correct.

5  Q.    For testing?

6  A.    Yes.

7  Q.    So I am no health care lawyer, sir, but it seems to me

8  that Putnam would then have to have some capacity for testing

9  if a physician -- let me change the hypo.  If the physician

10  knows about Putnam, I mean, there would have to be some

11  capacity for testing at Putnam, would there not?

12  A.    The short answer is yes.  The -- I mean, again --

13  Q.    Is there a long answer for that one, sir?

14  A.    Well, I mean, I'm getting down to pure guessing.  I guess

15  Putnam could have re-referred out with another under

16  arrangements setup, but, obviously --

17  Q.    Did you write about that?

18  A.    No.

19  Q.    Because he didn't ask you, did he?  Did he, Mr. Thomas?

20  A.    I wrote this opinion in -- November 29, 2016.  I don't

21  have independent knowledge.  I definitely did this work.

22  Clearly, the question was, can Pinnacle be a marketer for the

23  hospital, and the answer is yes.

24  Q.    Pinnacle is a lab?

25  A.    Yes.

1  Q.    Okay.  And, in reality, the specimens are going directly

2  to Pinnacle Labs.  Did Mr. Porter tell you that?

3  A.    I have no knowledge of that.

4  Q.    From physicians and sober homes and recovery centers that

5  have no clue what Putnam is?

6  A.    (Shakes head negatively).  I don't know.

7  Q.    You're shaking your head no?

8  A.    I don't know.

9  Q.    Is that because you didn't talk about it with Mr. Porter?

10  A.    I don't remember talking about that with Mr. Porter, no.

11  I think -- I do recall talking about marketing.

12  Q.    Let me go to the introduction on page 2, sir.

13          The first paragraph of the introduction -- let me

14  back up.  Sorry.  I'll cover this top paragraph quickly.

15          You write, Note that PCMH, which is Putnam, is

16  regulated under Missouri law, thus Missouri law may be

17  implicated under this arrangement.  I'm not licensed to

18  practice law in Missouri, and I've not addressed any

19  implications of Missouri law in this opinion.  In the event

20  there is any question as to PCMH's compliance with Missouri

21  law, I recommend that Pinnacle retain independent legal counsel

22  in Missouri to render advice as to compliance of this

23  arrangement with Missouri state law.

24  A.    Correct.

25  Q.    So you're just saying, I'm a Florida lawyer, I'm not a

1  Missouri lawyer.  If you need help on Missouri law, go ask

2  somebody else?

3  A.    Yes.  I definitely did do some reviews of Missouri law,

4  but not in relation to this opinion.

5  Q.    Let's go to the introduction.  It says, It is my

6  understanding that, 1, Pinnacle will market and promote PCMH's

7  toxicology testing to independent physicians who may order such

8  testing for their patients.

9         Do you see that?

10 A.    Correct.

11 Q.    So that is part of the hypothetical that Mr. Porter

12 provided to you, Jim Porter?

13 A.    Correct.

14 Q.    Did you talk to Sean Porter about this at all?

15 A.    Not to my recollection.

16 Q.    I mean, the letter is to Jim, isn't it?

17 A.    Yes.

18 Q.    Here?

19 A.    Yes.

20 Q.    Number 2, PCMH will provide toxicology testing for the

21 physicians' patient specimens?

22 A.    Correct.

23 Q.    Now, sir, the only way to read that is that Putnam will

24 actually test the sample, correct?

25 A.    I think it's fair to say that is what I was thinking when

1    I wrote that subsection 2.  Again, the model would be the same

2    if -- if the hospital re-referred out under arrangements.  But

3    that's not in the opinion.

4    Q.    Right.  It's not?

5    A.    Correct.

6    Q.    Number 3, PCMH will send clinical test report results to

7    the physicians?

8    A.    Correct.

9    Q.    That's Putnam doing that, right?

10   A.    Correct.

11   Q.    Not Pinnacle?

12   A.    Right.  If the concept was that the hospital would be

13   doing the testing, then only the hospital would have results to

14   report.

15   Q.    That was the concept.  That's what you wrote, sir, right?

16   A.    Yes.

17   Q.    Okay.  So don't say if it was.  I mean, it is the concept,

18   isn't it?

19   A.    Again, whoever does the testing reports the results.  The

20   assumption in the letter clearly is that the hospital does the

21   testing, so it's the hospital that would report the results.

22   Q.    Number 4, PCMH will bill and collect from commercial

23   third-party payers for the testing.

24          Do you see that?

25   A.    Correct.

1  Q.    That's for the testing that Putnam does, right?

2  A.    Correct.

3  Q.    And it says and -- I'll just say Putnam for PCMH, if

4  that's okay?

5  A.    Sure.

6  Q.    Because that's how it's defined.

7           Putnam will reimburse Pinnacle for its services based

8  upon productivity.

9  A.    Correct.

10  Q.    Let's go down to -- it is the last paragraph of this

11  section.  It says, It is my understanding that Putnam will

12  accession, test, and bill based upon patient specimens without

13  the patients presenting to the hospital, correct?

14  A.    Correct.  And that's a -- I think a very clear statement

15  that reflects on everything else.

16  Q.    Mr. Thomas, we might have finally agreed on something.  I

17  agree with that.

18           And so what that means is not just accessioning,

19  right?  Putnam will accession, test, and bill, correct?

20  A.    Yes.

21  Q.    And during this timeframe, where Putnam has no lab, it

22  can't do testing, period, can it?

23  A.    Again, the -- the only method by which specimens could be

24  tested once Pinnacle as a marketer got the specimens to Putnam

25  would be for Putnam to refer it back out again to another

1  clinical laboratory.

2  Q.   That's not what you said earlier, sir.  You said that in

3  this letter -- this is about the physicians sending specimens

4  to the hospital.

5  A.   I'm sorry.  You're right.  I misspoke.

6         The physicians' offices sending the specimens to

7  Putnam.  The only way that the tests could be tested if there

8  was not an LC-MS machine at the hospital would be for Putnam to

9  refer the specimens out to another lab that did have an LC-MS

10 machine.

11 Q.   The rest of that paragraph, it says, This form of

12 arrangement is typically referred to as testing for a hospital

13 "nonpatient," meaning while the patient specimen is tested at

14 PCMH, the patient is neither an inpatient nor an outpatient,

15 and the claim is a bill as a type of code -- I'm sorry, the

16 claim is billed as a "Type of Bill 14X" claim.

17        Do you see that?

18 A.   Yes.

19 Q.   So the 141 code means -- let's try to clear up a little

20 bit from earlier, if we can -- the specimen goes to the rural

21 hospital, right?  The nonpatient specimen.

22 A.   As I'd stated earlier, this is the opposite arrangement of

23 what we have been talking about this morning where the specimen

24 doesn't necessarily go to the hospital.  Here the specimen does

25 go to the hospital.  But a 141 test is -- is site neutral.  The

1  claims manual states that.  But clearly here --

2  Q.   I'm not talking about the claims manual, sir.  We're

3  talking about private payer insurance.

4           MR. SADOW:  Your Honor -- excuse me.  Excuse me.  I'd

5  like to have the witness be able to finish his answer.  It's

6  the only thing I'm asking in connection with this.  And I

7  thought we had come to an understanding on it.

8           THE COURT:  Okay.  All right.  Mr. Sadow.  Thank you.

9           MR. DUVA:  Your Honor, what I'm getting at is this

10 is --

11          MR. SADOW:  Your Honor, I object to what he's getting

12 at.  He asked a question and he had an answer, and he didn't

13 allow the witness to finish.

14          THE COURT:  All right.  Mr. Duva, just hold on a

15 second.

16          Mr. Thomas, what's the rest of your answer?

17          THE WITNESS:  The rest of my answer is a 141

18 nonpatient, the specimen can be on site at the hospital or not.

19          THE COURT:  All right.  Mr. Duva, what's your next

20 question?

21 BY MR. DUVA:

22 Q.   This letter is about private payers, correct?

23 A.   Right.

24 Q.   I'm not asking you about Medicare, correct?  Do you

25 understand that?

1  A.   The assumptions of this legal opinion were that it

2  excluded Medicaid, Medicare, and TRICARE tests.

3  Q.   On page -- bottom of page 2, there's a -- there's a

4  reference to anti-kickback and anti-patient brokering/anti-fee

5  splitting and Florida law.

6       Do you see that?

7  A.   Yes.

8  Q.   Now, it says Florida law.  It doesn't say Missouri law,

9  does it?  This is a Florida statute that we're going to look

10 at?

11 A.   That's correct.  I don't know if you want me to go into

12 any detail as to why I did that.

13 Q.   Well, I think we --

14 A.   I don't want to presuppose.

15 Q.   I think you might have already said that in the letter on

16 page 2 at the top, about this is -- essentially, I'm

17 paraphrasing, so correct me if I'm wrong.  This -- you're not a

18 Missouri lawyer and you're sort of referring Mr. Porter to a

19 Missouri lawyer if he has questions about Missouri law.

20 A.   Right.  The only reason I was citing Florida law is that

21 Pinnacle is a Florida company.

22 Q.   Okay.  And this is similar to other letters you have

23 written on this topic about the kickback statute, correct?

24 A.   Yes.

25 Q.   A cut-and-paste job at this point?

1  A.   I wouldn't say that.  I would say that I do a lot of

2  kickback and self-referral work.

3  Q.   I'm handing you a document that's not marked, but it's

4  redacted and it looks somewhat similar to the letter, and

5  specifically looking at the Florida kickback statute.  If you

6  want to just kind of keep that side by side.  Okay.

7          Okay.  Mr. Thomas, this -- this kickback statute

8  you're citing -- I mean, this is actually text from the Florida

9  Anti-Kickback Statute, correct?

10 A.   The section regarding the Florida Anti-Kickback Statute,

11 correct, are just simply pulled right out of the Florida law.

12 Q.   And that applies to government insurance and private

13 payers, does it not?

14 A.   That's true.

15 Q.   So that provision under the statute there starts with,

16 Further -- which says, Further, Florida law prohibits the

17 "brokering" of patients or the "splitting" of any professional

18 fee in exchange for the referral of a patient for the provision

19 of any good or service.

20          And then you have a footnote to the statute; is that

21 correct?

22 A.   Correct.

23 Q.   And then two paragraphs later, it says, It is important to

24 note that the Florida Anti-Kickback law is applicable as to any

25 payer, so a prohibited arrangement would be illegal, regardless

1  of whether the payer is a government entity or not?

2  A.    Correct.

3  Q.    So that would apply if a marketer went to a recovery

4  center to harvest samples to send to a lab and paid the

5  recovery center money --

6           MR. BELL:  I'm sorry.  I'm going to object to the --

7           THE COURT:  Hold on.

8           MR. BELL:  Objection to 403 and 404.  And objection

9  to this line of questioning.

10          THE COURT:  Hold on a second.

11          Overruled.

12 BY MR. DUVA:

13 Q.    Do you want me to ask again, Mr. Thomas?

14 A.    Would you, please?

15 Q.    Sure.  So if a -- let's just give an example of a recovery

16 center in South Florida.  If there was a marketer that went to

17 that recovery center and said, Okay, I know you're testing --

18 you know, I know you have people pee in a cup two or three

19 times a week, whatever --

20          THE COURT:  Let me see counsel at sidebar a minute,

21 please.

22     (Sidebar conference:)

23          THE COURT:  So, Mr. Duva, I understand you've got the

24 letter and I think it's fair game on cross-examination.  I just

25 want to make sure that -- that we're not -- I want to make sure

1  that your cross-examination is not asking the witness about

2  potential crimes that are not part of the case that we're

3  trying here.  Because I think that could be problematic.  And

4  I'm just trying to make sure that that's not what's happening.

5        MR. DUVA:  I'm not going to name names, but this goes

6  back to the alleged conversation that Mr. Marcotte had with

7  Mr. Durall and Ms. Zaffuto, and his sort of light-bulb moment

8  that there's something problematic about this.  So I'm just

9  asking him, sanitized, without -- I'm not going to say Reliance

10  Labs, not going to say Aaron Durall, not going to say Neisha

11  Zaffuto -- not going to say any of that.  What does this

12  statute -- I can just ask him that.  What does this mean?  What

13  conduct does this make illegal?

14        MR. RAFFERTY:  I'm just going to renew my objection.

15  I'm going to renew my objection to the admissibility of the

16  letter, to this line of inquiry, and given the prejudice to

17  Mr. Durall, I'm moving for a mistrial at this time.

18        MR. SADOW:  And Your Honor has granted a limiting

19  instruction.  What's being done now is setting up a potential

20  for an argument before this jury in which the contents of an

21  exhibit admitted against only two parties is argued to somehow

22  involve or in some way should be considered by the jury against

23  other parties that it has not been admitted against.

24        MR. RAFFERTY:  And that's the clear implication of

25  this line of questioning, Your Honor, as it relates to

1  Mr. Marcotte, who never mentioned anything to do with any

2  patient brokering statute.

3          There has been no reference to this.  I raised this

4  before trial.  I objected to it.  I objected to the any

5  reference to it.  And I think this is going way beyond what the

6  Court intended when it allowed him to question this witness

7  about this.  It is immensely prejudicial to Mr. Durall.  And I

8  move for a mistrial.

9          MR. LOWTHER:  And I understand the objection and what

10  the objection involved, but I adopt that objection and

11  Mr. Rafferty's proposal for a mistrial as it relates to

12  Ms. Zaffuto.

13          MR. SCHWARTZ:  And if I can add, Judge, there's no

14  obligation --

15          THE COURT:  Step back, please.

16      (The following proceedings occurred in open court, in the

17  presence of the jury:)

18          THE COURT:  Ladies and gentlemen, we need to talk

19  about something and it's going to take more than a couple of

20  minutes.  So I know you haven't been out here that long, but go

21  ahead and -- I think it will be probably about ten minutes or

22  so.  So you can be on break and we'll get you back out here.

23          Thank you, ladies and gentlemen.

24      (Jury exits, 2:58 p.m.)

25          THE COURT:  All right.  Can I see the exhibit,

1   please?

2          MR. DUVA:  Your Honor, the Court is willing -- I can

3   go light on this and say what are you advising Mr. Porter about

4   here.

5          THE COURT:  Let me just take a look.

6          MR. BELL:  Judge, just one brief comment as the Court

7   looks at this.

8          THE COURT:  Yeah.

9          MR. BELL:  There are a number of exhibits in here

10  that minimal reference has been made.  And it may have some

11  collateral consequences.  But in the overall weight of the

12  evidence -- but then the focus of these questions on this

13  portion of the letter is not only -- is 403, but I would

14  suggest, as Mr. Rafferty did -- but really 404 evidence as

15  well.

16         THE COURT:  404?

17         MR. BELL:  Well, the -- that one or more of these

18  individuals have committed other crimes, violating the

19  Anti-Kickback Statute.

20         THE COURT:  So, Mr. Duva, I'm trying to understand --

21  so what this letter is here -- and I -- I admitted it and I

22  thought it was appropriate to admit it, because, again,

23  Mr. Porter called Mr. Thomas on an advice-of-counsel defense.

24  He opined about oral opinions he had given to Mr. Porter about

25  the matters at issue.  This turned out to be a written opinion

1  that he apparently had forgotten about.

2      I -- I might have thought that he would have reviewed

3  it before he came in to testify in court today, but apparently

4  he didn't.  And so when I see the subject matter, it seemed to

5  me to be a perfectly pertinent letter that is the perfectly

6  pertinent subject of cross-examination.

7      But as many legal letters do, opinion letters, it

8  talks about a number of different statutes only -- only to then

9  kind of say it doesn't apply or it -- it only applies in

10  certain situations.  It's not clear to me that -- it's not

11  clear in reading the letter that he -- that it's really much

12  more than some kind of canned recitation of various laws that

13  may or may not bear on these issues.

14      I'm a little concerned about having you cross-examine

15  Mr. Thomas on things that aren't part of the charge in the case

16  specifically, although I understand it's certainly in the

17  neighborhood, and I'm just -- I just want to make sure that we

18  don't go down a trail here that -- that is going to be

19  problematic.  I don't think it's happened yet.  The motion for

20  a mistrial is due to be denied.

21      MR. RAFFERTY:  If I can add to the record on that,

22  Your Honor?

23      THE COURT:  Yes, sir.

24      MR. RAFFERTY:  With respect to that line of inquiry

25  that Mr. Duva is going down right now, the only individual at

1  trial that that would have any application to is my client, so

2  that -- whether or not he mentioned my client's name or not,

3  the clear implication from the line of inquiry from Mr. Duva is

4  to suggest to the jury that there was something improper about

5  Mr. Durall's relationship with Kyle Marcotte, which they stated

6  up here on the record.

7        That has absolutely nothing to do with this witness's

8  testimony.  It's clearly done to prejudice Mr. Durall and it is

9  done to exploit the Court's ruling to allow the admission of

10 this document, which I respectfully submit should never have

11 been brought into evidence.

12       It is immensely prejudicial to Mr. Durall.  I

13 objected to the government saying the word "kickback" or the

14 reference to this statute in the opening statement.  The Court

15 has yet to rule on that, and -- but did prevent the government

16 from saying anything about kickbacks in its opening statement.

17       And now, at the eleventh hour, the government,

18 through a witness whose advice-of-counsel defense for somebody

19 completely unrelated to Mr. Durall -- they're going to start

20 positing hypotheticals about things that go right to

21 Mr. Durall?

22       There's no unringing that bell.  I would respectfully

23 move for a mistrial.  And I ask in the alternative that the

24 Court reconsider its ruling, prevent Mr. Duva from asking any

25 more inquiries about this particular statute.

1        And to the extent the Court intends on letting the

2    jury see this document, that any reference to the patient

3    brokering statute, the Anti-Kickback Statute, or any other

4    statute in that document be redacted.

5        MR. SADOW:  Your Honor, if I might add to that.  I

6    think it's important -- I know the Court is considering this.

7    The exact questions that were asked were in reference to sober

8    homes or treatment centers, things that clearly there is not a

9    shred of evidence in this record that has anything to do with

10   Pinnacle in connection with that.

11       As Mr. -- sorry -- Mr. Rafferty said, it only affects

12   Mr. Durall.  But by affecting Mr. Durall, it affects all of us,

13   because we're in an alleged conspiracy.

14       So what I'm asking the Court to do, at least as to

15   Mr. Fletcher, is to strike from the record all questions that

16   have dealt whatsoever with this area of inquiry, tell the jury

17   to ignore.

18       I don't want a mistrial for Mr. Fletcher, but I do

19   move to strike all those questions.  And I think if the court

20   reporter -- not that I'm asking you to do so, but if you had it

21   read back, you'd see that there's no way it's being connected

22   to Pinnacle or the advice of counsel.  It was directed

23   specifically as to Mr. Durall.

24       THE COURT:  Anybody else?

25       (No response.)

1          THE COURT:  All right.  Mr. Duva.

2          MR. DUVA:  This is in the letter, Your Honor.  This

3   is the advice that Mr. Thomas gave to Mr. Porter.  This is the

4   letter that was consciously not put into evidence by

5   Mr. Schwartz on direct.  It came to us in very odd

6   circumstances.  I am entitled to ask if this is part of the

7   advice that Mr. Thomas gave to Mr. Porter.

8          I'm also I think entitled to ask why do we just get

9   this now, about an hour ago, and why and if Mr. Thomas covered

10  this with Mr. Schwartz yesterday, because the Court just said

11  he doesn't think so.  I beg to differ, Your Honor.  I think

12  they covered this.

13         MR. SCHWARTZ:  I've had --

14         MR. SADOW:  That's outrageous to make an allegation

15  without any benefit of facts at all.  That's just not the way

16  things are done.  It may be how you do it, but that's not --

17         THE COURT:  That's enough.  We're not talking to each

18  other.  You're talking to me.  And, everybody, lower the

19  temperature.  I -- I'm not -- I'm not going to have anything

20  otherwise.

21         MR. DUVA:  Your Honor, may I briefly respond to that?

22         MR. SCHWARTZ:  May I respond, Judge?

23         THE COURT:  Hold on, Mr. Duva.

24         Mr. Sadow, what were you saying?

25         MR. SADOW:  Your Honor, allegations like that without

1   a factual basis --

2            THE COURT:  I'm not sure what the allegation is.

3            MR. SADOW:  The allegation is that in some form or

4   fashion, with all due respect, as I heard it, that my

5   co-counsel in some way with the witness has gotten together and

6   attempted to conceal this information.  And that is outrageous

7   to me without any basis in fact whatsoever.  If I did that to

8   government counsel, if I did that, I would expect that they

9   would be so outraged that I'd wind up having to deal with it in

10  another forum.

11           MR. DUVA:  Mr. Sadow has asked probably 30 witnesses

12  in this trial if they were shown something.  So for him to jump

13  up and down like that is disingenuous, it makes no sense, and

14  what I get to ask Mr. Thomas, I think, is, did you go over this

15  letter with Mr. Schwartz when you met with him before trial?

16  Mr. Sadow, how many people has he asked that?  I said 30.  It's

17  probably less.  But it is many, many people.

18           MR. SCHWARTZ:  If I can respond, Judge?  I don't have

19  a problem if he asks Mr. Thomas if we went over it, because we

20  didn't.  I did produce this stuff, or at least tried to.  I

21  don't know if they got it or not, just like my e-mail that I

22  sent today in front of Mr. Winters, and it went to Mr. Winters,

23  but didn't get it somehow.  I did produce it.  It was buttoned

24  up on April 26th.

25           THE COURT:  I know.  You've gone through all that.

1       MR. SCHWARTZ:  This is the second time, Judge, that

2  he's called me a liar.  That's exactly what he has done.  And I

3  did not review this with Mr. Thomas.

4       THE COURT:  All right.  I'm in recess.

5       COURT SECURITY OFFICER:  All rise.

6       (Recess from 3:08 p.m. to 3:25 p.m.; all parties present.)

7       COURT SECURITY OFFICER:  All rise.  This Honorable

8  Court is now in session.

9       THE COURT:  Y'all can have a seat.

10      All right.  I'll address at a later time, as

11  necessary, the unprofessional conduct that I witnessed just a

12  few minutes ago, because it's my purpose to progress with the

13  trial, not to -- not to stop and deal with that.

14      So here's -- I have now had a full opportunity to

15  review Exhibit 69 and -- and it seems to me that -- a couple of

16  things.  It's regrettable that the government just got it.  I

17  don't know why that's so, and I am not going to delve into that

18  at the moment.  I'm not sure what happened there, but I think

19  that has been part of the issue.  And I also think that it's --

20  I would have thought that Mr. Thomas, if -- on his direct

21  examination, if he had done an opinion letter for Mr. Porter in

22  this -- involving matters relevant to this case, I would have

23  thought it would have come up on direct, but it didn't.  I

24  suppose that was Mr. Schwartz's choice.

25      I'm surprised that Mr. Thomas, as a lawyer who's

coming in to testify in a federal criminal trial, would not

have reviewed his file before he came in, apparently.  So --

all those things surprise me.

But we have to -- we have to deal with what -- where

we are.  The government has Exhibit 69.  I have admitted it and

I did so because I felt as though, since Mr. Thomas has been

permitted to offer testimony about oral advice he gave to

Pinnacle and, by implication, Mr. Jim Porter and Mr. Sean

Porter, about matters that are germane to this case that if he

also gave a written opinion that it would -- it was fair enough

that the government be permitted to cross-examine and to admit

that opinion letter, to the extent that it provided relevant

information.

As I am -- as I have reviewed the letter now, and as

I have heard the questioning that the government is getting

ready to go into, I do have a concern that if -- if the letter

is -- is gone through carefully by Mr. Duva on

cross-examination, that there's an awful lot of statements of

law and quotations from statutes that are matters that are not

charged in this case.

I recognize, as I read the letter, that you could --

you could pick a few sentences out of some of that and probably

make it germane to this case, but I don't think that --

reviewing this letter and using that as a basis for

hypotheticals, which bring us back to this case based upon

 1   statutes that are not directly at issue in this case, I think

 2   that runs the risk of being overly prejudicial.  And so I'm --

 3   I just am not comfortable allowing that to happen.

 4           It's a close call, because I do think the government

 5   should have the opportunity to cross-examine Mr. Thomas on --

 6   on his letter, but I'm concerned about the citation to these

 7   laws that are not the same laws that are actually at issue in

 8   this case and the -- and the concern for jury confusion.

 9           I don't think any of that has happened yet.  I

10   think -- I looked back at the transcript and we just started

11   getting into this.  I'm going to instruct the jury that the

12   references to the kickback statute -- they should disregard

13   that at this time, and then we're going to go on.

14           It does seem to me -- and I'll figure out later

15   whether to redact this exhibit or not.  It does seem to me that

16   the -- and Mr. Duva has already done this and made -- made

17   some, I suppose, points off of it.

18           It does seem to me that the first two pages of the

19   letter, that is, the -- the letter -- the beginning of it, the

20   introduction, where Mr. Thomas states what his mission is in

21   the letter -- and then if you skip past the applicable law,

22   which is the part, I think, that could be problematic,

23   questioning on that and the analysis of the law, there is a

24   summary section on the back of the -- of the letter.

25           And the first sentence refers to the anti-kickback

1  and anti-self-referral laws.  I think we'll omit any reference

2  to that.  But then there's four or five other paragraphs that

3  potentially do have some bearing on this case, and I think

4  could be the proper subject of cross-examination.

5        And so I'm going to sustain the objection to the

6  extent that I'm not going to permit cross-examination on the

7  portion of the letter that is under applicable law all the

8  way -- so that starts on page 2 and that goes all the way to

9  page -- through page 8.

10        I will permit, if Mr. Duva wishes to do so,

11  cross-examination on the -- not the first paragraph of page 9,

12  but the rest of those paragraphs, because they do seem to me to

13  be potentially -- if not directly relevant to the case, they

14  could be made as points of departure from -- from this case,

15  which is something Mr. Duva has been doing in his questioning,

16  that is, asking the witness whether the client told him certain

17  things or not about how the situation was set up.

18        I do not think that a mistrial is even close to being

19  required in these circumstances, so all motions for mistrial

20  are denied.

21        I will instruct the jury that the -- the witness's

22  references -- and it really had just gotten started before --

23  there was a question.  I overruled it.  Mr. Duva asked it

24  again, and then I thought better of it and that's when I called

25  everybody up to sidebar.

1       So I can just tell the jury that the reference that

2   the witness made to kickbacks, they should disregard that.

3   That's also consistent with the Court's in limine order.  I

4   don't -- I don't think the government transgressed that order

5   in this circumstance, because the government didn't have the

6   benefit of this opinion letter until today and they had to kind

7   of deal with it in a -- in a situation in which they were doing

8   the best they can to try to cross-examine on it on what's, you

9   know, an important piece of evidence.

10       And so I'm not -- I do not believe the government's

11   transgressed the in limine order, and to any extent that it

12   has, I don't think it's been prejudicial, and I will so

13   instruct the jury and then we are going to move on.

14       I will entertain -- and so, Mr. Duva, I'm going to

15   ask you not to put up the parts of the letter that I have

16   prohibited, but you can still cross-examine on the parts that I

17   have permitted cross-examination on.  I'll make a determination

18   later as to whether the exhibit needs to be redacted.

19       Have I ruled on all matters that are before the Court

20   at this time?  Is there anything -- Mr. Rafferty?

21       MR. RAFFERTY:  I just wanted to perfect my record.

22       THE COURT:  Yes, sir.

23       MR. RAFFERTY:  You know, I've objected on the

24   grounds -- I've asked for a mistrial.  Alternatively, I would

25   ask for severance under Rule 14, which allows the Court to

1    grant a severance at any time if justice so requires.

2          I would suggest that the introduction of this

3    evidence would also provide a basis for a severance.  I would

4    move for that severance.  I take the Court's order as denying

5    that as well.

6          THE COURT:  Do you -- Mr. Rafferty, I'm -- I know

7    you're doing what you think is right, but I've often -- I had a

8    situation one time when I was trying a case with one of my

9    partners when I was a lawyer, and we asked the judge for a

10   mistrial, never in a million years thinking the judge would

11   grant it, and then he did.  And we looked at each other and

12   said, well, that's not really what we wanted.  We were just

13   trying to make a record.

14         Are you really telling me that at the point we are in

15   this trial, that you're asking to be severed out, which would,

16   I take it, would it not, require a retrial of the -- of the

17   case against Mr. Durall, would it not?

18         MR. RAFFERTY:  Unfortunately, Your Honor, I think I

19   made clear in my pretrial motions in limine before the

20   government ever opened, I recognized the damaging aspect of the

21   evidence that the government was trying to elicit about the

22   patient brokering statute.

23         I specifically asked that not be mentioned even in

24   opening statement, because I could see how damaging that would

25   be.  The government had spent an immense amount of time talking

1    about Mr. Marcotte and how much money Mr. Marcotte was paid by

2    my client, and now they're trying to tie that up with this

3    particular statute.

4              THE COURT:  But it hasn't even been talked about yet.

5              MR. RAFFERTY:  I believe the statute was put up on --

6    it was put up by the government.  It was walked through before

7    Mr. Duva asked this witness this hypothetical question.  The

8    hypothetical question was asked twice in front of this jury.

9              And as I said before, the only individual in this

10   trial who was at all implicated by that is my client.  And so,

11   regretfully, I am asking for a mistrial.  I am meaningfully

12   asking for a mistrial.  I am asking for a severance.

13             THE COURT:  Okay.  All right.  All right.  I don't

14   think there's been the type of prejudice that you're concerned

15   about.  I think that -- I'm looking at the transcript here as

16   to what was said before -- before we all got together at

17   sidebar, and I just don't see the type of prejudice that

18   you're -- that you're concerned about, especially given the --

19   the context in which we're operating, which is that we're in a

20   multi-week trial where there's been mountains of testimony and

21   will be more testimony to come.

22             Whatever brief reference is here, I just don't

23   think -- and I'm not -- I'm not even 100 percent sure that this

24   is impermissible, but I think in the interest of -- of making

25   sure that we don't run afoul here, I'm going to do as I

1  suggested, which is -- and I'm looking here, Mr. Rafferty,

2  the -- the -- here's -- here's what I see the transcript

3  showing me, which is that -- so I gave the limiting instruction

4  on -- that it only applied to the Porters' case, which I was

5  asked to do.

6          And Mr. Duva went over the portions of 69 and then he

7  got to -- I'm not -- I'm not seeing where the statute was

8  displayed, but you -- I'll take your word for it.  But what

9  statute are you talking about?  The Anti-Kickback Statute or --

10          MR. RAFFERTY:  The patient brokering statute that he

11  was going over with respect to the witness when he brought up a

12  hypothetical, Your Honor.  It was on the screen.

13          THE COURT:  Okay.

14          MR. DUVA:  It was on the screen, Your Honor.

15          THE COURT:  Yeah, I understand.  I just want to see

16  where -- where it was so I can make sure I'm being correct

17  about this.

18          MR. RAFFERTY:  And as you're doing that, Your Honor,

19  the other thing I just want to put on the record as well is,

20  like the government, I have not seen this letter until about 20

21  minutes ago either.

22          THE COURT:  I understand.  Well, let's -- it's all --

23  it's regrettable, but it's also -- you know, trials are very

24  dynamic things, and we all do the best we can, I'm sure, and --

25  but we can't always control every -- every aspect of it, and

1  this is the way it played out, and I'm just dealing with it the

2  best I can.

3      I'm looking here.

4      MR. RAFFERTY:  My recollection is, Your Honor, it

5  was -- I don't know what page it is, because I'm looking on it

6  electronically, but there was a section in the letter entitled

7  Applicable Law.

8      And then under that, there's a subheading called

9  Anti-KickBack and Anti-Patient Brokering, Anti-Fee-Splitting

10  Law.  And then there's a subheading under that called Florida

11  Law.

12      And it was at that point in time, in that section

13  specifically, the Florida Law section, that Mr.  Duva was

14  referring to upon questioning the witness.

15      MR. HAYES:  Top of page 3.

16      MR. RAFFERTY:  Yeah.  That's right.  Top of page 3.

17      THE COURT:  All right.  So I'm looking here that --

18  Mr. Duva said, And this is similar to other letters you've

19  written on the topic about the kickback statute, correct?

20      Yes.

21      And a cut-and-paste job at this point.

22      And then it goes on from there.  He handed him a

23  similar copy, which I assume is the letter that we've seen

24  earlier today.

25      He talks about -- so that provision under the statute

 1   refers to -- prohibits brokers -- that's what you're talking

 2   about, Mr. Rafferty?

 3            MR. RAFFERTY:  I believe that is correct, Your Honor.

 4            THE COURT:  Okay.  It -- I don't -- I mean, I see

 5   what you're saying and I understand your concern, but I just do

 6   not see a substantial enough prejudice here.

 7            I will tell the jury to disregard that testimony

 8   and -- and then Mr. Duva is not going to talk about it anymore,

 9   not going to put it up on the screen anymore.  I just think it

10   was too fleeting.

11            And I think the sensitivities of the lawyers to it is

12   way higher than the jury's sensitivity to it.  And I just don't

13   see it as fundamental or prejudicial enough to warrant either a

14   mistrial or a severance for Mr. Durall.

15            I think you've made your record on that.  But I

16   don't -- I just don't see it.  And I'm -- I'm going to instruct

17   the jury and -- and then we're going to proceed on.

18            I also have said that -- I've asked Mr. -- directed

19   Mr. Duva not to cross-examine, and if he wants to leave this

20   letter entirely, that could be another option.  But I am

21   letting him talk about the two parts I said.  If he wants to

22   ask him whether he talked about it with Mr. Schwartz, I guess

23   he's entitled to do that.

24            And -- and I'll instruct the jury to disregard the

25   testimony.  And I'm also considering whether to redact the

1 letter or to withdraw it, depending on what we do later, but we

2 don't have to worry about that now.

3       Does anybody wish to be heard any further?

4 Mr. Sadow?

5       MR. SADOW:  Mine is on an unrelated matter.

6       THE COURT:  Well, hold on.  Let's -- let's get this

7 done.

8       MR. HAYES:  Your Honor --

9       THE COURT:  Yes.

10       MR. HAYES:  -- we should block out -- we're going to

11 show this page, the final page.

12       THE COURT:  Yeah.

13       MR. HAYES:  We should block out the top --

14       THE COURT:  Yeah, the top sentence, the top two

15 sentences.  That's correct.

16       MR. DUVA:  Can I have the original back?

17       THE COURT:  Yeah.  Sure.

18       MR. DUVA:  The one I had I wrote on it.

19       THE COURT:  Yes.  Sure.

20    (Counsel confer.)

21       MR. HAYES:  I just want to make sure Mr. Rafferty

22 heard that.  We're going to block out the top two sentences.

23       MR. RAFFERTY:  Can I see it?  I don't have a copy of

24 it.

25       THE COURT:  Yes.

1       (Counsel confer.)

2           MR. RAFFERTY:  Thank you.  Yeah.  I agree with that,

3    Your Honor.

4           THE COURT:  All right.  Here's my proposed

5    instruction to the jury:  Ladies and gentlemen, before we

6    broke, you heard brief testimony and had displayed Florida

7    statutes regarding, quote, broker, close quote, and, quote,

8    anti-kickback, close quote, laws.  Those laws are not relevant

9    to your consideration and I instruct you to disregard that

10   testimony and that display.

11          Preserving all rights that the defendants have, based

12   on their motions for mistrial and other motions, does anybody

13   wish to be heard on -- on that instruction?

14          MR. BELL:  No, Your Honor.

15          THE COURT:  Does the government wish to be heard on

16   that instruction?

17          MR. DUVA:  No, Your Honor.

18          THE COURT:  All right.  Are we ready for the jury?

19          MR. SADOW:  Your Honor?

20          THE COURT:  Yes, sir.  Oh, I'm sorry, Mr. Sadow.  You

21   did say you had a matter.

22          MR. SADOW:  It's never appropriate to raise one's

23   voice in a courtroom particularly to a jury.  But if we can

24   have an understanding that when we make an objection, that the

25   questioner actually stops asking the question until the Court

1   has an opportunity to either listen to the objection or rule on

2   the objection, which is why voices got raised the last time,

3   because at least as to that question -- I won't go back to

4   anything else, but as to that question it was continuing to be

5   asked even though parties were objecting.

6         THE COURT:  All right.  So, Mr. Sadow, I hear you.

7   And I agree with you.

8         And I'm assuming -- I mean, I've assumed all along

9   that we're going to have professional behavior.  Sometimes that

10  hasn't been a proper assumption.  But that's for another day.

11        I agree with you, I think the questions -- I think

12  the question has to be asked before it can be objected to, and

13  so I think it works a little bit both ways.  But if there is an

14  objection, I'm sure Mr. Duva will stop and the witness will

15  stop until I can rule on it.

16        But I would ask the -- I would ask that the

17  objection -- and I know it's a timing issue.  But I'd ask that

18  the objection not be made until the question has been asked.

19        And I'd ask the witness to not answer a question --

20  if the witness hears an objection, I'd ask the witness not to

21  answer the question until the Court can rule.

22        MR. SADOW:  And my -- my issue was, certainly as to

23  that, it was the subject matter that was being brought up.

24        THE COURT:  I understand.

25        MR. SADOW:  That was the problem.  It wasn't a

 1    question of whether you were going to allow the question.  It

 2    was whether the subject matter should come in.

 3              THE COURT:  I understand.  All right.  All right.

 4    Everybody take a deep breath.

 5              All right.  Let's have the jury, please.

 6              COURT SECURITY OFFICER:  All rise for the jury.

 7              MR. BELL:  Judge, the good news is we won't have any

 8    dead time.

 9              THE COURT:  I guess there's that.

10         (Jury enters, 3:50 p.m.)

11              COURT SECURITY OFFICER:  Please be seated.

12              THE COURT:  Well, ladies and gentlemen, I'm -- I'm

13    not doing a very good job today with your time.  And I

14    apologize.  It is just -- I think I told you during jury

15    selection that, unfortunately, trials aren't always like *Law &*

16    *Order*, where everything just goes according to plan and

17    everything's over in 60 minutes.  So we just had to -- to talk

18    about something, and it's my fault it took as long as it did.

19              I apologize to you.  But we are going to go ahead and

20    complete this witness.  And, as I said, he'll be the last

21    witness of the day.

22              But before we do that, let me just give you this

23    instruction, please.

24              Before we broke, you heard brief testimony and had

25    displayed Florida statutes regarding, quote, brokering, close

1    quote, and, quote, anti-kickback, close quote, laws.  Those

2    laws are not relevant to your consideration, and I instruct you

3    to disregard that testimony and the display that was put up

4    on -- on the screen there.

5            All right.  Ladies and gentlemen, thank you so much

6    for your patience.

7            And, Mr. Duva, you may proceed.

8            MR. DUVA:  Thank you, Your Honor.

9    BY MR. DUVA:

10   Q.   Mr. Thomas, we're going to go to the last page of the

11   letter, which has two paragraphs that I want to focus on.

12   They're both up on the screen.

13           The first one says, I do recommend that Pinnacle

14   obtain assurances from Putnam that Putnam's third-party payer

15   contracts contain no contractual limitations regarding the

16   proposed billing arrangement.  I have not reviewed any such

17   agreements, and, therefore, I cannot offer any opinions as to

18   the potential contractual liability.

19           That's what that says?

20   A.   Yes.

21   Q.   And that's correct, sir.  You -- just to not belabor the

22   point, you reviewed zero contracts between Putnam and the

23   private payers?

24   A.   That's correct.  The purpose of this legal opinion was to

25   do a review of the statutes and regulations that are

1  applicable, state and federal.  I did not look at any

2  contracts.

3  Q.   The next paragraph says, In the event that any third-party

4  payer objects to the, quote/unquote, nonpatient hospital lab

5  services claims, the payer -- meaning the private payer, right?

6  A.   Right.

7  Q.   -- is clearly and directly notified of the exact nature of

8  the misrepresentation [sic].

9        MR. BELL:  Objection.

10        THE WITNESS:  Of the arrangement.

11        MR. DUVA:  I'm sorry.  Of the -- I'm sorry.  I

12  skipped a line.

13  BY MR. DUVA:

14  Q.   Of the exact nature of the arrangement.  Correct?

15  A.   Correct.

16  Q.   And then in parentheses, it says, So as to preclude any

17  potential allegation of a fraudulent misrepresentation.

18        Is that what that says?

19  A.   Correct.

20  Q.   And the payer has the option of simply not paying the

21  claims.

22  A.   That's correct.  It's the entire purpose of the 14X.

23  Q.   Can I -- okay, I want you to just -- I haven't asked a

24  question yet.

25        So this says that if the third-party payer objects to

1  any lab claim services -- and we looked at some letters earlier

2  where there's some questions back and forth, correct -- between

3  Anthem.  We looked at that exhibit, 27X, Y -- or X and Z,

4  correct?

5  A.   Correct.

6  Q.   Okay.  And so what you're telling Mr. Porter is that the

7  payer is clearly and directly notified of the exact nature of

8  the arrangement.  And then there's the parentheses.

9       In other words, what you're telling him is you have

10  to be 100 percent honest with the payer if there's a dispute

11  that arises or if there's an inquiry.

12       Is that what you're saying?

13  A.   What I'm saying in this letter is that I'm -- I'm highly

14  recommending that Pinnacle obtain assurances from the hospital

15  that the hospital is going to bill the claims properly, meaning

16  a TOB 14X, to put the payer on notice so the payer can look at

17  the claim and say if 14X is covered or it's not covered.

18  Q.   But I think this paragraph we just looked at -- and maybe

19  we need to go over it again -- is that if the payer objects,

20  the payer is clearly and directly notified of the exact nature

21  of the arrangement.

22       Is that what that says?

23  A.   Correct.

24  Q.   So, in other words, tell them the truth, correct?

25  A.   Of course.

1  Q.    Mr. Thomas, did you go over this letter with Mr. Schwartz,

2  which is the only written document that we have from you

3  addressing these issues, before you testified here today?

4  A.    I don't think so.  I didn't think it was relevant, given

5  that this is a -- my understanding of the case -- and I'm not

6  an attorney in the case.  But it's -- I thought the allegations

7  were health care fraud and money laundering, and -- and that

8  doesn't go to this.

9  Q.    You're saying you don't think this letter is relevant to

10  this case?

11  A.    That's --

12  Q.    Is that your testimony, sir?

13  A.    That's a matter, I think, for the judge and the jury.  I

14  have no idea.

15  Q.    You just expressed your viewpoint of relevance.  And I'm

16  just trying to tie up -- do you think this letter is relevant

17  to this case?

18  A.    I'm trying to be mindful of the instruction that the judge

19  just gave to the jury.  I did not review this prior to today

20  because I had no expectation that this would come up.

21  Q.    You didn't think that the only writing that we have here

22  in this courtroom that the jury has seen would come up today?

23  A.    Mr. Duva, I have no idea what other writings there are.  I

24  can only talk about this exhibit in front of us, No. 69.  And I

25  did not go over it because I didn't appreciate that any of the

1  laws that are addressed in this opinion were at issue in this

2  case.

3  Q.    Well, on that last page, you talk about fraudulent

4  misrepresentations, don't you?

5  A.    Absolutely.

6  Q.    And that's kind of relevant in the health care fraud

7  statute and the wire fraud statute under federal law, is it

8  not?

9  A.    Yes.  Again, the laws that are addressed in Exhibit 69 are

10 not, to my understanding, at issue in this trial.

11 Q.    We'll move on, Mr. Thomas.

12         Are you aware that, through billings to the insurance

13 companies, that Putnam County Memorial Hospital paid Hospital

14 Laboratory Partners $59.9 million?

15 A.    I'm unaware of how much the payments were.

16 Q.    Are you aware that during the time that Putnam had no lab,

17 from dates of service prior to February 10, 2017, of -- of that

18 $59.9 million, that insurance companies paid $37.6 million?

19 A.    I'm unaware of any of the monetary transactions in this

20 case.

21 Q.    Okay.  And what I -- I made a mistake in the question.

22         But from the insurance reimbursements to Putnam, that

23 Putnam paid Hospital Laboratory Partners during that time, no

24 equipment in the toxicology lab at Putnam, $37.6 million?

25 A.    I was unaware of any of the numbers.

1   Q.   Mr. Porter never told you that?

2   A.   Not that I recall.

3   Q.   And you continued to be his lawyer after this, all the way

4   up until this trial?

5   A.   Absolutely.

6           MR. DUVA:  Your Honor, I have no further questions.

7           THE COURT:  Mr. Schwartz?

8           MR. SCHWARTZ:  Yes, sir.

9                       **REDIRECT EXAMINATION**

10  BY MR. SCHWARTZ:

11  Q.   All right.  Mr. Thomas, I'm not going to spend a bunch of

12  time on this, but I do have some questions about the letter

13  that Mr. Duva was showing you.

14          Well, let's just start at the end.

15          Mr. Duva asked you about this paragraph -- I'm sorry,

16  this paragraph, In the event that any third-party payer objects

17  to the nonpatient hospital lab service claims, the payer is

18  clearly and directly --

19          THE COURT:  A little fast.  A little fast.

20          MR. SCHWARTZ:  All right.  I'm just trying to moving

21  it, Judge.

22          THE COURT:  I know.

23  BY MR. SCHWARTZ:

24  Q.   -- the payer is clearly and directly notified of the exact

25  nature of the arrangement so as to preclude any potential

1  allegation of a fraudulent misrepresentation, and the payer has

2  the option of simply not paying the claim.

3          Your response was to talk about TOB 14X.  What did

4  you mean by that?

5  A.   In the event that the arrangements proposed underneath

6  Exhibit 69 were to come to fruition, the claim that would have

7  gone out is a -- is a UB-04.

8          A UB-04 doesn't have any data fields.  Unlike the

9  outpatient claim form, it's -- it's range 32, I believe, on the

10 CMS 1500, to talk about exactly who does the tests.  On -- on

11 an -- under arrangements provision, that's simply -- there's no

12 way to report it underneath the current forms.

13         The -- the direction that's given to the payer is the

14 TOB 14X.  Typically, it's a 141 claim.  That's the description

15 that's given to the payer by the hospital to tell the payer by

16 the hospital, this is a nonpatient claim, so that the payer can

17 look at the face of the claim, see the 141, look it up

18 underneath their contract and say, Is that a covered service

19 and we're going to pay the claim?  Or is it not a covered

20 service and we're going to deny the claim?

21 Q.   Now, this letter -- this opinion letter deals with

22 marketing and promotion, correct?

23 A.   Correct.

24 Q.   Not testing?

25 A.   Correct.

1  Q.    In fact, it says marketing and promotional services at the

2  bottom?

3  A.    Correct.

4  Q.    Now, you had talked on direct and on cross about the under

5  arrangement, essentially where a hospital contracts with a

6  laboratory to process samples, test samples, for the hospital,

7  that the hospital puts in the data through the LIS system,

8  accessions the data --

9  A.    Correct.

10 Q.    -- into the system.  And when the hospital puts in the

11 order information and the provider NPI, doesn't it populate all

12 kinds of information about the physician?

13 A.    That's my understanding.  I'm not an IT person and I'm not

14 a biller, but as a lawyer, that's my understanding of the way

15 the system works.

16 Q.    Okay.  So then at that point, the hospital would have all

17 the information about the physician and the testing

18 requirements, right?

19 A.    Correct.  Otherwise, I don't think that the hospital can

20 do its job.

21 Q.    Sure.  The samples can go directly to the under

22 arrangement lab, which is not the hospital, but the lab that's

23 testing for the hospital?

24 A.    Correct.  That's the entire point of the under

25 arrangements contract.

```
1   Q.   Okay.  At that point the test results that the lab would

2   test -- the test results go back to the provider?

3   A.   Correct.

4   Q.   Information also through the LIS goes back to the

5   hospital --

6   A.   Correct.

7   Q.   -- so that he can prepare the billing on the UB-04?

8   A.   Correct.

9   Q.   Using the hospital's NPI and the hospital's tax

10  identification number, correct?

11  A.   Correct.

12  Q.   To then bill insurance?

13  A.   Correct.

14  Q.   To receive a payment from insurance?

15  A.   Correct.

16  Q.   To then pay the under arrangement lab --

17            MR. DUVA:  Objection.  Leading.

18            MR. SCHWARTZ:  Judge, it's already been discussed.

19  I'm just trying to move it quickly and make sure we're on the

20  same page.  I'm almost done.

21            THE COURT:  All right.  Ask your question.

22  BY MR. SCHWARTZ:

23  Q.   To then have the hospital pay the lab for whatever their

24  arrangement is?

25  A.   Correct.
```

 1   Q.   Keep the difference, if any?

 2   A.   Yes.

 3   Q.   Right?  The sample never has to go to the hospital, right?

 4   A.   That's correct.

 5   Q.   Okay.  And that is an under arrangement system --

 6        THE COURT:  Ask a -- ask your question, please.

 7   BY MR. SCHWARTZ:

 8   Q.   Is that an under arrangement system that is completely

 9   lawful?

10   A.   Yes, sir.

11   Q.   All right.  Now, while that's going on, if the hospital

12   decides to start building their own lab, is that okay?

13   A.   Surely.  But I don't think any hospital is ever locked

14   into an under arrangements contract.  Once there is an under

15   arrangement contract, unless the laboratory and the hospital

16   act under the under arrangements contract, the hospital is free

17   to do whatever it wants.

18   Q.   So if the hospital at that point starts building a lab,

19   once the hospital lab is done and it starts running its own

20   samples, then there's a different structure that's set up,

21   correct?

22   A.   Correct.  It's the exact opposite of an under arrangements

23   contract.  And for critical access hospitals, as that

24   happens -- and that's -- that's relatively common because a

25   critical access hospital just doesn't have enough time, energy,

1   and money to hire the staff and get the equipment and -- and do

2   it all at the same time.  So they have an outside reference

3   laboratory under arrangements, and as they start adding the

4   equipment under their own roof, they no longer need the under

5   arrangements contract.

6   Q.    Okay.  And so if there's a situation where a hospital has

7   an under arrangements contract and that's been running, but

8   during that period they're building out their lab and their

9   lab's ready to go online --

10  A.    Yes.

11  Q.    -- then is there any problem with a lab like Pinnacle

12  transitioning to a promotional and marketing service for the

13  hospital?

14  A.    No.  It's a different kind of an arrangement because the

15  reference laboratory no longer acts as a reference laboratory,

16  but there's no prohibition.

17  Q.    And if we look at page 1 of your letter, it talks about

18  Pinnacle's marketing and promotional activities, right?

19  A.    Correct.

20  Q.    On paragraph 2?

21  A.    Correct.

22  Q.    So, hypothetically, if a hospital was using an under

23  arrangement lab, but while that's going on, the hospital is

24  building out its own full-service lab, when that lab becomes

25  operational, then the under arrangement lab could then start

1  doing promotional and marketing activities to promote the

2  hospital's in-house lab, correct?

3  A.   Yes.  Absolutely.  And I -- I would note that as of the

4  date of this letter, November 29, 2016, I -- this is written

5  in -- in future tense, meaning at the time that I was writing

6  this, I wasn't specifically saying I -- I know that Putnam's

7  got the equipment to be doing the testing.  I had no idea.

8        So it could have been in the future.  I didn't mean

9  it to be fixed as to any particular time because I had no idea

10 in the world what it is that Putnam had on the floor at the

11 time.

12 Q.   Did we go over this letter when I met with you?

13 A.   Number 69?  I don't think so, Mr. Schwartz.  I don't

14 recall that.

15 Q.   Okay.  Did I show you the RightCHOICE contract with

16 Putnam, though?  And I'll get the exhibit number.  Hold on.

17 I'll show it to you.

18 A.   If I could see it, please.

19 Q.   I'll -- I'll --

20 A.   A lot of contracts in this case.

21        MR. SCHWARTZ:  Can we get 27DD, please.  First

22 person, yeah.

23        MR. DUVA:  Your Honor, I have a relevance objection.

24 Can we approach?

25        THE COURT:  Yes, sir.

1      (Sidebar conference:)

2           THE COURT:  Y'all are working me today.

3           All right.

4           MR. DUVA:  Your Honor, I object to relevance.  It

5  does not matter if Mr. Schwartz showed this contract to him at

6  a recent time, whether it was yesterday or sometime leading up

7  to the trial.

8           It matters if he had seen this at the time that he

9  gave the legal advice, which is memorialized in the letter, and

10  also the other oral advice that he's talking about.  So him

11  looking at it prior to the payer contract with Putnam six years

12  later, in preparation for the trial, is not relevant.

13           THE COURT:  Mr. Schwartz?

14           MR. SCHWARTZ:  I think I can ask him if he's reviewed

15  it, and does that change his opinion, because they were

16  focusing on the fact that he hadn't reviewed them at the time.

17  I acknowledge he hadn't reviewed them at the time.  But he has

18  since come back and -- we spent time yesterday looking at these

19  payer agreements.  And he says that they all -- that the

20  unrelated -- the under arrangement situation is compliant with

21  these payer agreements.

22           THE COURT:  Why didn't you -- why didn't you ask him

23  that on his direct?

24           MR. SCHWARTZ:  Because it hadn't come up yet on

25  the -- on this issue.  And --

1    MR. DUVA:  That's not the advice he gave to Jim

2  Porter, Your Honor.

3    MR. WINTERS:  And that's what's relevant.

4    MR. SCHWARTZ:  Well, I think it's -- I think it's

5  relevant if it affects his advice at all because they're --

6  they're trying to insinuate that if he would have looked at the

7  contracts, it would have changed.  And --

8    THE COURT:  Okay.  I'm going to sustain the

9  objection.

10   (The following proceedings occurred in open court, in the

11  presence of the jury:)

12  BY MR. SCHWARTZ:

13  Q.   When you're looking at the United States Code and the CMS

14  guidelines and things like that that you talked about on direct

15  as the basis of your opinion for the under arrangement --

16  A.   Yes.

17  Q.   -- does that matter if it's a private payer?

18  A.   It's a complex relationship as to how those statutes

19  relate to a private payer.  There's very little guidance as to

20  private payers.  Medicare is standard to -- the gold standard.

21   Again, I -- I build the models that I do to be sturdy

22  enough to withstand scrutiny as to any payer class.  And I'm

23  always nervous about putting something together that will only

24  work for commercial payers because of crossover claims, because

25  everything will have to be retooled in the event that, you

 1  know, the provider starts providing Medicare or Medicaid or

 2  TRICARE services.

 3       What I would offer is -- I don't think that there is

 4  an absolute direct requirement for anyone to utilize the

 5  statutes or the regulations that apply to Medicare or Medicaid

 6  and TRICARE to commercial work, but it's the only guidance that

 7  there is.  So that's what I have always relied upon.

 8       And my mentality all along was, How is it possible

 9  that it's legal for Medicare, but it's criminal underneath the

10  commercial contract?  That just never made any sense to me.

11            MR. SCHWARTZ:  Hey, Tysen?  What was the exhibit that

12  was -- I believe the Pinnacle and Putnam?  Talks about

13  overflow?  Do you know the exhibit number?

14            MR. DUVA:  27KK.

15            MR. SCHWARTZ:  27KK, can I see that?  Thank you.

16  Yes.

17  BY MR. SCHWARTZ:

18  Q.   Now, Mr. Duva asked you about this on cross-examination.

19       This contract is a reference laboratory services

20  agreement between Pinnacle and Hospital Laboratory Partners.

21  And it talks about overflow testing.  Does that -- or that

22  statement, overflow, prohibit Pinnacle from acting as an under

23  arrangement lab?

24  A.   No.  I'm unsure exactly what "overflow" means here.  I

25  would interpret it to mean that both entities are doing

1    testing.  But to the extent that any of the HLP-contracted

2    hospitals ran out of capacity -- and that happens pretty

3    frequently at a critical access hospital, even for analysis

4    tests, let alone confirmation -- that Pinnacle would pick up

5    that work.

6            Again, I -- I interpreted this arrangement to be that

7    HLP would be kind of an air traffic controller for the patients

8    and the doctors, and would simply be moving specimens to

9    whomever it is that had capacity to do the testing.

10   Q.    Okay.  Now, Mr. Duva asked you about out-of-state doctors,

11   and you had indicated that -- you suggested essentially that

12   bylaws be changed, or something like that.

13           Do you remember that?

14   A.    I have a distinct recollection of drafting some language

15   for the Putnam medical staff bylaws to suggest to someone as to

16   making sure that Putnam was keeping track of the doctors who

17   were submitting orders to the hospital underneath the

18   nonpatient under arrangements contract.

19   Q.    Okay.  And --

20   A.    Again, because I'm conservative, I wanted to be buttoned

21   up.

22   Q.    Now, Ms. Pickens testified before this Court, and she is

23   the CEO of Putnam.  And I'll show you a transcript --

24           MR. SCHWARTZ:  You want to see it first?

25   BY MR. SCHWARTZ:

1    Q.    -- of the proceedings.

2         MR. DUVA:  Your Honor, I'm going to object to showing

3    a transcript of testimony of one witness to another.

4         MR. SCHWARTZ:  Judge, he represented that this hadn't

5    been done and it actually has.  The witness testified --

6         THE COURT:  All right.  Okay.  Mr. Schwartz, fine.

7    You can -- you can ask the witness, but let's not display it up

8    on the screen, please.

9         MR. SCHWARTZ:  Sure.

10   BY MR. SCHWARTZ:

11   Q.    Okay.  So the question was by Mr. Sadow.

12        MR. SCHWARTZ:  That's the kindest way I've ever heard

13   it put.

14        MR. DUVA:  Your Honor, this is the same thing of just

15   reading a question and answer of another witness.  I don't

16   think that's happened one time in this trial.

17        THE COURT:  I think it's -- I think it's -- I'm going

18   to let him do it, I think.  Let me -- let me hear the question

19   and then I'll -- then I'll -- then I'll decide.

20        MR. DUVA:  The question is going to just be reading

21   the question.

22        THE COURT:  So -- all right.  Go ahead, Mr. Schwartz.

23   BY MR. SCHWARTZ:

24   Q.    And if we may, I'll have one other area, I believe, I want

25   to cover, and then we'll be finished.

1          In 2016 the hospital changed its bylaws to allow

2    out-of-state physicians who could write orders, correct?

3          Answer:  I wasn't involved in that, but I think that

4    is correct.

5          MR. DUVA:  Is that a question, Your Honor?

6          THE COURT:  So what's -- what's the question,

7    Mr. Schwartz?

8    BY MR. SCHWARTZ:

9    Q.   Sure.  The -- the question then is, When Mr. -- strike

10   that.

11         The question is:  Is the fact that Putnam changed

12   their bylaws to allow out-of-state physicians to write

13   orders -- is precisely the type of thing you were talking

14   about, right?

15   A.   Yes.  I -- I don't want to say that it was necessarily my

16   suggestion or my language, but the timing is the same.  And

17   good for them.  That's what I recommended.

18         MR. SCHWARTZ:  Thank you.  That's all I have.

19         THE COURT:  Very brief.

20         MR. DUVA:  One question, Your Honor.

21                    **RECROSS-EXAMINATION**

22   BY MR. DUVA:

23   Q.   Mr. Thomas, Mr. Schwartz said that this letter was asking

24   you a question.  It does not deal with testing.

25         Do you remember that?  He said it deals with

```
 1   marketing?
 2   A.   Right.  Mr. Duva, is that No. 69?
 3   Q.   Yes, sir.
 4   A.   Yes.  That's correct.
 5   Q.   Okay.  And I'm getting there.
 6         But the letter actually says, i.e., the specimens
 7   will be collected at the physician's office and sent directly
 8   to PCMH -- for what, sir?
 9   A.   For testing.  That's my understanding that's what the
10   marketing was for, PCH's testing.
11   Q.   So the letter addressed testing, did it not?
12   A.   Yes, of course.  The marketing and promotion of testing.
13         MR. DUVA:  No further questions.
14         THE COURT:  All right.  Everybody good?
15   (No response.)
16         THE COURT:  Thank you very much, sir.  You may step
17   down.
18         THE WITNESS:  Thank you, Your Honor.
19   (Witness excused.)
20         THE COURT:  All right.  Ladies and gentlemen, I --
21   we're -- I'm going to let you go, but let me talk to the
22   lawyers just one second.
23   (Sidebar conference:)
24         MR. BELL:  I'll stand on this side.  Change it up.
25         THE COURT:  Okay.  So I just wanted to make sure what
```

```
 1   I'm telling them for tomorrow.  It would be we have your

 2   expert?

 3               MR. SCHWARTZ:  Yes, sir.

 4               THE COURT:  Okay.  And you say he's -- he's ready to

 5   go?

 6               MR. SCHWARTZ:  Assuming his flight gets in.  It's

 7   supposed to get in at 11:30 tonight.  I won't know until -- but

 8   he's coming from California, so --

 9               THE COURT:  All right.  And --

10               MR. SADOW:  Me.

11               THE COURT:  You have an expert?

12               MR. SADOW:  I have an expert.  Assuming his expert

13   testifies, we'll make the final decision on whether we're going

14   to call our expert.

15               THE COURT:  Okay.  But your -- but your point, you

16   want your expert to testify?

17               MR. SCHWARTZ:  Yes, sir.

18               THE COURT:  And we're expecting him to be here?

19               MR. SCHWARTZ:  Yeah.  I -- literally, I got a text

20   saying the best I could do is 11:30 p.m. landing, so

21   hopefully -- I don't know that there's another one.  I don't

22   know if he's coming from Dallas or Charlotte or Atlanta, but

23   it's not a direct, obviously.

24               THE COURT:  All right.

25               MR. TASKER:  I called him, like, five minutes ago and
```

1  he did not answer, so I'm assuming he's on the flight.

2  THE COURT:  All right.  Any of you -- you don't --

3  you haven't made a final decision as to whether to call your

4  expert?

5  MR. SADOW:  Correct, depending on his expert, whether

6  it covers the same subject matter.

7  THE COURT:  All right.

8  MR. SADOW:  Then we have those two documents to seek

9  admission.

10  THE COURT:  All right.  I need to give your -- I need

11  to -- where's Mr. Rowland?  I need to get his exhibit into

12  evidence, so -- okay.  All right.

13  And is that all?  Is everybody going to rest after

14  that?  There's no other witnesses on the horizon?

15  MR. SADOW:  Correct.

16  THE COURT:  All right.  Is the government

17  contemplating rebuttal?

18  MR. DUVA:  Possibly, Your Honor.  We're going to

19  serve Mr. Thomas with a subpoena for all of his communications

20  with Jim Porter.  So that's been served.

21  THE COURT:  Okay.  All right.  So that would be the

22  nature of the rebuttal.

23  MR. DUVA:  Could be that.  We may -- we're discussing

24  putting on a coding witness and we're going to have to talk

25  about that tonight.

1          THE COURT:  Okay.

2          MR. SADOW:  Well, is this a coding witness that we

3    have notice of?

4          MR. DUVA:  It is not.  So we're --

5          MR. SADOW:  That's a problem.

6          MR. DUVA:  -- we're going to talk about this tonight.

7          THE COURT:  All right.  Well, okay.  I understand,

8    but -- and I understand it's rebuttal, but you're going to have

9    to give some kind of notice about what you're --

10         MR. DUVA:  It's -- it's based on Larry Small's

11   testimony.  So had we not heard what we heard, we wouldn't be

12   contemplating this, but we did.  And so we started talking

13   about it yesterday and talking to this person.  And so we will

14   advise the Court if we're going to call the person.  But we

15   need to have a chance to have a discussion about it.

16         MR. SADOW:  The difficulty is --

17         MR. BELL:  The clarification of Larry Small's coding?

18   What about Larry Small?

19         THE COURT:  All right.  Okay.  Well, all right.  I

20   don't need -- we don't need to do this with the jury here.  I

21   can tell the jury to be here at quarter to 9:00, and we're

22   planning to go, right?

23         MR. SADOW:  Right.

24         THE COURT:  All right.

25       (The following proceedings occurred in open court, in the

1  presence of the jury:)

2      THE COURT:  All right.  Ladies and gentlemen, I'm

3  going to go ahead and turn you loose, and we -- if you'll be

4  back here tomorrow at a quarter to 9:00, and we'll -- we'll get

5  going.  And we are making good progress, so you should -- you

6  should feel good about that.  All right?  All right.  Ladies

7  and gentlemen, have a good evening.  Sorry for all the delays

8  today.

9      COURT SECURITY OFFICER:  All rise for the jury.

10     (Jury exits, 4:19 p.m.)

11     THE COURT:  All right.  Everybody have a seat.

12     All right.  So, Mr. Schwartz, assuming the airlines

13  are cooperative, you'll put your witness on at 9 o'clock,

14  correct?

15     MR. SCHWARTZ:  Yes, sir.

16     THE COURT:  And, Mr. Sadow, you'll make a decision

17  after you hear that testimony as to whether to call your

18  witness or not.

19     MR. SADOW:  That's correct, Your Honor.

20     THE COURT:  And that's Mr. --

21     MR. SADOW:  Herbers.

22     THE COURT:  -- Herbers.  All right.  Is he here?

23     MR. SADOW:  He -- I believe he is here.

24     THE COURT:  Okay.

25     MR. SADOW:  So, yes.

1    THE COURT:  So he's available if needed?

2        MR. SADOW:  If needed, absolutely.

3        THE COURT:  All right.  And -- and then Mr. Porter.

4        Mr. Rowland, I neglected to do this.  I can do it in

5    front of the jury if you wish, but I can go ahead and put Sean

6    Porter No. 1 into evidence, I take it, without objection; is

7    that correct?

8        MR. DUVA:  Yes, Your Honor.

9        THE COURT:  All right.  I'm going to go ahead and put

10   it into evidence.

11       (Defendant Sean Porter's Exhibit 1 received into

12   evidence.)

13       THE COURT:  At some point I'm going to be calling on

14   you to announce rest.  If you want to announce this exhibit at

15   the time, you can.  Okay.

16       MR. ROWLAND:  (Nods head affirmatively.)

17       THE COURT:  All right.

18       MR. DUVA:  Your Honor, I have one housekeeping

19   matter.

20       THE COURT:  Yeah, hold on one second, Mr. Duva.

21       So let me just make sure where we are here in

22   sequence.  Mr. -- let's see -- so Mr. Durall has rested.

23       We just had a witness for Mr. Porter, but Mr. Porter

24   cannot rest yet because he's got the expert.

25       Mr. Sean Porter is prepared to rest now that his

1  exhibit's in.  Is that correct, Mr. Rowland?

2        MR. ROWLAND:  Aside from the one that we're -- we're

3  waiting on receipt from Blue Cross, yes, Judge.

4        THE COURT:  Okay.  Mr. Sadow and Mr. Citro, you're --

5  the only thing that's keeping you between -- keeping us between

6  you and resting are the possible testimony of an expert, and

7  then are there -- you said there were some exhibits; is that

8  correct?

9        MR. SADOW:  There were two exhibits that were

10  discussed with government expert Dr. K, 95 and 96, that I said

11  I'm moving into evidence, but never really pursued it to the

12  point of getting a ruling.

13        THE COURT:  Okay.  So you just want to announce that

14  before your -- before you rest.  Okay?

15        MR. SADOW:  Correct.

16        THE COURT:  All right.  And, Mr. Lowther and

17  Ms. Galnor, you're just going to announce rest when asked?

18        MR. LOWTHER:  Correct.

19        MS. GALNOR:  Yes, Your Honor.

20        THE COURT:  Okay.  All right.

21        Now, Mr. Duva, tell me -- so you said it's

22  possible -- and it's already escaped me.  What did you say you

23  were -- not the coding person, but the other person?  You --

24  you indicated you had two potential rebuttal witnesses?

25        MR. DUVA:  We may call Mark Thomas back, Your Honor.

1    THE COURT:  Okay.

2    MR. DUVA:  We issued him a subpoena for his

3 communications with Jim Porter because we did not receive any.

4    THE COURT:  Okay.

5    MR. DUVA:  So we'll see what happens with that.

6    THE COURT:  Okay.  And then tell me about this coding

7 person.

8    Mr. Hayes?

9    MR. HAYES:  When we were at the sidebar, Mr. Duva

10 went into this a little bit.  It kind of depends on what the

11 prior expert said, and also what Dr. Arrigo may say tomorrow.

12 We're not saying we're definitely going to call this coding

13 person in rebuttal, but depending on what Dr. Arrigo says,

14 perhaps we would.

15    THE COURT:  All right.  So this is an undisclosed

16 witness for rebuttal.  And what's the -- but I -- I feel like

17 there has to be some disclosure here.  What -- what -- who's

18 the person and what's their potential area of testimony?  I

19 don't -- I don't -- I mean, I think you're entitled to put on a

20 rebuttal case, but I don't think in the circumstances we're in,

21 it needs -- it should be a surprise.

22    MR. HAYES:  We agree, Your Honor.  We're going to

23 discuss as to whether or not we're even going to do it.  If you

24 want, I can give the identity of who it is right now or tell

25 counsel after court.  Whatever you want.

 1          THE COURT:  All right.  Well, why don't you just go

 2   ahead and tell us who it is.

 3          MR. HAYES:  Her name is Kara McVey.  She's -- she's

 4   testified in other related litigations in this case.

 5          THE COURT:  Okay.

 6          MR. HAYES:  I think that Dr. Arrigo is familiar with

 7   her.

 8          THE COURT:  Okay.

 9          MR. HAYES:  In fact, they've gone against each other

10   in other cases.  We're not saying we're going to call her.  But

11   I don't -- in that sense, I suppose that's heartening, but it's

12   not really a surprise.

13          THE COURT:  And what's the -- what's the -- you said

14   this was based on Mr. Sam's testimony?

15          MR. BELL:  Small.

16          THE COURT:  Mr. Small, sorry.

17          MR. HAYES:  Small's and what we expect Dr. Arrigo to

18   say, Judge, in his report.

19          THE COURT:  In the area of coding?

20          MR. HAYES:  Coding and what the 141 code signifies in

21   the outreach program.

22          THE COURT:  Okay.

23          MR. LANDES:  Can I have a complete spelling, the

24   first and last name, please.

25          MR. HAYES:  Yeah, K-a-r-a, M-c-v-e-y.  I'll

1  double-check that and e-mail you to make sure.

2         MR. BELL:  That was part of my question.  I don't

3  recall Small testifying about what I would classically consider

4  coding, in terms of how the -- how -- the drug codes that were

5  associated with it.  What I'm understanding Mr. Hayes to say is

6  that related to the 141 code?  I mean, that's a different --

7         MR. HAYES:  The 141 code, the modifier is the

8  outreach program, which I think Small did testify to.

9         MR. BELL:  All right.  Just to make sure I'm clear on

10 what he's rebutting.

11        MR. HAYES:  And I think Dr. Arrigo's going to get

12 more into it.  I think it's really more -- I think it is fair

13 to say she would be more a rebuttal witness for Dr. Arrigo than

14 Small.

15        MR. BELL:  Okay.  I --

16        THE COURT:  All right.

17        MR. SADOW:  May I be heard for a moment?

18        THE COURT:  Yes, sir.

19        MR. SADOW:  Rebuttal witnesses obviously are

20 different creatures, but when you call an expert rebuttal

21 witness, you not only are violating Rule 16, which is 16(e)

22 when it comes to the requirement of notice and summary of the

23 testimony, but with all due respect, Your Honor, once this case

24 is over, do you think there's any way that we could be ready,

25 upon receiving information today, to cross-examine or

1  investigate or research the credentials of an expert that has

2  been disclosed the day before potentially the end of trial?

3         I would suggest that under the circumstances that --

4  I don't think it's necessarily called a sanction, but I think

5  that the violation of Rule 16 -- the late notice -- if this is

6  to -- what's your guy's name?

7         MR. SCHWARTZ:  Arrigo.

8         MR. SADOW:  -- this is to Arrigo, they've been on

9  notice about Arrigo and supposedly his coding, if that's what

10  this is for, since -- at least the end of April?

11         MR. SCHWARTZ:  April.

12         MR. SADOW:  So we're talking about now six weeks that

13  they could have given us notice before this.  I think the only

14  sanction here is not to be able to call the rebuttal witness.

15         THE COURT:  All right.  I'm not going to borrow

16  trouble because the government may choose not to do this.  And

17  I will -- I hear your argument, and it's an argument to be made

18  and I will consider it.  And if -- if at the time the

19  government tries to call the person, then we'll -- I'll

20  determine who the person is and what they're going to testify

21  about and whether or not to allow it in rebuttal or not.

22         And I'm not -- I have to confess I don't know a

23  precise rule of whether experts in a criminal case can be

24  called in rebuttal without disclosure.  I know, generally,

25  rebuttal experts oftentimes are not disclosed right at the

 1  get-go until you know don't know what you have to rebut until

 2  you -- you have to, and sometimes new witnesses come up in that

 3  endeavor.

 4          But an expert may be different.  I'll try to take a

 5  look at that in my spare time overnight.  But I'm not going

 6  to -- I'm not going to make a ruling right now.  I'm just going

 7  to -- I'm just going to wait and see if it's offered, and

 8  that's all I can do.  Because I don't think I'm -- I don't

 9  think I'm prepared to make that decision, and it may not even

10  come to pass.

11          All right.  So -- and then -- so it's possible that,

12  depending on the Mark Thomas situation, there might be some of

13  that.  And then it's possible, depending on whether the

14  government offers and whether I allow it, that there might be a

15  rebuttal witness for the government on coding.

16          Is that -- that would be the -- the only possible

17  areas of rebuttal; is that correct?

18          MR. DUVA:  Yes, Your Honor.

19          THE COURT:  Okay.

20          All right.  So now we know what it is and we'll deal

21  with it accordingly, but I'm not prepared to rule on the -- on

22  the coding issue or the coding witness.

23          MR. SADOW:  I understand that.  I just want to make

24  sure what I said was -- I said the wrong -- it's Rule 16, but

25  it's (a)(1)(G).

1       THE COURT:  Okay.

2       MR. SADOW:  And -- and to be accurate, it speaks only

3  in terms of case in chief, at least on its face, so I want to

4  make sure that's correct.

5       THE COURT:  Okay.  Yes, sir.

6       And, of course, if you -- if any of you have any

7  authority one way or the other that you want to favor me with,

8  I'll be happy to have it.  I know Ms. Milliron would too.

9       All right.  Mr. Duva, you said you had a matter?

10      MR. DUVA:  Yes, Your Honor.  Our records reflect that

11 23D, as in dog, was admitted.  I think the clerks do not and

12 just I'd like to move that in.  We didn't pass around the board

13 to the jury, so we're just trying to move in 23D.

14      THE COURT:  Okay.  Any objection?

15      All right.  Government's 23D will be formally

16 admitted.

17    (Government's Exhibit 23D received into evidence.)

18      MR. RAFFERTY:  Judge, I have one small housekeeping

19 matter as well.

20      THE COURT:  Yeah?  Okay.  Yes, sir.  Go ahead.

21      MR. RAFFERTY:  I raised with Mr. Hayes this morning

22 when I was direct-examining Jay Smith that I noted in the --

23      THE COURT:  Can you get that microphone a little bit

24 closer to you, sir?  Thank you.

25      MR. RAFFERTY:  Yes.  With -- with one of the

1    exhibits, I noted there was a page that -- it looks like it was

2    accidentally appended to Exhibit 7Y or 7Z, I can't recall which

3    it is.  I was going to confer with Mr. Hayes, and we just -- if

4    we both can agree, can we just remove that extra page?

5            THE COURT:  Yes.  Yes.

6            MR. HAYES:  We're going to agree, Your Honor.  I

7    looked at it when Mr. Rafferty showed it to me, and it looked

8    like he was right.

9            THE COURT:  And, by the way, in light of my ruling,

10   and there may be a couple of other exhibits.  You-all need

11   to -- you-all need to check -- check me on this, and you also

12   need to work with each other and the clerk.  There may be a

13   couple of exhibits, we talked about redacting things on the

14   fly, and I -- I want to make sure that has happened.

15           With respect to Exhibit 69, now having heard the

16   examination, I'm simply going to order the parts from page 2

17   through page 8 to be redacted so that -- so that that material

18   is not before the jury.  And I'll allow the exhibit, otherwise,

19   to go back to the -- to the jury.  So that needs to happen as

20   well.

21           All right.  What else?

22           So we -- I -- we've got a couple of things here.

23   We've got Rule 29.  We've got charge conference.  Mr. Rafferty

24   wanted to talk about closing arguments and timing on that.  And

25   we also have -- and maybe we can save this for the time when

1  the jury is deliberating -- but we also do have to address the

2  forfeiture issue.  And I know that doesn't affect all

3  defendants, but I need to know -- I need to know whether

4  parties are going to want their jury trial right as to

5  forfeiture in the event there's a conviction, and, of course,

6  I'm not predicting that, but I have to be prepared.

7          I need to know -- because if we -- because obviously

8  that's going to affect my statements to the jury and so forth.

9  So that has to be thought about.

10          I know nobody really wants to think about it, and I

11  don't blame you because you've got plenty of other things to

12  worry about, but it -- we can't let it sneak up on us.  And I

13  know we're already preparing the jury instructions if that's

14  the way we have to go.  But I -- I just -- I don't want -- I

15  don't want to let that get out of our -- of our sight.

16          So I am inclined, if we can, to -- to spend a little

17  time -- we can take a short break if you want to, but I'm

18  inclined to spend at least a little bit of time on -- on jury

19  instructions.  And then we can also -- if you're ready to do

20  so, I don't know if you are -- even if you're not 100 percent

21  ready, if there are areas that you want us to be looking at for

22  sure that -- on your first perusal, at least we can be looking

23  at that.

24          So -- and then we'll -- depending on what time of day

25  it is, we can talk about Rule 29s.

1    Let's go ahead and do some low-hanging fruit before
2    we take a break.
3        Mr. Rafferty, you said you wanted to talk about
4    closing arguments.  It looks to me like the closing arguments
5    will likely be on Tuesday.  Is -- did -- are you -- do you have
6    a proposal or you just wanted to get me to set some parameters
7    or what?  I definitely am going to set parameters and I'm going
8    to mean it, but I don't know what they are yet.  And maybe I
9    should start by asking the government what its request would be
10   for closings.
11       MR. DUVA:  Your Honor, due to the breadth and scope
12   of this case and a number of eight defendants -- and this is
13   something I've never asked for, but we're asking for 90 minutes
14   for the opening close and 30 minutes for rebuttal.
15       I know that's not something I've ever asked before.
16   This has been a long process.  We had a two-week break in the
17   evidence from the first week, and there's eight defendants that
18   we bear the burden on, assuming that everything goes to the
19   jury with all eight defendants.
20       I don't think that's unreasonable.  I don't know that
21   we'll use all of it, but this is a lot to put together.  And
22   that's why we're asking for 90 minutes in the opening close.
23   Mr. Hayes is doing that.  I'm going to do the rebuttal.  I've
24   got to rebut eight closings.  I think half an hour -- I'd like
25   to ask for more, but I think that's -- I think that's a

1   reasonable request on both ends.

2           THE COURT:  All right.

3           Mr. Rafferty, since you're the one that brought up

4   the topic, what -- what's your recommendation as to how we

5   should proceed?

6           MR. RAFFERTY:  Your Honor, I can't speak for all

7   lawyers in this case.  I think some defendants have obviously

8   been the focus more of the evidence than others.  I don't know

9   if the Court has an intention of going individually.

10          On behalf of Mr. Durall, I'd ask for -- for an --

11  about an hour.  I don't know that I'll use all that time.  I

12  think in my opening I didn't use all the time that was allotted

13  to me, but I think an hour, given -- the same reasons that

14  Mr. Duva said.

15          It was a very long trial.  There was a two-week

16  delay.  And as it relates to Mr. Durall, there was a

17  substantial amount of testimony that concerned him that I'd

18  like to have the opportunity to respond to in some fashion.

19          I think my colleague, Mr. Sadow, has spoken to some

20  of the lawyers as well about structuring this so that we can do

21  this in a way that makes sense.  I know ordinarily we go down

22  the line in the indictment, but I think he had a suggestion as

23  it relates to that.

24          THE COURT:  All right.  Mr. Sadow?

25          MR. SADOW:  It seems impractical to believe that

1  we're going to be able to do all the closing arguments on one

2  day.  If the government -- assuming the government gets what

3  it's requesting, that's two hours.  I think -- I know that I

4  would like to have at least an hour.

5          I think that other counsel, except for Zaffuto and

6  Alonzo, would want an hour as well.  So the thought would be

7  that either we get a set amount of time for the entire defense

8  group and then we can divvy it up, or we can do it

9  individually.

10          It seems to me, based on everything that I'm hearing,

11  that if we had seven -- seven and a half hours' worth of

12  arguments, we could divvy that up.  And, again, that would not

13  be able to be done on one day.

14          The order kind of thing would be, as it stands now, I

15  would probably go last.  And then there would be -- order would

16  be followed, although there may be a little change in between

17  after Mr. Rafferty.  But that's what we're thinking about.

18  There's a lot to cover, a lot of documents, a lot of witnesses.

19  Everyone has individual arguments, and, again, I doubt that the

20  Court gives that kind of argument in most cases, but we are

21  talking about -- how many real trial weeks?  Four, five weeks?

22  A good four weeks, so -- and hundreds of documents.  So that's

23  our -- our idea at this point.

24          If the Court were to consider that, if you start

25  arguments at 9:00 in the morning, we would never finish, and

1   what I would consider doing -- request doing, is if we're going

2   to break, we break before my argument.  I'd make mine the next

3   morning, and then Mr. -- I guess, Mr. Duva would be doing his

4   30 minutes.

5          THE COURT:  Let me get a little quick feel here -- I

6   appreciate everybody's thoughts.  And I -- I would, of course,

7   prefer that the closings be done in a day.  And I'm not sure --

8   I hear what you're saying, Mr. Sadow.  I'm wondering, though --

9   I'm looking here -- some of the defendants who haven't -- who

10  have not had the quantum of evidence that -- that others have

11  that they need to be responsive to, I don't want to limit them,

12  but I also wonder whether it's possible that even if I -- even

13  if, for example, I gave everybody an hour, whether there

14  wouldn't be some defendants who might not use that and maybe

15  use substantially less than that.  And let me just -- let me

16  just pick somebody and ask.

17         Ms. Galnor, what -- do you have a contemplation as to

18  how much time you'll take on closing?

19         MS. GALNOR:  Yes, Your Honor.  I estimate 15 minutes

20  or so.  I mean, I intend on being very brief.

21         THE COURT:  Mr. Lowther, what about you?

22         MR. LOWTHER:  20 minutes, Your Honor.

23         THE COURT:  Mr. Landes?

24         MR. LANDES:  I don't think I'd go more than 45

25  minutes, Judge.  I'd reserve the right for an hour, but I doubt

1    very much that I would use that.  I would probably be more like

2    40 to 45 for a whole host of reasons.

3            THE COURT:  Mr. -- I'm sorry.  I didn't mean to

4    interrupt you.

5            MR. LANDES:  And I just -- you know, Mr. Sadow just

6    brought up, you know, order again.  If Mr. Sadow wants to

7    cleanup, so to speak, and go last, that's fine.  But I would

8    otherwise prefer and expect that we go in the order of the

9    indictment, as we did with the opening statements.

10           THE COURT:  Okay.  Mr. Rowland, what's your thinking?

11           MR. ROWLAND:  I would anticipate about 30 minutes,

12   Your Honor.  I think it may go 45, depending on what's argued

13   ahead of me, but I think I'm pretty comfortable with 30 to 45

14   minutes.

15           THE COURT:  Okay.

16           MR. SADOW:  That's why I suggested maybe seven hours.

17   If you think about it, that's pretty much where we just came

18   out.

19           THE COURT:  Okay.  Well -- all right.  First of all,

20   I -- I had -- Mr. Duva, I -- you -- you're a half hour longer

21   than I was thinking.  I was thinking an hour and then 30

22   minutes on rebuttal, but I understand it's a lot of evidence

23   and you're talking about eight people.  So I think the

24   government's request is reasonable and I'll -- we'll plan on

25   that.

1    Mr. Hayes, if you're the one doing the 90 minutes,

2    there is absolutely nothing saying you have to use every minute

3    of it, but that's -- and, you know, not -- not that I'm any

4    expert, but, you know, there is the law of diminishing returns

5    at some point, so -- and then it seems to me -- let me just...

6    I'm willing to -- I'm willing to grant -- I don't --

7    I don't really know how to separate out defendants and only

8    give certain ones a certain amount of time and others -- but --

9    so I think it's -- I think it's appropriate.  I'll give each

10    defendant an hour.

11    But if Ms. Galnor only uses 15 minutes, then she only

12    uses 15 minutes of that hour, and that's all to the good.  I'm

13    not going to add that back into the -- to the mix for the other

14    defendants, though.

15    So I think each defendant will have an hour.  And how

16    they choose to use that or how much of that will be up to

17    each -- each lawyer for that party.

18    And, Mr. Sadow, the only thing I'll say to you is

19    if -- if you're going last and that's -- that's an agreement

20    that has to be discussed, and if everybody is good with it, I'm

21    not prepared to commit to you that I would hold it over just to

22    hold it over.  So, in other words, if we're done by -- you

23    know, if everybody is done by 2:30 or something, I'm going --

24    I'm going to want you to go, and I'm going to want Mr. Duva to

25    go.

1    So I think you need to be prepared, but if -- if

2  folks take -- take it -- more time than they think they are and

3  we're getting late in the day, I'm certainly not going to run

4  us here until a late hour trying to get people to listen.  And

5  if we have to carry it over, we will.  That's not my

6  preference.  So I think everybody needs to be ready to go on

7  Tuesday.

8    Each of you has an hour.  And if you need a time cue,

9  you'll -- you can get it from Ms. Hatfield.  So --

10    MR. SADOW:  The only thing I ask in that regard --

11  and, of course, I'll be ready to go whenever the Court tells me

12  to go.  That's just the way it is.  But if we can't get in the

13  government's rebuttal on the same day, I'd like the opportunity

14  at least to be on the same day as their rebuttal.

15    THE COURT:  I hear you.  You don't want the only

16  argument to be the government's rebuttal.  That's what

17  you're --

18    MR. SADOW:  Very well stated.

19    THE COURT:  All right.  I hear you.  I hear you.  I

20  would think that that wouldn't happen.  Either we're going to

21  get it all done or we're going to bleed over, I'm guessing.

22    MR. BELL:  If he takes to the end of the day, then

23  they just waive.

24    THE COURT:  All right.  So, Mr. Duva, the government

25  has its two hours and everybody else has their hour and we'll

1  just -- we'll work on it that way.  All right?  And -- but I

2  want everybody ready to go on Tuesday, because if -- if the

3  thing starts to go, and it might, you know, you need to be

4  ready to be the next person up and -- all right?  All right.

5  So that's that.

6          All right.  I think -- I'm going to take just a --

7  just a five-minute comfort break for everybody and then let's

8  see what we can get done here.

9          MR. BELL:  Jury instructions, you mean?

10          THE COURT:  Yeah.

11      (Recess from 4:44 p.m. to 4:49 p.m.; all parties present.)

12                            * * * * *

13      (Whereupon the charge conference was reported, but not

14  transcribed.)

15                            - - -

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATE**

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA       )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 16th day of June, 2022.



                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC