IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Jacksonville, Florida |
| Plaintiff, | Case No. 3:20-cr-86-TJC-JBT |
| vs. | June 17, 2022 |
| JORGE PEREZ, et al., | 8:52 a.m. |
| Defendants. | Courtroom No. 13A |

EXCERPT OF JURY TRIAL PROCEEDINGS
(VOLUME XVIII)
(CHARGE CONFERENCE NOT TRANSCRIBED)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT COURT JUDGE

COURT REPORTER:

Shannon M. Bishop, RDR, CRR, CRC
221 North Hogan Street, #150
Jacksonville, FL 32202
Telephone: (904) 549-1307
dsmabishop@yahoo.com

(Proceedings reported by mechanical stenography; transcript produced by computer.)

# A P P E A R A N C E S

GOVERNMENT COUNSEL:

    **ANDREW TYSEN DUVA, ESQ.**
    US Attorney's Office - FLM
    300 North Hogan Street, Suite 700
    Jacksonville, FL  32202

    **GARY A. WINTERS, ESQ.**
    United States Department of Justice
    1400 New York Avenue NW
    Washington, D.C.  20902

    **JAMES V. HAYES, ESQ.**
    Department of Justice, Criminal Division, Fraud Section
    1400 New York Avenue, N.W.
    Washington, D.C.  20902

COUNSEL FOR DEFENDANT JORGE PEREZ:

    **THOMAS M. BELL, ESQ.**
    Thomas M. Bell, PA
    301 West Bay Street, Suite 1460
    Jacksonville, FL  32202

COUNSEL FOR DEFENDANT RICARDO PEREZ:

    **RICHARD J. LANDES, ESQ.**
    Richard Landes, Esq.
    736 2nd Street North
    Jacksonville Beach, FL  32250

COUNSEL FOR DEFENDANT AARON DURALL:

    **BRIAN T. RAFFERTY, ESQ.**
    BakerHostetler
    1170 Peachtree Street NE, Suite 2400
    Atlanta, GA  30309-7676

COUNSEL FOR DEFENDANT JAMES F. PORTER, JR.:

    **SETH SCHWARTZ, ESQ.**
    **ALBERT J. TASKER, IV, ESQ.**
    Schwartz Law Group, PA
    10365 Hood Road, Suite 105
    Jacksonville, FL  32257

COUNSEL FOR DEFENDANT SEAN PORTER:

    **CALEB D. ROWLAND, ESQ.**
    Rowland Law
    2130 Riverside Avenue
    Jacksonville, FL 32204

COUNSEL FOR DEFENDANT CHRISTIAN FLETCHER:

    **STEVEN H. SADOW, ESQ.**
    **VINCENT ALBERT CITRO, ESQ.**
    Steven H. Sadow, PC
    260 Peachtree Street NW, Suite 2502
    Atlanta, GA 30303

COUNSEL FOR DEFENDANT NEISHA ZAFFUTO:

    **JOSHUA SABERT LOWTHER, ESQ.**
    Lowther Walker, LLC
    Centennial Tower
    101 Marietta Street NW, Suite 3325
    Atlanta, GA 30303

COUNSEL FOR DEFENDANT AARON ALONZO:

    **DARCY D. GALNOR, ESQ.**
    Galnor Shumard, PA
    121 West Forsyth Street, Suite 610
    Jacksonville, FL 32202

# T A B L E   O F   C O N T E N T S

Page No.

PROCEEDINGS:

Defendant James Porter, Jr. rests................. 96
Defendant Neisha Zaffuto rests.................... 97
Defendant Aaron Alonzo rests..................... 97
Defendant Sean Porter rests..................... 103
Defendant Fletcher rests........................ 104


WITNESSES FOR THE DEFENDANT:

**MICHAEL F. ARRIGO**
DIRECT EXAMINATION BY MR. SCHWARTZ................ 40
CROSS-EXAMINATION BY MR. HAYES................... 58
REDIRECT EXAMINATION BY MR. SCHWARTZ............. 94

## E X H I B I T S   R E C E I V E D

Page No.

Government's Exhibits:

70............................................... 88

Defendant Fletcher's Exhibits:

95 and 96........................................ 104

1          P R O C E E D I N G S

2  June 17, 2022                                    8:52 a.m.

3                        - - -

4          COURT SECURITY OFFICER:  All rise.  This Honorable

5  Court is now in session.

6          Please be seated.

7          THE COURT:  All right.  Good morning.  The -- let's

8  go ahead and deal with the issue involving Ricardo Perez.

9          Mr. Landes, what's the situation?

10         MR. LANDES:  Good morning, Judge.

11         THE COURT:  Good morning.

12         MR. LANDES:  I got an early morning phone call --

13  actually, the phone call was from Mr. Bell.  My understanding

14  was that Ricardo Perez, on his way to court this morning, fell

15  down a flight of stairs, went head over shoulders and injured

16  himself.

17         He was not able to get up, he was not able to move.

18  An ambulance was called.  He was brought to UF Shands hospital.

19  He has been checked out.  The very latest news I got just about

20  a minute ago through his brother, Jorge Perez, is that he may

21  have suffered a cracked or fractured rib, but he's being taped

22  up, he's been tested, MRIs, tests like that, and he is going to

23  be discharged shortly.  He needs to return to the place that

24  he's staying, get dressed for court.  And in terms of how

25  quickly he can be here, it's now five of 9:00.  I'm going to

1    take a guess and say he can probably be here by 10 o'clock.  I

2    have -- maybe not 10 o'clock.  All right.  I'm getting -- I'm

3    getting maybe not quite that early.

4            So -- so that's the latest that -- that I know.  I

5    did speak to him briefly this morning.  In terms of moving

6    forward -- and, of course, this is up to the Court -- I did ask

7    him specifically, Would he waive his appearance for some of

8    these expert witnesses?  He indicated to me that he would, that

9    he wanted the trial to go on.

10           I did some very cursory brief research this morning.

11   Under Federal Rule 43(c)(2), I believe that Mr. Ricardo Perez

12   can waive his appearance for a portion of this trial.

13           Now, the waiver that I got was oral.  I don't have

14   anything in writing from him.  I don't know if that's

15   something -- you know, a way the Court wants to proceed.

16           I would suggest giving this perhaps an hour if we

17   need to -- one counsel said perhaps -- I think it was actually

18   Mr. Duva that said perhaps we could go forward with something

19   like Rule 29 motions in more depth this morning.  I don't think

20   that Mr. -- I think that Ricardo Perez would -- would not

21   necessarily need to be present for that.

22           It's up to the Court in an abundance of caution, but

23   it's not going to be the whole day.  As I said, I believe he's

24   about to be discharged.  He may be in some pain if he's got a

25   fractured rib or a cracked rib.  That was his indication to me

1　this morning that he was in a fair amount of pain.  That's the

2　latest that I have, Judge.

3　　　　THE COURT:  Okay.  Well, we certainly wish him well.

4　Let me -- Mr. Landes, before I proceed, I -- of course, I have

5　the exact same rule that you have, which is rule 43, so I -- so

6　I'm -- I think he -- I think we can take a waiver from him and

7　proceed if -- especially given the type of testimony we're

8　likely to hear this morning, because it's really a defense

9　expert, as I understand it.  But let me find out exactly what

10　we're dealing with here today in terms of witnesses and so

11　forth.

12　　　　So, Mr. Schwartz, what is -- is your -- is

13　Mr. Arrigo -- is it Mr. or Dr.?  I'm not sure.

14　　　　MR. SCHWARTZ:  Mr.  He's -- he's present, Judge.

15　　　　THE COURT:  He's ready to go?

16　　　　MR. SCHWARTZ:  Yes, sir.

17　　　　THE COURT:  All right.  And so he'll be our first

18　witness.  And then, Mr. Sadow, are you still in the posture of

19　waiting to hear Mr. Arrigo before you make a decision or have

20　you made a decision?

21　　　　MR. CITRO:  I have not made a decision -- we have not

22　made a decision.  We're -- we're still in the waiting posture.

23　　　　THE COURT:  I'm sorry, Mr. Citro.  If I'm asking the

24　wrong person, I forgot the --

25　　　　MR. SADOW:  Judge, he was talking through me.

1    MR. CITRO:  It's fine.  It's no problem.  We are

2 still in the same posture.  We're going to listen to

3 Mr. Arrigo.  Mr. Herbers arrived last night in Jacksonville.

4 He's present here today.  And if we need him, we'll put him on

5 the stand after Mr. Arrigo.

6    THE COURT:  Okay.  And as I understood it from

7 yesterday, that would be the totality of any further defense

8 evidence; is that correct?

9    MR. CITRO:  Subject to the admission of the two

10 exhibits that I don't think the Court actually received, for

11 which the predicate was laid during the government's case in

12 chief, that is correct.

13    THE COURT:  Okay.  Is there any -- any other

14 defendant -- has a witness or evidence that they're going need

15 to put in?  I -- I will have to ask each of you, of course,

16 about your case in front of the jury, but, Mr. Rowland?

17    MR. ROWLAND:  The -- the exhibit that we provided you

18 yesterday.  And then I'm going to be --

19    THE COURT:  Right.

20    MR. ROWLAND:  -- contacting Florida Blue's counsel

21 today at our lunch break to find out if we can possibly get

22 those documents earlier.  If so, I'll get with the government,

23 find out if we can admit those without testimony.

24    THE COURT:  And remind me what they are.

25    MR. ROWLAND:  They are the employment information for

1    Agent Schwinger.

2            THE COURT:  Okay.

3            MR. ROWLAND:  But if -- if we can't get those, then

4    it would be Tuesday morning that we'd be able to put those

5    in -- well, assuming that the -- the witness actually shows up.

6            THE COURT:  Yeah.  Well, the witness, meaning who?

7            MR. ROWLAND:  Well, we had asked that the records

8    custodian appear so that in the event that there was an

9    argument over admissibility, they could testify as to those --

10   those records.

11           THE COURT:  And are you in contact with Florida Blue

12   or not?

13           MR. ROWLAND:  I haven't contacted them yet, but I

14   plan to at our lunch break.  I know that Mr. Duva had contacted

15   them a few days ago.  He sent me an e-mail with the -- with the

16   counsel's contact information.

17           THE COURT:  Is that Jared Burns?

18           MR. ROWLAND:  I'm sorry?

19           THE COURT:  Is that Jared Burns?

20           MR. ROWLAND:  I'm not sure what the name is, Your

21   Honor.  I'll have to check the e-mail.

22           MR. DUVA:  Yes, Your Honor.  I gave him Jared Burns's

23   name.  I spoke with Jeremy Ches on his -- on their behalf, and

24   gave them Jeremy Ches's direct phone number at Florida Blue.

25           THE COURT:  Okay.

1          MR. DUVA:  I was asked to do more.  I'm, like, I

2     really don't know what else I can do.

3          THE COURT:  All right.  I -- I guess, Mr. Rowland,

4     I'm not sure why you're waiting until lunchtime on Friday to be

5     talking to -- I mean, Jared Burns has been representing Florida

6     Blue in this case the entire time.

7          Jeremy Ches is their in-house person, and they've

8     been sitting in the courtroom here.  They've been -- I -- I

9     guess I'm -- I'm not sure about waiting until Tuesday for these

10    records.  So, I mean, I'm not -- I'm not being critical, but I

11    -- I just -- I'm not understanding what's -- what's stopped you

12    from talking to them.

13         MR. ROWLAND:  Well, I only got the contact

14    information, I believe, Wednesday night.

15         THE COURT:  Okay.

16         MR. ROWLAND:  Was kind of tied up in court all day

17    yesterday, and then dealing with the Rule 29 stuff last night.

18    So I've been a --

19         THE COURT:  Okay.  Yeah.  I understand it's hard to

20    run a case and get witnesses, too, but I guess I'm -- all

21    right.  Well, let's see what can happen.  I would hope that --

22    if that's available, I would hope that it could be produced.

23    I'm trying to think of -- who would be aware of this request on

24    Florida Blue's side now?  Where -- where did you serve it?

25         MR. ROWLAND:  It had to be served through the

 1 | Department of Financial -- I forget the last word on that.  I
 2 | know that they have -- I know that it has been served.
 3 |         THE COURT:  Okay.
 4 |         MR. ROWLAND:  So, like I said, I mean, I'm going to
 5 | contact them, but I -- unless Your Honor wants me to walk
 6 | outside and give them a call right now, I can do that, too, but
 7 | I thought it would probably be better to...
 8 |         THE COURT:  Okay.  All right.  All right.  But other
 9 | than that, there's no other defense case, Mr. -- right?
10 |    (No response.)
11 |         THE COURT:  Okay.  Mr. Duva, what's -- what's the
12 | government's rebuttal thinking?
13 |         MR. DUVA:  Thinking it's unlikely.  We'll see what
14 | Mr. -- how it goes with Mr. Arrigo.  That individual we talked
15 | about yesterday, Kara McVey, is in Arizona, but I -- I'm not
16 | saying absolutely not, but I think it's unlikely that we would
17 | have any rebuttal case.
18 |         THE COURT:  Okay.  All right.
19 |         MR. SADOW:  Your Honor, I know that you're
20 | considering the potential waiver, but with all due respect,
21 | we're in a situation where a man went to the hospital, may be
22 | in pain, may be using medication, may be under the influence of
23 | pain medication.  To suggest that that, in some form or
24 | fashion, would put the Court in a position to accept a waiver,
25 | if, unfortunately, things don't go well, that wouldn't be

1   challenged later, I think the Court's experience, my experience

2   would be you're just asking for trouble.

3          THE COURT:  I don't know about that.  I -- I mean,

4   the rule says the defendant who is initially present at trial

5   or have pleaded guilty or nolo contendere waives the right to

6   be present under the following circumstances.  When the

7   defendant is voluntarily absent after the trial has begun

8   regardless of whether the Court informed the defendant of an

9   obligation to remain during the trial.

10          I guess you're suggesting that Mr. Ricardo Perez

11   isn't voluntarily absent, even though he's -- I mean, what --

12          MR. SADOW:  That's -- that's precisely it.  I mean,

13   again, I haven't researched it and, therefore, I'm not

14   suggesting that what I'm saying is definitive, but I find it

15   hard to believe that any Court reviewing this would say that he

16   voluntarily absented himself by accidentally falling down a

17   flight of stairs and having to go to the hospital.

18          THE COURT:  So, Mr. Landes, I guess I wasn't

19   understanding you to be -- what was -- what's your position?  I

20   thought your position was that your client was waiving his

21   appearance and that we could go forward with his blessing.

22          MR. LANDES:  That is my representation, Judge.  I did

23   speak to him this morning.  He was lucid.  It was one of the

24   first things that I thought to ask him.  He expressed to me

25   that he wanted things to go on.  He knew the who witness

 1   was who was going to appear.  He's aware of the fact that I

 2   have not cross-examined or examined any of the defense

 3   witnesses.

 4        I certainly wouldn't waive his appearance for

 5   something like government summation or my summation.  But that

 6   was what he had indicated to me, is that he was willing to have

 7   these proceedings go forward, at least just in terms of this

 8   one particular expert, without him.

 9        THE COURT:  What's the government's position?

10        MR. DUVA:  Your Honor, I certainly appreciate

11   Mr. Landes's position and representation.  I believe it's

12   accurate, but I think the problem is we don't have a waiver

13   from Ricardo Perez.  We have one through Mr. Landes, that he

14   spoke to him.  But I think we should probably -- the Court

15   should probably in some way communicate directly with

16   Mr. Landes [sic] to perfect the record on this.

17        THE COURT:  You don't mean Mr. Landes; you mean

18   Mr. Perez?

19        MR. DUVA:  Ricardo Perez, yes, sir.

20        THE COURT:  And do we know where he is right now,

21   Mr. Landes?

22        MR. LANDES:  Judge, I tried -- right before court was

23   in session, I tried to reach out to him.  I couldn't even get

24   through to his phone or get through to him.  I don't even know

25   if he has his phone on him at this time.

     1          And that was also Mr. Jorge Perez -- Mr. Jorge

     2   Perez's idea, that maybe he didn't even have his phone on him

     3   or maybe it wasn't turned on.  So --

     4          THE COURT:  Where did he fall, in the hotel or...

     5          MR. LANDES:  He's staying in -- they're staying in an

     6   Airbnb in Springfield, and they're on a second floor, and

     7   there's a narrow flight of stairs going down and a turn.  And

     8   he had his bag and his laptop, so he tumbled down a flight of

     9   stairs, Judge.

    10          THE COURT:  Sure.

    11          MR. LANDES:  It wasn't just a quick, you know, slip

    12   and fall.

    13          THE COURT:  Yeah.

    14          MR. LANDES:  Judge, I might -- maybe at 9:15, we

    15   could get through to him, but -- if -- that's a very short

    16   delay, and I could get an update then.

    17          THE COURT:  Yeah.

    18          MR. LANDES:  If the Court is willing to -- you know,

    19   to do that.

    20          THE COURT:  All right.  Well, I'm -- I'm not -- I'm

    21   not so...

    22      (Counsel confer.)

    23          MR. LANDES:  I have no objection -- or, actually, it

    24   should be Mr. Bell.  But Mr. Bell, I don't think, has any

    25   objection if Jorge Perez wants to speak on this.  He spoke

1    directly to a nurse or hospital personnel at the hospital, and

2    he has more information than I do.  So that's something that if

3    the Court wants to hear directly from Jorge Perez, he may be a

4    better source of information.

5         MR. BELL:  Judge, no objection -- Mr. Perez, just

6    tell him.  You just spoke with him about ten minutes ago.

7         DEFENDANT J. PEREZ:  Yes, Your Honor.  I spoke with

8    the attending ER nurse, and she was by his bedside, and she

9    said that he was -- he was conscious, he was fine, and they had

10    done several diagnostic tests, and that he was -- they think he

11    probably has a fractured rib, one or two of them, but he is in

12    a little bit of pain, but they were going to give him

13    something -- just something light to get the pain out, but that

14    they were going to discharge him.  They -- she didn't tell me

15    the time, but they said that they were going to discharge him.

16    So...

17         THE COURT:  All right.  Thank you, sir.

18         Well, I don't -- I don't -- I don't gainsay the right

19    of a defendant to be present in a criminal trial that affects

20    that defendant.  It's important -- it's an important right.  It

21    can be waived.

22         And I initially thought that a waiver potentially

23    is -- is available here.  But when I have -- when I have both

24    counsel for -- for Mr. Fletcher offering his, I assume, opinion

25    as an officer of the court, and then I have the government also

1   expressing their concern about whether it's appropriate to go

2   forward without a more explicit waiver, that's something I have

3   to pay attention to and think about.

4         And so -- and we had -- of course, this issue just

5   came up. I was telling my folks upstairs that I'm -- by the

6   end of this trial, every single legal issue that exists is

7   going to have occurred. And so we had an opportunity to pull

8   Rule 43. We had an opportunity to find one Eleventh Circuit

9   case about a disruptive defendant. And -- but that's a little

10   bit different situation.

11         So we probably need to -- to take a deep breath here

12   and think about what we need to do. So I guess the question I

13   have is -- I certainly can tell the jury we're on standby. I

14   guess I'll just, for now, tell them that -- that a matter has

15   come up, and it's just going to take us a little bit of time.

16         I would -- I'm still, of course, hoping and expecting

17   we'll be able to complete the testimony today. And -- but let

18   me -- I think a couple things need to happen.

19         Mr. Landes, you need to continue to try to find out

20   Mr. Ricardo Perez's whereabouts and to try to determine when he

21   might be able to be here, the soonest he can be here, if he's

22   able to do so.

23         And I'm not that worried about him giving a waiver.

24   I'm not -- if he -- if he's being judged to be lucid by both

25   the medical staff and by Mr. Landes, I'm not all that worried

 1   about it, but we probably need some more direct contact with

 2   him.

 3          Perhaps even a -- even a phone contact would be

 4   potentially available if we can reach him, so that we can at

 5   least hear him, and I can make a determination as to whether

 6   any waiver is voluntary or at least make an assessment of when

 7   he'd be able to -- to return.  So maybe we can see if that's

 8   possible.

 9          In the meantime, Mr. Rowland, this will give you an

10   opportunity to call Mr. Burns or Jeremy Ches, whoever --

11   whoever is the right person to call and see what you can do

12   about those documents.

13          I also -- I also, of course, am continuing to review

14   the jury instruction issues that were discussed yesterday.

15   I've made some tentative decisions.  We're -- we're still

16   looking at a couple of the issues upstairs -- or, I guess,

17   downstairs.  And so I'm not ready to -- to make final rulings

18   yet, but I'm getting pretty close.

19          And I don't know what else to do at the moment.

20          MR. SADOW:  Your Honor, we did submit a supplemental

21   instruction just a little while ago by e-mail.  I e-mailed it

22   to everybody.  I know no one's had a chance to look at it yet,

23   but I just wanted to let the Court know.

24          THE COURT:  What's the topic?

25          MR. SADOW:  You might remember during the trial, we

 1  were talking in terms of basically violations of civil law not

 2  being violations of criminal law in and of themselves.  It's in

 3  that area.

 4          THE COURT:  And where did you -- you said you sent an

 5  e-mail.  Which --

 6          MR. SADOW:  I sent it to Susanne.

 7          THE COURT:  Susanne?  Okay.  That's fine.  Yeah,

 8  because -- that's fine.

 9          MR. SADOW:  And I can print one if you want.

10          THE COURT:  No, that's fine.  If we've got it

11  upstairs, we can -- we'll take a look at it.

12          All right.  So, Ms. Hatfield, tell -- tell the jury I

13  apologize, but we're in a -- in a delay with a matter that

14  needs attention, and that we are -- they -- we would not call

15  them back into session for at least 30 minutes, and that

16  we'll -- we'll let them know after that.  Okay?

17          All right.  I'm going to -- I'm going to be in recess

18  for 30 minutes.  If there are developments that have me come

19  down sooner, then I'll be happy to -- to come down sooner, but

20  I -- I want to give people a chance to see what's going on.

21  And -- but I'm not aware of anything else we can do at this

22  moment.

23          Right?

24          MR. RAFFERTY:  I have a housekeeping request, Judge.

25          THE COURT:  Yes, sir?

 1          MR. RAFFERTY:  I know I am required to submit a thumb

 2   drive with all my exhibits.

 3          THE COURT:  Yeah.

 4          MR. RAFFERTY:  Unfortunately, I think I need some

 5   copies of those so that I can scan them.  And so in this break,

 6   if I could just have access to some of the Durall exhibits,

 7   I'll run to the library and make some copies and get that

 8   started.

 9          THE COURT:  Sure.  That's fine.  However -- however

10   you want to do it.  Sure.

11          All right.  We're in recess for 30 minutes, unless I

12   get called sooner.

13          COURT SECURITY OFFICER:  All rise.

14      (Recess from 9:14 a.m. to 10:20 a.m.; all parties

15   present.)

16          COURT SECURITY OFFICER:  All rise.  This Honorable

17   Court is now in session.

18          THE COURT:  Everybody have a seat.

19          All right.  Mr. Landes, what's the latest?

20          MR. LANDES:  Judge, Ricardo Perez has suffered two

21   cracked ribs.  So he is -- I doubt he's going to be with us

22   today.  He is still in the hospital.  I have not been able to

23   speak to him despite repeated efforts.

24          What we did do is -- is Civil Lawyer Ron Marney, who

25   has been in the courtroom for most of this trial -- I think he

 1    was his civil lawyer in the Missouri case.  But in any event,

 2    Mr. Marney personally went to the hospital.  He drafted a

 3    waiver.

 4         He and I have spoken about it, about the language

 5    that should be in there.  I believe he's having Ricardo Perez

 6    read that and sign that, and he's on his way, at some point in

 7    time, back from the hospital.  I did say to him if there is any

 8    way possible that I could talk to Ricardo, I'd really like to

 9    hear this, once again, from Ricardo Perez.  I'd like to hear it

10    from the horse's mouth.  Even though I trust Mr. Marney, I

11    would like to hear it personally.  So Mr. Marney attempted

12    to -- he is attempting to get him somehow to a nurse's station

13    so that he can call me.  I'm awaiting that call.  But that's

14    everything that's going on.

15         If I'm not able to speak to Ricardo Perez, I expect

16    that within the next half an hour or so, maybe less than that,

17    Mr. Marney will be back here with a signed waiver from Ricardo

18    Perez.

19       (Counsel confer.)

20         MR. LANDES:  Oh, I'm sorry.  He's also -- I'm

21    informed he's undergoing some CT scan, CT contrast testing,

22    some additional testing as well.

23         THE COURT:  All right.  Well, I'll tell you what --

24    what I know, and then I'll hear from anybody else as to any

25    suggestions as to how we proceed.

1      Of course, we all know what Rule 43 says in terms of

2  the right to be present.  There's also a constitutional right

3  to be present as well in certain circumstances.  So it's an

4  important right, and we don't want to -- we rightly need to be

5  careful about it.

6      I have -- I have an Eleventh Circuit case *United*

7  *States versus Novaton*, 271 F.3d 968, in which -- in which the

8  absence from trial was the issue.  And in that case, the -- it

9  was an eight-week-long trial, and the defendant -- one of the

10  defendants took ill.  His counsel waived his right to be

11  present and requested permission to allow the defendant to stay

12  home because he was still feeling poorly.

13      The Court agreed.  The next day, counsel reported to

14  the Court that the defendant was physically unable to

15  participate in the trial, and he -- he consented to have the

16  trial go forward.  However, he said that if it got to parts

17  that were relevant to his case, that he would -- he would not

18  be agreeing to do that.

19      So the whole case is really about what happened after

20  counsel withdrew the consent.  And the Eleventh Circuit ended

21  up reversing because the consent had been withdrawn, and they

22  were -- and they actually put on evidence that was -- that bore

23  on that defendant's situation.  And so I won't -- I won't go

24  through the whole thing.  But the Eleventh Circuit reversed.

25      You can read the case, though, as having no problem

 1 with the initial couple of days when counsel had consented and

 2 they asked to go forward.

 3         So it does appear that -- that a waiver could be

 4 obtained to -- to allow us to go forward in -- in a lawful way.

 5         I'm -- I guess I'm wanting -- if we can, I'd like

 6 to -- the written waiver, I think will be helpful if it's

 7 obtained.  I guess we'll have to look at it and see -- see what

 8 it says, but I guess -- I guess we'd have to determine whether

 9 I can accept the written waiver without further inquiry or

10 whether -- whether I need more information in order to be able

11 to accept it correctly.

12         I do think we have some situation here that I'm --

13 that I -- I think is -- is important to -- to put into context.

14 One is that Ricardo Perez has rested his case.  And the only

15 testimony that we know for sure we're going to hear today are

16 two defense experts, maybe one, who -- and so the proceedings

17 are -- are such that, unlike in this Novaton case, matters

18 directly -- that -- that Mr. Ricardo Perez would be directly

19 responding to or part of, are not going to be held today.

20         So I do think that is something that distinguishes it

21 from other situations where it might be more problematic.

22         MR. BELL:  Your Honor, could Mr. Jorge Perez be

23 excused to take the phone?  It could be him.

24         THE COURT:  Yes.  Yeah.  Sure.

25     (Counsel confer.)

1          MR. LANDES:  Judge, my understanding is that Ron

2    Marney, who is his civil lawyer, does have a written waiver in

3    hand, is on the way back, but I was not able to speak to

4    Mr. Ricardo Perez because Mr. Perez, Ricardo Perez, is being --

5    was taken for a CT scan, so I couldn't speak to him.

6          Judge, I just wanted to add this, too.  In terms of

7    the waiver, the waiver would be for today.  He is not waiving

8    his right to be present for either the government summation or

9    for my summation come Tuesday.

10          THE COURT:  Of course.

11          MR. LANDES:  But this is Friday, we have three days,

12   so I would fully expect that he could be in court.  I would

13   hope that he could be in court on Tuesday.

14          THE COURT:  Yeah.  I understand.

15          And the other thing that I -- that I think I'm going

16   to be thinking about is -- is the prejudice to the other

17   defendants and -- and to the trial itself.  We know the history

18   of this trial and how -- how many delays we've already taken.

19   We also know that these -- that the jurors are being held

20   together, but we -- we -- and we expect that they'll be able to

21   complete their service, but it's -- every day that goes by that

22   we're not complete, it raises that concern, especially given

23   the health -- health challenges that everybody in this case

24   seems to have had, including jurors.

25          So I think -- I think I am inclined to try to take a

1  waiver if I can -- if I can feel comfortable that I've got one

2  that's appropriate, especially, as I said, given that

3  Mr. Ricardo Perez has rested his case, that his lawyer is not

4  opposing and, in fact, asking the Court to go forward, just for

5  today, and that in the overall scheme of the case -- if he was

6  the only defendant, of course, or if we were in a different

7  scenario, I -- I might be -- I might just say let's just wait.

8  But I -- I do think if we can get a valid waiver, we ought to

9  get one and -- and go forward.

10         So I guess my thought right now is we'll have to wait

11  for Mr. Marney to come back.  Perhaps I can ask him to state on

12  the record his assessment of Mr. Perez's state at the time that

13  he signed the waiver.  We can look at the waiver, and then we

14  can make a determination as to whether we have a sufficient

15  record of a voluntary waiver of his right to be present in

16  order to go forward.

17         I think that's my -- I think that's my proposal.

18  If -- if it turns out we can talk to him personally, that's

19  fine, but I'm not necessarily saying that that's a deal

20  breaker.  So that's what I'm thinking right now.

21         Does -- Mr. -- Mr. Duva, you had counsel for the

22  Court earlier.  What's your counsel right now?

23         MR. DUVA:  I think that course makes sense, Your

24  Honor.

25         THE COURT:  Okay.  Mr. Sadow, you also had counsel

1    for the Court.  What's your thinking?

2         MR. SADOW:  I agree with the government.  I agree

3    with the Court's position.

4         THE COURT:  All right.  So we're going to have to

5    wait for Mr. Marney to get back, and I'll ask him to come up as

6    an officer of the court and -- and describe the situation and

7    how he obtained the waiver, and I'll have to look at the

8    waiver.

9         And assuming I can satisfy myself that that's

10   acceptable and assuming that -- that counsel who are advising

11   me as both -- both directly involved and as officers of the

12   court -- assuming that we can't think of -- of some reason not

13   to go forward, I think we're going to try to go forward at that

14   time.

15        Mr. Rowland, while we're waiting for a moment -- and

16   I'll probably take a recess until Mr. Marney gets back, but

17   I -- for some reason I have Sean Porter 1, which is always a

18   bad thing when I have the exhibits.  So I'm giving it to

19   Ms. Hatfield right now.  That's been admitted.

20        What's the situation with your Blue Cross subpoena?

21        MR. ROWLAND:  I was in touch with Mr. Byrns.  They're

22   reviewing it.  He's supposed to be getting back to me sometime

23   this afternoon.

24        THE COURT:  Okay.

25        MR. ROWLAND:  I should have some more information for

1    you after lunch, Judge.

2         THE COURT:  Okay.  And, Mr. Sadow, I did get your

3    proposed jury instruction.  I'm taking -- I'm taking a look at

4    that.  I'm -- I'm taking a look at that.  We'll address that.

5    We'll probably -- you know, depending on how this plays out,

6    we'll -- we'll, I assume, have some time this afternoon to

7    hopefully address jury charge matters and get the -- get the

8    charges settled.  I think we're pretty close.

9         As I said, I've made -- I made a couple of decisions

10   last night, and then I've got -- we've got some -- I've got

11   some research out in the field on a couple of the issues, the

12   venue issue being one.

13        The issue of whether the -- the Court should agree

14   with Mr. Sadow's verdict form, which I -- as I take it, says

15   that if his client is found not guilty as to Count One, that he

16   can't be found guilty of the money laundering counts.  We're

17   looking at both those things.

18        Obviously, I'll take advice from the lawyers when we

19   get back to that, but -- but we're -- we're taking an

20   independent look at both of those issues, and that's what I'm

21   doing right now.

22        MR. BELL:  Judge, I presume that would apply to

23   all -- be relevant to everyone.

24        THE COURT:  Yes, sir.  Yes, sir.

25        All right.  I don't think we can do anything else

 1    until we address this waiver issue, so I'm just going to be in

 2    recess until -- he's on his way back?

 3             MR. LANDES:  Yep.  He's on his way back from the

 4    hospital.

 5             THE COURT:  Okay.

 6             MR. LANDES:  He's in a car -- in an Uber.  He's on

 7    his way back.

 8             THE COURT:  Okay.

 9             MR. LANDES:  And I don't think UF -- UF Shands is too

10    far away from here.

11             THE COURT:  Okay.  All right.  Well --

12             MR. BELL:  Going to advise the jury?

13             THE COURT:  Yeah, we'll -- we'll tell the jury.  And

14    I -- you know, I'm inclined to tell the jury what happened.  I

15    mean, I -- you know, I mean, there's -- there's an instruction

16    that you can't have sympathy for people and so forth, but, you

17    know, I'm inclined to treat them like adults and say this

18    happened, and -- and we -- we're going to go forward, and he'll

19    be back.

20             But we'll -- we'll talk about that when I come back

21    out.  All right.  We're in recess until Mr. Marney...

22             Ms. Hatfield, will you let the jury know we're still

23    handling a matter and I'll get to them as soon as I possibly

24    can.

25             COURTROOM DEPUTY:  I will.

```
 1              THE COURT:  Thank you.
 2         (Recess from 10:33 a.m. to 10:48 a.m.)
 3              THE COURT:  All right.  I believe everyone's present.
 4              Is that correct?
 5              MR. LANDES:  Mr. Lowther, I think, is missing.
 6              THE COURT:  Say it again.
 7              MR. LANDES:  I think Mr. Lowther is -- is not here.
 8              THE COURT:  Okay.  We'll get him.
 9              Ms. Zaffuto, do you know where Mr. -- Ms. Zaffuto, do
10    you know where Mr. Lowther is?
11              DEFENDANT ZAFFUTO:  No, Your Honor.  I do not.  I
12    will call him.
13              THE COURT:  Okay.
14              DEFENDANT ZAFFUTO:  Your Honor, it's going straight
15    into voicemail.
16              MR. SADOW:  I just texted him as well.
17              MR. CITRO:  I did, too.
18              MS. GALNOR:  I did, too.  I think we all did.
19              THE COURT:  Do you have -- do you have Tom down --
20    with your colleague downstairs?  Oh, here he is.  Okay.
21         (Counsel enters the courtroom.)
22              THE COURT:  All right.  We are now all gathered.  So
23    I'm going to try to make a record here and then see where we
24    are.
25              So the issue is, this morning, that Mr. Ricardo
```

1  Perez, one of the defendants in our -- in our case here,

2  unfortunately fell down a flight of stairs and apparently has

3  injured himself sufficiently that he is in the hospital

4  having -- undergoing tests.  We -- we think the nature of that

5  injury are likely some type of broken ribs.  He's being

6  evaluated.  It -- it doesn't appear to be more serious than

7  that at the moment, which is good, of course.

8          And when this happened earlier this morning,

9  Mr. Landes, his lawyer, was able to speak with Mr. Ricardo

10 Perez and has represented to the Court that Mr. Ricardo Perez

11 did, in fact, not wish to continue the case, and did wish the

12 case to go forward today in his absence because it does look

13 like he will be absent for today.

14          The Court, with advice of counsel in -- in the case

15 here, was concerned that that statement, even though almost

16 certainly good enough, in an abundance of caution, that the

17 Court ought to do more to try to determine whether Mr. Ricardo

18 Perez, in fact, was waiving his appearance today and was, in

19 fact, inviting and encouraging the trial to continue today in

20 his absence.

21          And so as part of that effort, Mr. Marney went to the

22 hospital and has obtained a written waiver from Mr. Perez,

23 which I have in front of me right now.

24          And Mr. -- is Mr. Marney in the courtroom?  Could you

25 come up to the podium, please, sir.

1   And I've seen you, sir.  I think you've been in a

2   good part of the trial; have you not?

3           MR. MARNEY:  I have.

4           THE COURT:  Yes.  Okay.  Good.

5           So, Mr. Marney, can -- just for the record, can you

6   tell us who you are and what your relationship is to the -- to

7   Mr. Ricardo Perez and to the case?

8           MR. MARNEY:  I'm a lawyer licensed in Missouri and

9   Kansas.  I'm not -- I've not entered appearance in this case,

10  but I represent both of the Perez brothers on other matters.

11          THE COURT:  Okay.  And so you have -- so Mr. Ricardo

12  Perez is your client.  I know he's not your client in this

13  case, but he is your client?

14          MR. MARNEY:  That's correct.

15          THE COURT:  Okay.  And were you -- will you just

16  describe what you did this morning in terms of going to the

17  hospital?  Describe how you found Mr. Perez, describe the

18  circumstances under which you obtained this waiver, please.

19          MR. MARNEY:  Yes.  Well, I was here this morning and

20  nobody could get ahold of Mr. Perez.  I have since learned

21  there's zero reception in the emergency room.

22          So I went back, I talked to him.  He had talked to

23  either Mr. Landes or to Jorge Perez and said, You can help me.

24  They would like a written waiver.

25          So I got a piece of paper and went out to where I had

1  reception, and at Mr. Landes's direction, I wrote down what you

2  have in front of you.

3      THE COURT:  Okay.  And so this is your handwriting on

4  the waiver itself.

5      MR. MARNEY:  Yes, it is.

6      THE COURT:  Okay.  And then -- and how did you find

7  Mr. Ricardo Perez, in terms of his lucidity, in terms of -- of

8  your observations of his ability to make a -- a decision like

9  this?  What -- what was your observation of that?

10     MR. MARNEY:  I found him to be completely lucid,

11  pretty much like normal.  I know he's got to be in a lot more

12  pain than he appeared to be, but he has a couple of cracked

13  ribs.  And -- but he was completely lucid, and I think he

14  understood everything that we talked about and that was written

15  down there.

16     THE COURT:  All right.  And do you have any reason to

17  doubt that?

18     MR. MARNEY:  I don't.

19     THE COURT:  Okay.  And I know he's probably under

20  some type of medication, but are you -- what was your

21  observation again?  I know I'm repeating myself.  But did he --

22  did -- did the medication, whatever medication he's on, did

23  that appear to be interfering with his ability to think clearly

24  or to act intelligently on his own behalf?

25     MR. MARNEY:  In my judgment, no, the medication

1    didn't have that effect at all.

2            THE COURT:  Okay.  All right.

3            So you've presented me with a -- a waiver, which I

4    now know the language, that you drafted in conjunction with

5    Mr. Landes, and it reads as follow:  I -- I, Ricardo Perez, do

6    hereby waive my attendance for today only in the federal -- in

7    federal court in *U.S. versus Perez, et al.*  I am lucid and have

8    discussed this waiver with my attorney.  I am under light pain

9    medication only and fully understand this decision.  I have not

10   been forced or coerced into this decision.

11           And it's dated 6/17/22.  There's a -- a signature

12   that -- that I think you created, Mr. Marney -- a name, Ricardo

13   Perez, and then underneath it, there is a signature.  Did you

14   actually witness Ricardo Perez sign this document?

15           MR. MARNEY:  Yes, I did.

16           THE COURT:  Okay.  And, also, there's a witness -- it

17   says witness Ron Marney, which is you, and a signature

18   underneath it.  Did you sign this as a witness to Mr. Ricardo

19   Perez signing this waiver?

20           MR. MARNEY:  Yes, I did.

21           THE COURT:  Okay.  With advice of counsel, is there

22   any other matter that you think I ought to inquire into with

23   Mr. Marney?

24           MR. DUVA:  No, Your Honor.

25           THE COURT:  Anybody?

1        MR. LANDES:  No, Your Honor.

2        THE COURT:  Okay.

3        MR. LANDES:  Just to -- just to be clear, the waiver

4   is for today only.

5        THE COURT:  I understand that.

6        MR. LANDES:  And I believe that that is -- that is in

7   the letter.  Thank you.

8        THE COURT:  Okay.  Mr. Marney, thank you very much.

9        MR. MARNEY:  You're welcome.

10        THE COURT:  Mr. Landes, as the attorney for Ricardo

11  Perez, I -- I want your position on the matter as well.

12  You've -- obviously, you've been a part of this

13  decision-making, but I want to establish whether or not you, on

14  behalf of Ricardo Perez, are willing to accept this waiver and

15  accept -- and to proceed today as his attorney, with him being

16  voluntarily absent.

17        MR. LANDES:  Yes, I am, Your Honor.  And in addition

18  to the waiver that you have in front of you, I would note that

19  I spoke to Mr. Ricardo Perez shortly after his accident.  It

20  was 7:15 or so in the morning.

21        And this may be on the record already, but one of the

22  first things I asked him was, Would you be willing to waive

23  your appearance for today?  He said to me, Yes, I would for

24  today, just because we're having a couple of expert witnesses.

25  I would want to be there for the rest of the trial.

1     But he -- he also informed me of that orally, so I

2     did speak to him this morning.

3         THE COURT:  Okay.

4         So it seems to me that under the provisions of

5     Rule 43(c) that -- 43(c)(1)(A), it says, When the defendant is

6     voluntarily absent after the trial has begun, he can waive his

7     appearance.

8         And -- and(c)(2) says, If the defendant waives the

9     right to be present, the trial may proceed to completion.

10        Now, I understand this is a limited waiver for today

11    only, so we're not going to go to completion.

12        But it seems to me that, in -- in reading the case

13    law, including this *United States versus Novaton* case, 271 F.3d

14    968, that while Mr. Ricardo Perez's situation was

15    involuntary -- that is, he obviously didn't absent himself

16    purposefully or voluntarily, but -- but because he has now

17    assessed the situation, he has now voluntarily chosen to absent

18    himself and to waive his right to appear by entering into this

19    signed waiver and also giving Mr. Landes an oral waiver, and

20    the Court is convinced that the waiver is appropriate and

21    valid, the Court's convinced that it was obtained under

22    appropriate circumstances by another officer of the Court, that

23    is an attorney who represents Mr. Ricardo Perez, the Court

24    accepts the statement by Mr. Marney that Mr. Perez was lucid,

25    that the medication did not appear to be affecting his ability

1  to act -- to think clearly or act intelligently and on his own

2  behalf, and that there were no other impediments to him signing

3  this waiver.

4         The Court further finds that the waiver itself, the

5  written waiver, which Mr. Ricardo Perez personally signed, and

6  was attested to by Mr. Marney, also offers the Court solid

7  ground to determine that the waiver should be accepted.  And

8  Mr. Landes, Mr. Ricardo Perez's attorney, joins in that

9  request, for today only.

10        And so with all that information, the Court feels

11 that it's on solid ground to accept the waiver and to proceed

12 in Mr. Ricardo Perez's absence.

13        I will note for the record that an additional -- I

14 don't -- I think that's all I need, but, additionally, I will

15 note again for the record, that Ricardo Perez has rested his

16 case, and that the evidence to be adduced today is in the

17 nature of defense expert testimony from other defendants.  And

18 so that it is not a -- it is not a matter in which evidence is

19 going to be offered directly against Ricardo Perez, that he

20 would need to consult with his attorney about, or that other

21 parts of the trial where Mr. Ricardo Perez clearly would want

22 to be here and want to have that ability, that this particular

23 part of the trial, that there is very minimal involvement with

24 Ricardo Perez because of the nature of the testimony that the

25 Court's going to be considering today.

 1          And if that were to change or if I were to have any
 2   concern about evidence being offered in the case in his
 3   absence, I would consult with Mr. Landes, and I'm sure
 4   Mr. Landes would bring it to my attention.  But I don't expect
 5   that.
 6          And I finally will say that because we are in a
 7   multi-week trial and because there are other -- there are seven
 8   other defendants that are on trial and that there is an
 9   interest in advancing the case today, given the -- given the
10   nature of -- of the delays we've already taken into account --
11   and so I do think it's in the interest of justice for me to
12   proceed.  And I -- and I do feel like -- I just really don't
13   have any concern about proceeding in this situation, now that
14   we've made the record that we have made.  And I think it's
15   consistent with both Rule 43 and with Eleventh Circuit
16   precedent.
17          Mr. Landes, do you accept the Court's findings in
18   regard to this?
19          MR. LANDES:  Yes, I do, Your Honor.
20          THE COURT:  Is there any other defendant that wants
21   to be heard on this issue?
22          MR. RAFFERTY:  No, Your Honor.
23          THE COURT:  Mr. Duva, does the government accept the
24   Court's findings in this regard?
25          MR. DUVA:  Yes, Your Honor.

1    THE COURT:  All right.

2    Then I think we're ready to proceed; is that correct?

3    MR. RAFFERTY:  Yes, Your Honor.

4    THE COURT:  Okay.

5    MR. LANDES:  I think the only other issue is what you

6  were going to inform the jurors of.  You -- you mentioned

7  before, that you were going to tell them what happened.  I have

8  no objection to that and I -- I welcome that as well.

9    THE COURT:  Yeah.  Let me just say what I think I'm

10  going to say to them and see if anybody -- I'm going to tell

11  them that I really apologize for the delay this morning.

12  Unfortunately, things happen.  And today, unfortunately,

13  Mr. Ricardo Perez suffered a fall that has required him to get

14  medical attention, that he's not going to be able to be present

15  with us today, but that he has authorized us to go forward in

16  his absence.  That's what I would say.

17    MR. LANDES:  All right.  That's fine.

18    THE COURT:  Is that all right?  All right.  Let's

19  have the jury, please.

20    COURT SECURITY OFFICER:  All rise for the jury.

21    THE COURT:  And, Mr. Schwartz, go ahead and get me a

22  witness, please.

23   (The witness entered the courtroom.)

24    MR. BELL:  The Court has to --

25    THE COURT:  I'm sorry?

 1              MR. BELL:  The Court has to inform the jury whether

 2   he's a 111 or a 22.

 3              THE COURT:  I will not be doing that.

 4              MR. ROWLAND:  And, Your Honor, I know that you had

 5   said that you had placed our exhibit into -- into evidence.  I

 6   just wanted to make sure that we had that on the record.

 7              THE COURT:  Yeah.  Well, I'm going to -- when -- when

 8   Mr. Schwartz rests, I'm going to call on you, and you can

 9   announce that and then announce rest if that's what you --

10              MR. ROWLAND:  Right.  Thank you, Judge.

11              THE COURT:  Yeah, sure.

12         (Jury enters, 11:07 a.m.)

13              COURT SECURITY OFFICER:  Please be seated.

14              THE COURT:  Excuse me a second.

15              Sir, can you just go ahead and get on the witness

16   stand for me so I can see the jury.  Thank you.  Appreciate it.

17              Good morning, ladies and gentlemen.  So I apologize

18   for the delay.  Let me tell you what's been going on here.

19   Unfortunately, as you know, in life, things happen.  And today,

20   unfortunately, Mr. Ricardo Perez, Mr. Landes's client, suffered

21   a fall this morning and had to be taken for medical attention.

22   And so he's not going to be able to be with us this morning.

23   We were waiting to see whether he'd be able to -- to be with

24   us.  But he has authorized us to go ahead and proceed without

25   him today.  Of course, Mr. Landes will be here to represent his

1    interests.

2        So that's what's going on.  I apologize for the

3    delay, but it was just unavoidable.  And we are ready to

4    proceed with the trial.  And as I say, Mr. Ricardo Perez has

5    authorized us to proceed without him being here today.  And I

6    do expect him to rejoin us the next time we're in session.

7        All right.  Ms. Hatfield, you may proceed.

8        COURTROOM DEPUTY:  Raise your right hand.

9        Do you solemnly swear that the testimony you are

10   about to give before this court will be the truth, the whole

11   truth, and nothing but the truth, so help you God?

12        THE WITNESS:  I do.

13        COURTROOM DEPUTY:  Okay.  If you could take a seat.

14   And please state your full name and spell your last name for

15   the record.

16        THE WITNESS:  My name is Michael, M-i-c-h-a-e-l,

17   middle initial F, as in Frederick, Arrigo, A-r-r-i-g-o.

18        MR. SCHWARTZ:  Thank you, Judge.

19        **MICHAEL F. ARRIGO, DEFENDANTS' WITNESS, SWORN**

20                    **DIRECT EXAMINATION**

21   BY MR. SCHWARTZ:

22   Q.   Hello, Mr. Arrigo.

23   A.   Hello.

24   Q.   Can you please state your education.

25   A.   Yes.  My undergraduate education started at -- in college

1 at the University of California, Irvine, where I studied

2 statistics, economics, and computer science. I then

3 transferred to the University of Southern California and

4 focused on business administration for my college degree.

5 Subsequently, in my health care industry experience,

6 I've been trained as a certified professional medical auditor,

7 or CPMA. I attended Stanford medical school, where I studied

8 biomedical informatics, which is essentially the use of health

9 care data for better decision-making. I also studied at

10 Harvard Medical School in biomedical ethics, essentially which

11 is about issues of the rights of patients, and the institution

12 and resolution of ethical issues.

13 And I believe that the health care industry is very

14 wide and deep, and ongoing education and information and

15 learning every day is important.

16 Q. And what is your experience in the health care field?

17 A. I have 22 years' experience in the health care industry.

18 I am cofounder of a company that focuses on health care data,

19 regulations, and economics. Our company first started in the

20 medical device industry. We were fortunate enough to secure a

21 client that's now owned by Johnson & Johnson in the optics

22 field, so a lot of our work was in FDA adverse event reporting

23 and product safety.

24 We started doing more and more work, though, with

25 health care providers and hospitals. Some of our work started

1   with the new medical diagnosis coding standards over ten years

2   ago.  And it gave me and my team the opportunity to help train

3   physicians throughout the United States on accurate

4   documentation, accurate coding and billing standards.

5           We've worked subsequently on electronic data

6   interchange and claim standards with health insurers in many

7   different parts of the country, hospital systems, doctors,

8   laboratories.  And most of our work is advising them on data

9   regulations and economics and doing the right thing.

10          Subsequently, as -- as a part of that work, when I

11  started publishing information, I was invited to become an

12  expert witness, approximately ten years ago, which I do

13  selectively.

14  Q.   Have you been published?

15  A.   Yes.  I'm very proud of the work that I've done.  In fact,

16  the -- the work I'm most proud of was right here in Florida

17  with Baptist Health South Florida, where I had a chance to work

18  with the senior management team on clinical documentation

19  accuracy; in other words, documenting the accurate information

20  of the patient's condition and how the billing and coding

21  works.  And it was peer-reviewed, meaning others in the field,

22  including the executives at the hospital, had to review my work

23  and affirm that it was accurate and that it was published in

24  the Healthcare Financial Management Association's journal.

25          And I published -- written in other articles that

1  have been published as well.

2  Q.    Have you been quoted anywhere?

3  A.    Yes.  I've been quoted in *The Wall Street Journal*

4  regarding accurate diagnosis coding and reimbursement and the

5  economic issues, as well as health care data privacy.  I've

6  been quoted in *Fortune* magazine regarding electronic health

7  records and fraud.  I have been quoted in *Forbes* -- actually,

8  that article is running in about three weeks -- on health

9  insurance, as well as several health care industry

10  publications, such as *Healthcare IT News*, regarding health care

11  data, regulations, and privacy.  And there are others.

12  Q.    Have you previously given testimony as an expert?

13  A.    Yes, I have.

14  Q.    In what kind of proceedings?

15  A.    I have given -- I've been retained as an expert, and I

16  have given testimony in arbitrations in different state cases.

17  I have been retained as an expert and given testimony in state

18  cases in various states, including Florida, Texas, California,

19  and others.  And I have also been retained and given testimony

20  in proceedings under federal rules or federal court.

21  Q.    Okay.  Have you had occasion to be hired as an expert, but

22  not give testimony?

23  A.    Yes.  Sometimes when I'm hired as an expert, a lawyer will

24  say, I want you to be an expert consultant, which means I would

25  not give testimony until some change in that relationship.

1    Or I may be retained as an expert with the plan of

2  giving testimony, but if the case settles before I give

3  testimony, then I would not give testimony in that case.

4  Q.    Have you previously been hired by the United States

5  Department of Justice?

6  A.    Yes.  I'm -- I'm proud to say that I have been selected by

7  the Department of Justice as an expert three times by different

8  individuals with U.S. Department of Justice, or DOJ, as it's

9  called sometimes.

10  Q.    All right.  And in this case, how much have you been paid?

11  A.    I've been paid $52,000.

12  Q.    All right.  And that doesn't include travel expenses like

13  flight and hotel and things like that?

14  A.    That's correct.  That excludes expenses.

15  Q.    Let's talk about under arrangement lab testing.

16    What is under arrangement lab testing?

17  A.    "Under arrangement" is a phrase that's used in, first and

18  foremost, information published by the Centers for Medicare &

19  Medicaid Services, which is part of the federal government's

20  Health & Human Services Department or agency.  And it's

21  commonly referred to as "reference lab billing."

22    Reference lab billing descriptors that you can read

23  talk a lot about type of bill 141, or TOB 14X, if you like.

24  And one of the most important phrases is, quote, under

25  arrangement, which means that the hospital may bill for tests,

1  where the tests are performed by a laboratory.  And sometimes

2  the -- the common phrase is "the test is sent out."  The -- the

3  hospital chooses not to perform the test themselves.

4          In the case of this under arrangement or reference

5  lab billing, it's for a nonpatient of the hospital.  The

6  specimen that is collected may be collected through a variety

7  of means.  It does not have to go to the hospital.  The

8  laboratory performs the test that was ordered by the doctor and

9  sends the result to the doctor, and the hospital bills for that

10  laboratory test.

11  Q.    Is the under arrangement lab testing model something

12  that's widely known in the health care space, or is it a

13  secret?

14  A.    It's widely known, widely published.  And one of the

15  things that I'll -- I'll share today is -- is some of the

16  American Hospital Association's communication about that widely

17  known standard with the federal government.

18  Q.    How is an under arrangement lab testing model between a

19  lab and a hospital set up?

20  A.    Well, the "under arrangement" phrase is, as I see it and

21  understand it, very broad.  It does not specify a lot of

22  criteria.  It simply says under arrangement, and it's up to the

23  hospital and the laboratory to contract how that arrangement

24  should work, generally speaking.

25  Q.    All right.  Well, let me give you a hypothetical and you

1  can tell me if this qualifies as an under arrangement lab

2  testing model with the hospital.

3      So if an independent lab wants to contract under

4  arrangement with a critical access hospital, a rural hospital,

5  to perform the hospital's toxicology lab testing, and samples

6  are selected from all over the country, those samples go

7  directly to the lab, not to the hospital.  So they go directly

8  to the lab.

9      The hospital is doing the data accessioning, the data

10 entry for the orders in the LIS system.  The lab tests the

11 samples that came directly to it, provides the results back to

12 the physicians, and -- and puts them in the LIS system.

13     The hospital then bills that test on a UB-04 with the

14 hospital's NPI number and the hospital's tax ID number, EIN, to

15 the insurance company.  The insurance company then -- there's

16 nothing -- let me back up?

17     There's no indication that the lab that tested the

18 sample is on that UB-04 claim because the NPI is of the

19 hospital and the EIN is of the hospital.  The insurance

20 companies pay that claim to the hospital.  The hospital then

21 pays the laboratory for whatever its services are.

22     MR. HAYES:  Your Honor, this is a very long

23 hypothetical.

24     THE COURT:  It is, but I think it's all right.  Go

25 ahead.

1          MR. SCHWARTZ:  I'm just trying to move it, Judge.

2          THE COURT:  I know.  Go ahead.  I think it's all

3    right.

4    BY MR. SCHWARTZ:

5    Q.   The hospital then pays the laboratory for running that

6    test under whatever their agreement says.  The hospital keeps

7    the difference of the money, if any.

8          Is there any issue with that?

9    A.   Well, I'd like to talk about standards and what the

10   standards say.  And, to my knowledge, there's nothing in the

11   published standards that I used, or that I used as a basis for

12   my opinions to rebut one of the government's witness, that says

13   that that -- that description is -- doesn't meet the standard.

14   To my knowledge, it does meet the standard.  There's nothing in

15   the standards that restricts the arrangement that was just

16   presented to me in that question.

17   Q.   Okay.  And those samples can be procured from providers

18   all over the country?

19   A.   That's correct.

20   Q.   Is there any limitation to volume of samples, the number

21   of samples that a hospital can bill for under that arrangement

22   annually?

23   A.   Not to my knowledge.

24   Q.   Does the hospital have to have a working toxicology lab in

25   that model?

1    A.    No, they do not.

2    Q.    Do the samples ever have to go to the hospital at all?

3    A.    They do not.  Specimens can be collected through a variety

4    of means.  And in my report that I wrote in this case, I noted

5    many of the standards and had citations to the standards,

6    saying that contractors can be secured to collect these

7    specimens to get them to the lab.

8    Q.    The accessioning that's done, the data entry of the lab

9    testing information, does that have to be done at the hospital?

10    A.    No, it does not.  Hospitals may, depending on their size

11    and their staffing, have an internal documentation and billing

12    department, or they may outsource part of it, meaning to a --

13    to a third party who does some or all of this collection of

14    information for the billing.

15    Q.    And under that hypothetical, it's appropriate for the

16    hospital to bill that claim as a 141 nonpatient claim, so long

17    as the patient never presented at the hospital to provide the

18    sample?

19    A.    That's correct, bill type 141 or 14X.

20    Q.    Let me adjust that hypothetical a little bit to say that

21    the hospital starts building its own full toxicology lab, and

22    during that process, does the hospital then -- if the lab's not

23    operational yet, does the hospital then have to reroute samples

24    to itself and then send them to the lab, or can they continue

25    to go directly to the under arrangement lab?

1   A.    I'll note that that's a hypothetical.  And I -- I could

2   imagine many possible things that could be done.  But there's

3   no requirement, based on my knowledge of the standard, that

4   says if the hospital has its own lab, does not have its own

5   lab, are they restricted in any way to do reference lab

6   billing, to send out tests, to do the sort of billing

7   arrangement we're talking about.  No, there are no

8   restrictions.

9   Q.    Okay.  Let's build on that hypothetical a little bit more.

10  That hospital that was building the full-service toxicology

11  lab, finally that lab opens and the hospital is able to test

12  some samples, but not a full number of samples because they're

13  getting operational, but they're able to test some samples at

14  the hospital.

15          So is it authorized for some samples to go to the

16  hospital that the hospital can test, other samples continue to

17  go direct to the laboratory, under this scenario?

18  A.    All of those things could be possible, yes.  To my

19  knowledge, again, there's nothing about the standards that

20  restricts the scenario that you're describing.

21  Q.    Okay.  A little bit more on that hypothetical.

22          When the hospital's lab is fully operational and

23  running correctly at capacity, if the hospital then diverts

24  samples directly to itself because it can then run the

25  toxicology on its actual campus, but let's say there's a little

1  bit too much going on and they need a little bit of assistance,

2  can they then resend samples to the off-site lab?

3  A.    Yes, they can.  And I noted in the testimony of another

4  witness -- I believe it was Smart [sic] -- there's a phrase

5  that's used in laboratory testing called "esoteric," something

6  that is rare, perhaps, something that the hospital determines

7  by itself it's not capable of testing for a variety of reasons,

8  whether capacity or sophistication or type of test.

9          The hospital can make the decision to send that test

10  out, quote/unquote, in a reference lab arrangement.

11  Q.    All right.  And the under arrangement scenario that I --

12  the hypothetical I presented to you, is that something that's

13  new or novel?

14  A.    No.  This has been done for years.  Reference lab billing

15  is very common; it's been done for years.

16  Q.    Now, you're giving opinions based on the hypothetical that

17  I gave you.  Where did these opinions coming from?  Are they

18  your own opinions?

19  A.    They're not simply my opinions.  When I provide an

20  opinion, I think it's important to be -- to make every effort

21  to be accurate and to use my specialized knowledge in the field

22  and generally accepted industry standards.  And so in the

23  report I wrote, for example, I have 83 citations to various

24  published standards, mostly from the federal government.

25          I then take my specialized knowledge and those

1    standards and apply them to the facts that I have been given in

2    a case.  And then I provide my opinions.  So my opinions are

3    based on that methodology.  And I strive to always do that when

4    I give opinions.

5    Q.    And are your opinions also based on federal law?

6    A.    Well, I'm not here, of course, to opine on the law,

7    specifically, and I'm not a lawyer, but many of these standards

8    are in the Federal Register, and they are things that lawyers

9    look to in cases like this and others as to what the issues at

10   hand are and what the outcome may be.

11   Q.    So when we talk about billing a 141 code, what does that

12   really mean?

13   A.    When you bill a bill type 141 code, that code or TOB or

14   type of bill appears, if we think about a paper form -- and

15   it's easier usually for people to imagine a piece of paper than

16   something abstract and electronic.  But, you know, claims today

17   can be submitted electronic or -- or via these paper forms.

18          In the upper right corner is a type of bill section.

19   And when you enter -- or when a health care provider or a

20   hospital enters 141, it's telling whoever looks at that bill

21   that it's a reference lab bill.  It's putting that person on

22   notice that they are looking at a bill performed by a reference

23   lab.

24   Q.    All right.  And that's also known as a bill type 14X?

25   A.    Yes.  Sometimes people will say 14X or 147 or 141, but

1  it's type of bill 14X.  Yes.

2  Q.    All right.  One of the things that, I guess, is in your

3  report you talk about is in 2017 there was some data that was

4  released as to laboratory-type claims under the 12X, 13X, and

5  14X categories.

6          Are you familiar with that?

7  A.    Yes.

8  Q.    All right.  And so can we talk about the frequency of

9  these 141 claims that are being done?

10  A.    Yes.  What you're referring to is a letter that I read in

11  considering my opinions that I would write and express in this

12  case.  And the letter is from the American Hospital

13  Association.  And for brevity for -- for you-all and for the

14  court reporter, I'm going to say "AHA," meaning American

15  Hospital Association.

16          AHA wrote a letter to the secretary of the Centers

17  for Medicare & Medicaid Services, which I'll also abbreviate as

18  "CMS."  CMS is a federal agency or federal department.  And the

19  American Hospital Association sent this letter to explain their

20  position on various issues about type of bill billing.

21          And so, as you can see, we have 12X, 13X, and 14X.

22  The number 1, that first digit means hospital.

23          And so, here, what I thought was important about this

24  chart, which is excerpted from that letter, is the American

25  Hospital Association that represents 5,000 hospitals is telling

1  the federal government, Our members use 14X.  We bill 14X and

2  it's common.  It's billed in this chart, according to AHA data,

3  almost 14 million times in 2017 alone.

4          And I would just direct your attention to the column

5  label which is frequency.  That's not dollars.  So each of

6  those -- almost 14 million claims has a dollar amount attached

7  to it.

8          Now, I don't know what that is.  It could be $50,

9  $100, $1,000, $10,000, but you can imagine that this is a large

10 economic amount.

11 Q.   And the 12.2 percent that is in the -- excuse me -- far

12 column, what does that represent?

13 A.   What that means is that of these three types of bill

14 claims, over 12 percent are reference lab billing using type of

15 bill 141, or TOB 14X, as we've been saying today -- or I've

16 been saying in my testimony.

17 Q.   So the 141 bill code is not some obscure thing that's

18 showing up recently now?

19 A.   No.  And I would add that this letter is publicly

20 available on the Internet for anyone to see, this communication

21 between AHA and the federal government.

22 Q.   And who is the American Hospital Association, the AHA?

23 A.   The AHA is -- is a national organization with over 5,000

24 hospital members.  And sometimes one of their roles is to

25 contact the federal government when they're considering making

1  rules or -- or changing standards and advocating for what the

2  hospitals' interests are and what's reasonable with regard to a

3  federal government or CMS request.

4  Q.    Did you have an opportunity to review some of the claims

5  data in this case?

6  A.    I did.  And there were some problems with it.

7  Q.    What do you believe the problems are?

8  A.    Well, first of all, I looked at one particular file.  It

9  had a -- a number in it, I believe a Bates number, and I think

10  it said DOJ with some numbers after it.  And it was primarily,

11  if not exclusively, data in the state of Missouri.  When I

12  looked at the state field, the -- excuse me, the date field,

13  some of the dates were dates that I could understand; for

14  example, hypothetically 5/9/15.  That would say, okay, this is

15  a claim in May of 2015.

16        In many of the entries in that column, there were

17  numbers, 5,286, perhaps, and a huge number of pound signs.  So

18  you couldn't understand what the date was.  Whenever I look at

19  claim data, regardless of who I work for -- plaintiffs,

20  defendants, federal government -- I always say, You need to do

21  a quality assessment on the data first before you can trust

22  that data.

23        And you want to make sure that the data meets

24  generally accepted standards, particularly standards that are

25  specified by the federal government.  And that means that you

1  have to have easy-to-understand dates, accurate dates, and

2  other information.  And I did not see that in some of the data

3  that I reviewed.

4  Q.   Okay.  Did you notice that all of the claims were 141-type

5  claims?

6  A.   I saw a column that said 141 in much of the data.  I also

7  noted in the testimony of Dr. Kongstvedt -- and I -- no

8  disrespect to that physician, but I believe he's been referred

9  to as Dr. K for short, so I'll say Dr. K.

10        Dr. K said that it wasn't important that that data

11  was missing from Aetna -- Aetna's data.  And I disagree.

12  Because of the importance we've been talking about of type of

13  bill 141 and communicating that information.

14        I wouldn't want to trust data that excludes

15  information that's part of the federal standard on how claim

16  data is supposed to be transmitted, stored, archived, and

17  produced.  And if it's missing, I would want to know why that's

18  missing.

19  Q.   So the 141 part of that billing field is important for the

20  insurance companies to pay attention to?

21  A.   Yes, it is.

22  Q.   And, in fact, every UB-04 that is sent to an insurance

23  company for a claim must have what type of bill it is, right?

24  A.   Yes.  Particularly in reference lab billing, it's --

25  you're telling an insurance company that it's a reference lab

1  bill.  And so that's important information to communicate.

2  Q.   But even if it wasn't reference lab billing, it still

3  needed to tell the insurance company what type of billing

4  that -- the UB-04 that's being relayed is, right?

5  A.   Yes.  The other day I was looking at skilled nursing data,

6  for example, and there's a very different number, but a type of

7  bill that's used when you're billing skilled nursing.

8           So it's common and generally accepted practice to

9  have a type of bill in insurance claim data.

10 Q.   Did you also notice that there was a code 22 in that

11 claims data?

12 A.   Yes.  The code 22, as I understand it, had to do with what

13 called "place of service."

14           THE WITNESS:  And for the jury and for the reporter,

15 I may mention this in a term -- abbreviated term called "POS,"

16 for place of service 22.

17 BY MR. SCHWARTZ:

18 Q.   All right.  What is place of service 22?

19 A.   Place of service 22 has to do with outpatient procedures.

20 Q.   And what does that mean in relation to a 141 bill?

21 A.   Well, 141, again, means that it's a reference lab bill and

22 it's a nonpatient.  Typically, you might see a different place

23 of service code used there.

24           But my understanding, based on testimony of the

25 insurance companies, is that they unilaterally decided, or

1  their systems automatically placed place of service, or POS,

2  code 22 in the claim.  That was not done by the provider, and I

3  think that's unusual.  The provider's responsible for

4  communicating where the service was performed.

5          And if the health plan unilaterally makes that

6  change, that's of concern to me.  Why would they do that?

7  Q.    Can a 141 nonpatient code simultaneously exist with a 22

8  hospital outpatient place of service?

9  A.    Well, it doesn't make sense to me.  It doesn't make sense

10  to me, and I don't understand why the health plans would decide

11  to add that themselves.

12  Q.    Does the code 22 denote that the testing of the sample was

13  done on the hospital campus?

14  A.    Well, it -- it leaves into question why that claim was

15  changed or altered, why that data was changed, and what it

16  actually does mean because type of bill 14X means reference

17  lab.  It means that the test was performed at a lab.  It means

18  that the -- the patient was a nonpatient of the hospital.

19          And when you then have place of service 22

20  outpatient, it seems to be in conflict with generally what type

21  of bill 14X is.  Generally health plans are very strict about

22  what they will and will not accept from providers.  They will

23  reject claims if the data doesn't make sense.  So for the

24  plan -- the health plan, the health insurer to add those things

25  themselves seems strange to me.

1      MR. SCHWARTZ:  That's all I have.  Tender the

2  witness.

3          Thank you, sir.

4          THE WITNESS:  You're welcome.

5          THE COURT:  Anybody on the defense side?

6      (No response.)

7          THE COURT:  All right.  Then, Mr. Hayes, you're up.

8          MR. HAYES:  Thank you, Your Honor.

9                    **CROSS-EXAMINATION**

10  BY MR. HAYES:

11  Q.   Good morning, Mr. Arrigo.

12  A.   Good morning, Mr. Hayes.

13  Q.   I think it is still morning.  And, Mr. Arrigo, do you have

14  a copy of your report at the witness stand with you, I think,

15  digitally?

16  A.   Yes, I do.

17  Q.   I -- I may ask you to refer to it.  And, by the way, we've

18  never met, correct?

19  A.   That's correct.

20  Q.   Okay.  So I'm one of the attorneys for the government.  I

21  just have a few questions for you.

22          So you went over your qualifications and you went to

23  Stanford and Harvard, I believe, the medical school at both

24  places, but you're not a medical doctor yourself, correct?

25  A.   I am not a medical doctor.

1  Q.   And, therefore -- and I don't know actually if this is

2  true.  But you've never had occasion or maybe you have in

3  your -- and you have a lot of experience in the laboratory

4  field, but you haven't, as a doctor, been submitting laboratory

5  claims yourself, correct?

6  A.   That's correct.

7  Q.   And maybe you've actually submitted laboratory claims

8  yourself on -- on some minor occasions, but as a doctor, you

9  don't do it regularly, correct?

10  A.   Well, sir, minor occasions, I don't -- I don't understand

11  that, but doctors generally do not submit the claims

12  themselves.  And I have submitted many laboratory claims, both

13  in testing for insurance companies and for laboratories.

14  Doctors typically order the tests, but don't submit them.

15  Q.   Fair enough.  That's what I was asking, though.  I was --

16  what I was saying is I think perhaps you have -- and I don't

17  know about ordered -- but submitted claims yourself.  But you

18  haven't ordered them as a doctor, correct?

19  A.   Absolutely.  That's correct.

20  Q.   Okay.  So thank you for the clarification.  I was a little

21  unclear there.

22        And you do not have any credentials -- I'm going to

23  talk about your coding experience now.  And you've already gone

24  over it.  I'm not asking for a recap, but you don't have any

25  credentials from the American Academy of Professional Coders,

1  or, for short, the AAPC, correct?

2  A.   I've been trained by AAPC, and I've spoken at their

3  national conference.

4         By "credentials," what do you mean?

5  Q.   You don't have any -- are you a member of the AAPC?

6  A.   I am a member of the American Academy of Professional

7  Coders, yes.

8  Q.   Okay.  But you -- do you have any -- are you a fellow or

9  do you have any special credentials besides being a member?

10  A.   I've been an invited speaker to their national conference.

11  Q.   So the answer to that question is, no, besides being a

12  speaker, correct?

13  A.   I -- I don't know that the AAPC has a fellow designation.

14  I know people there, but it -- I'm not aware of that.

15  Q.   Okay.  Let's ask a different one.

16         Do you have any credentials from the American Health

17  Management Association?

18  A.   Are you speaking of the AHIMA, American Health --

19  Q.   Yeah.

20  A.   -- Information Management Association?

21  Q.   So AHIMA for short.  Thank you.

22  A.   Yes, I'm -- I'm a member of AHIMA as well, and I've also

23  spoken at the AHIMA conference, and I have been trained by

24  AHIMA.

25  Q.   Okay.  And have you ever specifically worked in a

1  laboratory?

2  A.    Worked in as a management consultant with my team, yes; as

3  an employee, no.

4  Q.    That's what I was asking.  So you've never worked as an

5  employee in a lab, correct?

6  A.    That's correct.

7  Q.    Okay.  And you've taken -- it's cited in your report, so

8  this is -- might be a point where I ask you to refer to your

9  report -- you've taken one online course in laboratory billing,

10  correct?  It's cited in footnote 10 on page 154 of your report,

11  the American Society for [sic] Clinical Pathology, correct?

12  A.    American Society of Clinical Pathology, that's correct.

13  Q.    And it's a certificate course, correct?

14  A.    That's correct.

15  Q.    Okay.  And you mentioned that you've testified as an

16  expert before.  You've testified -- and I'm not asking you the

17  names of the cases or anything beyond this.  You've testified

18  in related litigation on behalf of management companies, rural

19  hospitals, and labs in cases similar to this one, civil cases,

20  correct?

21  A.    That's correct.

22  Q.    And so you mentioned what you've been paid in this case.

23  But you have testified as an expert -- I understand that you

24  did it in the DOJ in other cases.

25         But you've testified as an expert on essentially the

1  same side you're testifying now in prior cases, correct?

2  A.  That's correct.

3  Q.  Okay.  And as far as the facts of this case -- and I'm

4  going to ask you some almost painfully obvious questions, so I

5  apologize if it's a little tedious -- but you did not work in

6  any of these laboratories or consult with any of these

7  laboratories, that's Pinnacle, LifeBrite, or Reliance, correct?

8  A.  No, I've never heard of or worked for these labs before

9  this case.

10  Q.  Okay.  You never worked -- by the same token, you never

11  worked for any of the hospitals, correct?

12  A.  That's correct.

13  Q.  And you did not inspect the hospitals, go to see any of

14  their machines or look at their capabilities, correct?

15  A.  That is correct.

16  Q.  And you were not there when samples arrived or

17  accessioned, either by the lab or the hospital, correct?

18  A.  Specimens, you mean?

19  Q.  Correct.

20  A.  No, I was not.

21  Q.  Is it more correct to say "specimens" than "samples,"

22  Mr. Arrigo?

23  A.  I generally say specimens.

24  Q.  Okay.  I'll try to do that.  If I say "samples," I mean

25  specimens, okay?  And you did not see any of the testing,

1  correct?

2  A.   I did not.

3  Q.   And you reviewed the payer provider manual for Aetna in

4  preparation for your testimony in this case -- and I'm going

5  off your report because it's listed in the documents -- but you

6  didn't review any other payer provider manuals, correct?

7  A.   That's not correct.

8  Q.   Fair enough, but it's not on -- it's not on the list on

9  your report; only the Aetna provider manual is?

10  A.   I believe I cited to Medicare, chapter 16, which is the

11  laboratory testing standards and guidelines.

12  Q.   You did?

13  A.   As the largest and most important payer in the federal

14  payer, so that one.

15  Q.   Fair enough.  But what I said was private payer, sir.

16  A.   Ah.  Thank you.  I missed that word.

17       I don't recall, but I think -- I think it's likely.

18  Aetna and chapter 16, although I do cite to various standards

19  of various payers, including United and Blue Cross in my

20  report, in those 83 citations.

21  Q.   Okay.  And the Aetna provider manual, you reviewed that

22  for a prior case, correct?

23  A.   For this case and a prior case, yes.

24  Q.   Okay.  And, by the way, you don't know -- I mean, I

25  understand that Mr. Schwartz gave you a lengthy hypothetical,

1  but you don't know whether the samples went to the hospital

2  first or the lab first in this case, just as a matter of fact,

3  correct?

4  A.    I do not know that.

5  Q.    Okay.  And you don't know whether or not the labs

6  themselves -- the Reliance, Pinnacle, LifeBrite -- were capable

7  of doing tests themselves, correct?  Meaning --

8  A.    Sorry.  One more time, please.

9  Q.    Let me put it a different way, I was a little clumsy

10  there.

11        You don't know whether or not Reliance Labs -- let's

12  just take Reliance Labs -- was capable of doing confirmatory

13  urinalysis tests and presumptive or screening urinalysis tests,

14  correct?

15  A.    Presumptive or definitive tests?

16  Q.    Correct.

17  A.    I don't know if any presumptive or definitive tests were

18  performed in a certain location or not in this case, no.

19  Q.    And all I'm getting at -- I'm being a little clumsy

20  there -- but you don't -- you don't know the capabilities of

21  the labs or the hospitals to do either kinds of tests, based on

22  a matter of fact, correct?

23  A.    That is correct.

24  Q.    Okay.  But you would assume that an independent

25  laboratory, because you have experience in the field, could do

1  presumptive and definitive tests, correct?

2  A.    Well, I hypothetically could presume that.  If that were

3  part of my expert testimony, I'd want to confirm that.  But it

4  wasn't really part of my scope to know about presumptive or

5  definitive, exactly.

6  Q.    Did Mr. Schwartz not tell you whether or not Reliance,

7  LifeBrite, or Pinnacle could do presumptive or definitive tests

8  themselves?

9  A.    Well, presumptive or definitive tests are types of tests.

10  The answer to your question, I'll give you a direct answer, no,

11  it wasn't the subject of our conversation.

12  Q.    That's fair.  So it's a yes-or-no question.  The answer

13  is, no, he didn't tell you that.  And all I'm saying is you

14  would assume that an independent laboratory or Quest

15  Diagnostics, for example, a big reference laboratory, could be

16  able to do both types of tests, correct?

17          And I understand you'd want to confirm that because

18  you're an expert and you want to be careful.  But it's fair to

19  say you would know that, that that lab could do both those

20  kinds of tests, correct?

21  A.    Well, the devil's in the detail, sir.  Respectfully, sir,

22  I would just say right now I am working on -- with my team, on

23  an appeal of an adverse determination for a laboratory in a

24  completely separate case.

25          And there's an algorithm and doctors' orders that

1   decide or inform which type of test a lab might do.  I could

2   see a hypothetical situation, where they may only do

3   presumptive or they may only do definitive.

4         So your question was pretty broad.  I would assume,

5   generally, tests could -- could be performed, but I -- again,

6   the devil's in the detail there, I think.

7   Q.   I understand the devil's in the detail.  But I'm asking

8   you a fairly simple question, I think, is that -- you would

9   assume a large independent laboratory could do presumptive and

10   definitive tests?

11   A.   I never like to assume.  I like to confirm those things.

12   Q.   Okay.  But you have extensive experience in the field and

13   you have worked with big independent laboratories in the past,

14   correct?

15   A.   Yes.

16   Q.   And those independent laboratories that you worked with in

17   the past, based on your experience, could do presumptive and

18   definitive tests, correct?

19   A.   The lab right now that I'm working with performs

20   presumptive and definitive, yes.

21   Q.   Okay.  Thank you.

22         So -- and you know in this case, based on your

23   experience in the field, that -- I think you just said this in

24   your prior answer -- that doctors had to have ordered the tests

25   in order for them to be performed, whatever tests they were,

1  blood tests, urine tests, whatever, correct?

2  A.    Yes.  I'm not a doctor, but I know that doctors, licensed

3  clinicians, sometimes others in certain jurisdictions,

4  typically order the test before it's performed.

5  Q.    Okay.  And you didn't talk to any of the doctors who

6  ordered the tests in this case, correct?

7  A.    No, but I have a follow-up comment there.

8  Q.    There will be redirect.  So the answer is just, no,

9  correct?

10  A.    Okay.  No.

11  Q.    All right.  Thank you.

12          And you know as an expert in the laboratory field,

13  that results for tests that doctors ordered have to be

14  delivered promptly, so, for example, for a presumptive

15  urinalysis test, correct?

16  A.    Define "promptly" and in what context, please.  It might

17  vary based on test, type of specimen, and so forth.

18  Q.    Well, let's just say that results have to be delivered.

19  Let's leave it at that.  Correct?  The doctor has to get

20  results?

21  A.    Results, generally, are transmitted electronically these

22  days, but, yes.

23  Q.    That's how they're transmitted, but results have to be

24  delivered.  There have to be results for a test for the doctor

25  to act on it, correct?

1  A.   That's correct.

2  Q.   Okay.  And you know that in this case, there's been

3  evidence that FedEx boxes filled with urine samples were piling

4  up in the hall, were never tested, and then were simply sent

5  back to where they came, correct?

6  A.   I'm -- I may or may not have seen testimony or facts about

7  that.  I don't -- I don't know.  It wasn't really part of my

8  scope.

9  Q.   Okay.  So "may or may not have seen" means I actually

10  don't know, correct?

11  A.   I don't.  I don't know.

12  Q.   Okay.  Thank you.

13       So Mr. Schwartz didn't tell you that either, correct?

14  A.   There may have been a discussion about it.  I -- I don't

15  recall.  It wasn't the focus of my report and my opinions.

16  Q.   I'm not trying to be difficult, but it may -- it may have

17  been -- it's what -- it -- really, you don't know, correct?

18  A.   The best answer should be I -- I don't recall.  I really

19  don't.

20  Q.   Okay.  Fair enough.

21       And I believe that you reviewed some of the

22  contracts.  When you were talking about this case, it's my

23  understanding that you reviewed private payer contracts with

24  the hospitals fairly recently, correct?

25  A.   Yes.

1  Q.   Okay.  So you did that just before your testimony here

2  today, correct?

3  A.   Yes.

4  Q.   Okay.  And you're aware that in some of these agreements,

5  not all of them, but some of them, that the hospital was, for

6  example -- and I -- I'm going to back up for a second --

7  doctors have to order the tests, correct?

8  A.   Yes.

9  Q.   And one of the reasons doctors do that is because they

10 have made a determination that the test is medically necessary,

11 correct?

12 A.   Yes.

13 Q.   Okay.  And you're not a doctor yourself, but you're aware

14 that's one of the prerequisites for ordering a test, correct?

15 A.   Yes.

16 Q.   Okay.

17       MR. HAYES:  So, Ms. Stockholm, if we can put up

18 Government's Exhibit 26M.

19 BY MR. HAYES:

20 Q.   I'm going to represent to you that this is an exhibit

21 already admitted in this case between Hospital Partners and

22 Putnam County Memorial Hospital.

23       Do you see that?

24 A.   Yes.

25 Q.   Okay.  And it's a contract involving LifeBrite

1  Laboratories as well, correct?

2  A.   Yes, I see that.

3  Q.   Okay.  And I'm not going to go through this whole

4  contract, thankfully.

5        MR. HAYES:  But I'm just going to ask Ms. Stockholm

6  to turn to the second page, 1.6.

7  BY MR. HAYES:

8  Q.   And it says -- you were talking about collection points of

9  the hospitals when Mr. Schwartz was asking you questions,

10  correct?

11  A.   Yes.

12  Q.   And it says here, Hospital is responsible for collecting

13  specimens, conducting the qualitative urine drug screen, and

14  determining if medical necessity exist for a confirmation test.

15        Correct?

16  A.   Yes, I see that.

17  Q.   And you would agree with me that it is hard to determine

18  if medical necessity exists for a confirmation test if the

19  sample never comes to the hospital, correct?

20  A.   Sorry?  One more time, please.

21  Q.   It's hard to determine if medical necessity exists for a

22  confirmation test after the qualitative or presumptive urine

23  drug screen is done if the sample never comes to the hospital,

24  correct?

25  A.   I -- I don't know.

1  Q.   Okay.

2  A.   The specimen may be collected elsewhere and the test may

3  be performed elsewhere.  And I don't understand the medical

4  necessity in the context of where a specimen is sent.  What --

5  I -- I don't understand where you're going with that.

6  Q.   Well, fair enough.  But you're talking about two

7  different -- I mean, there are collections --

8  A.   No, no.  I'm just trying to understand your question.

9  Q.   The question is -- I'm saying you would agree with me that

10  it is hard to determine if medical necessity exists for a

11  subsequent test if you never received the initial test in the

12  first place and never got the specimen, correct?

13  A.   Well, I'm -- I'm having trouble following, respectfully,

14  sir, because you said the doctor makes the decision, the doctor

15  orders the test, the doctor may be somewhere else.

16       If the specimen is then sent to a lab and the lab

17  performs the tests ordered by the doctor, I don't -- I don't

18  understand the problem.  What -- what's wrong?

19  Q.   Well, what I'm talking about -- point out is it says here,

20  The hospital is responsible for determining if medical

21  necessity exists for a confirmation test.

22       You see that, correct?

23  A.   Thank you.  I -- it -- when you say "it," you're referring

24  to a contract, not to the federal type of bill 141 standard.

25       And -- and, to me, I'm not here to interpret

1  contracts or opine on whether they're binding.  And it -- and

2  there may be a contractual dispute here between a payer and a

3  doctor or a hospital or a lab.  So "it" is a -- is a contract.

4  "It" is not the type of bill 141 standard.

5  Q.    Certainly not.  But all I'm saying is that is what this

6  contract that I'm showing you says, correct?

7  A.    I -- I see the words, yes.

8  Q.    Okay.

9         MR. HAYES:  We can take that down, Ms. Stockholm.

10  Thank you.

11  BY MR. HAYES:

12  Q.    And you mentioned some of the standards that you cite in

13  your report.  Now, there's citations to the CMS 1500 in your

14  report, correct?

15  A.    Yes, CMS 1500, or 1500.  It's a form.

16  Q.    And you would agree, the CMS 1500 is how an independent

17  laboratory would submit a claim for a lab test, commonly,

18  correct?

19  A.    In certain situations, it's used; in other situations,

20  it's not used.

21  Q.    Okay.  So it is -- if I say "commonly," perhaps that's too

22  broad.  You're saying that in certain situations it is used,

23  correct?

24  A.    Yes.

25  Q.    And we would agree that independent lab claims are not at

1   issue in this case because we're talking about a UB-04 or a

2   CMS 1450, correct?

3   A.    Yes.  The UB-04, 1450 is also called an institutional

4   claim.  "Institutional" generally means something like a

5   hospital bill.

6   Q.    Okay.  And, in fact, all claims in the case, as you

7   testified, were submitted on the UB-04 format, but it was

8   actually the 837I electronic submission format, which is also

9   known as the CMS 1450, correct?

10  A.    Well, thank you.  Now you're getting to my follow-up

11  comment.

12  Q.    You're welcome, I think.  But if -- if you could just

13  answer the question, please.

14  A.    Well, I am.  I am.

15  Q.    Am I right about that, that the claims at issue in this

16  case are submitted electronically under an 837I format?

17  Correct?

18  A.    Well, you're -- you're asking -- sir, I have a problem

19  answering your question because you're asking me to

20  characterize 100 percent of the data and 100 percent of the

21  forms, which I have never seen and which Dr. K never saw, and

22  then characterize everything in this case as something.

23           So that's part of my issue.  There -- there are

24  almost no proper sample sizes in Dr. K's opinions to validate

25  that something was or was not characterized a certain way or

1  happened a certain way, and you'd have to have a statistically

2  valid sample size to know that.

3  Q.   I don't think that was my question.  I almost wish we

4  waited for redirect, but, look, all I'm saying is 141 code was

5  on every single claim in this case except, as you said, when it

6  was left off some of the data, correct?

7  A.   I did see that, yes.

8  Q.   Okay.  Fair enough.

9      So we're agreeing on that.

10 A.   Yes.

11 Q.   And, you know, Mr. Arrigo, there's been extensive

12 testimony in this case.  I don't think this is in dispute.  I

13 don't -- I'm not trying to characterize evidence.  But the 837I

14 is what we're talking about in this case, correct?

15 A.   Yes.  That's a HIPAA X12 standard.  The "I" stands for

16 institutional, and it's an electronic claim, mandated federal

17 standard with certain important data elements.

18 Q.   Okay.  And you're aware as an expert in the field that

19 outreach laboratory claims, as they're sometimes called, are

20 normally not submitted on the UB-04 or 837I format at all.

21 They are commonly submitted -- and I understand that "commonly"

22 may be too broad for you -- but often submitted in the CMS 1500

23 form, correct?

24 A.   I disagree.

25 Q.   Okay.  We'll agree to disagree on that because now I'm

1   going to show you Government's Exhibit 57.

2           MR. HAYES:  Please, Ms. Stockholm, page 11.  And if

3   we can blow up the nonpatient -- the first full paragraph.

4   Thank you.

5   BY MR. HAYES:

6   Q.   I don't think this is hard for Ms. Stockholm to find

7   because we've been over this a lot in this case.

8           But, Mr. Arrigo, can you see what's in front of you?

9   A.   I see something in front of me, yes, but ask your next

10  question.

11  Q.   It -- this is from the CMS manual that's in evidence in

12  this case as Government's Exhibit 57.  It's 100-04 Medicare

13  Claims Processing, okay?

14  A.   Is it chapter 16?

15  Q.   I actually don't know if it's chapter 16.  One second.

16       (Counsel confer.)

17  BY MR. HAYES:

18  Q.   It's just -- no.  It's actually just a definition of the

19  141 code.  Okay?

20  A.   Okay.  Thank you.

21  Q.   Thank you.

22          So what it says here is -- I'm going to read this.

23  Okay?

24          A nonpatient is defined as a beneficiary that is

25  neither an inpatient nor an outpatient of a hospital, but that

1   has a specimen that is submitted for analysis to a hospital and

2   the beneficiary is not physically present at the hospital.

3        Okay?

4   A.   Yes.

5   Q.   I'm not -- I'm not going to go through everything else

6   here, but what that says is it's two parts, that it has to be a

7   nonhospital patient, correct?

8   A.   Yes.

9   Q.   Whose specimen -- and they -- it says specimen, not

10  sample, so you're correct -- a specimen is submitted to the

11  hospital for analysis, correct?

12  A.   I see that, yes.

13  Q.   Okay.  So this does not say specimen submitted to the

14  hospital for accessioning a registration, correct?

15  A.   I don't see the word "accessioning," that's correct.

16  Q.   It says "submitted for analysis"?

17  A.   Yes.

18  Q.   And you mentioned before that reference lab billing TOB --

19  and I -- TOB 14X is what it says there, a 141 code -- would

20  normally represent that the member was -- the insured person

21  was a nonpatient of the hospital, and is -- a specimen is

22  submitted to analysis for a hospital.

23        That's what it says there, correct?

24  A.   I see that, yes.

25  Q.   Okay.  And it's true, based on your experience in the

1  industry, that CLIA -- you know what CLIA is, correct?

2  A.    Yes.

3  Q.    And that requires all laboratories to keep written records

4  of orders they've received, correct?

5  A.    Yes.  Clinical Laboratories Improvement Act has many

6  requirements, and I'm familiar with it.

7  Q.    So based upon that law, a reference laboratory, you would

8  expect, would have a referral or order for testing from, let's

9  say, the rural hospital to that laboratory, correct?

10 A.    I don't know.  I think that depends on the way the claim

11 is submitted, the way the specimen is collected, and so forth.

12 Can you be more specific, please.

13 Q.    I don't think I can.  I mean, we just went over that CLIA

14 requires that if you're a reference laboratory and you receive

15 a sample from a hospital, there has to be an order from the

16 hospital for the test, correct?

17 A.    Yes.

18 Q.    Okay.  So the answer is yes.

19        So you would expect that under CLIA's laws, then,

20 that reference laboratories should have that order from the

21 hospital, correct?

22 A.    Order from a physician.  Order -- an order to perform a

23 test would come from a physician.

24 Q.    Okay.  But I'm talking about --

25 A.    That physician may be in a variety of locations.  Just --

1  sorry, but I have to -- precision is -- precision's important
2  to me.
3  Q.   That's the order for the -- that's the order for the test
4  itself?
5  A.   Yes.
6  Q.   But when the reference lab -- when the hospital refers it
7  to the reference lab, CLIA would require that there be some
8  record of that order for the reference, correct?  Or are you
9  just saying, no, it's just the doctor's test?  Sorry, just the
10  doctor's order?  My -- my mistake.
11  A.   So the doctor orders the test, and the test is -- the
12  order goes where?  From the physician, if -- if you could help
13  me with that, please.
14  Q.   I don't really think I can answer questions from you.  So
15  I guess --
16  A.   But to -- to understand your question, I -- I --
17  Q.   I'm saying that did you -- let me ask it a different way.
18        Did you see any orders or referrals in this case from
19  the hospitals to the defendants -- the defendant labs for
20  testing?
21  A.   No, I don't think I did.
22  Q.   Okay.  So Mr. Schwartz didn't show you those, correct?
23  A.   No.
24  Q.   Okay.  And you mentioned in your report -- one thing you
25  mentioned was the AHA, the American Hospital Association,

1 correct?

2 A.   Yes, I did.

3 Q.   And so your report, you -- you cite in June 1995 an OIG

4 document on page 13 of your report, I believe?

5 A.   I'm going to now open and refer to my report to follow

6 along with you.

7 Q.   Okay.

8        MR. HAYES:  Mr. Arrigo, I have a hard copy if that

9 helps.

10        THE WITNESS:  I don't like paper.  Thank you.

11        MR. HAYES:  Okay.  Fair enough.

12        THE WITNESS:  Okay.  And where are we going in the

13 report, please, sir?

14        MR. HAYES:  I believe, if I'm correct, it's page 13.

15        THE WITNESS:  Okay.  And -- and the phrase that

16 you're reading again?

17 BY MR. HAYES:

18 Q.   You cited June 1995 OIG document.  This is about the --

19 A.   Is this where I said OIG and American Hospital Association

20 say it's common practice for hospitals to bill for laboratory

21 tests --

22 Q.   Yes.

23 A.   -- when the specimen comes from nonpatient?

24 Q.   Mr. Arrigo, I'd -- I'd appreciate if you don't read the

25 report out loud.

1   A.   Well, I'm just trying to understand where --

2   Q.   That is it.  And all I'm saying is it's June 1995,

3   correct?

4   A.   Yes.  I see that now.

5   Q.   Okay.  And how is that even possible if the American

6   Hospital Association did not define type of bill 141 until 2006

7   to represent nonpatient lab testing?

8   A.   I'm simply -- I'm simply citing to the OIG document, that

9   it exists.

10  Q.   Okay.  But you would agree with me that what I just said,

11  and my question -- the premise of my question, that the

12  American Hospital Association -- you're an expert in this

13  field -- did not define TOB 14X, or 141, until 2006 to

14  represent nonpatient laboratory testing, correct?

15  A.   I didn't do a comparison of dates or timeline.  I don't --

16  I actually don't recall.  I don't.  Just simply saying what I

17  read and citing to it here.

18  Q.   Okay.  And, by the way, I'm going to jump back for a

19  second.

20         One thing about the doctor ordering the tests, you're

21  aware that the doctor must have physician rights or knowingly

22  order the tests from the hospital in order to order a test,

23  correct?

24  A.   I -- I'm just am not understanding something, though.  I

25  said in my cite there, Reference laboratories typically focus

1  on specific duties and testing.

2      So the phrase "reference laboratories" is something

3  that was mentioned in the OIG document.  And you're asking me

4  something slightly different, which is type of bill 141.  So --

5  Q.  Right.  I'm saying there's a difference between reference

6  laboratories and type of bill 141.  Okay, Mr. Arrigo?

7  A.  The terms are used synonymously, though.  And, again,

8  precision is important to me.  I wouldn't quote something that

9  I hadn't read out of a federal agency.  So they say reference

10  laboratories and the date is June 1995.  So the concept of

11  reference laboratories has been around a long time.

12  Q.  The concept of reference laboratories has been around

13  before June of 1995.  I'm not disputing that.  I'm talking

14  about type of bill 141.

15  A.  I understand.  I understand.

16  Q.  All I'm saying is maybe -- all I'm saying is, and I'm

17  not -- this isn't a got-you game.  I'm saying maybe, you know,

18  it wasn't as precise as it could have been in that section of

19  your report.  Okay?

20      But let's move on.  What I'm now saying is, before, I

21  was talking to you about a doctor.  A doctor has to have

22  physician rights at the hospital in order to order a test from

23  that hospital, commonly, correct?

24  A.  Physician rights?  You mean they have privileges at the

25  hospital or an employee of the hospital?

1    Q.    I don't know necessarily about an employee --

2    A.    An affiliate with the hospital?

3    Q.    An affiliate with the hospital, right.

4    A.    Okay.  I'll agree with that, sure.

5    Q.    Okay.  Thank you.

6          I want to ask you some questions now -- and this is

7    what you mentioned that -- the -- what you wanted to add in,

8    the 837I.  So you had an occasion to review data in this case,

9    correct?  Billing data?

10   A.    Yes, and very poor quality data.

11   Q.    Okay.  Fair enough.  And you said you didn't like some of

12   the data because the date fields you thought were -- had too

13   many numbers in them and asterisks.

14   A.    Because it doesn't meet the federal standards for

15   producing the data or how it's maintained or transmitted.

16   Q.    Let's talk about the federal standards.

17   A.    Sure.

18   Q.    I didn't mean to interrupt you there.  I actually just

19   did.  I'm sorry.  Let's talk about the federal standards in a

20   different way.

21          In the data you reviewed, you would agree with me

22   that the -- the name of the testing laboratory that performed

23   the tests and its address are not in the billing data, correct?

24   A.    Not as I recall, no.  I don't think it was.

25   Q.    Okay.  But the NPI number and tax ID number of the rural

1  hospital that was billing for the test was, correct?

2  A.   Yes, which is completely normal.

3  Q.   That's not what I asked, but, okay.  There's -- you know,

4  I'm sure you're going to do that on redirect anyway.

5        It's just -- it's in the data, correct, the NPI and

6  tax ID number?

7  A.   Yes.

8  Q.   Okay.  And there is a patient control number in the data

9  that sometimes has initials in it that might be "LB," which

10  I'll represent could be LifeBrite, correct?

11  A.   I don't remember the patient control number.  Don't know.

12  Q.   Did Mr. Schwartz not show you the patient control number?

13  A.   If it was in data that I received, and you're representing

14  to me it was in the data, I probably reviewed it, but don't --

15  don't recall specifically.

16  Q.   Fair enough.  Because there are a lot of fields in that

17  data, correct?

18  A.   Yes, but the number of fields doesn't tie to the quality

19  or reliability of the data.  Just means there's a lot of stuff.

20  Q.   So there were a number of fields in the data, Mr. Arrigo?

21  A.   Yes.

22  Q.   And I want to ask you about -- there's something you quote

23  in your report, the AS C, or the American Standards Committee.

24  And I -- I think I'm going to get this right, the ASC X12,

25  correct?

1    And I don't -- "quote" is perhaps too broad a term,

2  but you -- you refer to it in your report?

3    And this is -- we were -- you were talking before

4  about requirements in the data.  This is the HIPAA requirements

5  for processing the submission of claims.

6  A.    Ah, American National Standards Institute, ANSI, or

7  A-N-S-I, is probably what you're referring to?  ANSI X12

8  standard.

9  Q.    Is it ANSI X12 or ASC X12?

10  A.    If you can direct me to where you're looking in my report,

11  I can...

12  Q.    It's replete in your report, but let me -- let me try it a

13  different way.

14  A.    Ah, yes.  Accredited Standards Committee.  Yes.  I agree.

15  Q.    So it is actually -- I did get it right.  I'm not -- I

16  don't know about this stuff as much as you, but I did get the

17  ASC correct, right?

18  A.    Yes.

19  Q.    Okay.  So that's the American Standards Committee.  And

20  that provides the standards that are used in the electronic

21  data interchange for HIPAA-compliant claims submissions,

22  correct?

23  A.    Yes.

24  Q.    Okay.  And HIPAA is Health & Human Services, kind of the

25  law that establishes national standards for electronic

1  transactions, correct, or billing?

2  A.    The Health Insurance Portability and Accountability Act of

3  1996, HIPAA, yes.

4  Q.    Okay.  Thank you.

5         And you mentioned HIPAA and the ASX12 is a

6  requirement at different points in your report, correct?

7  A.    Yes, I did.

8  Q.    So these are rules and standards for the proper submission

9  of electronic claims, correct?

10  A.    Yes.  Not only the proper submission, but retention and

11  production of data.

12  Q.    Okay.  Thank you.

13         And Mr. Schwartz was talking about the UB-0 form --

14  UB-04 form.  But the claims in this case were electronic and

15  were done as 837I claims, correct?  It wasn't actually a paper

16  form.  Not that it couldn't be a paper form, but in this case

17  it wasn't, correct?

18  A.    It could be.  And I don't know with complete certainty if

19  all were electronic, if some were paper.

20  Q.    Right.

21  A.    But -- but I can agree generally with where you're headed.

22  Q.    And as we've been getting to know each other during this

23  cross-examination, I figured you would not like it if I was too

24  broad, so I was saying, look, I don't even know.  Maybe some of

25  them were on paper.

1          But the majority of these claims, the data you

2     reviewed, are electronic, correct?

3     A.    I believe so.  Yes.

4     Q.    Okay.  And you're familiar with the National Uniform

5     Billing Committee, or NUBC, and the UB-04 data specification

6     manuals that it publishes, correct?

7     A.    I am.  Yes.

8     Q.    Okay.  And these things that I've been going over, the

9     N -- I'm going to -- I'm going to get this wrong, so pardon me.

10          The ASC X12 and the NUBC committees' manuals, they're

11    official sources of billing information on how you do a UB-04

12    through the 837 claim transaction standards, correct?

13    A.    Sir, that was a lot, but I -- I understand there are a lot

14    of acronyms in health care.  I -- I think I get that.  Yes.

15    Q.    Okay.  So they make -- basically, they make you

16    HIPAA-compliant, correct?

17    A.    HIPAA-compliant is a different conversation, but compliant

18    with what part of HIPAA?  I think I'll help you there a little

19    bit.

20    Q.    Thank you.

21    A.    Compliant with the data standard for transmitting claims,

22    is that where you're going?

23    Q.    Yes.  Thank you.

24    A.    Okay.

25    Q.    And you're right, HIPAA's very broad.

 1   A.    Yes.

 2   Q.    So compliant with the data transaction standards.  So you

 3   cite to them in your report on page 92 and then footnote 43 on

 4   page 157, correct?

 5   A.    I'm just checking to make sure.

 6   Q.    I gave you two cites there, so take your time.

 7   A.    What footnote and note number was that, please, sir?

 8   Q.    The footnote, I believe, is footnote 43.  And it's on, if

 9   I can help you, page 157.

10   A.    Yes, the 837 implementation guide.

11   Q.    Okay.

12   A.    Yes.

13   Q.    And I'm about to hand you -- one moment.

14         I'm about to hand you what's been marked for

15   identification as Government's Exhibit 70.

16         Please let me know if you recognize what that is.

17   A.    Well, I see it's from Washington Publishing Company.  I'm

18   certainly familiar with their content.  And I see at the top

19   it's 5010, which is the EDI standard, where I've done work.

20   And it says 837.  And it says "health care claim

21   institutional," yes.

22   Q.    Okay.  And this is the ASC X12N.  You can see that at the

23   top?

24   A.    Yes.

25   Q.    So this is what we were just talking about, it's the ASC

1  X12.  This is kind of a -- laying out the standards for

2  electronic submissions in the EDI format, correct?

3  A.   Yes.

4        MR. HAYES:  Okay.  Your Honor, at this time the

5  government seeks to admit Government's Exhibit No. 70.

6        THE COURT:  Be received, Government's 70.

7     (Government's Exhibit 70 received into evidence.)

8  BY MR. HAYES:

9  Q.   All right.  And in your report -- and I'm looking now at

10  your footnote, you mention that the 837 implementation guide

11  states that the rendering provider loop is situational and is

12  not a synactically [sic] required loop?

13  A.   Syntactically required, yes.

14  Q.   Yes, syntactically.  Sorry.

15        However, the loop is required when the rendering

16  provider information is different than that carried in either

17  the billing provider or the pay-to-provider loops, correct?

18  A.   Yes.  Great opportunity for me to explain why that is.

19  Q.   Can you wait for my question?

20  A.   Okay.

21  Q.   And, Mr. Arrigo, I'm not trying to be difficult, but,

22  believe me, Mr. Schwartz is going to be able to redirect you,

23  so if you'll just confine yourself to answering my questions,

24  I'd appreciate it.

25  A.   Great, we'll have a lot of fun.

1  Q.   All right.  So I -- I know you're looking forward to it.

2  I'm sure we all are.

3         So what that says is -- translated is that the -- if

4  the billing provider is different than the provider that

5  rendered the service, the provider that rendered the service

6  has to be identified in some way in the 837I submission,

7  correct?

8  A.   Well, my quote doesn't say a 837I.  It says 837, space,

9  and the letter I, as an implementation.  It doesn't talk about

10  institutional in the quote that I put there.

11  Q.   That's fine.  But what I'm saying is you would agree with

12  me that if the service provider is different than the billing

13  provider -- than the biller, that what this -- let's -- why

14  don't I just ask you to turn to page 21.

15         MR. HAYES:  And we can put this up on the screen,

16  please.  So, Ms. Stockholm, Government's Exhibit 70, page 21.

17         MR. SCHWARTZ:  It's not page 21.

18         MR. HAYES:  Well, there's -- it's 21 of the PDF.

19         THE WITNESS:  Is this 070-21?

20         MR. HAYES:  If you look up -- I don't know.  If you

21  look up at the top.

22         THE WITNESS:  Yes, I -- I have it here on paper.

23         MR. HAYES:  And we're going to blow it up just for

24  the jury.  Ms. Stockholm, could you just blow that up, please.

25  BY MR. HAYES:

1  Q.   This says "service facility location name."  And I've --

2  required it -- it's a loop repeat, required when the location

3  of health care service is different than the carry --

4  A.   Sorry -- sorry, sir.  Where are you reading?

5  Q.   Do you see where it's highlighted under "situational"?

6  A.   Yes.

7  Q.   And it says, Situational rule required when the location

8  of health care service is different than that carried in -- and

9  then it says loop.

10         I won't read all the numbers, and in parentheses,

11  billing provider.  Okay?

12         And in the notes, it says, When an organization

13  health care provider's NPI is provided to identify the service

14  location, the organization health care provider must be

15  external to the entity identified as the billing provider (for

16  example, reference lab).

17         Do you see that?

18  A.   I see that.

19  Q.   Okay.  And that is sometimes referred to in the 837I as

20  the NM177, correct?

21  A.   I'm still reading, just to make sure I have that down, and

22  the follow-on point.  Go ahead.  Sorry, sir.  Go ahead.

23  Q.   So that is commonly referred to in the 837I as the NM177,

24  correct?  Or do you not know?

25  A.   Well, now -- now we're getting into some esoteric stuff.

1  Not in my scope today.

2          THE COURT:  It hasn't been esoteric before?

3          MR. HAYES:  Thank you, Your Honor.

4  BY MR. HAYES:

5  Q.    And -- and, Mr. Arrigo, I don't --

6  A.    This is really esoteric.

7  Q.    I don't know is a perfectly acceptable answer, but NM177,

8  I will represent to you we have actually heard testimony about

9  this before.

10          Let me ask you a different question and we can tie

11  this up.

12  A.    Well, I want to -- I want to answer to the best of my

13  ability.  And I -- and I think the TR3 note, in its entirety,

14  is important to read, not just the green highlighted part.  TR3

15  note 1.

16  Q.    Tell you what, why don't we do that on redirect.  All I'm

17  asking you is -- I'll ask a different question.

18          Assume for the purposes of my question that -- you

19  were given hypotheticals by Mr. Schwartz that the hospital is

20  billing, but another lab is doing the test, correct?

21  A.    Yes.

22  Q.    Did you review any of the 837I information that's been

23  admitted in this case at all?

24  A.    Thank you for asking that.

25  Q.    Did you?

1  A.   We didn't get an 837 -- we didn't get 837I data elements

2  in this case.  We got far less, and not -- and incomplete

3  questionable-quality data.  So it's hard to know what -- what's

4  there and what's not.

5  Q.   Well, that's the billing data, Mr. Arrigo.

6  A.   And the -- the electronic data is different from the UB-04

7  and the 1450 form and what they require and what they capture.

8  So...

9  Q.   You're welcome again, I think.

10        But all I'm saying, Mr. Arrigo, is you -- did you

11  review EDI submissions that came from a clearinghouse, from

12  ZirMed or anything like that, in this case?

13  A.   I did not.

14  Q.   So Mr. Schwartz didn't give them to you, correct?

15  A.   If he had, they're not humanly readable unless you convert

16  them.  So...

17  Q.   Okay.  So the answer is, no, he didn't give them to you?

18  A.   No, probably extend his lifespan to...

19  Q.   Okay.  So you don't know one way or the other whether the

20  service provider's name, facility location, as referenced here,

21  was included in that 837I data, correct?

22  A.   I want to make sure I have that down.  One -- one more

23  time, please, sir.

24  Q.   If you didn't review -- it's a simple question.

25        If you didn't review the 837I data that I just

1  mentioned, you can't possibly know whether the service facility

2  location was in it or not, correct?

3  A.   Well, I'll just have to answer your question.  There's

4  deficiencies in assumptions, but, no.

5  Q.   I don't think that one -- respectfully, I think that one

6  was a simple yes-or-no question.  The answer has to be no.  But

7  one moment.

8  A.   You've oversimplified a couple of concepts there, but go

9  ahead.

10      (Counsel confer.)

11 BY MR. RAFFERTY:

12 Q.   Dr. Arrigo, I'm going to try it one more time --

13 Dr. Arrigo.  Pardon me.  Mr. Arrigo.

14 A.   Don't call me a doctor.

15 Q.   My question is just -- I don't think there are assumptions

16 in it.  If you didn't review the 837I material that's been

17 admitted in this case because it wasn't given to you by

18 Mr. Schwartz, there's no way whether -- you can tell whether

19 the service facility location's name, the labs in the

20 hypothetical that Mr. Schwartz gave you, you can't tell whether

21 or not that information was included in that data, correct?

22 A.   Nor can anyone else in this case.

23 Q.   That's not what I'm asking.  You can't tell, correct?

24 A.   I can't.

25 Q.   Okay.

1          MR. HAYES:  One moment, please, Your Honor.

2          THE COURT:  Yes, sir.

3       (Counsel confer.)

4          MR. HAYES:  Thank you very much, Mr. Arrigo.  No

5    further questions.

6          THE WITNESS:  You're welcome.

7                    **REDIRECT EXAMINATION**

8    BY MR. SCHWARTZ:

9    Q.   Mr. Arrigo, is there a box in the UB-0 -- or on the UB-04

10   where that would be transmitted by the 837I data that would

11   identify the referral lab or the under arrangement lab?

12   A.   No, there's not.

13   Q.   And to be clear, is the under arrangement model that we

14   discussed appropriately billed by the hospital with the

15   hospital's EIN and NPI?

16   A.   Yes, that's correct.

17   Q.   Now, Mr. Hayes asked you about medical necessity and

18   samples going to a hospital.  Can you determine medical

19   necessity by looking simply at a cup of urine?

20   A.   Absolutely not.  That's why I had trouble with the

21   question.  I couldn't really understand it.

22   Q.   And the medical necessity would be determined by the

23   physician's order ordering the test?

24   A.   Generally, yes.

25          MR. SCHWARTZ:  Can we see that definition of

1  nonpatient.  I don't remember the exhibit number, I apologize.

2      (Counsel confer.)

3  BY MR. SCHWARTZ:

4  Q.    Mr. Hayes had shown you this definition talking about

5  neither inpatient nor outpatient of a hospital, but has a

6  specimen that is submitted for analysis to a hospital, and the

7  beneficiary is not physically present at the hospital?

8  A.    Yes.

9  Q.    With that, is under arrangement allowable?

10  A.    Well, this doesn't really cover how reference lab billings

11  work comprehensively because, as I said in my report, where I

12  disagreed with Dr. K, specimen collection and -- and I'm

13  referring to my -- only to my report and nothing else.

14  Specimen collection and remote testing with or without

15  requiring the use of the nearest testing laboratory,

16  contractors collecting specimens and so forth is all part of

17  the reference lab billing standard and is permitted in the

18  federal standards published by Medicare, the same organization

19  that published this billing manual.

20  Q.    Okay.  So just to be clear, when you have an under

21  arrangement system for toxicology testing, the under

22  arrangement stands in the foots [sic] of -- feet of the

23  hospital, right?

24  A.    Yes, it does.

25  Q.    And it's looked at that way for billing even if the sample

1  never makes it to the hospital or is not run at the hospital?

2  A.   That's correct.

3       MR. SCHWARTZ:  That's all I have.  Thank you.

4       THE COURT:  All right, sir.  Thank you very much.

5  You may step down.

6       THE WITNESS:  You're welcome, Your Honor.  I have an

7  exhibit here.  Who should I -- who should I give this to?

8       THE COURT:  Just leave that right there.  They'll

9  take care of it.  Thank you.

10      THE WITNESS:  Thank you.  Thank you.

11      THE COURT:  Mr. Schwartz, what say you?

12      MR. SCHWARTZ:  Mr. Porter rests.

13      THE COURT:  All right.  Mr. James S. Porter, Jr., has

14  rested.

15    (The witness exits the courtroom.)

16      THE COURT:  Mr. Rowland, on behalf of Sean Porter,

17  what say you?

18      MR. ROWLAND:  Your Honor, I'd like to make sure that

19  we move that Exhibit 1 into evidence.  That's the Department of

20  Corporations listing for TYSI.

21      THE COURT:  All right.  That -- that -- I previously,

22  outside the presence of the jury, had admitted Sean Porter

23  Exhibit 1, but I'll affirm on the record that I have done so.

24      MR. ROWLAND:  And then, Your Honor, I've got a phone

25  call here in about ten minutes, if I can let you know about

 1    that.

 2              THE COURT:  Okay.  All right.  We'll just hold on to

 3    that.

 4              Mr. Lowther, on behalf of Ms. Zaffuto, what say you?

 5              MR. LOWTHER:  Ms. Zaffuto rests, Your Honor.

 6              THE COURT:  All right.  Ms. Galnor, on behalf of

 7    Aaron Alonzo, what say you?

 8              MS. GALNOR:  Mr. Alonzo rests, Your Honor.

 9              THE COURT:  Okay.  Let me see counsel at sidebar

10    briefly.

11         (Sidebar conference:)

12              THE COURT:  So, Mr. Sadow, what are you going to do?

13              MR. SADOW:  We're going to make an evaluation if you

14    would give us over the lunch hour, but our expectation is that

15    we are not going to call the expert.

16              THE COURT:  Okay.  Well, I guess I -- I guess I might

17    let the jury go if we weren't going to have any more witnesses.

18    We're not going to have any more testimony, I don't think.

19              Are you going to rebut?

20              MR. DUVA:  No.

21              MR. SADOW:  If you want to give us ten minutes, I'll

22    be more than happy to let you know, and then we can let the

23    jury go.

24              THE COURT:  Yeah, let's do that.

25              MR. SADOW:  Okay.

 1          THE COURT:  I'm just going to give them a 15-minute

 2     recess.

 3          MR. SADOW:  Okay.

 4       (The following proceedings occurred in open court, in the

 5     presence of the jury:)

 6          THE COURT:  Ladies and gentlemen, we've got a couple

 7     of things working here, and I know it's getting close to

 8     lunchtime, but we're -- we're trying to figure out a little bit

 9     about the scheduling here today.

10          So I'm going to go ahead and give you a 15-minute

11     recess, and then when you come back, I'll be able to tell you

12     what our -- what we're doing, and we'll either be eating lunch,

13     or we may be going in a different direction.  So let --

14     let's -- go ahead and take 15 minutes, and I'll -- I'll get

15     back to you.  Thanks.

16          COURT SECURITY OFFICER:  All rise for the jury.

17       (Jury exits, 12:23 p.m.)

18          THE COURT:  So you can have a seat for just -- just

19     for a second.

20          So, Mr. Rowland, you're literally intending -- if you

21     get these records, you're literally intending to just try to

22     introduce them into evidence without further commentary; is

23     that correct?

24          MR. ROWLAND:  Yes, sir.  That's all it would be.

25          THE COURT:  All right.  Okay.

1        Well, it seems to me that regardless of whether that

2   sorts itself out this afternoon, it seems to me that decision

3   can be made even Tuesday morning if -- I mean, I know the

4   government hasn't seen it and neither have you, so we don't

5   know what we're talking about.  But I guess what I'm saying is

6   it's not attached to any witness testimony; is that correct?

7   All right.

8        MR. ROWLAND:  Well, assuming that it is considered a

9   business record, and it's being held by Florida Blue in that

10  fashion, then I would agree.  Yes.

11       THE COURT:  Okay.  Well, this is the personnel file

12  of one of their employees.

13       MR. ROWLAND:  Not the entire personnel file, Judge.

14  It's basically the offer letter to --

15       THE COURT:  Mr. Schwinger.

16       MR. ROWLAND:  -- Mr. Schwinger, yes.

17       THE COURT:  Okay.  Well, I would think that would be

18  a business record of Florida Blue.

19       MR. ROWLAND:  I would agree.

20       THE COURT:  So -- so I don't think that's going to be

21  an issue.  And it's just a question of whether we're going to

22  be able to admit it or not, if you can get it.  So I guess what

23  I'm saying is that's not a basis to hold us up this afternoon,

24  I don't think.

25       MR. ROWLAND:  Not at all.

1          THE COURT:  All right.

2          So Mr. Sadow is going to have some time to consider

3    his situation and he'll let me know.  If he says we're not

4    going to call the witness, are we completely done with

5    evidence?

6          MR. DUVA:  Yes, Your Honor.

7          THE COURT:  Right?  Okay.

8          MR. SADOW:  We'll be moving in -- excuse me, 95 and

9    96, but, yes.

10          THE COURT:  Okay.  And -- all right.  And then I do

11    think, unless -- I'm going to go upstairs at lunchtime and look

12    at jury instructions.  So I'm thinking that we would -- after

13    lunch, we would complete the jury instructions, we would have

14    any argument on Rule 29 that anybody wanted to be heard on, and

15    just kind of organize ourselves for Tuesday.  And then we

16    would -- that would be it.  So that's what I'm thinking.  Does

17    that sound good?

18          MR. DUVA:  Yes, Your Honor.

19          THE COURT:  Okay.  Is that good with y'all?  Okay.

20          So we're in recess for a few minutes while Mr. Sadow

21    makes his decision, and then we'll -- and then we'll go from

22    there.  All right.

23          MR. ROWLAND:  Your Honor, I'm going to get on the

24    phone with Mr. Byrns.  Just wanted to let you know.

25          THE COURT:  That's fine.

 1          (Recess from 12:26 p.m. to 12:41 p.m.; all parties

 2    present.)

 3              COURT SECURITY OFFICER:  All rise.  This Honorable

 4    Court is now in session.

 5              THE COURT:  Have a seat.  Mr. Citro, what's the

 6    decision?

 7              MR. CITRO:  Your Honor, Mr. Herbers would simply be

 8    repetitive of Mr. Arrigo, so we are going to decline to call

 9    him and rest after we admit Fletcher Exhibits 95 and 96.

10              THE COURT:  Is there any objection to 95 and 96 from

11    the government?

12              MR. DUVA:  No, Your Honor.

13              THE COURT:  Okay.  All right.  Then, Mr. Citro, I'll

14    let you just announce that in front of the jury.  I'll admit

15    those exhibits and then you can announce rest.

16              MR. CITRO:  Yes, Your Honor.  Thank you.

17              THE COURT:  Okay.  And then we'll hold Mr. Porter's

18    case open for potentially the one document, but I'll -- I tell

19    you what.  I'm going to -- I'm going to let you announce rest,

20    Mr. Rowland, and I'll just tell the jury that -- that

21    there's -- or you can say we're waiting on a document, but --

22    you want to do that?

23              MR. ROWLAND:  You might be able to assist us in this.

24    I just spoke with Mr. Byrns.  They are -- they confirmed that

25    there is an offer letter.  The issue is they only keep physical

1  copies, and apparently since COVID, they haven't had anyone

2  physically in the office.

3         So in talking with Mr. Duva, we've agreed this would

4  be a business record, so I don't believe that I'm going to need

5  a witness on Tuesday for that.  However, I know you've said if

6  the Court can assist in any way, I believe that Mr. Byrns may

7  have previously been a law clerk of yours, if there's any way

8  that we could speed that process up, we could go ahead and

9  announce today.

10        THE COURT:  Well, I don't know how to announce

11  something that you don't have.  I'm not sure what you're asking

12  me to do.

13        MR. ROWLAND:  The issue -- the issue is they're

14  telling me they can't have anybody in the office until Tuesday

15  morning and then they're going to have to scan and e-mail it

16  over.  I'm just trying to maybe speed the process up a little

17  bit.

18        THE COURT:  All right.  Okay.  All right.  I'm just

19  going to -- I'm going to -- you can just tell the jury that

20  there's a document pending that we're going to try to have in

21  evidence on Tuesday, and other than that, you rest.  Okay.

22  Let's do it that way.

23        MR. ROWLAND:  Okay.

24        THE COURT:  All right.  Let's do that.  All right.

25  And then that's everybody, right?

1       Okay.  Then I'm going to send them home for the

2  weekend and ask them to be here on Tuesday.

3       All right.  Let's have the jury, please.

4       COURT SECURITY OFFICER:  All rise for the jury.

5    (Jury enters, 12:43 p.m.)

6       COURT SECURITY OFFICER:  Please be seated.

7       THE COURT:  All right.  Ladies and gentlemen, we're

8  just going to do a couple of things here, and then I think

9  you're going to be done for the day.  But let me -- let me do

10  it in the right order here.

11       So, Mr. Rowland, on behalf of Sean Porter, what say

12  you?

13       MR. ROWLAND:  Thank you, Your Honor.  We're awaiting

14  one document from Florida Blue.  Subject to us receiving that

15  on, I believe, Tuesday, maybe earlier, but that's going to be

16  probably the earliest we'd be able to put it in evidence.

17  Other than that, Mr. Porter will announce rest.

18       THE COURT:  Okay.  So we'll just await that

19  particular document if it becomes available, but other than

20  that, Mr. Sean Porter is resting; is that correct?

21       MR. ROWLAND:  Yes, Your Honor.  I just want to make

22  perfectly clear that we're reserving our right to be able to

23  put that into evidence when --

24       THE COURT:  Yes, sir.

25       MR. ROWLAND:  -- and if we receive it.

1          THE COURT:  Yes, sir.

2          MR. ROWLAND:  Thank you.

3          THE COURT:  Okay.  Mr. Citro, on behalf of

4   Mr. Fletcher?

5          MR. CITRO:  Your Honor, during the course of the

6   case, I believe Mr. Sadow had laid the predicate for Fletcher

7   Exhibit 95 and 96, but it had not been received into evidence.

8   So we move those into evidence at this time.

9          THE COURT:  So Fletcher 95 and 96 will be received

10  without objection.

11     (Defendant Fletcher's Exhibits 95 and 96 received into

12  evidence.)

13         MR. CITRO:  Thank you, Your Honor.  And with that,

14  Mr. Fletcher rests.

15         THE COURT:  All right.  So, ladies and gentlemen,

16  all -- I'm sorry -- Mr. Duva, I -- I should formally ask you.

17  I think I already know the answer.

18         But does the government wish to put on a rebuttal

19  case?

20         MR. DUVA:  No, Your Honor.

21         THE COURT:  All right.  Is the government resting?

22         MR. DUVA:  The government rests, Your Honor.

23         THE COURT:  All right.  So all evidence is now before

24  you, ladies and gentlemen.  All parties have rested.  So we've

25  got some work to do, though, before we're ready for the next

1   phase of the case, which will be the closing arguments in the

2   case.

3           The way it works, of course, is that there will be

4   closing arguments from all the lawyers, and then I will be

5   instructing you on the law, and then we'll be giving you the

6   case for your consideration.

7           So we'll be working this afternoon, but it does not

8   require you to be here.  And so you -- you'll have the

9   afternoon off.

10          Monday is a federal holiday.  Monday -- Juneteenth is

11  a federal holiday, so we will not be in session on Monday.  So

12  we'll ask you to be back here on Tuesday at 8:45, ready to

13  start with the closing arguments of the lawyers at 9 o'clock.

14  All right?

15          So it's important as we -- as we get toward the

16  ability for you to deliberate in the case, still important that

17  you not talk about the case with anybody, including your fellow

18  jurors.  Don't let anybody talk to you about it.  Don't do any

19  of your own research, computer or otherwise.  And do not engage

20  on social media regarding the case.

21          So we appreciate everybody's continued service.  We

22  are working toward -- toward the time when you'll be able to

23  consider the case.  And so we'll be working this afternoon.

24  We'll see you back here on Tuesday for closing arguments.

25          Is everybody okay?  Any questions?  Everybody good?

1         Have a nice weekend, a long weekend.  Don't come on

2  Monday.  Nobody will be here.

3         COURT SECURITY OFFICER:  All rise for the jury.

4      (Jury exits, 12:48 p.m.)

5         THE COURT:  So we can take a little break and then we

6  can come back.  I guess the question is, how long do you want?

7  I assume some of you would prefer to be getting on about your

8  business, and I -- I've got a matter I need to attend to today,

9  too.  So -- so what -- how long do you want to take to have a

10 break?

11        MR. SADOW:  1:30?

12        THE COURT:  Is that all right?  Is that all right

13 with everybody?

14        MR. LANDES:  Yes, Your Honor.

15        THE COURT:  1:30.

16     (Recess from 12:49 p.m. to 1:31 p.m.; all parties

17 present.)

18               * * * * *

19     (Whereupon the charge conference was reported, but not

20 transcribed.)

21              - - -

22

23

24

25

## <u>CERTIFICATE</u>

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 17th day of June, 2022.



                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC