IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,     Jacksonville, Florida

    Plaintiff,          Case No. 3:20-cr-86-TJC-JBT

vs.                June 21, 2022

JORGE PEREZ, et al.,       8:52 a.m.

    Defendants.       Courtroom No. 13A

_____

JURY TRIAL PROCEEDINGS
(VOLUME XIX)
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT COURT JUDGE

COURT REPORTER:

       Shannon M. Bishop, RDR, CRR, CRC
       221 North Hogan Street, #150
       Jacksonville, FL  32202
       Telephone:  (904) 549-1307
       dsmabishop@yahoo.com

    (Proceedings reported by mechanical stenography;
transcript produced by computer.)

A P P E A R A N C E S

GOVERNMENT COUNSEL:

**ANDREW TYSEN DUVA, ESQ.**
US Attorney's Office - FLM
300 North Hogan Street, Suite 700
Jacksonville, FL  32202

**GARY A. WINTERS, ESQ.**
United States Department of Justice
1400 New York Avenue NW
Washington, D.C.  20902

**JAMES V. HAYES, ESQ.**
Department of Justice, Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C.  20902

COUNSEL FOR DEFENDANT JORGE PEREZ:

**THOMAS M. BELL, ESQ.**
Thomas M. Bell, PA
301 West Bay Street, Suite 1460
Jacksonville, FL  32202

COUNSEL FOR DEFENDANT RICARDO PEREZ:

**RICHARD J. LANDES, ESQ.**
Richard Landes, Esq.
736 2nd Street North
Jacksonville Beach, FL  32250

COUNSEL FOR DEFENDANT AARON DURALL:

**BRIAN T. RAFFERTY, ESQ.**
BakerHostetler
1170 Peachtree Street NE, Suite 2400
Atlanta, GA  30309-7676

COUNSEL FOR DEFENDANT JAMES F. PORTER, JR.:

**SETH SCHWARTZ, ESQ.**
**ALBERT J. TASKER, IV, ESQ.**
Schwartz Law Group, PA
10365 Hood Road, Suite 105
Jacksonville, FL  32257

COUNSEL FOR DEFENDANT SEAN PORTER:

    **CALEB D. ROWLAND, ESQ.**
    Rowland Law
    2130 Riverside Avenue
    Jacksonville, FL 32204

COUNSEL FOR DEFENDANT CHRISTIAN FLETCHER:

    **STEVEN H. SADOW, ESQ.**
    **VINCENT ALBERT CITRO, ESQ.**
    Steven H. Sadow, PC
    260 Peachtree Street NW, Suite 2502
    Atlanta, GA 30303

COUNSEL FOR DEFENDANT NEISHA ZAFFUTO:

    **JOSHUA SABERT LOWTHER, ESQ.**
    Lowther Walker, LLC
    Centennial Tower
    101 Marietta Street NW, Suite 3325
    Atlanta, GA 30303

COUNSEL FOR DEFENDANT AARON ALONZO:

    **DARCY D. GALNOR, ESQ.**
    Galnor Shumard, PA
    121 West Forsyth Street, Suite 610
    Jacksonville, FL 32202

# T A B L E   O F   C O N T E N T S

Page No.

PROCEEDINGS:

Closing Argument by Mr. Bell...................... 69
Closing Argument by Mr. Landes................... 108
Closing Argument by Mr. Rafferty................. 125
Closing Argument by Mr. Schwartz................. 159
Closing Argument by Ms. Galnor................... 189
Closing Argument by Mr. Lowther.................. 199
Closing Argument by Mr. Rowland.................. 207
Closing Argument by Mr. Sadow.................... 218
Rebuttal Closing Argument by Mr. Duva............ 250

# E X H I B I T S   R E C E I V E D

Page No.

Defendant Sean Porter's Exhibits:

2................................................. 218

1                    P R O C E E D I N G S

2   June 21, 2022                             8:52 a.m.

3                         - - -

4         COURT SECURITY OFFICER:  All rise.  This Honorable

5   Court is now in session.  Please be seated.

6         THE COURT:  Good morning.

7         Mr. Perez, I hope you're feeling better.  I see you

8   moving a little slowly there, but glad that you're able to

9   rejoin us.

10        DEFENDANT R. PEREZ:  Thank you.

11        THE COURT:  Over the weekend, I guess Friday evening,

12   we sent out what we think is the final version of the jury

13   instructions, the verdict forms, although we have made one

14   change to the verdict form, and -- and the redactions to the

15   indictment.

16        The only change to the verdict form is that on those

17   pages where you're -- where it's a conspiracy count and you're

18   supposed to skip the next question, we -- we added that you're

19   supposed to skip the next question and go to the following

20   question.  We just explicitly added that language.  And we can

21   provide that to you-all.

22        But I did not receive any feedback from those

23   instructions.  And so I'm assuming that there were no further

24   issues with the instructions or the other materials.

25        All right.  Hearing none, then we have now printed

 1   them without the headers, which is what the final version that

 2   goes to the jury will be.

 3          To the extent any of you need a clean copy of what

 4   will be actually given to the jury, we've got a couple -- we

 5   made a couple of sets.

 6          We can make more if we need it, but we will also send

 7   it to you by e-mail, so you'll have that in case you want to

 8   refer to it during your arguments.

 9          The -- as I understand it -- does anybody need a set

10   right now for any of their -- what they're doing?  Or is

11   everybody loaded up?

12          Okay.  The only thing I don't want -- if you do show

13   the instructions or refer to them, I don't -- I don't want you

14   showing the headers, because those are coming out, so...

15          MR. BELL:  I may show a few, Judge.  So if I can get

16   a copy without the header.

17          THE COURT:  Yeah.  We've got them right there.

18          MR. BELL:  Thank you.

19          THE COURT:  So as I recall it, Mr. Hayes, you're

20   doing the closing for the government.  And you've got up to 90

21   minutes.

22          I'll -- and I haven't discussed this with

23   Ms. Hatfield, but I will discuss with her momentarily, that

24   I'll give you a 15-minute -- she'll give you a 15-minute cue

25   and then a five-minute cue, in case you need them.  And that

1  will be the same for all of the parties.

2  Every other defendant is entitled to an hour.  No one

3  is required to use all their time, but -- but the time limits

4  will be enforced.  And so you just need to plan accordingly.

5  So Mr. Hayes will go first.

6  And then, I guess, Mr. Bell, you're up.

7  And I would assume that somewhere in there there will

8  be a break, and then we'll just go down the line.

9  Mr. Sadow, has it been decided that you'll go last

10  for the defendants?

11  MR. SADOW:  I believe so, Your Honor.

12  THE COURT:  Okay.  All right.  And then Mr. Duva is

13  going to follow up.

14  We'll just see how far we get today.  As I said, I

15  think everybody needs to be prepared to go, because I just --

16  you know, it's just hard to predict how much time people will

17  actually take.

18  And so are there any other matters?  Mr. Landes?

19  MR. LANDES:  Just a brief matter, Judge.  Mr. Ricardo

20  Perez is in a -- in some amount of pain.  It is much less

21  painful for him when he's standing than sitting.  He can sit,

22  but sitting for the whole day is going to be difficult.

23  I would just ask that if he feels the need, he can

24  just quietly get up, perhaps stand up against that wall, and

25  then come and sit down for his personal comfort.

 1          THE COURT:  Absolutely.

 2          MR. LANDES:  All right.  Thank you, Judge.

 3          THE COURT:  I may do a little bit of that myself.  So

 4     we'll -- yes, sir, Mr. Sadow?

 5          MR. SADOW:  Your Honor, do I understand that it is

 6     permissible to take the jury instructions that the Court is

 7     going to give and actually show those to the jury during

 8     argument?

 9          THE COURT:  Yes, sir.

10          MR. SADOW:  Is that okay?

11          THE COURT:  Yes, sir.  As long as you're using the

12     version that -- the final version, you're good to go.

13          MR. SADOW:  Thank you.

14          THE COURT:  And we can provide -- I think Mr. Hayes

15     just took the second set, but we can actually provide those to

16     you.  You're pretty far down the road there, so we'll get those

17     to you if you need them.

18          Matter of fact, Ms. Milliron, why don't you go ahead

19     and e-mail final versions to everybody now.  And then if they

20     need hard copies, we'll get those for them.

21          Yes, sir?

22          MR. HAYES:  Two things, Your Honor.  We put the jury

23     instructions in a PowerPoint.  So we won't be showing them on

24     paper.

25          THE COURT:  That's fine.

1          MR. HAYES:  And any typos -- I don't think there are

2   any, but if there are I'll make clear that the Court's jury

3   instructions control.

4          THE COURT:  Yeah.

5          MR. HAYES:  Also, I discussed this with

6   Mr. Rafferty -- 48L, which was the patient file --

7          THE COURT:  Yes.

8          MR. HAYES:  -- we're taking out some things that

9   don't belong in the patient file.  So I'm going to show that to

10  Mr. Rafferty at lunch and make sure that we're both in

11  agreement on 48L.

12          And I mentioned, since the pages are going to change,

13  since we took stuff out, that there will be a 48L(1).  That

14  will be what I went over.  So that -- I mean, I don't know that

15  that was ever officially admitted, but we just admit it now,

16  48L(1).

17          MR. RAFFERTY:  As like a court exhibit that's not

18  going to back to the jury?

19          MR. HAYES:  No.  It's going to go back to the jury.

20          MR. RAFFERTY:  Which one is not going to go back to

21  the jury?

22          MR. HAYES:  Huh?

23          MR. RAFFERTY:  Which one's not going to go back to

24  the jury?

25          MR. HAYES:  They're both going to go back, because

 1   48 -- what I said in front of the jury was, Here's 48L.

 2   Mr. Rafferty said we're taking some stuff out in front of the

 3   jury, so I'll make a 48L(1), that will be what I showed to the

 4   jury, instead of nine -- ten pages I showed the jury.

 5            MR. RAFFERTY:  Okay.

 6            THE COURT:  All right.  Mr. Hayes, are you planning

 7   on showing the verdict forms or not?

 8            MR. HAYES:  No, Your Honor.

 9            THE COURT:  Okay.  Because those did change a little

10   bit.  And we'll get those to you -- well, I think we just

11   handed them to you, but, anyway...

12            So is there anything else y'all can think of?

13            Ms. Hatfield.

14       (Judge confers with courtroom deputy.)

15            THE COURT:  All right.  Are we ready for the jury?

16   Let's have the jury, please.

17            COURT SECURITY OFFICER:  Yes, sir.

18            MR. HAYES:  Can we have the display, Your Honor?

19            COURT SECURITY OFFICER:  All rise for the jury.

20       (Jury enters, 8:59 a.m.)

21            COURT SECURITY OFFICER:  Thank you.

22            You may be seated.

23            THE COURT:  Well, good morning, ladies and gentlemen.

24   I hope -- I hope y'all enjoyed a three-day weekend, at least

25   from jury service.  I know you probably had other things going

1  on in your lives, but welcome back.  And thank you all, again,

2  for your faithful attendance.

3          We are moving into the next phase of the case.  And

4  those are called closing arguments.  As their name implies,

5  these are the opportunities for the lawyers to summarize the

6  evidence they believe has been given to you and to make

7  arguments to you about what you should do with that evidence.

8          Of course, what the lawyers say is not evidence, but

9  it can be helpful to you in evaluating the evidence.  And like

10  everything else in a trial, we have some rules about how we go

11  on this.

12          So the government, as you know, has the burden of

13  proof in the case.  So, therefore, the rules of closing

14  arguments are that the government gets to go first.

15          And so Mr. Hayes is going to be giving the first

16  closing argument on behalf of the government.  And he's got a

17  specific amount of time that he's allotted.  You may hear

18  Ms. Hatfield give him some time cues as he gets closer to the

19  end of his allotted time.

20          After that each defendant may present closing

21  argument.  And we will give each one of them an opportunity to

22  do that.  They also have time limits.  Some of them may not

23  take all the time they have, but they do have time limits.  So,

24  again, you may hear some time cues.

25          After all the defendants have given their closing

1  arguments, the government does get the last word.  It's called

2  rebuttal.  And the government gets the last word.  It's a

3  shorter argument than -- than the one Mr. Hayes is likely to

4  give you, but they do get the last word, because, as I said,

5  the government has the burden of proof.

6          After all that happens -- and it will take a while.

7  We don't know how long it will take.  Obviously with this

8  number of -- of defendants involved and the government going

9  first and last, it will take some time.  We'll take breaks as

10 we did during the trial, but it will take some time.  We'll

11 see -- we'll just see how long it does take, and then we'll --

12 we'll go from there.

13          And it's even possible we won't finish today and

14 we'll have to finish up the closings tomorrow, but we'll see.

15          If that -- once the closings are done, regardless of

16 when it is, then I instruct you on the law, the law that you'll

17 apply to the facts of the case -- and we've been working -- the

18 lawyers and I have been working on -- on settling those

19 instructions.  And we have them settled.

20          So you may hear the lawyers refer to those

21 instructions during their arguments, which is perfectly

22 permissible.  But, remember, I'm going to be giving you the

23 complete set at the end of the case.

24          And so you don't have to try to memorize them or

25 anything.  And I'll also be giving you written versions of the

 1  instructions, so you'll have them as well.  So you'll have some

 2  tools to use when you -- when you actually begin to deliberate

 3  upon your verdict.

 4          So after the -- the instructions of the Court, then

 5  the case will be given to you for your consideration.  And I'll

 6  be talking to you about the logistics of how we're going to go

 7  about doing that later on.

 8          But for now I know that you'll give the lawyers the

 9  same attention that you've been giving throughout the entire

10  trial while they present their closing arguments.

11          And, Mr. Hayes, you may proceed on behalf of the

12  United States whenever you're ready, sir.

13          MR. HAYES:  Thank you, Your Honor.

14          Good morning, ladies and gentlemen.  And today we're

15  going to be presenting to you closing arguments, both sides.

16  This is a day you probably never thought would come when we

17  started this trial on May 9th, but here we are.

18          So these are the closing arguments.  And I'm not

19  going to go over every single piece of evidence, but I'm going

20  to point out what the government thinks is important.  Then the

21  defense will go.  The government will go again.

22          And on behalf of the government -- I know I speak for

23  the defense, the Court, and everyone -- we thank you for your

24  service up to this point.

25          So, ladies and gentlemen, as we told you at the

1 beginning of this trial, this case is about lies for money and

2 using rural hospitals as billing hubs for lab testing, because

3 the defendants knew that they could get paid more that way.

4          Now, why could they get paid more that way?  It's

5 simple.  And a lot of the aspects of this case, ladies and

6 gentlemen -- we know it took a long time, but this case is

7 actually quite simple.

8          The hospitals were in-network.  And because they were

9 rural hospitals, they got favorable payment rates to enhance

10 access to medical care in rural areas.  Now, that's a worthy

11 goal.

12          And the defendants knew if they billed tests as

13 out-of-network labs, they would make far less money.  So they

14 targeted desperate rural hospitals that were on the verge of

15 closing.  They took them over with a management company.

16          They promised they had a secret sauce, a way to

17 increase revenue through lab testing that would save the

18 hospital.  And after taking advantage of these desperate

19 places, they set the scheme in motion.

20          And which hospitals?  You've heard about them through

21 this whole trial, Campbellton-Graceville, or CGH; Regional

22 General-Williston, or RGH; Chestatee; and Putnam.

23          Now, billing for what?  You now know, based on the

24 evidence you've heard, that they were billing mostly for urine

25 drug testing.  This case has been about urine drug testing,

1    liquid gold, as Mr. Perez, Mr. Byrns, and others called it.

2           And that was the secret sauce.  That was the whole

3    plan put in action by Jorge Perez, by Aaron Durall, by

4    Christian Fletcher, by James Porter, and others; take over

5    hospitals by promising to save them, get their billing rate,

6    invest in them at first and set up labs at the hospitals, get

7    urine samples from all over the country, do most of the testing

8    at their own independent labs, but bill all of the testing

9    through the rural hospitals without telling the insurance

10   companies that the labs were doing most of it, and make a

11   killing.

12          And you now know that this case is about confirmation

13   urine drug testing, or definitive testing, or quantitative

14   testing.  That's where the real money was.

15          The vast majority of what was billed and paid was

16   confirmatory urine testing.  And you now know, based on the

17   evidence, that none of the hospitals could do confirmation

18   testing at all except for Putnam Hospital during a short time

19   period.  And they didn't do very much.

20          And you now know, based on the evidence you've heard,

21   that the defendants recruited urine specimens, or samples, from

22   all over the country, sometimes through marketers like Kyle

23   Marcotte, who you heard from, and John Skeffington, who were

24   paid to provide urine samples; from Nestor Rojas and Aaron

25   Alonzo, or they got them from doctors and from other sources.

1          You now know, based on the testimony you heard, that

2   these urine samples were sent directly to the labs owned by the

3   defendants.  That's Reliance, LifeBrite, and Pinnacle.

4          Then these samples were often split, and a portion of

5   them was sent to the rural hospitals in this case.  But I want

6   to stress, ladies and gentlemen, the samples in most cases went

7   to the independent labs first.

8          And you now know, based on the evidence that you've

9   heard, that the labs were capable of doing all of the testing

10  themselves.  Linda Sullivan and others told you that Reliance

11  always had the capability to do all the presumptive tests and

12  all the confirmatory tests.  Mona Tague told you the same for

13  Pinnacle.

14         What that means is that these labs didn't need to

15  send anything to the hospitals to do the testing.  The

16  hospitals were not handling their overflow.  It's absurd.

17         So why did they send these specimens to the hospitals

18  in the first place?  It was simple, to touch the hospital, so

19  they could get their billing rate.

20         And Dr. Kongstvedt, when he testified, told you that

21  this was inappropriate, that a normal reference lab arrangement

22  is fine, but not what the defendants did.

23         And you saw this diagram.

24         Ms. Stockholm, if we can go -- this is what a normal

25  reference laboratory is, ladies and gentlemen.  So we'll just

1    go through it.  You now know, based on the evidence -- you can

2    click ahead -- that the provider orders tests from a network

3    rural hospital.  The rural hospital runs the tests it can, but

4    sends those it can't to a network reference lab.

5           The reference lab bills the insurance company only

6    for tests it ran.  And the hospital bills the insurance company

7    for only tests it ran.

8           That's the way a normal reference lab works.  And

9    there's nothing wrong with that.  Putnam is doing that even to

10   this day, as you heard.  The specimen comes to the hospital.

11   The hospital runs what it can, and references out what it

12   can't, for patients that are connected to the hospital within

13   its area.  But the defendants did it another way.

14           Next slide, please, Ms. Stockholm.

15           And you heard about this.  And there's really no

16   dispute about this, as far as the facts.  This is what the

17   defendants did.

18           The provider was ordering tests from an

19   out-of-network independent lab.  The out-of-network lab ran the

20   confirmatory tests.  The out-of-network lab then sent a portion

21   of the specimen to the network hospital lab for screening

22   tests.  The rural hospital billed insurance for all of the

23   urine tests in this case.

24           There's no real dispute that this happened, ladies

25   and gentlemen.  This is the evidence you heard, that the

1   physicians and other providers were going straight to the labs,

2   the labs were splitting the samples and sending them to the

3   hospitals, and the hospitals were billing for everything.

4          Now, calling this a reference lab or an outreach

5   program doesn't change what happened, because this is what

6   actually happened and this is the evidence you saw.

7          And you know that the contracts the hospitals have

8   with the insurance companies said they could only bill for what

9   they did, for hospital services, and did not even address this

10  reference lab arrangement.  And sometimes the contracts even

11  strictly prohibited the use of reference labs.

12         That's the contracts that the hospitals had with the

13  insurers.  There's another set of contracts, the contracts the

14  defendant labs made with the hospitals they controlled, which

15  were essentially a contract with each other, an agreement

16  between the defendants that the payers never even saw.

17         And you know now, based on the evidence you heard,

18  that the contracts the hospitals signed with the labs had

19  nothing to do with what was actually going on.

20         The Reliance contracts -- and we'll get to those in a

21  moment -- said that the hospitals would handle their overflow.

22  But there was no overflow.  The labs could do all the testing.

23  Reliance could do all the testing.

24         The LifeBrite contracts all provided that the urine

25  specimens would come to the hospital first.  They even

1  specified a delivery time, some of them.  And you know that

2  didn't happen, and they would then just refer it out to the

3  labs.  Everything went to the labs first, virtually.

4       You know that Hospital Lab Partners was just a

5  billing company.  It had nothing really to do with laboratory

6  testing.

7       All the samples went to Pinnacle or to LifeBrite or

8  to Reliance.  The legal advice that James Porter received from

9  Mark Thomas actually said this.  But that's not what happened.

10  The exact opposite happened.

11       And you know another thing that happened that is not

12  in dispute.  At the heart of this case is how all of these

13  tests were billed.

14       There's no dispute whatsoever that the NPI, National

15  Provider Identification number, and tax ID number of the rural

16  hospitals were used in every single claim.  You saw those.

17       And I have good news.  I'm not going to put up the

18  long list of claims to show it to you again.

19       Every insurance witness who came in here told you

20  those numbers were how the service provider would be

21  identified.  And in almost all cases you know that the

22  hospitals didn't do the confirmation tests, but their NPI and

23  tax ID number appears on all the claims anyway.

24       It's on each claim as if the hospital did a

25  confirmation test that they did not do.  And that was a

1  misrepresentation, a lie, in every claim.

2      You also know that the 141 code was used in virtually

3  every claim.  And you know -- next slide, please,

4  Ms. Stockholm -- from Exhibit 57, and from every witness in

5  this case, that this means the test has to be for a nonpatient

6  and also has to be submitted to the hospital for analysis.  All

7  of the witnesses in this case agreed with that, even the

8  defense expert -- next slide, please, Ms. Stockholm --

9  Mr. Small agreed with that.

10     And he said, If the specimen was never received in

11 the hospital, it should have been billed by the hospital.

12 That's the 141 code.

13     And you know now that the samples did not come to the

14 hospital, but, instead, went to the labs.  So every time that

15 the 141 code was used, that was a misrepresentation.  It had

16 nothing to do with what Mr. Thomas, Mr. Small, Mr. Arrigo were

17 telling you.  That's the 141 code, ladies and gentlemen.

18     So the 141 code does not save the defendants.  The

19 141 code is part of the misrepresentations in each and every

20 bill they submitted.

21     And, finally, you know the claims in this case were

22 submitted electronically using the 837I format.  And you know

23 now that the coding rules say that if the service provider, the

24 lab, is different than the billing provider, the hospital, as a

25 normal reference lab arrangement, the name and address of the

 1 reference lab service has to be included in the electronic 837I

 2 submission.

 3          Even the defense expert Mr. Arrigo admitted this when

 4 he was on the stand, because it was in his report.  And you

 5 know now that the defendants did not do that.  They never

 6 identified the labs that were doing the confirmation tests.

 7          And their reason is that the UB-04 does not have a

 8 space for the lab.  But that's the paper form.  These claims

 9 were submitted electronically.  And the coding rules expressly

10 require them to provide the service provider if it's different

11 than the billing provider.  This is in Government's Exhibit

12 No. 70.  This is on page 21 of Government's Exhibit No. 70.

13 It's page 341 at the bottom.

14          And you'll see there in a reference lab arrangement

15 when the NPI is provided it must identify the service location

16 if it's different than the billing provider.  It's very clear.

17          And I'm not going to show you -- I have good news --

18 the 837Is, but they're Government's Exhibit 37.  And they did

19 not do that.  So every time they did not do that, that is

20 another misrepresentation.

21          All right.  Ladies and gentlemen, so you know that

22 when the insurers caught on, defendants evaded, gave half-truth

23 answers, and moved on to other hospitals.

24          John Skeffington, for example, told you that after

25 CGH got audited and shut down, they had a backlog of three or

1   four months where they couldn't bill anything and they went to

2   Putnam.  And we'll get to that in a moment.

3        David Byrns told you that.  He showed you the coverup

4   and how letters were answered to -- even contrary to legal

5   advice.  And what we're saying, ladies and gentlemen, is it

6   starts with CGH, it moves on to RGH.  It then goes to Putnam.

7   Chestatee is in there, too.  The defendants move from hospital

8   to hospital as the insurance companies try and catch up with

9   them.

10        And, finally, ladies and gentlemen, you heard

11  evidence that it's not just how the defendants billed these

12  claims, but what they were billing for.

13        Witnesses told you that boxes of urine piled up in

14  the halls and were never tested.  They told you about how

15  records of tests were never found.

16        We even showed you that Putnam billed for tests when

17  it couldn't do any at all, from approximately September or

18  November of 2016 to February 2017.  And billing for tests you

19  can't do at all is fraud, ladies and gentlemen.

20        In fact, you know many times, based on the evidence

21  you heard, that doctors did not even order the tests that were

22  billed.

23        Dr. Wang and Dr. De Carvalho came in here and told

24  you that they rarely did confirmation tests in their practice

25  because they wouldn't have needed them for their patients and

1  did not order them.  And they were surprised at the amount of

2  testing billed in their name.

3          Dr. Waller came in here, the government's expert, and

4  told you he analyzed the data and a limited amount of patient

5  files, and he determined that the tests were too frequent, too

6  close together, too steady, too complicated, and didn't make

7  any medical sense at all.  And he told you he could tell that

8  from the data.

9          He said even for the presumptive test, the results

10 were not coming back quick enough to be used in treatment.  He

11 told you that he did not think these tests -- and he did not

12 say all of them -- he did not think the tests were medically

13 necessary, based on the data he reviewed.

14         And one of the ways to explain what Dr. Waller was

15 telling you was what Dr. Wang and Dr. De Carvalho told you.

16 They never ordered the tests.  Now, that was just two doctors.

17         I understand that there were many more doctors than

18 two, but two doctors is enough.  They never ordered the tests.

19 They didn't order confirmation tests for their patients.  They

20 told you they were mostly doing cup tests, point-of-care tests.

21         What Dr. Waller and Dr. Wang told you explains --

22 what Dr. Waller and De Carvalho have told you, excuse me,

23 explains what Dr. Waller is telling you.  The patterns he

24 identified are explained by doctors that came in here and said,

25 I never ordered these tests.

1       And you even heard from patients who said they were

2   tested, a point-of-care test would have been enough, and no one

3   ever went over the results.  So that's what's going on here,

4   ladies and gentlemen.

5       It's not just how these tests were billed, which was

6   fraud, because the rural hospitals weren't doing the

7   confirmation tests, it's what was being billed for.

8       And Dr. Kongstvedt told you that the way they were

9   being billed did not meet industry standards.  And remember

10  what each insurance witness told you.  They said the same

11  thing.

12      Kelly Tobin, Garrett Shohan, Theresa Jackson, Carey

13  Bobbitt -- they all said they would not have paid their

14  companies if they knew the hospital did not do the tests but

15  billed for them with the NPI and tax ID number.

16      They also said it took them time to figure out what

17  was going on.  And they chased the insurance comp- -- the

18  insurance companies chased the defendants, but couldn't figure

19  it out right away.  And this did take time -- in the end it's

20  very simple, but it did take time for the insurance companies

21  to realize what was happening.

22      So how they billed, the NPI, the tax ID.  They didn't

23  do the electronic submissions correctly.  They didn't identify

24  the service provider.  That's what this case is about.

25      I'm going to tell you some things this case is not

 1    about.  It's not about Medicare rules.  There was a lot of talk

 2    about Medicare rules.  These are private insurance companies.

 3            It's not about whether the hospitals did some of the

 4    presumptive urinalysis tests.  They did.  Chestatee did quite a

 5    few.

 6            It's not about whether Jorge Perez and Aaron Durall

 7    and others bought new equipment and furniture for the hospitals

 8    to invest in them when they first started this scheme so they

 9    could keep using them as billing hubs.  They absolutely did.

10            It's not whether normal reference lab arrangements

11    are okay.  They are.  And it's not about an advice-of-counsel

12    defense to James Porter.

13            Because as you heard when he came in, he talked

14    before lunch about a situation that once we showed him his

15    letter he had to admit was not in his letter.

16            So he testified about something before you, but then

17    he had to be confronted with the advice he gave at the time,

18    which was different, because he wasn't told what was actually

19    going on.

20            You can't rely on the advice of counsel if your

21    lawyer doesn't know what's going on.  His Honor will instruct

22    you on the law in that regard.

23            It's not about mistakes.  Like Jose Salazar coming in

24    here and telling you that he made an $87 million mistake in

25    favor of Durall and others when he billed for confirmation

1    testing when it wasn't confirmation testing.

2         That doesn't make any sense, ladies and gentlemen,

3    particularly since all of the contracts the defendant signed

4    said they were going to be doing confirmation testing in the

5    first place.  It just doesn't make any sense.

6         This isn't about Jaquanda Smith coming in here and

7    sitting in that chair and telling you she lost a contract with

8    Kyle Marcotte.  Evidently computers don't exist.  There's no

9    way to find it.  It's just gone.

10         That doesn't make any sense.  That contract was

11    backdated.  You saw it.  Kyle Marcotte told you about the car

12    ride beforehand.

13         This case isn't about Mark Thomas seemingly

14    forgetting the advice he gave and then remembering it once we

15    showed it to him.  This case is actually about fraud, lies, and

16    deceit.

17         Ladies and gentlemen, this isn't a case where the

18    defendants helped the rural hospitals.  Instead, this is a case

19    where the defendants helped themselves to the rural hospitals

20    in order to get the higher billing rate.

21         They took advantage of them.  They used them.  They

22    left them to pick up the mess after they left.  Some of these

23    hospitals closed.  Some of them are still dealing with the

24    ramifications today.  Gayle Pickens told you that.  They're

25    still getting insurance claims.

1        Next slide, please.

2        Remember what Ms. Jordan told you when she was asked

3   if they were taken advantage of.  She said, You know, in a

4   rural community like Graceville, we tend to be more trusting.

5   You know, it's the -- it's probably the closest thing to

6   Mayberry in real life you could get.  It's a place you don't

7   lock your doors at night.  And we just tend to -- we tend to

8   trust people, I guess, more blindly.

9        And she was asked, Who do you feel took advantage of

10  the hospital?

11        And she says, I think PCH did, Dr. Guterman, Jorge

12  Perez, Aaron Durall, Christian Fletcher.  And, of course, Aaron

13  Alonzo and Nestor Rojas in creating the holding company.

14  That's what this case is about.

15        Now, Ladies and gentlemen, not all the defendants did

16  the same things.  Each of them had their roles.  I'm going to

17  talk about conspiracy in a moment.  And that's what conspiracy

18  is.  Each defendant has a different job.

19        Some of them ran the management companies and did the

20  pitch to get the hospitals in the first place, like Jorge

21  Perez.  Some did billing, like his brother Ricardo Perez.  Some

22  owned a lab and a hospital at the same time, like Aaron Durall.

23  Some just ran labs, like Christian Fletcher and James Porter.

24  Some moved the money and helped set up the labs, like Sean

25  Porter.  Others just did billing, like Ricardo Perez I

1    mentioned before, and Neisha Zaffuto, for Medivance.  And some

2    brought in urine to test, like Aaron Alonzo, and like some of

3    the people like John Skeffington, Kyle Marcotte and others I

4    was talking about.

5            Some of the defendants did more than others, ladies

6    and gentlemen.  We don't dispute that.  What we're telling you

7    is they all did enough.  And all of the evidence in this case,

8    the insurance company witnesses that we brought in here, the

9    employees of each hospital, the employees of the labs at the

10   hospital, all the cooperating witnesses, our medical expert,

11   Dr. Waller; our industry expert, Dr. Kongstvedt; the

12   consultant, Ms. Parks, who showed you all of the trends in the

13   billing that I'll get to in a moment; the forensic accountant,

14   who showed you how all the money moved; the financial records,

15   all the contracts, the e-mails, the billing data.

16           Even the defense witnesses, ladies and gentlemen --

17   all of them tell you the same story that I just went over, just

18   like Mr. Duva told you in his opening statement.  And that's

19   the story of this case.

20           Now, I'm going to talk a bit about the evidence you

21   saw and the charges and how they fit together.  We put in an

22   awful lot of evidence, ladies and gentlemen.  And you should

23   look at whatever you want when you go back in that jury room.

24           I'm going to point out some of what the government

25   thinks is important, but you're the judges of the facts.

 1    You've been taking notes this whole trial.  You'll look at

 2    whatever evidence you want to.

 3            We went hospital by hospital and insurer by insurer.

 4    So that's how I'm going to go now.  But first I'm going to talk

 5    about the charges.

 6            The next slide, please.

 7            The first charge is conspiracy to commit health care

 8    fraud.  Now, ladies and gentlemen, the judge is going to

 9    instruct you on the law.  And this just a PowerPoint, but the

10    judge's instructions are what control.  Okay?

11            A conspiracy to commit health care fraud and wire

12    fraud, it's just an agreement two or more persons, in some way

13    or manner, agreed to try and accomplish a common and unlawful

14    plan to commit health care fraud and wire fraud, as charged in

15    the indictment.  And we have to show that the defendant knew

16    the unlawful purpose of the plan and willfully joined in it.

17            Next slide.

18            This is what a conspiracy is.  It's an agreement by

19    two or more persons to commit an unlawful act; in this case,

20    health care fraud and wire fraud.

21            And I want to point out, ladies and gentlemen, that

22    in the instruction you're going to get a person can be a

23    conspirator even -- a conspirator, sorry, even without knowing

24    all the details of the unlawful plan or the names and

25    identities of all other alleged conspirators.

1    And even if the defendant only played a minor part in

2    the plan -- and, ladies and gentlemen, we agree that some

3    defendants played a lesser role than others -- but had a

4    general understanding of the unlawful purpose of the plan and

5    willfully joined on at least one occasion, that's sufficient

6    for you to find them guilty.

7    If we can go to the next slide.

8    Now, what are they charged with?  These are the

9    substantive counts, Two through Six, but it's a conspiracy to

10   commit health care fraud and wire fraud.  Health care fraud is

11   what drives the bus, ladies and gentlemen.

12   It says that the defendant knowingly executed, or

13   attempted to execute, a scheme or artifice to defraud a health

14   care benefit program -- that's the insurance companies -- to

15   obtain money -- that's the payment -- from that insurance

16   company through false or fraudulent pretenses.

17   And I went over those with you.  It's the NPI and tax

18   ID of the hospital.  It's the 141 code, even though the samples

19   never make it to the hospital.  It's the electronic coding that

20   doesn't identify the service provider.

21   It's the fact that the doctors have no connection to

22   the hospitals whatsoever.  It's the fact that a lot of these

23   tests aren't even medically necessary.  These are all false or

24   fraudulent pretenses, representations, or promises the

25   government is alleging.

1    That the defendant acted willfully and intended to

2  defraud, and did so in connection with the delivery of payment

3  for health care benefits and/or services.

4    Next slide, please.

5    Ladies and gentlemen, you'll hear that the insurance

6  companies in this case that you heard from were all health care

7  benefit programs.  You'll hear what a scheme to defraud is.

8    And you'll hear a material fact, all the insurance

9  companies' witnesses that came in here testified that it was

10  important to them to know who was actually doing the testing.

11  And these misrepresentations that I just talked about were

12  material.  And had they known, they would not have paid.

13  That's what a material fact is.

14    If we can go to the next slide, please.

15    And before I get to this one, ladies and gentlemen --

16  this is reasonable doubt -- I'm going to talk a little bit

17  about the cooperators that came in here.

18    Kyle Marcotte was a cooperator.  He did the

19  recruitment and he did money laundering.  Alonzo [sic] Rojas

20  did recruitment of samples.  David Byrns came in here and

21  testified before you.  And he helped run Putnam for the

22  conspiracy.

23    Now, ladies and gentlemen, the government did not

24  choose these cooperators.  The defendants did.  The defendants

25  did when they chose to work with them.  And that's who they

1  chose to work with.

2         At the beginning of this case you were probably

3  wondering how these businesses ran, where they got their

4  samples, who was working for them.  We showed you some of these

5  people.

6         Some of them are people like Gayle Pickens or Mona

7  Tague or Dr. Fender or Gary Ayres.  But some of them are Kyle

8  Marcotte, Alonzo Rojas, and David Byrns.

9         Kyle Marcotte was a guy that tried to open recovery

10  centers, but also an admitted drug addict, who admitted that to

11  Mr. Durall in a long e-mail you saw.  But he was making him so

12  much money for Mr. Durall, Mr. Durall kept him on.

13         Alonzo Rojas, who was doing recruitment -- I'm sorry,

14  Aaron Alonzo, who was doing recruitment along with Nestor

15  Rojas, and David Byrns.  David Byrns, who was abusive to staff

16  and a chronic alcoholic himself.

17         Ask yourself:  Why were these people providing urine

18  to test?  And why did the defendants trust them?  The answer is

19  simple, because these people helped them make money.  That's

20  the reason those cooperators testified in front of you.  Okay?

21         Now, money laundering, I'm going to talk a little bit

22  about that.  Counts Two through Six are substantive health care

23  fraud counts.  Several defendants are charged in these counts.

24         And the billing companies who did that, that doesn't

25  mean that the defendants aren't responsible and aren't

 1    attesting that these services are necessary when they're

 2    billed.  It's submitted or caused to be submitted.

 3         There's just five substantive health care fraud

 4    counts.  And then there are two money laundering conspiracies.

 5    The first money laundering conspiracy is simply proceeds of

 6    money laundering.  Okay?

 7         It is Counts Eight and Eleven through Twenty-Three.

 8    And that's a conspiracy where all the defendants are charged

 9    except for Aaron Alonzo.

10         And that conspiracy is that they moved over $10,000

11    or more of proceeds from health care fraud in financial

12    transactions.  There are substantive counts of it.  And there's

13    a conspiracy if they all agreed to do it.

14         All they have to know is that the funds came from

15    some sort of illegal activity.  They don't have to know

16    specifically what kind of illegal activity.

17         And the government has to prove to you that these

18    were actually the proceeds of health care fraud, which we did

19    through Kimberly Henderson, and showed you how the money moved.

20         There's another money laundering conspiracy that

21    involves Aaron Durall and Neisha Zaffuto and Kyle Marcotte,

22    which was a promotional money laundering conspiracy.  And

23    that's Counts Seven, Nine, and Ten.

24         And that money laundering conspiracy is moving money

25    in order to promote the scheme, further the scheme, payments in

1 order to get urine through the proceeds of health care fraud.

2 And all the defendants have to know Aaron Durall and Neisha

3 Zaffuto -- and we submit to you they know it from the car

4 ride -- is that money came from some illegal activity.  Okay?

5            So those are the counts, ladies and gentlemen.

6            Now, you're going to hear about the government's

7 burden.  And it's a burden we welcome, which is to prove the

8 charges beyond any reasonable doubt.  So that's the slide

9 that's been sitting up here for a while.

10           And you see that a reasonable doubt is a real doubt

11 based on your reason and common sense after you've carefully

12 and impartially considered all the evidence in this case.

13           And, ladies and gentlemen, I'm going to ask you to

14 focus on "reason and common sense."  I want you to apply that

15 to each piece of evidence that I'm about to talk about.  So the

16 government doesn't shy away from this burden.  We welcome it.

17 We have proven our case beyond a reasonable doubt, I submit to

18 you.  But you're supposed to use your reason and common sense

19 in evaluating the evidence.

20           Now, let's go over the evidence.  And I'm going to go

21 hospital by hospital, ladies and gentlemen.

22           The first hospital is Campbellton-Graceville

23 Hospital.  People's Choice gains control over CGH in about 2015

24 and Jorge Perez is named CEO.  You heard that.  Michele Jordan

25 told you the pitch he gave to the board to take it over.

1    Government's Exhibit 26B, the next slide, is just the

2   contract between Reliance and CGH.  And you see that -- this is

3   in page 3 and 4 -- what Reliance is agreeing to do are liquid

4   chromatography mass spectrometry technology.  And it says

5   there, though, by CGH.  And you know CGH can't do that.  That's

6   the confirmatory testing.

7    And you see that CGH will perform testing services

8   for physicians on an as-ordered basis.  And you know that when

9   it comes to confirmatory testing, CGH could not do that.  You

10  heard that in the testimony.  And this one was signed by Mears

11  and Durall.

12   Then 26C, this is the contract with LifeBrite.

13  LifeBrite agreed to provide reference lab services -- excuse

14  me, ladies and gentlemen.

15   LifeBrite agrees to provide reference laboratory

16  services on an as-needed basis to assist the hospital in the

17  performance of quantitative urine toxicology testing at its

18  laboratory.  So it's saying it's going to do the confirmatory

19  testing.

20   And the next page, please.

21   It says here the hospital is responsible for

22  collecting the specimens.  This is the CGH/LifeBrite contract.

23  This is Government's 26C.

24   The hospital's responsible for collecting specimens,

25  conducting the qualitative urine drug screen, and determining

1    if medical necessity exists for a confirmation test.

2            Now, you know that medical necessity comes from the

3    doctors, the doctor is not affiliated with this hospital, and

4    that this contract is actually agreeing -- if you look even a

5    little further, hospital shall deliver specimens to be tested

6    to lab between the hours of 9 and 5 p.m., Monday through

7    Friday, in a manner in compliance with LifeBrite's requirements

8    and applicable legal requirements for such transport as amended

9    from time to time.

10            So what this contract is saying is the hospital is

11    going to collect the specimens and deliver them to LifeBrite.

12    It even specifies a time.

13            And, ladies and gentlemen, you know that didn't

14    happen.  So you know that these contracts are saying the

15    opposite of what the reality was.  You can't have a good-faith

16    defense if you're doing the opposite of what your own contracts

17    say.

18            Now, Gary Ayres came in here and told you how the

19    labs were set up, and that they couldn't do any confirmation

20    testing.

21            He told you about how there was a rush and the

22    samples piled up in boxes in the halls.  And at first they got

23    new machines and it was something he was happy about, but

24    pretty soon everything got overtaken.

25            Brenda Rhodes also came in here and told you the same

1  thing, and told you how everything worked, the accessioning.

2  She told you how her and her team sat in something like a

3  boiler room entering data for samples with no connection to the

4  hospitals at all.

5        She told you how they arrived, how they opened them

6  up, how there were requisition orders.  She told you that there

7  was a difference between some of the samples -- the ones from

8  Reliance and LifeBrite were tested on-site qualitative testing.

9  The samples from all of the other labs that came into CGH were

10  accessioned and then shipped back to other labs.

11        I'm not going to show them to you, but you have the

12  requisition orders in 41A and 41B.  I am going to show the next

13  slide, which is 52D.

14        Brenda Rhodes showed you this, LifeBrite and

15  Reliance.  This test is going to be run in-house.  This test is

16  going to be done here, the qualitative testing.  But the

17  quantitative testing -- Brenda Rhodes told you, Gary Ayres told

18  you, everyone told you -- that had to be done by the lab.

19        The next slide, please.

20        It had to be done by the lab.  And you remember

21  Ms. Sullivan.  She testified that Reliance could do all the

22  testing.  So she was asked, How many qualitative or presumptive

23  screening, positive/negative machines did Reliance obtain?

24        And she answered, For the qualitative, we had three

25  machines.

1    Then for the confirmation testing, she was asked how

2  many machines Reliance had for that.  She said, Three to five,

3  because we didn't get them all at the same time.  As we kept

4  growing, you know, if we needed -- then we would purchase

5  another machine.

6    So she was asked -- and it was a long question -- but

7  did Reliance always have the machines necessary to test all

8  those samples?  She said, Correct.

9    And that's an important piece of testimony, ladies

10 and gentlemen.  Because what that means is the labs could

11 always do all the tests that were sent to them.

12    Now, Kyle Marcotte.  Kyle Marcotte was Reliance's

13 best account and one of its first accounts.  And here's another

14 thing, throughout your entire time with Reliance and your job

15 as the lab manager and supervising those employees, was

16 Reliance able to test all the samples it received?

17    And the answer is yes.

18    We're going to keep it there.  We're not going to

19 advance the slide.

20    So Kyle Marcotte was one of Reliance's best accounts.

21 He was the first marketer.  He brought in Beaches and a host of

22 other places after Sky Toxicology shut down.

23    You saw all the exhibits and you heard all of his

24 testimony.  And what he told you was after Sky Toxicology shut

25 down, a lot of people were looking for places to send samples.

1    And he helped hook up Durall with as many places as he could.

2    It didn't matter to Aaron Durall that Kyle Marcotte

3    was using drugs.  He confessed that to him in an e-mail.  But

4    there were millions of dollars going through Kyle Marcotte to

5    bring him samples.  It was too much money.  And so Kyle

6    Marcotte kept bringing samples, not just from Beaches, but from

7    other places.  He even recruited Dr. De Carvalho into this

8    scheme, as you heard Dr. De Carvalho say.

9    And all of these payments went on month after month

10   after month.  I'm not going to show you all of them.  But the

11   next slide is Government's Exhibit 7T.

12   By the way, this is just the picture, what Gary Ayres

13   told you about, of all of the tests piled up at Reliance --

14   sorry, at CGH, that couldn't be tested.

15   And that's an important part of this case as well,

16   because that means tests weren't getting done and results

17   weren't coming through, even positive/negative results, even

18   for presumptive testing.

19   Next slide, please.

20   These are the payments to Kyle Marcotte from Aaron

21   Durall.  This is Government's Exhibit 17.  You can see that

22   it's -- it might be a little hard to read.

23   But if you go through all the 7s, you'll see that

24   this is $2.7 million in commissions, just for September of

25   2017.

 1          Aaron Durall says, What's up, my guy?  How are things

 2     with you?  This storm looks menacing.

 3          And he's talking to Kyle Marcotte.  Marcotte was one

 4     of the people bringing the money in.  And all that money moving

 5     around to promote the scheme and make things happen is part of

 6     the promotional money laundering scheme and the counts.

 7          So this is what was going on.  It was a lot of money.

 8     Reliance got it, from people like Kyle Marcotte.  And it got

 9     sent to them month to month.

10          And as we keep going, ladies and gentlemen, that's

11     not the only thing that happened regularly.

12          If we can go to the next slide, please.

13          This is Edith Mears.  And she was asked -- she

14     testified that reimbursement money would come into CGH's bank

15     account.  She said, Correct.  She was asked what instructions

16     she was given.  She said she would get a spreadsheet weekly

17     where the money should be paid and how much.  It would come

18     from the Miami office.  It would either be Ricardo or someone

19     else named Yesenia.  You heard from Yesenia Hidalgo.

20          And the next slide, please.

21          THE COURT:  Mr. Hayes, when you're reading off of the

22     screen, if you could just do it a touch slower, I'll appreciate

23     it.

24          MR. HAYES:  Sure, Your Honor.  And my apologies to

25     the court reporter.

 1      28L, ladies and gentlemen, this is Yesenia Hidalgo.

 2   This is what Edith Mears was talking about.  These are the

 3   weekly sheets from Ricardo.  Jorge Perez is on there, too.  You

 4   see Edith Mears.

 5      This is the money coming in and where it's supposed

 6   to go.  So attached is included weekly totals for all the

 7   accounts.

 8      And if you'd just go to next slide.

 9      The top two are LifeBrite and Reliance.  And there

10   are other labs there, too.  This is still Government's 28L.

11   This is the money being disbursed.  Ricardo Perez from the

12   billing company, Jorge Perez, Christian Fletcher, Aaron Durall,

13   they all know.

14      If you go to 27F, Christian Fletcher, this is to

15   David Byrns.  He says, No problem.  Also preferably CAH or a

16   rural hospital.  For the lab side, this will give us the best

17   opportunity to maximize the relationship.

18      And that's what's going on here, ladies and

19   gentlemen, maximizing the relationship, maximizing the

20   reimbursement.

21      And what is this all about, ladies and gentlemen?

22      The next slide, please.

23      It's about definitive testing for money.  This is

24   something that Ms. Parks showed you.  It's Government's 25E(3).

25   This is definitive testing.

1          The total paid is 107 million for all testing.  And

2     the definitive testing for Campbellton-Graceville, from the

3     time period up there, November 2015 to October 2017, 99 million

4     out of 170 million is for definitive testing, confirmatory

5     testing, quantitative testing.  That's what this case is about.

6          Everything else is salad dressing.  It's confirmatory

7     testing.  It's not the presumptive testing that can be done at

8     the hospital.  It's the confirmatory testing that can't.

9          And every single witness told you that.  And the

10    documents show it.  And the e-mails show it.  And the billing

11    data shows it.  That's what this case is about, that much money

12    for confirmatory testing.

13          This isn't a mistake.  This isn't a coding error.

14    This is deliberate.  And it's planned.

15          If you'd go to the next slide.

16          This is a little more confusing, but this is why.

17    This is the yield.  This is Government's 25E(7).

18          Campbellton-Graceville is getting a percentage of

19    paid to bill the 23 percent, whereas the laboratories, for

20    stuff they bill on their own, much less.

21          And that's why they did it, both for presumptive and

22    definitive.  If you do it through a hospital, you get paid more

23    regularly and you get paid more.  That's what this case is

24    about.

25          Now, I'm going to talk a little bit about someone

1    that wasn't exactly ignored during the trial, but wasn't talked

2    about quite as much, which is Aaron Alonzo.  Now, Mr. Alonzo

3    entered into -- the next slide, please.

4             You heard about this.  Government's 26E, a master

5    services agreement between Jorge Perez, Alonzo, and CGH.  This

6    is CGH and CGH Holdings.  Nestor Rojas told you how this

7    worked.

8             They were twins.  They worked together.  In three

9    months they billed over $9 million.  And then Jorge Perez froze

10   them out.

11            This provided that CGH Holdings would market lab

12   services and negotiate contracts with labs that would perform

13   testing on behalf of CGH.

14            In exchange, as you see at the bottom there, CGH

15   Holdings was going to receive 70 to 80 percent of collections

16   from CGH for billing the tests.

17            So it explicitly says this contract -- that they'll

18   arrange for the labs to test the samples, but CGH is going to

19   bill for them.  In other words, these labs can do it, but CGH

20   bills for it.

21            Nestor Rojas came in here and confirmed for you that

22   the purpose of the contract was they would recruit labs that

23   had urine samples, CGH would bill the samples, and then they'd

24   get this percentage of reimbursement.

25            So they went and found labs that had the full

1   capacity to do the tests, like CompanionDX, B3, and Central

2   Labs.  Those were full-service labs that could do all the

3   testing.

4           Rojas told you that he had a phone call with Perez

5   and Alonzo where Jorge Perez said he wanted a sample split,

6   part goes to CGH to do screening, and the confirmatory would be

7   down at CompanionDX and other places.

8           And why?  Remember what Rojas told you.  He said, So

9   it can touch the hospital.

10          That's what this case is about, touch the hospital,

11  all the time.

12          Go to the next slide.

13          This is something that actually Brenda Rhodes showed

14  you.  This is 52A.  This was the arrangement at CGH.  This was

15  part of her log telling which samples were what.

16          You see Aaron and Nestor, Aaron and Nestor's.  Those

17  are their labs, their accounts.  There were other accounts up

18  there, like Christian Calhoun you might remember.  You can see

19  him.  He's not blown up, but he's in the top left.  That's what

20  Aaron and Nestor is.

21          So Reliance and LifeBrite, they come in.  They're

22  tested.  Then the samples are thrown away after seven days.

23  Because the originals that the confirmatories are being done on

24  are at the labs.

25          Aaron and Nestor, those are their accounts.  They're

1    done by the labs but billed through CGH.  And that's just one

2    way that CGH got urine to test.  Nestor Rojas explained it all

3    to you.

4            And then the next slide is Government's Exhibit 30A.

5    This is Aaron Alonzo e-mailing Nestor.  This is the payout for

6    ON3 AD for Central Labs.  You'll see the 70 percent split.

7    It's just $17,000 and change this time.

8            And Government's 24D, this was the layout of all of

9    the different companies and all of the different payments that

10   were coming in to both Nestor Rojas and Aaron Alonzo.

11           It's all there, ladies and gentlemen.  You're going

12   to see -- we admitted several of these boards that you can take

13   back to the jury room with you and put up on the walls when you

14   want to see the arrangements between different people.

15           That's something that didn't get talked about as much

16   at trial as perhaps some other people.  But this is just one

17   source.  It's not just Kyle Marcotte.  It's Aaron Alonzo and

18   Nestor Rojas to bring urine samples in.

19           And then, ladies and gentlemen, as this is going

20   on -- the next exhibit, Government's 30E.  Well, actually, I'm

21   going to talk about something else here.

22           This is a standing order.  You'll remember Dr. Wang

23   came up -- this is Government's Exhibit 59.  She said, This is

24   my standing order.  It was for a point-of-care test for all

25   patients on admission.

1          This standing order was just for point-of-care tests.

2   She had no idea what the confirmation tests were.  And you'll

3   remember her samples were going to Reliance.  We showed you

4   those requisition orders.

5          If we'd go to the next slide, please.

6          This was Dr. Waller's standing order, 67D.  He told

7   you that he didn't order that many confirmation tests.  And he

8   wasn't aware of that many confirmation tests being done.  This

9   is another thing that's going on through CGH and Reliance and

10  other labs.

11         Doctors are not ordering the tests that are being

12  billed.  This is another thing.  Besides the sources that Kyle

13  Marcotte is bringing in -- and Kyle Marcotte had something to

14  do with Dr. De Carvalho coming in.

15         Besides all the things that are going on to

16  recruit -- remember Per Wickstrom, the name you heard, where

17  Kyle Marcotte brought him in.  All this is happening and the

18  doctors are not actually ordering the tests that are being

19  billed.

20         So if you go to Government's 25O, this is what was

21  billed for Dr. Wang for the tests -- remember, she sat there

22  and said, I never ordered these tests.  2.5 million billed and

23  1.2 million paid.

24         The next one is Dr. De Carvalho, 25P.  16 million

25  billed and 3.7 million paid, for tests that they told you they

1  never ordered.

2  And remember what Dr. Waller told you.  He saw this

3  pattern throughout the billing data.  And this helps explain

4  it.  So now -- now I'm getting to 30E, ladies and gentlemen.

5  The next slide.

6  This is what was happening at CGH.  You see at the

7  bottom Florida Blue is writing a letter that says, We have

8  found hospitals billing Florida Blue for services allegedly

9  provided to members who actually sought such services from

10  wholly separate, independent clinical laboratories that do not

11  participate in any of Florida Blue's networks, and, as such,

12  are not considered legitimate billable services.

13  That's what's happening.  The insurance companies are

14  starting to catch on.  They're saying, We think you're billing

15  for this as if the hospitals did it, but we think the

16  out-of-network labs did it, and that's not legitimate.

17  So what do the defendants do?  They move on to

18  another hospital around this time, to Regional

19  General-Williston.

20  And that's the next slide.

21  There's RGH.  Remember what Arceli Encienzo and Katie

22  Tucker told you, that, even though there was a confirmation

23  machine, an LC-MS machine, put into RGH, it was never

24  operational when they were there.

25  RGH could not do definitive testing at any time when

1    those witnesses were there.  But the spike in definitive tests

2    at RGH show that the defendants were billing for it anyway.

3            Exhibit 24A, the next slide, this shows the

4    movement -- remember Ms. Henderson went over this with you.

5    This shows the movement from hospital to hospital.  This is

6    just follow the money.  This is going from

7    Campbellton-Graceville to RGH to Putnam and Chestatee.  This is

8    how it worked, ladies and gentlemen; moving along, trying to

9    stay one step ahead of the insurance companies.

10           If we'd go to the next slide, please.

11           This is what it's about at Regional General Hospital

12   of Williston, ladies and gentlemen.  $42 million paid from

13   February 16, 2016, to February 28th of 2018.  And of that

14   42 million -- this is Government's 25F(3), 39 million and more

15   is for definitive testing.  That's what this case is about,

16   confirmatory testing.

17           And, again -- the next slide -- why?  Because they

18   got paid more for it.  This is the percentage of return.  If

19   they billed as independent labs, they wouldn't get paid as

20   much.  It's pretty simple.

21           And, remember -- Government's Exhibit 1DD is the next

22   exhibit.  This is the Aetna/Regional General-Williston

23   contract.  It says that reference laboratory services are not

24   eligible for payment and that these services are generally

25   indicated with a bill type of 141, hospital laboratory services

1  provided to nonpatients.  So the very contract that Aetna had

2  with RGH prohibited this sort of arrangement.

3          And next, ladies and gentlemen, the next slide,

4  please, we're going to talk about Chestatee.  Chestatee was a

5  little different.  The government doesn't dispute that an awful

6  lot of presumptive testing was done at Chestatee.

7          But, remember, Government's Exhibit 1EE, again -- and

8  this one is signed by Neisha Zaffuto.  So she knows one of the

9  defendants -- reference laboratory services, this is the

10  Aetna/Chestatee contract, Government's Exhibit 1EE, August

11  17th, 2016.  Reference laboratory services are not eligible for

12  payment.  These services are generally indicated with a bill

13  type of 141, hospital laboratory services provided to

14  nonpatients.  It's on page 32 at section (l).  You might

15  remember I kept calling it section 1, but it's (l).

16          And, remember, ladies and gentlemen, that's not all

17  of the Chestatee or Neisha Zaffuto story.  There's also

18  Government's Exhibit 53B, the next exhibit.

19          This is the backdated contract that Jaquanda Smith

20  came in and talked about.  This is actually the first e-mail --

21  and this is February 26, 2018, Government's Exhibit 53B.  You

22  see Jaquanda Smith is on there.

23          This is being sent by Kim Davis.  Kyle Marcotte told

24  you about this.  And the next exhibit -- all of a sudden it's

25  August 2015.  Look at the top.  It's 2018.  The signature is

1  2015.  This contract wasn't lost.

2         Remember the car ride that Mr. Marcotte told you

3  about.  He had been working with CGH.  He didn't even know what

4  CGH was until he was told.  He had been coming to Chestatee to

5  set up a lab.

6         All of a sudden he's summoned to Fort Lauderdale for

7  a car ride.  And I want you to think about what you thought

8  when Mr. Marcotte was up here telling you that, a car ride,

9  where he's taken around by Neisha Zaffuto and Aaron Durall, and

10  they tell him, Something is going on.  We've got to do

11  something.  There's this Florida law.  We've got to backdate

12  these contracts.  We've got to do something.

13         And for the first time he realized he was into

14  something bad.  The relationship kept going on.  And he's an

15  adult.  He made his own decisions.  But ask yourself what kind

16  of a business meeting that is.  What's going on here?

17         What's going on here is the defendants are trying to

18  cover themselves.  And that's what this contact is about.  It's

19  not about a lost contract.  It's not about someone who's loyal

20  to Aaron Durall coming in here and saying something that isn't

21  credible.  It's about what Kyle Marcotte told you.

22         And, remember, Chestatee was doing presumptive

23  testing.  But Dr. Waller showed you that even the presumptive

24  testing done in Government's 48L, that was the patients' --

25  different patients we were going over.  Some of that wasn't

1   done in time, two or three days.

2        Even the -- and the piles of boxes piling up at CGH.

3   Even the presumptive testing isn't always medically necessary,

4   and the results always don't come back in time and they're done

5   too close together. And a point-of-care test can handle it

6   just as well. This is stuff that has to be sent to a lab.

7        So the fact that Chestatee did more presumptive

8   testing, that makes it different, but it doesn't make it

9   better, ladies and gentlemen.

10        And Reliance still had no reason to even refer

11   anything to Chestatee, because Reliance could do all the

12   presumptive tests itself anyway. The only reason it's going to

13   Chestatee or any of the other hospitals is to touch the

14   hospital.

15        Remember what Kyle Marcotte told you, when Mr. Durall

16   had finally purchased -- or acquired ownership of Chestatee, he

17   was very excited, because now he could use the hospital's

18   billing rate. That's how Marcotte pitched it to people.

19   That's how Skeffington pitched it to people. That's all this

20   case is about. That's all the hospitals are good for, their

21   billing rate.

22        And remember Neisha Zaffuto trying to freeze out

23   Kelly Smallwood when she asked questions, asked her if she

24   liked having her job, not giving her access anymore, cutting

25   her off.

1      This shows defendants' intent.  This shows that
2 they're trying to hide things.

3      And Government's Exhibit 25H(3), the next slide.

4      Ladies and gentlemen, it is about presumptive testing
5 here.  We don't dispute that.  This is Chestatee.  And in this
6 time period there's 126 million paid for presumptive tests.
7 But we submit to you they're no better than the definitive
8 tests for all the other hospitals.

9      Too close together, not used in treatment.  Reliance
10 could do it all anyway.  It's just for the billing rate.  And
11 there are 4 million -- over $4 million worth of confirmatory
12 tests that you know Chestatee couldn't do.

13      And then next slide, H(7), this is why.

14      Why do it this way?  Because Chestatee is going to
15 make more money than Reliance would if it billed on its own.

16      All right.  Next we come to Putnam Hospital, ladies
17 and gentlemen.  And Putnam Hospital kind of lays this whole
18 scheme bare.  It's a little more stark.

19      The contracts between Putnam and HLP -- HLP is just a
20 bank account.  That's the next slide, Government's Exhibit
21 27KK.

22      This is between Hospital Laboratory Partners and
23 Pinnacle.  It says, Pinnacle will provide the laboratory
24 testing services as requested by HLP for overflow that HLP
25 cannot test.  Toxicology, that's what this case is about.

1          And then 26M.

2          This is the Putnam Hospital Partners/LifeBrite

3   agreement.  It's three parties.  And it says, again, that the

4   hospital is responsible for collecting specimens, conducting

5   the qualitative urine drug screen, and determining if medical

6   necessity exists for a confirmation test.

7          It's similar to the LifeBrite/CGH contract we were

8   looking at before.  This is Government's Exhibit 26M.

9          And remember, ladies and gentlemen, you now know that

10  the hospital was not collecting the specimens, because the

11  specimens weren't getting sent to the hospital.

12         And the doctors that are determining if medical

13  necessity exists for a confirmation test have no affiliation

14  with the hospital.  And there's no delivery from 9:00 to 5:00.

15         And the next slide, ladies and gentlemen.  You

16  remember David Byrns.  He talked to you about the entire

17  scheme.

18         Did Jorge Perez use the term "reference lab"?

19         And his answer was, Yes.

20         And was there any discussion about the financial

21  prospects of a laboratory program at Campbellton-Graceville?

22         And he said, The financial prospects were huge.

23         And what did Mr. Perez tell you -- Mr. Jorge Perez

24  tell you about that?

25         He told me -- he called it liquid gold.  It was very

1  profitable.

2  He's talking about urine testing, ladies and

3  gentlemen.  That's the story of this case.

4  The next slide, please.

5  And later on, when he was talking about insurance

6  companies asking questions -- and then even thereafter, when

7  Putnam had the ability to do testing, where were the

8  quantitative or confirmatory tests done?  Were they done at

9  Putnam?  Or were they done at LifeBrite and Pinnacle Labs?

10  And he said, LifeBrite and Pinnacle Labs.

11  And he was asked, So this was some minor exceptions,

12  that's a lie, isn't it?

13  And he said, Yes.

14  Because the tests were being done by the labs, not by

15  the hospitals, in all cases.

16  The next slide, please.

17  This is Mona Tague.  She was asked, What happened

18  once the lab got started?

19  This is after the period where there was no lab.

20  She said, We had a toxicology lab -- or a second

21  laboratory in the hospital for drug screening.

22  And David Byrns, who was acting as the CEO, explained

23  that, We would be getting urines from the United States and it

24  would save the hospital.  And he referred to the urine as

25  liquid gold, and that we would be able to make a lot of money

1  for the hospital.

2  That's what this case is about.

3  And Dr. Fender, she was asked, Did it make any sense

4  that Putnam is even being used as a reference lab?

5  And she said, None.

6  Why not?

7  And she told you, Unionville is -- as I said, it is a

8  very small town.  It is about an hour and a half away from the

9  nearest airport, and -- and certainly from the nearest town of

10  any size by a two-lane blacktop.  So it seemed very isolated to

11  me.  It did not seem like it would be the best location for a

12  reference lab.

13  So, ladies and gentlemen, use your common sense.

14  Dr. Fender was there.  It didn't seem right to her.

15  And if we can go to the next slide, please.

16  This is the legal advice that James Porter was given.

17  And you'll remember this letter -- and this is written on

18  November 29, 2016.  This is from Mark Thomas to Jim Porter.

19  And he indicates in three separate places that the

20  specimens will be collected at physicians' offices and sent

21  directly to PCMH, or Putnam, for testing.  That is the top

22  part.

23  Mr. Thomas writes his understanding that, No. 2, PCMH

24  will provide toxicology testing for the patients -- for the

25  physicians' patient specimens.

1       And then later, the third part, It is my

2   understanding that PCMH, or Putnam, will accession, test, and

3   bill based on patient specimens without the patients presenting

4   to the hospital.  This form of arrangement is typically

5   referred to as testing for a hospital nonpatient, meaning while

6   the patient specimen is tested at PCMH, the patient is neither

7   an inpatient or an outpatient, and the claim is billed as a

8   type of bill 14X claim.

9       So the patient doesn't come to the hospital, but the

10  urine specimen does.  That's the advice that Mark Thomas gave.

11  And you know that what he was talking about before he was shown

12  this letter was something different.  He was talking about an

13  under arrangement or outreach program.

14      If we can go to next slide.

15      And when we showed him this letter, we asked him --

16  it says, i.e., the specimens will be collected at the

17  physicians' offices and sent directly to PCMH for testing.  Do

18  you see that?

19      Yes, that's correct.

20      In other words, this is the exact opposite of what we

21  were talking about this morning.  This is not an under

22  arrangements testing arrangement.  This is an in-hospital

23  testing arrangement.

24      You don't have any written advice about what you were

25  talking about this morning, do you?

1    He says he doesn't know, he'd have to look.  He may

2  have an opinion that reflects the under arrangements contracts.

3  He doesn't know.

4    And what we're talking about are patients or

5  physician specimens going to Putnam?

6    He says, Correct.

7    And the next slide.

8    I'm going to get to this in a moment.  But this is

9  what happened at Putnam, ladies and gentlemen.  The specimens

10  didn't go there.  So Mark Thomas gave legal advice on a

11  situation that never actually happened.  And there was

12  something else that happened at Putnam.  And that's the

13  back-billing.

14    Mr. Skeffington said that for three months nothing

15  was getting paid, even though the specimens had been tested,

16  because CGH is under an audit, and there's nowhere for these

17  samples to go.

18    So he was asked what happened up to those three

19  months.  And he said, After those three months, when Putnam

20  opened, we got new requisition forms to switch our current

21  testing to go through Putnam Hospital.  And the tests that were

22  being done in the last three months were then starting to

23  bill -- bill out of Putnam.  And at first I was a little -- I

24  was like, Where is all our tests?  Because I expected a big

25  lump of money to come in so I could pay all my reps.  And I was

1  told that they cannot bill them all at once because that would

2  trigger -- trigger some type of audit with the insurance

3  company.  So they need to trickle those payments, so they would

4  release the older billing, release it slowly with all the newer

5  billing.

6          And he was asked by me, And this -- I'm going to call

7  it back-billing.  Were all the tests that you had been waiting

8  for eventually billed through Putnam?

9          And he said, Yes, they were.

10          So that back-billing, ladies and gentlemen, is

11  something that happened deliberately over the course of this

12  scheme, holding on to billing even though the tests had been

13  done, and their results, and then billing them through the

14  hospital as if they were done there.

15          That in and of itself is fraud.  And there's

16  something else.

17          The next slide, please.

18          Even though the defense expert Mr. Small agreed that

19  if these things are not sent to the hospital, but the billings

20  contained the 141 code as if they had been submitted to the

21  hospital, that would have been false?

22          And he said, yes, he would think so.

23          So even the defense expert agrees if you're billing

24  for the 141 code, you have to send this stuff to the hospital.

25          And the next slide, please.

1        And, ladies and gentlemen, this is something that we

2  went over and over again throughout this case, the billing at

3  Putnam before February 10th, 2017, when the lab was opened.

4        So there was no lab at Putnam able to do any testing

5  whatsoever.  And the total billed was 68 million -- over 68

6  million.  And the total paid was 37 million.  This is

7  Government's 25G(10).

8        This is how much was billed and paid during the

9  period of no testing.  And that in and of itself is fraud,

10  ladies and gentlemen.

11        Jim Porter knew this.  Sean Porter knew this.

12        Putnam's lab at this time could have been a vacant

13  building down the street from the Jacksonville courthouse, but

14  it's paying James Porter, Sean Porter, and others, during this

15  time that there was no lab, to the tune of $37.6 million.

16        And then Government's 25G(3).  This is all of the

17  definitive testing.  And you see there out of 114 million paid,

18  79 million of it was for definitive testing in the time period

19  we're listing there, on 25G(3).

20        And you'll see the why again in 25G(7), because they

21  could be get paid more.

22        And you know that Gayle Pickens -- she came in and

23  told you that they're using a reference lab today for the

24  patients with doctors that are connected to the hospital, but

25  they're still picking up the pieces.  They're still dealing

1  with insurance claims to this very day, looking for some of the

2  money that I was just showing you.

3          And you're going to see also -- the next exhibit,

4  Government's 27M.

5          This is Sean Porter to Mr. Byrns.  Sean Porter, who

6  hasn't been talked about as much in this trial as some of the

7  other people -- David, thank you for the concern.

8          This is November 2nd, 2016.  So before the lab is

9  open.

10          We need to proceed with the install of the first

11  machine.  Please do not hold it up.  We can relocate it when I

12  come next Tuesday, if necessary.  It can be moved up to final

13  validation.  Afterwards it becomes a hassle.

14          So this is Sean Porter, who knows.  And he moves

15  money -- he knows that there is no lab set up in November.

16  This is Government's Exhibit 27M.

17          27T, the next exhibit, this is money Ricardo Perez --

18  he's sending it to David Byrns.  This is money going to

19  Pinnacle and LifeBrite.  And Perez is sending it to a bunch of

20  people.  He says, Jorge said yes.

21          So this is the movement of the money.  Ricardo Perez

22  knows.  David Byrns knows.  Jorge Perez knows.  Pinnacle and

23  LifeBrite know.  That's Fletcher and Porter.

24          Exhibit 38B, that's an e-mail from Ricardo Perez to

25  Jim Porter.  This shows more disbursements, and also shows,

1  Please wire to LifeBrite, Christian, $802,053.09, at the

2  bottom.

3         And this is more disbursement, in Government's

4  Exhibit 38B.

5         You also know that there was a coverup that Mr. Byrns

6  told you about.  If we can go to -- what I'm going to call the

7  Forsythe letter.  This is Government 27X.

8         These are the five questions that were asked.  You

9  probably remember this from that testimony.  So they're asking

10  questions.  And I'm going to concentrate on question 5, the

11  testing area of the hospital.

12         And the next exhibit -- so Perez sends this to Byrns.

13  Read this and call me.

14         And then Thomas goes back to Perez and Christian

15  Fletcher, Jorge, I think the attached is good.  The answer to

16  question 5 will be important.  I do recommend that the hospital

17  report that the specimens are to be primarily from within the

18  hospital's greater patient service area.

19         Now, ladies and gentlemen, you know how to read the

20  English language.  And you know that didn't happen.  The

21  greater patient service area was the entire country.  It might

22  as well have been Fairbanks, Alaska.  That's what was

23  happening.

24         And the advice that Mr. Thomas gave wasn't followed.

25  The next exhibit, 27Z.

1    If you look at 5, In what geographical areas are the

2 specimens being collected, he doesn't say they're coming from

3 all over the country.  What it does say is that Putnam

4 maintains a state-of-the-art, full-service laboratory, and that

5 the lab provides routine and emergency clinical services for

6 hospital patients, and to areas where physicians associated and

7 credentialed with Putnam are located.

8    Now, ladies and gentlemen, there's no dispute that

9 that isn't true.  The physicians aren't associated and

10 credentialed with Putnam.  They're from all over the place.

11    And this is something about the good faith defense

12 that the defendants are going to bring up.  If this was all

13 okay, why didn't they just tell the insurance companies what

14 they were actually doing?

15    We're accessioning.  We're billing it through the

16 hospitals.  But the labs are doing it.  The physicians are

17 referring it to the labs.  Some of the testing is being done at

18 the hospitals.  The physicians come from all over the place.

19 That's not what they're saying.  That tells you all you need to

20 know.

21    Exhibit 8E, this shows the money -- you have this

22 here, ladies and gentlemen.  It's in these exhibits that you

23 can take back to the jury room with you.  This is the money

24 flow to Sean Porter and others.

25    And 8D, the next slide, this is the money flow to Jim

1  Porter and to Sean Porter.

2          Ladies and gentlemen, there are brothers in this

3  case.  There's Ricardo Perez and Jorge Perez.  There's Jim

4  Porter and Sean Porter.  We're not blind to that.  Okay?

5          But in the end, the defendants did not follow their

6  conscience.  They followed their brothers.  Ricardo Perez did

7  what Jorge Perez wanted him to do.  Sean Porter did what Jim

8  Porter wanted him to do.  They were adults and they made their

9  own decisions.

10          Jorge Perez did more and James Perez [sic] did more.

11  But their brothers did more than enough.

12          And, ladies and gentlemen, all of the money in this

13  case -- Government's 24E -- this is what this case is about.

14  This is the percentage of deposits into the lab accounts from

15  urine and drug testing.  LifeBrite, Pinnacle, Reliance.  This

16  is Government's 24E.

17          It's tens and even hundreds of millions of dollars.

18          The next exhibit 25M, I think.

19          The next exhibit.

20          Okay.  And this is for the definitive tests, ladies

21  and gentlemen.  942 million billed and 222 million paid before

22  with the presumptive, hundreds of millions of dollars from

23  these hospitals.

24          That's what this case is about, for urine drug

25  testing, for confirmatory or definitive or quantitative urine

1 drug testing, making more money than you should have because

2 you billed through the hospitals.

3        That's what this case is, doing it in such a way that

4 conceals it from the insurance companies so they can't figure

5 it out, until it's too late, because everything is

6 auto-adjudicated.  As you heard the insurance company witnesses

7 tell you, it gets paid right away.

8        The defendants knew what they were doing.  These are

9 sophisticated people, ladies and gentlemen.

10        So I'm going to tell you to take all of these

11 exhibits, the government's poster boards back with you for the

12 money laundering counts.  I'm not going to go over them in any

13 great detail, other than to say that the promotional money

14 laundering counts -- that's Marcotte, Zaffuto, and Durall.

15 That's to further the scheme.

16        The proceeds, money laundering counts, there's a lot

17 more than $10,000 in these counts.  You've got it all there.

18 You've got Nestor Rojas and Aaron Alonzo there.

19        These are things that you can just put up on the wall

20 when you go back in the jury room to look at as you're going

21 count by count, as we know you will, because we know you're

22 going to deliberate carefully, because there's been a lot of

23 evidence in this case.

24        But again, ladies and gentlemen, it's simple.

25 There's been a lot of evidence.  There's been a lot of

1　testimony.  You've been here weeks.  We all appreciate your

2　service, particularly in the time of a pandemic.

3　　　　　One of the things that makes this country great is

4　that you get to decide.  We give the case to you and you get to

5　be the judges of the facts.

6　　　　　And when you're going over this evidence, we want you

7　to keep in mind that this case is simple.  The hospitals had a

8　preferential payment rate.  The defendants wanted it.  They

9　took the hospitals over.  They used them.  They billed for

10　these tests as if the hospitals were doing them.

11　　　　　The hospitals weren't doing them.  They moved

12　hospital to hospital until the sand ran out of the hourglass.

13　It's that simple.

14　　　　　And part of the tragedy of this case is these

15　defendants are sophisticated people who ran businesses.  These

16　are not people that acted in an impulsive manner in the heat of

17　passion.

18　　　　　These are repeated lies over the course of years,

19　over and over and over again.  These are people that could have

20　done things the right way.  They had all the education.  They

21　had all the opportunity.  But they chose to do things the wrong

22　way.  They chose to do what we showed you they did.

23　　　　　And that's part of the tragedy of this case, is they

24　could have done things the right way.  They had independent

25　labs.  But they didn't do it.

1      And some of the things we showed you, billing for

2   Putnam when Putnam didn't have a lab, the car ride with

3   Marcotte, Skeffington and the back-billing -- all of those

4   things just on their own -- the fact that tests were medically

5   unnecessary, all of these things show that what the government

6   is accusing these defendants of is true.

7      And when we put all of these things together -- if we

8   just came in here and said, We have a medical expert that says

9   these tests weren't necessary, and that was all the evidence we

10  presented to you, that would be enough to convict, but you

11  wouldn't be comfortable doing it.

12     When we show you just how the billing was done, the

13  141 code, the NPI, the tax ID numbers, that would be enough to

14  convict, but you wouldn't feel comfortable doing it.

15     If we showed you just some of these things in

16  isolation that I've been talking about, those alone would be

17  enough to convict.  You wouldn't feel comfortable doing it.

18     But when we show you all of these things together,

19  there is no reasonable doubt anymore.  There is no doubt at

20  all.  All of these defendants are guilty, those that are

21  charged -- because, remember, Sean Porter is not charged with a

22  conspiracy to commit health care fraud.  But all the other

23  defendants are guilty of conspiracy to commit health care fraud

24  and wire fraud.

25     And, by the way, ladies and gentlemen, wire fraud

1    just means it was done with a computer and they were done

2    electronically.  That's what wire fraud is, is did they submit

3    claims under false and fraudulent pretenses electronically?

4        And there's no dispute about that.  So if they

5    committed health care fraud, they committed wire fraud.

6        All the defendants are guilty, that are charged --

7    all the defendants are guilty of conspiracy to commit health

8    care fraud.

9        The defendants that are charged in Counts Two through

10   Six with health care fraud, substantive counts, are guilty of

11   health care fraud.

12       The defendants charged in the two money laundering

13   conspiracies are guilty of money laundering.  And the

14   substantive counts of money laundering, all the defendants

15   charged in them are guilty.

16       The defendants did what they did.  They could have

17   done something else.  They chose this.  And now it is time for

18   you to decide -- and I submit to you, the government submits to

19   you, these defendants are guilty, guilty, guilty.

20       Thank you --

21       THE COURT:  Thank you, Mr. Hayes.

22       Mr. Bell, I'm going to go ahead and let you get

23   started.  Depending on how long your argument is, we may have

24   to break in the middle somewhere, but we'll do that.

25       Go ahead.

1          MR. BELL:  Thank you, Your Honor.

2          THE COURT:  Yes, sir.

3          MR. BELL:  And I've enlisted Mr. Landes to help me

4    with the ELMO.

5          THE COURT:  While Mr. Bell gets set up, if y'all want

6    to stand up for a minute, feel free.

7          -- are you ready, sir?

8          MR. BELL:  Yes, sir.

9          THE COURT:  You may proceed.

10          MR. BELL:  Thank you, Your Honor.  Counsel.

11          Good morning, ladies and gentlemen.

12          Jorge Perez is not guilty of these crimes.  There's a

13    reasonable doubt that he knowingly and willfully committed any

14    of the acts that constitute the crimes charged in this

15    indictment.

16          The evidence, ladies and gentlemen, is that for every

17    laboratory test that was billed, an actual patient existed, a

18    requisition order existed, a test was performed, a valid

19    procedure and diagnostic code was associated with that claim.

20          In short, ladies and gentlemen, there is -- this case

21    is simple.  There were no material misrepresentations or

22    omissions made to the giant insurance companies.  There was no

23    scheme to defraud.

24          Those were some of my comments in the -- in the

25    opening statement four weeks ago, or six weeks ago, depending

1  on how you count our time together.

2      The evidence, ladies and gentlemen, has shown that

3  those comments were true.  I pause just for a minute on behalf

4  of both Jorge Perez and myself to thank each of you for your

5  time and commitment over -- that you've made over the course of

6  this trial.

7      Everyone here understands and appreciate the --

8  appreciates the significant commitment and sacrifice each of

9  you have made.

10      This is the last chance I'll have to speak with you

11  about the reasonable doubt as it applies to Jorge Perez.  I ask

12  you to listen closely for the next 45 minutes or so.

13      The game plan is as follows.

14      First, I outlined what I suggest are some of the

15  critical instructions Judge Corrigan will give to you tomorrow.

16  Or course, everything Judge Corrigan tells you is important.

17  But I focus on a handful of the instructions that I suggest

18  provide the framework for you to process all the evidence that

19  you've heard over the course of this case.

20      Then I'm going to -- towards the end of that, I'm

21  going to focus on a particular set of instructions that apply

22  to assessing the evidence, the testimony, the documentary

23  evidence you've seen in this case.

24      And as we go through this process on both -- on all

25  ends, as -- these instructions all cross-reference the

1    evidence.  You've heard and seen how it applies to the

2    particular instructions.

3           The first instruction I want to refer to is the

4    reasonable doubt instruction.  In my view it's the single-most

5    important instruction in our -- in our legal system.

6           If we could put the reasonable doubt instruction up,

7    I'll focus on the middle paragraph.

8           A "reasonable doubt" is a real doubt, based on the

9    reason and common sense after you've carefully and impartially

10   considered all the evidence.

11          "Proof beyond a reasonable doubt" is proof so

12   convincing that you would be willing to rely on it and act on

13   it without hesitation in the most important affairs of your

14   life.

15          I suggest, ladies and gentlemen, a useful way, in my

16   view, of assessing whether a reasonable doubt exists in a case,

17   you can find reasonable doubt in three ways:  from the evidence

18   itself, from conflicts in the evidence, and from the lack of

19   evidence in a case.

20          And you can use these three analytical tools to

21   assess whether there is reasonable doubt in a case.  So let's

22   talk about a few examples of each one of these.  Let's start

23   with the evidence itself.

24          Larry Small's testimony that the outreach programs in

25   this case were consistent with industry standards, ladies and

1  gentlemen, is evidence of reasonable doubt.

2  The claims were billed on the appropriate UB-04

3  forms.  The claims were also -- correctly reflect the type of

4  bill, 141, nonpatients.

5  The claims information, the UB-04, containing the

6  taxpayer identification number or national provider number,

7  were in the correct location and fields.  Those were all

8  consistent -- that's all evidence of what -- of reasonable

9  doubt, ladies and gentlemen.

10  Both Mr. Small's testimony as a whole and

11  Dr. Arrigo's testimony, as well about the applicable CMS

12  regulations for nonpatients, hospital billings, 141 -- 141

13  codes, the 837I, electronic bill transmissions, was all

14  evidence, ladies and gentlemen, of reasonable doubt.

15  A second way that you can find reasonable doubt,

16  ladies and gentlemen, is -- and there are many more.  I just

17  kind of highlight those at this point to kind of give you a

18  guide -- a guideline for the evidence itself.

19  Conflicts in the evidence, this is another way for

20  you to find reasonable doubt.  Ladies and gentlemen, there's --

21  there was considerable dispute in this case about what the

22  evidence means.

23  Although when you think about it, there's really not

24  as much dispute about what the evidence is.  Let's talk about

25  one of the conflicts, ladies and gentlemen.

1      And you heard Mr. Hayes refer to it in his statement.

2  We know -- there's really no dispute that the billing company,

3  the people that coded the bills, were -- was owned by -- or was

4  done by a company called JVS, under contract with Empower,

5  owned by a person named Jose Salazar, who worked with a company

6  in India, in the preparation of the -- the data that went into

7  the 837I format to the various clearinghouses.

8      Those bills -- and Mr. Salazar on the stand made no

9  doubt about it -- contained the correct billing information in

10  his view.

11      It contained the all-important 141 nonpatient code.

12  It contained, in his view, the correct billing for the

13  presumptive or confirmation test.

14      Now, Mr. Salazar's testimony -- which was brought to

15  you by the defense, by the way, not from the government -- is

16  important, because the government now suggests it was the

17  coding that was the fraud.

18      The government now tells you there must have been

19  some type of fraud, because after all, from its analysis done

20  late in the day, that the billing for CGH and RGH and Williston

21  shows that more than 90 percent of the bills were billed as

22  confirmatory, while the reverse was true at Chestatee.

23      Now, ladies and gentlemen, this -- yet another

24  last-minute theory to the government might have some

25  superficial appeal until you consider that Mr. Salazar's

 1   testimony, in his view -- and he was pretty adamant about it,

 2   pretty determined, right or wrong -- his view was the coding

 3   was correct.

 4        And when you think about it, there were several other

 5   witnesses, including the experts, and even Garrett Shohan, the

 6   insurance company investigator, who described the complexity of

 7   the -- of the billing, and he also described the changes that

 8   occurred over 2016, '17, and '18.

 9        And there seemed to be some consensus -- one of the

10   few consensuses amongst the insurance people, amongst the

11   insurance company investigators, amongst the experts, that

12   coding was a -- difficult and a process that required quite a

13   bit of judgment.

14        This is the type of conflict in the evidence, ladies

15   and gentlemen, that I would suggest to you constitutes

16   reasonable doubt.  You just don't know.  You just can't form an

17   opinion that there was a willful and intentional violation.

18        One more example of reasonable doubt in the evidence,

19   ladies and gentlemen, that I want to touch on now is what I

20   would characterize the desperate attempt by the government and

21   the insurance companies to convince you that -- what I would

22   characterize as these generic terms of service paragraphs

23   contained in virtually all these contracts should be somehow

24   interpreted to preclude outreach labs.

25        And virtually every insurance -- and I won't put them

 1   all up there.  Every insurance contract between the hospital

 2   and the various labs -- or the insurance companies and the

 3   various hospitals, there was a generic service contract that

 4   they suggested to you precluded outreach labs.

 5          This construction, ladies and gentlemen -- this kind

 6   of verbiage from contract lawyers, I would suggest to you,

 7   verges on pathetic.  There are hundreds and hundreds of pages

 8   of contracts between the insurers and hospitals in evidence.

 9   All of the contracts were drafted by the insurance companies.

10          I note just a couple of provisions of the contracts

11   that we can refer to to demonstrate just how ridiculous this

12   argument is, as this generic paragraph somehow precludes what

13   we're taking about.

14          One is the contract between Anthem and Putnam.  And

15   we touched on it in the cross-examination of one of the -- the

16   witnesses for Putnam, that had a clause in it that eliminated

17   the usual rule of contract interpretation that any ambiguity in

18   the contract is construed against the drafter.

19          Now, for those of you who don't really keep up with

20   this type of arcane contract law -- generally speaking, if

21   there's an ambiguous clause in a contract, the tie goes against

22   the party that drafted it.

23          But Anthem had the wherewithal, with their lawyers,

24   to remove that paragraph, because they don't want to be -- if

25   there's a vague provision of it, they don't want that to be

1  construed against them.

2          So they had the wherewithal to remember that, but

3  they couldn't draft a paragraph in there about outreach labs.

4  They couldn't put a specific provision in their paragraph about

5  reference labs.  They couldn't put a specific paragraph in

6  their contracts about 141 codes, at least not in 2016.

7          There was another provision of the contract that we

8  touched on briefly that Anthem had the ability to unilaterally

9  change the contract with Putnam.

10          So, seriously, the government is asking you now to

11  find that the party that drafted all these documents wanted to

12  rely on these service clauses to prohibit outreach labs, and

13  that fraud somehow occurred as a result of violating these

14  paragraphs?

15          If only there was something that these giant

16  insurance companies could have done to protect themselves.

17  They did do something.  Absolutely they did something.  And

18  Mr. Hayes pointed it out just a minute ago.

19          Aetna did something in 2015.  It inserted a clause in

20  the contract that addresses this specific issue that we've

21  spent the last month and a half talking about.

22          The Aetna contract with RGH, drafted in 2015,

23  expressly said, We'll no longer pay for laboratory services for

24  nonpatients that are billed 141.

25          The result is when the biller -- when the provider

1 submits a bill that tells you truthfully, We're billing for

2 nonpatient 141s, Aetna is not obliged to pay.

3 It doesn't have to ask you to engage in all these

4 mental gymnastics of convincing you that somehow this obscure

5 paragraph in -- paragraphs in the contracts applied. For RGH

6 and Aetna, it's right there. They're not obliged contractually

7 to pay.

8 But what it isn't, it isn't fraud, because they've

9 told you exactly what they were doing, which is what they did

10 in every instance here. We're billing for a non- -- a 141

11 nonpatient.

12 Now, you'll notice in the Putnam contract as well,

13 with Aetna, which I think is 1CC -- we won't necessarily go to

14 it.

15 Exhibit 1CC I believe is the contract between Aetna

16 and Putnam. Virtually all the people from the insurance

17 companies at some point told you that lab -- well, we can kind

18 of rely as much or as little as we want on CMS regulations.

19 Just for your reference point, at page 40 of one of

20 those contracts -- and it's in many of the provisions -- is

21 that the -- the contracts all, at some point, explicitly

22 reference CMS guidelines as the guideposts for what they do.

23 A third means -- so, ladies and gentlemen, conflicts

24 in the evidence. The conflict about what the contracts mean.

25 The government, using these desperate attempts for these

1   obscure provisions of the paragraphs to convince you somehow

2   that -- that the outreach lab model was prohibited, it simply

3   wasn't.

4         The third means of assessing reasonable doubt, ladies

5   and gentlemen, is lack of evidence.  Of course, the most

6   obvious and easiest, most significant lack of evidence in this

7   case is the absence of any false statement or representation in

8   the billing submissions.  But I'm going to come back to that to

9   you a little bit later.

10        I'm going to focus on two other issues which in my

11   view are representative of the -- the lack of evidence in this

12   case.

13        First, the government failed to produce any evidence

14   that the tests were actually performed at the hospitals.  We

15   know now that the government seized a server from CGH early in

16   the investigation which contained all of the LIS system data.

17   We know now that the government did nothing with it for years.

18        It does not appear that it even tried to seize the

19   data from the other hospitals, RGH, Chestatee, or Putnam.  It

20   was only after one of my colleagues insisted on examining the

21   contents of the -- of the server that Daniel Simoa, the former

22   Empower employee, helped recover it.

23        And what did the data reveal, the LIS data reveal?

24   That hundreds of thousands, if not millions, of individual

25   tests -- and, remember, of course, individual tests are more

1  than the individual samples.

2      There was a photograph of the actual testing machine

3  and, you know, as many as 20 to 24 tests could be run on a

4  particular sample.  But hundreds of thousands, if not millions,

5  of individual tests were run by the hospital.

6      But apparently this wasn't important to the

7  government, and it wasn't important to the insurance companies.

8  Because after all, ladies and gentlemen, for much of this

9  investigation the government, convinced by the insurance

10  companies, believed the data provided by the -- by the

11  insurers.

12      They believed the code 22 theory.  They believed

13  essentially that these were all outpatients, these people were

14  not connected to the hospital.  So it didn't really matter to

15  the government then, and I'm not sure that it does today, that

16  the -- that many of the tests were performed at the individual

17  hospitals.

18      Another example of lack of evidence, ladies and

19  gentlemen, is that -- the investigation at RGH, the Regional

20  General Hospital in Williston in August of 2016.

21      Now, you heard multiple witnesses tell you that in

22  late -- I forget the exact date, sometime in late August of

23  2016, multiple -- several agents visited the facility.

24      And what happened when they got there?  Did anybody

25  kind of cover up and kind of disguise what was going on there?

1　Absolutely not.　They gave them a guided tour.　We walked them

2　through the lab.

3　　　　　You heard Ms. Encienzo -- I apologize for the

4　mispronunciation -- walked her through the lab.　You heard Raj

5　testify about the tour that they got.

6　　　　　They showed them the CLIA certificates.　They showed

7　them the COLA certificates, about the lab testing.　The agents

8　took pictures of the working lab.

9　　　　　Now, none of those photographs were introduced into

10　evidence by the government in this case.　Now, there are some

11　photographs that were introduced by the defense, essentially

12　showing the lab at different stages, including the quantitative

13　machines that came in later.

14　　　　　But there was no testimony from any of the agents or

15　the investigators who visited RGH.　For that matter, there

16　wasn't really any testimony from any of the agents or

17　investigators who visited any of the hospitals in this case.

18　There was no description of RGH by any of the -- of the agents

19　in this case.

20　　　　　Now, ladies and gentlemen, listen, you might ask

21　yourself:　Is losing a couple of pictures in an investigation

22　this massive really a big deal, that's just not that central to

23　the government's case?

24　　　　　And what I'd suggest to you, ladies and gentlemen,

25　is -- the testing data from the labs and the hospitals, and the

1    pictures and the description of the lab -- of those labs at RGH

2    all represent one thing, a working lab.

3          It's consistent with Larry Small's and Mr. Arrigo's

4    testimony about developing lab outreach programs.  But what it

5    is -- but what it -- what -- it's also inconsistent with fraud.

6    It's lack of evidence, ladies and gentlemen.  It's another --

7    it's more evidence of reasonable doubt.

8          There's one more reasonable doubt kind of issue that

9    I want to discuss with you at this point.  I'm not really sure

10   entirely what box it goes on.  So I'll just put it here at

11   the -- in the cumulative box.

12         Jorge Perez obviously had some role in all three

13   hospitals here.  CGH, RGH, and Putnam are three of the

14   hospitals.  The government in its rebuttal will point to some

15   of the activity at CGH in May and June of 2016 as fraud.

16         There is evidence, ladies and gentlemen, that the lab

17   at CGH was overwhelmed at this point.  Seth Guterman, you

18   remember him.  He was the person who actually went to the board

19   the first time to meet with the people at the hospital, was

20   directing Edith Mears, who you may remember, to sign contracts

21   with various -- with various labs.

22         There was more urine being delivered to CGH than it

23   could test.  There was testimony that Jorge Perez moved some of

24   those samples from the -- from the hospital.  But I ask you to

25   consider three things when you think about this.

1       One, there's simply no evidence about what happened

2   to any of these samples.  Most importantly, there's no evidence

3   that -- that any testing or lack of testing that occurred from

4   any of these samples was ever billed.  Of course, they never

5   bothered to look to see what was tested anyway.

6       Remember, also, the timeline.  And some -- several

7   witnesses touched on this in the course of cross-examination,

8   all -- it seemed to be a consensus that Jorge Perez was on the

9   move all the time.  He was -- he was going to RGH.  He was

10  going to CGH.  Testimony that if he was at CGH once a week that

11  was fairly typical.

12      You'll remember from the testimony of both Raj and

13  others that it was March of 2016 when Jorge Perez is entering

14  the contract to start RGH.  Jorge Perez is on -- going his own

15  way by June of 2016.

16      The last comment I'll have about the -- about the lab

17  work at CGH in May, June, and, for that matter, July, is

18  remember the testimony of Larry Small and Mr. Arrigo.

19      As long as it's accessioned at the hospital and

20  there's evidence that the hospital is expanding its outreach

21  program, it is consistent with the lab outreach model, and,

22  most importantly, ladies and gentlemen, it's consistent with

23  CMS guidelines to bill it through the hospital.

24      So despite the government's efforts, after the 22

25  theory and all these other fail, that Larry Small, who -- who

1  they quoted in small parts here -- when you look at the larger

2  testimony and you consider all of Mr. Small's testimony, as

3  long as it's accessioned at the hospital, the hospital

4  essentially owns it for -- for billing purposes.

5       And the government, desperate to this day, devotes

6  some portion of its argument to Exhibit 70 about translating

7  837I data, in terms of whether the service provider should have

8  been included in the electronic data, which -- where did the

9  government get the electronic data?  From -- from the Empower.

10      But when they focus on this electronic transmission

11 issue, as they described in Exhibit 70, the very last exhibit,

12 is -- one, there's no companion CMS regulation to tie it up to.

13 There's no indication that there's any requirement that -- that

14 the 837I data contained this information.  Mostly, there's

15 no -- there's no field for it in UB-04.

16      And, remember, both Mr. Small and virtually all the

17 witnesses, a UB-04 is -- is the appropriate form.  The boxes

18 have to be filled out appropriately.

19      All right.  So, ladies and gentlemen, the bad news is

20 we're still on the first instruction.  The good news is that

21 the rest are going to go much faster.

22      The next instruction I want to put up is the

23 fraud-related instruction.  And we're going to focus on the

24 language -- this is Instruction No. 12, essentially describing

25 the elements of fraud.

1    Now, I want to focus really -- on the bottom of it is

2  where, A "scheme to defraud" means any plan or course of

3  actions intended to deceive or cheat someone out of money or

4  property by using false or fraudulent pretenses,

5  representations, or promises.

6    Now, essentially, the next page of this goes a little

7  further.  If we could go to the next page, please, just to

8  make...

9    MR. LANDES:  Your Honor, I'm sorry.  I think the jury

10  is signalling.

11    JUROR:  I need three minutes.

12    MR. BELL:  Oh, need a break, Your Honor.

13    THE COURT:  Okay.  All right.

14    All right.  Ladies and gentlemen, let's go ahead and

15  take 15 minutes.  It's 20 till.  If you'll be back at five

16  minutes to 11:00, please.

17    Thank you.

18    COURT SECURITY OFFICER:  All rise for the jury.

19    (Jury exits, 10:40 a.m.)

20    COURT SECURITY OFFICER:  Thank you.  You may be

21  seated.

22    THE COURT:  All right.  We're in recess.

23    (Recess from 10:41 a.m. to 10:55 a.m.; all parties

24  present.)

25    COURT SECURITY OFFICER:  All rise.  This Honorable

 1 | Court is now back in session.

 2 | Please be seated.

 3 | THE COURT:  Let's have the jury, please.

 4 | COURT SECURITY OFFICER:  Stand for the jury.

 5 | All rise for the jury.

 6 | (Jury enters, 10:56 a.m.)

 7 | COURT SECURITY OFFICER:  Thank you.

 8 | You may be seated now.

 9 | THE COURT:  All right.  Ladies and gentlemen, welcome

10 | back.

11 | And, Mr. Bell, you may proceed.

12 | MR. BELL:  Thank you, Your Honor.

13 | I believe we left off on the -- we were reviewing the

14 | definition of the fraud instruction itself.  And I want to

15 | direct your attention, if I could, to the next page of this

16 | instruction.  And, remember, you'll get all these from both the

17 | Court and a written copy as you go back.

18 | But if you could, go to the next page.

19 | And we have the definition of "scheme to defraud."

20 | Nope.  It should be page 2 of the fraud related.

21 | All right.  A "scheme to defraud" means any plan or

22 | course of action intended to deceive or cheat someone out of

23 | money or property by using false or fraudulent pretenses,

24 | representations, or promises.

25 | A statement or representation is false or fraudulent

1  if it is about a material fact that the speaker knows is untrue

2  or makes with reckless indifference to the truth, and makes

3  with the intent to defraud.

4      A statement or representation may be "false" or

5  "fraudulent" when it is a half-truth or effectively conceals a

6  material fact, and is made with the intent to defraud.

7      If we can skip to the bottom, where we get to the

8  act -- to act with "intent to defraud" means to act knowingly

9  and with the specific intent, excuse me, to use false or

10  fraudulent pretenses, representations, or promises to cause

11  injury or loss.  Proving intent to deceive alone -- and I'll

12  just read the -- without the intent to cause loss or injury, is

13  not sufficient to prove intent to defraud.

14      So, ladies and gentlemen, I would suggest we could

15  agree that's a pretty complex definition.  So we've got a

16  couple of others that you're going to get that I -- I would

17  suggest to you can help kind of explain what you need to hear

18  from the evidence, aside from the fact that the coding at 141

19  for nonpatient was not false, and aside from the fact that

20  putting the provider ID and the tax ID number of the hospital

21  in the appropriate locations in the UB-04 forms was not

22  false -- but aside from that, we can get to a couple of other

23  instructions.

24      And if we could get to the one for "knowingly" and

25  "willfully."

1    MR. LANDES:  Is that No. 20?

2    MR. BELL:  No. 20, yes.

3    And if you saw there, the terms "knowingly" and

4  "willfully" were used in the -- in the specific intent portion

5  of the fraud definition.

6    The word "knowingly" means that the act was done

7  voluntarily and intentionally and not because of a mistake or

8  by accident.

9    The word "willfully" means the act was committed

10  voluntarily and purposefully, with the intent to do something

11  the law forbids, and that is with the bad purposes or

12  disobey -- to disobey or disregard the law.  While a person

13  must have acted with the intent to do something the law

14  forbids, before you can find that the person acted "willfully,"

15  the person need not be aware of the specific law or rule that

16  his or her conduct might be violating.

17    So that helps you, I would suggest, when you decide,

18  you know, whether there was a specific intent to defraud.  And

19  there's another instruction that is particularly applicable to

20  this case that Judge Corrigan will give you.  And Mr. Hayes

21  referenced it a couple of times, because there's a lot of

22  evidence of this in this case.  It's called good faith.

23    And if we could put the good faith instruction up.

24    So the "good faith" is a complete defense to a charge

25  that requires intent to defraud.  A defendant isn't required to

1  prove good faith.  The government must prove intent to defraud

2  beyond a reasonable doubt.

3         An honestly held opinion or an honestly formed belief

4  cannot be fraudulent, even if the opinion or belief is

5  mistaken.  Similarly, evidence of a mistake in judgment, an

6  error in management, or carelessness can't establish fraudulent

7  intent.

8         But an honest belief that a business venture would

9  ultimately succeed doesn't constitute good faith if the

10  defendant intended to deceive others by making representations

11  the defendant knew to be false or fraudulent.

12         I want to stop for just a minute.  And let's talk

13  about some evidence of good faith in this case, ladies and

14  gentlemen, and from Jorge Perez in particular.

15         You learned a lot of this case -- a lot of evidence

16  in this case on cross-examination.  And cross-examination

17  answers are important, because, ladies and gentlemen, they

18  don't get to prep with -- beforehand.

19         And so essentially, as you may recall, the

20  demeanor -- and we'll talk about this in a little bit.  The

21  responses of many of the government's witnesses were

22  considerably different on cross-examination than they were on

23  direct examination.

24         David Byrns, among others, told you Jorge Perez truly

25  believed in this outreach lab model.  He could save hospitals

1    and make money too.  And there's really nothing wrong with

2    making money.  And he could save hospitals.

3         He didn't hide his secret sauce.  He'd tell anybody

4    that would listen.  He'd go to board meetings.  It's not like

5    these were done, you know, in the back rooms.  He would go and

6    make public statements, very public statements, about what the

7    plan was and how they intended to effect that plan.  He would

8    tell anybody that would listen.

9         Ladies and gentlemen, that's -- that's evidence of

10   good faith.  That's evidence of lack of specific intent.  And

11   you know what, more evidence of good faith, other people would

12   agree with him.

13        Larry Small, 55 years in the industry, he agrees with

14   him.  Mr. Arrigo, lawyers apparently agree with him.  Evidence

15   of good faith, ladies and gentlemen, evidence of lack of

16   specific intent to defraud.

17        You heard testimony from people like Raj.  And I

18   won't even venture to try to mispronounce his last name.  The

19   person that worked at RGH with him -- even Edith Mears:  Jorge

20   would always be helpful.  Jorge would always be truthful.  How

21   sincere and committed Jorge Perez was to this rural hospital

22   model.

23        And keep in mind, ladies and gentlemen -- there were

24   a couple of references to it -- when you look at the contracts

25   that Empower Billing -- Empower had with the contracts for

1    their billing-related work, which, of course, JVS did

2    significant portions of, the usual bill was 6 percent, or even

3    less in some instances.  Empower, Jorge Perez, made money, but

4    not an amount inconsistent with the amount of work that was

5    done.

6            As David Byrns described it in cross-examination, he

7    billed less than the usual industry standards for the

8    billing-related work and the -- the services he provided.

9            Now, as we've already heard -- and you're going to

10   hear it again at the end, ladies and gentlemen.  The government

11   is going to point to all these beautiful charts they've made,

12   about, Look at how -- all the revenue that shot up at CGH and

13   then RGH and then Putnam.

14           The essence is, according to the government, they

15   simply used these hospitals as a -- as shells to exploit and

16   then discard as circumstances dictate.

17           And they suggest to you, Well, it's got to be fraud.

18   A couple of points on that.  One, that's a backwards way of

19   doing it.  You know, the result of having the revenue change

20   doesn't make it fraud.  It's either fraud because it was

21   specific intent to defraud in the first instance or there

22   wasn't.

23           Now, let's think about the -- all these magnificent

24   charts that they introduced.  Keep in mind, as they flow

25   through the revenue streams, change from one hospital to the

1 other, why did that happen?

2          Well, it happened because the insurance companies cut

3 off the funds.  The revenue ended.  So there was no more -- no

4 more availability to bill through the outreach lab model at the

5 particular hospital.  So they had very little alternative.

6          It's also yet another comment on -- remember each one

7 of these paragraphs -- now, of course, we've only touched on --

8 many of these paragraphs -- or contracts that we've talked

9 about in this case were, you know, 50 to 100 pages long.

10          There was a dispute resolution clause in virtually

11 all of these contracts, where essentially in the -- in the

12 event of a dispute, there's certain procedures you're supposed

13 to go through.

14          Was there any evidence that any of that happened?  Or

15 what happened, ladies and gentlemen, is the insurance companies

16 just cut off the revenue, stopped paying the claims.  That

17 accounts for why the revenue streams kind of shifted from one

18 hospital to the other.

19          But in terms of the good faith, also consider this,

20 ladies and gentlemen, the testimony of Raj in particular, and

21 Edith Mears to some extent.

22          After that happened, which I think was in the -- I

23 forget the particulars -- and we won't put the chart up now.

24 And you have -- it was sometime in the summer or fall of 2016

25 the revenue stream stops at RGH.

 1        Did Jorge Perez bail out?  Did Jorge Perez leave the

 2   hospital?  Raj, the person who's now doing some type of

 3   doctoral dissertation on saving rural hospitals, as he was

 4   inspired by all this, he didn't leave.  He didn't bail out.  He

 5   continues to try to develop a market for the confirmatory

 6   tests.

 7        Remember the machines that the government has told

 8   you repeatedly, ad nauseam, that they never tested confirmatory

 9   tests at RGH, but they had the machinery, but they never got it

10   hooked up?  Well, they had the machinery.  Never had an

11   opportunity to use it.

12        But, ladies and gentlemen, I would suggest to you,

13   contrary to Mr. Hayes' suggestion, you know, painting a few

14   rooms -- they were doing significant improvements.  They were

15   committed to the revenue streams of these hospitals.  It wasn't

16   simply -- now, ultimately all bad things happened to them, but

17   it -- was it the cause of this, or was it the cause that the

18   insurance companies simply decided they weren't going to pay

19   anymore?

20        But the evidence -- the evidence of good faith -- and

21   I introduced that -- that tax statement there showing the

22   amount of -- you know, significant high-dollar items that --

23   that was brought by RGH in 2016 for the upgrades to the

24   hospital.

25        And, by the way, that tax statement for Levy County,

1    not Alachua County, reflects where -- where -- it is a more

2    accurate statement of where RGH is actually located.

3           But, ladies and gentlemen, what that demonstrates to

4    you, what the evidence, in terms of the -- the photographs and

5    Raj's testimony -- and there was others as well, that Jorge

6    Perez -- it is evidence of good faith, ladies and gentlemen.

7    It is evidence of lack of specific intent, even if there were

8    mistakes made, in terms of what was -- what was happening,

9    which I'm not quite sure that there was anyway.  But that's the

10   essence of this, is a good faith.

11          One more instruction that probably is a little bit

12   unique to this case -- if we could get No. 23, please.

13          And this also, I would suggest to you, helps guide

14   your assessment of the evidence on -- on the concept of

15   specific intent and knowledge and willfulness.

16          This is called standard of care.  You've heard --

17   obviously we've heard more testimony than any of us care to

18   hear about insurance industry standards and insurance coverage,

19   including contracts, policies, and agreements.

20          And I remind you, as the judge will tell you, that a

21   violation of a standard of care or industry standards is not a

22   crime.  The defendants are not on trial for violations of the

23   standard of care or industry standards.

24          However, this evidence may be relevant in determining

25   whether any defendant acted -- any defendant, excuse me, acted

1    with intent to defraud.

2          We learned a lot more about contracts than any of us

3    ever hoped to know in this case.  We did -- a couple of things.

4    The evidence seems to be -- well, the evidence seems to be

5    pretty clear, although there was some resistance by the

6    insurance companies that CMS guidelines are the gold standard.

7    They define the terms.  They define the terms that's been

8    introduced by -- by Mr. Fletcher.  It's been introduced by

9    myself.  It was introduced in some capacity by the government,

10   some variety of chapter 16 of the CMS regulations.

11         They define the term as nonpatients.  They define the

12   use of the type of bill code 141X.  They define the coding

13   parameters for electronic data transmissions, that they're

14   consistent with the UB-04 form and, at a minimum, contain the

15   information provided in the UB-04 form.

16         Now, it's clear, as -- as we've learned over the

17   course of the case, the insurance companies, in negotiating

18   private payers, where -- where government Medicare payments

19   aren't being made, have the ability, to some extent, to

20   negotiate and modify, to the extent otherwise permitted by law,

21   some of the regulations by contract.

22         So, for example, for non-Medicare patients, the

23   insurance companies could force the hospitals to agree to

24   different rates for characterized nonpatients or outpatient

25   laboratory work prior to 2016.

1          And, ladies and gentlemen, as you've learned over the

2    course of this case, is that where the contracts alone aren't

3    enough to protect these insurance giants from these

4    hospitals -- remember Blue Cross?  What was the testimony?

5    Their assets worth about $19 billion.  And they operate under

6    the name GuideWell.

7          You may hear something from the government coming

8    down the road about, Why did they have all these different kind

9    of corporate entities?  Blue Cross operates -- you know, the

10   holding companies and various corporate names are -- nothing

11   unusual or illegal about them in and of themselves.

12         Blue Cross -- a guy could barely remember what name

13   Blue Cross is operating under now.  It's called GuideWell, is

14   the Blue Cross affiliate.  Anthem has Blue Cross affiliates in

15   virtually every state, or many other states.

16         But, in any event, policy manuals are a different

17   subject that we talked about at great length.  And essentially,

18   as the contract language will provide -- as you go through all

19   these contracts, there's a clause in there that permits or

20   requires -- or permits the insurance company to change the

21   rules of the game with modifications to their policy manuals.

22         Now, ladies and gentlemen, the evidence in this case

23   is quite simply that these poor helpless insurance companies

24   could have done any number of things to address the issue of

25   outreach labs through these rural hospitals.

 1      But for whatever reason, CGH, a critical access care

 2  hospital, and excepting Aetna at RGH, and Putnam, for whatever

 3  reason, -neither in their policy manuals or in their contracts

 4  did they bother to -- to specifically address these issues.

 5      And if we could get 35F, which we've seen before --

 6  we're going to change screens, Mr. Landes, and we'll go with

 7  the government's exhibit here.

 8      So you've seen this before, and you'll see it again

 9  before the end of the day, 35F.  Well, maybe we won't see it

10  again.

11      All right.  Well, we will -- I'll just have to tell

12  you about.  It's the e-mail from Heather Burch to her employer,

13  to her superior.  I think it was James Balcom, but I can't

14  remember for sure.

15      But Heather Burch, so bluntly and matter-factly put

16  it, Pass-through billing is not prohibited by the existing

17  Putnam contract.

18      But you did learn also, as the insurers' agents

19  were -- representatives were testifying, Anthem quickly fixed

20  that problem.

21      Now, both in the e-mail and through the testimony,

22  what did it do?  It didn't amend the service -- the terms of

23  the service contract.  That paragraph about what constitutes

24  service, it didn't amend any of the language of the contract

25  and insert a clause about billing under type of bill 141 for

1  nonpatient billing for laboratory services.

2  What did Anthem do in response to this, that they

3  were very proud of and got kudos all around?  They simply

4  lowered the rate that it had to pay.  They exercised their

5  ability to -- another clause they negotiated to unilaterally

6  modify the contract to lower the rate.

7  And, ladies and gentlemen, that's what this case is

8  really all about.  It's not about service of paragraphs --

9  THE COURT:  Mr. Bell, if you wanted to, we could

10  probably get 35F out of the stack and you could put it on the

11  screen.

12  Do you want to do that or are you --

13  MR. BELL:  No, thank you, Your Honor.  I appreciate

14  it.

15  Now, it later did change the -- the policy manual for

16  nonpatient laboratory services.  That happened sometime after

17  all this.  But these changes, this last instruction, you know,

18  violations of industry standards, whether there was a contract

19  violation or not, isn't evidence of fraud.

20  And I would suggest to you, ladies and gentlemen, in

21  this instance the policy changes, the absence of any reference

22  to pass-through billing on the -- in the Putnam contract is

23  evidence of lack of fraud.  It's evidence of no fraud in this

24  case, because there's not even a contractual violation.

25  There's no specific intent, particularly when you're telling

1    them exactly what's due.

2          They knew what was happening.  It's not like they

3    didn't realize it pretty quickly.  And, keep in mind, the

4    pass-through billing concept through -- as Larry Small

5    characterized it, is -- as long as the specimen is accessioned

6    at the hospital -- that's what they're talking about

7    pass-through billing.  They're not talking about where the

8    hospital does some portion of the test itself, for example, the

9    presumptive test, and that the confirmatories -- that's

10   completely separate than pass-through billing.

11         The pass-through billing component of this -- it

12   addresses the exact situation where Putnam doesn't have an

13   operating lab yet because they're building one.  That's the

14   language that really that -- that is directed to.

15         But these are kind of the -- the basic legal

16   framework that you'll apply all the evidence to as you decide

17   the facts of this case, ladies and gentlemen.

18         And these are just some of the instructions that the

19   judge will give you.

20         COURTROOM DEPUTY:  Mr. Bell, you have 15 minutes.

21         MR. BELL:  Thank you.

22         I want to turn now for our last 15 minutes to a

23   couple of the other instructions that you're going to get that

24   help you apply these legal instructions.  And one of those

25   instructions addresses prior felony convictions and

1    inconsistent statements.

2          And without -- so essentially this instruction will

3    provide you that you can consider inconsistent statements in an

4    individual's felony conviction as evidence that they weren't

5    credible, quite honestly, is what it comes down to.

6          Now, in this case both Mr. Rojas, Mr. Skeffington --

7    and Mr. Marcotte all had prior convictions.  And, of course,

8    this is just one of the many factors that you consider when

9    you -- when you're deciding who and how much of any witnesses'

10   testimony you're going to believe.  But the status as a

11   convicted felon stands alone.

12         Inconsistent statements are another significant issue

13   that you can consider in deciding the credibility.  And this

14   came up most often with -- in addition to people like

15   Mr. Rojas, but with many of the government's witnesses.

16         Mr. Rojas was one.  And Ms. Galnor may talk about him

17   a little bit more later, entered a plea deal with the

18   government, made statements absolutely 100 percent the opposite

19   of what he told you in trial earlier, under-oath statements.

20         His description of his omissions in his application

21   process for becoming a banker -- really?  They don't ask you

22   when you fill out any job application whether -- it's not

23   whether you've been convicted, it's whether you've ever entered

24   a plea to a charge like this, or ever had something.

25         So Mr. Rojas has -- there's considerable evidence

1  that he'll say what he needs to say to help himself through

2  whatever the situation may be.

3      David Byrns, not only -- who made a number of

4  inconsistent statements, which we'll talk about in a little bit

5  more depth later, as the day unfolds.

6      But I highlight only one of the inconsistent

7  statements as an example of Mr. Byrns.  It happened at the end

8  of his tenure at Putnam.  He wrote a letter -- his resignation

9  letter.

10      There's no letter -- nothing about that letter that

11  would suggest that -- that there was any fraudulent activity

12  occurring in his time at Putnam.

13      Now, of course, with Mr. Byrns there are many reasons

14  for you to doubt his credibility on the central issues.  His

15  testimony about his drinking problem.  He was intoxicated at

16  meetings.

17      You learned that Mr. Byrns was compensated

18  $7.8 million for one year's work at Hospital Lab Partners?

19  And, again, when you're thinking about good faith, remember,

20  Jorge Perez got 200,000, compared to that 7.8 thousand [sic].

21      So Mr. Byrns has multiple strikes with inconsistent

22  statements, and the simple fact that his drinking-related

23  behavior may affect his ability to remember these events.

24      And Mr. Byrns has another instruction that applies to

25  him and a limited class of witnesses, and that addresses what I

1  characterize as informer testimony.

2          I don't know if we have that one, Mr. Landes.  In the

3  middle.

4          But a witness who hopes to gain more favorable

5  treatment may have a reason to make a false statement in order

6  to make a -- strike a good bargain with the government.

7          Again, we have Mr. Rojas, stricken with cancer; Kyle

8  Marcotte, drug addict; John Skeffington, alcoholic; David

9  Byrns, alcoholic.

10         On the hook to the government, would they say

11 something that isn't true, ladies and gentlemen, to help

12 themselves?  I think you all know the answer to that question.

13 But I do want to make two specific comments about the plea

14 agreements of Mr. Skeffington and Mr. Byrns.

15         With Mr. Skeffington it's hard to know where to

16 begin.  He gets too drunk to testify.  But one observation

17 about his plea agreement, as the government comments, remember

18 the circumstances of this case.  He was already on probation or

19 supervision for a fraud-related charge.  He made a number of

20 false statements to get his business going with the South

21 Florida labs.

22         He implicated his fiancée, now his wife, in this

23 criminal activity.  He pleas to charges that are indirectly

24 related to -- to the charges in this case.  When confronted --

25 and we come back to the inconsistent statement.

1    When confronted by the agents about the allegations

2 in this case, the quote was he expressed difficulty accepting

3 criminal conduct.

4    Ladies and gentlemen, his testimony, if you believe

5 any of it -- and they rely very much on the backdating.  Was

6 there any connection between that and the actual bill?

7    One comment about David Byrns' plea agreement as

8 informer, remember, he pled guilty shortly after the criminal

9 investigation began in 2018.  You'll have this.

10    One critical component of that plea was -- included

11 the admission, quote, the patients had no connection to the

12 hospital.  At the time the government's working theory

13 was there -- was that the -- all these patients were treated as

14 outpatients.

15    David Byrns must now -- must now continue to toe the

16 company line to get the benefit of his bargain.  He's got -- to

17 get that favorable sentencing recommendation.

18    But, ladies and gentlemen, you don't.  You don't have

19 to believe David Byrns, and you shouldn't, about material

20 issues, although, having said that, I leave you with this.  One

21 remark he said on both -- actually, I think he said this to the

22 government.

23    He said the object was to make money, to save the

24 hospitals and make money.  I think this came to a government

25 question.

1        He didn't say the object was to deceive these

2   insurers by making false representations so that we'd all make

3   a lot of money.  He said the object was to save the hospitals.

4   He didn't say, We had a scheme to defraud.  That wasn't his

5   testimony.

6            When -- he pled guilty.  But when you look at the

7   factual basis and the theory he's operating under, it's

8   significantly different than what we've come to learn in this

9   case.

10           A couple of last comments -- one of the last

11  instructions I want to talk to you about is credibility of

12  witnesses.  And there's a series of questions.  The first one

13  is:  Did the witness impress you as one who was willing to tell

14  the truth?

15           Well, I suggest Larry Small, David Simoa, Raj, and

16  Jose Salazar are much more impressive as telling the truth than

17  Rojas, Skeffington, Marcotte -- Brenda Rhodes, remember her?

18  Deleted some testing data.  We don't know exactly what.

19  Referred to Jorge Perez's assistant as that little monkey.

20           David Byrns, Howard Rochay, even, the Blue Cross

21  executive -- did a witness have a reason not to tell the truth?

22  Well, the cooperators, of course, have significant reasons not

23  to tell the truth.

24           But what about the insurance companies?  These

25  people?  The group, collectively, who told you, Well, they may

1   have been truthful by using the form UB-04.  They may have

2   represented on the 837Is the electronic equivalent of the UB-04

3   that the type of bill was nonpatient, but our billion-dollar

4   operations aren't programmed to capture this.  So we just

5   ignored the data.

6          Our programs didn't recognize that many of these

7   claims contained a reference to the lab and the patient ID

8   number, but that wasn't important to us, our auto-adjudication

9   process.

10         The insurers' program simply converted this number to

11  code that they did use, to code 22, which, under the

12  regulations, is for an outpatient.  It has a completely

13  separate definition.

14         So the investigators start looking at this uptick in

15  revenue and they mistakenly focus on this

16  patients-have-no-connection-to-the-hospital theory.

17         Worst of all, it convinces the government to use this

18  theory; the nonpatients, as reflected in David Byrns' plea

19  agreement.  To this day it's unclear if the insurers have ever

20  actually looked at the 837I or the UB-04 forms.  They don't

21  need them.  They don't care.

22         The insurance people, most assuredly, have a reason

23  not to tell you the truth.

24         Does the witness have an interest in the outcome?

25  Well, of course the insurers have an interest in the outcome.

1          COURTROOM DEPUTY:  You have five minutes, Mr. Bell.

2          MR. BELL:  I'm going to talk about Dr. K for just a

3  minute, though.  I'll talk about the former insurance company

4  executive, a professional witness for the insurance company.

5          He, much like Missy Parks and Dr. Waller, for that

6  matter -- but Dr. K's testimony, I suggest to you, can be

7  characterized with one observation.

8          On cross-examination my colleague Mr. Schwartz

9  pointed out that the policy manual that he had introduced into

10  evidence was from Colorado, not Missouri, the expert witness

11  had no pride in our state.

12          Misleading?  Absolutely it's misleading.  An outright

13  fabrication?  I'll leave for you to decide.  His testimony is

14  simply not worthy of belief.

15          Missy Parks and Dr. Waller, both, I would suggest to

16  you, suffer from similar problems.  They work for the

17  government.  They work for insurance companies.  And, most

18  importantly, all those beautiful charts that they did for you

19  are completely the product of the insurance company

20  spreadsheets, which are really designed to tell you what the

21  insurance companies want.

22          Good memory.  Does the witness seem to have a good

23  memory?  John Skeffington, he couldn't remember where he had

24  been three days before he came here.

25          Now, listen, I don't want to pick on somebody that

 1    has an alcohol problem, but it's the United States that

 2    presents him as evidence.

 3            Did the witness have the opportunity to see and know

 4    the things they testified?  A couple of these insurance

 5    companies weren't even working for those insurers when the

 6    events happened.

 7            Howard Rochay -- I don't know if many of you remember

 8    the old television series *Hogan's Heroes* -- Howard Rochay, very

 9    much at the beginning, couldn't remember much of anything.  The

10    Sergeant Schultz character, I know nothing.

11            But when you think about their testimony, it really

12    makes sense in this respect.  There isn't a good explanation

13    for the 22/141 code.  They really can't explain how the patient

14    information -- the patient ID information on their spreadsheets

15    containing explicit reference to the labs.  There really isn't

16    a good explanation for why the contracts/policy manuals don't

17    address this.  There isn't a good explanation, ladies and

18    gentlemen.  There is an explanation.

19            If we could go to Exhibit 19.

20            The explanation, ladies and gentlemen, is this,

21    depicted on Exhibit 19, the e-mail depicting James Balcom, who

22    discovered some pretty publicly available information about

23    Jorge Perez -- it denotes the conniving character from

24    Mr. Burns from *The Simpsons*.

25            The unfortunate answer to the question, ladies and

1  gentlemen, is the insurance companies were out to get these

2  outreach labs.  The unfortunate, ladies and gentlemen, is that

3  the insurance companies misled the government into believing

4  this fraud theory.  The unfortunate answer, ladies and

5  gentlemen, is the government believed them.

6          The United States is wrong, ladies and gentlemen.

7  The outreach labs and critical access care hospitals were

8  legitimate business models, billing for lab services.

9          Using the 141 type of bill code was associated with a

10  regulatory framework.  As Larry Small and Mr. Arrigo and others

11  suggested, using the hospital tax ID and NPI number is the --

12  on the designated UB-04 box was consistent with industry

13  standards.

14          There wasn't -- there simply wasn't any fraud by

15  Jorge Perez, ladies and gentlemen.  Jorge Perez is not guilty

16  of Count One.  He's not guilty of every count.

17          Thank you.

18          THE COURT:  Thank you, Mr. Bell.

19          Mr. Landes, on behalf of Ricardo Perez.

20          MR. BELL:  Judge, if I could assist Mr. Landes, since

21  he was kind enough to --

22          THE COURT:  Sure.

23          MR. LANDES:  I'm okay.  I'm not going to need

24  anything.  Thank you.

25          MR. BELL:  I'll get my stuff out of the way for him,

1  Judge.

2       MR. LANDES:  May it please the Court?

3       THE COURT:  Yes, sir.

4       MR. LANDES:  Fellow defense counsel, government

5  counsel, ladies and gentlemen of the jury.

6       This is the last time you're going to hear me say, My

7  name is Richard Landes and I represent Ricardo Perez.  When I

8  spoke to you back in May, when I made my opening statement, one

9  of the things I told you was that it was the vision of Jorge

10  Perez to go into small rural hospitals, try and turn them

11  around, introduce new revenue streams, and make them

12  profitable.

13       As we've seen and heard, that's exactly what he did.

14  At Campbellton-Graceville Hospital, over in the Panhandle, at

15  Williston hospital near Ocala, and Putnam Hospital in Missouri,

16  he made all of them profitable, at least for a time.

17       And that word "vision" struck -- stuck in my head,

18  because I heard that word from a number of witnesses.  It was

19  Jorge's vision, is how their testimony started.

20       Now, ultimately, he wasn't successful.  But why was

21  that?

22       The government would have you believe that these

23  South Florida businessmen descended onto these hospitals, took

24  over, ran them into the ground, forced them to declare

25  bankruptcy, and caused the longtime employees at these

hospitals to lose their jobs.  They would have you believe that these accused individuals victimized these hospitals.

Is that what happened here?  Or is it closer to the truth that these hospitals were on their last legs, had one foot in the grave, in debt, tax liens, barely any revenue? Nobody stepping in to help them until Jorge Perez and the Empower company offered them a lifeline.

The tax liens were paid.  Their debts were paid. Reference lab programs brought in.  Hundreds of thousands of dollars in machinery, testing equipment, reagents purchased, Empower installed laboratory information systems, billing software, modernization, hospital staff not only kept on, but promoted.  New people hired from the community that these hospitals served.

And in the process, the Empower company made money, between 5 and 6-and-a-half percent of bills claims, which, as you heard, was cheap, one of the witnesses told us.  And the independent labs made money.  And the hospitals made money.

Remember the testimony of David Byrns, the CEO of Putnam?  Mr. Duva asked him, What was the purpose of all of this?

And his answer, as Mr. Bell just told you, as that also stuck in my mind, wasn't to commit fraud, to commit health care fraud, to commit money laundering.  His answer was, To save the hospitals and make money.

1      The health care lawyer, Mark Thomas, went even

2  further, explaining that these rural hospitals are fragile

3  entities, and in order to survive, they're encouraged to expand

4  their footprint.

5      The government put up for you Exhibit 28L, a

6  spreadsheet that Yesenia Hidalgo prepared, an Empower employee

7  that worked for Ricardo Perez, which showed not only what

8  Empower and the independent labs made in a week, but also what

9  Campbellton-Graceville Hospital made in one week.

10      The government put that up quickly, sort of glossed

11  over what the hospital made in a week.  It doesn't really fit

12  in with their theory here.  What did they make in a week?

13  You've seen it before, $185,129,000.20, in a week.

14      Of all the government charts you saw, prepared by

15  forensic accountants, that Exhibit 28L was a rare glimpse into

16  what the hospitals were making as well.

17      So the Empower company, of which Ricardo Perez was a

18  part owner, is guilty of making 5 to 6-and-a-half percent of

19  billed claims.  So what?

20      Did anyone try to hide the fact that they were making

21  money?  Did you hear any evidence of secret offshore bank

22  accounts or hidden transactions, taxes not being paid?  Or,

23  instead, did you hear evidence of Ricardo Perez and Yesenia

24  Hidalgo openly e-mailing spreadsheets every week,

25  disbursements, I believe as the government referred to them in

1   their closing arguments.

2          How much you made this week.  Here's how much you

3   made.  Here's how much we made.  Here's how much the hospital

4   made.  Everyday, open, honest, regular-course-of-business

5   stuff.

6          Were these rural hospitals unhappy with these

7   reference lab programs?  Do you remember the e-mail from

8   Michele Jordan, who, by the way, was portrayed here just

9   moments ago by the government as some innocent deer in the

10  headlights, we're Mayberry, and we're all trusting here and we

11  were taken advantage of?

12         Do you remember that e-mail from that lawyer, Michele

13  Jordan -- a lawyer for Campbellton-Graceville Hospital --

14  embracing the reference lab program and writing in an e-mail,

15  CGH should be in the driver's seat as far as what these labs

16  are offering.  And we can probably negotiate a better rate.  We

17  have what they want, which is our CAH, critical access

18  designation.

19         These rural hospitals were more than happy to have

20  these lab outreach programs making money for their hospitals

21  and benefitting from all the other improvements to these

22  hospitals that that revenue brought in.

23         You know, for better or worse, health care in this

24  country is a for-profit business.  We heard that from a number

25  of witnesses.  We're not Canada or France or England, where

there is universal taxpayer-supported, government-subsidized
health care.

Were these independent labs and the Empower company
making more money than the hospitals?  Yes, they were.  They
were also taking the most business risk, spending the most
money to improve these hospitals, hiring personnel, investing
millions of dollars.  Why shouldn't they get the lion's share
of the proceeds?  You know, it's not as if these failing
hospitals were getting nothing.

Let's take another look at Exhibit 28L.  I'll tell
you who -- who wasn't happy with these perfectly legal lab
outreach programs.  I'll tell you who wasn't making money.  The
insurance companies.  They were spending money.

These reference lab programs and lab outreach
programs were costing them.  The billion-dollar for-profit
businesses of Anthem, Blue Cross Blue Shield, UnitedHealthcare,
Aetna were, in their minds, spending too much money.

Now, when I call them for-profit businesses, don't
get me wrong.  I'm not demonizing them.  They have a place in
the health care world.  There's nothing wrong with these
insurance companies trying to make as much money as they
possibly can.  So when they saw they were losing money, they
shut these programs down.

The reimbursement dried up, the hospitals went out of
business, and people lost their jobs.  Isn't that what really

1　happened here?

2　　　　Garrett Shohan of Aetna sent out letters to these

3　hospitals.  You will no longer be reimbursed for this type of

4　lab testing.  This is the guy who didn't believe any testing of

5　any kind was going on at these hospitals at all.  And as he sat

6　on the witness stand, he still held that belief.  He just saw

7　too much money going out.

8　　　　When the insurance companies saw all this billing

9　coming out of the rural hospitals, the insurance companies

10　either put them on pre-payment review or, in Anthem's case with

11　Putnam Hospital, unilaterally renegotiated the hospital's

12　contract, changed the fee schedule, and reduced the amount paid

13　for all lab testing by 75 percent.

14　　　　That's what James Balcom from Anthem told us.  Like

15　Garrett Shohan, Mr. Balcom never went to any of these

16　hospitals.  He never saw any labs, never saw the work that was

17　being done.  Mr. Balcom told us that the original contract did

18　not address pass-through billing.  So the Anthem insurance

19　company changed it, just like that.  Not so different from what

20　Garrett Shohan from Aetna told us regarding

21　Campbellton-Graceville Hospital.

22　　　　We had a conversation with them and suddenly the

23　hospital decided that they would no longer solicit urine

24　samples from any clinics.

25　　　　I can imagine the conversation that the insurance

company had with that hospital. And then the next day, That's

it. We're done. We're not soliciting samples anymore.

Did the insurance company contracts with these

hospitals in the past allow for a reference lab or lab outreach

programs testing samples for nonpatients of the hospital? Did

the contracts allow for this? They did.

As Kelly Tobin, one of the first witnesses who

testified from UnitedHealthcare told us -- I showed her a

United network bulletin that said reference lab programs

involving nonpatient specimen testing rules changed as of May

1st, 2020.

But, remember, the span of this indictment, the span

of this so-called criminal conduct runs from May of 2015

through February of 2018.

So the contract was changed to disallow this practice

more than two years later, because in the contracts before

these times, when these lab outreach programs were operating,

the insurance contracts -- company contracts did not prohibit

this practice.

Why would these insurance companies go to the trouble

of issuing alerts of what they were now allowing, or

renegotiate contracts with the hospitals, if the reference lab

program was illegal or prohibited before? And the truth is it

wasn't. And that's just common sense.

Remember when I told you if all of this sounds like a

1  contract dispute that's because it is?  How many contracts did

2  we look at?  How many clauses did we see where witnesses were

3  asked to interpret what particular contractual language meant?

4  Contracts were just put up again by the government.

5          Look, the insurance companies are entitled to change

6  their contracts going forward, to disallow certain things to

7  save money.  That's business.  Just don't come in here and say

8  what was happening before the contracts were changed was a

9  crime or fraud or money laundering, not when we saw real

10  doctors or other health care providers ordering real tests

11  which were performed, real results provided, and full

12  disclosure to the insurance company of what was happening.

13          The 141 code means reference lab.  Those were the

14  words of Michael Arrigo, summed up perfectly; simply, the 141

15  code means reference lab.

16          Laboratory outreach programs, commonplace, in the

17  words of Larry Small, Mark Thomas, Michael Arrigo.  We heard

18  that again and again, common, widely known, not unroutine, not

19  exotic.

20          Jorge's secret sauce, maybe not so secret.  This was

21  not some grand scheme that was hatched up in a back alley by

22  Jorge and Ricardo Perez and others.  It's been around for

23  years.  And it is -- exists to this day.

24          And isn't that exactly what Jorge Perez and the

25  Empower company were trying to accomplish?  Remember, one of

1   the witnesses -- I think it was Larry Small -- told us there

2   are a hundred different types of arrangements one can have with

3   a hospital.  And it can be called a lab outreach program, or

4   under arrangement, but it's all to the same effect.

5         Mr. Small told us, for example, splitting specimens,

6   aliquots -- I learned a new word -- as they were referred to,

7   having one part tested in an outside lab, another part tested

8   at the hospital, all billed through the hospital, completely

9   legal -- this wasn't just about, Ooh, the sample has to touch

10  the hospital.

11        These were legal programs that had been around for a

12  long time.  And these insurance companies, they got the lab

13  test billing wrong right from the start.  And they continue to

14  get it wrong to this day.

15        They are the ones that somehow, someway misread or

16  transformed a nonpatient code to an outpatient code.  This

17  practice of testing nonpatient samples at these hospitals was

18  transparent as billed.  Lies for money, as the government just

19  told you -- they couldn't have been more transparent if they

20  tried.

21        Was all this testing medically necessary?  Or was it

22  excessive?  Dr. Waller, the $750-an-hour expert, told us that

23  all this drug screening testing wasn't necessary, that in his

24  opinion 8 to 12 tests a year is enough, which lines up with

25  what the insurance companies are willing to pay for, 8 to 12

1    toxicology screening tests a year.

2           I'd never write three times a week or as needed, he

3    told us.  That's obviously excessive, or as I think as the

4    government just told you, too frequent.

5           Sounded good until we heard from a real patient, a

6    real former addict, Arthur Simmons, who told us testing helps

7    keep you sober.  He told us that he was drug tested three times

8    a week.  Remember that?  Told us that it was his job to line up

9    everybody three times a week at one sober-home facility, where

10   he stayed for two years.

11          So I put it to him directly, Do you think all that

12   testing was excessive?  He told us that it wasn't.

13          Now, if you do the math, three times a week, 52 weeks

14   a year, that's over 150 tests a year on one person.  These

15   insurance companies look at that and say, Oh, my God, this must

16   be fraud.  How could anybody possibly be tested?  How could we

17   possibly be expected to pay for 150 tests for one person for a

18   year?

19          And remember when he told us, Yeah, the insurance

20   company Florida Blue didn't pay for my tests?  Was that because

21   he was committing fraud, or because he had an excess of the

22   Dr. Waller and Florida Blue allowed 8 to 12 tests a year?

23          Remember what the other recovered addict told us,

24   Hunter Fuhr?  He told us that when he was living in a sober

25   home, he was tested every morning, seven days a week.

1    You know, it's easy for some expert in an ivory tower

2  to come in here who has never seen a patient, who's never

3  looked at patient records, to opine no one would need more than

4  8 to 12 tests a year.  Once a month, that's all that I would

5  do.  That's proper.

6    But in the real world, it sounds like three times a

7  week is standard.  The government experts don't see that.  They

8  don't recognize it.  Neither do the insurance companies.

9    There is no better evidence that this matter, from

10  the government's standpoint, is all about the money than the

11  40-plus charts prepared by -- Forensic Accountant Melissa Parks

12  showed us, showing us billed amounts, received amounts for each

13  hospital, broken down six ways from Sunday.

14    Did we really need to take the time to have this

15  shown to us in so many different ways?  You think this case

16  isn't about how much money the insurance companies paid?

17  That's all it's about.

18    You heard from several government cooperating

19  witnesses, or informants, who have pled guilty to certain

20  crimes both now and in the past.

21    What's their testimony worth?  Are they credible

22  witnesses?  They are admitted liars, cheats, thieves,

23  alcoholics, drug addicts, convicted felons all, and have lived

24  their lives that way.

25    Remember Belinda Fender, Dr. Belinda Fender, the

1  Putnam Hospital pathologist?  She told us, I never knew if

2  David Byrns was telling the truth.

3  　　　　John Skeffington, the land swindler, someone you

4  would trust?  Are any of them?  Heroin addict, Kyle Marcotte?

5  　　　　And, believe me, I feel for these people.  But this

6  is not a matter of feeling bad for someone.  This is a matter

7  of trusting them.  These witnesses only care about one thing.

8  Am I pleasing the government so I can get my deal and get out

9  from under?

10  　　　　Would you trust any of them outside of this courtroom

11  with a matter of some importance?  Would you, say, buy a car

12  from the likes of a John Skeffington or a David Byrns or a Kyle

13  Marcotte?  Would you trust what they had to say?

14  　　　　Would you trust them if they said, You know, it's a

15  great car.  I service it myself.  Runs like a top.  Take my

16  word for it?

17  　　　　Because that would be a matter of reasonable

18  importance.  You might lose 10- or $15,000.  It's a matter of

19  reasonable importance.

20  　　　　This is a matter of great importance.  Life-altering

21  for Ricardo Perez, determining his guilt or innocence.  These

22  government informants are bought and paid for, paid for with

23  something far more valuable than money.  They're paid with the

24  promise of their freedom.

25  　　　　But for whatever their testimony is worth, what did

 1   they tell you about Ricardo Perez?  He had a hand in the

 2   billing.  He sent out EOBs, or explanations of benefits.  He

 3   asked for access to insurance web portals to check on billing.

 4   He sent out spreadsheets or disbursements.

 5          One time there was some back-and-forth, some e-mails

 6   between Ricardo Perez and David Byrns.  David Byrns was at a --

 7   not even at Putnam Hospital, but wanted to know what to charge,

 8   what certain billing codes meant.  And he never really did get

 9   a straight answer from Ricardo Perez.

10          But it appears Ricardo Perez was trying to be

11   helpful.  Send me what you've got and I'll tell you what we

12   would charge.  That was about it.

13          Was there any government informant that pointed his

14   finger at Ricardo Perez to say he did this criminal thing or

15   that illegal thing or that fraudulent thing?  Ah, but he did

16   the billing.  This is what the government wants you to believe.

17   He did the billing.  He was in charge of the billing.  Was he?

18          Or was it done by the witness we heard from, Jose

19   Salazar and his company JVS Billing?  Jorge Salazar told us

20   that he did the coding.  Yesenia Hidalgo, Ricardo Perez's

21   assistant, also told us that Jose Salazar did the billing and,

22   yes, he worked with Ricardo Perez.

23          But did Ricardo Perez do it all, as the government

24   would have you believe?  If that were the case, why would the

25   Empower company need Jose Salazar?  Why would they need his

 1   company JVS Billing, or the Indian company Emed for that

 2   matter?

 3          An exhibit in this case is the service agreement of

 4   Jose Salazar, which states that the coding was Salazar's

 5   responsibility.  If it was all Ricardo Perez, none of those

 6   companies would have been needed or necessary.

 7          Now, having said that, did Ricardo Perez have some

 8   knowledge of the billing process?  Of course he did.  The term

 9   I believe Mr. Duva used on his redirect examination of Yesenia

10   Hidalgo was billing is sort of like making a sausage.  And I

11   agree with that.  It's -- a lot goes into the billing of a

12   claim.

13          In this instance, a lot of steps and a lot of hands.

14   Billing and coding is a complicated process.  Many witnesses

15   told us that, including Garrett Shohan of Aetna, who identified

16   two codes being used that he believed to be incorrect.  And he

17   sent an e-mail to Ricardo Perez about it.

18          And do you remember Ricardo Perez's response?  Oh,

19   our mistake.  We'll take care of it.  Transparent, open,

20   honest.

21          You heard Mr. Salazar tell us how the coding

22   regulations changed in 2015, and his pretty strong opinion

23   about what a mess it was.  Mr. Salazar told us that he

24   billed -- what he billed for and how some of the test results

25   for urine drug screens could be billed as qualitative,

1   quantitative, or a combination of both, because of the new

2   coding regulations.  It sounds like a mess.

3          And listening to that testimony, I suggest there's a

4   good chance that coding and, hence, billing was done

5   incorrectly.  But with criminal intent?  I mean, the

6   government, when they stood up just a little while ago, said

7   the very words "Jose Salazar made mistakes."

8          So mistakes were made.  Coding is complicated.  Is

9   that -- is that criminal, that some coding mistakes were made?

10  And in terms of exactly who was doing what, did it sound to

11  like you Ricardo Perez was looking over Jose Salazar's shoulder

12  every minute of the day, telling him what to do?  Or did

13  Mr. Salazar sound pretty confident and knowledgeable about the

14  billing codes he was using and what he was doing, mistakenly or

15  not?

16         Did you hear Jose Salazar say even once, Ricardo

17  Perez told me what to do, he told me how to bill, he told me

18  what codes to use, told me to bill the most expensive codes so

19  we could make the most money?  Did you hear any of that?

20         Ricardo Perez worked in Miami in the office, as Jorge

21  Aguilar told us, doing the day-to-day.  He'd go to a hospital

22  occasionally, shake someone's hand.  But did any witness

23  remember him much more than that?

24         I told you during my opening statement that you would

25  hear from a forensic accountant that I would call regarding how

1   much money Ricardo Perez made from 2015 to 2018, the span of
2   this indictment.

3          But I didn't call that witness, because there is no
4   need to put up even one more summary chart or accountant in
5   front of you talking about money, whether a lot or a little.

6          And this came to me when I think we got to Government
7   money chart 48 or so.  As I sat listening to this mind-numbing
8   testimony of these government accountants, showing you money
9   breakdowns, I realized that that's what they want this case to
10  be about.  But that's not what this case is about.  It's not
11  about how much or how little money someone made.

12         It makes no difference whether someone made $100,000
13  a year or a million or 10 million or 100 million for that
14  matter.  Instead, from my perspective, speaking on behalf of
15  Ricardo Perez, it's about whether Ricardo Perez engaged in
16  health care fraud and money laundering.

17         You know, the prosecutors here -- these gentlemen are
18  referred to as "the government."  The government calls such and
19  such a witness.  The government rests.

20         The government gets to respond to what I have said.
21  I don't get a chance to get up again and say anything.  This is
22  it for me.  They get the last word.

23         But with the privilege these gentlemen get of being
24  able to call themselves the government comes a burden, and it's
25  a heavy one.  It's called proof beyond a reasonable doubt.

1    Has it been proven to you that Ricardo Perez

2   committed health care fraud and money laundering?  Or do you,

3   instead, have many doubts about whether he, or anyone else for

4   that matter, did anything illegal?

5    In terms of money laundering, did you hear any

6   evidence that Ricardo Perez sent one wire transfer or money or

7   wrote a check in the amounts the government is talking about?

8    This matter is to be judged by you on the evidence or

9   on the lack of it, on credible, believable witnesses, or the

10  lack of them.

11    Ricardo Perez is not guilty of these charges.  It's

12  not even a close call.  And after you deliberate, I'm confident

13  you'll come back into this courtroom and tell him so.

14    Thank you so much for listening.

15    THE COURT:  Thank you, Mr. Landes.

16    Mr. Rafferty?

17    If y'all want to stand up for a second while

18  Mr. Rafferty is getting organized.

19    All right.  Everybody have a seat.

20    Mr. Rafferty, I'll just let you know that, depending

21  on timing and so forth, I may -- I may call for a break

22  that bisects your presentation, if that's all right.

23    MR. RAFFERTY:  I'll do my best to try and complete it

24  before the lunch hour, Your Honor.

25    THE COURT:  All right.  Well, then I'll let you --

1   let you go now.  You may proceed.

2              MR. RAFFERTY:  Thank you.

3              May it please the Court, Counsel, and ladies and

4   gentlemen of the jury?

5              For the last time, my name is Brian Rafferty.  And I

6   represent Aaron Durall.

7              And as I think about this case, I think about my

8   Father's Day and the time I spent with my son, elementary

9   school kid, voracious reader, unlike his father, a student of

10  history.

11             And he came to me and he told me about something he

12  read, the Salem witch trials.  He says, Dad, you're not going

13  to believe what I just read.  And as a father I just listened.

14             He said, Dad, there was a town in this world called

15  Salem in Massachusetts during the Colonial times who believed

16  they were inundated with witches.  And they created trials and

17  tests to determine if somebody was a witch.

18             He said, Dad, they tied and bound people, took a boat

19  into the middle of a lake and threw those folks overboard.  And

20  if they sank, they were innocent.  If they floated, they were a

21  witch.

22             My dad -- my son said to me, Dad, how could folks

23  miss something so obvious?  If you throw somebody overboard

24  who's bound and tied, they're not sinking because they're not a

25  witch or they are a witch.  They're sinking because they

 1    drowned.

 2              I thought about that when I was talking to my son, as

 3    I think about this case, because there's so many lessons we

 4    take from history.  And from the Salem witch trials we take

 5    many.

 6              One of those lessons is the way in which fear and

 7    ignorance and disinformation can lead a community of people to

 8    accuse others of crimes they never committed.

 9              It was years later that folks actually turned around

10    and apologized to the families of those, quote, witches.  And,

11    by the way, one other aspect of the Salem witch trials is this:

12    the only folks who survived who were accused of witches were

13    those who were accomplices, who would confess and who would

14    identify who they were working with.

15              So why am I thinking about the Salem witch trials as

16    I think about this?  Think about the evidence in this case.

17    Think about what we've heard.  It's a case that started with

18    fear.  Fear of these insurance companies.

19              Every one of them, fearful of one thing, getting bled

20    dry by this urine testing.  They looked at the contracts and

21    realized the contracts in most cases didn't even address what

22    happened in this case.

23              So where do we go to next?  We go to the billing

24    data.  They try and find a way -- anything to try and -- to

25    stop the bleeding.  And where do we end up?  With a 22 code, a

1  22 code that every one of these insurance companies ultimately

2  adopts and assumes that each of these defendants put on all

3  these claims, ignorant of the fact that there is no box on a

4  UB-04 form to even put the 22 code on there.

5       Every single insurance company assumed that people

6  from all over the United States were flying to Dahlonega,

7  Georgia or Graceville, Florida, or Williston, Florida, to pee

8  in a cup.  That's what they all believed.  That was their

9  smoking gun.  But it didn't end there.  That's where the

10  disinformation campaign begins.

11       You saw all this evidence, ladies and gentlemen.  You

12  saw that Blue Cross Blue Shield is the first company that

13  issues a company-wide alert about the 22 code.  And then they

14  share it with every insurance company, telling them, We were

15  defrauded because each of these defendants put a 22 code on

16  these claims, and, lo and behold, every insurance company looks

17  at their own claims data.  And what do they find?  The same

18  thing.  A 22 code.

19       And where does it go from there?  It goes to these

20  prosecutors.  You heard witness after witness talking about how

21  these prosecutors asked them:  Did you go to the hospital?

22       All these beneficiaries who came in here, Hunter Fuhr

23  and Steven Dompe and -- every one of them, what did they say

24  when I asked them questions on cross?

25       Yeah.  These prosecutors, they seemed really

1 interested in whether I ever went to Campbellton-Graceville

2 Hospital or Regional General Hospital, or Dahlonega, Georgia

3 and Chestatee Hospital.

4       Each one of them were asked those questions.  You

5 heard the same thing from some of the very cooperators we've

6 heard about.

7       Mr. Marcotte, he testified that in the midst of his

8 heroin relapse he was asked by these prosecutors:  Did your

9 Beaches Recovery patients actually go to CGH or to RGH or to

10 Chestatee?

11       Every single witness, ladies and gentlemen, was asked

12 the same thing.  But even worse, what ends up happening from

13 this 22 code is the most obvious evidence in this case is never

14 even collected.

15       We're talking about -- at bottom, what the government

16 has said -- did the tests happen at these hospitals or didn't

17 they?

18       Now, it doesn't take a rocket scientist to figure out

19 where is the best evidence of where the -- where the testing

20 took place?  I don't know, maybe at the hospitals.  Maybe the

21 LIS systems that I introduced here.  Maybe the millions of test

22 results that were in those LIS systems that these government

23 prosecutors never collected.

24       And worse than that, when it comes down to what tests

25 were actually done at Chestatee Hospital, the salad dressing I

1  think is what Mr. Hayes called it, the screens -- that's all

2  that Mr. Durall had anything to do with at Chestatee.

3        That's what happens, ladies and gentlemen, when

4  flawed investigations -- that's why Mr. Durall is here.  It

5  starts with this 22 code.  It ends with this 22 code.  That's

6  why we are all here.

7        And unlike the accused in the Salem witch trials, one

8  of the benefits that we learned from that history is that folks

9  like Mr. Durall and these other defendants have the benefit of

10 lawyers, who have the right to be represented by counsel, to

11 challenge the evidence.

12       But more important than that, ladies and gentlemen,

13 what do they have?  They have folks like you.  People with

14 strength and with courage, who are going to listen to the

15 evidence and listen to the facts and follow the law, jurors who

16 are going to beware of what fear and ignorance and

17 disinformation can do to each other, to people in our society,

18 and calls upon jurors like you to have the courage to stand up

19 to the truth.

20       And the truth in this case that has been borne out is

21 that Mr. Durall never lied to anyone.  He didn't cheat.  He

22 didn't steal.  He didn't conceal anything.  He didn't do any of

23 the things the government has accused him of.

24       He didn't agree with anyone to commit a crime.  He

25 never submitted a false claim.  He was not a part of any scheme

1  to defraud anyone.

2       There are no lies by Mr. Durall.  He's an innocent

3  man, and has been from the very beginning of this case.  And I

4  know that you're going to use your reason and your common sense

5  to see that, to see the truth.

6       Now, you've heard from all of these insurance

7  companies -- and I'm not going to repeat everything that

8  everybody said.  But I think one thing that's clear is that

9  these contracts that were in place were all very old.  And the

10  insurance companies started seeing tens of millions of dollars

11  bleeding out the door.  And what do they do?  They turn to

12  those contracts, as I said.

13       You heard witness after witness come in here.  They

14  got up on the witness stand and they looked at the contracts,

15  desperate to find a way to stop the bleeding.

16       Now, I'm not going to go through all of the e-mails.

17  But I want to remind you of Durall Exhibit 84, that speaks to

18  that very point.  This has to do with Chestatee Hospital and

19  Blue Cross Blue Shield.

20       You see at the bottom, Ron Lawrence from Blue Cross

21  Blue Shield is asking specifically about the particular codes

22  being billed and that each screening test is $2700.  That's

23  what he's worried about.  He's not worried about fraud.  He's

24  not worried about the patient's wellbeing or care.  He's not

25  concerned about any of those things.

1      What he's concerned about is right here, We need to

2  find out why we are paying this much money.  That's all these

3  insurance companies ever cared about.  They don't want to pay

4  this much money.  They don't want to pay $2700 a test, or

5  whatever it ultimately ends up getting paid out at Chestatee.

6      But it goes on.  The e-mail goes on.  And somebody

7  suggests, Well, maybe we can put a stop to this through the

8  contract.  Maybe I'm wrong.  Wouldn't this practice classify as

9  pass-through billing?

10      Sadly for Blue Cross Blue Shield, the answer comes

11  from Mr. Lawrence again.  This would not be pass-through

12  billing in this case.  The hospital lab is actually conducting

13  the lab tests and billing us directly.

14      The insurance companies are trying to figure out a

15  way to put them on a lab fee schedule, which we heard about

16  from the government's own expert.  This isn't about whether the

17  testing was medically necessary or not, or whether --

18  whether -- anything to do with pass-through billing.

19      This is about insurance companies who don't want to

20  pay this much money.  As Mr. Landes said, they want to pay 8 to

21  12 times a year at most.  The problem is, you've got folks that

22  are in these treatment centers that need it more often who have

23  insurance.  And when you have old contracts like the contracts

24  we've heard about in this case, these insurance companies are

25  stuck.

1       And this is where the government first buys into

2   these insurance companies and their theories.  You see, what

3   ends up happening is -- and what you heard so often throughout

4   the course of this trial is you can't possibly make this much

5   for urine testing.  It just doesn't make any sense.  There must

6   be cheaper tests.

7       These defendants are not accused of making sense or

8   not making sense.  They're accused of crimes.  They're accused

9   of crimes that have to do with false statements.  There aren't

10  any false statements in these claims.  And it doesn't matter if

11  it doesn't make any sense, to the government or anybody else.

12  And it doesn't matter if the insurance companies want to pay

13  less money.  That's not a crime.

14       Think of it this way.  How many different things do

15  you hear about every day do you not understand why people are

16  getting so much money?  You hear about actors getting paid -- I

17  read recently James Bond got paid like $100 million to make one

18  of those movies.  I read the sport pages every day about

19  athletes getting paid $50 million for this or $100 million for

20  that.

21       Do I think that's right?  Maybe not.  Maybe they

22  shouldn't get paid that much.  Maybe actors shouldn't get paid

23  that much.  Maybe teachers should get paid more.  Maybe nurses

24  should get paid more.  But I don't get to decide that.

25       And the fact that you make more money than perhaps

1   you should doesn't make it a crime, and that goes for lab

2   testing.  It is not a crime to make a lot of tests -- a lot of

3   money testing urine.  I hate to break it to you.  I hate to

4   break it to the government.  I hate to break it to those

5   insurance companies.  It is not a crime.  The crime is whether

6   somebody lied.  And there are no lies in this case.  And

7   there's certainly no lies by Mr. Durall.

8           And this is where ignorance starts.  Because the

9   contracts provide no course of relief, what do we see?  We see

10  those insurance companies desperately scouring these -- these

11  billing codes and columns and data and rows and rows of stuff.

12  And they settle upon one code.  And we've heard about it often,

13  the 22 code.

14          I think it's undisputed by anyone in this courtroom,

15  these defendants never did that.  That never happened.  But

16  what's also undisputed is the insurance companies, for sure,

17  thought we did.  And let's go to the first exhibit we heard

18  about.  That's the fraud alert.

19          In writing -- don't take my word for it.  This is

20  RGH.  This is Durall Exhibit 10E.  You see right at the bottom

21  they're billing with a place of service 22, outpatient hospital

22  code.  It goes on to the next page.

23          The billing was changed to outpatient hospital and

24  billed to Florida Blue.  I know it's hard to read, but I know

25  you've all seen this before.  That's what these insurance

1  companies all said.

2      This went to every insurance company.  This

3  information was available to all of the insurers.  They all

4  testified about NHCAA and that they got this alert.

5      Every single insurance company assumed the same

6  thing.  Every insurance company produced data in this case with

7  a 22 code on it that they said initially that we put on there.

8  And remember this -- we heard about Florida Blue showing up.

9  They showed up at CGH right at the beginning of this case, in

10  August of 2016.

11      They come to the hospital for the specific purpose of

12  talking about the 22 code.  And they tell -- you heard from

13  Michele Jordan, and you've seen the e-mails, that they told the

14  people at CGH that you were billing as if these patients were

15  physically at the hospital, and that's fraud.

16      And so they all leave that meeting and they have

17  their little caucus.  And what does Julie Gallagher do, who's

18  the lawyer that was sitting here?  You heard so much about her.

19      She sends an e-mail to Edith Mears and to others and

20  says, I want to see these claims data.  And I want to see this

21  22 code.  I don't understand.  Explain this to me.

22      This is in August of 2016.  And what happens?  She

23  finds out that we never did that.  And you saw Exhibit --

24  Durall Exhibit 11U, sent that same week, Thursday, August 25th,

25  2016, at 10:45 a.m.

1        Let me see if I can zoom that in.  There it is.

2        You see that?  This is just a few days after the

3   meeting.  And what does she say?  What does she say in her

4   e-mail to Florida Blue?  And why is this significant?  I

5   highlighted the parts that I think are important.

6        You said claims were billed with a 22 code that

7   reflected the patient was at the hospital.  Our billing company

8   says all claims were made on the 141 form, which indicates

9   nonpatient and not at the hospital.  Can you send me the sample

10  of claims that shows what you said occurred?

11       What is she doing there?  She's telling them right at

12  the beginning of this investigation, Hey, guys, I think you got

13  this wrong.  We never did that.  We didn't bill a 22 code.

14       But what ends up happening?  What does Mr. Goldner do

15  with that information?  I'll bring you back to 10E.  This alert

16  was issued after that meeting in September of 2016.

17       Did they listen?  This is the greatest tragedy in

18  this case.  Florida Blue was told, We never did that.  And the

19  way they responded was to ignore it and to issue this alert.

20  And why?

21       I'm not going to attribute malicious intent.  I'm

22  going to say it comes to one thing, the bottom line, because

23  they were bleeding money.  And this was a way out.  They had

24  their way out.  They had their smoking gun.  That's why they

25  did that.

 1          And the problem with the 22 code that we've heard

 2     already, ladies and gentlemen, is that these are experienced

 3     insurance investigators, data analysts and others, at these

 4     companies, and yet they didn't realize that all they had to do

 5     was look at the UB-04 form that was submitted by each one of

 6     these defendants in this case, and they would see that that's

 7     not even possible.  That's not possible.  We couldn't possibly

 8     do that.

 9          And the reason why the UB-04 is important, ladies and

10     gentlemen, is because each of these defendants -- they're

11     charged with health care fraud and wire fraud and money

12     laundering, but it all comes back to one thing:  something has

13     to be false on those UB-04s.  There has to be a false

14     statement.  And there has to be a false statement attributable

15     to Mr. Durall there.  There isn't any.  There isn't any false

16     statements.

17          The evidence in this case has demonstrated that

18     Mr. Durall's samples were sent to these hospitals and they were

19     tested.  That's what they said at CGH.  That's what they said

20     at RGH.  And that's what they said at Chestatee.  That's what

21     happened in this case.

22          There isn't anything false.  And there certainly

23     isn't anything false that can be attributed to Mr. Durall.  He

24     never submitted any of these claims.

25          But you also heard from Mr. Jose Salazar -- you heard

1   about -- twice already.  What did he say?  Well, he said a lot

2   of the things that Mr. Landes and Mr. Bell said.  But what did

3   he also say?  He had nothing to do with Mr. Durall.

4        Mr. Durall didn't tell him what to bill.  He never

5   told him what codes to pick.  In fact, what he said was, I

6   picked the codes.  I've been doing this for years.  This is

7   what I do for a living.  I live, breathe, and sleep codes.  I

8   get lab tests.  I pick the codes.  This is what I do.

9        You saw his personality.  You saw him up there

10   yourselves.  He believed that what he was doing is right.  It

11   was his job to do that.

12        And I showed him test results.  I showed him test

13   results for Dr. De Carvalho.  I showed him test results for

14   Dr. Wang.  I showed him test results for Hunter Fuhr.  And what

15   did those results say?

16        This is Durall Exhibit 140.  It just came in last

17   week.  You'll remember.  I showed this to him.

18        All of these patient test results I showed you, they

19   said right at the top, This is a screen.  This is at CGH

20   hospital.  And this is just a screen.

21        What did Mr. Salazar say?  Well, just because it says

22   it's a screen, it can be something else.

23        And he was very compelling.  I'm not here to tell you

24   that he's wrong.  I have no idea if he's right or wrong.  He

25   talked about the confusion and the codes and the CPT codes

1  changed, that there could be quantitative codes or qualitative

2  codes or codes that mean both.

3        Can I say that he's wrong?  No.

4        Can I say the government's wrong?  Yes, I can.

5        Because he looked at this himself.  He is the trained

6  person.  And he said, based on what he saw -- he mentioned 6

7  a.m. is heroin.  You remember that.  He talked about Tramadol.

8  He talked about Zolpidem.

9        He insisted as he looked at these test results that

10  these are confirmations and screens, which the codes that were

11  billed allowed for.  That's not Mr. Durall speaking.  That's

12  not me speaking.  That's Jose Salazar speaking.

13        And here's the other thing that he said.  You know

14  who interviewed him prior to trial?  The government did.  They

15  spoke to him.  They knew that this was his job.  They knew that

16  this is what he did.  But it is up to me to call him as a

17  witness, to show him these test results, to get him to explain

18  to you exactly what happened.  Remember that as you think about

19  what reasonable doubt is in this case.  There's many.

20        And cementing -- cementing the doubt in my mind about

21  Mr. Durall in this case is the government's own evidence as it

22  relates to these charts.  We saw all these charts, multiple

23  charts about how many codes were billed and what they were

24  billed and what's definitive and what's not.

25        And their own expert came up and looked at the

1    results from CGH and RGH and they said, These don't make any

2    sense.  98 percent of these test results, these are

3    confirmations, that couldn't possibly happen, something has

4    been turned on its head.

5          And then he turns to -- to Chestatee, which the

6    government now just glosses over.  But you saw the billing data

7    from the government.  Not from me.

8          The government's own evidence shows that as it

9    relates to Chestatee, which is the one hospital that Mr. Durall

10   actually bought and had control over, 92 percent of what was

11   billed are just screens.

12         And you heard testimony from witness after witness

13   that those tests were done at Chestatee.  You heard it from

14   Lisa Zini, the government's own witness.  They tested every

15   sample at that hospital, and they just did screens.

16         Even Dr. Waller said, in his own experience, from

17   what he does, 8 percent or so of confirmations is about right.

18   It is right, because that's what really happened.

19         And it also belies the government's theory in this

20   way.  The government and Mr. Hayes got up here and told you

21   that this is about billing for the most expensive test possible

22   at these hospitals, right?  So the one hospital that Mr. Durall

23   buys, what does he do?  He bills the cheaper test.  He doesn't

24   bill the most expensive test.  Not at all.  That's reasonable

25   doubt, ladies and gentlemen.  Those numbers, the government's

 1   own numbers demonstrate that.

 2           It is the most compelling evidence in this case,

 3   respectfully, Your -- ladies and gentlemen, that Mr. Durall

 4   didn't do anything wrong here.  He purchased that hospital.  He

 5   billed the same way he thought it was being billed at CGH and

 6   RGH.  He wasn't even a part of the billing at those other

 7   hospitals, and didn't even know they were doing that until the

 8   CGH bankruptcy -- when he settled that case, as you heard from

 9   Ms. Smith.

10           It's the most compelling evidence in this case.  And

11   it also proves that to the extent that Mr. Salazar billed

12   things wrong at CGH and RGH, Mr. Durall had nothing to do with

13   it.

14           I'm not saying he was wrong.  But look at what

15   Mr. Durall did when he bought his own hospital at Chestatee,

16   look at the way he billed through Ms. Zaffuto and Medivance.

17   He did it the right way.  He had no criminal intent.  He never

18   did.

19           It shows that the UB-04 form submitted at Chestatee

20   Hospital were true, that there's nothing false in any of these

21   claims, and, therefore, Mr. Durall is not guilty of -- of

22   everything in this indictment, ladies and gentlemen.

23           But the disinformation campaign began after this 22

24   code stuff came out from these insurance companies.  And you

25   saw it in a variety of different ways.  You need to look no

1  further than the way in which the government conducted its

2  investigation.  Okay?

3          Again, Mr. Hayes and the government, throughout this

4  trial, has talked about these tests were not being done at the

5  hospitals.  They stated that in a variety of different ways

6  throughout this trial.  And the question continues to come back

7  to:  Did the hospital actually perform these tests?  And we

8  know the way these tests are now performed.

9          They're put in these instruments.  They're connected

10  to computers which collect all of the tests in a computer that

11  sits there in these hospitals.

12          We heard that at CGH and RGH and Chestatee those

13  computers were there, yet they weren't collected.  Not one.

14  They collected the CGH server.  It sat on an agent's desk for

15  about eight months.  And then they just gave it back.

16          The government never bothered to even look into it,

17  and yet the case is supposed to be about whether tests were or

18  were not done at these hospitals.

19          And so the question is why.  That's the one question

20  you're probably wondering.  Why not take the LIS systems?  Why

21  not see what tests were done there?

22          I'll give you an answer, ladies and gentlemen.

23  Here's why.  The 22 code.  Because think of it this way, if, in

24  fact, the 22 code was put on every one of these claims, as

25  every insurer told these prosecutors -- if that happened, would

1   it really matter what test results existed at the hospital?

2          Because, remember, a 22 code says that the patient

3   physically came from Hawaii, to use Mr. Duva's example, jumped

4   on a plane, flew to Graceville to pee in a cup.  That never

5   happened.  Nobody ever said it did.  And if you think that's

6   what happened, you don't need the test results.  You don't need

7   to get a server.  You don't need to look at any test results

8   from any hospital, because you think that these claims are all

9   simply fraud because there's a 22 code on there.

10          That's why those servers were never searched.  That's

11  why they never collected those computers.  That's why --

12  notwithstanding the skilled FBI agents that could have looked

13  at these computers and looked at these LIS systems and found

14  all these test results, that's why they never looked at any of

15  them, because it didn't matter.  And it continued, ladies and

16  gentlemen.

17          So you see, as you listened to all the witnesses that

18  testified in this case, witness after witness testified about

19  specific questions that were asked either in the grand jury or

20  in interviews by these government agents and prosecutors.

21          They were all asked the same thing.  And it went on

22  for years.  I'm not talking 2016.  Not just 2017.  Not just

23  2018.  Not just 2019.  But into 2020.

24          Those four beneficiaries that testified, Ms. Russell

25  and Mr. Dompe and Arthur Simmons and Hunter Fuhr, they were all

1  interviewed in early 2020, shortly before this case is

2  indicted.  And they're all asked the same thing.  And they

3  can't explain why -- when I asked them -- they're all asked:

4  Did you ever go to Campbellton-Graceville Hospital?  Did you

5  ever go to Regional General Hospital?  Did you ever go to

6  Chestatee Hospital?

7          Why are they being asked that?  They didn't go to

8  Quest Labs.  They didn't go to Reliance Labs.  They didn't go

9  to any labs for their urine testing.  But why are they being

10  specifically asked about whether they went to those three

11  hospitals?

12          The only answer, ladies and gentlemen, is because the

13  government believed as late as 2020 that we put a 22 code on

14  these claims.  That's what drove this case.  That's part of the

15  disinformation campaign that I talked about when it comes to

16  the Salem witch trials.  It never actually happened.  But the

17  government believed it.

18          Gary Ayres -- you heard the government mention Gary

19  Ayres.  They flew all the way out to New Mexico to talk to him.

20  Mr. Duva and others were sitting out there.  And what did

21  they -- what did he say they asked him?  He was told that there

22  was a problem at CGH because all of the claims were billed as

23  if the patients were physically at the hospital.

24          What does that sound like?  That's the 22 code.

25  That's why they were asking him that.

1    Michele Jordan, I mean, you saw her own text

2  messages.  You don't have to take my word for it.  I mean, her

3  contemporaneous text message from this time is in evidence.

4  You can see it.  You can read them.

5    What does she say?  They tried to tell us that the

6  patients were all physically at the hospital.  We know that

7  wasn't the case.  They told us our claims were false.

8    Look at her text messages to Mr. Durall.  That's what

9  she says.  That's from -- that's from right when this all

10 happened.  That never actually happened.

11   And as I said, even Kyle Marcotte, Mr. Marcotte, the

12 heroin addict who is in relapse when he's interviewed by the

13 government, who can't show up for one of these interviews

14 because he's in the hospital because he had an overdose -- even

15 he tells you -- when I asked him questions, Did they ask you

16 about whether there was a problem with the Beaches Recovery

17 patients never going to CGH or RGH or Chestatee, he said, Yes.

18   This is in 2019.  This is right around the same time

19 he pleads guilty.  He thinks because they told him that the

20 problem is that the Beaches Recovery patients never went there.

21 And why does he think that?  Because of the 22 code.

22   Now, the government wants you to credit

23 Mr. Marcotte's testimony in a lot of different ways because he

24 was paid a lot of money.  They talk -- all this money, about

25 how much Mr. Marcotte got paid.

 1        But the fact of the matter is what he also said is he

 2   had a real business.  It was a real business with a CFO and a

 3   CEO.  And he had an ADP contract.  And he had contracts with

 4   various other companies.

 5        Now, the government talks a lot about backdating of

 6   contracts.  And they want you to completely disregard Jaquanda

 7   Smith, simply because she worked for Mr. Durall.  That was

 8   years ago.

 9        She got up on that witness stand, just like

10   Mr. Marcotte, and swore to tell the truth, just like he did,

11   and told you a -- told you exactly what happened.  And she had

12   documents and other things to back up what she said occurred.

13   And everything she said is supported by the e-mails and the

14   documents.

15        Why would she come up here and just say that?  She

16   has nothing to gain.  She doesn't even work with Mr. Durall.

17   She isn't even involved with him any longer.  Why would she do

18   that?  There is no reason.

19        And it happens, ladies and gentlemen.  We've heard

20   throughout this case that mistakes happen.  She admitted she

21   made a mistake.  But the other things that she said that make

22   her credible, I submit to you, has to do with that whole

23   bankruptcy.  Everything that she said is bookended by dates and

24   times and documents.

25        She recalls exactly why she sent Mr. Marcotte down

1  there, because they found out about that billing data.  For the

2  first time Mr. Durall learns that they're billing for

3  confirmations which he knew they hadn't done.  He knew that he

4  hadn't done that.

5           It was his impression all along that it was screens.

6  And he had a reason to think that, because look at how much

7  money he was making on the screens at Chestatee.  He didn't

8  know that they were billing for confirmations.  And when he

9  found out, he told Jay, as she told you, We have to close this

10 business and we've got to tell Kyle and we're shutting this

11 down, because it's over.  I'm finished.

12          And that's exactly what happened.  And that's what

13 Jaquanda Smith said.  And you can't just credit Mr. Marcotte

14 because Mr. Hayes says so.

15          Mr. Marcotte couldn't remember many things, and

16 refused to admit that perhaps he was less than honest.

17 Dr. De Carvalho said he was less than honest.  I'm not -- I'm

18 not criticizing Mr. Marcotte.  He was under the same

19 misimpression that every other witness in this case has been

20 put under, the disinformation campaign about this 22 code.

21          He was told by these government prosecutors before he

22 ever pled guilty that the problem was his Beaches Recovery

23 patients never came to the hospital.

24          And the fact of the matter is it doesn't matter how

25 much money Mr. Marcotte was paid.  None of that matters because

 1  Mr. Marcotte can't really speak to the one issue that the

 2  government itself has admitted throughout this case is what

 3  matters, and that is whether the tests were done at the

 4  hospitals.

 5          Mr. Marcotte didn't even know about CGH or RGH, as

 6  Mr. Hayes said; therefore, he has no information about what

 7  tests were actually performed at that hospital.

 8          And when it comes to Chestatee, he was in the midst

 9  of a relapse, and only went up there a handful of times to look

10  at a toxicology center that they were trying to open up, or a

11  rehab center, within that hospital.  He can't speak to what the

12  tests -- what tests were run.  He certainly can't speak to it

13  more than what the folks who worked at CGH and RGH and

14  Chestatee can.

15          The lab techs from those hospitals, each of whom

16  testified that of all the samples, the Reliance Labs samples

17  were the ones that were tested at those hospitals.  And at

18  Chestatee, Lisa Zini testified that every test, every sample

19  was run, every one of them.

20          The way in which this investigation went demonstrates

21  how sometimes we don't learn from history, that in many ways

22  what happened in this case is the same thing that happened in

23  those Salem witch trials.

24          People are driven by fear, ignorance, and then

25  disinformation drives this case.  This whole investigation was

1 driven by false information about what these defendants did,

2 what codes were put on these claims.  And that's the reason

3 why -- the various steps the government took.  And that's

4 enough, ladies and gentlemen, for you to find Mr. Durall not

5 guilty.

6        But as Mr. Bell has already talked to you about,

7 there's even more.  Because, again, we don't have a burden to

8 process anything.  We don't have to produce any evidence, but

9 we put Daniel Simao up there, who you heard from, you heard

10 from just last week.

11        And he talked to you about the work that he did to

12 get those test results in -- you know, available for us to show

13 you.  And there were literally millions of test results on

14 those LIS systems.

15        He went through all of these different steps.  And

16 make no mistake, the steps he took, those are complicated

17 steps.  It's hard to do.  I couldn't repeat it.  I'm not a

18 computer guy.

19        But I'll tell you who has the ability to do exactly

20 what Daniel did.  That's the government.  That's the FBI.  The

21 CART team at the FBI is the most sophisticated computer

22 forensic team in the world, and yet they didn't bother.  They

23 had the server from CGH sitting on someone's desk who does this

24 for a living.  And what did he do?  Nothing.  Absolutely

25 nothing.

1        But Mr. Simao did do the work.  He explained it to

2    you.  He explained it to you in some detail.  And he showed

3    you -- he showed you what he found.

4        And for me, at least -- and I can't speak for you,

5    ladies and gentlemen.  But the numbers on Durall 150 are

6    astounding.  This is what's on the system.  This is what the

7    government ignores.  At CGH, over a million tests.  At RGH,

8    millions of tests.  And at Chestatee, millions and millions of

9    tests.

10        The number of tests that were done at these hospitals

11    is staggering.  And what's even more staggering, ladies and

12    gentlemen, is that the government didn't bother.

13        And, again, this takes me back to the Salem witch

14    trials.  You miss the obvious when you're dealing with

15    ignorance and you're dealing with fear and you're dealing with

16    misinformation.

17        The obvious here in this case is the best evidence of

18    what tests were done at these hospitals is on these LIS

19    systems, and yet the government didn't bother to search for

20    them at all.

21        This has never been a search for the truth, ladies

22    and gentlemen.  It's been a search to reach the conclusion that

23    these insurance companies always wanted.

24        The last bit of evidence that the government just

25    doesn't even pay any attention to that I just want to spend a

1   moment talking to you about is the amount of money that

2   Mr. Durall spent on these hospitals.

3           They don't think it matters at all.  I think it does.

4   I submit to you that it shows his good faith.  Because here's

5   the deal.  He buys Chestatee Hospital not for $1,000, not for

6   $100,000, not for $1 million, not for $10 million.  He spent

7   $15 million for that hospital, $15 million.

8           And when he bought the hospital, what did he do?  You

9   heard evidence about how he restores the operating room,

10  $2 million to build an operating room.  That has nothing to do

11  with urine testing.

12          If he -- truly it was designed to create a billing

13  hub, as the government has alleged, why would he spend $2

14  million refurbishing the operating room?  Why would he buy

15  furniture for these rooms that people were going to sit in?

16  Why buy beds?  Why start a 401(k)?

17          Why do all the things that the evidence that's in the

18  record here shows he did?  Why would he do that?  He wouldn't.

19  He wouldn't at all.

20          All of that evidence about the amount of money he

21  spends on Chestatee goes to his intent, that he acted in good

22  faith.  He tried to help that hospital, just like they tried to

23  help CGH and RGH.  And the insurance companies just didn't like

24  it.

25          And as they -- as I showed to you in Exhibit 84,

1  Durall 84, all the insurance companies really wanted to do at

2  Chestatee -- all they ever wanted to do was to stop the

3  bleeding.  And there was nothing that they could do with the

4  contracts except to try and renegotiate and put them on a lab

5  fee schedule.  That's what the evidence has shown.

6          But it didn't just occur at Chestatee.  Mr. Durall,

7  he purchased an instrument that he put at CGH for the specific

8  purpose not -- of testing his samples.  That's why it was

9  there.  Not to test anyone else's samples, but his samples.

10          Logic tells you that.  Common sense tells you that.

11  Reason tells you that.  So if other samples are sent to the

12  hospital, they're to be tested somewhere else.

13          Mr. Durall put an instrument at that hospital for one

14  purpose, to test the samples.  He paid for reagents to have

15  sent to that hospital for one purpose, to test his samples.  He

16  paid for the salary of an employee at that hospital, at CGH,

17  for one purpose, to test his samples.  And that's what

18  happened.  That's what the evidence has shown.  He did the same

19  thing at RGH.  He paid for reagents.

20          You heard from Arceli Encienzo.  She remembered the

21  first day that the samples came in.  Whose samples came in?

22  Reliance Labs and those of Aaron Durall.

23          And what happened to those samples?  She worked there

24  until 3:00 in the morning, I believe, testing them.  They were

25  all tested.  All of his samples were tested.  They were

1    screens.  But they were tested.

2         And the FedEx shipments, you know, you have witnesses

3    that have testified, including Mr. Shohan, who believes that to

4    this day that the samples weren't tested at the hospitals, yet

5    you've got witnesses at every hospital that say that Reliance

6    samples were tested.  You've got FedEx records -- and there's

7    two boxes of them over here.  I'll point it to you.  Right over

8    here, these two boxes right here -- boxes, boxes of FedEx

9    shipping records from Reliance Labs.  There's two boxes there

10   of receipts for shipments by Reliance Labs.

11        Again, why is that important?  Because it shows

12   Aaron's good faith.  He never had an intention to do anything

13   wrong, ever.  If this were truly a search for the truth, you'd

14   be hearing about that from the government.  But you're not,

15   because it's inconsistent with theory.

16        It's an acknowledgment that Mr. Durall always acted

17   in good faith.  And they left it out because it runs counter to

18   this 22 code narrative you've heard so much about.

19        Each of the things, ladies and gentlemen, that I've

20   talked to you today is enough to create reasonable doubt.  I'm

21   not going to go through what the reasonable doubt means.

22   You've seen it twice already.  You've heard about it before.

23        What it means is a doubt based on reason and common

24   sense.  And your common sense and experience should tell you

25   that any one of the things I've talked to you about is enough

1    to create reasonable doubt.

2           The millions of dollars spent by Mr. Durall into

3    these hospitals, that's enough to create reasonable doubt about

4    this whole case.  The government's steady drumbeat about money,

5    money, money, and how money, money, money -- this is just too

6    much money, and all the exhibits and all the documents that

7    they spent all of this time focusing your attention on without

8    focusing your attention on any line, on any claim that's false

9    and attributable to Mr. Durall, that's enough by itself to

10   create reasonable doubt.

11          The foundation of this whole case, this 22 code, and

12   the way in which it influenced every step of the investigation

13   of this case from start to finish, that's enough to create

14   reasonable doubt.

15          The existence on those LIS systems for Mr. Simao of

16   millions of test results run at these hospitals, which the

17   government never bothered to obtain in the course of its entire

18   five-year investigation, and which proves that tests were run

19   at these hospitals, that's enough to create reasonable doubt in

20   this whole case.

21          And the way in which each witness was interviewed,

22   with the specific purpose to prove that they weren't physically

23   present at this hospital, to support this bogus 22 code theory,

24   that's enough to create reasonable doubt by itself.  Any one of

25   those things by itself is enough to create reasonable doubt.

1  And all of them taken together have to leave you with

2  reasonable doubt.

3         The bottom line here, folks, is that this case has

4  never been about fraud.  It has never been and never will be.

5  Mr. Durall never lied.  He never cheated.  He never stole.

6         The case was screwed up from the start, with

7  billion-dollar insurance companies fooling themselves, and law

8  enforcement and these prosecutors, about what these defendants

9  did in order to protect their own bottom line.

10        And the current theory of the government that

11 Mr. Durall's samples were not tested at these hospitals flies

12 in the face of the facts and the evidence, that he spent

13 millions of dollars testing the samples at these hospitals.

14        And the best evidence of what tests were run at these

15 hospitals, the actual samples from those -- from those

16 hospitals was never even seized by this government.

17        I've waited two years, ladies and gentlemen, to speak

18 with you about this case, to show you what the evidence is and

19 what it's not.  The evidence is not that there was any fraud or

20 deceit by Mr. Durall.  He never lied.  He never cheated.  He

21 never stole.

22        And I return you to the Salem witch trials and my

23 final words.  As I said at the outset, one of the key lessons

24 from those trials is the importance of good people like you who

25 serve as jurors to have the courage and the strength to stand

1  tall when it's hard, to not be afraid to question the

2  government and false theories, to do justice, to find people

3  like Aaron not guilty.

4        By doing that, we demonstrate that we have learned

5  the lessons of history.  For years I have stood between Aaron

6  and the government, fighting at every turn, at every lie, at

7  every false accusation lodged against him, but now I turn him

8  over to you.

9        And I'm confident you will continue in my mission,

10  that you will evaluate the evidence, you will evaluate the law,

11  and you'll return the only verdict that is consistent with both

12  the facts and the truth.  Speak the truth about Aaron, send him

13  home to his family, and declare him not guilty.

14        Thank you.

15        THE COURT:  Thank you, Mr. Rafferty.

16        Ladies and gentlemen, we'll go ahead and take our

17  lunch break.  Let's -- let's try to take a little less time

18  today, if we can.

19        If we -- let's see.  It's 12:45.  If we come back at

20  25 to 2:00, is that going to give y'all enough time to eat

21  lunch?  Is that okay?

22        All right.  We'll be back in session at 25 minutes

23  until 2:00.

24        COURT SECURITY OFFICER:  All rise.

25     (Jury exits, 12:43 p.m.)

1          THE COURT:  Anything from counsel?

2     (No response.)

3          THE COURT:  All right.  We're in recess.

4          MR. ROWLAND:  Judge, we did have one issue.

5          THE COURT:  Yeah.  I'm sorry.

6          MR. ROWLAND:  I've been in touch with Mr. Burns at

7     Florida Blue.  He told me that they were going to be getting

8     the offer letter over to us.  He said between 2 and 3 o'clock.

9     I've asked him to motivate as much as possible on that.

10          So I just wanted to keep you updated on where we are

11     on that.  I've spoken with Mr. Duva.  We're going to review it.

12     And then we're going to -- we'll bring up any issues if we have

13     any.

14          THE COURT:  Thank you.

15          MR. ROWLAND:  Sure.

16          COURT SECURITY OFFICER:  All rise.  This Honorable

17     Court is in recess.

18     (Recess from 12:44 p.m. to 1:32 p.m.; all parties

19     present.)

20          COURT SECURITY OFFICER:  All rise.  This Honorable

21     Court is now back in session.

22          THE COURT:  All right.  Everybody can just have a

23     seat for a moment until the -- or stand, whichever you want to

24     do, but...

25          MR. BELL:  Judge, before the jury comes out, I

1  neglected -- this morning I was going to renew my motion for

2  judgment of acquittal, which I understand is procedurally

3  required, although the Court hasn't ruled on the first one yet.

4  THE COURT:  Yeah.

5  MR. BELL:  But just for a place mark -- a

6  place-keeping point of view, I would renew.

7  THE COURT:  So I think -- I'll consider all

8  defendants to have renewed their Rule 29 motions at the close

9  of the evidence.

10  MR. ROWLAND:  And, Your Honor, in case the jury's

11  deliberations go beyond Wednesday, do you want to handle the

12  *Garcia* hearing then?

13  THE COURT:  Yeah.  I don't want to do it until I have

14  to.

15  MR. ROWLAND:  Sure.

16  THE COURT:  Yeah.

17  MR. ROWLAND:  I just want to make sure that we're

18  still on.

19  THE COURT:  I hear you.

20  I will also say that -- and, again, I'm not, of

21  course, prejudging any verdict the jury might bring in.  But we

22  will need to have a discussion with those defendants who are

23  subject to potential jury trial on a forfeiture claim.

24  Hold on one second.

25  COURT SECURITY OFFICER:  Yes, sir.

1     THE COURT:  And, Kelly, I had that right here.

2  What...

3       (Judge confers with law clerk.)

4     THE COURT:  Right.  The potential defendants who are

5  at issue are Jorge and Ricardo Perez, Christian Fletcher.

6     James Porter, I'm not clear about whether he's

7  entitled to a jury trial or not since it's just a money

8  judgment issue and not specific funds.  So we'll have to have

9  that discussion.

10     But, again, we're going to have to -- under the

11  rules, I have to determine before the jury retires to

12  deliberate whether the defendants are asking for a jury trial

13  on their forfeiture issue.

14     That doesn't mean they can't change their mind later,

15  which happened in Judge Howard's trial a few weeks ago, but we

16  do -- we will need to have that discussion at some point.

17     I know you've already given me some initial

18  indications, but we'll -- we'll have those discussions before

19  the jury retires to deliberate.  So you just have to be at

20  least thinking about it a little bit.

21     All right.  Let's have the jury, please.

22     COURT SECURITY OFFICER:  All rise for the jury.

23       (Jury enters, 1:36 p.m.)

24     COURT SECURITY OFFICER:  Thank you.  You may be

25  seated.

1          THE COURT:  Mr. Schwartz, I believe you're up.

2          MR. SCHWARTZ:  Yes, sir.  Thank you.

3          THE COURT:  Welcome back, ladies and gentlemen.

4          MR. SCHWARTZ:  Repeatedly through this case you've

5   seen money, money, money.  They talked about it when they

6   started.  The first words out of their mouth, 1.4 billion,

7   400 million.

8          The insurance companies talked about it.  You saw

9   slides about it.  You heard witness after witness talk about

10  it.

11         What the government's trying to do is evoke your

12  emotion, because when you're emotional you're not thinking

13  clearly.  You're responsive based on that emotion.

14         But what we're trying to do is get you to think about

15  the facts, think about all the testimony you heard, think about

16  federal law, and what is lawful and authorized and legal.

17         Federal law allows pass-through billing.  You heard

18  the experts.  You heard Mr. Thomas.  42 U.S.C. 1395(l), CMS

19  guidelines, the gold standard when contracts are silent as to a

20  situation, how it's interpreted.

21         This case is full of reasonable doubt, clear doubt.

22  There's no fraud.  There was no intent to commit fraud.

23  There's no money laundering.  There's no false statement or

24  omissions of material information.

25         And in the end the insurance companies just cram down

1　that reimbursement rate.  They don't have the vehicle to

2　continue.  They were just worried about how much they were

3　paying.

4　　　　　And you've seen evidence on that.  You've heard the

5　testimony.  Proof beyond a reasonable doubt is proof so

6　convincing you would be willing to rely and act on it without

7　hesitation in the most important of your own affairs.  Anything

8　less than that is reasonable doubt.  And, again, this case is

9　full of it.

10　　　　　Now, Mr. Porter, Mr. Jim Porter, did not do this on

11　his own.  He didn't create any of this on his own.  He heard

12　about an organizational idea and he went to lawyers.  You heard

13　Mark Thomas testify.  You heard him testify that other lawyers

14　were involved also.

15　　　　　And Mark Thomas talked about a scenario where the

16　idea that a laboratory can contract with a rural or critical

17　access hospital to test their samples is absolutely authorized

18　by federal law.  It's called under arrangement.

19　　　　　And under arrangement is not a very specific way of

20　doing things.  It's more of a fluid way of doing things.  And

21　there's certain things that need to happen to make that

22　authorized.  You heard the same from expert Michael Arrigo.

23　　　　　So the scenario is that a hospital and a lab talk to

24　each other in contracts for the lab to run testing.  The

25　samples can be sent directly to the laboratory.  It doesn't

1   have to be sent to the hospital.

2          The lab will do the testing and provide samples

3   through the LIS system, the lab information system.  That's the

4   same system that the hospital uses to put the data in about the

5   testing.  And when they do that, they find out about the

6   providers, the doctors, through their NPI numbers.

7          The lab then provides the test results.  The hospital

8   then bills it the only way the hospital is lawfully allowed to

9   bill it, on a UB-04, or its equivalent CMS 1450, or the 837I

10  you heard so much about.  And when the hospital bills those

11  claims, it must use its own NPI and its own tax ID numbers.

12         Mark Thomas, Michael Arrigo talked about how it has

13  to be done that way pursuant to federal law.  And that's what

14  was done in this case.

15         So the billing is done and it's sent to the insurance

16  companies.  The insurance companies then pay the hospital.  The

17  hospital then pays the laboratory whatever their agreed-upon

18  rate is, and they keep the difference.

19         Now, that's not the only model that was going on,

20  because different hospitals were at different levels in this

21  process.

22         Another model was the idea that a hospital was

23  building its toxicology lab.  Millions of dollars were put into

24  the lab at Putnam to get it up and operational, with the idea

25  that the hospital then would handle its own testing and

1   wouldn't need that under arrangement scenario anymore.  But

2   that doesn't make the under arrangement improper or unlawful.

3        So while the under arrangement scenario is going on,

4   Putnam is building out its lab, to the tune of millions of

5   dollars, putting in the best equipment, state of the art, using

6   PhDs to run that lab.  Their personnel are being trained at the

7   top levels.

8        And the idea was for that lab to become operational,

9   understanding that the day that it opened it wouldn't be at 100

10  percent.  And to think so is unreasonable.  It takes a little

11  bit of time to get something running to full capacity.

12       Now, you've heard lots of testimony about that lab

13  opened up in the beginning of February.  Before then they were

14  running an under arrangement model.

15       Mark Thomas said that that was authorized by federal

16  law.  Mark Thomas, who is a board certified specialist in

17  health law with the Florida Bar, one of only 128 lawyers barred

18  in Florida through the Florida Bar, out of 128,000 barred

19  attorneys in Florida.  He is literally one of 1,000.

20       You heard about his experience with the Attorney

21  General's Office prosecuting Medicaid fraud.  You heard about

22  his experience with AHCA, running that portion of AHCA which is

23  responsible for licensing physician offices and clinics

24  throughout the state of Florida, a state agency just like the

25  Florida Attorney General's Office.

1          You heard about him being appointed as a Special U.S.

2   Attorney to prosecute health care fraud issues in the Southern,

3   the Middle, and the Northern Districts in the federal courts

4   for the state of Florida.

5          This is not some guy that was found on some corner in

6   a strip center.  This is a specialist that understood the

7   situation, that reviewed what Mr. Porter told him, and that

8   said this is absolutely authorized.  Mr. Porter followed that

9   advice to the letter.

10         The government has discussed Mr. Thomas' opinion at

11  length.  And I want to show that to you.  I believe it is 69 --

12  Government's Exhibit 69, I believe.  But I want you to pay

13  attention to some important parts of this opinion.

14         They want to try to sell you that this opinion is

15  about testing.  It's not.  Specifically it asked about

16  Pinnacle's market and promotion, to market and promote the

17  clinical laboratory toxicology testing services of Putnam

18  County Memorial Hospital in Missouri to independent physicians.

19         Now, this is dated November 29, 2016.  It's very

20  important.  Because the under arrangement model was going full

21  throttle at Putnam at this time.  But what else was happening?

22  Putnam's lab was being built and was expected to come online

23  roughly about February.

24         So, again, when we look at this opinion, it talks

25  about Pinnacle's marketing and promotional activities.  It

1 doesn't say Pinnacle testing for Putnam, because this is a

2 different model.  This is what happens after the under

3 arrangement is already going.  This is what happens when

4 Putnam's lab comes online.

5 Pinnacle will be merely educating physicians as to

6 the benefits of Putnam County Memorial Hospital.  It's my

7 understanding that Pinnacle will market and promote PCMH's

8 toxicology testing to independent physicians who may order such

9 testing for their patients.

10 PCMH will provide toxicology testing for the

11 physicians' patient specimens.

12 And it goes on how PCMH will send the clinical test

13 report results to the physicians and so on.

14 It's my understanding that the marketing contract

15 between PCMH and Pinnacle is -- and it goes on to what that

16 marking contract will be.

17 And the reason this is being done in -- November

18 29th, 2016, is because it takes time to get the individuals in

19 place and create this business model to promote Putnam's

20 testing.

21 He ends with, I do not perceive any substantial legal

22 risk in the proposal, but I do perceive potential business

23 risk.  While the proposed arrangement appears comfortably

24 legal, third-party payer credentialing limitations could most

25 certainly preclude reimbursement.

1          To the extent any commercial payer refuses to pay

2    PCMH for its toxicology service, Pinnacle, in turn, will not be

3    paid for its marketing and promotional services.

4          Now, what we know about 141 claims is that they are

5    nonpatient claims, meaning that somehow the hospital, when it's

6    running its own toxicology lab, would have to reach out to

7    clinics and practitioners throughout the country to say that,

8    We are a full-service toxicology lab and we can take your

9    samples, test them, turn them back around to you, and send you

10   the results quickly.

11         You've got to get somebody out there to let people

12   know.  That's the marketing.  That's the promotional services.

13   This is not a situation where you put an ad on TV, because

14   you're targeting a very specific demographic, clinics and

15   practitioners, and you say, Listen, we've got a lab, services

16   that you can use, send us your sample, we'll turn it around

17   quick, you'll be very happy with us.

18         That's what the purpose of that opinion was.  It

19   wasn't about Putnam has to test and samples had to go to Putnam

20   to invalidate this under arrangement situation.

21         The under arrangement was working completely fine and

22   authorized.  And this was the secondary part of that, to get

23   Putnam County online with its own lab, so it could do it

24   itself.

25         The under arrangement was never intended to be

 1   permanent.  Millions of dollars were put into that lab to help

 2   the hospital.

 3          You heard both Mr. Arrigo and Mr. Thomas say samples

 4   could come from anywhere.  There wasn't any geographic

 5   limitation.  There wasn't any limitation to volume of samples.

 6   So long as the data was inputted by the hospital into the LIS,

 7   which is undisputed at this point, it was fine.  And that's

 8   what happened.

 9          There were over 1,000 independent physicians, over

10   1,000, that didn't know each other, that didn't have ties to

11   each other, that were ordering these tests based on the

12   physician's own independent medical decision-making, that these

13   physicians felt it was appropriate to order these tests, order

14   confirmations when they wanted to, order screens when they

15   wanted to.  Nobody made them do that.

16          And, again, I believe most importantly -- the idea of

17   the billing and how that had to be done, you saw testimony or

18   heard testimony from Mr. Thomas and Mr. Arrigo that the

19   hospitals had to bill it this way.  That's based on CMS

20   guidelines, federal agencies, federal rules.

21          They had to use their NPI.  They had to use their

22   EINs.  And there's not a place on the 04 for any more

23   information.  And I submit to you that if the government wanted

24   to put more information on those 04s, they would amend their

25   governmental form UB-04.

1    All of this information is reasonable doubt as to

2   whether Mr. Porter acted to intentionally deceive or omit

3   material information from anybody.

4    Again, he went to a super qualified attorney, one of

5   128 in the state of Florida, 128, to get this information.  He

6   did disclose materially what was happening, fully disclosed it,

7   and said, Am I okay to do this?

8    And Mark Thomas said, Yes, as long as you do it this

9   way, which has been explained, and Mark Thomas testified to,

10  and Michael Arrigo agreed with, absolutely lawful, absolutely

11  authorized.

12    You saw the lab contracts.  These contracts were

13  prepared by attorneys.  These were not Google contracts.  You

14  can read them and see that it's not layperson language.

15    You heard Mark Thomas talk about working with other

16  lawyers.  A lot of people with a lot of specialized knowledge

17  looked at this situation and gave it a thumbs-up and said it is

18  absolutely authorized under federal law.

19    Again, Mr. Michael Arrigo talked about this under

20  arrangement model.  He talked about a transitioning model where

21  the under arrangement continued while the lab was being built

22  out; Michael Arrigo, who was hired by the Department of Justice

23  on three separate occasions to give opinions.

24    He agreed that the way this was billed was

25  appropriate and was authorized.  The 141 code put the insurance

1　companies on notice that this was a reference lab billing.

2　　　　But what did you hear from Dr. K?  The insurance

3　companies weren't paying attention to that.

4　　　　Really?  I submit to you there's no more important

5　part of a UB-04 claim than the type of bill.  It tells the

6　insurance companies what's going on.  Is it an emergency room

7　visit?  Is it an inpatient or outpatient?  Or is it a

8　nonpatient?  It tells them exactly what's happening.  And Dr. K

9　says, Insurance companies weren't paying attention to that.

10　They weren't looking at it.

11　　　　Well, you know what, their negligence in not looking

12　at something does not create fraud, an intentional misstatement

13　or omission by Mr. Porter.  It just doesn't.  It was disclosed.

14　　　　And the insurance companies cannot close their eyes

15　and plug their ears and say, Nah, nah, nah, I didn't hear you;

16　therefore, it doesn't exist.

17　　　　It doesn't work that way.  It was fully disclosed.

18　　　　And when Michael Arrigo is testifying to you, he's

19　explaining where his opinion comes from.  He's well researched,

20　over 80 citations to authority.  He doesn't say, like Dr. K

21　said, It's my opinion, and since other people come to me for my

22　opinion, therefore, I must be right.

23　　　　No.  He says, I look at federal law.  I look at

24　federal rules.  I look at what's really happening in the health

25　care business.  I look at all of these different bases of

1  authority in the environment.  And then from that I put

2  together my opinion.  That is a sound opinion.

3       People ask me what the weather is going to be like

4  all the time.  Most of the time I'm wrong.  But just because

5  people come to me about, What do you think the weather is going

6  to be like, doesn't make it right, doesn't make me all knowing.

7       Michael Arrigo backed up what he was saying.  Mark

8  Thomas backed up what he was saying, from external sources,

9  including federal law and federal rules.  Dr. K didn't.  He

10  said, Because people come to me for my opinion, therefore, it

11  is.  Ask yourself why.

12       This was not something that was pulled out of a

13  vacuum.  This has been going on for over 15 years, from what

14  Dr. K said.  Pass-through billing is nothing new.

15       So I submit to you if there was something that

16  specifically said that you can't do it, some kind of law, or

17  rule, or code, they'd have brought it up.

18       Can I have 35F, please.

19       Thank you.

20       We've seen this e-mail over and over.  One of my

21  co-counsel went over it.  But what I want to focus on is the

22  top part.  And this is the e-mail where Heather Burch says, We

23  can't hold them to the pass-through rule because there's

24  nothing in the contract about it.

25       But, more importantly, James Balcom -- and you heard

 1   his testimony, when he sat right there and talked to you, Just

 2   wondering if there is/was a general rule or guideline that

 3   covered this issue, even if it wasn't spelled out in a specific

 4   contract.  Asking because I have no idea.

 5           And when I asked him about that, if he ever got a

 6   written rule or policy on it, what was his answer?  No.

 7           So that doesn't exist, at least within RightCHOICE,

 8   Anthem, Blue Cross Blue Shield, yet somehow these defendants

 9   are supposed to know -- they're supposed to figure it out

10   somehow.  I have no idea how they're supposed to, but that's

11   what the government wants you to believe.

12           Mr. Balcom, if you recall, was a retired DEA agent.

13   He knows how to investigate something.  He was looking for the

14   general rule or guideline that covered this issue.  And he

15   never got it.  If it existed, somebody would have said, Here it

16   is.  It's right here.

17           And then that same idea, when Dr. K was testifying --

18   the government showed you a provider manual.  And in that

19   provider manual it said pass-through billing is prohibited.

20   The provider manual was from 2015.  They highlighted that.

21           But where was it from?  Colorado.  They didn't tell

22   you that.  That came out when I was questioning Dr. K.  And

23   what did Dr. K say about that?

24           The providers are responsible for the contracts and

25   provider manuals in their home state.  And he acknowledged in

 1   this case we've got hospitals in Missouri, Georgia, and

 2   Florida.  Nobody in Colorado.  And the labs are in Georgia and

 3   Florida.  Nobody in Colorado.

 4          Ask yourself why the government didn't bring it out.

 5   This is a Colorado manual and we know it doesn't apply, but

 6   let's look at this.

 7          Because they were hoping you wouldn't pick up on it

 8   and nobody else would.  When does it show up?  In Missouri's

 9   manual in September of 2017, well after the conduct in this

10   case is done.  Then it shows up.

11          But you know what the Colorado tells me -- or the

12   Colorado, excuse me, manual tells me?  It tells me that Blue

13   Cross/Anthem understood that this was a potential issue, and

14   they knew it existed.  And if they wanted it in their Florida,

15   Georgia, or Missouri manuals, they could have put it in there.

16   In fact, they could have cut and pasted it in there.  But they

17   didn't.

18          And, remember, this was not anything new or novel.

19   Dr. K said this has been going on for a long time, over 15

20   years.  It's been known.

21          Mr. Arrigo talked about TOB 14X, 141 claims, these

22   reference lab nonpatient claims.  And he talked about the fact

23   that they're not obscure and they're not hidden.  And we put up

24   a demonstrative -- we can take this down, please.

25          Thank you.

1    And if you recall this when Mr. Arrigo was

2  testifying, we put up a demonstrative that talked about the 14X

3  bill claims, the 141s.  And it occurred -- in 2017, 12.2

4  percent of all laboratory claims were a type 141, 12.2 percent,

5  almost 14 million individual claims.

6    This is not something that's hidden or obscure.  This

7  is happening all over the place out there.  And Mr. Arrigo

8  talked about it.  Dr. K acknowledged that pass-through billing

9  was nothing new.

10    So if the insurance companies wanted to prohibit it,

11  they could have.  They didn't.  And now, on the back side,

12  they're coming back and saying, Oh, well, maybe we should have

13  done more, but we didn't; therefore, we want to create a

14  criminal situation and say to you that these individuals failed

15  to tell us about it or omitted material information that we

16  didn't know about it at the same time Dr. K is saying, They

17  weren't paying attention to the 141, which, again, I submit to

18  you is probably the most important piece of that UB-04, because

19  that's where that claim starts, because if it's something

20  different, let's say -- if it's a 121 that deals with inpatient

21  and it's a claim for surgery, if it doesn't say that and it

22  says nonpatient 141, but there's a surgical claim in there, and

23  there's a claim for keeping somebody in the ICU for a week,

24  they're going to wonder, Wait a minute, why are they asking us

25  to pay for an ICU stay and surgery for a nonpatient?  This

1    doesn't make any sense.

2         I submit to you they were paying attention to that

3    141, because they wouldn't know what kind of claim anything

4    was, and it wouldn't make any sense to them on why to pay

5    something or why not to pay something.

6         But the easiest thing for Dr. K to say, They weren't

7    paying attention to it, because he can't get up there and

8    explain, if they were paying attention to it, how they didn't

9    know.

10        But, again, it's not obscure.  12.2 percent of all

11   laboratory claims, almost one in eight, were nonpatient 141

12   claims in 2017.

13        You heard about the in-network lab Quest.  If this

14   was in-network, none of this would have happened.  That's what

15   the insurance company witnesses were saying.

16        Well, let me remind you about this contract.  Quest

17   Diagnostics, the in-network lab.  Hospital third-party billing

18   agreement.

19        For purposes of this agreement, the terms

20   "inpatient," "outpatient", "nonpatient" have the definitions as

21   set forth in the applicable Medicare regulations.

22        Now, the government wants you to believe that CMS

23   guidelines, Center for Medicare & Medicaid Services, don't

24   apply, because this is commercial.  That's not what Quest

25   thinks.  That's not what this says.

1    CMS guidelines are the gold standard.  That's what

2  all the payers look to for definitions and for guidance.

3    Each of the following is a "third-party payer" within

4  the meaning of this agreement.

5    It talks about Medicaid, Medicare, and commercial

6  payers.  That's the way the health care space works.  They look

7  to federal law and federal rules to define these important

8  terms.

9    It talks about for each test order submitted by the

10  hospital or testing service to be performed by Quest, the

11  hospital shall be responsible for informing Quest Diagnostics

12  as to the status of the patient as an inpatient, outpatient, or

13  nonpatient.  This is a specific designation.

14    The testing services, it talks about commercial

15  payers, outpatients and nonpatients only.  You can't do it with

16  inpatients.  It talks about Quest Diagnostics will not bill

17  third-party payers for testing it does not perform under the

18  agreement; for example, tests that are referenced to another

19  laboratory, including, without limitation, a Quest Diagnostics

20  Center of Excellence, not specifically included as a provider

21  under this agreement, which means that if they add another

22  reference lab on top of themselves, then they can bill it the

23  same way.

24    So you literally could have reference lab on

25  reference lab on reference lab doing the tests and it's still

1 authorized, as long as they add it.

2 This was agreed to with Putnam County Memorial

3 Hospital by its CEO on November 2nd, 2012, years before these

4 defendants and my client, Mr. Porter, got involved with

5 reference lab under arrangement testing.

6 Again, Quest, the in-network lab that we heard would

7 know to bill direct on a CMS 1500.

8 No, they're doing the same thing.  And why?  Because

9 it is authorized under federal law.  And the agreement --

10    (Counsel confer.)

11 MR. SCHWARTZ:  It had been going on since 2012.

12 And, more importantly, after my client and these

13 defendants stopped, it continued to go on.  And you saw the

14 evidence that was admitted where the testing that was done was

15 sent to Quest.  Quest didn't bill it directly on a 1500 like

16 the insurance company said that they would have.

17 No, they did the testing and they sent the results.

18 And then they sent the invoice to the hospital.  The hospital

19 then billed it on a UB-04, or its digital equivalent, the 837I,

20 with the hospital's own NPI and EIN, the same exact thing that

21 was going on with these defendants.

22 The hospital then sent the claim, received the money,

23 paid Quest whatever their agreed rate was, kept the difference,

24 and did it again.

25 Now, there's a minor distinction, but it's of no

1   consequence.  And the government wants to make a big deal about

2   this.  With Putnam they did it with outpatients.  But there's

3   no prohibition doing it with nonpatients.  There's a

4   distinction without a difference.  And, in fact, this contract

5   talks about it being okay with nonpatients.

6           If it was so illegal, if there was so much fraud, if

7   there was so much misrepresentation and omission, why is it

8   still happening?

9           And if you remember Ms. Pickens, who is a CEO, said

10  that the insurance companies are well aware of this.  It is not

11  a violation of any of their agreements.  And, in fact,

12  RightCHOICE attorneys knew about it.  And it was still going

13  on.

14          The reason it's going on is because it's entirely and

15  completely lawful.  There's nothing illegal about it.  The

16  insurance companies may not like it.  They may want something

17  different.

18          But, unfortunately, for them, this is federal law.

19  You heard Mark Thomas:  You don't like it, call your

20  Congressperson.

21          They can change it.  They've chosen not to.

22          Reasonable doubt, did Mr. Porter act to intentionally

23  deceive an insurance company or intentionally omit information

24  to prevent them from understanding what's going on?  The answer

25  to that is absolutely not.

1          Again, it's still happening with the insurance

2    companies' own in-network lab, Quest, that they told you would

3    not do this.  But they do it because it's legal, lawful,

4    authorized.

5          The government wants to try to tell you that this is

6    so clear, easy, you can see all this stuff.  Well, it's clear

7    as mud.  In fact, Dr. K was paid over $100,000 to try to

8    explain how it's so clear and, again, couldn't come up with one

9    citation to why his opinion was right.  Couldn't say, Look at

10   this statute.  Look at this federal rule.  Look at this

11   authority.  Nope.  My opinion.  I know what I'm doing;

12   therefore, I'm right.

13         You saw the problems with this investigation.  You

14   saw the problems with the insurance companies' investigation.

15   You saw the problems with the data.  The case agent, the guy

16   that was in charge of running this investigation up until the

17   time of indictment, FBI Agent Robert Schwinger, went to work

18   for Florida Blue.

19         Now, I submit to you:  Why would Florida Blue hire

20   somebody that botched an investigation?  Well, those problems

21   in the investigation all went to the benefit of the insurance

22   company, all of them.

23         They didn't benefit the defendants.  They benefitted

24   the insurance company.  And the insurance company got what they

25   wanted, an indictment, so that they could go backwards in time

1   and say, You know what, we messed up, but we're going to try

2   fix it backwards in time.

3         And so what happened?  The agent in charge of this

4   investigation, the case agent at the time, that produced all

5   the information that led to an indictment, was given a job with

6   their Special Investigations Unit at Florida Blue.  He was

7   rewarded.

8         I'm not going to talk about this too much, but let's

9   talk about code 22, because it's important.  Code 22 is the

10   outpatient services.  You heard from the witnesses.

11         You can't have a nonpatient claim, where an

12   individual never shows up on a campus hospital -- or the

13   hospital's campus, and an outpatient claim at the same time.

14         They are diametrically opposed.  It is like being up

15   and down or wet and dry at the same time.  It is impossible.

16         More importantly, you heard that code 22 has no place

17   on a UB-04 -- there's not a place to put it -- yet the data

18   that the insurance companies provided has code 22 all over it.

19   And every one of those claims is a 141 claim.  You can't have a

20   nonpatient and an outpatient at the same time.

21         The majority of them admitted that.  They also

22   admitted that the insurance companies created that code that

23   investigators relied on.  Investigators from the insurance

24   company relied on it.  And they thought it was a slam dunk.

25         You heard Mr. Rafferty talk about it.  They thought

1   there's a smoking gun.  Aha, the defendants billed all of these

2   claims as if people were at the hospital peeing in cups.  And

3   we know that that's not true.  We got them.

4          Yet that data was created by the own insurance

5   companies that those investigators worked for.  That's what led

6   this investigation.  That's what led this case.  That's what

7   led this indictment.  And none of it is true.  None of it.

8          You heard the insurance company say that it was

9   created by them.  And then they tried to spin it a little bit,

10  saying, Oh, well, what it really means is that the testing was

11  done at the hospital.

12         No, it doesn't mean that.  We showed you all the

13  definitions.  No, it means outpatient services, somebody

14  appeared at the hospital, boots on the ground on a hospital

15  campus.  And we know that that's not true.

16         And we also know that none of the billing that was

17  provided by the defendants had code 22 on it, yet all of the

18  claims data had it on there.  The insurance company just made

19  it up.

20         Let's talk about Dr. Waller for a minute.  He was the

21  one that got up there and said that the thousand independent

22  doctors, they don't know what they're talking about, and I'm

23  going to look at some data and I'm going to decide that none of

24  these claims, or the majority of these claims are not medically

25  necessary, just, shoo, I'm Dr. Waller, so I know what I'm

1  talking about.

2        A thousand-plus independent doctors having

3  independent medical decision-making responsibilities and

4  capabilities made decisions to test the way they did.

5        You heard Dr. Solomon, one of the first witnesses you

6  heard from the government put up:  When I do a screen, I want a

7  confirmation every time.  I need the screen quick, because that

8  helps me with my diagnosis and patient treatment.  I want the

9  confirmation to see what's going on, kind of a trust-but-verify

10  situation.  Because I want to know:  Is the screen accurate?

11  Did somebody try to mask the screen?  Did somebody take a

12  little bit of a pill and scrape a little bit into urine so the

13  screen shows positive, but when I get the confirmation it's

14  negative?  Or how much of that drug is in their system?

15        Because when they're providing their services and

16  prescribing different drugs, they can overprescribe something

17  not knowing what's going on.  So he said, As long as I get the

18  confirmation before I see the patient next, I'm good.

19  Typically it's 30 days.

20        But he got right there up and told you, government's

21  witness, Dr. Solomon, that I ordered these because I need them.

22        Dr. Fender, she was the one that was Putnam's lab

23  director.  You can't just look at an order and determine if a

24  doctor should have determined it or not.  You need to call the

25  doctor.

1    And then she said, even her, as a doctor, I will only

2    call physicians that I know.  I won't call them when I don't

3    know.  You need to contact the doctor to find out what's going

4    on.

5    Did Dr. Waller call any doctors?  No.  I don't need

6    to is what he said.  Don't need to.

7    Now, the government gave him two physicians that were

8    witnesses for the government, and he looked at that

9    information.  But all the other ones, over 1,000 other doctors

10   throughout the country that are independent and not tied to

11   each other in any way, did they pick up the phone and call them

12   and say, Hi, I'm Dr. Waller.  I'm doing a little investigation.

13   Would you mind talking to me?

14   He was paid by the hour.  You heard him.  He charged

15   over $120,000 just for him, and adopted information in a report

16   from Dr. Clark, who charged the government about $325,000, so

17   together about $450,000, because this is so clear anybody would

18   know what's going on, but, most importantly with all this,

19   Dr. Waller said he didn't have the provider information.  He

20   didn't get the NPI information in his data set.

21   Ask yourself why.  He needs that information.

22   Now, he didn't ask for it either.  He could have

23   said, Hey, these things were prescribed by doctors all over the

24   country.  I think I should talk to some of them.  He didn't say

25   that to the government.

1    But you know who did get the provider information?

2 Dr. K did.  Dr. K didn't need it.  Why is there different types

3 of information going to these experts?  Ask yourself that.

4    When I asked Dr. Waller about his methodology and

5 being peer-reviewed, his snarky response was, I wasn't aware I

6 was writing a paper.

7    You're not, Dr. Waller.  You're doing something much

8 more important, much more important than writing a paper.

9    He agreed that doctors have a difference of opinion.

10 He agreed that people get second opinions for a reason.  He may

11 think what he wants to think, but the physician on the ground

12 treating the patient knows what they're doing.

13    And to suggest that one individual can get up here

14 and look at some data sets and make a determination that all of

15 the other doctors in this case, over 1,000 of them, that

16 reviewed patient information, have the patient in front of

17 them, knew their history and prescribed what they did somehow

18 don't know what they're doing and are wrong is preposterous.

19 It's asinine.  That's more reasonable doubt.

20    The government has brought up this idea about some of

21 the labs bill 98 percent of their claims as confirmations, 98

22 percent.

23    Well, you heard testimony about how you can't bill a

24 screen if it was done by the clinic, by the physician.  And if

25 all they're asking for are confirmations, then that's what you

1     can bill.  That's it.

2            But you also heard testimony that the screens are run

3     in every case to verify the validity of the samples for the

4     confirmation.  You have to run a screen to make sure there's no

5     adulterants in it or anything that's going to mess up that

6     sample for the confirmation.  So they did.  And they did not

7     bill it, which is why only 2 percent of the screens were

8     billed.

9            But you know what, if they were trying to commit

10    fraud, and this was only about money to them, and they were

11    trying to misrepresent information, they would have billed

12    every single screen, too.

13           And what you would hear is, there's a perfect 50/50

14    on the screens and on the confirmations.  There were X numbers

15    of screens run and X number of confirmations.  And everything

16    that was done was billed.

17           Because you know what, they could have made a whole

18    lot more money by billing all of those extra screens.  They

19    didn't do that because it's not right to do that.  That would

20    be fraud.

21           So what?  They only billed what they were able to.

22    All of the other ones that they ran they didn't bill.  But they

23    ran them anyway, to make sure that the confirmation samples

24    were accurate.

25           COURTROOM DEPUTY:  Mr. Schwartz, you have 15 minutes.

1          MR. SCHWARTZ:  Thank you.

2          You heard a lot about the money trail.  There's

3   nothing hidden in this.  The accounts were opened up by the

4   individuals that were the owners of the company.

5          Their real dates of birth were used.  Their real

6   names were used.  Their real identifying information was used.

7   Their real addresses were used.  There were checks written

8   between companies.  There were wire transfers between

9   companies.  There were no piles of cash.

10         You didn't hear about millions of dollars switching

11   hands in cash.  You didn't hear about offshore transfers and

12   piles of shell companies where one company creates five others

13   and has accounts all over the world and moves money that way.

14   You didn't hear any of those things.

15         You didn't hear where there was a bunch of cash going

16   to some restaurant and money was coming out the other side to

17   make it look legitimate.  No.

18         All of this is right on its face.  Company A pays

19   Company B through a check.  And it's written that way.  It's

20   signed by the individuals that are the -- the owners or the

21   relevant parties.  It's deposited in American bank accounts.

22         There's no straw people.  You didn't see any checks

23   written to John Doe or Jane Smith or somebody else that has

24   nothing to do with anything.  You didn't see any witnesses that

25   were like, Oh, well, I received a million dollars from Pinnacle

 1  and I don't really know what's going on, but they paid me money

 2  to do that.

 3       None of that happened. Because they were running

 4  this corporation the way that they knew how to correctly. This

 5  wasn't hidden. This isn't some grand criminal enterprise.

 6  They're not trying to hide anything from anyone.

 7       Mr. Jim Porter is charged with conspiracy to commit

 8  health care fraud and, I believe, 13 money laundering counts.

 9  But, notably, what he's not charged with is a health care fraud

10  count, a substantive health care fraud count, something that

11  says, Look at this specific act, this specific thing, because

12  that is a violation of law. Nope.

13       And it's not like they're trying to save space,

14  because they hit him for 13 money laundering counts. Ask

15  yourself why.

16       They want to lump him in with a bunch of other people

17  and confuse the issues and say, Somewhere, something, somehow

18  he made an agreement to do something illegal.

19       He didn't. This was an under arrangement situation.

20  Money was put into the hospitals to build their labs to make

21  themselves sufficient. The billing was absolutely authorized

22  and lawful. It was done the only way it could have been done,

23  the same way that Quest and Putnam are still doing it today.

24       There's reasonable doubt everywhere, everywhere. The

25  contract issues that were brought up by the government, that's

1   just a matter of interpretation.  There's nothing clear and

2   unambiguous in there.

3           Those are civil issues.  Those are not criminal

4   issues.  They're civil in nature.

5           The idea that the insurance companies weren't paying

6   attention is unbelievable, they weren't paying attention to the

7   141 code, the one thing that told them that these were

8   reference lab billings.

9           In one of the jury instructions you'll see the advice

10  of counsel defense that my client Jim Porter raises.  And

11  that's a good faith reliance on the advice of counsel.  Good

12  faith is a complete defense to the counts Jim Porter is charged

13  with.

14          And because the government must prove beyond a

15  reasonable doubt that he acted with the intent to defraud, good

16  faith is extremely important.  Evidence that Mr. Porter acted

17  in good faith and followed the advice of counsel is

18  inconsistent with that unlawful intent.

19          And you'll see in the jury instructions, Unlawful

20  intent has not been proved if a defendant, before acting, made

21  a full and complete good faith report of all material facts to

22  an attorney he considered competent.

23          I'd submit to you that Mark Thomas is an absolute

24  health care specialist.  To suggest that he's not competent is

25  ridiculous.  He is one of 128 health care specialists in the

1  state of Florida with the Florida Bar, out of 128,000

2  attorneys.  He has prosecuted fraud.  He knows what it is.  And

3  he listened to Mr. Porter and gave him advice.

4  Now, Mr. Porter received Mr. Thomas' advice as to the

5  specific course of conduct that was followed, and Mr. Porter

6  reasonably relied on that advice in good faith.

7  The government wants to tell you that Mr. Porter

8  didn't disclose all of the stuff.  No, he did.  You heard me

9  question Mr. Thomas up here.

10  The government wants to point to Mr. Thomas' opinion.

11  You just saw again that that's a marketing and promotional

12  opinion for when Putnam goes online with its own lab.  That has

13  nothing to do with the under arrangement model that was already

14  running and authorized.

15  The government wants to confuse you.  But it's not

16  confusing.

17  Mr. Porter fully disclosed what he was thinking about

18  doing to Mark Thomas.  Mark Thomas heard that, gave his advice

19  based on federal law, and Mr. Porter followed that advice.

20  And the information that you've heard in this case is

21  exactly what that advice was.  Pinnacle was going to partner up

22  with hospitals, with agreements to test the hospital samples.

23  Those samples could come from anywhere in the

24  country.  Those samples could be sent directly to Pinnacle or

25  the hospital.  And the hospital could forward them, whichever,

1    didn't matter.

2    　　　　The hospital would do the accession and put the data

3    into the LIS systems.  The hospital would do the billing.  The

4    lab would send the results to the providers.  The hospital

5    would receive the moneys from the insurance company, pay the

6    lab, keep the difference, and do it again.

7    　　　　That's what this is.  The hospitals would bill with

8    their own NPI and their own EIN.  The labs would do the

9    testing.

10   　　　　That's what this is.  That's what Mark Thomas

11   testified was absolutely lawful, and otherwise known as under

12   arrangement.  And that's what Michael Arrigo testified is

13   absolutely lawful and otherwise known as under arrangement.

14   　　　　There's no conspiracy to commit health care fraud by

15   Mr. Porter.  There's no money laundering by Mr. Porter.  The

16   government has absolutely failed to prove their case.  I submit

17   to you the only correct verdict in this case to Mr. Porter is

18   not guilty on all counts.

19   　　　　I thank you for your time and I thank you for your

20   service.

21   　　　　THE COURT:  Thank you, Mr. Schwartz.

22   　　　　Mr. Rowland?

23   　　　　MR. ROWLAND:  Your Honor, we've got a bit of a lineup

24   change.

25   　　　　THE COURT:  Okay.

1    MR. ROWLAND:  Ms. Galnor I believe is going to go

2 ahead and summarize now.

3    THE COURT:  All right.  Ms. Galnor.

4    MR. ROWLAND:  And just so the Court knows,

5 Mr. Lowther will probably be going next as well.

6    THE COURT:  Thank you.

7    MS. GALNOR:  It's nice not to go last.

8    May it please the Court?

9    THE COURT:  Yes.

10    MS. GALNOR:  Counsel.

11    So a few weeks ago when we all first met, I remember

12 saying in my opening statement that this was going to be a long

13 ride.  I'm not sure that any of us fully appreciated then how

14 long that ride was actually going to be, but here we are at the

15 end, finally.

16    I also told you in my opening that I would be brief

17 and succinct and prepared in my questioning and my presentation

18 of my case on behalf of Mr. Alonzo.  And I hope I have lived up

19 to that.

20    I would also like to remind each of you the most

21 important thing I said in my opening statement.  And at the

22 time I yanked it from Mr. Rafferty.  And I'm going to do that

23 here again today.

24    I told you Mr. Alonzo didn't lie, he didn't cheat, he

25 didn't steal, he didn't misrepresent anything, and he didn't

1  conceal anything, and that you'd hear and see no proof that he

2  did.

3          I also told you he didn't conspire with anyone, he

4  didn't knowingly and willfully participate in any conspiracy,

5  and that the government wouldn't prove that he did.

6          Here we are a short 43 days later, 44 government

7  witnesses later, only six of those witnesses even uttered

8  Mr. Alonzo's name, only two actually met him in person, and

9  only one tried to implicate him in a crime.

10          So 43 days, 44 witnesses, and the government is

11  asking you to convict Aaron Alonzo of participating in a

12  multi-million-dollar conspiracy, and they're asking you to rely

13  on the testimony of one man, Nestor Rojas.  You shouldn't.  And

14  in a moment I'll tell you why.

15          I was -- my intent was to go over some of the jury

16  instructions that I believe are relevant to Mr. Alonzo.  But in

17  the interest of time and because Mr. Bell touched on them, I'm

18  going to skip over that and respectfully ask that you remember

19  these instructions that I'm about to list when considering

20  Mr. Alonzo's case.

21          And those are, of course, the reasonable doubt

22  instruction, as you've heard, proof so convincing you would be

23  willing to rely and act on it without hesitation in the most

24  important of your own affairs.

25          The other jury instruction is the credibility of

1  witnesses.  And as Mr. Bell touched on, you'll see that those

2  are phrased, many of them, in questions.  And I encourage you

3  to ask yourself those questions as you're weighing the

4  credibility of witnesses.

5       The next is criminal conviction, or what we call

6  impeachment based on a prior inconsistent statement.  I ask

7  that you pay attention to that.  Of course, also the

8  instruction regarding cooperating witnesses, who we heard -- we

9  heard from several of those, and then the multiple defendants,

10 multiple counts.

11      And, remember, out of nearly two dozen counts in the

12 indictment, Mr. Alonzo is charged in one, Count One.

13      I'd like to spend a few minutes going over the

14 testimony of the six witnesses who did mention Mr. Alonzo's

15 name.  But first -- and please forgive me -- or as Mr. Duva

16 said a few days ago, God help me for even mentioning these

17 words, but UB-04, 22 code, type of bill 141, claims, billing,

18 patient, outpatient, nonpatient -- I could go on and on and on,

19 but I won't, I promise.

20      There is not one shred of evidence that has been

21 presented to you that Mr. Alonzo was even familiar with these

22 words or that he had even heard them before, nor did you hear

23 any evidence that Mr. Alonzo had access to any of the systems

24 that housed this type of information or that submitted these

25 types of claims to the insurance companies, nor were you

1  presented with any evidence that Mr. Alonzo had any intent to

2  defraud anyone.

3        Now for those witnesses, six of them, two actually

4  met him, Gary Ayres, Nestor Rojas, and one tried to testify he

5  committed a crime.

6        With respect to Mr. Alonzo, who you must consider

7  individually, that's the government's entire case.  Who were

8  those witnesses?

9        Attorney Michele Jordan.  She did not know

10  Mr. Alonzo.  She did not testify to anything Mr. Alonzo said,

11  did, or knew, not a thing.

12        Brenda Rhodes, Mr. Alonzo was copied on an e-mail

13  with her.  She said Mr. Alonzo was connected to CompanionDX.

14  Again, she did not testify to anything Mr. Alonzo said, did, or

15  knew.

16        Kimberly Henderson, the FBI forensic accountant.  She

17  testified about the flow of money to CGH Holdings.

18  Importantly, that amount was less than 1 percent of the

19  $1.4 billion the government alleges was involved in this case.

20        And as to the flow of money, members of the jury, we

21  do not dispute that at all.  It's not proof Mr. Alonzo

22  committed a crime, and should not be considered as such.

23        Edith Mears is the next witness.  Again, she didn't

24  speak to Mr. Alonzo's knowledge of anything.  She referred to

25  Mr. Alonzo as a lab broker.  Why?  Because Jorge Perez called

1   him a lab broker.  We're going to come back to that.

2       Gary Ayres met Mr. Alonzo, wasn't sure how many

3   times, once or twice.  He said he didn't consider Mr. Alonzo a

4   salesperson.  He said that Mr. Alonzo helped him and that he

5   appreciated and, in fact, very much needed the help.  He did

6   not testify to anything Mr. Alonzo said, did, or knew.

7       And, finally, Nestor Rojas, the one witness who tried

8   to implicate Mr. Alonzo in a crime -- and I'll add more to the

9   "tried" part in a moment -- the one witness with the most to

10  lose, namely, his freedom, the one witness with the most to

11  gain, again, his freedom.

12      Mr. Rojas was undoubtedly the least credible witness

13  to take the stand during this entire trial.  Why?

14      Well, the jury instructions, provided by the Court --

15  not the government, not me, not any of the other defense

16  lawyers, but the Court -- they lay that out for you pretty

17  clearly.  And I'm going to track those questions and the

18  credibility of witnesses -- I'm going to sort of track those

19  questions as I go through his testimony.

20      Did Mr. Rojas have a particular reason not to tell

21  the truth?  When he entered a plea of guilty, he made a

22  decision acting only with his best interest in mind to plead

23  guilty and cooperate.  Who decides whether or not his

24  cooperation was helpful?  The government.

25      Who makes the recommendation to Judge Corrigan about

1  what his sentence should be?  The government.

2          And how will that determination be made?  Well, let's

3  just say Mr. Rojas is hoping and praying that you believed him.

4          Does Mr. Rojas have a personal interest in the

5  outcome?  Well, he testified that he did.  He's going to be

6  sentenced by this Court.  He's facing 20 years in prison.  He's

7  now been convicted of two crimes of dishonesty, both felonies.

8  He could face deportation because of that.  The only ones who

9  can help him stay in this country, the United States

10 Government.

11         Did Mr. Rojas have a good memory?  Well, he didn't

12 remember giving a deposition in 2019 in litigation related to

13 this case, a half a dozen or so lawyers were there, his lawyer

14 was there, a guy he paid and hired to be there.  He went under

15 oath.  A court reporter was there.  He was questioned at length

16 about acts he now says are a crime.  And he didn't remember it.

17 Use your own judgment.  But I submit to you that is not

18 credible, at all.

19         But perhaps this is common for Mr. Rojas.  He

20 doesn't -- he also doesn't remember discussing his guidelines

21 with his lawyers.  His -- the consequences of his plea, the

22 likely sentence he will face before this Court.  Again, not

23 credible.

24         He also didn't remember the answers he gave to the

25 FBI twice a mere week before his trial testimony.  The first

1  was he didn't remember Jorge Perez being interested in

2  Companion's technology.  The second was he didn't remember Gary

3  Ayres saying that he was glad to work with -- with Mr. Alonzo

4  because he was a good person.

5         It seemed, didn't it, that he didn't remember

6  anything that was helpful to Mr. Alonzo.  Like when he said he

7  didn't know why CGH Holdings was named that, but in his

8  deposition in 2019 he clearly said he knew, and he clearly said

9  it stood for Cambridge Group Holdings.  Even after I showed him

10 a copy of that sworn statement in black and white, he still

11 didn't remember it.

12        But, again, a repeat occurrence for Mr. Rojas.  He

13 doesn't even remember what charge he pled to, a felony crime of

14 dishonesty in Broward County.  He thought it was a misdemeanor.

15 It is, in fact, a felony.

16        But he had it sealed so that others that worked with

17 him, like Mr. Alonzo, couldn't see it.  They couldn't find it.

18 But you know what he does remember well?  He remembers well

19 that Bank of America application not asking him to disclose

20 that he had previously pled to a felony.

21        Odd, because that certainly seems like something Bank

22 of America, or, really, any large employer in this country,

23 would ask.  The government is asking you to rely on his memory

24 and his credibility to convict Mr. Alonzo.

25        The next question:  Did Mr. Rojas answer questions

 1   directly?  He didn't answer my questions directly.  He didn't

 2   answer Mr. Bell's questions directly.  He was evasive about his

 3   prior completely inconsistent statement during that -- that

 4   sworn statement that I just mentioned.

 5          That statement that he gave when he wasn't facing the

 6   prospect of a federal trial and conviction, and federal prison

 7   time, he was evasive about the Bank of America application and

 8   not being truthful to them.  He was evasive about his prior

 9   felony plea.

10          But he did answer one question directly, didn't he?

11   It was asked by the government a few times.  And the question

12   was, essentially, What did you do with Mr. Alonzo?

13          To which he responded, We did this to bill insurance

14   companies at a higher rate.

15          Members of the jury, he essentially quoted the

16   indictment, which Judge Corrigan will tell you is not evidence.

17   He parroted what he believed to be the government's theme of

18   this case.

19          It was a canned response, a canned response designed

20   to implicate Mr. Alonzo, to help the government, but, most

21   importantly, to save himself, a response that candidly did not

22   even implicate Mr. Alonzo in any crime.

23          Mr. Rojas was not a credible witness.  You do not

24   have to take my word for it, or, as we've heard so many times

25   during this trial, my representation to you.

1    Simply read the jury instructions provided by the

2   Court.  And therein lies your answer.  And please, please,

3   please rely on your common sense.  Jurors in our system are

4   instructed that you do not check your common sense at that

5   door.  You bring it in to the courtroom with you.

6           I'll quote from the instructions.

7           Is Nestor Rojas so convincing that you would be

8   willing to rely and act on his testimony without hesitation in

9   the most important of your own affairs?

10          If your answer to that question is no, your

11  deliberations with respect to Mr. Alonzo are over.  You find

12  him not guilty.

13          During your deliberations I implore you to ask

14  yourself these questions:  What did Mr. Alonzo know, if

15  anything, and when did he know it?

16          The government has not answered those two simple

17  questions for you.  Why?  Well, that's because the government

18  can never prove what he learned -- what Mr. Alonzo learned from

19  Jorge Perez.  Remember when I said I'd get back to something?

20  Well, this is it.

21          Mr. Alonzo was described as an acquaintance of Jorge

22  Perez.  The witnesses who knew nothing about him, that's all

23  they knew, he was an acquaintance of Jorge Perez.

24          I point this out for one reason, when all is said and

25  done at the conclusion of this trial, you may believe that

1   Jorge Perez committed a crime, you may believe he was involved

2   in a conspiracy.  This does not mean Aaron Alonzo committed a

3   crime or that Aaron Alonzo knowingly and willfully participated

4   in any conspiracy.

5        You must consider him individually.  What did Aaron

6   Alonzo know and when did he know it?  And if you believe that

7   Mr. Perez committed a crime, do you believe he called or

8   communicated with Mr. Alonzo and told him every detail, roped

9   him in?  Did Jorge Perez do that with Edith Mears, with Gary

10  Ayres, with Brenda Rhodes?  Did he tell them every detail?

11  Those witnesses testified to the contrary, that they did not.

12       So despite that, those witnesses knew much, much more

13  than Mr. Alonzo ever knew.  If Jorge Perez told Aaron Alonzo

14  the details, why did Mr. Alonzo hire a private investigator

15  after the fact?

16       Why did Mr. Alonzo hire lawyers to try to get

17  answers?  And why then -- when Mr. Alonzo confronted Jorge

18  Perez in August of 2016 to return money to payers for samples

19  that went missing, why was Mr. Alonzo ghosted?

20       No one would return his calls, not Edith Mears, not

21  Yesenia Hidalgo, no one.  If that doesn't tell you what

22  Mr. Alonzo knew or didn't know, I don't know what does.

23       If he knew and willfully participated in a conspiracy

24  for millions of dollars, is any of that logical?  The fact of

25  the matter is the government has not and could never prove

1  Mr. Alonzo knowingly and willfully participated in any crime.

2  Nestor Rojas doesn't prove it.  No other witness

3  proved it, because it didn't happen.  Mr. Alonzo did nothing

4  wrong.  And we ask that your verdict reflect that.

5  On behalf of Mr. Alonzo, on the most important day of

6  his life, we thank you for your time, your attention, and your

7  consideration.

8  THE COURT:  Thank you, Ms. Galnor.

9  Mr. Lowther, are you next?

10  MR. LOWTHER:  Good afternoon, ladies and gentlemen.

11  Again, my name is Joshua Lowther.  And I represent

12  Ms. Neisha Zaffuto.

13  Thank you for your service.  I don't always say thank

14  you for being here, because I know all of you came here on a

15  summons.  But with the COVID issue, resuming the trial, the

16  time issues involved, the fact that 14 of you came back when we

17  resumed, that's extraordinary.  And thank you for that.  Also,

18  thank you for your attention.

19  The subject matter is not exactly riveting.  But as

20  you can imagine, this is the most important event in

21  Ms. Zaffuto's life.  And I know you've been attentive.  She

22  knows you've been attentive.  And we thank you for that.

23  In my opening statement, which was very brief, I said

24  Ms. Zaffuto owns Medivance Billing Services, Medivance Billing

25  Services billed for Chestatee Hospital, and you'd hear very

1  little about her in this trial.

2          And that was true.  You heard very little about her

3  over the last four weeks of trial.

4          I want to give credit to the government in its

5  opening statement because it was very candid about its theory

6  of Ms. Zaffuto's guilt.  It simply said -- or Mr. Duva said,

7  And Ms. Zaffuto is Mr. Aaron Durall's right-hand man.

8          That was the extent of it.  Now, the government's

9  opening statement obviously isn't evidence, but it's a very

10  good indication, obviously, about what the government actually

11  had to prove against Ms. Zaffuto.

12          And being someone's right-hand man is certainly not a

13  crime.  And it's not evidence or proof of any crime beyond a

14  reasonable doubt.

15          Ms. Zaffuto's charged in this indictment.  And it's a

16  lengthy indictment.  You'll have a copy to take back in the

17  jury room with you.  But she's only charged in three counts.

18          She's charged in Count One, conspiracy to commit

19  health care fraud and wire fraud, along with all of the other

20  defendants except Mr. Sean Porter.

21          She's charged in Count Seven, conspiracy to commit

22  money laundering with Mr. Durall only.  And then she's charged

23  in Count Twenty-Three, which is the substantive count, as

24  you've heard it called, of money laundering; again, with only

25  Mr. Durall.

1       Now, the government, as you've already heard from --

2  and it's a little difficult to go fifth or sixth, or wherever

3  we are, because a lot of -- a lot of law and issues have been

4  covered, so I don't want to just repeat that.

5       But the government does have the burden to prove all

6  of the elements of all of these offenses beyond a reasonable

7  doubt before you're authorized to convict Ms. Zaffuto of

8  anything.  So what exactly does the government have to prove in

9  relation to her?

10       Now, the Court's going to give you -- charge you on

11  the law.  It will tell you, This is the law.  This is how you

12  apply the law to the facts.

13       But what you'll hear in relation to Ms. Zaffuto's

14  charges is, again, a conspiracy is essentially an agreement to

15  commit a crime.  In this particular case, it's an agreement

16  between Ms. Zaffuto and other people to commit health care

17  fraud and wire fraud.

18       The substantive count, which I've already mentioned

19  once, is just the alleged crime itself.  And, of course, that's

20  money laundering in this case.

21       Now, a conspiracy is not just any agreement.  A

22  person to conspire with someone else has to knowingly -- that

23  is, without mistake -- and willfully -- that is, knowing this

24  is a crime, consciously choosing to do it anyway -- commit the

25  underlying offenses.  And the underlying offenses of health

1  care fraud and wire fraud, not to get too technical, they

2  require a specific intent to defraud.

3      And just another way to say that is you have to

4  subjectively -- the person charged has to subjectively intend

5  to defraud someone -- in this case private insurers -- and to

6  cause harm.  And the government has not proven any of that in

7  this particular case.

8      So what evidence did the government present through

9  just a handful of witnesses against Ms. Zaffuto?  She was

10  present at Reliance Labs.  Well, of course she was, because the

11  evidence was Medivance handled the billing for Reliance.

12      She was also present at Chestatee Hospital.  As I

13  said in my opening statement, and as you heard the witnesses

14  say, she handled the billing for Chestatee.

15      The government's most significant piece of evidence

16  against Ms. Zaffuto, according to Mr. Hayes in his closing

17  today, was the Kyle Marcotte issue, if you want to call it

18  that.  Ms. Zaffuto introduced Kyle Marcotte to Mr. Durall.

19  That's the evidence you heard from Mr. Marcotte.

20      Now, Ms. Zaffuto's company, Medivance, as you know,

21  handled the billing for Mr. Marcotte.  She also, as I just

22  said, handled the billing for Reliance.

23      And how did Mr. Marcotte describe Medivance?  It was

24  a reputable company.  It was very well known in the industry.

25  And the last word he used to describe it was awesome.

1          So, again, she takes two of her customers and she

2     introduces them.  That's the extent of that relationship,

3     except for one other point Mr. Hayes mentioned, is this

4     infamous car ride with supposedly Ms. Zaffuto, Mr. Durall, and

5     Mr. Marcotte.

6          But as Mr. Rafferty pointed out, and clearly

7     explained today, that was about a civil bankruptcy proceeding.

8     That had absolutely nothing to do in 2018 with any kind of

9     criminal conspiracy.

10          That evidence, which is all that the government was

11     able to present against Ms. Zaffuto, is certainly insufficient

12     to show that -- the knowledge element that I talked about in

13     conspiracy, and certainly not the willful level.

14          But what evidence do we have in addition to that

15     which was not presented by the government directly against

16     Ms. Zaffuto, but certainly applies to her?

17          There were four hospitals involved in this case.  And

18     as the government stated several times, Ms. Zaffuto is only

19     related to Chestatee Regional Hospital in Dahlonega, Georgia.

20     That's it.  That's the only hospital for which she billed.

21          Now, what did Dr. Corey Waller say?  He reviewed

22     data -- claims data for all four hospitals.  And three of the

23     four hospitals had billed approximately 98 percent

24     confirmations, 2 percent screens.

25          He says, again, I don't need to talk to doctors.  I

1   don't need to talk to anybody else.  I'm looking at this data,

2   and that's not correct.

3         But when Mr. Rafferty confronted him with the chart

4   about Chestatee, Well, wait a minute, Chestatee is completely

5   opposite.  It's 98 percent screens, 2 percent confirmations, he

6   said, That's about right, because he also said the

7   confirmations should not be more than 8 percent.  And that was

8   well below 8 percent.

9         Now, the common denominator in the three hospitals

10   other than Chestatee was JVS Billing.  You heard from Mr. Jose

11   Salazar, JVS Billing.  He handled the billing for all of those

12   hospitals.

13         However, when Mr. Durall purchased Chestatee Hospital

14   and enlisted Ms. Zaffuto and Medivance to do the billing, the

15   billing obviously was done correctly.

16         What did Dr. Peter Kongstvedt say?  And I hope I

17   pronounced that correctly.  In response to another question, he

18   said, in part, Except for billers.  Billers only process the

19   information that they're given.

20         That goes back to a part of my opening statement

21   where I said three things have to happen for claims to be

22   properly adjudicated by Medicare or by private insurers.  They

23   have to be medically necessary, the services actually have to

24   be rendered -- that's obvious -- and the claim form has to be

25   correctly completed.  When that happens, a claim can be

1   properly adjudicated.

2           Well, as I mentioned, it's not up to Ms. Zaffuto and

3   Medivance to determine whether anything is medically necessary.

4   A biller doesn't go back and question the judgment of a

5   provider.

6           Secondly, it's not Medivance's position or duty or

7   responsibility to even determine, or any biller, whether the

8   service was provided.  But what you do know here is that the

9   services were provided at Chestatee.  There's no doubt about

10  that.

11          So what is her responsibility?  Her responsibility is

12  to submit the claim forms accurately, correctly.  And what did

13  she do?  The data that Medivance was providing is that

14  Chestatee Regional Hospital performed a urine drug test.

15          So she takes that information and she places it on a

16  UB-04/CMS 1450 form.  That is the only form that a biller is

17  allowed to use for an institution.

18          The type of bill, she included a 141 code.  And at

19  least we don't have to go down all the analytics of that.  But

20  that's the type of bill for a nonpatient.  And that was what --

21  the information provided to her, that's what was actually done,

22  and that's how she filled the form.

23          And also avoiding the place of service code 22 -- as

24  you've heard probably 14 or 15 times, there is no place on a

25  UB-04 for a place of service code.

1    So, again, she gets data.  Tests were run at

2  Chestatee Hospital.  She takes the UB-04.  She adds the type of

3  bill code 141 and she submits it.  And that's exactly what she

4  was supposed to do.

5    Not only is that what she was supposed to do, it's

6  clear, based on that, that she made no false statement on any

7  claim.  The absence of that false statement and the correct

8  processing of that information shows that she had no intent to

9  defraud.

10    And if she had no intent to defraud, there cannot be

11  any proceeds in any money laundering count that represent

12  specified unlawful activity, which in this case is health care

13  fraud and wire fraud.  It's just simply not there.

14    And that -- I do agree with Mr. Hayes, from his

15  comment this morning, to an extent, and at least as it relates

16  to Ms. Zaffuto, the case is simple.  She's the biller.  She

17  received information.  She filled out the claim exactly as she

18  was supposed to fill it out.  And then she submitted it

19  correctly.  Absolutely no false statement.  Absolutely no

20  intent to defraud.

21    And based on that, I ask you to return a verdict for

22  her, which is the only one that the evidence that the

23  government presented supports, and that's not guilty on

24  conspiracy to commit health care fraud or wire fraud,

25  conspiracy to commit money laundering, and money laundering.

1        Thank you.

2        THE COURT:  Thank you.  Mr. Rowland.

3        MR. ROWLAND:  Good afternoon.  I know you haven't

4   seen me in about six weeks.  I'm Caleb Rowland.  I represent

5   Sean Porter.

6        I'm going to echo what my co-defense counsel said,

7   thank you for the attention that you've shown during all this

8   testimony.  I know it's been a lot.  I've noticed that several

9   of you have been taking notes.  I know that Mr. Porter

10  appreciates that.

11       If you recall when I first talked with you in the

12  opening, I told you that the government's case basically boiled

13  down -- at least as to Mr. Sean Porter, basically boiled down

14  to throwing large numbers at you and expecting you to convict.

15       And what did they do?  They did exactly that.  I'll

16  show you two of their charts.

17       Your Honor, if I could approach and put this up so

18  y'all can see.

19       $1.4 billion in alleged fraudulent -- and what did

20  they show you?  A bunch of large numbers, including 952,000,

21  27.2 million, plus 80,000.  It wasn't even explained to you.

22  And then in terms of the actual charges against Mr. Porter, go

23  back to what I talked about earlier, two checks $75,000 each.

24       Now, I'm not psychic.  Don't ask me for lottery

25  numbers or picks on an NFL game.  The reason I told you that is

 1   because that's all that they have, from the beginning.  That's

 2   all they've had against Mr. Porter.

 3           Now, the government also told you this morning, these

 4   defendants were, quote, making more money than they should

 5   have.  That's really what this boils down to.

 6           The government had insurance company executives come

 7   in and talk about the, quote, services that they provide their

 8   members, as if they're doing something out of the goodness of

 9   their heart.

10           Let's be perfectly clear.  Insurance companies are

11   not in the business of paying out claims.  They're in the

12   business of taking in premium payments and paying as few claims

13   as possible.

14           Florida Blue, Aetna, United decided they were paying

15   more than they wanted to, bottom line.

16           Now, I'm not going to go into a lot of the health

17   care fraud issues, because my co-defense counsel has already

18   done that.  And I anticipate Mr. Sadow will do that.

19           And I'm also not going to go into a lot of the jury

20   instructions, because you've already gone over them, and you're

21   going to have them.  You'll know what they say.  I would ask

22   you to think about a couple of things that are involved in

23   those.

24           And I appreciate the way -- I appreciate the way that

25   Ms. Galnor put it to you, in terms of the standard that the

1  government has to meet.

2     Proof so convincing that you would be willing to rely

3  and act on it without hesitation in the most important of your

4  own affairs.

5     Has any of the evidence that you've heard against

6  Mr. Porter -- and to be fair, he's been mentioned like six

7  times in six weeks.  Has any of that evidence risen to the

8  level that you would be willing to rely and act on it without

9  hesitation in the most important of your own affairs?

10     Now, throughout this trial the government has had the

11  burden of proving to you beyond a reasonable doubt that

12  Mr. Porter committed a crime.  That burden was theirs and

13  theirs alone.

14     I submit to you that you haven't heard any evidence

15  that reaches the level of being so convincing that you would be

16  willing to rely on it as to any of the defendants, but

17  certainly not as to Mr. Porter.

18     Mr. Hayes told you that this case is simple and there

19  is no doubt at all.  Well, one of the things I'll highlight for

20  you is if it takes two experts, $650,000 worth of time to

21  explain to you whether a crime has been committed or not, that

22  by itself is reasonable doubt.

23     And the biggest question here is:  Was there any

24  crime committed?  Based on the evidence the government has put

25  on for you, the answer to that has to be no.

1       The government didn't show you one law or regulation

2   that prohibits what the defendants in this case did.

3       And as to Mr. Porter, what did you hear?  He was an

4   employee responsible for setting up a reference lab.  No

5   evidence that he had any real involvement in the business side

6   of the lab's work.

7       Now, remember what Dr. Fender told you when she was

8   testifying about speaking with Mr. Porter when she was

9   concerned about this reference lab.

10      If you recall, she was talking about her blood

11  pressure being high.  And she said that -- after talking with

12  Sean Porter, my blood pressure lowered.

13      She felt like her concerns had been addressed.

14      The other interesting thing to me is that the

15  evidence shows that Mr. Porter was working to set up the exact

16  lab the government complains wasn't available for testing.  Of

17  course it wasn't.  It was being set up.

18      And Mr. Porter and his -- his brother Jim Porter

19  spent tremendous amounts of money to get a high-quality working

20  lab going at Putnam County.

21      Mr. Porter is charged with one count of conspiracy to

22  engage in money laundering and two counts of substantive money

23  laundering, meaning actual money laundering.

24      Part of what the government has to prove to you --

25  and this is contained -- the language here is contained both in

1  the jury instructions and in the superseding indictment.

2  But in terms of the substantive money laundering

3  counts, Counts Sixteen and Twenty-Two, one of the things the

4  government has to prove to you beyond a reasonable doubt is

5  that he knew that the funds involved in those two transactions,

6  those two $75,000 transactions, were the proceeds of some

7  illegal activity.

8  Now, knowledge or knowingly isn't, Well, he should

9  have known, or he could have known, or he probably knew.  He

10  has to have actual personal knowledge.

11  And for those counts that means that he knew that the

12  funds were the proceeds of some illegal activity.  In terms of

13  the conspiracy count, Count Eight, again, the government has to

14  prove to you that he knew when he agreed to engage in the

15  transaction the funds were the proceeds of illegal activity.

16  It took the government almost $700,000 to explain to

17  you why this allegedly was illegal.

18  Now, Mr. Schwartz went over the advice-of-counsel

19  defense, so I'm not going to belabor that point.  But there are

20  some questions that I think would be important for you to ask

21  yourselves while you're deliberating.

22  Did you hear any evidence of any agreement between

23  Mr. Porter and anyone else?  Did you hear any evidence that

24  Mr. Porter knew the government considered any of these payments

25  that he allegedly agreed to receive were for something illegal?

1    Did you hear about Mr. Porter trying to conceal those payments?

2            And, by the way, notice those payments were literally

3    written to him.  Okay?  He deposited those into an account for

4    a company that, when you look at our Exhibit 1, you'll see has

5    his name on it.  It's publicly available on a State of Florida

6    website.

7            Did you hear about the use of aliases of fake names?

8    Did you hear about hidden accounts, offshore accounts?  Did you

9    hear about Mr. Porter and his brother creating any false

10   documents?  Did you hear about sham investments, putting the

11   money into diamonds or art, crypto currency?  Did you hear

12   about any strawman account holders, somebody else holding on to

13   the money for him, any false information on any bank documents?

14           You didn't hear about any of that.  And you can use

15   that to determine the knowledge requirement.

16           You're going to see, if you look at Mr. Porter's

17   exhibit, that TYSI, LLC, his company, was created in 2013, over

18   three years prior to the events that are covered in the

19   indictment.

20           And, again, what evidence did you hear that convinces

21   you beyond a reasonable doubt?  And to be very clear, that's up

22   here.  Okay?  This isn't more likely than not.  This isn't

23   probably happened.  This is up here.

24           What evidence did you hear that convinces you beyond

25   a reasonable doubt that Mr. Porter knew the payments he

received were for something the government considered illegal? That itself is reasonable doubt right there.

Now, one other thing that I brought up in the questioning of Ms. Henderson, Kimberly Henderson, the FBI's forensic accountant -- note that both of these are checks and they're handwritten.

And if you recall Ms. Henderson's testimony, she said that it didn't involve a wire transfer, didn't involve an internet transfer, those checks were most likely hand-delivered.

She also confirmed that the account that those checks went into was located in Ocala, Florida. And she confirmed that the account that those checks came from was located in Ocala, Florida.

The government has to prove to you that these transactions affected interstate commerce for it to be a federal crime. They haven't done that. They haven't met that burden.

So putting aside all the other issues that there is in the case, if you want to find something to hang your hat on, there it is.

There is no evidence that those transactions affected interstate commerce, meaning obviously between two states, or foreign commerce, meaning between the U.S. and a foreign country. That's a minimum requirement for a conviction here.

1    And the government hasn't proven that to you.

2            If you think back to the testimony that Mark Thomas,

3    the attorney, gave, Mr. Porter and his brother relied on the

4    advice of counsel and followed their lawyer's opinion after

5    having informed that lawyer of the specific acts they planned

6    to take.  That's a complete defense.

7            Mr. Schwartz went over that when he was talking about

8    Jim Porter.  And, also, notice the sleight of hand here.  The

9    letter deals with marketing.  Mr. Thomas told you that he

10   orally gave his opinion on the under arrangement that Jim

11   Porter's lab, Pinnacle, was involved in, and HLP.

12           Now, as to the government's witnesses -- and these

13   are just things that kind of caught my attention during the

14   trial.  And I wrote them down.

15           On the health care fraud counts, you heard that the

16   insurance companies' own clearinghouses changed the information

17   that's sent from the providers before it ends up reaching the

18   insurance companies.

19           And, also, take into account that while the

20   investigation was ongoing, the government's own case agent went

21   to work for one of the alleged victims here, Florida Blue,

22   Robert Schwinger.

23           In case you're interested in what he looks like, my

24   understanding is he's sitting right back there now.  First time

25   he's been here.

 1       You're the ultimate judge in terms of the credibility

 2  of the government's witnesses.  Again, not going to belabor

 3  that point.  But think about this, one of the government's star

 4  witnesses couldn't be trusted not to get intoxicated before he

 5  came in and testified to you, couldn't be trusted not to.

 6       If you think about Michele Jordan, the attorney that

 7  testified earlier in this case, why is it that the defense is

 8  the one who's providing you with the text message, where she's

 9  talking about how great this would be for the hospital?

10       And if you notice, every time one of the government's

11  witnesses would give them an answer they didn't want, you'd

12  start hearing about money again, large amounts of money.

13       Again, I'm not a psychic.  It doesn't take a psychic

14  to figure out that they're going to lean heavily on what they

15  allege to be fraudulent billing.

16       Now, after Judge Corrigan gives you your instructions

17  and you go back to the jury room to deliberate, the issues that

18  I brought up here and the issues that my colleagues have

19  brought up should be of the utmost importance for you to

20  thoughtfully, fully, and seriously consider.

21       Because as several of the defense counsel have told

22  you, this is the most important day of every one of these

23  defendants' lives.

24       There is simply insufficient evidence to convict

25  Mr. Porter of any crime.  And I say that because there is no

1    evidence of a crime being committed here.

2        We're asking you to hold the government to their

3    standard of proof.  We've all implicitly agreed by living in

4    the country past the age of 18 that there's certain rules that

5    we're going to play by.

6        And one of those is that if the government is going

7    to convict you of a crime, they have to prove beyond a

8    reasonable doubt that that crime occurred and that you did it.

9    Not maybe he did it.  Not he could have done it.  Not he most

10   likely did it.  Not he probably did it.  Beyond a reasonable

11   doubt he did it.

12       When you were sworn as witnesses [sic] you're

13   required to leave -- you weren't required to leave your common

14   sense at the door.  Ms. Galnor brought that up.

15       THE COURT:  You said sworn as witnesses.  Were you --

16       MR. ROWLAND:  I apologize.  When you were sworn as

17   jurors -- I misspoke -- you weren't required to leave your

18   common sense at the door.  Use that.

19       If you hold the government to their standard of

20   proof, beyond a reasonable doubt, I'm confident that you'll

21   return with a verdict of not guilty on all counts against

22   Mr. Porter and you'll send him home to his family.

23       Thank you.

24       THE COURT:  Thank you, Mr. Rowland.

25       We'll take a recess.  It's 3:17.  Let's try to come

1  back at 3:30.  Okay?

2           COURT SECURITY OFFICER:  All rise for the jury,

3  please.

4       (Jury exits, 3:17 p.m.)

5           THE COURT:  All right.  So we'll be in recess.

6           And then, Mr. Sadow, you're going to finish up.  And

7  then, Mr. Duva, I think we'll have time to go ahead and get

8  your rebuttal in as well.

9           MR. DUVA:  Yes, sir.

10          THE COURT:  All right.  We're in recess.

11      (Recess from 3:18 p.m. to 3:32 p.m.; all parties present.)

12          COURT SECURITY OFFICER:  All rise.  This Honorable

13 Court is now back in session.

14          THE COURT:  Ready for the jury?

15          MR. ROWLAND:  Your Honor?

16          THE COURT:  Yeah.

17          MR. ROWLAND:  We received the document we were

18 waiting on.  There's no objection.  I just wanted to alert the

19 Court in front of the jury.

20          THE COURT:  All right.  So that will be Porter 2?

21          MR. ROWLAND:  Yes, sir.

22          THE COURT:  Sean Porter 2?

23          MR. ROWLAND:  Yes, Your Honor.

24          THE COURT:  Okay.  It will be received.

25          All right.  Let's have the jury, please.

 1          COURT SECURITY OFFICER:  All rise for the jury.

 2      (Jury enters, 3:33 p.m.)

 3          COURT SECURITY OFFICER:  Thank you.  You may be

 4      seated.

 5          THE COURT:  All right.  Welcome back, ladies and

 6      gentlemen.

 7          Before Mr. Sadow begins, Mr. Rowland had asked me to

 8      hold open his case because he wanted to get an additional

 9      exhibit, which we've now been able to obtain.  And I understand

10      there's no objection.  So I'll admit Sean Porter Exhibit 2.

11      (Defendant Sean Porter's Exhibit 2 received into

12      evidence.)

13          THE COURT:  Thank you, sir.

14          And then I'm not sure, Mr. -- you've already given

15      your closing, of course.  But I'm not sure you ever officially

16      announced rest.  I think you did announce rest subject to that

17      exhibit.  So you have rested your case on behalf of Sean

18      Porter.

19          And now we're back to closing arguments.

20          And, Mr. Sadow, you may proceed.

21          MR. SADOW:  Pay no attention to the man behind the

22      curtain, a familiar phrase from *The Wizard of Oz*.  And you know

23      the man behind the curtain in this case is the insurance

24      company.

25          You're supposed to ignore how they've manipulated

1 this entire case, and given it to the government so that the

2 insurance company can win, so they can get their money back.

3 And we know this is what's happened because, as I unfold this

4 in front of you, you will see the part that the insurance

5 company plays.

6       It's been five years and eight months since this case

7 started being investigated in August of 2016. And I'm taking

8 us to the beginning of this trial on May 9th.

9       And in August of 2016, Florida Blue and a federal

10 agent by the name of Holt had interaction at CGH,

11 Campbellton-Graceville Hospital.

12       And how did that take place? There was a visit. I

13 believe the visit was on August the 22nd of 2016. And at that

14 visit Mr. Holt and the SIU individual Goldner from Florida Blue

15 came to visit. And they had a conversation with a number of

16 people, including the lawyers and some of the lab people.

17 You'll remember this.

18       And they said, and you've heard it, and you'll hear

19 it, unfortunately, again -- they said, Where are all these

20 people coming from to be outpatients at CGH? We don't

21 understand how all these people from all over the country can

22 be coming to CGH to be outpatients.

23       And the individuals from CGH, including the lawyers

24 and Edith Mears, in some bewilderment said, But, wait, that's

25 not accurate. That's not true. They're not outpatients.

 1   They're something else.  They're nonpatients.  You know what a

 2   nonpatient is to the investigators?  They didn't have a clue,

 3   didn't have a clue.

 4          As far as they were concerned, there was something

 5   called a place of service code 22 that was showing up on the

 6   insurance company Florida Blue's claims, and that meant it had

 7   to be an outpatient.

 8          Now, I digress momentarily.  Because do you think

 9   that the investigators that are involved for the federal

10   government or from an SIU, who have been involved in an

11   investigation for five years and eight months, ought to make a

12   guest appearance at a trial like this, because maybe, just

13   maybe, the jurors would like to hear about the investigation

14   from the people that actually conducted it.

15          So who was there that day?

16          Mr. Holt?  Mr. Holt?  Mr. Holt?

17          Never made it to this courtroom.  Surprising?  No.

18          Mr. Goldner?  Mr. Goldner?  Mr. -- he's not here

19   either.  He never made it to this courtroom.

20          What about Ms. Gallagher?  Remember, she was the

21   lawyer that questioned whether or not this outpatient was

22   accurate.  She's the one that wrote the letter, e-mail, which

23   is in evidence as Durall 11U, 11U -- Ms. Gallagher?  Ms. --

24   wait.  She's not called by the government either.

25          So the first three important people that start this

1  case off, the government chooses not to call.

2  Why would you not call those people to come forward

3  to tell us about how this investigation starts?  Well, everyone

4  might have their own opinion, so I'll give you mine, because

5  they don't want to hear what they got to say.  That's the only

6  reason the government doesn't call somebody, is because they

7  don't want to hear what they got to say.

8  Now, the judge -- the Court is going to instruct

9  you.  And I have Mr. Citro.  Thank goodness I have a great

10  co-counsel.  The first instruction is the one I want to deal

11  with that has to do with this area.

12  If you'll put it up.

13  I expect the Court will instruct you, just with the

14  language that's on the screen now.  The keys are the indictment

15  or formal charge is not evidence.  The law presumes the

16  defendant -- and when I'm speaking, I'm speaking for Christian

17  Fletcher.  I speak for no one else.  What I may have to say may

18  apply to others, but I talk for Christian Fletcher and

19  Christian Fletcher alone.

20  A defendant does not have to prove his or her

21  innocence or produce any evidence at all.  And that means it

22  all must come from the government if you don't produce evidence

23  or call witnesses.  Mr. Fletcher had no need to call witnesses,

24  because the government failed to prove its case.

25  The defendant does not have to testify.  And if a

1  defendant chooses not to testify, you can't consider it in any

2  way.  I don't have to say any more.  You all understand what

3  that means.

4       And then bottom line, The government must prove guilt

5  beyond a reasonable doubt.  If it fails to do so as to any

6  defendant, you must find that defendant not guilty.  That's the

7  essence of this instruction to begin with.

8       So when you look at this, you say to yourself, What

9  has the government introduced as evidence in this case to prove

10 guilt?  And if they haven't proved it or they haven't adduced

11 evidence, the absence of evidence creates reasonable doubt as

12 well.

13      So let's go back to August.  We don't call -- the

14 government doesn't call anyone -- you can take it down --

15 doesn't call anyone -- anyone that can testify about that

16 particular investigation, and they don't call Ms. Gallagher.

17 Why?

18      Because this case starts off on the wrong foot.  It

19 starts off on a faulty premise, on a false -- false premise.

20 And you know when it gets corrected?  Never.  It never gets

21 corrected, because they start with a type of bill 141.  They

22 equate it -- that is, the insurance companies equate it to a

23 22, and off we run.

24      And as other counsel have already pointed out to you,

25 that never changed.  How many witnesses did we ask about type

1   of bill 141 who were involved with the insurance companies that

2   didn't know what it was, were confused about what it was,

3   thought it meant outpatient?

4           The best example was the individual that came in from

5   one of the insurance companies, who looked at you when I was

6   asking questions about the 837 and the type of bill 141, and I

7   said, What does that mean?

8           And they said -- this was the -- the tech expert.  I

9   said, What does that mean?

10          He said, Outpatient.

11          I said, What?  141 means outpatient?

12          He said, It means outpatient.

13          How do you know it means outpatient?

14          Because I talked to a guy from X12 and he told me,

15  based on his knowledge, that it was outpatient, and, therefore,

16  I coded every single type of bill 141 claim as an outpatient

17  claim, every one of them.

18          Do you even know what a nonpatient is?

19          I have no idea.  No idea what a nonpatient is.

20          This is the information the insurance companies were

21  feeding to the government.  And when they were shown to be

22  inaccurate, did they change?  No.  Of course they didn't

23  change.  They wouldn't change.

24          Because if they changed and admitted that they've

25  known from the get-go that this was a nonpatient, who doesn't

 1   have to be at the hospital, whose specimen only has to be sent

 2   for analysis to a hospital or under agreement to a lab, that

 3   would have ended it.

 4          So why admit that which would put an end to this

 5   investigation?

 6          They didn't.  Nope.

 7          I'm going to talk a little more at this point about

 8   the other agents.  Because you know from Ms. Henderson that on

 9   September 21st, 2018, she attended a meeting.

10          She attended a meeting with other agents, one of

11   which was the case agent, Mr. Schwinger, who, of course, was so

12   fortunate that upon leaving the FBI, after his many years of

13   service, was able to find a job with Florida Blue.

14          Coincidental, I'm sure.  It had nothing to do with

15   his involvement in the investigation by the FBI of the

16   insurance companies and working with Florida Blue during this

17   case.  And, of course, it took place only three months after he

18   left the FBI.  Again, I'm sure it was a coincidence.

19          Mr. Schwinger was there and Mr. Holt was there and

20   all these prosecutors were there and all the insurance company

21   for Anthem -- their lawyers were there, and not a single one of

22   these agents, because Ms. Henderson didn't -- remember, she

23   didn't remember much about it.

24          She knew the type of bill 141 was mentioned, but not

25   code 22.  But no Mr. Schwinger and no Mr. Holt to talk about

1    why it is that the agents and the government are meeting with

2    the insurance company attorneys during the investigation of the

3    case.

4           And how many other meetings like that did we not hear

5    about -- did we not hear about because they didn't call the

6    agents?  Do you think they were meeting with the insurance

7    company attorneys just for the heck of it?  Do you think there

8    was nothing going on in which they were attempting to work

9    together and try to straighten some of this mess out?

10          Let's talk about how the insurance companies work

11   with the government.  The government says, Here's a grand jury

12   subpoena and we'd like to get claims data.  We'd like to get

13   the claims data that was submitted to you by the billing

14   company Empower through JVS.  We want that data.

15          And the insurance companies, to a one, go, Okay.  No

16   problem.  We're going to get you that data.  We're just going

17   to add a few things to it.  We're just not going to give you

18   all the data.  We're going to leave some of it out.  We're

19   going to add in the place of service 22.  And then we're going

20   to talk about how all the other data that we don't give you --

21   data that we tried to lessen its importance didn't really make

22   a difference.  We're going to just kind of add -- we're going

23   to act like that doesn't make any difference.  We're going to

24   act like the submitter field, in which LifeBrite is -- that

25   doesn't make any difference.

1        We're going to act like the type of bill 141 -- that

2    doesn't make any difference.  We're going to say the patient

3    control number, which has the actual name, either LB for CGH or

4    RGHLIFE, which is LifeBrite for RGH, or PCLIFE for Putnam --

5    we're going to say that doesn't make any difference.

6        We're going to tell you -- and leave off of our

7    sheets where all the patients, the beneficiaries were coming

8    from.  We're going to leave off all the information about where

9    the doctors were coming from.  We're going to give you just

10   enough information to help you make your case against these

11   defendants.

12       We won't give you all.  We'll give you enough.  We'll

13   create it and you can use it.  They didn't even talk about the

14   837s.  At that point I don't know if they even knew what they

15   were.  But they gave them the data.

16       So now they've given them the data.  And the

17   government has been told to run with it.  And they tried to.

18   And they find out that there are 837s in which a UB-04 form,

19   it's a CMS 1450 -- it's what the gold standard CMS talks about

20   using, everybody does it, and then the government has to start

21   dealing with facts.  Or facts?  Wait, not facts.  We don't need

22   to deal with facts.  I know what we need to deal with.  Let's

23   deal with contracts.

24       I was shocked, shocked I say, in the government's

25   opening.  You know what it said?  And I wrote it down.  This is

1 about the LifeBrite contracts.

2 You knew there was something wrong going on because

3 of the delivery times that are mentioned in the contract, the

4 delivery times. That's where the government comes up with

5 LifeBrite as being somehow involved in wrongdoing, through the

6 delivery times?

7 Let's ignore the rest of the contract. Let's not

8 talk about all the other terms in the contract. Let's go on

9 delivery times.

10 Who is supposed to be honest here? Who's supposed to

11 be transparent? Who's supposed to tell you what the real facts

12 are? Well, I guess on the contracts it's going to be me.

13 So let's start with 26C, please, if you can put that

14 up.

15 Now, 26C is the services agreement for reference

16 laboratory services between LifeBrite Laboratories and

17 Campbellton-Graceville Hospital. It's dated October 2015,

18 signed off on by Mr. Fletcher on behalf of LifeBrite and Edith

19 Mears on behalf of Campbellton-Graceville Hospital. And at

20 that point Ms. Mears, as you know, was CFO, Chief Financial

21 Officer.

22 What does this say? This outlines exactly what the

23 agreement was between CGH and LifeBrite for the performance of

24 services.

25 It indicates as clear as it possibly can -- and

1    you'll have a copy of this to look at.  It indicates that

2    LifeBrite was going to do confirmatory testing.  Not

3    presumptive testing.  Confirmatory testing.  Definitive

4    testing.

5            They were going to -- that the hospital bill that's

6    in 2.2 of that particular agreement, they were going to receive

7    80 percent of that which was paid.  That's in 2.1 of the

8    agreement.

9            And in 1.6 of the agreement, they were talking about

10   the hospital responsibility.  And the hospital's responsibility

11   in 1.6 of the agreement was for collecting specimens and

12   conducting the qualitative urine drug screens, that's what the

13   hospital was responsible for, collecting specimens and

14   conducting the qualitative, which are the presumptive urine

15   drug screens, and determining medical necessity.

16           Now, you know from the two experts that testified for

17   the defense, Mr. Small, Mr. Larry Small, and Mr. Michael

18   Arrigo, that when it speaks in terms of CMS gold standard

19   regulations that the hospital is in control of the sample or

20   specimen.  That's what the regulations pertain to.

21           And collecting the specimens equates to control and

22   ownership of the specimens.  And what that simply means is the

23   hospital determines how the specimens are to get to the

24   hospital under this agreement.

25           And you know from the testimony that what was agreed

1  upon is that the hospital and LifeBrite -- LifeBrite would

2  split the specimens.  It would keep a portion.  It would send

3  to the hospital CGH a portion, and CGH would have the

4  responsibility under the agreement to do the presumptive

5  testing.

6          They would then put those results into the laboratory

7  information system, the LIS, and then LifeBrite would do

8  exactly what they were supposed to do, which is the

9  confirmatory testing.

10         Now, what did you hear in reference to that type of

11 testing from the witnesses?  Not a single person said that

12 LifeBrite related specimens to CGH were not tested.  You know

13 from Brenda Rhodes that they had protocol.  LifeBrite gets

14 tested.  LifeBrite gets their specimens tested.

15         There was no question about it.  Indeed -- and I've

16 tried to write some of this down so that -- in case y'all want

17 to look at it later when you're in the jury room.

18         If you'll look at Defense Exhibit 32 and Government's

19 Exhibit 52B -- outlines that protocol for CGH.  She made it

20 perfectly clear that that's the way it was to be done.  And

21 what did LifeBrite do then?  The confirmatory tests.

22         Did you have one person come in, even one, that said

23 that LifeBrite didn't do its confirmatory tests exactly the way

24 it was supposed to do it?

25         Let's go further than that.  You've heard from

1  others.

2         How many people from LifeBrite came in here and told

3  you that LifeBrite did something improper or inappropriate?

4  None.  Not a single person.

5         You may have heard from others that are involved in

6  this case.  Did you hear any doctors come in here and say that

7  LifeBrite did anything inappropriate or improper or wrong with

8  patients that ultimately -- their specimens would associate or

9  be connected to LifeBrite?  Not a single doctor.  Not a single

10  doctor.

11         How about a patient?  Has there been one single

12  patient -- five years, eight months' worth of investigation.

13  Has there been a single patient that came in here and said,

14  LifeBrite did something wrong.  I don't know what they did.

15  I'm concerned about what they did?

16         Not a single person.  Who did they call?  They called

17  one doctor, the government, Erik Solomon.  And what did Erik

18  Solomon say?  It must have been a surprise to the government.

19  Erik Solomon says, LifeBrite did a great job.  And I order

20  presumptive and definitive, confirmatory testing on every

21  single one of my patients.

22         I'm a specialist.  This is what I do.  This is the

23  way it needs to be done.  I can't just trust for false

24  positives on screens.  I can't trust for false negatives on

25  screens.  I want a confirmatory test.  And what did LifeBrite

 1   do beyond that?  They came up with a concept of co-branding.

 2          And we know what that means because we went over it

 3   in court.  Co-branding had LifeBrite in the left corner and it

 4   had the name of the hospital, CGH, RGH in the right-hand

 5   corner.  And that co-branding began early on.

 6          In fact, you might remember when Ms. Rhodes was on

 7   the stand -- and, again, I'm referring specifically to -- and

 8   you'll see the co-branding in Defense Exhibits 41C, 41F, 33,

 9   and 40.

10          And the one I'm referring to now is Defense Exhibit

11   40.  That's the one in which you have an e-mail from Ms. Rhodes

12   which is to Christian Calhoun and Christian Fletcher.

13          The government said, You met Christian Fletcher,

14   didn't you?

15          Ms. Rhodes said, No, no.  I met Christian Calhoun.

16          And they said, Well, but you mean Christian Fletcher?

17          No, no, no.  It's Christian Calhoun.

18          And when I got up, I said, You know, maybe you really

19   meant this to go to Christian Calhoun and sent it to

20   Mr. Fletcher by mistake.

21          She goes, Well, that's possible.

22          And I said, Because the response you got back from

23   LifeBrite was very simple.  We always co-brand our requisition

24   forms.  So if you're -- why would you send us an e-mail that

25   says from now on you need to identify in your requisition form

1   who you are?

2           It's in the e-mail.  And it was all forms co-branded.

3   It was LifeBrite who did that.  And did you hear anyone come in

4   and say that they were misled by a co-branded requisition form?

5           And the requisition form is just an order coming from

6   the -- from the doctor, the doctor who makes the decision about

7   medical necessity.  He's the one that sends it out.

8           Let's go further with that.  Because the government

9   said something else in opening statement -- in their opening

10  argument.  It said the provider physician ordered tests from

11  out-of-network labs.

12          Not a single person came in here, not a one -- not

13  even one said that they ordered LifeBrite to do the testing.

14  Every one of them for CGH and RGH was on a co-branded form that

15  identified for the physician that the hospital was going to be

16  involved.

17          Now, you-all are going to have an exhibit back there

18  that has all of the orders processed by LifeBrite for CGH, RGH,

19  and Putnam.  It's 3500 pages.  I know you're going to read

20  every one of them.  You're going to check every page out.

21          But, truly, the bottom line on it is there are

22  hundreds of doctors on there, hundreds of doctors, who

23  prescribe or requisitioned or ordered these tests.  And the one

24  that they bring in is Erik Solomon, who says, This is the way

25  we do it.  This is the way we do it.

1          But wait, wait, wait, wait.  We have Waller.  You

2    have Waller.  What did he charge, 100-something thousand?  You

3    have Waller.  And, boy, I tell you, he had a lot to say.

4          You know, I never get a chance to make up charts, so

5    I'm taking advantage of one.  This is Waller,

6    cross-examination.

7          Remember, it was the end of the day -- y'all were

8    tired, kind of like you are now -- and I -- and the judge was

9    saying, Are you going to be able to complete this examination

10   before the end of today?

11         And I said, Yeah.  Let's get to the bottom line.  And

12   I said, Tell me what you know about the lab tests done by

13   LifeBrite Laboratories.

14         Dr. Waller's answer, Nothing.

15         So that takes care of Dr. Waller, because he don't

16   know nothing about LifeBrite.  Not a thing.

17         All right.  Let's move to 26G, if you would, ma'am.

18         Now, this is the agreement between LifeBrite and RGH.

19   And RGH -- this is June 27th of 2016.  First one was in October

20   of '15.  This is June of '16.

21         And you will see that, for the most part, this

22   agreement mirrors the same as CGH.  Same idea.  Services

23   agreement for reference laboratory services.  It has the same

24   responsibility in 1.6 of the hospital.  The same billing must

25   be done exclusively.  And that's in 2.2.  Both the agreements

we've gone over, exclusive billing.

LifeBrite could not bill, by agreement -- by their

under arrangement agreement, they were permitted not to -- they

were not to bill.

And then you have the same thing.  This is the notion

that LifeBrite has the ability to do the definitive or the

quantitative testing, and they're doing it for the patients

that have their specimens split and sent to RGH.  And, again,

let's talk about proof.

Government:  How many people came in from RGH to say

they didn't test the LifeBrite specimens?

None.

How many people came in and said that LifeBrite

didn't test -- confirmatory test for the specimens after the

RGH lab did its qualitative presumption test?

None.

How many people said that LifeBrite didn't live up to

its contract that it had with RGH?  None.

Surprising now, so far we've gone to CGH and no

witnesses.  We're at RGH and no witnesses.  No government

agents coming in at all.

So what is the evidence against LifeBrite?

Apparently, according to the government, it was the delivery

times.  I'm not quite sure how that fits in.  But this sure

sounds like it could wind up -- oh, wait, there's another piece

1  of evidence.

2　　　　How many people came in and said that LifeBrite,

3  Christian Fletcher, had any idea what the contractual

4  arrangements were between the hospitals and the insurance

5  companies?  Want to guess?

6　　　　None.  Not a single one.

7　　　　So Christian Fletcher is operating a lab.  He's doing

8  it exactly the way it's supposed to be done.  He's living up to

9  his contract.  There's no evidence that he knows that there's

10  anything in the agreements between the hospitals and the

11  insurance companies that forbid what he's doing, and he is

12  doing what it is he's supposed to do.

13　　　　We call that doing good legitimate business.  And we

14  know during this time period -- at the beginning of 2016 he's

15  had some interaction with David Byrns.  A lot has been said

16  about Mr. Byrns.

17　　　　The -- what's the old saying?  You don't want to beat

18  a dead horse.  So I'm going to stay away from David Byrns,

19  except that the government chose to show him some e-mails that

20  somehow gave a suspicious tone to the notion about Mr. Fletcher

21  wanting to get into business in purchasing hospitals that he

22  could actually then control what was going on with the

23  specimens and the hospital and the reimbursement rate.

24　　　　You saw that.  And then I, on cross-examination,

25  brought up all the rest of the exhibits that went all the way

1  from January of 2016 until April of 2016.

2         And when Mr. Byrns was shown all of them and asked

3  the questions about that business, what did he say?  That there

4  was something wrong?  Nope.  That there was something

5  underhanded?  Nope.  That it was a legitimate business that

6  they were trying to go in to.  And he never suggested

7  otherwise.

8         But you know who did suggest otherwise?  They did.

9  Just like everything else.  You know, if you're going to be

10  transparent, let's tell the whole truth, not just what seems to

11  be beneficial to the government.

12         And then -- and then Mr. Byrns said, You know, we

13  were going to get involved with this hospital called Stokes in

14  North Carolina, but we didn't.  But Christian Fletcher did.

15  And you know he did because, when Ms. Henderson testified, she

16  said, in talking about the money that came in, when she was

17  doing her analysis, there were 15 bank accounts.  There was a

18  hospital Stokes in North Carolina.  There's a hospital in

19  Georgia called Early.

20         And just to make it as clear as possible, the money

21  that was coming in -- when they were trying to say how much

22  money LifeBrite had made from this alleged scheme, she said,

23  Well, it's over $74 million, which is exactly what I told you

24  in opening statement.

25         But this time around she also had to say, There was

1  almost $49 million made from the same type of lab work outside

2  of these hospitals.  And that didn't take into account at all

3  the millions of dollars from Stokes, the millions of dollars

4  from Early, or any other business venture that they were in.

5  And when I asked her what the accounts were, you know what she

6  said?

7          I don't remember.  I know -- the only thing I did in

8  the whole case is put these charts together.  And I spent all

9  my time and I got all these bank records.

10          She couldn't tell us where the bank records came

11  from, bank account numbers.  She couldn't tell us what

12  expenses.  She couldn't tell us anything.  I guess she was

13  given that job of making the chart and that was it.  We're not

14  going any further than the chart.  But the chart -- and this

15  chart is 30 -- excuse me, 24E, Government 24E.

16          This is a chart from urine drug and blood testing.

17          Wait a second.  Did anybody hear anything about money

18  coming in from blood testing?  Did anybody even hear anything

19  about blood testing?  How does a chart get said urine drug and

20  blood testing when there's no evidence that anyone got paid

21  money from blood testing?

22          Oh, I know.  Second chart.

23          Mr. Skeffington, on the witness stand -- and he's

24  trying, you know -- again, I'm not -- he's already --

25  everyone's talking about Mr. Skeffington.  Clearly he has a bad

memory, among other things.

And Mr. Hayes has got him on direct examination.  And Mr. Skeffington just couldn't get it.  He's trying.  He's trying to think of names of people that he's supposed to talk about, but he's not having it.  He's just not getting to it.

So what does he say?  Here it is.  He's been given a couple of different chances.  And Mr. Hayes, he's going to be helpful.

It's Hayes:  Could it be LifeBrite?

Skeffington:  LifeBrite.  Sorry.

Why don't we just tell them what the answer is?  Wait, that's pretty much the way direct examination went for the government the whole time.  They would give them the facts and hope they'd say yes or they'd say no.

Now, that's the way it came into evidence.  But it kind of is more helpful, I think, to the jurors, to you, ladies and gentlemen, when the witness actually is giving you the testimony, as opposed to the government suggesting what that testimony might be.

Because on cross-examination people's memory seemed to go away.  They didn't remember.

Yeah, it's been a long time ago.  I don't remember.  I don't recall.  It could have been that way.

Everybody knew the answers on direct.  Nobody knew the answers on cross.

1    Surprising?  No.  Not surprising.

2    Who were the witnesses?  Insurance company witnesses,

3  the people that -- behind the scenes manipulating behind the

4  curtain, the insurance company.

5    So this sure sounds to me like it's a business

6  contract dispute, not a federal criminal case.

7    This is a federal criminal case.  This is when things

8  are -- couldn't be any more important to someone.  This is when

9  decisions are made that will affect lives, families.  This is

10  this.  This is not a contract dispute.  This is not the

11  insurance company suing somebody.

12    This is the federal government prosecuting basically

13  in the shoes of the insurance company, which takes us, if we

14  could, to the next instruction.

15    If you'll put up the one that deals with willfully

16  and knowledge, please.

17    This really hasn't been explained the way I think it

18  needs to be.  I believe the Court will charge you, instruct you

19  that knowingly means that an act was done voluntarily and

20  intentionally and not because of a mistake or by accident.

21    Now, willfully is a little different.  And the reason

22  this is important is because on Count One, where you have a

23  conspiracy to commit health care fraud or wire fraud, one of

24  the elements the government must prove beyond a reasonable

25  doubt is willfulness.  Willfully.

1        And what does willfully mean?  That the act was

2   committed voluntarily and purposely with the intent to do

3   something that the law forbids; that is, with bad purpose to

4   disobey or disregard the law, with bad purpose to disobey or

5   disregard the law.

6        Now, I ask you to think about the evidence here, with

7   that in mind.  What evidence was presented to you that

8   Christian Fletcher, using LifeBrite Labs, acted with bad

9   purpose to disobey or disregard the law?

10       If you don't find that, not guilty is automatically

11  required.  It's that simple.  That element's not proved unless

12  the government proves beyond a reasonable doubt bad purpose to

13  disobey or disregard the law.

14       And what do we know about the -- not the law, per se,

15  but CMS?  We've been all through it.  We know that

16  nonpatients -- we know what that means.  We know what TOB, or

17  type of bill, 141 means.  We know that code 22 isn't part of

18  that.  We know that there is such a thing called under

19  arrangement.

20       All of those are in evidence.  If you want to see all

21  of the CMS-related guidelines, you can go to Defense Exhibit 23

22  and look at 30.3 and 40.1 in chapter 16.

23       You can go to Defense Exhibit 44, which talks in

24  terms of the type of bill 141.  And you can go to Government

25  Exhibit 57, which also speaks about 30.3 and 40.3 and 40.3.1.

1    A lot of numbers.  I give it to you only if you

2 choose to look at it.  But the bottom line on that is, the

3 contracts that LifeBrite entered into, under arrangement

4 contracts, are permitted by the gold standard CMS regulations.

5    The billing can only be done by either the referring

6 laboratory or the reference lab.  LifeBrite was always the

7 reference lab, hidden under the billing.  The referring

8 laboratories or the hospitals -- hospital laboratories did all

9 the billing.  It was followed to the T, exactly the way it was

10 supposed to be.

11    And as an aside, you do know that during this time

12 period -- although Mr. Byrns was hesitant, you do know that

13 there was an attorney connected to LifeBrite.  And you know

14 that because, if you go to a particular e-mail, there was a

15 reference to that attorney and his e-mail address that talked

16 about health care.

17    You remember that's when David Byrns couldn't

18 remember, couldn't remember, couldn't remember?  Until I said,

19 What about that redline exhibit, the one that talked about --

20 that you sent along?

21    And he said, Oh, yeah, yeah.  I remember.  I sent

22 that along to the attorney.

23    And I said, You mean the attorney that dealt with

24 LifeBrite?

25    He goes, Yeah.  Now I remember.  Now you remind me.

1          He wasn't going to, but that's what he said.

2          So everything is being done right by LifeBrite.  The

3     reason we're here, because they made a lot of money, and the

4     insurance companies were not happy about it.

5          Now, let's move on to Putnam, 26M, please.

6          Now, this one's different.  And this goes to show you

7     that LifeBrite was trying to do it the right way.  You have a

8     contract.  This is the contract between Putnam County Memorial

9     Hospital.  It's September 16th of 2016, which is three months

10    after the last one we just talked about from RGH.

11         And this one is not called -- is not called the same

12    as the others.  This one -- the others -- the first two were

13    services agreement for reference laboratory services.

14         And LifeBrite's role there was to do confirmatory

15    definitive testing.  This one is an hospital outreach

16    laboratory development.  And as I said, this is September of

17    2016.

18         Now, what do we know about this timeframe?  We know

19    that Byrns has met with and talked to Chairman Luscan, the

20    board of trustees at Putnam County Memorial Hospital.  And he's

21    attended two board meetings, September 1st and September 12th

22    of 2016.

23         And they're outlining the program that is going to be

24    brought into play, the laboratory toxicology new lab that

25    they're going to bring to Putnam.

1       And on cross-examination I asked Mr. Byrns, Isn't it

2   a fact that you told Mr. Luscan in August or September of 2016

3   that this was going to be an outreach laboratory, and that

4   until the lab was up and running and could perform the tests,

5   presumptive, confirmatory tests, that they would be conducting

6   them through an outside lab who would be operating basically in

7   the place of or in stead of the soon-to-be Putnam lab?

8       And what did Mr. Byrns say?

9       Yes, I -- that's exactly what I told him.

10      And this contract is exactly what that is.  You go --

11  if you look at this and compare it to the first two, this one

12  is talking about developing a hospital outreach laboratory,

13  that is, that LifeBrite is going to be doing that for Putnam.

14      It talks about who's going to be performing the

15  tests.  It talks about the responsibility is still with the

16  hospital under 1.6.  Billing is still going to be by the

17  hospital, because this is an outreach under agreement.

18      It's -- and then, most interestingly, there is a

19  section for the first time that says that until the lab becomes

20  operational, that is, the hospital's lab becomes operational --

21  until that time, LifeBrite is going to perform both

22  qualitative, the presumption, and quantitative testing, and

23  that that will change when they are given notice by a manager

24  or Putnam Hospital that things are changed, that the hospital

25  lab is fully operational and doing the work it's supposed to be

 1    doing.

 2         And this agreement starts in September of 2016.  And

 3    what does LifeBrite do?  It does exactly what it has contracted

 4    to do.  Is there anyone that says otherwise?  Not a witness.

 5    Not a soul.

 6         And this is even more different, because specimens

 7    aren't -- there's no evidence that specimens are being

 8    separated here.  The specimens are going to LifeBrite because

 9    LifeBrite is standing in the shoes of the hospital.  That's

10    what the agreement says.

11         And LifeBrite is doing a qualitative and a

12    quantitative test.  And that's exactly what it does.  And

13    that's exactly how they're billed by the hospital.

14         And the fact that the hospital's lab, the toxicology

15    lab, is not operational until February of 2017 is exactly what

16    Government's Exhibit 27 -- excuse me, 26M contemplated.  It's

17    what the board of trustees contemplated.  It's what Byrns

18    contemplated.  It's what LifeBrite contemplated.  And, in fact,

19    that's what was done, exactly what's in this agreement.

20         So how do you have a bad purpose to disobey or

21    disregard the law when you're doing exactly what you've

22    been -- agreed to do, and the hospital knows exactly what's

23    going on?

24         You can go through the rest of Putnam.  And you can

25    see Putnam board of trustees was told who was being paid.  It

 1    was told what the checks were going for.  It was told on a
 2    monthly basis.  All of it was outlined to Putnam.  And things
 3    were operating exactly the way they had hoped.  And the lab got
 4    up and running.  It got up and running in February, not fully,
 5    but that's the timetable.
 6             So the idea of some phantom lab and LifeBrite doing
 7    something and concealing, there was no concealment.  Putnam
 8    knew exactly what was going on, board of trustees all the way
 9    down.
10             But, wait, is there something wrong with billing that
11    way?  Because Ms. Bobbitt came in from Anthem, with her 14
12    years of experience, and I asked her on cross-examination about
13    Quest, and I said, You know, do you not, that billing done by
14    Quest as a reference lab is -- it's billed under the hospital's
15    identification, and its -- its NPI and its tax identification?
16             And she said, Oh, no, it's not.  No, it's not.  I'm
17    experienced.  I've got 14 years.  That's not the --
18             COURTROOM DEPUTY:  Mr. Sadow, you have 15 minutes.
19             MR. SADOW:  Thank you.
20             That's not the way it's done.  That's not the way
21    it's done.
22             So what happens?  Ms. Pickens comes in from Putnam,
23    who was a nurse, and now is elevated -- I think she's CEO.  And
24    I asked her, What about Quest billing?
25             Oh, we bill for Quest all the time.  They do -- they

1  do the reference lab work and we do the billing.  That's what

2  we've always done.  And then we have the agreements that show

3  that that's exactly what they're still doing.  Not any -- no

4  difference at all.

5       So you've got the regulations that back up what

6  LifeBrite was doing, CMS.  You've got the contracts that back

7  up what LifeBrite was doing.  You have LifeBrite as an

8  operational entity with hospitals, with labs, conducting

9  business during the whole time.  No bankruptcies.  Their

10  business -- that's the business they do.  That's what Christian

11  Fletcher does.

12       And no one comes in here and tells you anything

13  different except insurance witnesses, because they're the ones

14  that didn't want to pay the money.

15       You know, the government opened up by saying lies for

16  money, that this is what it was.  What was the false

17  representation?  What was the false statement that Christian

18  Fletcher supposedly made?

19       I listened for 75 minutes in the government's opening

20  argument and they didn't say one thing that Christian Fletcher

21  said false, not one representation.  He didn't do the billing.

22  He wasn't responsible for the billing.  He did lab work.

23       Lab testing, that's LifeBrite.  Not billing.  Not

24  false statements.  Nothing coming out of Christian Fletcher was

25  false.  Everything was done pursuant to the agreements reached.

Everything was done aboveboard and open and honest.

When he was asked to provide documents, he provided documents. They made a big deal out of the fact that there was letters sent out to the -- to the doctors at one point in order to come back and show that they had sent it to LifeBrite and a certain hospital.

If you check those e-mails, you'll see that Christian Fletcher says, To give you even more documentation, I'm going to reach out to these people to get them to back up exactly what we've been doing. And every one of them came back and said that's what it is. It's in the evidence.

So where do we go in the last few minutes? Here's where we go. The government's going to get back up. They're going to make a closing argument. It's called a rebuttal argument. I don't get a chance to say anything else, not another word.

And I expect that you're going to hear potentially a lot of screaming, a lot of passion, a lot of, This is why we're right and they're wrong.

And when that happens, if you'll continue to think to yourself, Where is that evidence?

You know, you can be as passionate as you want, you can scream as loud as you want, you can even yell at a witness when the witness says something you don't like, like David Byrns on redirect -- when they asked, And what was going on?

 1  What was this arrangement for?

 2          And David Byrns said, Well, save the hospital.

 3          And the prosecutor lost it.  He didn't want that

 4  answer.  It was like, If I yell loud enough, maybe you'll take

 5  it back.

 6          Well, I'm expecting to hear a lot of that.  And I'm

 7  going to touch money laundering real quick.  Money laundering

 8  requires knowledge.

 9          We're talking about Counts Eight, Fifteen, and

10  Eighteen.  Eight is a conspiracy.  Fifteen and Eighteen are

11  called the substantive offenses.

12          You've got to have knowledge that the money you're

13  receiving in this money laundering comes from criminal

14  activity.

15          What you have here is LifeBrite receiving the money

16  it earned for the work it did.  The two times in which there

17  are wire transfers into their account, it's for the work they

18  were conducting at Putnam Memorial Hospital pursuant to their

19  agreement, not criminal activity.

20          He's got to know it comes from a crime.  He's not

21  guilty of Count One.  No willfulness.  He's not guilty of the

22  money laundering conspiracy in Count Eight.  He's not guilty of

23  Count Fifteen.  He's not guilty of Count Eighteen.

24          I told you in opening statement that I look to you to

25  return Christian Fletcher to his home and to his family.  And

1  I'm not going to get emotional now because I'm going to hold it

2  back.

3          But here's a man who has spent the last several years

4  of his life trying to show the government that he did it right.

5  And they didn't want to hear it.

6          You know why they didn't want to hear it?  Because

7  the insurance company didn't want to hear it.  The insurance

8  company didn't want to hear it because they didn't like the

9  idea that they paid out a great deal of money for services

10 rendered.

11         They want the rules to be different, but they weren't

12 different.  When they could change the contract in Putnam, they

13 changed it unilaterally.  When they wanted to cut the amount of

14 billing, they cut it.  They controlled.  But they couldn't

15 control what the law allowed Christian Fletcher and LifeBrite

16 to do.

17         The only entity with the collective wisdom that can

18 tell the government and, in turn, the insurance companies that

19 Christian Fletcher did not commit a crime is you.

20         And I'll take your wisdom any day over that of an

21 insurance company, over that of the government; to be honest,

22 over that of me and defense counsel.  All I ever ask for is a

23 jury to hear it, listen to the evidence, and do the right

24 thing.

25         This is a search for the truth and search for

1    justice.  And in this case, for Christian Fletcher, that's not

2    guilty four separate times.

3            And I ask you please to do that.  Thank you.

4            THE COURT:  Ladies and gentlemen, that concludes the

5    closing arguments on behalf of all the defendants.  Remember, I

6    told you that because the government has the burden of proof in

7    the case they do get to make the final rebuttal argument.

8            And, Mr. Duva, you may proceed.

9            MR. DUVA:  Thank you, Your Honor.

10   Counsel.

11           This is a search for the truth, ladies and gentlemen.

12   That's exactly what it is.  And that's what you went through

13   with 44 government witnesses and 13-and-a-half days, and the

14   cross-examinations of the defendants' case, which honestly was

15   probably more helpful to our case than our case was, with Mark

16   Thomas and Michael Arrigo and Larry Small talking about things

17   that had absolutely nothing to do with what happened.  At

18   times, especially with Mr. Thomas, it was laughable.

19           It was interesting to stand there and think, Is this

20   actually happening in a federal courtroom?  Did a defendant

21   like James Porter put up Mark Thomas -- and there's a --

22   there's a saying, Let's go on paper.

23           But when it plays out, this person couldn't even

24   remember before lunch that particular day that he wrote a

25   letter and then, boom, there's the letter.  And the letter has

nothing to do with the oral advice that Mark Thomas says he

gave to Jim Porter, his client of nine years.

And, in fact, it got so ridiculous that there's

really nothing that Mark Thomas said that you can take

seriously other than the big flaw for Larry Small, Michael

Arrigo, and Mark Thomas was all of this business in Medicare --

and this is a private insurance company, private payer case --

about doctors referring samples to the hospitals have to have

the doctor in some way connected to the hospital.  They have to

have privileges with the hospital.

Was there any evidence of that in the entire trial?

Zero.

Is there any evidence that Hospital Laboratory

Partners was a marketing company to -- that did anything to

connect urine samples to Putnam?  Zero.

Those witnesses talked about something that didn't

happen.  It's desperate.  It's pathetic.

And so what we want you to do is look at the facts.

And the facts are these.  The facts are -- and Mr. Sadow didn't

talk about this, because he doesn't want you to look at it.

The facts bear out, in March of 2016, and even before

that, when David Byrns said that he met Christian Fletcher --

there's an e-mail from Mr. Fletcher and there's about a

nine-page back-and-forth about critical care access hospitals.

And Mr. Fletcher writes that he wants to find these

1  hospitals, preferably a CAH, a critical access hospital, for

2  the lab side.  This will give us the best opportunity to

3  maximize the relationship.

4         And that's all this was, all the way through.  This

5  isn't a case of insurance companies, Florida Blue, Anthem, UHC,

6  and Aetna, convincing the three of us stooges, apparently, to

7  do their bidding for them.

8         We would have to be the stupidest people in the

9  Department of Justice for six years to do exactly what they

10 told us to do and let them move us around a checkers board like

11 we're little pieces.

12        That's not what happened.  That's what they want you

13 to think.  But that's because they can't really talk about the

14 facts in a compelling way.  They can talk about a fact over

15 here, a fact over there.

16        But when you really connect it, you've got to look at

17 the consistency of the evidence.  And the consistency of the

18 evidence, ladies and gentlemen, is these people got together to

19 overtake these rural hospitals, to jam their NPI number and tax

20 ID number into these insurance company databases and claims, as

21 much as they possibly could, when none of those samples had

22 anything to do with the hospitals.

23        These samples -- and we'll use the Marcotte example.

24 Kyle Marcotte collected these samples from all over the country

25 to send them to Reliance Labs.

1    Is there any evidence that any doctor had any

2  connection to Campbellton-Graceville, Williston, or Chestatee?

3  No.  But they don't want you to focus on that.

4    Reliance Labs received those samples and Reliance

5  Labs tested them.  And you can see in the contracts, the

6  Reliance Labs/Campbellton-Graceville contracts, that

7  Campbellton-Graceville, the hospital in Graceville, Florida, in

8  the middle of nowhere, was going to do the overflow testing for

9  Reliance Labs.

10    The trouble for Aaron Durall, there wasn't any.

11  Linda Sullivan told you that.  She took that witness stand, lab

12  manager for 30 years.  And I asked her -- and this was in the

13  first part of the closing:  Ms. Sullivan, were there any

14  samples that Reliance couldn't test?  No.

15    Right there Aaron Durall is done.  It's over.  Those

16  rural hospitals -- that next step of those samples going to

17  Campbellton-Graceville, going to Williston, going to Chestatee,

18  it never needed to happen.

19    And then the Aaron Durall lie gets worse over time

20  with Jaquanda Smith.  And this is what we want you to do.  We

21  want you to focus on the evidence as a whole.  And Jaquanda

22  Smith gets on the stand to explain away -- she doesn't know the

23  number, but you do from the forensic accountant, $87 million

24  worth of confirmatory testing reimbursements, about 98 percent

25  of that is confirmatory testing to Aaron Durall.  And he steps

1  back and goes, Oh, God, I had no idea.  I had no idea it was

2  for confirmatory tests.  I'm going to go pay $5 million in a

3  bankruptcy proceeding involving Campbellton-Graceville -- well,

4  87 minus 5 is 82.  Even us stooges over here are smart enough

5  to do that.  It's not that difficult.  Cost of doing business.

6  He knew that was coming the whole time.

7         And then he goes to Chestatee.  He goes to Chestatee

8  and he does it a little different.  He gets a little smarter,

9  gets a little craftier.  There's no question about it.

10        But the main misrepresentation remains, every sample

11 that went to Reliance, every single one in the Chestatee days,

12 could be tested, never needed to go there.

13        You heard from some of the beneficiaries that are

14 lined up with Counts Two through Six -- you did not meet

15 Mykelle Johnson.  But her lab requisition form for Reliance is

16 in Exhibit 54.

17        And the ones that you did hear from said, I was in

18 recovery.  I peed in a cup.  They did a dipstick test.  It was

19 negative.  They told me.

20        Did you get any more information after that?  Nope.

21        So the whole thing after that is a farce.  It's a

22 fraud.  It's about maximizing the relationship.  That's what

23 Christian Fletcher had in his mind.

24        Ladies and gentlemen, Mr. Bell said during his

25 closing that there were no material misrepresentations made to

 1   the giant insurance companies.  He said "giant" twice.  They

 2   are giant.  Okay?  They do make a lot of money.  That money

 3   comes from premiums, as Mr. Rowland pointed out in his closing.

 4   They don't have it themselves.  That's where it comes from.

 5          And these people over here constructed this lie to

 6   use the NPI numbers and the tax ID numbers of these hospitals

 7   as billing hubs, as I said a long time ago, 40-something days,

 8   or whatever it's been.  That's all this was about.  There was

 9   all this technical stuff.  A lot of it you could really ignore,

10   about nonpatients and patients and inpatients and outpatients,

11   and Mr. Thomas -- about the only thing that bumbling fool got

12   right was, Oh, no, a nonpatient is different from a patient

13   that has no connection to the hospital.

14          We've been saying that forever.  That's exactly

15   right.  This isn't a nonpatient sample that went into Putnam

16   Hospital from a nearby doctor to get a test that the hospital

17   could run.  That's not a -- that's not it at all.

18          These defense experts, and Mr. Thomas, were willing

19   to listen to my ridiculous -- ridiculous hypothetical about the

20   guy in Hawaii, in Honolulu, who's in recovery, who has a sample

21   tested, and that sample can then go all the way to some lab in

22   Florida or Georgia, or wherever, and be tested, and that that

23   could be billed through Putnam County Memorial Hospital, a

24   hospital in a town of 1500 people.  If it sounds ridiculous,

25   it's because it is.  But that's what happened in this case.

1       That's exactly the fact pattern.  And no amount of

2  contracts that these guys came up with between Christian

3  Fletcher and Hospital Partners and Hospital Laboratory Partners

4  and Pinnacle Labs and defendants entering into these bogus

5  agreements -- none of that stuff can make this legitimate.

6  None of it.

7       And I'll get to LifeBrite here.  LifeBrite -- these

8  samples that went to LifeBrite -- and you'll see in Exhibit

9  280 -- it's about this thick, times three, 280(1), 280(2),

10  280(3) -- look at it.  Those are LifeBrite samples.  Those are

11  samples that went directly to LifeBrite.

12       So LifeBrite has the sample.  And what in the world

13  is the sample then going to go to Campbellton-Graceville

14  Hospital so it can do a basic positive/negative test, so that

15  Campbellton-Graceville Hospital can refer the sample back to

16  LifeBrite, which it already had, to do the quantitative test?

17       And that's what 26A and 26 -- or 26C and 26G and 26M

18  are all about.  It's a bunch of wordsmithing bull.  That's all

19  it is.  And it didn't even play out that way.

20       There's this late justification in the trial in

21  section 1.6 in those contracts that, Oh, the hospital, you

22  know, is responsible for these -- collection of these samples.

23  And there's this big fantastical thing about how that can come

24  about, and the specimen, according to the defendants, has to

25  have nothing to do with the hospital or that's okay.

1    That's not how this works.  And Gayle Pickens told

2  you that.  Gayle Pickens, from Putnam, uses Quest Diagnostics

3  as a reference lab.  And they just gloss over that.  They're

4  just like, Oh, well, you know, there it's from an inpatient or

5  an outpatient, provides the specimen, but they still do it.

6    It's like, Yeah, that person actually has something

7  to do with the hospital.  They're there.  They're a part of it.

8  Okay?

9    That's why, when you really just look at it, you can

10  pick it apart pretty easily.  It's not that hard.

11    There's a lot of talk about good faith.  There's a

12  good faith instruction.  There's a good faith reliance on

13  counsel.  We've dealt with Mark Thomas already.  But there's a

14  general good faith instruction that you're going to see.

15    And when you're assessing that, look at the real-time

16  answers that these people gave to the insurance companies in

17  the letters from Anthem, from Florida Blue, from UHC.

18    They either, one, ignored the letter, Yeah, I'm going

19  to put this in the drawer and never answer, or they lied to

20  them.  Because the real use of good faith, or the real

21  illustration of that, is looking at what they said.

22    Did they say that they'd lay out this accessioning

23  program?  Nope.

24    Did they say where the specimens came from?  Nope.

25    Did they say, Oh, gosh, all these physicians have

1  hospital privileges at Putnam?  Here's the list.  Here they

2  are.  Nope.  That didn't happen either.

3         Did they say that the individual labs, like Reliance,

4  LifeBrite, and Pinnacle, got the specimens first?  Nope.

5  Didn't say that.

6         Did they say that independent labs did the

7  quantitative confirmatory tests?  Nope.  Didn't say that.

8         Do you know why?  Because they would have stopped

9  paying.

10        Did they explain why the samples went from the

11  independent labs to the hospitals when the labs could do and

12  did do the confirmatory tests?  Didn't tell them that either.

13        Did they say the hospitals could not do the

14  confirmatory test?  No.

15        And that's the dagger, because that's what the claims

16  data says.  That's what the claims say, is that the hospitals

17  did the expensive confirmatory tests.

18        Campbellton-Graceville could never do one.  Williston

19  could never do one.  Putnam could do a handful.  Chestatee

20  couldn't do any, period.  That's it.  That's why the defendants

21  are guilty of participating in this conspiracy.

22        Richard Landes, for Mr. Ricardo Perez, during his

23  closing, said, They couldn't have been more transparent if they

24  tried.

25        I almost fell out of my chair.  I mean, what?

 1    Really?  They couldn't have been more transparent in those

 2    answers to the insurance companies, where they lied to them

 3    like crazy?

 4           Mr. Salazar took the stand.  His only business at JVS

 5    Billing was from Empower.  That's it.  Had one client.  Had no

 6    other business.  And 98 percent of the time he made a mistake

 7    in the favor of these defendants?  That's just not credible.

 8           Yes, there's probably a couple of codes that are a

 9    little confusing, but there's a CPT code book every year.

10    Missy Parks talked about it.  It comes out and it says, These

11    are the CPT codes for confirmatory testing.

12           They're all over the claims data.  These were

13    confirmatory tests that the hospitals couldn't do, excluding

14    Chestatee.  But I'm talking about CGH, RGH, and Putnam right

15    now.

16           And these mistakes -- these mistakes made Aaron

17    Durall $87 million.  They made Christian Fletcher $74 million.

18    And all the defense counsel, Oh, the government likes to talk

19    about the money.  They like to talk about the money.

20           It is what it is.  I mean, this is what they did.

21    This is the money they made from this scheme.  Of course we're

22    going to talk about it.  It's obscene.  And it shows the intent

23    and why they did it, because you can marry that up -- you can

24    marry that up with the billings that Reliance Labs, Pinnacle

25    Labs, and LifeBrite Labs did directly to the insurance company

1    on the CMS 1500 professional claim form, where they billed for

2    testing and, you know what, they're out of network.  And that

3    really, really irritated Larry Small.

4           That's when it came out, like, Who is this guy?  Why

5    is he saying some of this stuff?  And it's like, He doesn't

6    like it that the insurance companies don't have more labs that

7    are in-network.  That's not his call.  That's the insurance

8    companies' call.  Maybe we all don't like that a little bit.

9    But so what?

10          That doesn't give them the right to concoct this

11   scheme to come up with a lie to bill the insurance company that

12   these hospitals had anything to do with these samples.  They

13   didn't.

14          The defense loves to talk about the 22 code.  And I

15   bring that up to just tell you I'm not going to talk about that

16   much, because it doesn't matter.  It doesn't matter.

17          This -- it's place of service code, Carey Bobbitt

18   told you that.  Theresa Jackson told you that.  And it's like,

19   Well, it really means that somebody was there.  They're like,

20   No, it's a place of service.  Let's move on.

21          COURTROOM DEPUTY:  You have 15 minutes, Mr. Duva.

22          MR. DUVA:  Thank you.

23          The fact that Derek Holt, in August of 2016, as this

24   is unfolding realtime, and Jorge Perez is taking his band from

25   Campbellton-Graceville to RGH, didn't get it, so what?  I

1    didn't get it at first.  What is a 22 code?  I don't know.

2          But that's why you do a thorough investigation.

3    That's why you do all the interviews.  And they want to act

4    like we weren't there for this stuff.

5          I mean, Mr. Sadow credits that.  But we did the

6    interviews with the agents.  We went to New Mexico.  We talked

7    to these people to unravel something that is difficult to

8    unravel.  But when you do, the answer smacks you right in the

9    face.

10          And the answer is this was all concocted to take

11    advantage of favorable billing contracts between the private

12    insurance companies and these critical access care hospitals.

13    And when the insurance companies realized, and they became game

14    to it, they shut it down.

15          And when it got shut down, they moved hospitals, CGH

16    to RGH.  And the reason that Aaron Durall was so nice to

17    Michele Jordan in those text messages, look at Kimberly

18    Henderson's chart.  You're going to see it in the 24 series.

19          Because the days during those exchanges, he's getting

20    millions of dollars.  PCH had been cut out, but Aaron Durall

21    was in the money big time.

22          June 23rd, June 24th, 2016, look at those dates, look

23    at the charts.  That's the time where Kyle Marcotte is

24    beginning the promotional money laundering scheme that Aaron

25    Durall and, at a later time, Neisha Zaffuto participated in.

1    And that was perfected along the way once Chestatee started.

2           And I want to talk about Ms. Zaffuto, the car ride.

3    It's a big deal.  Are you going to believe Jaquanda Smith, who

4    said that Kyle Marcotte was summoned down to Florida for a car

5    ride around Broward County about a bankruptcy proceeding that

6    he wasn't a part of, that Mr. Durall was and he was going to go

7    settle?

8           Or was it like, Hey, shut your mouth, because, you

9    know, people might start asking some questions about this

10   because the heat is on a little bit?

11          Yeah, it's the second one.  It's the second one.

12          And Neisha Zaffuto, according to Mr. Marcotte, was

13   there.  And look at the billing from Medivance for the

14   Chestatee claims, the claims that never should have been billed

15   by Chestatee, they should have been billed by Reliance, but

16   they were billed by Chestatee.

17          I don't know why she participated.  I think it was

18   just the money.  But you'll see 260,000,

19   100-something-thousand, 270,000 paid to Ms. Zaffuto.

20          Was she the biggest participant over there?  No, she

21   wasn't.  But if you participate once and you know what's going

22   on, especially in the money laundering world, you know that

23   this specified unlawful activity -- you know what it is, and

24   you know that it's dirty, and you engage in the transactions,

25   you're guilty.  You're guilty.

1    You can even give her a pass on Count One if you

2  want.  But on the money laundering, there's really no way

3  around it.  She participated in transaction after transaction

4  after transaction.  And she got paid a lot of money to do it.

5    Aaron Alonzo.  Nestor Rojas took the stand and talked

6  about his involvement with Aaron Alonzo and CGH Holdings.

7  He'll look at it at first and say, yeah, $9.4 million, that's

8  not that big of a deal comparatively.

9    And you're like, Whoa.  What am I talking about?

10  It's $9.4 million in three months.  That's what CGH Holdings

11  and these labs, CompanionDX, B3, and Central Labs -- they had

12  the samples.  It's just like the Reliance model.  Those are

13  their samples.  They do the testing.

14    And they do this nonsense of sending a requisition

15  form and a sample to Campbellton-Graceville.  So apparently the

16  boiler room over there, led by Brenda Rhodes, can enter all

17  this information and get it into the LIS system, as if those

18  samples had something to do with Campbellton-Graceville.  They

19  don't.  It was about billing.

20    And Aaron Alonzo knew exactly what he was doing.  And

21  Nestor Rojas told you how.  Is Nestor Rojas rough around the

22  edges?  Yeah.  Totally.  But he was hanging out with Alonzo.

23    Is Skeffington that way?  Yes.

24    Is Marcotte that way?  Yes.

25    Is Byrns that way?  Yes.

 1          Would you hire them to manage your affairs?  No.

 2          But they did.  They did.  They found these people.

 3          And that's exactly what happened.

 4          Again, with Alonzo and Rojas, it's the Reliance

 5  model.  It's the sample never needs to go to the hospital.

 6  Reliance they did, but Nestor Rojas and Aaron Alonzo, they

 7  skipped that step.

 8          Sean Porter.  Mr. Rowland in opening, and here today,

 9  he kept talking about two checks for $75,000.  That's not what

10  this is about.  He's on e-mails with his brother setting up the

11  lab.

12          And through Putnam, while that lab is being set up,

13  $37 million of claims were being paid for quantitative testing

14  that Putnam could never do for samples that did not come from

15  doctors that had a relationship with Putnam.  They came from

16  all over the place.  And they went to Pinnacle Labs and they

17  were tested.

18          That should be it, end of story, end of story.  Those

19  samples had nothing to do with Putnam.  Putnam was just a

20  billing hub.  That's all it was.  It was next in the link of

21  chain.  That's all it was.

22          So Sean Porter, when he's paid $450,000, and

23  ultimately 3.2 million through the different transactions that

24  you see, yes, he laundered money.

25          He was actually at the hospital at the lab and saw

 1  like, Okay.  There isn't one.  So we need to at least go

 2  through the process of building out one.

 3          Well, how long do they get the under arrangement

 4  excuse?  They did it for like nine months.  Do you get two

 5  years?  How about five years?  Is that too many?

 6          It's ridiculous.  If you pull the thread, you knock

 7  out the card of a house of cards.  It just falls apart at

 8  Putnam.  That was where the mask came off.  It was the Wild

 9  West really -- I mean, the Midwest.

10          So at the end of the day, ladies and gentlemen -- we

11  heard some other things.  I'm going to wrap up soon.  We heard

12  about the 837Is.  And you saw Charles Kagey, who looked like

13  Cosmo Kramer from *Seinfeld*, I thought.

14          He went through the 837I from Waystar and those

15  documents that were produced by Empower.  And he said, This is

16  just the submitter field.  It's saying, Hi.  Here we are.  I'm

17  Waystar.  I'm sending this to the next link in the chain.

18          Did any of the material information change in these

19  transactions?  No.

20          The billing provider's the same.  The rendering

21  provider's the same.  And that NM177 field in Exhibit 37, is

22  there a place to identify the rendering provider, perhaps the

23  lab?  Yes, there is.

24          Not on the paper UB-04 form, no.  But there is there.

25          It wasn't done.  You know where it was?  The patient

1   control number.  How pathetic is that?

2       Theresa Jackson, Carey Bobbitt, they were

3   repeated- -- they were asked:  What does the patient control

4   number have to do with claims adjudication?  Nothing.

5       But they suggested to you in opening statement,

6   Mr. Sadow did, it said PCLIFE, LifeBrite, LifeBrite.  Like,

7   really?  You're going to take LifeBrite Labs in Georgia from

8   the word "life" that's in a patient control number that means

9   nothing to these insurance companies?  That's how desperate

10  this became.  That's not right.  That's not what happened.

11      The NPI number and the tax ID number of the hospitals

12  is what got these claims paid.  Even the insurance company

13  witnesses said, Yeah, the 141 code, this nonpatient code, that

14  means the sample has to go to the hospital.

15      Oftentimes it didn't.  It didn't for Pinnacle, like

16  ever, almost.

17      The co-branded requisition forms from LifeBrite.

18  Useless.  Totally useless.  You know why?

19      Because the claim had been billed and the claim had

20  been paid before anybody saw the co-branded requisition form.

21  The co-branded requisition forms that go with the claims, they

22  don't.  They're just made up and they're there in case the

23  insurance company starts asking some questions.  When they did,

24  they got lied to.  But the co-branded requisition forms don't

25  mean anything.

1      And Mr. Sadow said about Mr. Fletcher, $74 million is

2  exactly what I told you in opening statement.  Yeah, because he

3  had the chart.  Like, that's discovery.  You have to get it.

4      So there aren't these discoveries along the way.

5  Sure, was the understanding by some of the agents in August of

6  2016 imperfect?  Yes, it was imperfect.

7      But did that evolve over time into an indictment in

8  June of 2020, after investigation, after talking to witnesses,

9  after talking to insurance companies, after guilty pleas, after

10  talking to John Skeffington, David Byrns, Kyle Marcotte, and

11  ultimately, in this case, Nestor Rojas, who pled guilty to

12  Count One, exactly what Mr. Alonzo is charged with?  Would that

13  have happened if this was all legit, if it was totally okay on

14  an under arrangement agreement?  No.  It defies common sense.

15      Are these people, again, that you would rely on to,

16  like, give them your debit card or anything like that?  I mean,

17  if you gave David Byrns your debit card and sent him to Walmart

18  for a case of beer, he'd probably drink it on the way back.  So

19  that wouldn't be a good idea.

20      But can you take their word for it and their

21  associations with these defendants?  When you see the e-mails

22  with David Byrns and Christian Fletcher about how they're going

23  to find rural hospitals to maximize a relationship, yeah, you

24  can.

25      We're not asking you to rely on their word alone.

1  We're asking you to evaluate their testimony based on the

2  corroborating evidence.

3          For Kyle Marcotte --

4          COURTROOM DEPUTY:  Five minutes.

5          MR. DUVA:  -- e-mail communications with Aaron Durall

6  weekly, based on all the specimens that were collected

7  throughout the entire country and sent to Reliance Labs and

8  tested.  That's where it should have ended.  But it didn't.

9          There was the -- the ruse of sending these samples to

10  these hospitals for testing, positive/negative testing.  And,

11  yeah, we could have shown you that.  The defense did.  What

12  does that really add to the story?

13          I mean, nothing.  You know, when you're considering

14  that the billing for Campbellton-Graceville, Williston, and

15  Putnam was for confirmatory testing, what you test and then

16  what you bill for in this case, with those hospitals, were

17  totally different, totally different.

18          So we focused on the lie to the insurance companies

19  in the claims data, which was the billing of the confirmatory

20  tests, which didn't happen at the hospital, and the hospital

21  had no connection to whatsoever.

22          It didn't.  This wasn't a reference lab.  This wasn't

23  LifeBrite having a sample, like I said before.  LifeBrite has

24  the sample.  It's like being a little kid.  You can go down to,

25  This is my ball, so I'm going to refer my ball to you so you

 1    can refer it back to me for something.

 2           No, this is your ball.  This is your thing.  This is

 3    your sample.  You test it right then and there and you bill it

 4    on the CMS 1500.

 5           But Christian Fletcher had a time of doing that.  He

 6    didn't like the result.  That's why he participated in this.

 7    That's why Aaron Durall participated in this.  And this was all

 8    part of the secret sauce, started by Jorge Perez in the back.

 9           He had the billing company.  He had his brother,

10    Ricardo.  And those guys -- those were the two that started

11    this ball game.  Jorge Perez, the idea guy.  He went out

12    throughout the country.  He went into Campbellton-Graceville

13    with Seth Guterman and PCH in May of 2015.  And he talked his

14    way into the management agreement.

15           And Ricardo, on the back end, the COO, as Jorge

16    Aguilar called him, he was the biller.  And Mr. Landes tried to

17    get Mr. Salazar to say, You were really the guy that did the

18    billing and Ricardo wasn't.  And on cross-examination,

19    Mr. Salazar is like, No, Ricardo knew a lot about the billing.

20    He knew the details, like totally.

21           And there were a lot of objections to that, and

22    understandably so.  But that's what happened.  So when you put

23    the whole story together from pillar to post, from the

24    witnesses, the insurance companies, the cooperators, the people

25    that worked at Empower, Linda Sullivan at Reliance, Lisa Zini

 1   at Chestatee, and you put it all together, it becomes clear,

 2   the contractual agreements that these defendants entered into

 3   was a way one day to justify this.

 4          And that's what they're trying to do.  But it doesn't

 5   work.  Focus on the lie.  Focus on the misrepresentation.

 6   That's what starts the money flow from the hospitals -- I'm

 7   sorry, from the insurance companies to the hospitals to the

 8   labs.  It's all dirty money.  And any transaction thereafter is

 9   a money laundering transaction.

10          Ladies and gentlemen, it's been a long road.  And

11   you're about to get a mountain of evidence to look at and

12   parse.  And what we want you to do is to go back there and do

13   justice.

14          And what we, the United States of America, believe is

15   that justice is to find these defendants guilty beyond a

16   reasonable doubt.

17          Use your reason and common sense that you brought in

18   here with you.  You don't check it at the door.

19          Thank you, ladies and gentlemen.  It's been a long

20   road.  You've endured something as a jury that I've never seen

21   before.  But we appreciate it.

22          And we thank you for your service.

23          THE COURT:  Thank you, Mr. Duva.

24          Ladies and gentlemen, that completes the closing

25   arguments in the case.  And we're going to go ahead and call it

1    a day.  Let me -- let me just explain to you briefly what will

2    happen tomorrow and -- and then we'll let you go.

3             So let's go ahead and be back at quarter to 9:00,

4    like we have been.  And we'll get started as soon as we can

5    after that.

6             And then I have to give you the instructions on the

7    law.  You saw some of the lawyers reference certain

8    instructions that I'm going to give.  But I'll give it to you

9    all in one cohesive set of instructions.

10            And I'll need you to -- ask you to listen to me on

11   that.  It will take maybe 45 minutes, something like that.  And

12   then after that the case will be given to you for your

13   deliberation.

14            And we'll have some work to do to get you the

15   exhibits and do some things.  And you're going to be

16   deliberating on the twelfth floor, not on the floor we're on.

17            Because we have a big courtroom available for you

18   where we have seats -- you know, so it would be more

19   comfortable and let you spread out and so forth.  So we'll have

20   to do a little bit of logistics work, but we can talk about

21   that tomorrow.

22            But please remember, we're still at the point -- even

23   though we're getting close to you talking about the case, do

24   not talk about the case, don't let anybody talk to you about

25   it, don't do any of your own research, computer or otherwise.

 1   Don't do anything on the case until you actually are given the

 2   ability to deliberate on it, which should come tomorrow

 3   morning.

 4          So, again, if everybody could be here by a quarter to

 5   9:00.  And thank you for your continued service.  We'll see you

 6   tomorrow.

 7          COURT SECURITY OFFICER:  All rise for the jury.

 8      (Jury exits, 4:57 p.m.)

 9          COURT SECURITY OFFICER:  Please be seated.

10          THE COURT:  Have a seat for a second.

11      (Judge confers with law clerk.)

12          THE COURT:  All right.  I'm -- I'm hopefully getting

13   the forfeiture stuff down here just to briefly talk about that,

14   because I do have to -- I do have to -- under the rule I have

15   to find out before the jury retires who -- which defendant

16   wants a jury consideration.

17          And I'm trying to make sure -- I know that Mr. Jorge

18   Perez, Mr. Ricardo Perez have specific assets that the

19   government is seeking to forfeit, and that those would, I

20   think, be eligible for a jury consideration, as opposed to -- I

21   think I'm right about this, as opposed to money or other assets

22   in lieu of specific assets.

23          If they're in lieu of, I don't think that there's

24   jury consideration.  I think that just becomes my -- part of my

25   forfeiture consideration.

1    If it's just -- if they're just monetary judgments

2  being sought with no specific assets being identified, then I

3  think that also is for my consideration.  That's my

4  understanding of the law.

5    But I know -- I'm pretty certain that Jorge Perez,

6  Ricardo Perez -- Mr. Fletcher, I think, has one item of

7  property that potentially he has a right to a jury trial over.

8    I don't think Mr. Porter does, James Porter.  We

9  originally had him listed.  But I think his -- the forfeiture

10  being sought is in lieu of assets.

11    But we -- and I -- I take it, Mr. Duva -- I don't

12  know if -- are you handling this or is Ms. Tran handling it,

13  or -- I know you just -- I know you just came off your

14  argument, and --

15    MR. DUVA:  We're going to handle it together, Your

16  Honor.  I would like to be able to confer with her --

17    THE COURT:  Okay.

18    MR. DUVA:  -- about this before I really give the

19  Court any answers.

20    THE COURT:  Okay.  Hold on one second.

21    Ms. Meyer.

22    (Judge confers with law clerk.)

23    THE COURT:  All right.  And I -- please, I know -- I

24  don't want any of the defendants thinking I'm predicting any

25  particular result by the jury, but the -- the real hard truth

 1 | of it is -- is that if the jury is going to be asked to

 2 | continue consideration of matters, then -- then I have to know

 3 | that, and then I have to be able to communicate that to them

 4 | after they return a verdict, if there are any verdicts of

 5 | guilty as to the affected defendants.

 6 | So the -- Jorge Perez, Ricardo Perez, Mr. Fletcher

 7 | are potentially entitled to jury consideration as to some of

 8 | the assets.

 9 | Again, maybe we'll get Ms. Tran down here tomorrow

10 | and we'll actually make specifics on that.  So, for example --

11 | there's also a release of lis pendens as to some of it that I'm

12 | not sure is any longer in play.  So I guess we're just going to

13 | need to work through that.

14 | But I take it, though, that -- so, Mr. Bell,

15 | Mr. Landes, Mr. Sadow, or Mr. Citro.  And then, again, I'm

16 | not -- I don't think James Porter has assets that are subject

17 | to forfeiture that -- to which he's entitled to a jury

18 | consideration, but it -- but they were listed originally as

19 | being that way.  So we need to clear that up as well.

20 | So I guess I would ask all of you to review that

21 | overnight with your clients.  And I would ask the government to

22 | be prepared at some point tomorrow to let me know -- to make

23 | sure that I'm in the right place here about what we need to do.

24 | There is an option, of course, but it's completely up

25 | to the defendants, to allow -- because the Court has to

1   consider a number of forfeiture matters anyway.  There's only a

2   subset of forfeiture that the defendants are entitled to jury

3   consideration on.

4          So there is an option for the defendants to waive

5   jury and to let the Court consider all forfeiture issues,

6   but -- but they do have the right to jury consideration on some

7   issues.

8          And so the question is going to be whether -- as to

9   those issues, whether the -- any of the defendants who are

10  affected by that have -- do wish to have a jury trial on it.

11         I don't believe -- and I think I'm right about this.

12  I don't believe any of the other defendants are affected by

13  this, because I think their forfeiture issues are all for the

14  Court, as opposed to for the jury, at least that's how I've

15  been advised so far.

16         Is there -- anybody have anything to say about that

17  or want to be heard?  Probably not.

18         MR. BELL:  I see Ms. Tran has arrived.

19         On behalf of Jorge Perez, the initial inclination was

20  he would not stipulate and would want the jury to resolve any

21  of those issues.  We will discuss it again.  Frankly, we

22  haven't had a chance to follow up on it and discuss it --

23         THE COURT:  Oh, sure.

24         MR. BELL:  -- at any great length, and hoping it

25  isn't an issue.  But hope to have an answer for the Court early

1   in the morning.

2          THE COURT:  Yeah.  And it's just -- the way the rule

3   is written, it's just a little bit different.  It requires the

4   Court to inquire before the jury starts deliberating on the

5   main verdict.  I'm not sure why the rule is written that way,

6   but it is.

7          And so I feel -- I feel like in order to comply with

8   the rule, I have to ask you before deliberations start

9   whether -- if a guilty verdict is returned, whether your client

10  wishes jury consideration of a forfeiture issue.

11         MR. BELL:  And, Judge, I will apologize, I haven't

12  been in this situation very often with these forfeiture

13  determinations.  We don't advise the jury before they go back

14  to deliberate one way or the other?

15         THE COURT:  No.

16         MR. BELL:  So, theoretically, we could change our

17  mind?

18         THE COURT:  You could change your mind.  And that has

19  happened.  You could reserve your right to the jury.  And then

20  afterwards you can change your mind.

21         Matter of fact, I think that just happened in one of

22  Judge Howard's cases, so -- but the rule is -- is such that --

23  let me pull it up here.

24         MR. BELL:  Is that 32 --

25         THE COURT:  32(d)(5) I think it is.  And, let's see,

 1    Ms. Meyer sent it -- no, Ms. Milliron sent it to me.

 2          MR. BELL:  I can say our position as of tonight is

 3    jury.

 4          THE COURT:  Okay.  Well, we'll talk about it in the

 5    morning.

 6          Ms. Tran, the -- what I'm looking at here is -- is it

 7    true that any asset that's listed in lieu of something else, or

 8    a monetary amount that's listed in lieu of something else, is

 9    not eligible for jury consideration?  Is that correct?

10          MS. TRAN:  That is not my understanding, Your Honor.

11          THE COURT:  I thought it was only specific assets,

12    not -- if it's -- if it's $200,000 in lieu of some piece of

13    property -- if you're not trying to attach that piece of

14    property, I thought it's not entitled to a jury consideration,

15    so you need -- you need to look at that for me.

16          Because right now I have a fairly limited number of

17    items that I think are entitled to a jury consideration.  But

18    we need to obviously have a clear understanding about that.

19          So will you take a look at that, please.

20          MR. BELL:  Judge, I can only add my knowledge of this

21    is almost completely dependent on Charlie Lembcke's arguments a

22    couple of years ago in front of Judge Howard, which I'll have

23    to go refresh my recollection of.  But I know he disagreed with

24    that at the time.

25          THE COURT:  Well -- and, you know, unfortunately --

1　forfeiture issues don't come up that often, especially those

2　that might be tried to a jury.  And, unfortunately, they always

3　come up at this point in the trial, where everybody is

4　always -- has been focused completely on other things, and

5　so -- but that doesn't -- I mean, in this case we're talking

6　about some fairly substantial assets.

7　　　　And, you know, the Court will deal with forfeiture --

8　the portion that the Court is supposed to deal with, the Court

9　will deal with that down the road.

10　　　　But if I need this jury to do something, obviously I

11　need to find out if the defendants wish the jury to do it, and

12　I need to be very clear on which defendants and which assets

13　are being the subject of jury consideration.

14　　　　The government has already told me they're not asking

15　for jury consideration.  So that -- that aspect is up to the

16　defendants.  But I'm counting on the government to be

17　absolutely correct about which assets are available for jury

18　consideration.  And if -- if I'm wrong about what I said just a

19　few minutes ago, then I need to be shown to be wrong.

20　　　　So -- and then we'll have more -- what that would

21　simply mean is there's more assets that would be subject to the

22　forfeiture consideration of the jury, and possibly more

23　defendants.  And that might include Mr. James Porter then.  So

24　if I'm wrong about the way I'm reading the law, I need to be --

25　I need to be advised.

1    MR. HAYES:  Your Honor, I'm happy to look into the

2  issue of the money in lieu of the property, the specific

3  property.  I was only treating it as if it were specific

4  property, because it is specifically attached to the real

5  property itself that we took the money in lieu of, and treating

6  that separately, which is why I included it in the seven listed

7  specific assets that we were looking to move forward on for the

8  Perez defendants, Your Honor.

9    But I will double-check just to confirm if it is the

10  case the lieu -- the money in lieu of the property is not --

11    THE COURT:  Well, explain to me -- what does "in

12  lieu" mean?  Does that mean that you have -- did you reach an

13  agreement so that you -- you released property and took cash?

14    MS. TRAN:  Yes, Your Honor.  So it is not an amount

15  of cash that was seized prior to indictment, for example.  It

16  was later, after the real properties were charged in the

17  indictment, that we agreed to have the real property sold.  So

18  there is a distinction.

19    THE COURT:  And where is the cash that is reflective

20  of that?

21    MS. TRAN:  It has been deposited into the U.S.

22  Marshals' fund, Your Honor.

23    THE COURT:  So there is a specific amount then

24  that's -- all right.  So that -- I did not understand that.

25  That may make a difference.

1        Is that true of everything that says in lieu of

2   something?

3        MS. TRAN:  Yes, Your Honor.  And there's only two.

4        THE COURT:  Okay.  All right.  We'll take another

5   look at that, then.  All right.  But will you look at it

6   overnight, too, and make -- I need to be -- I need to have the

7   government be very clear with me as to which defendants and

8   which assets are subject to jury consideration as to

9   forfeiture --

10       MS. TRAN:  Yes, Your Honor.

11       THE COURT:  -- at least from the government's point

12  of view.

13       All right.  But -- and on the defense side, it's at

14  least something you need to be thinking about.  I know it's

15  awkward to have to think about it before we know what the

16  verdict is, but that's just the nature of the beast.

17       All right.  Is there anything else today?  I've got

18  the charges, which I'm prepared to read.  I've reviewed them

19  again, and think they're -- the ones we settled upon.

20       I've got the verdict forms and the redacted

21  indictment.  So I'll be reviewing all that with the jury in the

22  morning.  And then I'll give it to them for their

23  deliberations.

24       In terms of your logistics, if it will help you --

25  because the jury will be on the twelfth floor, they're going to

1  be one floor below, in a courtroom that we've been using during

2  COVID for jury deliberations -- I think that's better, because

3  it's all set up in a U-shape and it gives them more room to

4  deliberate and spread out.

5          So what that essentially means is that defense

6  counsel, especially, will have kind of the run of the 13th

7  floor.  You can be in the courtroom.  You can be in the

8  chambers.  Hopefully you can use the library.

9          But I am going to be asking everybody to stick pretty

10  close to -- around, because if -- it's going to be -- if I have

11  to try to round up eight sets of -- or nine sets of parties in

12  order -- and if the jury has a question or we have a verdict,

13  we can't be having people scattered to the wind.

14          So I'm going to be asking people to hew pretty

15  closely to the 13th floor and make sure that you're in

16  communication with Ms. Hatfield and with each other.

17          And I'll probably give a lunch break -- in other

18  words, tell you that for the next X period of time you're free

19  to -- to go to lunch or whatever.

20          But other than that, I'm going to ask everybody to be

21  pretty much around, so that in the event we have a question

22  from the jury or we have a verdict, that everybody is available

23  pretty quickly.

24          The other thing I will ask you-all to do, and it may

25  have already been done -- Ms. Hatfield feels pretty good about

1  it.  But to the extent that the exhibits are -- the exhibits

2  need to be, obviously, ready to go to the jury in the manner in

3  which they're supposed to be, including any redactions that

4  were supposed to have been made, any other issues that we had.

5          I'm looking here at Mr. Sadow.  I don't know that

6  your -- your red, white, and blue charts go back to the jury.

7  So I think those probably can get retrieved.

8          But the -- but, anyway, I just want -- I want the

9  government and any counsel to -- to make sure that there's --

10  that there's no questions about the exhibits, because

11  Ms. Hatfield will be taking them to the jury after I finish the

12  instruction.  And this is a good opportunity to make sure of

13  any issues that might have arisen, to make sure that they've

14  been resolved.

15          Anything else?

16          LAW CLERK:  (Shakes head negatively.)

17          THE COURT:  Anything else, Kerri?

18          COURTROOM DEPUTY:  No.

19          MR. HAYES:  Your Honor, we've been talking about some

20  of the exhibits.  Can we have access about 8:30 tomorrow before

21  the jury comes in to go over the exhibits?

22          THE COURT:  That's fine.  We'll make the courtroom

23  available at that time.

24          MR. HAYES:  Thank you.

25          THE COURT:  Okay.  And I'm going to ask everybody to

 1    be present at quarter to 9:00, so -- and if the jury is here,

 2    we'll get started before 9:00.  But we'll be ready -- everybody

 3    should be ready to go at quarter to 9:00.

 4              Anything else?

 5              MR. LANDES:  No, Your Honor.

 6              THE COURT:  All right.  We're in recess.

 7              COURT SECURITY OFFICER:  All rise.

 8         (The proceedings adjourned at 5:12 p.m.)

 9                              - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE

UNITED STATES DISTRICT COURT    )
                                )
MIDDLE DISTRICT OF FLORIDA      )


        I hereby certify that the foregoing transcript is a true

and correct computer-aided transcription of my stenotype notes

taken at the time and place indicated herein.


        DATED this 6th day of July, 2022.



                    s/Shannon M. Bishop
                    Shannon M. Bishop, RDR, CRR, CRC