UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

    v.                           Case No. 3:20-CR-86-TJC-JBT

JORGE PEREZ, et al.,
        Defendants.

## DEFENDANTS JORGE AND RICARDO PEREZ'S[1] ALTERNATIVE MOTION/MEMORANDUM FOR NEW TRIAL PURSUANT TO FED.R.CRIM.P. 33(a)

Defendants Jorge Perez and Ricardo Perez, by and through their counsel, pursuant to Fed.R.Crim.P. 33(a), alternatively move this Court to enter an order granting him a new trial on Counts One, Two, Three, Four, Five, Six and Eight of the superseding indictment for the following reasons:

### A. Juror Misconduct During Trial and Deliberations

The following conduct by certain jurors tainted the jury's deliberations, deprived the defendants of their Sixth Amendment right to an impartial jury, and entitles them to a new trial:

---

[1] Ricardo Perez filed a Rule 29 motion shortly after trial raising issues unique to the evidence against him. (Doc.786). His counsel, Richard Landes, did request an extension of time, which was granted, to supplement his motion for JOA and to file a Rule 33 motion. However, Mr. Landes was recently hospitalized with a significant health problem where he remains. Defendant, Ricardo Perez joins this motion with the approval of his attorney.  At his direction, Mr. Landes's signature appears on this motion.  AUSA Tysen Duva has been informed of this joinder and has no objection.

In a post-trial interview, Juror No. 10 reported his/her personal observation of the following juror misconduct:  During the trial, he/she walked into the jury room and heard part of a discussion between two other jurors whom she declined to identify.  One of those jurors told the other that his wife had googled Jorge Perez and learned that he had been associated with 16 or 17 other hospitals.  Those two jurors then stopped talking when they noticed Juror No. 10 had entered the room.

In a post-trial interview with Juror No. 29, he/she reported that during deliberations, one or two other unidentified jurors stated that Jorge Perez had been connected with 16 or 17 other hospitals.

These reports establish that grave misconduct took place during the trial and deliberations in these respects:   (a) at least one juror had private communications with a third party during the trial by which extraneous prejudicial information was improperly brought to his attention (outside research by his wife[2]) in violation of the Court's instructions; (b) at least one juror shared

---

[2] Considerably more prejudicial information about Jorge Perez exists on the internet that could be -- and indeed may have been -- found by any Google researcher.  For example, a certain Jorge Perez (but not this defendant) was convicted of possession of a firearm by a felon, possession with intent to distribute heroin, and possession with intent to distribute methamphetamine in this very court, and his convictions were affirmed by the Eleventh Circuit in an unpublished opinion on March 13, 2019 (*US v. Perez*, No. 18-10634, Non-Argument Calendar (11th Cir. Mar. 13, 2019).  Nothing in that opinion suggests the defendant there was, in fact, one and the same as this defendant.  And a certain Jorge A. Perez (not this defendant) unsuccessfully appealed the denial of his 28 U.S.C. §2255 claim in connection with a conviction in the Southern District of Florida for an undisclosed criminal offense in 2007 (*Perez v. United States*, No. 07-11171

that extraneous information with at least one other juror, in violation of the Court's specific instructions; c) during deliberations, at least one juror shared that extraneous information with other jurors, in violation of the Court's specific instructions; and (d) at least two jurors discussed the case and evidence between themselves before retiring to deliberate, in violation of the Court's specific instructions.

It is vital "that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.  Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated....  Private communications, possibly prejudicial between jurors and third persons ... are absolutely forbidden and invalidate the verdict at least unless their harmlessness is made to appear."  Mattox v. U.S., 146 U.S. 140, 149-50, 13 S.Ct. 50, 53 (1892).  More recently, in Remmer v. U.S., 347 U.S. 227, 229, 74 S.Ct. 450, 451 (1954), the Court noted:

> In a criminal case, *any private communication [or] contact . . .* directly or indirectly, with the juror during a trial about the matter pending before the jury *is, for obvious reasons, deemed presumptively prejudicial,* if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. [Emphasis added.]

---

Non-Argument Calendar (11th Cir. May 16, 2008).  There are other criminal cases involving persons having the same name.

Defendants have presented specific, detailed and credible *prima facie* evidence drawn from the court-approved interviews undertaken by defense counsel that the jury deliberations and the verdicts were improperly tainted by the conduct described herein. "As a matter of established law, the burden of proving prejudice does not lie with the defendant because prejudice is presumed the moment the defendant establishes that 'extrinsic contact with the jury in fact occurred.'" U.S. v. Martinez, 14 F.3d 543, 550 (11th Cir. 1994) (quoting U.S. v. Caporale, 806 F.2d 1487, 1503 (11th Cir. 1986)).

When a defendant has shown extrinsic contact, "the burden shifts to the government to demonstrate that the consideration of the evidence was harmless." Martinez, F.3d at 550. That presumption is not conclusive, "but the burden rests heavily upon the government to establish, after notice to the defendant, that such contact with the jury was harmless to the defendant." Id. (quoting Remmer, U.S. at 229, S.Ct. at 451). "The jury's consideration of extrinsic evidence requires a new trial 'if the evidence poses a *reasonable possibility of prejudice* to the defendant.'" U.S. v. Pessefall, 27 F.3d 511, 516 (11th Cir. 1994) (quoting U.S. v. Awan, 966 F.2d 1415, 1432 (11th Cir. 1992)). "To rebut the presumption of prejudice, the government must show that the jurors' consideration of extrinsic evidence was harmless to the defendant." U.S. v. Ronda, 455 F.3d 1273, 1299 (11th Cir. 2006) (citing Remmer, U.S. at 229, S.Ct. at 451).

Defendants respectfully request that the Court summon all members of the jury (and the wife of the particular juror who received her research) for an inquiry into these matters so as to develop and determine the nature and extent of the extrinsic contact between one juror and his wife, and between that juror and another, and whether the information obtained by the first juror gleaned from the research by his wife was further disclosed to the whole jury during deliberations, and the manner in which the information reached the jury.  In situations of this kind, a defendant is entitled to a post-trial hearing.  Dennis v. U.S., 339 U.S. 162, 167, 171-2, 70 S.Ct. 519, 521, 523 (1950) (convicted of contempt of Congress, defendant who alleged the jury was composed primarily of U.S. government employees was "free to show the existence of actual bias"; "Preservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury").  The district court has broad discretion as to how to proceed at such hearing, "including discretion to interrogate the jurors."  U.S. v. Hernandez, 921 F.2d 1569, 1577 (11th Cir. 1991).  A duty to investigate arises "when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality."  U.S. v. Cuthel, 903 F.2d 1381, 1383 (11th Cir. 1990) (citation omitted).  A post-trial hearing at which jurors are questioned is justified when a defendant shows "clear, strong, substantial and incontrovertible evidence ... that a specific,

nonspeculative impropriety has occurred." <u>Id</u>.   Defendants have met that standard.

### B.  <u>Juror Bias as to Undisclosed Prior Jury Service</u>

During the same post-trial interview, Juror No. 10 revealed that another juror. Number 55, stated during the course of deliberations that she had been a juror in seven previous trials.  This statement is inconsistent with her statements, under oath, during jury selection. This potential juror's misconduct by concealment of material information as to which she was directly questioned, indicative of both dishonesty and bias, precluded the Court's exploration of her impartiality, possible bias or prejudice.  Had the information been disclosed (seven times a juror rather than one state and one federal), it would have formed the basis for a challenge for cause by defendant and/or assisted them in using their peremptory challenges more effectively, particularly where there is evidence that this same juror repeatedly discussed her prior experience as a former Blue Cross employee during deliberations.

"*Voir dire* examination serves to protect the right to a jury capable and willing to decide the case solely on the evidence before it." <u>U.S. v. Carpa</u>, 271 F.3d 962, 966 (11th Cir. 2001) (citing <u>McDonough Power Equip., Inc. v. Greenwood</u>, 464 U.S. 548, 553, 104 S.Ct. 845 (1984)).  The goal of voir dire is to expose "possible biases, both known and unknown on the part of potential jurors." <u>McDonough</u>, U.S. at 554, S.Ct. at 849.  <u>Carpa</u> set out these controlling principles:

To obtain a new trial for juror misconduct during *voir dire*, a party must: 1) demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then 2) show that a correct response would have provided a valid basis for a challenge for cause. * * * *McDonough* first "requires a determination of whether the juror's answers were honest." * * * Then, there must be a showing of bias that would disqualify the juror. * * * Bias may be shown either by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed. * * * A juror's dishonesty is a strong indication of bias. * * * If a court determines there was actual bias, the juror's inclusion in the petit jury is never harmless error. <u>Id</u>. at 967 (citations omitted).

Silence under these circumstances -- when squarely asked a question in voir dire -- bespeaks dishonesty because it constitutes "an active and wholly unjustifiable failure to disclose" matters that "would evidence a distinct and undeniable bias toward one party" and warrant a challenge for cause.  <u>U.S. v. Ippolito</u>, 313 F.Supp.2d 1310, 1316 (M.D. Fla. 2003), *aff'd sub nom*. <u>U.S. v. Carpa</u>, 129 Fed.App'x 601 (11th Cir. 2005) (citing <u>Williams v. Netherland</u>, 181 F. Supp. 2d 604, 613-4 (E.D. Va.), *aff'd sub nom*. <u>Williams v. True</u>, 39 Fed.App'x 830 (4th Cir. 2002)). Such silence can constitute "a material evasion that establishes bias." <u>Id</u>.

As to nondisclosure of her prior jury service, "it is essential that the defendant have accurate information concerning prior jury service" in order to exercise peremptory challenges, and counsel is entitled to develop some information in that regard.  <u>U.S. v. Price</u>, 573 F.2d 356, 362 (5th Cir. 1978). Furthermore, "[i]f counsel can show specific evidence that the prior service

biased a particular juror, that juror will be excused for cause." <u>U.S. v. Jefferson</u>, 569 F.2d 260, 261 (5th Cir. 1978).

But this juror's intentional concealment of her prior jury service wholly prevented defendants from seeking such an inquiry and from later making a more informed decision on their peremptory challenges. Here, too, her silence was "a material evasion that establishes bias." <u>U.S. v. Ippolito</u>, 313 F.Supp.2d at 1316.

Defendants request a hearing at which this juror is summoned and questioned her prior experience as a jury and a more through inquiry of her experiences at Blue Cross. Full disclosure of all of these plainly material matters was absolutely required, and that information would have assisted defendant in seeking to challenge her for cause or exclude her peremptorily. <u>Dennis v. U.S.</u>, 339 U.S. at 167, 171-2, 70 S.Ct. at 521, 523 (defendant is "free to show the existence of actual bias"); <u>Smith v. Phillips</u>, 455 U.S. 209, 215-16, 102 S.Ct. 940, 945 (1982) ("the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias").

### C. <u>Weight of the Evidence</u>

Rule 33(a) provides that, on the defendant's motion, the court may vacate a judgment and grant a new trial "if the interest of justice so requires." Although motions for a new trial are disfavored (<u>U.S. v. Martinez</u>, 763 F.2d 1297, 1313 (11th Cir. 1985)), the "interest of justice" standard is broad, and the trial court is vested

with substantial discretion in determining whether to grant such a motion. Id. at 1312. When a defendant challenges the weight of the evidence in a motion for a new trial, the court "need not view the evidence in the light most favorable to the verdict" and "[i]t may weigh the evidence and consider the credibility of witnesses." Id. "The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." Id. at 1312-3. For a court to set aside the verdict, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." Id. at 1313.

### 1. *New Trial as to Count One*

Jorge and Ricardo Perez have met that standard to overturn the verdicts as against the weight of the evidence. Their motion for judgment of acquittal set out in detail the glaring inadequacies in the government's evidence as to Count One (conspiracy to commit health care and/or wire fraud), as well as the resulting legal infirmities of the remaining six counts which were dependent upon the sufficiency of Count One. (Doc. 821). Defendants adopt and incorporate by reference all of the facts, authorities and rationales in the JOA motion as though fully set out herein. To summarize:

(a)   The government's allegation that Mr. Perez knowingly and falsely represented that the laboratory testing was performed at the rural hospitals when they were not was unsupported in every respect. The electronic form (the UB04)

used by the billing company to initiate a claim lacked any field to identify the location of the lab testing.   The form nowhere required or requested that information.   *See* Kongstvedt, Vol. XV, pp. 195, 203-4.   Defendant was never asked to identify the place of testing, *and he never did*, nor did the billing company.   Every exhibit showing a UB04 reflected the format of the UB04 (Doc 809-3).   The documentary evidence prevails over any contrary testimony, and yet nearly all the testimony from government witnesses further confirmed this fact.

The second element for conviction -- that Mr. Perez knew his supposed representations were false -- is completely unsupported.   To the extent that the lab location made any difference to Florida Blue, the Medicare Claims Processing Manual (Doc. 817- 57) expressly permitted defendant to submit a claim where the testing actually occurred at reference labs chosen by the rural billing hospitals, in keeping with Chap. 15, sec. 40.1 thereof.   Dr. Kongstvedt's testimony about standard billing practices in the industry was irrelevant and flawed because it was based on his mistaken idea that the provisions in the Blue Cross Colorado contract and manual as to pass-through billing were the same as those in Missouri, Georgia and Florida.   The email chains (817-35C and 84) proved otherwise.   Billing for testing done in reference labs was not prohibited in these venues.   And as far as Anthem/Right Choice Missouri was concerned, CMS guidelines trumped any conflicting policy of the insurer (Grayson, Vol. X, pp.

182-3).   Again, the written documents and authorities overcome testimony or circumstantial evidence or inferences as to defendant's state of mind.

(b)   The government's allegation that Mr. Perez knowingly and falsely represented that the persons supplying urine samples for testing were in-patients or out-patients of the rural hospitals when they were not was completely unsupported.  In every UB04 claim sent out, the code "141" had been put in the "Type of Bill" field (Kongstvedt, Vol. XV, p. 142).  The "141" entry signifies a _non-patient_ (Tobin, Vol. II, pp. 172, 175-7; Kongstvedt, Vol. XV, pp. 137, 142).   The government never produced any claims data that contained something other than "141" (id.).

As the UB04 claims made their way from the independent billing company to a clearinghouse and then ultimately to insurers, _other_ actors added or deleted information that the billing company had supplied.  Notably, a "22" entry for "Place of Service" was put into the data by the insurance companies themselves (Tobin, Vol. II, pp. 177-8, 208; Kongstvedt, Vol. XV, pp. 156-7, 195).   The government conceded that the "22" code was never submitted by any defendant, including Mr. Perez.  Significantly, the government never presented evidence of the original versions of the documents or raw data that the billing company and the hospitals actually sent to the clearinghouses, or even the versions sent out by the clearinghouses.  It only utilized the spreadsheets containing the final version of the data after the additions and alterations by others involved in the handling

of the claims -- including "information that was put in there by the payer company itself ... information that wouldn't be on the claim."  Kongstvedt, Vol. XV, pp. 156-7; *see also*, Tobin, Vol. II, pp. 208-11.  The government attempted to pass off these final versions as the fraudulent representations of the defendant.

The government produced no evidence that Mr. Perez knew the UB04 information was being altered along the claims-handling process.  No inference that he directed, allowed, or suffered these alterations and additions to be made can reasonably be drawn from the record to establish his deliberate indifference to the changes or an intent to defraud.

(c)   The government's allegation that Mr. Perez knowingly and falsely represented that the urine testing was "medically necessary" when it was not, was likewise lacking any supporting evidence.  The urine testing was ordered by hundreds of doctors around the country.  Mr. Perez was not shown to have contacted or communicated with any of those ordering doctors or others authorized to order the tests, or with their patients.  No evidence indicated he exercised control or influence over any of them.

The opinion of Dr. Waller, based upon a statistical analysis of the number and timing of the tests ordered, was that *the ordering physicians* failed to meet some undefined standard of care in their own medical practices.  On the factual basis from which Dr. Waller began, he did not, and could not opine that Mr. Perez somehow caused or contributed to cause the negligent or reckless conduct

of those doctors who were the objects of his criticism.  And without examining the medical records in each case that he found suspicious so that he could understand each doctor's assessment of each patient and why the doctor decided to order testing, Dr. Waller could not reasonably have inferred that any such testing was not medically necessary.  That would be a wholly uninformed opinion.  This Court acknowledged the serious shortcomings in Dr. Waller's testimony by giving its limiting instruction to the jury.

Mr. Perez reasonably and properly relied on the medical determinations of trained and skilled physicians.  The government presented no evidence that he knew any test was, in fact, unnecessary or that he willfully submitted false claims in connection with them.  Assuming *arguendo* that Dr. Waller's testimony had any probative value on these issues, it was greatly outweighed by all the other evidence.

Here, too, no evidence was presented that defendants _knew_ or _could_ _have_ _known_, or had any duty to investigate, whether the testing ordered by physicians was, in fact, medically unnecessary for those particular patients.  No criminal intent was demonstrated or could reasonably be inferred from the circumstances.

(d)   The government's allegation that Mr. Perez knowingly and falsely represented that the claims submitted complied with the terms of the health care plans was unsupported.   Substantial, probative evidence supported the defendant's good-faith interpretation of the contract terms and its silence as to

certain matters, with ambiguities to be construed in his favor, and that he had broad latitude to submit the claims for payment in the manner that was actually done.  The email chain between Heather Burch and James Balcom in February 2017 (Doc. 817-35C) reflects her view that the existing contract with Putnam County Memorial Hospital did not prohibit pass-through billing.  Burch intended to negotiate a new contract that did.  Burch, Vol. XV, pp. 278, 283-4.  A simple contract dispute, regardless of the amount of money at stake, should not give rise to a criminal prosecution.

The credible evidence (testimonial and particularly documentary) and reasonable inferences to be drawn from it, as well as the dearth of the government's evidentiary showing on crucial matters including Mr. Perez's alleged intent to defraud, preponderate heavily against the verdicts.   In the interest of justice, a new trial should be ordered.

### 2. *New Trial as to Remaining Counts*

Because the convictions for conspiracy to commit health care and wire fraud (Count One), substantive health care fraud counts (Counts Two-Six) and conspiracy to commit money laundering (Count Eight) all hinge upon the conviction for conspiracy to commit health care and wire fraud (Count One), then granting a new trial as to the latter necessarily requires that the other convictions be vacated and a new trial order as to the former counts as well.

D. **Admission of Improper Evidence**

(1) The Court erred in allowing the government to present evidence in the form of the Claim Spreadsheets.  Those exhibits were prepared by the private insurers in anticipation of litigation and provided by them to assist the government in its case against Mr. Perez and the other defendants.  The data reflected in them was admitted by witnesses to be both incomplete and inaccurate, and no comparison was made between what was included in them and the original UB04s/837Is.  *See* Tobin, Vol. II, pp. 208-11; Bobbitt, Vol. X, p. 236; Balcom, Vol. XI, p. 84; Kongstvedt, Vol. XV, pp. 156-7.  The insurers themselves added the "22" designation, not defendant or the independent billing company.   *See* Tobin, Vol. II, pp. 177-8, 208; Bobbitt, Vol. X, pp. 220-3; Kongstvedt, Vol. XV, pp. 156-7, 195.

The identity of the person(s) who created the spreadsheets or are responsible for their creation -- believed to be employees of the insurers -- was never disclosed at trial, nor did the government inform defense counsel of the identities.  The underlying data on which the spreadsheets were fashioned (the UB04s and 837Is) were not provided to the government by the insurers.  Tobin, Vol. II, pp. 208-9; Bobbitt, Vol. X, pp. 208-12; Balcom, Vol. XI, p. 84. Consequently, defendants were unable to examine and compare the underlying data from the time it was sent out by the clearinghouses (to another clearinghouse or the private insurers).  Id. The insurers have had this

information, or the means to obtain it, for some six years; the government has had the right of access almost as long.  Bobbitt, Vol. X, pp. 208-12.

Fundamentally, none of the transmissions of information about the urine testing constitutes a *statement* *by* *Jorge* *Perez*.  Rather, other persons conveyed that information electronically (*i.e.*, a statement) to the independent billing company, which then completed the UB04/837I form and transmitted it (another statement) to a clearinghouse, which then altered some of that information and transmitted it (yet another statement) either (*i*) to the insurance company or (*ii*) to another clearinghouse which again altered the data and transmitted it (another statement) to the insurance company.  The insurance companies added some data (the "22" code, for example) and deleted some data.  This version amounts to each insurer's own statement.  *See, e.g.*, Bobbitt, Vol. X, pp. 205-7; Salazar, Vol. XVI, p. 252.  Then, years later, the insurers created these spreadsheets -- a final statement -- for the government's convenience for use at trial.

At each step in the claims adjudication process, one or more speakers has made a statement about these claims that the government has attempted to attribute to Mr. Perez. Because the spreadsheets were altered in substance along the way and used by the government during trial in an effort to prove his criminal conduct, they were "testimonial statements" within the meaning of the

Confrontation Clause,[3] and therefore defendant had the right to confront at trial each person who made a statement in this process, or else to have been afforded an opportunity to cross-examine each of them before trial. <u>Crawford v. Washington</u>, 541 U.S. 36, 55-60, 124 S.Ct. 1354, 1366-69 (2004). The Constitution absolutely requires this: "Testimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." U.S. at 59, 68; S.Ct. at 1369, 1374.

The <u>Crawford</u> Court squarely rejected the contention that testimonial statements are admissible if they fall within an exception to the hearsay rule (such as business records) and are "reliable":

> Where testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of "reliability." ... Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability

---

[3] <u>U.S. v. Clotaire</u>, 963 F.3d 1288, 1294 (11th Cir. 2020), addresses the difference between testimonial and non-testimonial computer-generated statements. The former includes those where, first, the communicative content has been changed, and second, some "human discretion or judgment" has been exercised in making the change. It also distinguished between "authentication" and "creation" of a record containing a statement: "a clerk could not create a record for the sole purpose of providing evidence against a defendant, but could, with an affidavit, authenticate an otherwise admissible record." <u>Id</u>. at 1296.

of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined....

Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.   This is not what the Sixth Amendment prescribes....

Reliability is an amorphous, if not entirely subjective, concept. There are countless factors bearing on whether a statement is reliable....  Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them.   Some courts wind up attaching the same significance to opposite facts.

U.S. at 61-3; S.Ct. at 1370-1.

Prior to trial, Defendant Durall sought to exclude these spreadsheets on the ground that their admission violated the Confrontation Clause (Doc. 450, pp. 1-2, 3-4, filed December 1, 2021), citing Crawford.  That was overruled prior to trial, but the motion was raised again during the trial (with counsel for the Perez's joining) and denied again on the grounds that the spreadsheets were properly authenticated business records and "the defendants have [not] made any showing to me of indicating a lack of trustworthiness" (Vol. II, pp. 72-3).   Crawford teaches that those grounds were erroneous.

In addition to the Confrontation Clause ground, defendant contends that the spreadsheets were improperly admitted because they were hearsay not subject to any exception (F.R.E. 802, 803); were admittedly incomplete and altered by the clearinghouses and the private insurers and thus were inaccurate, unreliable and not corroborated by comparison with the underlying records and

data (F.R.E. 807); were inadmissible as summary exhibits because the underlying records and data were never produced to defendants (F.R.E. 1006); were misleading and confusing to the jury, such that any probative value was greatly outweighed by the inherent dangers of admission (F.R.E. 403); and were unduly prejudicial because defendant was unable to compare the spreadsheets with the underlying data for accuracy and completeness (F.R.E. 403).

Defendants adopt and incorporate by reference as though fully set out the statement of facts, grounds for exclusion, argument and authorities contained in Defendant Fletcher's Motion for Hearing to Determine the Admissibility of Evidence filed December 1, 2021 (Doc. 448), and those contained in Defendant Durall's Motion to Bar Admission of the "Claim Spreadsheets" filed December 1, 2021 (Doc. 450).

(2)  The Court erred in admitting the Mark Thomas letter (Doc. 817-69) without redactions. The Court erred in allowing the jury to view the unredacted version of the Mark Thomas letter while the witness was being cross-examined by the government attorney.  The exhibit was irrelevant to all defendants except two (the Porter defendants), but its content was highly inflammatory and prejudicial. The Court's limiting instructions were insufficient to remove the prejudice and a mistrial should have been granted as defense counsel requested.  A mistrial should now be declared, together with a finding that it is compelled by the government's presentation, questioning and publishing the letter to the jury and

consequently defendants may not again be placed in jeopardy for the alleged criminal activity under the Fifth Amendment.  In the alternative, a new trial is an appropriate remedy.

Shortly after the jury was seated at 2:34 p.m. (Vol. XVII, p. 187), the unredacted exhibit was received into evidence and the Court explained (pp. 188-9):

> I am admitting this exhibit, Government Exhibit 69, which is a letter expressing Mr. Thomas's legal opinions as it bears only on the case involving James S. Porter, and Sean Porter, and not as to any other defendant.

Although page 2 contains the heading "APPLICABLE LAW" the Court declined defendants' request to advise the jury further that the legal opinions Mr. Thomas expressed, in his letter and in his testimony, were not to be considered the law applicable to any defendant and that only the Court's instructions could be considered proper and applicable to assist the jury in reaching their verdicts (id. pp. 180-2, 184-5).

Thereafter parts of the letter were shown on the ELMO device (id. p.189). Several pages were displayed, including at least pages 1, 2, 3 and 4 (id. pp. 189, 195, 201, 202, 203, 219), until the jury was excused for a break and exited at 2:58 p.m. (id. p. 205).  During that period, the jury was shown page 2 of the exhibit (id. p. 195).  While the witness was questioned about some matters on that page, the jury was free to study other parts, particularly the beginning of a quotation of the Florida Anti-Kickback and Anti-Patient Brokering/Anti-Fee Splitting Law at

20

the bottom, as pointed out by Mr. Duva (id. p. 201). Page 3 of the exhibit was displayed which contains a lengthy quotation from the Florida statutory text while Mr. Duva asked, "This is a Florida statute we're going to look at?" and if the citation was a "cut-and-paste job" (id. p. 201). He then  reminded the jury the letter set out "actually the text of the Florida Anti-Kickback Statute" and that it applies to both "government insurance and private payers" (id. p. 202). At approximately that point, page 4 of the exhibit was displayed to the jury. Mr. Duva quoted the paragraph following the text, that the Florida statute "prohibits the 'brokering' of patients or the 'splitting' of any professional fee in exchange for the referral of a patient for the provision of any good or service" and pointed out a footnote citing authority for that statement (id. p. 202). Mr. Duva quoted another paragraph on that page, reading: "It is important to note that the Florida anti-kickback law is applicable to any payer, so a prohibited arrangement would be illegal regardless of whether the payer is a governmental entity or not" (id. p. 202-3). Mr. Duva then attempted to elicit an opinion from the witness based on a hypothetical question, which drew an objection and a lengthy bench conference after the jury exited (id. pp. 203-25). But the jurors were free to read all of page 4 of the Thomas letter until they left the courtroom (id. p. 219). At the bottom of that page below the heading "2. Federal Law" are three lines -- one full sentence with a footnote at the end of it and an incomplete second sentence:

> Federal law prohibits any entity from intentionally paying or receiving any form of financial benefit in exchange for services that

might be paid for by the government. *  If only one purpose of the
payment at issue is to induce patient
[*The footnote cited 42 USC § 1320a-7b(b); 42 CFR § 1001.951.]

The jury had been told to expect a 10-minute break at 2:58 (id. p. 205)
while the issue was sorted out, but they were not permitted to return for nearly
an hour, at 3:50 (id. p. 225).  Then the jury saw that the original letter had been
replaced with a heavily redacted version that excluded some portions the jurors
had already seen and heard about, and over four more pages they had not viewed
(id. p. 226).  To suggest their curiosity had not been piqued by the questioning
and handling of the exhibit is to deny human nature.  In fact, as proof that the
letter's content was significant and had an explosive impact, in his post-trial
interview with Mr. Duva, the juror "viewed Mr. Thomas' late-breaking letter as
another light bulb moment (he called it an 'oh, s**t!' moment in the trial)." (Doc.
805) Other jurors may have shared that reaction and in their deliberations may
have discussed at length the letter's content, the irrelevant state and federal
statutes they had seen, and speculated about parts they were not allowed to see or
hear about.

The letter in its entirety contained information that was not probative of
any of the charges against Jorge Perez and Ricardo Perez (notably the so-called
kickback issue, the Florida anti-kickback statute, the Florida anti-patient
brokering and anti-fee splitting statute that the government knew were not
germane) and was highly inflammatory and unduly prejudicial to them.  The

22

Court itself noted that, coupled with Mr. Duva's questions, the risk of urging the jury to consider uncharged crimes and juror confusion was real and present (id. pp. 203-4, 207, 213-4), and that much of the letter was not relevant (id. pp. 213-5).

When the jury was again seated, the Court gave this instruction withdrawing some of the evidence and issues that had been improperly presented (id. pp. 225-6):

> Before we broke, you heard brief testimony and had displayed Florida statutes regarding, "brokering" and "anti-kickback" laws. Those laws are not relevant to your consideration, and I instruct you to disregard that testimony and the display that was put up on -- on the screen there.

The jurors' perception of the information and its importance is the paramount focus, though the actual impact cannot be fully determined. Defense counsel articulated the dire consequences (id. pp. 207-9, 217-8). The Court's confidence that this evidence was not unduly prejudicial considering the "mountains of testimony" (id. p. 218), that the testimony was "too fleeting," that the jury's "sensitivity to it" was not significant, and that it was not fundamentally unfair or "prejudicial enough to warrant ... a mistrial" (id. p. 221) was misplaced. No actual evidence establishes the jury's lack of confusion of the issues or justifies the belief or faith in the jury's ability to follow its instructions and not consider the withdrawn evidence. After all, the jury only convicted two defendants as to whom the content of the letter and the cross-examination of Thomas was

immaterial.  And the juror who telephoned Mr. Duva was greatly impressed by the exhibit and presumably the citations to irrelevant law, notwithstanding the Court's instruction.  The Court should have taken stronger measures to protect the fairness of the trial.

Although appellate courts routinely defer to a trial court's calculation as to the harmful effects of improper evidence and frequently pronounce that juror are presumed to follow limiting instructions and those that withdraw issues and evidence, that approach should not be applied here.  Jurors are _also_ instructed not to conduct outside research, and not to discuss the trial or evidence with other jurors before they begin deliberations, and not to discuss those things with third parties, and not to consider extrinsic evidence or matters extraneous to the evidence presented during the trial.  They are _also_ instructed to answer questions posed on voir dire fully and honestly, and they swear an oath to do so.  But in this case, it strongly appears that at least three jurors disregarded and disobeyed those bedrock instructions.  *See* sections A and B above.

Under these circumstances, one cannot pretend that all of the jurors in this trial faithfully adhered to the Court's limiting instructions as to Exhibit 69 when they violated earlier instructions.  As the Eleventh Circuit has declared:

> The government contends that each juror assured the court that it [*sic*] could follow the court's instructions and deliberate in a fair and impartial manner.  In this case, such assurances are unavailing because ... the majority of the jury demonstrated an inability to follow the district court's instructions.  Although we assume that jurors follow the trial court's instructions, in instances such as this,

where jurors demonstrate a willingness to disregard the court's instructions, we are justifiably skeptical of the jurors' ability to follow instructions in the future.

U.S. v. Martinez, supra 14 F.3d at 551 (citing U.S. v. Heller, supra 785 F.2d at 1526-8).

The Court's limiting instructions were inadequate to cure the prejudice resulting from the handling of Exhibit 69.  A mistrial should be declared, together with a finding and determination that defendants may not be retried because of the government's conduct.  Alternatively, a new trial is warranted.

**WHEREFORE**, defendants Jorge Perez and Ricardo Perez respectfully move for an order declaring a mistrial, attributable to the government's conduct in presenting the unredacted Exhibit 69.  The Court should find the defendants were placed in jeopardy and denied a fair trial by reason of the government's action and cannot be subjected to a second trial.  Alternatively, defendants respectfully move for an order granting each of them a new trial on Counts One, Two, Three, Four, Five, Six and Eight.

Respectfully submitted,

**S:// Richard J. Landes**
RICHARD J. LANDES, #0071390
736 2nd St. N.
Jacksonville, Florida 32250
Telephone (904) 343-4556
rjlandes@gmail.com
Attorney for Ricardo Perez

**S:// Thomas M. Bell**
THOMAS M. BELL, #0615692
 301 West Bay Street, Suite 1460
Jacksonville, Florida 32202
Telephone (904) 354-0062
tbellesq@bellsouth.net
Attorney for Jorge Perez

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 27, 2022, I electronically filed the foregoing with the clerk of the Court by using CM/ECF system which will send a notice of electronic filing to A. Tysen Duva, AUSA and all counsel of record.

S:// Thomas M. Bell
THOMAS M. BELL

25