UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.   Case No. 3:20-cr-86(S1)-TJC-JBT

JORGE PEREZ, ET AL.

**RESPONSE TO JORGE PEREZ'S AMENDED MOTION TO
STAY FINAL ORDER OF FORFEITURE PENDING APPEAL**

The United States opposes Jorge Perez's amended motion to stay the enforcement of a final order of forfeiture (Doc. 1265) as to the real property located at 96000 Overseas Highway, Unit M-4, Key Largo, Florida 33037 ("M-4 Condo"). As set forth below, the Court should deny Perez's motion.

**MEMORANDUM OF LAW**

**I.   Background**

1. The Court entered a preliminary order of forfeiture for the M-4 Condo because it was purchased with health care fraud proceeds and was involved in the money laundering conspiracy. Doc. 1184.

2. The United States mailed direct notice to third parties with a potential interest in the M-4 Condo of their right to challenge the forfeiture by filing a judicial petition with the Court pursuant to 21 U.S.C. § 853. Doc. 1259. The United States also notified them of their right to also, or alternatively, submit a petition for remission or mitigation to the Attorney General as provided in 28 C.F.R. § 9.4(a).

3. Perez's long-term partner, Liansy Carbonell, elected not to file a judicial petition asserting an ownership interest and challenging the forfeiture of the M-4 Condo pursuant to 21 U.S.C. § 853(n)—perhaps because this Court has already found that Perez bought it with criminal proceeds. Instead, she submitted a petition for remission, requesting that the Attorney General recognize her alleged interest and remit the property to her once it is forfeited.

4. Buttonwood Bay Condominium Association (Buttonwood Bay HOA),[1] and Judgment Collection Company (JCC) also submitted petitions for for remission as lienholders.

5. The Chief of DOJ's Money Laundering and Asset Recovery Section, Criminal Division has been delegated authority to decide petitions for remission of judicially forfeited property. *See* 28 C.F.R. § 9.1(b)(2). The United States will not sell the M-4 Condo before Carbonell's petition for remission is decided.

6. The property taxes on the M-4 Condo have not been paid for five years (2020-2024). *See* Monroe County Tax Collector's website, https://county-taxes.net/fl-monroe/property-tax. The United States intends to satisfy the Tax Collector's lien with the proceeds of the sale of the M-4 Condo. Doc. 1259.

7. Perez appealed his criminal judgment, and the issues are fully briefed. *See United States v. Jorge Perez et al.*, Case No 24-13762 (11th Cir.), at Doc. 29 (Perez

---

[1] When Buttonwood Bay HOA submitted its petition for remission on January 29, 2025, it was owed $33,242,93. However, based on an account ledger they provided, it appears that this debt was recently satisfied.

2

Brief); Doc. 43 (Government Brief). Perez is not challenging forfeiture, but is requesting that the Eleventh Circuit reverse his conviction.

8. The United States's motion for final order of forfeiture of the M-4 Condo, (Doc. 1259) is ripe for decision because all third-party claims have been resolved. Doc. 1262 at 3.

9. Perez now requests that the Court stay the final order of forfeiture pending the completion of his appeal, asserting his belief that he is likely to succeed on appeal, and that permitting the sale of the M-4 Condo before his appeal is decided will cause him and Carbonell irreparable harm. Doc. 1265. Although Carbonell failed to contest the forfeiture pursuant to 21 U.S.C. § 853(n) and does not reside at the M-4 Condo,[2] Perez asserts that the Court should consider her interest in the property. *Id.* It should not.

## II. **Legal Argument**

This Court should not stay the entry of the final order of forfeiture because the law does not authorize such a stay. Additionally, unless certain conditions are met, including the payment of all outstanding amounts owed to the Tax Collector and Buttonwood Bay HOA, the United States opposes a stay on the enforcement of

---

[2] Carbonell lists a Miami, Florida address on her petition for remission. *See* Doc. 1213 at 3. According to records available at the Miami-Dade Tax Collector's website, https://county-taxes.net/fl-miamidade/property-tax, she has claimed homestead exemptions on this Miami property since at least 2013. Moreover, Carbonell did not request that DOJ consider mitigation of the forfeiture, admitting denial of her petition would not cause her "extreme hardship." *See* Doc. 1213 at 6.

3

the final order of forfeiture. Perez is unlikely to prevail on appeal and he has not demonstrated that the M-4 Condo has any intrinsic value to him. Even if he did prevail, the Government can compensate him from the sale proceeds. Moreover, the expense of maintaining the M-4 Condo and the risk of depreciation if enforcement of the final order of forfeiture is stayed warrant denial of the motion.

### A.   The Court Should Not Stay *Entry* of the Final Order of Forfeiture

Under Rule 32.2(d), a defendant can seek a stay of a forfeiture order to ensure that the property remains available pending the appeal of his conviction. Fed. R. Crim. P. 32.2(d). However, this rule was not meant to delay *entry* of a final order of forfeiture; indeed, the rule states that the stay should not "delay the ancillary proceeding or the determination of a third party's rights or interests." *Id.* Rule 32.2(d) further provides that, if the court rules in favor of any third party while an appeal is pending, the court may amend the preliminary order of forfeiture by entering a final order of forfeiture. *See id.* Thus, the issue of whether a stay is warranted does not implicate the Court's obligation to enter a final order of forfeiture under Rule 32.2(c)(2). Besides, staying the entry of the final order is not necessary to address Perez's primary concern, which is the sale of the M-4 Condo.

### B.   Perez Cannot Advocate for a Stay or Assert an Interest on Carbonell's Behalf

This Court should disregard Perez's attempts to advocate for Carbonell and her alleged interest in the M-4 Condo as a basis for imposing a stay. *See United States*

*v. Pate*, No. 4:14-CR-00125, ALM-CAN, 2016 WL 11474077, at *4 (E.D. Tex. June 30, 2016), *r. & r. adopted*, 2016 WL 4054912 (July 29, 2016) (denying stay pending appeal and concluding that defendant cannot assert interests of third parties). Under 21 U.S.C. § 853(h), third parties can ask the Court to restrain or stay the sale or disposition of forfeited property pending the disposition of a defendant's criminal appeal. 21 U.S.C. § 853(h). However, the movant seeking relief must be someone "other than the defendant or a person acting in concert with him or on his behalf." *Id.* Plainly, Perez cannot seek a stay on behalf of Carbonell. And she lacks standing to do so.

  Carbonell chose not to challenge the forfeiture by filing an ownership petition in this ancillary proceeding. As a result, any interest she had has been extinguished. *United States v. Marion*, 562 F.3d 1330, 1336-37 (11th Cir. 2009) (stating that the failure to file a petition within the section 853(n)(2) 30-day period "extinguishes a third-party's interests"); *see also* Rule 32.2, Advisory Committee's Note (2000 Adoption). Since Carbonell has no standing to challenge entry of the final order of forfeiture, it would "risk eroding the finality of judgments" to allow her to seek a stay under 21 U.S.C. § 853(h). *See U.S. v. Salti*, No. 1:96 CF 153, 2008 WL 276515, at *2 (N.D. Ohio Jan. 29, 2008) (affirming denial of stay sought by third party without standing to pursue claim). Granting Perez a stay of the final order of forfeiture pending his appeal, to protect the **alleged** interest of a third party with no standing to seek a stay herself, would plainly "circumvent the procedures for the validation of

5

third-party interests" in section 853(n) and go beyond the interests that section 853(h) aims to protect. *See United States v. Carmichael*, 440 F. Supp. 2d 1280, 1282-83 (M.D. Ala. 2006) (third party with no interest in property under section 853(n)(6) cannot use section 853(h) to stay sale of forfeited property).

    **C.    Grounds Do Not Exist to Stay *Enforcement* of the Final Order of Forfeiture**

Rule 32.2(d) gives the Court discretion to stay enforcement of a final order of forfeiture pending appeal. *See* Fed. R. Crim. P. 32.2(d); *United States v. Houghton*, 132 F. App'x 130, 132 (9th Cir. 2005) (district court had discretion in ruling on motion to stay forfeiture proceedings pending appeal). Perez advises the Court to consider "traditional" stay factors when ruling on his motion, including: (1) the likelihood of success on the merits, (2) irreparable harm absent a stay, (3) injury to other parties, and (4) the public interest. Doc. 1264. However, he does not cite any cases where "traditional" factors are considered when deciding a motion to stay a final order of forfeiture.

The Eleventh Circuit has not yet stated the factors this Court should consider when reviewing a motion to stay a final order of forfeiture pending a defendant's appeal, but district courts within the Circuit have found it reasonable to examine modified factors that are tailored to the context of forfeiture, including: (1) the likelihood of success on appeal; (2) whether the forfeited assets will depreciate over time; (3) the forfeited assets' intrinsic value to the defendant (*i.e.,* the availability of substitutes); and (4) the expense of maintaining the forfeited property. *See, e.g., United*

6

*States v. Fisher*, No. 1:21-cr-231-02-TCB-CMS, 2024 WL 2001596, at *2 (N.D. Ga. April 1, 2024), *r. & r. adopted*, 2024 WL 2000633 (May 6, 2024).

Other appellate courts have also applied these modified factors. *See United States v. Ngari*, 559 Fed. App'x 259, 272 (5th Cir. 2014); *United States v. Johnson*, 956 F.3d 510, 520 (8th Cir. 2020). Indeed, courts have acknowledged the "traditional" stay factors but have found no abuse of discretion in applying the modified factors, which are tailored to the forfeiture context. *See, e.g., United States v. Grote*, 961 F.3d 105, 123 (2d Cir. 2020) (noting that courts apply a modified version of the traditional stay factors when considering a motion to stay forfeiture, and finding no abuse of discretion in court denying stay under such factors). Thus, the Court should consider these modified factors when evaluating Perez's motion. And, as set forth below, a review of these factors as applied to this case support denying the motion.

### D. The Likelihood of Success on Appeal

#### i. There Is Sufficient Evidence to Support Conviction

The Perez defendants do not contest the testimony and evidence that they developed and carried out a plan to bill urine specimens collected around the country through the hospitals. *See, e.g.*, Doc. 738:90-91 (Rojas). They do not dispute the evidence that Campbellton-Graceville Hospital (CGH) and Regional General Hospital (RGH) never had the capacity to perform definitive tests or that Putnam County Memorial Hospital (Putnam) did not have the capacity for any urine testing before February 9, 2017. Doc. 745:62 (Byrns). Instead, they argue that there was

7

insufficient evidence to prove that they made false statements in the urine drug testing claim submissions to insurers and that they knew the testing was not medically necessary. But the jury had plenty of evidence to conclude otherwise, and sufficient evidence on either theory would support a fraud finding support defendants' convictions. *United States v. Browne*, 505 F.3d 1229, 1261-62 (11th Cir. 2007).

        a.        The Claims Were False and Misleading

The evidence showed that the claims submitted to the hospitals falsely represented that the urine drug testing was completed at the hospitals. Every claim used the hospitals' NPI and Tax ID number. *See* Doc. 684:57-61, 94-96 (Tobin); Doc. 688:127-128 (Rochay); Govt. Ex. 1A(1). The NPI and Tax ID number identifies the provider of the service. *See* Doc. 684:28-29 (Tobin); Doc. 688:127-128 (Rochay); Doc. 738:294 (Jackson); Doc. 739:117 (Shohan); Doc. 741:208 (Bobbitt). Industry experts testified that using the NPI and Tax ID number in an electronic claim to an insurance company means "[t]hat the billing provider did the service." Doc. 746:46,62 (Kongstvedt); Doc. 742:230-231 (Waller).

Defendants argue that they did not falsely represent that lab testing was performed at the hospitals because a "141" code was used on the claims. But the evidence at trial demonstrated that the 141 code signified a "non-patient" that has "a specimen that is submitted for analysis to a hospital." Govt. Ex. 57 at 11. Thus, using the 141 code requires that "the specimen be submitted to the hospital and that

8

the hospital performs the test." Doc. 746:97-98 (Kongstvedt). Submitting a claim with the 141 code does not just mean a claim is being made for a lab test performed for a non-patient, but more specifically, that *the hospital* has provided testing for a non-patient's specimen *that was submitted to the hospital for testing*. In this case, the specimens were submitted to the independent labs and in many instances, and particularly for the definitive tests, the independent labs and not the hospitals performed the tests. The insurer representatives testified that it was "false" for a hospital to classify a bill type as 141 when the test did not occur at the hospital and instead at an independent lab. Doc. 688:81-82 (Tobin); Doc. 741:220 (Bobbitt). Thus, the jury could reasonably conclude that defendants submitted false claims when the hospital's NPI and Tax ID and the 141 code were used on a claim despite the testing being conducted at an independent lab.

Defendants also suggest that the patient-account field on the claim forms disclosed that testing was performed by the laboratories, but this was an internal hospital tracking number; insurer representatives testified that the number meant "nothing" to the insurer for the adjudication process. Doc. 688:86-88 (Tobin); Doc. 688:132-133 (Rochay). Nothing on the claims submitted indicated that the tests had been performed by independent labs. Doc. 684:116-119 (Tobin).

Defendants also argue that it was appropriate for the hospitals to bill for tests completed by independent laboratories, relying on the Medicare Claims Processing Manual, Chapter 16, sec. 40.1, to characterize the scheme as a reference-lab

9

arrangement. But as industry insiders and experts testified—and consistent with the plain terms of the pertinent Medicare guidance—the description of a reference-lab arrangement, including how billing is to be handled, is specific to "Medicare beneficiaries" and does not govern private insurers' contracts with hospitals. Doc. 688: 115 (Tobin); Doc. 746:75-76 (Kongstvedt); Doc. 688:195 (Rochay). In this case, the insurer contracts governed, and the contracts provided that they would pay only for services rendered by the hospitals. Govt. Exs. 1Y, 1Z, 1BB, 1CC, 1DD, 1GG, 1II, 1JJ, 1LL; Doc. 684:36-56 (Tobin); Doc. 688:146-151 (Rochay); Doc. 739:8-9 (Jackson). In fact, one of the contracts specifically provided that "[r]eference laboratory services are not eligible for payment." Govt. Ex. 1DD at p. 118 (RGH-Aetna contract).[3] A reasonable jury could conclude that neither the insurer-hospital contracts nor the Medicare provision on reference-lab arrangements, were ambiguous or unconstitutionally vague. Importantly, the law requires only that there be evidence that a defendant's statement "is not true under a reasonable interpretation of" the law or contract. *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002).

The evidence also demonstrated that the defendants *knew* that their scheme was not a true reference-lab arrangement and that the claims were false and misleading. The jury reasonably could have regarded the hospital-lab contracts

---

[3] Furthermore, Kongstvedt testified that the circumstances would not even qualify as a reference-lab arrangement. Doc. 746:84-88.

(Govt. Ex. 26C-D, 26G-I)—which stated that the hospitals would collect specimens, determine medical necessity, and "deliver" samples to the labs—as shams that demonstrated that defendants knew what qualified as an appropriate reference-lab arrangement, and that their scheme did not qualify.

Moreover, Kongstvedt testified that any individual running a lab or hospital billing entity would know the "fundamental" principle and industry standard that "[t]he provider that performs the service is the one that bills for it." Doc. 746:105-107. Given defendants' leadership roles and status as industry insiders, the jury could infer their knowledge that using the hospital's NPI and Tax ID numbers and the 141 code constituted a false representation that the hospital provided the service. *See Bradley*, 644 F.3d 1213, 1243, 1246 (11th Cir. 2011) (jury could infer that defendants, as experienced industry professionals, had same knowledge "as the industry insiders who testified at trial"). The jury could also infer defendants' fraudulent intent by the disproportionate profits they realized from running billing through the hospitals. *Id.* at 1247.

Finaly, fraudulent intent could be inferred from the evidence that defendants continued their scheme at new hospitals even after insurers alerted defendants that their billing practice was inappropriate (Doc. 737:236-239 (Mears); Govt. Ex. 30E) and impeded insurer investigations through delayed, incomplete, or misleading responses. Doc. 742:34-47, 117-120 (Balcom), Doc. 737:219-231 (Mears); Doc. 684:138-151 (Tobin), Govt. Ex. 35M.

11

    b.  Defendants Knew the Testing Was Medically Unnecessary.

The trial record is also replete with evidence that claims submitted by the hospitals were false and fraudulent because the testing was medically unnecessary. *See United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016) And, contrary to defendants' claim on appeal, the circumstantial evidence— which can be used to demonstrate knowledge—showed that defendants knew the testing was medically unnecessary. *United States v. Chalker*, 966 F.3d 1177, 1185-87 (11th Cir. 2020) (pharmacist's knowledge proved by his awareness of numerous red flags regarding unnecessary prescriptions).

Dr. Waller, who reviewed all the claims, testified that "the clear majority of these tests were not medically necessary" and were merely to generate revenue. Doc. 742:256. Definitive testing should be relatively rare compared to presumptive testing, but the hospitals billed a much higher quantity of definitive tests than presumptive tests, and demonstrated "no medical justification." *Id.* at 221-22; Govt. Ex. 48A and 25K. Moreover, the evidence showed that defendants billed a huge number of tests per patient, among other fraud indicators. Doc. 742:235-38 (Waller); *see, e.g.* Govt. Ex. 48H. The pattern of providers from all over the country ordering excessive testing in a similar pattern was an obvious red flag. Doc. 742:179-180. The fact that specimens were not tested at all, or were not tested for more than 30 days, bolstered the evidence that the defendants were aware the testing was not medically necessary. Doc. 737:60,86-87 (Ayres); Doc. 742:154-55, 190 (Waller).

Defendants claim ignorance because the tests were ordered by physicians. But this Court has repeatedly rejected this simplistic defense, noting that "[a] doctor's prescription is not a get out of jail free card." *United States v. Grow*, 977 F.3d 1310, 1321-1322 (11th Cir. 2020). A doctor's orders do not insulate non-doctors from findings of fraudulent intent. *See United States v. Palin*, 874 F.3d 418, 424 (4th Cir. 2017) (in upholding lab owners' convictions for fraudulent urine drug testing, rejecting defense that "their lab was bound to perform drug screens ordered by referring physicians").

Finally, defendants' payment of kickbacks to providers encouraged a high volume of tests without regard for medical necessity. Doc. 740:167 (Skeffington). The jury could infer defendants' knowledge from the evidence that they engaged recruiters who paid kickbacks to the providers and also paid kickbacks directly to providers or facilities. Doc.740:133, 144-168 (Skeffington); Doc. 740:276, 296 (Marcotte). *See United States v. Martinez*, 921 F.3d 452, 471 (5th Cir. 2019) (paying kickbacks is indicator of health care fraud); *Gonzalez*, 834 F.3d at 1215.

      ii.      *The Court Did Not Abuse Its Discretion in Admitting Insurance Claims Data Spreadsheets as Business Records*

Defendants' argument that the Court erred in admitting insurance claims data spreadsheets under Federal Rule of Evidence 803(6) is also unlikely to succeed. The admitted "record" was the claims data in the spreadsheets, which the insurers received, handled, stored, and retrieved as a part of their regular business activities. Doc. 684:72-74, 108-110; Doc. 688:125-126; Doc. 738:289; Doc. 741: 213-214. The

13

spreadsheets themselves were simply the format in which the claims data was accessed for trial. Doc. 684:73. As the Eleventh Circuit has explained, "the format of an extracted dataset has nothing to do with whether it qualifies as a business record." *United States v. Clotaire*, 963 F.3d 1288, 1294 (11th Cir. 2020) What matters is whether the *original* record met the requirements of Rule 803(6). *Id.*

Perez has not offered any credible factual basis for why the claims data spreadsheets lacked trustworthiness. The record is clear that the hospitals sought reimbursement by listing the CPT code for the medical procedure they claimed was performed, and the spreadsheets accurately documented the CPT codes that the hospitals used. Doc. 684:61 (Tobin).

        *iii.*    *The Court Did Not Abuse Its Discretion in Denying Defendants' New Trial Motion on Purported Newly Discovered Evidence*

Defendants argue that the Court abused its discretion in denying their motion for new trial and hearing based on what they characterize as "extraordinary deviations" from their trial to the second trial, injecting unwarranted meaning to the use of the word "screen" in column K of the claims spreadsheets. The evidence was always that the CPT code defines whether a test is presumptive or definitive, and it was the CPT codes on the insurer spreadsheets that demonstrated that the hospitals billed for vastly more definitive tests than presumptive tests. Doc. 684:90-91 (Tobin Trial 1), Doc. 984:193, 985:30-31 (Tobin Trial 2); Govt. Ex.25K (Trial 1); Doc. 1151-1:3-6 (McVey Aff.). An insurer's use of the word "screen" in column K—which was available to defendants in the first trial—does not change the meaning of the CPT

code from definitive to presumptive, and defendants offered no evidence to that effect. Regardless, Putnam had *no* capacity to perform any urine drug testing before February 10, 2017.

Thus, the purported "new" evidence was not new, material, or likely to result in a different outcome, and this Court did not abuse its discretion in denying the new trial motion. *See United States v. Thompson*, 422 F.3d 1285, 1294-95 (11th Cir. 2005). Furthermore, the Court did not err in declining to hold a hearing; the record itself disposed of defendants' arguments and supported the denial. *United States v. Scrushy*, 721 F.3d 1288, 1305 n.30 (11th Cir. 2013).

>    iv.   *The Court Did Not Clearly Err When Excluding Evidence Regarding Post-Trial Communication with Jurors*

Nor did the Court clearly err in finding that the defendants' counsel violated the Court's oral and written order regarding juror contact, which limited communications to juror's individual impressions of the proceedings and forbade communication about the jury's deliberation process or internal discussions. Doc. 879. This violation was a permissible basis for excluding the evidence defense counsel elicited from jurors. *See United States v. Caballo*, 790 F.3d 1202, 1228 (11th Cir. 2015); *United States v. Venske*, 296 F.3d 1284, 1291-92 (11th Cir. 2002); *see generally* Fed. R. Evid. 606(b). As there was no other evidence of the jury's potential exposure to extraneous information, there was no basis for the Court to investigation further. Thus, taken as a whole, there is no basis to believe that defendants will

prevail on appeal. Accordingly, this factor weighs against the issuance of a stay of the final order of forfeiture.

### B.     Whether the M-4 Condo Will Depreciate Over Time

The M-4 Condo may deteriorate if the United States cannot enforce the final order of forfeiture and take full control of the property. *Fisher*, 2024 WL 2001596, at *3 (it is reasonable to presume that a residence may deteriorate if a defendant is permitted to occupy it knowing that it is likely to be forfeited). Additionally, the M-4 Condo is an area with a heightened risk of flooding,[4] and the property's value could depreciate if severe weather impacts the area. *See United States v. Miller*, No. 17-CR-213, 2020 WL 525125, at *1 (E.D. Va. 2020), *aff'd*, No. 20-4118, 2020 WL 4590262 (4th Cir. 2020) (considering potential decline due to property having increased risk for storm damage). Thus, this factor weighs against the issuance of a stay.

### C.     The M-4 Condo's Intrinsic Value to Perez

Perez has not offered any facts to suggest that the M-4 Condo has intrinsic value. He claims that real property is inherently unique, but courts have not shared this view. *See Fisher*, 2024 WL 2001596, at *4; *see also U.S. v. Peters*, 784 F. Supp. 2d 234, 236 (W.D.N.Y. May 13, 2011). Perez's actions undermine his argument. But for the forfeiture, the Tax Collector and the HOA would have taken steps to force a sale of the condo to satisfy their liens. In the unlikely event that his conviction is

---

[4] The property is in Flood Zone AE. *See* FEMA Flood Map Service Center: Search by Address, https://msc.fema.gov/portal/search (last visited Aug. 20, 2025).

overturned after the property is sold, Perez would recover the proceeds of the sale from the United States. *United States v. Bradley*, 513 F. Supp. 2d 1371, 1380 (S.D. Ga. 2007). The M-4 Condo is one of 280 units in the Buttonwood Bay condominium community, and Perez could find a similar unit. *See Fisher*, 2024 WL 2001596 at *4. Thus, this factor weighs against the issuance of a stay.

### D. The Expense of Maintaining the M-4 Condo

Finally, in the event of a stay, the United States would be liable for maintaining the condo. It would pay all necessary expenses like electricity, while the monthly regular assessment (currently $1,384.09) and a special assessment installment (currently $296.91) to Buttonwood Bay HOA would also be paid from the eventual sale proceeds. Thus, prolonging the sale has the potential to reduce the amount of total net proceeds available to be restored to victims. Because property taxes cannot be assessed against the United States, delaying the sale would also prejudice the Tax Collector. Thus, this factor also supports denying Perez's request for a stay.

Fashioning an order requiring Perez to pay for the upkeep of the M-4 Condo pending appeal is not an effective solution. For one, Perez has a track record of unreliability, having failed to pay the outstanding taxes and HOA assessments on the property for years. Furthermore, even if Perez did use his own funds to adequately maintain the property, doing so would negatively impact his ability to repay the restitution he owes to the victims. *See Miller*, 2020 WL 525125, at *1.

## III.    Conclusion

In sum, Rule 32.2(d) does not authorize a stay on the entry of a final order of forfeiture, and Perez has not established why a stay on the enforcement of the final order of forfeiture is warranted. Accordingly, the Court should deny Perez's motion to stay the final order of forfeiture.

                                           Respectfully Submitted,

                                           GREGORY H. KEHOE
                                           United States Attorney

By:    *s/James A. Muench*
        JAMES A. MUENCH
        Assistant United States Attorney
        Florida Bar Number 472867
        400 North Tampa Street, Suite 3200
        Tampa, Florida 33602
        (813) 274-6000 – telephone
        E-mail: james.muench2@usdoj.gov

        *s/Anita M. Cream*
        ANITA M. CREAM
        Assistant United States Attorney
        Florida Bar Number 56359

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system that will send a notice of electronic filing to counsel of record.

                                           *s/James A. Muench*
                                           JAMES A. MUENCH
                                           Assistant United States Attorney